### IN THE COURT OF COMMON PLEAS OF
### LUCAS COUNTY, OHIO

# EXHIBIT 15

```
STATE OF OHIO,              )
                           )
          PLAINTIFF,       ) CASE NO. CR06-3339
                           )
v.                         )
                           ) JUDGE BARBER
ROBERT WILSON              )
                           )
          DEFENDANT.       )
```

- - -

BE IT REMEMBERED, that in the trial of

the aforementioned cause on September 3, 2008,

before the Honorable James E. Barber, in the

Lucas County Court of Common Pleas, the following

proceedings were held, to wit:

APPEARANCES:

On behalf of the Plaintiff:
Assistant Lucas County Prosecutor,
Michael Loisel, Esquire

- - -

On behalf of the Defendant, Robert Wilson:
Ronnie L. Wingate, Esquire
Neil S. McElroy, Esquire

- - -

Stacey L. McDevitt, RPR, Official Court Reporter
Lucas County Common Pleas Courthouse,
700 Adams Street, Toledo, Ohio 43624
(419) 213-4477

- - -

1                          I N D E X

2     STATE'S WITNESSES                D     CR    RD   RC   FRD

3     Detective Seymour              40   75    93
      Roger Craig                    94  104
4     Sergeant Niemiec              125  134
      Odetta Scott                  136  146   148
5     Janet Wilson        153/170   154/202  220  229 232
      Officer Malone                234
6     Alfonzo Davis                 245  257  261

7     DEFENDANT'S WITNESSES
      --

8
      STATE'S EXHIBITS                 ID   AD   OB   REC
9     1,  Photo                      132
      2,  Photo                      239
10    3,  Photo                      239
      4,  Photo                      240
11    5,  Photo                      240
      6,  Photo                      241
12    7,  Photo                      241
      8,  Photo                      241
13    9,  Photo                      242
      10, Photo                      242
14    11, Photo                      242
      12, Statement of Alfonzo Davis 266

15
      DEFENDANT'S EXHIBITS
16    A, Letter By Janet Wilson      208
      B, Interview of Janet Wilson   211

17

18

19

20

21

22

23

```
 1                              SEPTEMBER 3, 2008

 2                              COURTROOM #3

 3                              8:50 A.M.

 4          (WHEREUPON THE FOLLOWING DISCUSSION WAS

 5     HELD OUTSIDE THE PRESENCE OF THE JURY.)

 6          THE COURT:    I believe everyone is

 7     here.  Are we on the record?  Okay.  We are here

 8     for the second day of trial in State versus

 9     Wilson.  We have a few motions or a motion to

10     address before opening statements.  It appears

11     that the ruling will be rather crucial on how the

12     opening statements are to play out.  So, in the

13     nature of a Motion in Limine, Mr. Wingate, do you

14     want to expand on your motion at this point?

15          MR. WINGATE:   Yes, Your Honor, could

16     we -- you're talking about 404(b)?

17          THE COURT:    404(b) issue.

18          MR. WINGATE:   Could you we have a few

19     seconds?  The Prosecutor just provided us with a

20     stack of -- and just -- then we'll be ready to

21     proceed.

22                    (OFF THE RECORD.)

23          THE COURT:    Mr. McElroy.
```

1              MR. MCELROY:   Can we go back on the

2      record?

3              THE COURT:    Sure.  Back on the record.

4              MR. MCELROY:   At this time, Mr. Wingate

5      and I have both had an opportunity to review the

6      case law provided by Mr. Loisel and we're ready

7      to provide Motion in Limine 404 other acts of

8      evidence.  I believe it is the State's contention

9      that the exception for other acts that would

10     apply in this case is motive, not intent or

11     scheme or plan or any of the other exceptions

12     provided for in 404(b).  The important and

13     perhaps the threshold issue you and perhaps the

14     issue that the Court needs to consider throughout

15     its consideration of this motion is that the

16     standard for determining admissibility of such

17     evidence is strict and the statute and rule must

18     be construed against admissibility.  There was

19     some discussion yesterday about State v. Pelok.

20     After review of that case, other than the

21     proposition that the admiss -- the rule should be

22     construed strictly, I'm not certain that Pelok

23     applies in this matter.  Pelok had more to do

5

1    with scheme, plan, things of that nature, but

2    certainly it stands for the proposition that

3    Court's should view -- should read the statute

4    and the rule and construe it strictly against

5    admissibility.

6           It should also be noted State v. Broom

7    out of the Ohio Supreme Court and just about any

8    case regarding 404(b) motions, Courts have noted

9    that the overriding concern is that a jury will

10   consider the other acts to serve as a foundation

11   that the Defendant is inherently a bad person and

12   then use those other acts against him for fear

13   that he was not adequately punished for the

14   previous acts or was not punished at all for

15   those previous acts.  In this case, and I think

16   the most important fact that is relevant

17   specifically to this case, the State's suggestion

18   or contention I believe in Mr. -- and Mr. Loisel

19   will speak to this I'm certain -- is that the

20   motive here was that the victim was a -- had been

21   a confidential informant against Mr. Wilson.

22   There is a confidential informant mentioned in a

23   police report supplied to the Defense by the

1       State of Ohio, however, we have not received nor

2       do we have knowledge that there was a motion to

3       compel disclosure of the informant in that case,

4       that disclosure of the informant's name was given

5       in that case.

6              So, the other acts alone do not tend to

7       show that Mr. Wilson had a motive.  They may tend

8       to show that Ms. Navarre served as a confidential

9       informant, but it does not show that Mr. Wilson

10      had independent knowledge or knowledge from the

11      State of Ohio that Ms. Navarre had served as an

12      informant against Mr. Wilson.  There may be other

13      testimony available from other witnesses that can

14      say Mr. Wilson thought that she had served as an

15      informant, but with regard to the specific acts

16      that took place in the underlying charges that

17      the State seems to introduce, there's nothing to

18      show that he knew.  And if there is other

19      testimony available, which we certainly believe

20      there is that Mr. Wilson thought that Ms. Navarre

21      had served as an informant, then that evidence

22      would be more probative than evidence about

23      Mr. Wilson's alleged -- or convictions for

1    trafficking and drugs.

2          And the Court should also be aware even

3    if a case passes the 404(b) issue, it is still

4    subjected to the 403(A) dealing with relevant

5    evidence.  And although relevant, evidence is not

6    admissible if its probative value is

7    substantially outweighed by the fear of

8    prejudice, returning to the overriding concern of

9    the Court and 404(b) itself is that these other

10   acts the jury will use to say, okay, Mr. Wilson

11   is inherently a bad person, he hadn't been

12   punished adequately so we should punish him

13   whether we find him guilty on this specific

14   charge or not because he's guilty of those

15   others.  And if there's other evidence available

16   that would be more probative, it is the view of

17   the Defense that the other acts involving the

18   charges from 1993 and I believe the cases from

19   '94 should not be admissible.  And if I may have

20   just a moment, Judge.

21         One more thing, Judge, after speaking

22   with Mr. Wingate, that the State is alleging that

23   simply because Brenda Navarre -- it is our belief

1      and the State hasn't had an opportunity to speak

2      yet -- but because Brenda Navarre was an

3      informant that Mr. Wilson must have known that

4      she was an informant on this particular case.

5      There hasn't been any evidence offered to show

6      that he knew that.  And the knowledge is simply

7      imputed that Mr. Wilson knew that Ms. Navarre was

8      a snitch, and this is simply an assumption at

9      this time.  And if there is other evidence to be

10     offered, that evidence would be more probative,

11     and it is our contention that it should not come

12     in under 404(b) because it does not show motive.

13     And even if it does come through the 404(b) test,

14     it should not come in under 403(A) because there

15     is other evidence available.

16             THE COURT:    Thank you, Mr. McElroy.

17     Mr. Loisel.

18             MR. LOISEL:    Thank you, Judge.  Just so

19     the record is clear, I think this hearing this

20     morning stems from a motion that the State filed

21     in June of 2007 with respect to the notice of

22     intent to use evidence.  That ruling I think has

23     been held in abeyance until this point.  I

1        believe, I guess Defense Counsel can correct me

2        if I am wrong, that today is essentially a Motion

3        in Limine to exclude that evidence.  So, with

4        that in mind, a couple of things the State would

5        like to address.  I've given the case law

6        approximately eight cases that the State looked

7        over last night and I provided those cases to the

8        Bench, and I can go through the facts and

9        circumstances of those cases if the Court so

10       desires, which I think backs up the State's

11       position that other-acts evidence that show

12       motive would be admissible in this particular

13       case.

14            The Supreme Court held in Lowe that

15       other-acts evidence is admissible, one, if

16       substantial evidence shows that the Defendant

17       committed the other acts; and, two, that the

18       evidence tends to prove one of the enumerated

19       purposes in Evidence Rule 404(b).  The State

20       intends to plan -- strike that.

21            The State intends to call

22       Detective Seymour who was involved as a Vice

23       Narcotics Detective in 1993 with the victim,

1    Brenda Navarre, when she as a confidential

2    informant made approximately -- well, at least

3    three sales or three buys from the Defendant

4    that that detective personally viewed.  Also, the

5    State intends to produce evidence of a statement

6    from Ms. Navarre that she knew that this

7    Defendant had knowledge that she was, in fact,

8    the snitch.

9         Now, Judge, when you talk about you

10   mentioned to us yesterday in State v. Pelok,

11   obviously you're familiar with that case.  It was

12   a case out of your district in 1998.  In that

13   case -- I think I'm -- I don't want to assume

14   that Defense Counsel is familiar with those

15   facts, but there were two incidents of alleged

16   sexual misconduct -- and I'm not trying to tell

17   the Court what it doesn't already know, but I

18   want to make it part of the record -- evidence of

19   an alleged misconduct two years prior to the

20   incident that was in front of this Court for

21   trial, was brought before the Court and, Judge, I

22   believe you ruled that it was admissible,

23   however, it was admissible to show a general plan

1    or to show that the Defendant had a general

2    propensity to lure young women in his office for

3    lewd purposes.

4         Well, upon closer look to 404(b), and the

5    Appellate Court reversed on this, the State was

6    improper in admitting that evidence because it

7    was essentially trying to show that he acted in

8    conformity with his prior lewd conduct and that's

9    not what for Rule 404(b) allows.  It allows

10   evidence of as the rule states.

11        It may however be admissible for other

12   purposes such as proof of motive, opportunity,

13   intent, preparation, plan, knowledge, identity,

14   or absence of mistake or accident.

15        So, I think in that particular case it's

16   distinguished because in this case we're not

17   trying to show that he acted in conformity with

18   his drug dealing back in 1993.  What the State

19   intends to show through Detective Seymour is that

20   this Defendant had a motive to kill

21   Brenda Navarre in December of 1993, and that

22   motive relates directly to the fact that she was

23   a confidential informant and that she snitched on

1        this Defendant, and because of what she did, this

2        Defendant ended up being charged with felony drug

3        cases.

4                So, with respect to that, Judge, this

5        State does not care if the jury knows that this

6        Defendant was dealing drugs in 1993, that's not

7        its purpose.  We're not showing that he's acted

8        in conformity with that activity.  We're trying

9        to show intent that we believe 404(b)

10       specifically allows the State to do.

11               Additionally, Judge, like I said, I

12       believe I have eight cases that I can give

13       examples of where motive, prior bad act evidence

14       was allowed in from the Supreme Court down to the

15       6th District to show motive.  I can go through

16       the synopsis of those cases if the Court desires,

17       but I believe with that in mind, the State should

18       be allowed to question Detective Seymour with

19       respect to that case, thus allowing it to show

20       that this Defendant had motive to kill

21       Brenda Navarre.

22               THE COURT:    All right.  Mr. McElroy.

23               MR. MCELROY:   Just a brief response,

1      Judge.  The State made much of Pelok and whether

2      or not, it seems to me, that Pelok, that evidence

3      could have been admissible under 404(b), under a

4      common scheme or plan.

5              THE COURT:    That's what was argued.

6              MR. WINGATE:   Not that he acted in

7      conformity with his previous behavior but there

8      was a common scheme or plan, and this is

9      precisely why it was admitted at the trial court

10     as I'm certain this Court is aware, but Pelok was

11     reversed because identity, mistake, none of those

12     things were at issue in that trial and that is,

13     in fact, one of the tests is whether or not it is

14     at issue.

15             We can argue whether or not motive is an

16     issue in this particular trial.  The State -- in

17     my limited trial experience, the State almost

18     always argues that they need not prove motive.

19             So, I'm not certain that the State has an

20     accurate reading of Pelok with regard to whether

21     he was acting in conformity with scheme or plan

22     or why it was reversed.

23             With regard to the two prong test

1     referenced by the State, I believe we agree that

2     the two prong test says that it must be

3     substantial proof that the Defendant has

4     committed the prior acts, and the second prong,

5     that one of the exceptions must apply in this

6     particular case.

7            The argument boils down to, it seems to

8     me, in this case whether or not one of the

9     exceptions is applicable.  That exception the

10    State is alleging is motive.

11           It is still the position of the Defendant

12    that -- forgive me I lost my train of thought.

13           It is still the position of the Defendant

14    that motive is not the exception of -- the

15    exception of motive is not applicable in this

16    case because there's been nothing offered to show

17    that Mr. Wilson knew Brenda Navarre was a

18    confidential informant on these particular cases.

19           Lastly, I would like to point out that

20    the State of Ohio said they don't care whether or

21    not the jury knows about Mr. Wilson's drug

22    dealing.  If that is the case, there is other

23    testimony available to the State that will not

1    get into the prior acts of Mr. Wilson that they

2    can elicit that he knew or did not know that she

3    was a snitch.  There's other testimony available

4    that has nothing -- that has nothing to do with

5    the underlying charges that the State is seeking

6    to introduce.

7         MR. LOISEL:    Judge, if I may just

8    respond.

9         THE COURT:    Very shortly.

10        MR. LOISEL:    Yes.  Just with respect to

11   Pelok, again, I don't want to beat a dead horse,

12   you're obviously familiar with the case, but the

13   Appellate Court rules that the evidence of prior

14   misconduct was improperly admitted to show a

15   propensity to commit general kind of crime

16   charge.  The State argued that other act should

17   be allowed to show a common scheme or plan, but

18   generally common scheme or plan is admitted when

19   ID was questioned.  The ID in Pelok was not in

20   question.  They knew who the alleged perpetrator

21   was in the instance, no issue of motive or intent

22   was offered in that particular case, so, they

23   tried to back door it through common scheme or

1    plan when really what they were trying to show

2    was a general propensity for this individual to

3    lure young women into his office for lewd

4    purposes.

5            And secondly, Judge, with respect to the

6    evidence that we intend to show, as I said, the

7    State intends to show that as per the Supreme

8    Court decision orders -- doesn't order us to, but

9    we have to follow through with the Supreme Court,

10   substantial evidence shows that the Defendant

11   committed the other alleged acts, we will show

12   that.  There will be --

13           THE COURT:    You've got convictions,

14   right?

15           MR. LOISEL:   Convictions and the

16   detective viewed the drug sales between the

17   Defendant and the decedent.

18           Additionally, the second prong is the

19   evidence tends to prove one of the enumerated

20   purposes in Evidence Rule 404(b) motive, and

21   through the testimony of Detective Seymour we

22   will show that Brenda Navarre knew that the

23   Defendant was aware that she was a confidential

1     informant.

2          THE COURT:     Well, the only reason I

3     mentioned Pelok yesterday, because the 404 issue

4     was extensively argued in that case.  Went back

5     and looked at my notes and the issues in Pelok

6     were, in fact, lack of mistake and also modus

7     operandi, which is not really the issue that

8     we're looking at in this case.

9          I believe motive is a big part of this

10    case, and I believe that I'm going to have to be

11    very cautious and give a very strict cautionary

12    instruction to the jury, but I'm going to allow

13    this in under 404 with the exception.  I believe

14    justice demands that that at least be allowed to

15    be argued or presented to the jury in this case.

16    Facts are facts and they have to be relevant and

17    they cannot be excessively prejudicial, but I

18    believe the State has a right to at least make

19    its case.  So, I'm going to allow that testimony

20    in.  Your exception is noted.  Mr. McElroy.

21         MR. MCELROY:    Judge, can we make certain

22    for the record that we're objecting to the ruling

23    both on 404(b) and also --

1          THE COURT:     And 403 grounds.  I

2     understand the exceptions are noted with respect

3     to both rulings.  Are we ready to go?

4          MR. LOISEL:     Yes, Your Honor.

5          THE COURT:     All right.  Take two

6     minutes and we'll start.

7          (WHEREUPON THE PRECEDING DISCUSSION

8     OUTSIDE THE PRESENCE OF THE JURY CONCLUDED AND

9     THE FOLLOWING PROCEEDINGS WERE HELD.)

10          THE COURT:     Good morning, members of

11     the jury.  Just one other instruction I wish I

12     had given to you, there may be some publicity

13     during the course of the trial here.  In fact I

14     did note that there was a small little article in

15     The Blade today.  You should not be reading those

16     newspaper articles because as you well know, the

17     paper doesn't always get it right, so do not read

18     anything in the -- save the articles or save The

19     Blade.  Save the paper until your trial is over,

20     but don't be reading anything about the trial

21     because your decision has to be based on what you

22     hear in the courtroom and not what you read in

23     the paper.  You have a few instructions that I'm

1    going to give you and then we'll have you --

2    let's have you sworn in right now.

3                      (JURY PANEL SWORN.)

4              MR. WINGATE:   Just could we approach?

5              MR. LOISEL:    Could we approach?

6              (WHEREUPON THE FOLLOWING DISCUSSION WAS

7    HELD AT THE BENCH.)

8              MR. WINGATE:   We move for separation of

9    witnesses and I think it's a joint motion.

10             MR. LOISEL:    Joint motion when you get

11   a chance, if you could just make that --

12             MR. WINGATE:   And the other thing I

13   would ask is that would the Court inquire if

14   someone read the article as opposed to tell them

15   they can't read any future articles.  I'd like to

16   know if anyone read it this morning.

17             THE COURT:    All right.

18             MR. WINGATE:  All right.  Thanks.

19             (WHEREUPON THE PRECEDING DISCUSSION AT

20   THE BENCH CONCLUDED AND THE FOLLOWING PROCEEDINGS

21   WERE HELD.)

22             THE COURT:    The question was raised

23   did anyone see the article in The Blade this

1          morning.  Raise your hand if you did.  That takes

2          care of that problem.  Okay.

3                  Members of the jury, it is important that

4          you be fair and attentive throughout the trial,

5          you may not discuss this case among yourself nor

6          with anyone else.  Do not permit anyone to

7          discuss it with you or in your presence.  Do not

8          form or express any opinion about the case until

9          it is finally submitted to you.  And by law, I'm

10         required to read a synopsis of that instruction

11         at each recess but if overlooked, they apply to

12         your conduct throughout the course of the time.

13                 Perhaps difficult to understand is that

14         you may not discuss the case among yourselves

15         before it is finally submitted to you.

16                 You will receive the opening statements,

17         the evidence, the arguments and the law in that

18         order.  It would unfair to discuss the case among

19         yourselves until you receive everything necessary

20         for your decision.  You must explain this rule to

21         your family and friends.  When the trial is over,

22         you will be released from this instruction, at

23         that time you may discuss the case and your

1        experiences as a juror, but you are not required

2        to do so.  Until that moment, please control your

3        natural desire to talk about the case both here

4        and at home.  You may not talk with the

5        attorneys, parties, or witnesses during the

6        course of the trial.  Likewise, the participants

7        in the trial must not talk with you.  If anyone

8        should attempt to discuss this case with you,

9        please report the incident to the Court or the

10       Bailiff immediately.

11              You may not investigate or attempt to

12       obtain additional information on this case

13       outside the courtroom.  It is highly improper for

14       any of you to attempt to do so.

15              Any violation of these orders may cause a

16       new trial or it may require a penalty for

17       disobedience.

18              In the event that you experience any

19       personal problem, raise your hand.  You may

20       explain the matter to the Bailiff, the Court

21       Reporter or to the Court.  The message will be

22       conveyed to the Court and we'll address that

23       matter at that time.

22

1           I have handed out to you notepads.  You

2     will be allowed to take notes during the course

3     of the trial.  These notes are personal to you

4     and if you decide that taking notes would

5     distract your mind in anyway while you're taking

6     notes, then you should not be taking notes.

7           You will be allowed to take those notes

8     with you into the jury room, but I should advise

9     you that someone's recollection may be different

10    than what your notes say and each of you is going

11    to have to rely on your own individual judgment

12    and recollections irrespective of whether what's

13    in the notes or how you decide any issue of fact

14    that's been presented to you.

15          Before we hear the opening statements and

16    begin to take notes, I believe it would be

17    helpful in having some instructions to follow in

18    listening to and considering the evidence.

19          After you have heard all of the evidence

20    and closing arguments of Counsel, I will give you

21    further instructions covering additional law,

22    which you are to apply in this case.  It is the

23    duty of the Judge to instruct you of the law in

23

1       Ohio.  It is your duty to follow the law both as

2       I stated now and also at the conclusion of all of

3       the evidence.

4            First of all, it is your exclusive duty

5       to decide all questions of fact.  In connection

6       of this duty you must determine the effect and

7       the value of the evidence.  To do this you must

8       not be influenced by your decision of sympathy,

9       prejudice or passion toward any party, witness or

10      attorney in the case.

11           If in these instructions or in the

12      instructions which I will give you at the

13      conclusion of the evidence, any principal or idea

14      is repeated or stated in varying ways, no undue

15      evidence thereon is intended and none must be

16      inferred by you; therefore, you must not single

17      out any particular sentence or individual point

18      or instruction and ignore the others, but you

19      rather should consider each instruction in

20      relation to all of the other instructions.

21           The fact that I give you some of the

22      instructions now and some at the conclusion of

23      the evidence has no significance to their -- as

1     to their relative importance, nor is the order in

2     which I give you instructions.  Now, the

3     attorneys for the parties will have very active

4     roles in this trial.

5          They will make opening statements to you,

6     they will question witnesses.  I anticipate they

7     will make objections and finally they will argue

8     the case as the last step before you hear my

9     final instructions and you commence with your

10    deliberations.

11         Remember that attorneys are not

12    witnesses.  And since it is your duty to decide

13    the case solely on the evidence that you see and

14    hear in the case, you must not consider as

15    evidence any statement made by any attorney

16    during the course of the trial.

17         There is an exception to this rule and

18    that is if the attorneys agree to any fact.  Such

19    agreement or stipulation or admission of fact

20    will be brought to your attention and then you

21    will regard such fact that has been stipulated

22    and admitted to as having been conclusively

23    established and proved without the necessity of

1    any other evidence on that fact.

2         If a question is asked and an objection

3    to the question is sustained, you will then not

4    hear the answer, and you must not speculate as to

5    what the answer might have been, nor as to the

6    reason for the objection.  If an answer is given

7    to a question and the Court then grants a motion

8    to strike out the answer, you are then to

9    completely disregard such question and answer and

10   not consider them for any purpose.

11        A question in and of itself is not

12   evidence and may be considered by you only as it

13   does supply meaning to the answer.  As jurors you

14   have the sole and exclusive duty to decide the

15   credibility of the witnesses who will testify in

16   this case, which simply means that it is you who

17   must decide whether to believe or not believe or

18   disbelieve any particular witness.

19        In determining these questions you will

20   apply the tests of truthfulness which you apply

21   in your daily lives.  These tests include the

22   appearance of each witness upon the witness

23   stand; his or her manner of testifying; the

1    reasonableness of the testimony; the opportunity

2    he or she had to see, hear and know the things

3    concerning which he or she testified; his or her

4    accuracy of memory, frankness or lack of it;

5    intelligence, interest, and bias, if any;

6    together with all of the facts and circumstances

7    surrounding the testimony.

8         Applying these tests, you will assign to

9    the testimony of each witness such weight as you

10   deem proper.  You are not required to believe the

11   testimony of any witness simply because he or she

12   was under oath.  You may believe or disbelieve

13   any or all of the -- all of the testimony of any

14   witness.  You should not decide any issue of fact

15   merely on the basis of the number of witnesses

16   who testify on each side of an issue.  Rather,

17   the final test in judging evidence should be the

18   force and weight of the evidence regardless of

19   the number of witnesses on each side of the

20   issue.  The testimony of one witness believed by

21   you is sufficient to prove any fact.  Also

22   discrepancies in a witness's testimony or between

23   his or her testimony and that of others, if there

1    are any, does not necessarily mean that you

2    should disbelieve the witness, as people commonly

3    forget facts or recollect them erroneously after

4    the passage of time.  You are certainly all aware

5    of the fact that two persons who are witnesses to

6    an incident may often see or hear it differently.

7            In considering a discrepancy in a

8    witness's testimony, you should consider whether

9    such discrepancy concerns an important fact or a

10   trivial one and the overall impact upon his or

11   her testimony.  If you conclude that a witness

12   has willfully lied in his or her testimony, you

13   would then have the right to reject all of his or

14   her testimony, unless from all of the evidence

15   you believe that the probability of truth favors

16   his or her testimony and other particulars.

17           Are we going to have any depositions in

18   this case?

19           MR. LOISEL:    No, Judge.

20           THE COURT:    Okay.  This concludes my

21   preliminary instructions to you and I hope they

22   will be of some assistance to you in listening to

23   and in considering the evidence that you will

1     hear in this case.

2              Please keep these instructions in mind as

3     you listen to the evidence and the statements of

4     Counsel.  I may give you additional instructions

5     during the course of the trial.  When the

6     evidence and closing arguments are concluded, I

7     will give you additional instructions on the law

8     which you are to follow together with the

9     instructions that you have just heard and any

10    given during the course and conduct of the trial.

11             Now, at this time you will be hearing the

12    opening statements of Counsel.  These are

13    supposed to be concise and orderly descriptions

14    of each side's claims and the defenses and the

15    evidence that they expect to produce in support

16    of those claims and defenses.

17             I remind you that statements of Counsel

18    are not evidence, but they are -- it is an

19    attempt to give you a preview of what to expect

20    so when the evidence does come in you can put it

21    in some sort of structure.  Each side will

22    address you once during opening statements.

23    State's attorney will address you first.

29

1     Mr. Loisel.

2             MR. LOISEL:     Judge, separation.

3             THE COURT:     Oh, yes.  Any witnesses

4      who are expected to be called in this case will

5      please report to the witness room until such time

6      as they are called and, I will expect Counsel to

7      monitor the Court's ruling in that respect.  All

8      set?

9             MR. LOISEL:     Yes.  Good morning, again,

10     ladies and gentlemen.  As the Judge just told

11     you, what I'm telling you isn't evidence.  I'm

12     going to give you a preview of what the State

13     intends to show.  And what the State intends to

14     show is that that man dropped a 110 pound rock on

15     Brenda Navarre's head while she was laying on a

16     sidewalk, and as a result of that action,

17     Brenda Navarre died approximately a day later.

18             The State intends to show you that the

19     Defendant did this because Brenda Navarre told on

20     him.  Circumstantial evidence is going to show

21     you that Brenda Navarre was working with the

22     Toledo Police and that she made some drug

23     transactions with the Defendant, and the

1      Defendant knew that Brenda Navarre had worked

2      with the police, and in the Defendant's world,

3      this is how you deal with someone who tells on

4      you, you drop a 110 pound rock on their head.

5              The State is going to call

6      Detective Seymour and he's going to talk to you

7      about the drug investigation regarding the

8      Defendant, the fact that Brenda Navarre, who is

9      our victim, who died on December 1st of -- or

10     December 2nd of 1993 as a result of 110 pound

11     rock being dropped on her head.

12     Detective Seymour is going to talk to you about

13     his relationship with Brenda Navarre, about at

14     least three transactions where he watched

15     Brenda Navarre buy drugs from the Defendant.

16     You're going to hear that Brenda Navarre knew --

17     strike that.

18              -- that the Defendant came to find out

19     that Brenda Navarre told on him, and this is what

20     he did.

21              The State is going to bring forward

22     witnesses from that night, December 1st, 1993,

23     and they're going to talk to you about what they

1      saw that night.  They're going to talk about a

2      black male and a white female.  A white female

3      being savagely beaten on the sidewalk on the

4      corner of Paxton and E Street here in Toledo,

5      Ohio.

6                  You're going to hear from Toledo Police

7      Officers, one who is still an officer and one who

8      is now a sergeant who responded to that scene to

9      find Brenda Navarre barely alive on the sidewalk

10     with blood gushing from her head.  They are going

11     to tell you what they did that night, what they

12     saw.  The witnesses are also going to tell you

13     that they heard arguing between two people, black

14     male and a female around the time of the

15     homicide.  The scene officers will also tell you

16     that a large boulder, the 110 pound rock laid

17     next to Brenda Navarre on the sidewalk.

18                 You're also going to hear from

19     Dr. Barnett who worked in the Coroner's Office

20     and still does.  She's going to talk to you about

21     the extensive injuries that Brenda Navarre

22     received, the injuries that caused her death, a

23     compressed skull fracture on the left side of her

1    head, a severe injury on the front of her head,

2    other injuries on the other side of her head, and

3    her ruling -- or her verdict was, testimony will

4    show, that it was her opinion that Brenda Navarre

5    died from blunt force injuries to the head;

6    manner of death, homicide.

7         Also you're going to hear from some

8    detectives who worked on the case back in 1993.

9    You're going to hear about tips that they

10   received, names that surfaced with respect to

11   this case.  You're going to hear that

12   Robert Wilson's name was not initially one of

13   them, but they are going to tell you how they

14   investigated this case, how they talked to these

15   people, how they tried to verify information with

16   respect to what they have heard, and that back in

17   1993 and 1994, the case went cold.  They didn't

18   have a suspect because none of those leads panned

19   out.

20        You're also going to hear about other

21   information, as Counsel mentioned, DNA that was

22   taken from Brenda Navarre's dead body when she

23   was at the Coroner's Office, an anal swab and a

33

1        vaginal swab.  And you're going to hear that that

2        DNA does not come back to the Defendant.

3              You will also hear from Alfonzo Davis who

4        knows the Defendant, it's his stepfather, and

5        he's going to tell you that the admitted to him

6        what he did back in 1993.

7              You'll also hear from Detective Beavers,

8        more than likely you'll hear from other law

9        enforcement officers about the investigation and

10       after the case went cold sometime in 2003,

11       between 2003 and 2006, other information came

12       about.  That rejuvenated this investigation.

13       You'll hear about that information.

14             And, ladies and gentlemen, once you have

15       an opportunity to hear all of the evidence, all

16       of the information that you hear is going to

17       point directly to Robert Wilson back to that

18       night in 1993, and the evidence will show that he

19       is the man that dropped that 110 pound boulder on

20       Brenda Navarre's head causing her death.

21             THE COURT:    Mr. Wingate.

22             MR. WINGATE:   Good morning, ladies and

23       gentlemen.  As the Court has indicated and the

34

1       Prosecutor has indicated that as we address you

2       what we're saying is not evidence but what we

3       believe the evidence will show in this case.  And

4       in this case there will be one witness -- we're

5       talking about a 1993 homicide -- there will be

6       one witness that the State will present.  There

7       will be no physical evidence as the State has

8       indicated.  They talked about 110 pound boulder,

9       but the evidence will show that any physical

10      evidence that was collected in this case was

11      destroyed by the police.  Collected in 1993 and I

12      want to say in 2006, destroyed.  Anything from

13      that physical evidence that could be utilize to

14      buttress what this one witness will say is gone.

15      So, you don't have any physical evidence, the

16      State doesn't -- can't give you any.

17          DNA, as the Prosecutor told you, there

18      was physical evidence, semen found as a result of

19      a vaginal and a rectal swab of Mrs. Navarre.

20      That evidence was taken, remained from 2000 --

21      I'm sorry -- 1993 until 2007.  Never tested.

22      Never tested.

23          2007 Detective Beavers requested that it

```
 1      be sent off to a DNA lab for analysis.  The

 2      results showed that it excluded Robert Wilson,

 3      but there could have been another unknown male

 4      that could be identified if there were further

 5      evidence.  No physical evidence.

 6              We go back to this one witness,

 7      Janet Wilson.  And the evidence will show that

 8      Mrs. Wilson from 1993 until 2003 -- and before I

 9      get to that.

10              MR. LOISEL:   Objection, Your Honor,

11      with respect to what Mrs. Wilson may or may not

12      testify to.

13              MR. WINGATE:   I think the Prosecutor is

14      anticipating and anticipating incorrectly at this

15      point.

16              THE COURT:    Well, I have no idea.

17              MR. WINGATE:   Thank you.

18              THE COURT:    I'm going to allow the --

19      this is opening statement.  It is not evidence,

20      and if, in fact, it develops that there are

21      misstatements made during the course of opening

22      statement, we'll address it at that time in the

23      form of a curative instruction.
```

1             MR. WINGATE:   As I said, between -- and

2        we'll get to Mrs. Wilson, but from 1993 to 2003,

3        Crime Stopper reports are coming in.  Crime

4        Stopper reports that one name as being involved

5        in this homicide.  Several calls, same name as

6        being involved in this homicide.  Never the name

7        of Robert Wilson.

8             Now, 2003, Mrs. Wilson had a lot of

9        trials and tribulations with Robert, and at one

10       point had received a letter or had gotten a

11       letter that was intended for another female.  A

12       letter indicating, As soon as I get a divorce,

13       we're going to get married, we're going to have

14       kids.  And Mrs. Wilson who had experienced a

15       hysterectomy found this to be the last straw.

16       2003 she contacts the police and she makes a

17       statement.

18            MR. LOISEL:   Objection, Your Honor.

19       Can we approach?

20            THE COURT:   Come on up.

21            (WHEREUPON THE FOLLOWING DISCUSSION WAS

22       HELD AT THE BENCH.)

23            MR. LOISEL:   Judge, in chambers

1       obviously the Court is aware of the argument that

2       Counsel made with respect to what Mrs. Wilson may

3       or may not be able to testify to.  Now he's

4       explaining what she -- he thinks she's going to

5       testify to.  The Court has not made ruling with

6       respect to what is allowable.  I don't know that

7       Defense Counsel can articulate what she will

8       argue or what she will say at trial when the

9       Court limited the State in what it was allowed to

10      say during opening.

11              MR. WINGATE:   Judge, I have no

12      intentions of going into any details of her

13      statement except for saying that she made a

14      statement in 2003.  That's all.

15              THE COURT:    Over -- I'll overrule it

16      at this point.  Your exception is noted.

17              (WHEREUPON THE PRECEDING DISCUSSION AT

18      THE BENCH CONCLUDED AND THE FOLLOWING PROCEEDINGS

19      WERE HELD.)

20              MR. WINGATE:   As I indicated, letter

21      mistakenly received by Janet talked about

22      marrying this new chick, talked about having a

23      child with her and unable to give him a child.

1   Hell hath no furry like a woman scorned.  2003,

2   statement is made to the police department.  Come

3   down and testify.  Won't happen.  2005, financial

4   woes being experienced by Mrs. Wilson.  Come down

5   and testify.  Won't do it.  2006, another

6   statement made and the police department through

7   its Crime Stopper program said, If you will come

8   down to testify before the grand jury, we will

9   give you -- I'm in charge of this program, I will

10   give you 50 crisp $100 dollar bills.  Come on in

11   and testify.  Mrs. Wilson:  I don't know, I'll

12   think about it.  She testifies.  She takes the

13   money and she testifies.

14       We then have an indictment against

15   Mr. Wilson.  Mrs. Wilson:  I don't think I can go

16   through with this, I'm not going to testify.

17   You're not going to testify?  You take our money

18   and you're not going to testify?  We'll file

19   charges against you.  There are criminal charges,

20   felonies filed against Mrs. Wilson.  You won't

21   testify?  Somebody is going to jail for this,

22   either you or him.

23       This is the State's case.  So now

1      Mrs. Wilson has negotiated a deal, a deal that

2      cannot be consummated until after this trial is

3      over, after she testifies and, of course, the

4      inference being the better the testimony, the

5      better the deal she will receive on her pending

6      felony charges.

7            This is the State's case.  These are the

8      State's witnesses.  The Court told you, we're

9      talking about one witness and you will use your

10     tests of truthfulness, your commonsense and your

11     reason.  You will see that statements progress,

12     at least four or five potentially made by

13     Mrs. Wilson.  It gets better with each retelling.

14           Prosecutor told you in voir dire, Well,

15     you won't be upset if the memories of witnesses

16     tend to fade since this was 1993 and we're

17     talking in excess of 18 years, but Mrs. Wilson,

18     money in hand, criminal charges pending,

19     statement just gets better.

20           You're talking about listening to the

21     evidence in this case, and upon listening to the

22     evidence in this case, I believe that as a jury

23     you will come to one conclusion and that is that

40

1       Mr. Wilson is not guilty of this offense.  Thank

2       you.

3               THE COURT:    Mr. Loisel, call your

4       first witness.

5               MR. LOISEL:    Thank you, Judge.  At this

6       time the State would call Detective Bill Seymour.

7               THE COURT:    Call Detective Seymour.

8                        -  -  -

9               DETECTIVE WILLIAM SEYMOUR,

10      being first duly sworn by the Court, testified as

11      follows:

12              THE COURT:    Give us your name and

13      spelling of your name, please.

14              THE WITNESS:   My name is Detective

15      William Seymour, S-E-Y-M-O-U-R.

16              THE COURT:    Thank you.

17                       -  -  -

18                  DIRECT EXAMINATION

19      BY MR. LOISEL:

20      Q.    Good morning, Detective.

21      A.    Good morning, sir.

22      Q.    Obviously you just stated your name for the

23      record.  Detective, where do you work?

```
 1      A.      I work as a detective for the Toledo Police
 2      Department.
 3      Q.      And how long have you worked for the Toledo
 4      Police Department?
 5      A.      23 years.
 6      Q.      And so that's since approximately '85 or so?
 7      A.      That is correct, sir.
 8      Q.      And if you can, just briefly give us a
 9      little bit of your training and education with
10      respect to being a member of the Toledo Police.
11      A.      I have an associates in law enforcement.  I
12      have additional two years at University of Toledo
13      in criminal justice.  I got hired in September of
14      1985, went to the Toledo Police academy which is
15      approximately six months long.  From then I was
16      assigned to field operations to the streets, what
17      we call the streets, from graduation to the
18      academy until the summer of 1991.  I was then made
19      a detective and assigned to the Vice Metro
20      Narcotics Unit for six years, and then in 1997 I
21      became a detective in the Crimes Against Persons
22      section which is where I'm currently at right now.
23      Q.      Now, Detective, when you say in 1991 you
```

1      became a detective in the Vice Narcotics section,

2      explain to us what your duties were when you

3      became a detective in the Vice Narcotics.

4      A.    Yes.  The Vice is assigned the task of most

5      primarily narcotics, drug trafficking, drug

6      investigations, additionally prostitution and

7      gambling are also things that are addressed.

8      Q.    And I think you indicated in 1993 you were

9      working for the Vice Narcotics Unit?

10     A.    I was in 1993 as well, sir.

11     Q.    And let me ask you this:  In 1993 did up

12     occasion to investigate the Defendant Robert

13     Wilson?

14     A.    I did, sir.

15     Q.    And what was the nature of that

16     investigation?

17     A.    It was drug trafficking.

18             MR. WINGATE:   May we approach?

19             THE COURT:    All right.

20             (WHEREUPON THE FOLLOWING DISCUSSION WAS

21        HELD AT THE BENCH.)

22             MR. WINGATE:   Your Honor, at this

23     juncture we are renewing our objection to his

1    testimony on the basis that the probative value

2    in this matter is outweighed by any prejudicial

3    effect it will have upon the Defendant's rights

4    and him getting a fair trial, so we renew our

5    objection.

6              THE COURT:    This will involve

7    Ms. Navarre; is that correct?

8              MR. LOISEL:    That is correct.

9              THE COURT:    Upon that representation,

10   I'm going to overrule your objection.

11             (WHEREUPON THE PRECEDING DISCUSSION AT

12   THE BENCH CONCLUDED AND THE FOLLOWING PROCEEDINGS

13   WERE HELD.)

14   BY MR. LOISEL:

15   Q.    All right.  Detective, I think I asked you

16   in 1993 you were involved in an investigation with

17   regard to the Defendant -- involving the

18   Defendant?

19   A.    Yes, I was.

20   Q.    Without too much detail, what did that

21   investigation revolve around?

22   A.    Drugs.

23   Q.    And how long prior to that time did you know

1     the Defendant?

2     A.    That would have been when I --

3             MR. WINGATE:   I would object.

4             MR. LOISEL:    Just laying a foundation.

5             MR. WINGATE:   No, I'm going to object.

6             THE COURT:    I'm going to allow it.

7     Overruled.

8             MR. WINGATE:   Your Honor, could we

9     approach?  May we, please?

10            THE COURT:    Sure.

11            (WHEREUPON THE FOLLOWING DISCUSSION WAS

12    HELD AT THE BENCH.)

13            MR. WINGATE:   Judge, the problem I'm

14    having is this, now it is one thing to say we

15    conducted an investigation, he made the sales on

16    such and such days, but to say how long have you

17    known Robert Wilson seems to imply that he's --

18    as a police officer he's known him for a period

19    of time because of his criminal activity, and I

20    think that's highly prejudicial at this point to

21    allow this witness to testify to that.  That's

22    basically what he's saying.

23            THE COURT:    Under Rule 611 you're

1    allowed to add some background information, but

2    I --

3            MR. LOISEL:    Just -- I'm just laying a

4    foundation so he can identify the Defendant.

5            MR. WINGATE:    Then why don't you ask him

6    could he identify.  You're asking how long has he

7    known him.

8            MR. LOISEL:    Well, are you the

9    Prosecutor?

10            MR. WINGATE:    The only way he can ask --

11            THE COURT:    Well, I would be cautious,

12    but I'm going to allow you some rope, but your

13    exception is noted.

14            (WHEREUPON THE PRECEDING DISCUSSION AT

15    THE BENCH CONCLUDED AND THE FOLLOWING PROCEEDINGS

16    WERE HELD.)

17    BY MR. LOISEL:

18    Q.    Now, I didn't hear you answer, Detective.

19    A.    I'm sorry, could you please repeat?

20    Q.    Well, strike that question.

21            Do you recognize the Defendant here in

22    court today?

23    A.    I do, sir.

1  Q.  And is this the same individual that you

2  were involved with in an investigation back in

3  1993?

4  A.  It is, sir.

5  Q.  Now, additionally with respect to the

6  investigation of this Defendant, did you have any

7  contact with a Brenda Navarre?

8  A.  I did, sir.

9  Q.  And in what capacity did you know

10  Brenda Navarre?

11  A.  I knew Brenda Navarre as one of our

12  confidential informants.

13  Q.  And could you explain to us what exactly a

14  confidential informant does for the police

15  department?

16  A.  Yes.  A confidential informant is a person

17  who provides information or assistance in solving

18  whatever particular crime you're investigating,

19  and in the realm of Vice Narcotics, it primarily

20  concerns drug trafficking and a confidential

21  informant, confidential would imply the person

22  wishes to remain anonymous, in other words, they

23  do not want them to be known as an informant, and

1      in this case Brenda Navarre in this case was a

2      confidential informant of ours.

3              Informants are oftentimes paid for their

4      assistance, which is primarily mostly informants

5      are paid that we use, others just do it because

6      they want to.

7      Q.    Sometimes maybe they're working off charges?

8      A.    Sometimes, yes.  Sometimes they have pending

9      matters and they want to provide assistance to us

10     in hopes of perhaps alleviating some of their

11     later problems.

12     Q.    So in 1993 you were using Brenda Navarre as

13     a confidential informant?

14     A.    That is correct, sir.

15     Q.    What's another name for a confidential

16     informant?

17     A.    CI or a street term would be a snitch.

18     Q.    And was she involved with your investigation

19     of the Defendant?

20     A.    She was, sir.

21     Q.    And explain to us how she was involved with

22     your investigation of the Defendant.

23     A.    How Brenda Navarre was involved was, which

1      is typical, but any confidential informant, if

2      they know persons that are known or suspected of

3      selling drugs, they will set them up.  They will

4      utilize -- set them up and take police with them

5      to purchase narcotics or perhaps they'll go

6      purchase narcotics and subsequently we may do

7      search warrants.  In this particular case

8      Brenda Navarre took -- on a few occasions did take

9      police officers with her.

10     Q.     And if you recall how many times did

11     Brenda Navarre purchase narcotics from the

12     Defendant while you were there?

13     A.     Three times while I was observing.

14     Q.     And where did this take place?

15     A.     This took place in the McDonald's lot at

16     Front and Main in east Toledo, that's in Lucas

17     County, Ohio.

18     Q.     And if you recall what were the narcotics

19     that she was purchasing from the Defendant?

20     A.     That would be crack cocaine.

21     Q.     And did you personally observe these

22     transactions?

23     A.     I did, sir.

49

```
 1        Q.    And in general when you use a confidential

 2     informant or a CI and you obtain drugs, do you

 3     generally indict those cases immediately?

 4     A.    No, sir, we do not.

 5        Q.    And why don't you?

 6     A.    Generally speaking when you use a

 7     confidential informant, in order to protect the

 8     identity of the confidential informant as well as

 9     the identity of the undercover officer, typically

10     hold onto the warrants for several weeks, even

11     several months in hopes that by the time the

12     person gets arrested that they won't recall that

13     specific incident.

14        Q.    Now, just so we can make sure we're clear,

15     do you remember the dates on the purchases that

16     Brenda Navarre made from the Defendant?

17     A.    The approximate dates, yes, sir.  The first

18     one was either June 11th or 12th.  The second one

19     was June -- I'm sorry, June 11th or 12th, that

20     would be 1993.  The second one I believe June

21     16th, 1993, and the third one was September -- I'm

22     sorry, August 12th of 1993.

23        Q.    And you indicated that you were there
```

1      personally and viewed these sales?

2      A.     I did, sir.

3      Q.     And you saw the Defendant there on those

4      three separate occasions?

5      A.     I did, sir.

6      Q.     And I asked you about indicting.  As a

7      result of this information that you gained from

8      your confidential informant, from Brenda Navarre,

9      did you go forward --

10     A.     Yes.

11     Q.     -- with any criminal charges?

12     A.     Yes, we did.

13     Q.     And did you stay in contact with

14     Brenda Navarre after the last purchase, August

15     12th of 1993?

16     A.     Yes, we had periodic contact.

17     Q.     And how would you talk to her when you had

18     contact with her?

19     A.     Periodically she would call to see if --

20     perhaps providing additional information or

21     assistance on perhaps other people, and then I

22     received a final call from her at the -- I believe

23     it was the end of November of 1993.

1    Q.    And did you ever talk to her again after

2    that?

3    A.    No, sir, I did not.

4    Q.    And what was the nature of that call?

5          MR. WINGATE:   I will object.  I will

6    object.  May we approach?

7          (WHEREUPON THE FOLLOWING DISCUSSION WAS

8    HELD AT THE BENCH.)

9          THE COURT:    I assume hearsay.

10         MR. WINGATE:   Yes, Your Honor, because

11   if he's going to testify as to what

12   Brenda Navarre said to him, that is clearly

13   hearsay.  We have no opportunity to confront any

14   witnesses.

15         MR. LOISEL:    803 exception, hearsay

16   exception 803(3).  This Defendant is going to

17   talk about Brenda Navarre's state of mind during

18   the phone call.  She's -- he's not -- at least

19   not going to testify as to anything that the

20   Defendant said.  It was what the witness said in

21   her state of mind at that time and that is a

22   clear exception under 803(3).  It is a

23   declaration.  It is a statement of the

1      declarant's then existing state of mind.

2              THE COURT:     Maybe we ought to take a

3      recess and see exactly what this witness is going

4      to testify.  I don't know what he's going to say.

5              MR. LOISEL:     Well, that's fine.

6              THE COURT:     Due for a recess anyways.

7              (WHEREUPON THE PRECEDING DISCUSSION AT

8      THE BENCH CONCLUDED AND THE FOLLOWING PROCEEDINGS

9      WERE HELD.)

10             THE COURT:     I have an evidentiary

11     issue that we need to address outside of your

12     presence, so we're going to take a short recess.

13             Again, do not discuss this case among

14     yourselves, nor with anyone else.  Do not allow

15     anyone to discuss this case in your presence, nor

16     form or express any opinion about the case until

17     the case has been submitted to you.  Be in recess

18     for 15 minutes.

19                     (RECESS TAKEN.)

20             (WHEREUPON THE FOLLOWING DISCUSSION WAS

21     HELD OUTSIDE THE PRESENCE OF THE JURY.)

22             THE COURT:     All right.  We are in

23     chambers outside the presence of the jury.

1     Officer Seymour -- Detective Seymour has just

2     been asked a question about a statement that

3     Brenda Navarre made back to him in 1993 and

4     objection based on hearsay; am I correct?

5              MR. WINGATE:   That is correct, Your

6     Honor.

7              THE COURT:    Has been made at this

8     point.  I do not, and I believe the State is

9     going to be arguing 803(3) exception, but I don't

10    even know what the statement is about or what it

11    is.  Do we need to have the Detective in here to

12    testify as to what his statement will be?

13             MR. LOISEL:   Judge, make a proffer.

14             THE COURT:    Or tell me what it would

15    be.

16             MR. LOISEL:   I can proffer to the Court

17    what this Detective is going to testify.

18             THE COURT:    All right.

19             MR. LOISEL:   It is the State's

20    understanding that he's going to testify to that

21    he received a phone call at the end of November

22    indicating -- well, that Brenda Navarre was

23    fearful, that she was hysterical and that she

54

1     indicated that the Defendant knew that she was a

2     confidential informant, and that she was fearful

3     and hysterical on the phone.  The State does not

4     intend to admit any statement of the Defendant

5     because that would be improper.

6               MR. WINGATE:   Our objection is not to

7     any statement of the Defendant because I don't

8     think there is any, but there is clearly hearsay

9     and there is not an exception to hearsay.

10              He's testifying that this statement --

11    he's testifying to the truthfulness of this

12    statement that she, in fact, did call and say

13    that Robert Wilson knew that she was an

14    informant.  I anticipated this based upon the

15    statement, that was the opening statement that

16    was given by the State of Ohio, but that is no

17    exception to any hearsay rule.

18              If you're talking about simply her state

19    of mind, being excited, being afraid, we can

20    accept that, but to allow that statement to come

21    in, it denies Mr. Wilson and, of course, you

22    know, the only person that could testify to that

23    would be the deceased, Mrs. Navarre.  He's being

1    confronted with a statement that he has no

2    opportunity to confront, cross-examine and

3    actually test the truthfulness of it, and it is

4    prejudicial at this point.

5        MR. LOISEL:   Judge, I have two Supreme

6    Court cases that are directly on point with

7    respect to 803(3).  As you have in front of you,

8    803(3) revolves around a statement of the

9    declarant's then existing state of mind, emotion,

10   sensation, bodily health, et cetera.

11       Yes, this is hearsay, but this is a

12   hearsay exception.  We are offering it for the

13   truth of the matter and it is an exception and

14   according to 803(3) and case law, statements

15   concerning the declarant's state of mind, her

16   fear of the appellant are admissible according to

17   803(3) according to State v., it's Apanovitch,

18   A-P-N-O-V-I-T-C-H 33 Ohio St. 3d, 19.  I have two

19   cases here that are Supreme Court cases that

20   outline 803(3) and it's availability with respect

21   to the declarant's fearful nature and the

22   statement and it allows them in both instances.

23       MR. WINGATE:   Could you share those

1     statements with us, those case laws?

2          MR. LOISEL:    I can make copies of them.

3          MR. WINGATE:   We would like to review

4     them before we respond, Your Honor.

5          THE COURT:    I'll give you a little

6     time.  This is a significant issue.

7          MR. MCELROY:   We should let the Court

8     know that this statement was not supplied to

9     Defense Counsel regarding this phone call to the

10    police and it's clearly an inculpatory statement.

11         THE COURT:     Inculpatory.

12         MR. MCELROY:   Uh-huh.

13         THE COURT:     All right.

14         MR. LOISEL:    If I may respond, I'll

15    address that with this witness, and obviously

16    Mr. Wingate has an opportunity to cross-examine

17    this witness as to the availability.

18         MR. WINGATE:   Why don't you just proffer

19    to us why he -- so -- we don't have that

20    statement.

21         MR. LOISEL:    I will get it from the

22    witness.

23         MR. MCELROY:   It should be noted, Judge,

1           that if a police officer has a statement, that

2           knowledge is imputed to the Prosecutor's office

3           as they are --

4                   MR. LOISEL:    It is not a statement of

5           the Defendant.  The State has no obligation to

6           give this over to the Defense.

7                   MR. MCELROY:   As they are all the State

8           of Ohio.

9                   MR. LOISEL:    That is incorrect.

10                  MR. WINGATE:   Could we have the cases?

11                  MR. LOISEL:    I will make copies of that

12          when the Judge releases us.

13                  THE COURT:    Go ahead, make copies.

14          We'll come back on the record after you've had an

15          opportunity to review it.

16                              (RECESS TAKEN.)

17                  MR. WINGATE:   Your Honor, I'll indicate

18          that the State has provided us with copies of

19          State v. Frazier and State v. Reynolds, which the

20          State proposes supports their proposition.  State

21          v. Reynolds is cited as 80 Ohio St. 3d 670, and

22          State v. Frazier is cited as 73 Ohio St. 3d 323.

23                  In State v. Frazier, the Court states

58

1        that the trial court correctly ruled that the

2        statements concerning Skiba's state of mind,

3        i.e., her fear of appellant, were admissible

4        pursuant to the 803(3) and State v. Apanovitch.

5        The trial court went to great lengths to ensure

6        that the witnesses testified only to the fact

7        that Skiba expressed fear of the appellant.

8               However, in the Supreme Court case of

9        State v. Reynolds, the State says that Foster's

10       statements to her son and sister-in-law that she

11       was fearful or concerned were admissible under

12       Evidence Rule 803(3) which permits admission of a

13       statement of the declarant's then existing state

14       of mind, emotion, or sensation.

15              Goes on to say that Foster's statements

16       concerning Reynolds's actions in the days before

17       the murder and her statements explaining the

18       reasons why she was scared were clearly hearsay

19       and not admissible under any of the recognized

20       exceptions to the rule.  Then Apanovitch at 21,

21       514, and I'm reading from Page 10 of the Supreme

22       Court case of State v. Reynolds.

23              Your Honor, we have no objection to this

1    Detective indicating that he received a phone

2    call from Mrs. Navarre indicating that she was

3    fearful or afraid, but to the extent that she

4    goes into who she's afraid of, why she's afraid

5    of him, all of that is excluded under the Supreme

6    Court case that the State is now offering as

7    supplemental to its position that this

8    information should come in.

9        So, for that reason based upon the case

10   law that the State has provided to the Court, we

11   believe that this is not an exception to the

12   hearsay rule and should be excluded based upon

13   the case law of the Supreme Court of State v.

14   Reynolds.

15        MR. LOISEL:   Judge, if you look a

16   little closer, State v. Frazier, it indicates

17   that the trial Judge went to great lengths to

18   ensure that the witnesses testified only to the

19   fact that Skiba expressed fear of the appellant.

20   She can indicate -- Detective Seymour can

21   indicate that she was afraid of the appellant

22   during that phone call.  I think that is very

23   applicable with respect to Rule 803(3).  Other

60

1    case law suggests that she can explain why or he

2    can explain why she was fearful.

3         MR. WINGATE:   The most recent Supreme

4    Court case, that being Reynolds, indicates that

5    The actions and her statements explain the

6    reasons why she was scared were clearly hearsay

7    and not admissible under recognized exceptions of

8    the rule citing Apanovitch.

9         THE COURT:   Well, I've taken the

10   liberty of looking up some Weissenberger under

11   Ohio Evidence 803(3), and their citations to the

12   State v. Davis case and the State v. Stewart

13   case.  The Davis case appears to be just about

14   right on point.  Clearly the testimony --

15   anticipated testimony here would be hearsay, and

16   I intend to give the jury a qualifying

17   instruction that the truth of the matter cannot

18   be to ascertain from the statement because we

19   don't know, but she will be allowed to -- or the

20   testimony will be allowed to come in with respect

21   to her then existing, mental, emotional, or

22   physical condition under 803(3).  I think it

23   comes in.

1          MR. WINGATE:   Now, are you saying her

2      being afraid comes in or her being afraid of the

3      Defendant comes in?

4          THE COURT:    She's going to be

5      allowed -- the witness is going to be allowed to

6      testify to the gist of the telephone

7      conversation, but I'm going to advise the jury

8      that it is not going to be allowed for the truth

9      of the matter because we don't know what the

10      truth is.  That is going to have to be for them

11      to decide from all of the facts and circumstances

12      of the case.  But I'm going to let this the

13      testimony come in with respect to the gist of

14      that phone call.

15          MR. WINGATE:   All right.  Then, Your

16      Honor, we'll note for the record our objections

17      and the fact that we do not believe the curative

18      instruction will be sufficient to overcome the

19      prejudicial value of this evidence that's being

20      elicited from this witness, first thing.

21          Second thing, the Court had indicated

22      that it would give a cautionary instruction

23      relative to the criminal charges that -- the

62

1      three drug offenses that we talked about

2      initially.  Is the Court intending to give that

3      instruction?

4              THE COURT:     Sure.

5              MR. WINGATE:   At the end of his

6      testimony or at what point does the Court intend

7      to instruct the jury?

8              THE COURT:     Well, I was -- I can give

9      it right now if you want.

10             MR. LOISEL:    Well, Judge, it's the

11     State's position that during jury instructions

12     that the testimony would be made.  You heard

13     testimony about prior bad acts.

14             THE COURT:     That certainly come in at

15     that point.

16             MR. LOISEL:    I don't think that it's

17     necessarily proper to do it at this point, but,

18     of course, obviously the Court can do as it seems

19     fit.

20             THE COURT:     Well, I'll talk to the

21     jury a little bit.

22             MR. LOISEL:    One final thing, Judge,

23     you mentioned that the 803(3) you're going to --

1          I'm not certain as to how you're going to

2          instruct them.

3                   THE COURT:    I'm going to tell them

4          that we don't know what the truth of the matter

5          asserted in this conversation are.  That's going

6          to be up for them to determine from all of the

7          facts and circumstances of the case.  Going to

8          allow it to come in for the purpose of explaining

9          her motive.

10                  MR. WINGATE:   Just one other thing, Your

11         Honor.  The only other thing I want to add is

12         that as we indicated previously, this

13         information, and the Court has -- I mean, the

14         Prosecutor has stated to the Court on more than

15         one occasion that it has allowed us an

16         opportunity to come down and review the evidence

17         in this particular case relative to

18         Robert Wilson's trial, and we've taken advantage

19         of that and gone through a great deal of the

20         materials that the State of Ohio has; however, we

21         filed a motion asking that for any and all

22         information pursuant to the rules of discovery,

23         any and all information which all evidence known

64

1        or which may become known to the Prosecuting

2        Attorneys favorable to the Defendant and material

3        either to guilt or punishment pursuant to Ohio

4        Rules of Evidence 19(B)(1)(L), that was a request

5        that we made back in February and I believe it is

6        '08 -- '07, but a previously filed motion.  We

7        had not received this information that Seymour

8        would be testifying or had even produced a report

9        indicating that there had been a conversation

10       with Mrs. Navarre relative to any fear that she

11       may have expressed at any time, and based upon

12       that, we would also object to the introduction of

13       this evidence to this jury.

14              MR. LOISEL:   Judge, that motion was

15       made, I believe, I think -- I don't know if the

16       Court ruled on that.  The testimony of this

17       witness will be explained through his testimony.

18       Defense Counsel will have an opportunity to

19       cross-examine as to why these statements were not

20       memorialized.

21              MR. WINGATE:  Your Honor, whether

22       memorialized or not, if the State has this

23       information and the Defense has legitimately

65

1    requested it under the auspices of the rules of

2    discovery, then it is incumbent upon the State to

3    reveal this.  This is not a trial by ambush, and

4    it is not hard, it doesn't take a rocket

5    scientist to understand when we're asking for

6    evidence either favorable to the Defendant and

7    either material to the guilt or punishment, then

8    this should be given to us not at the day of

9    trial with the witness testifying and the State

10   saying, well, Defense has an opportunity to

11   cross-examine.

12        THE COURT:    I'm going to see it your

13   way.  If this statement had been revealed, I

14   would have allowed it under 803(3).  But the fact

15   that it was not shared -- is that, in fact, true,

16   that it wasn't shared?

17        MR. LOISEL:    Judge, with respect to

18   that argument, this information is not material

19   to this Defendant's guilt or innocence.

20        THE COURT:    Absolutely.

21        MR. LOISEL:    To motive.

22        THE COURT:    It absolutely has to go

23   with motive.

66

1          MR. LOISEL:    And that is not material

2     to his guilt or innocence.  It has to go through

3     the 404(b) information.

4          THE COURT:    No.  Motive is a very

5     important part of your -- also I've already ruled

6     it is a very important part of your case here and

7     for the life of me can't understand why you

8     wouldn't have revealed this information.

9          MR. LOISEL:    Judge, it is not as I

10    indicated.  It is not memorialized in any report.

11    The State became aware of it when I had read over

12    the transcript of the grand jury this weekend,

13    and it does not go to the guilt or innocence of

14    this party.  It goes to the Defendant's motive in

15    this case; therefore, the State feels it is not

16    discoverable according to the rules.  The State

17    is not trying a trial by ambush.  The State is

18    reading through the rules and following the rules

19    and it believes it is following the rules with

20    respect to this.

21          THE COURT:    I'm going to allow your

22    witness to testify that he received a call from

23    Ms. Navarre and based upon that information he

1    did whatever he did, but I'm not going to let

2    her -- I'm not going to let him use Mr. Wilson's

3    name.  That information should have been shared.

4    Really should have.

5           MR. LOISEL:   Judge, it is within the --

6    I believe the State is well within its rights.

7    The Defense Attorney --

8           THE COURT:   That's information that

9    should have been shared.  Motive is really

10   important in this case in light of the fact that

11   you've got one witness here.  I just think that's

12   fair.

13          MR. LOISEL:   So, I'm not sure exactly

14   how the State is to proceed at this point.  I

15   don't want to overstep the ruling of the Court.

16          THE COURT:   Just indicate that

17   received a call from Brenda Navarre and leave it

18   at that.

19          MR. LOISEL:   Judge, I think the State

20   should be allowed with respect to 803(3) that she

21   was fearful.  That's the whole rule -- that's the

22   whole exception to the hearsay rule, he that got

23   a call and she was fearful.

68

```
1              THE COURT:    That's as far as you need
2       to go.
3              MR. LOISEL:    Very well.
4              THE COURT:    Okay.  All right.  Let's
5       go back out.
6              (WHEREUPON THE PRECEDING DISCUSSION
7       OUTSIDE THE PRESENCE OF THE JURY CONCLUDED AND
8       THE FOLLOWING PROCEEDINGS WERE HELD.)
9              THE COURT:    Ladies and gentlemen of
10      the jury, at this time you'll be allowed to hear
11      a limited response from this witness with respect
12      to a phone call that he received from
13      Ms. Navarre.  I'm going to allow some limited
14      testimony with regard to that phone call under
15      Evidence Rule 803(3).  I'm giving you a
16      cautionary statement at this point -- or
17      instruction at this point.
18              Since Ms. Navarre is no longer available
19      to be subject to cross-examination or to give any
20      evidence with respect to this statement on her
21      own behalf, you are instructed that this
22      information and statement is received not for the
23      truth of the matter, because we don't know the
```

```
 1        truth of the matter, but only to the fact that

 2        the statement was made at this point.  You may

 3        proceed.

 4               MR. WINGATE:   Judge, one other thing.

 5        May we approach?

 6               (WHEREUPON THE FOLLOWING DISCUSSION WAS

 7        HELD AT THE BENCH.)

 8               MR. WINGATE:   The other cautionary

 9        instruction is about the charge for the drug

10        offenses.

11               MR. LOISEL:   Judge, I think -- well I

12        would object.  I think it is proper at the time

13        when you instruct the jury at the end of the

14        trial.

15               MR. MCELROY:   I believe the rule says it

16        is proper any time the Court feels it would help

17        the jury.

18               THE COURT:   Tell them what the

19        instructions are.

20               MR. LOISEL:   And, Judge, with respect

21        to what you just said, I think the whole point is

22        that it is a hearsay statement, it is offered by

23        the State for the truth of the matter asserted,
```

1       however, it is coming in under an exception.  I

2       don't know that you can tell them that it can't

3       be accepted for the truth of the matter.

4       Defense Counsel can argue that there's no way to

5       cross-examine that statement, however, when you

6       look at that at hearsay rule, it indicates that

7       it is being offered for the truth of the matter

8       asserted and that there is an exception allowing

9       the statement in.  So, I think what you just told

10      them contravenes what the hearsay rules allow the

11      statement to come in for.  You see what I'm

12      saying?

13               MR. MCELROY:   I believe it is still

14      hearsay.

15               THE COURT:    I think it is hearsay.

16               MR. LOISEL:   It is hearsay.  I'm not

17      arguing that it is not hearsay, but hearsay by

18      definition is a statement made by a declarant out

19      of the present -- or that the State contends that

20      it is for the truth of the matter asserted,

21      that's why it makes it hearsay.

22               THE COURT:    Explains motive or her

23      reason for making the phone call at this point

71

1     and that's what I'm going to allow it in on that

2     basis.

3             MR. LOISEL:    I think they can argue

4     that it is not, but I'm not -- I just want to

5     make sure that the Court understands the point

6     that it is hearsay and it is offered for the

7     truth of the matter asserted.

8             THE COURT:    Your objection is noted.

9     It is in the record.

10            MR. LOISEL:    It is already sated to the

11    jury that it is not offered for the truth of the

12    matter.

13            THE COURT:    We'll address it.

14            (WHEREUPON THE PRECEDING DISCUSSION AT

15    THE BENCH CONCLUDED AND THE FOLLOWING PROCEEDINGS

16    WERE HELD.)

17            THE COURT:    You may proceed,

18    Mr. Loisel.

19    Q.    Now, Detective, we were talking about a

20    phone call that you received from Brenda Navarre.

21    A.    Yes, sir.

22    Q.    Do you recall that line of questioning?

23    A.    I do, sir.

72

1      Q.    And do you recall approximately when you

2      received that phone call?

3      A.    Yes, I do.  It would have been at the end of

4      November of 1993.

5      Q.    And if you know, do you know when Brenda

6      Navarre was murdered?

7      A.    I believe the incident took place on

8      December 1st, 1993, and I believe that she had

9      passed away on December 2nd, 1993.

10     Q.    And without getting into what Ms. Navarre

11     said to you during that -- well, first of all, how

12     did you know it was Brenda Navarre on the phone?

13     A.    I talked to her.  I knew her two or three

14     years.  I talked to her on the phone, had a lot of

15     contact with her.

16     Q.    And so you're positive that it was

17     Brenda Navarre calling you?

18     A.    Absolutely.

19     Q.    And without getting into what she said, what

20     was her demeanor, what was her inflection with

21     respect to the phone call?

22     A.    She was very frantic.  She was crying and

23     hysterical on the phone.

1    Q.    So she was terrified when she was talking?

2          MR. WINGATE:  I will object.  He said

3    she was crying and frantic.  He didn't say she

4    was terrified.

5          THE COURT:    Rephrase.

6    Q.    So your is testimony that she was frantic.

7          THE COURT:    If you couch it in terms

8    of appeared to be or gave the appearance of, I'll

9    allow it.

10          MR. LOISEL:    I'm sorry, Judge?

11          THE COURT:    If you couch your question

12    in terms of did she appear to be frantic, I'm

13    going to allow it.

14          MR. LOISEL:    Okay.

15    BY MR. LOISEL:

16    Q.    You don't know what she was, but you heard

17    her voice over the phone, correct?

18    A.    I did, sir.

19    Q.    And her inflection, as you indicated, was

20    that she was frantic and what else?

21          MR. WINGATE:  I will object.

22          THE COURT:    Sustained.

23          MR. LOISEL:    Okay.

74

1    Q.    Now, with respect to this conversation, did

2    you ever put this down in any report or

3    memorialize it in a police report or a

4    supplemental report?

5    A.    No, I did not.

6    Q.    And why not?

7    A.    At the time it was information that came out

8    that I passed on by word of mouth and other means

9    later, but at that point there was no incident

10   that had occurred, additionally the Vice Squad, it

11   does happen periodically where someone will call

12   you in a frantic manner.

13        MR. WINGATE:   I'm going to object.  The

14    question was whether or not he had memorialized

15    it in a report.

16        THE COURT:    Sustained.

17   Q.    So the answer is you did not?

18   A.    I did not, sir.

19   Q.    And why didn't you?

20   A.    I did not put it in the report because at

21   this point there would have been no need for a

22   report.  No incident other than what we had

23   discussed on the phone had occurred, no other

1    incident had occurred.

2    Q.    And did you have any more phone contact with

3    Brenda Navarre after that phone call?

4    A.    That would have been the last conversation I

5    ever had with Brenda Navarre.

6         MR. LOISEL:    Thank you, Detective,

7     nothing further.

8         THE COURT:    You may cross.

9                    -   -   -

10                   CROSS-EXAMINATION

11    BY MR. WINGATE:

12    Q.    Now, Detective Seymour, I want to start with

13    your statement that you told this Prosecutor that

14    you had known Brenda Navarre for two or three

15    years and had a lot of contact with her; do you

16    recall telling the Prosecutor that?

17    A.    Yes.

18    Q.    And would this have to do with charges being

19    filed against her?

20    A.    No.

21    Q.    All right.  In the capacity of a

22    confidential informant?

23    A.    That is correct, sir.

1     Q.     All right.  And in knowing her two or three

2     years, would it be fair to say that more than five

3     cases she were involved in as far as being a

4     confidential informant?

5     A.     Yes.

6     Q.     More than 10?

7     A.     I don't know about more than 10 that I was

8     personally involved with her, but I would say

9     overall probably more than that even.

10    Q.     Probably more than 10.  And when you say as

11    far as you've been involved in, of course in of

12    your capacity in that Vice Narcotics Unit, you may

13    take a confidential informant, you may utilize the

14    informant; is that correct?

15    A.     That is correct, sir.

16    Q.     Another detective, and let's say

17    Detective Beavers, if he were in the department he

18    may utilize that informant in some of his

19    investigations?

20    A.     Absolutely.

21    Q.     All right.  So as far as Brenda Navarre

22    being a confidential informant for you, she could

23    have been working with two or three other

1    detectives on many different cases?

2    A.    Absolutely.

3    Q.    All right.  So, as of the two or three years

4    that you were involved with her, you can't tell

5    this jury the number of cases in which she was a

6    confidential informant; would that be fair?

7    A.    I could not tell you, yes, sir.

8    Q.    All right.  But as far as you are concerned

9    and your involvement with her, at least five to 10

10   cases she was involved in with you?

11   A.    Yes, sir.

12   Q.    All right.  And based upon your involvement

13   as a detective in Vice Narcotics, being a

14   confidential informant is a dangerous position to

15   be in; is that correct?

16   A.    It is, sir.

17   Q.    All right.  And as far as the buys that were

18   involved, the alleged sales that took place

19   involving Robert Wilson on June 12th, June 16th,

20   and August 12th, you personally observed these

21   transactions take place?

22   A.    I did, sir.

23   Q.    All right.  And it would have been between

1    Robert Wilson and Brenda Navarre as you observed

2    from across the street?

3    A.    That is correct.

4    Q.    Okay.  At any point did an undercover

5    officer accompany Mrs. Navarre over to the car,

6    anything like that?

7    A.    Yes, sir.

8    Q.    All right.  And that would have been

9    Detective Kantura; is that correct?

10    A.    That is correct.

11    Q.    And Detective Kantura would have had an

12    opportunity to see the transaction take place; is

13    that correct?

14    A.    Yeah, that is correct.

15    Q.    As far as a witness against Robert Wilson,

16    you didn't need Brenda Navarre because you

17    actually had an undercover cop there that

18    witnessed the transaction take place; is that

19    right?

20    A.    I'm sorry.  Wouldn't need Brenda Navarre for

21    what?  I don't understand.

22    Q.    To testify.

23          MR. LOISEL:    Objection, Your Honor.

1     Relevance as to what would needed to be testified

2     in a drug case.

3           MR. WINGATE:   I'll rephrase the

4     question.

5           THE COURT:    All right.

6     BY MR. WINGATE:

7     Q.    All right.  Outside of Brenda Navarre, you

8     also had an undercover detective,

9     Detective Kantura, who you indicated went over to

10    the car and observed the transaction take place?

11    A.    That is correct, sir.

12    Q.    All right.  So then you had at least two

13    witnesses to the transactions, correct?

14    A.    That is correct, sir.

15    Q.    And would it be fair to say that in order to

16    protect the identity of the confidential

17    informant, Brenda Navarre, would it be fair to say

18    that you did not need her as a witness in those

19    transactions because you had the detective?

20    A.    I don't recall ever using a confidential

21    informant as any witness, sir.

22    Q.    Right, because you have the detective there,

23    right?

1     A.     Well, yeah, I guess we don't use informants

2     as witnesses.

3     Q.     All right.  And the other thing is that the

4     reason you don't use is to protect their identity,

5     correct?

6     A.     Absolutely.

7     Q.     And so that I don't get -- so I don't

8     misunderstand you, for at least two to three years

9     she worked in the capacity as a confidential

10    informant?

11    A.     That is correct.

12    Q.     So we're talking from 1990 to 1991, the

13    beginning of 1990 or 1991 to 1993; is that

14    correct?

15    A.     Well, I came to the Vice Squad in 1991 and

16    she was an informant at that point in time.

17    Q.     All right.  Let me ask you this:  When you

18    came to the Vice Squad in 1991, you're saying she

19    was an informant at this point?

20    A.     That is correct.

21    Q.     Right.  And this was information given to

22    you that she could be utilized as an informant,

23    right?

1      A.     That is correct.

2      Q.     You don't know how many years prior to that

3      she had been an informant?

4      A.     That I do not know, sir.

5             THE COURT:     Mr. Wingate, just so we're

6      clear, you indicated -- you asked a question of

7      this witness about Ms. Navarre being involved in

8      five or ten other cases, are you claiming or

9      asking cases other than those that involve the

10     Defendant or --

11            MR. WINGATE:   Yes.

12            THE COURT:     Is that correct?

13            MR. WINGATE:   I'll clarify.

14            THE COURT:     All right.

15     BY MR. WINGATE:

16     Q.     As it relates to, as the Court was

17     inquiring, Mrs. Navarre's involvement as a

18     confidential informant for you, she was involved

19     in at least five to ten cases?

20     A.     Yes, five to ten different cases.

21     Q.     Different cases?

22     A.     Yes.

23     Q.     Outside of the one --

82

1     A.     That is correct.

2     Q.     -- involving Mr. Wilson?

3     A.     That is correct, sir.

4     Q.     And even though that number is for you, you

5     indicated that when you came into the Vice Metro

6     Unit in 1991, she had been a confidential

7     informant when you arrived?

8     A.     That is correct, sir.

9     Q.     You also talked about informants are often

10    paid?

11    A.     That is correct, sir.

12    Q.     Was Mrs. Navarre being paid?

13    A.     She was, sir.

14    Q.     Do you know how much she had been paid?

15    A.     Absolutely.

16    Q.     How much?

17    A.     She was paid the standard rate, was $30

18    dollars for a controlled buy.  Do you want me to

19    explain a controlled buy or --

20    Q.     Go ahead.

21    A.     $30 dollars for a controlled buy.  That is a

22    buy where they purchase narcotics without an

23    officer being present.  For example, if you send

1       someone to a house, they walk in the house, they

2       come back out.  The second one is a direct buy

3       which is primarily what we did.

4       Q.    I want to stop you right here.

5       A.    Sir, yes.

6       Q.    As you explained to the jury about the

7       controlled buy, a controlled buy never occurred

8       with Mr. Wilson.  There was always an officer

9       there with Mrs. Navarre, correct?

10      A.    Basically.  Well, the first -- well, I can't

11      say yes or no to that.  I would say that they

12      primarily were classified as direct buys.

13      Q.    And, again, with the direct buys involving

14      Mr. Wilson, detectives there?

15      A.    That is correct.

16      Q.    All right.  Go ahead I'm sorry.

17      A.    Yes, a direct buy, depending upon the amount

18      generally was paid, the informant was paid $60

19      dollars.  If it was extreme large quantities, the

20      informant would be paid more.

21      Q.    The Prosecutor said another reason or

22      incentive for an individual to become a

23      confidential informant is, one, you're being paid

1      and I think you mentioned could be to work off

2      charges?

3      A.    That's possible.

4      Q.    And in the case of Mrs. Navarre, was she

5      working off charges?

6      A.    Not that I'm aware of.

7      Q.    All right.

8      A.    No.

9           MR. WINGATE:   Just one second, Your

10       Honor.

11     Q.    By any chance can you recall the names of

12     the individuals that Mrs. Navarre was involved in

13     under your -- the five to ten cases you were

14     involved in subject of the investigation --

15     subject of an investigation?

16     A.    Oh, other people?

17     Q.    Yeah.

18     A.    I can't recall offhand.  It is 15 years ago.

19     That I cannot recall, sir.

20     Q.    Does the name Scottie Burrell sound

21     familiar?

22     A.    That doesn't sound familiar to me.

23     Q.    Now, let me ask you this:  You received this

1    phone call in November indicating -- or she was

2    frantic and crying, or appeared to be frantic and

3    crying; is that correct?

4    A.    That is correct.

5    Q.    And you did not pass this information onto

6    anyone?

7    A.    Not at that time.

8    Q.    All right.  You subsequently did not feel

9    that it warranted the filing of a report or

10   anything, you did not journalize it; is that

11   correct?

12   A.    No.

13   Q.    No reports?

14   A.    No, sir.

15   Q.    When did you pass the information on?

16   A.    It would have been after her death.

17   Q.    All right.  And that would have been?

18   A.    In December, early December of 1993.

19   Q.    Okay.  Did you become aware of the

20   investigation involving her death?

21   A.    Yes.

22   Q.    All right.  And were you involved in that

23   investigation?

86

1     A.     No, sir, I was not.

2     Q.     Okay.  Were you aware of any potential

3     suspects in that investigation?

4            MR. LOISEL:    Objection, Your Honor.  He

5       indicated that he's not aware of an

6       investigation.

7            THE COURT:     This is cross-examination.

8       Some allowances are allowed.

9     A.     I was not privy to any information

10    concerning the homicide case.

11           MR. WINGATE:    Just one second.  I may be

12      finished.

13    Q.     Just a few brief questions.  All right?

14    A.     Yes, sir.

15    Q.     See if you can recall any of the following

16    names as part of the investigations, plural, that

17    you were conducting back in -- using

18    Brenda Navarre as an informant.

19           MR. LOISEL:    Objection Your Honor.  It

20      has no relevance with respect to the case against

21      Robert Wilson.

22           MR. WINGATE:    May we approach?

23           THE COURT:     How is it relevant?

1          MR. WINGATE:   Your Honor --

2          THE COURT:    Approach.

3          (WHEREUPON THE FOLLOWING DISCUSSION WAS

4    HELD AT THE BENCH.)

5          MR. WINGATE:   Your Honor, as this Court

6    has indicated, motive is the reason why they are

7    alleging Robert Wilson was the one who committed

8    this offense.  There are in the Crime Stopper

9    reports that the State has given us, there are

10   several names, at least eight individuals that

11   were involved in drug trades that are associated

12   with Brenda Navarre.  If, in fact, you're talking

13   about motive, then any one of these eight

14   individuals would have a motive.  The only

15   question I'm asking him is whether or not these

16   names sound familiar as far as an investigation

17   that he conducted with the assistance of

18   Brenda Navarre acting as a confidential informant

19   and I think that is fairly relevant.

20         MR. LOISEL:   Judge, I would argue it is

21   irrelevant.  These names have nothing to do with

22   respect to the investigation of Robert Wilson.

23         MR. WINGATE:   No, but it tends to negate

```
 1        your proposition that he had the -- he was the

 2        only one with the motive to do this.

 3             THE COURT:     Allow 404 testimony.   In

 4        I'm going to allow him some leeway.   Overruled.

 5             (WHEREUPON THE PRECEDING DISCUSSION AT

 6        THE BENCH CONCLUDED AND THE FOLLOWING PROCEEDINGS

 7        WERE HELD.)

 8   Q.    Okay.  See if you can recall the following

 9        list of names as involved in your investigation

10        utilizing Brenda Navarre as a confidential

11        informant.

12   A.    Yes, sir.

13   Q.    All right.  John Garth?

14   A.    Yes.

15   Q.    Scottie Burrell?

16   A.    No.

17   Q.    Dave Pawlicki?

18   A.    No.

19   Q.    Andre Munn?

20   A.    No.

21   Q.    Norman Frazier?

22   A.    No.

23   Q.    Demoris Bankston?
```

1      A.      No.

2      Q.      James Rice?

3      A.      No.

4      Q.      Quanza Wyatt?

5      A.      No.

6      Q.      Afari?

7      A.      No.

8      Q.      Okay.  And although those names do not sound

9      familiar, there were at least outside of

10     Mr. Wilson five to ten other individuals that you

11     had utilized Mrs. Navarre as a confidential

12     informant on; is that correct?

13     A.      No, not specifically individuals.  When I

14     said five to ten cases, I thought you were

15     referring to cases overall.

16             Some cases that we worked with

17     Brenda Navarre were controlled buys, which

18     generally you're going after a particular

19     residence.  So, some of these people maybe I don't

20     know their names where they were actually

21     residences that we were attempting to get into

22     perhaps do a search warrant, and some, of course,

23     certainly were individuals.

90

1      Q.     I understand that.

2      A.     Yes, sir.

3      Q.     But even if you talk about controlled buy,

4      you're sending the confidential informant to the

5      house to make a buy?

6      A.     That is correct.

7      Q.     So in that capacity she's still a

8      confidential informant?

9      A.     Yes.

10     Q.     All right.  So, the question is even though

11     it may not have been one individual pointed out,

12     at least five to ten different cases, different

13     individuals that you had utilized her as a

14     confidential informant?

15     A.     Different cases, yes, sir.

16     Q.     Okay.  Involving different individuals?

17     A.     Yes, sometimes you don't know who the

18     individuals are, sir, but you're right.

19     Q.     Okay.  All right.  And as far as your

20     observation on June 12th, June 16th and April 12th

21     (sic) of 1993, the transaction that took place

22     between Robert Wilson or the transaction that you

23     observed only took place between Robert Wilson and

```
 1      Brenda Navarre with Detective Kantura there as an

 2      undercover officer?

 3      A.    Detective Kantura was present for two of the

 4      three, yes.

 5      Q.    For two of them.  Okay.  Was anyone else

 6      present in two of the three -- in any of the

 7      three?

 8      A.    We had several officers.  Traditionally when

 9      we're making a buy, we have multiple police

10      officers surrounding areas and observing buys.

11      Q.    Okay.  But certainly no one else in the

12      car --

13      A.    No, no.

14      Q.    -- okay -- with Mr. Wilson?

15      A.    No.

16      Q.    All right.  Just one second.

17            MR. WINGATE:    Nothing further.

18            THE COURT:    Any redirect?

19            MR. LOISEL:    Just briefly, Judge, may

20       we approach, please?

21            (WHEREUPON THE FOLLOWING DISCUSSION WAS

22       HELD AT THE BENCH.)

23            MR. LOISEL:    Judge, I think that the
```

1     Defense has opened the door with respect to the

2     phone call Brenda Navarre -- as to who the call

3     was regarding.  He's trying to infer it could

4     have been regarding any of five different people.

5     My question to the Detective would be the phone

6     call you received, who was it regarding.  I'm not

7     asking what it said or anything else.  I think

8     the door has been opened with respect to the

9     questioning about any of the five others.

10          THE COURT:    He testified the phone

11     call was from her and that she was -- appeared to

12     be hysterical.

13          MR. LOISEL:    Right.  The inference that

14     Defense Counsel is trying to make is it could

15     have been with respect to any of the

16     investigations.

17          THE COURT:    I didn't make that

18     inference.

19          MR. LOISEL:    Well, I was -- just make

20     for the record I believe it does exactly what

21     he's going to argue.

22          MR. WINGATE:    And I'll indicate no.

23          (WHEREUPON THE PRECEDING DISCUSSION AT

93

```
 1       THE BENCH CONCLUDED AND THE FOLLOWING PROCEEDINGS

 2       WERE HELD.)

 3                           -   -   -

 4                   REDIRECT EXAMINATION

 5     BY MR. LOISEL:

 6     Q.    Detective, just one question.  Do you recall

 7     Mr. Wingate asking you a question about who was at

 8     these buys, he asked you a couple of times

 9     Detective Kantura was --

10     A.    Yes, that's right.

11     Q.    Were there any other police officers there,

12     right?

13     A.    Yes.

14     Q.    Do you recall him asking you about a

15     confidential informant; do you have them testify

16     during the case?

17     A.    Yes, sir.

18     Q.    Now, you indicated that you try not to have

19     them testify because you're trying to protect

20     their identity; is that correct?

21     A.    That is correct, sir.

22     Q.    Why are you trying to protect their

23     identity?
```

1      A.     Trying to protect their identity so nothing

2      bad happens to them.  We don't want --

3      confidential informant is a very dangerous

4      business and we want to protect their life as much

5      as possible.

6                  MR. LOISEL:     Thank you, Detective.

7                  THE COURT:      Anything else?

8                  MR. WINGATE:    Nothing further.

9                  THE COURT:      Members of the jury,

10     you've just heard some testimony with respect to

11     three prior or legally called three bad acts,

12     three prior drug deals that involve the

13     Defendant.  I have allowed that testimony in

14     under Evidence Rule 404(b), and let me explain

15     that to you.

16                  That testimony is not to be used in any

17     way, shape or form to consider the character of

18     the Defendant or any conduct that he may have

19     engaged in with respect to those three other

20     acts.  Those are -- that testimony was submitted

21     solely for the purpose of shedding what light, if

22     any, upon the issue of motive, and that I will be

23     giving you written instructions on that regard,

1    but for now I'm telling you why that testimony

2    came in.  You may be excused.

3             THE WITNESS:   Thank you, Your Honor.

4             THE COURT:    You may call your next

5    witness.

6             MR. LOISEL:   State of Ohio calls

7    Roger Craig.

8             THE COURT:   Roger Craig.

9                     -   -   -

10                    ROGER CRAIG,

11    being first duly sworn by the Court, testified as

12    follows:

13             THE COURT:    Would you please give us

14    your name and spelling of your name.

15             THE WITNESS:  Roger Craig, R-O-G-E-R,

16    C-R-A-I-G.

17             THE COURT:    Thank you.

18                    DIRECT EXAMINATION

19    BY MR. LOISEL:

20    Q.    Good morning.

21    A.    Good morning.

22    Q.    You live in Toledo?

23    A.    Yes.

96

```
1      Q.    How long have you lived in Toledo?

2      A.    All my life.

3      Q.    And if I may, how old are you?

4      A.    47.

5      Q.    Okay.  So, for the 47 years you've lived

6      here in Toledo?

7      A.    Yes.

8      Q.    Where do you live currently?

9      A.    Dexter.

10     Q.    Okay.  Now, are you familiar with Toledo --

11     A.    Yes.

12     Q.    -- streets and such?

13     A.    Yes, pretty much.

14     Q.    Okay.  And obviously if you've lived here

15     you're whole life, back in 1993 were you living

16     here as well?

17     A.    Yes.

18     Q.    Okay.  Now, do you recall an incident that

19     took place on December 1st of 1993 in the area of

20     Paxton and E Street here in Toledo?

21     A.    Yes.

22     Q.    And tell us about that night.

23     A.    Well, I was -- we were planning on going out
```

1    that night, me and the person who I was going to

2    see and we pulled me and my brother turned -- came

3    down E, turned on Paxton, pulled up in front of

4    the house.  Now, the house is on the corner, it is

5    an old lady stay there, then the house I went to

6    is next to it, and right between those two houses

7    there was a body laying there and it was a big

8    boulder, a stone boulder that was laying somewhere

9    near her or whatever, but it looked like somebody

10   hit her with the boulder.

11            MR. WINGATE:   I would object.

12            THE COURT:    No, I'm going to allow the

13    question.

14   Q.    Go ahead, sir.  You said it looked like

15   what?

16   A.    It looked like somebody hit her with a

17   boulder.

18   Q.    Why do you say that?

19   A.    Because it was sitting -- it was right in

20   the area and it looked like it was blood on it or

21   whatever, but when I saw it, the body, I went -- I

22   was like, Oh, man, what the -- and the lady was on

23   the porch and she said, Well, what's going on, and

1      I said, I think you all need to call, you know,

2      911.

3              So, she went on in and called 911, I

4      guess, and then I went in the house to get Johnny

5      Ham and when I went in to get him to go out, by

6      the time we come out to the door, the police was

7      everywhere and they were asking, you know, what

8      happened and blah, blah, blah, and I said -- well,

9      I told them, you know, what I --

10     Q.    Let's back up for just a second.  You said

11     you were going out that night?

12     A.    Yes.

13     Q.    Do you remember who you were going out with

14     that night?

15     A.    I believe it was me, my brother, and Johnny

16     Ham.

17     Q.    And what's your brother's name?

18     A.    Charles.

19     Q.    Okay.  And were you walking, were you

20     driving, were you riding bikes, what were you

21     doing?

22     A.    I was driving a Bonneville.

23     Q.    Okay.  Were you driving?

1     A.     Yes.

2     Q.     And when you pulled up to that area, where

3     did you stop?

4     A.     Right in front of the second house.

5     Q.     And who were you going to visit in that

6     second house, if you recall?

7     A.     Johnny Ham.

8     Q.     Okay.  Now, you got out of the car, you said

9     you saw a boulder and someone on the sidewalk; is

10    that correct?

11    A.     Right.

12    Q.     Can you describe that person on the

13    sidewalk?

14    A.     It was a white female.  I think she was a

15    little petite and I think she had some glasses or

16    something.  I don't know.  But she had blond hair,

17    she was a small body woman.

18    Q.     Okay.  And what was her physical description

19    at this point, was she standing, sitting, laying?

20    A.     She was laying.  Laid out on the cement.

21    Q.     And did she appear to be injured?

22    A.     Yes.

23    Q.     And why do you say that, how?

1    A.    There was blood.

2    Q.    Where was the blood?

3    A.    It was -- it looked like it was oozing out

4    of -- coming out from her head area to me.

5    Q.    And did you at that point try to revive her

6    or do anything or did you see the woman and say,

7    Call 911?

8    A.    No.  I just seen the woman, you know, just

9    tried to do the right thing and tell her to call

10   911, you know.  You know, you see somebody laying

11   down, you know, hurt, first instinct is to try and

12   get some help to them or whatever.

13   Q.    Now, back in 1993, were you working back

14   then?

15   A.    Was I working?  I don't think I was.

16   Q.    Okay.  Do you remember that night, were you

17   guys partying, what were you doing prior to coming

18   upon this woman on the sidewalk?

19   A.    I don't know.  I think I was over at my

20   aunt's house, which who I was living on Russell

21   Street.

22   Q.    And so had you been drinking, doing anything

23   over there?

```
1    A.    No.

2    Q.    So you're clear as to what you saw that

3    night?

4    A.    Yes.

5    Q.    And you indicated that you went up to your

6    buddy's house the next house over, right?

7    A.    Right.

8    Q.    By the time you came out, the police were

9    there?

10   A.    Right.

11   Q.    Did you talk to the police?

12   A.    Yes.

13   Q.    Do you remember giving them a statement or

14   did you just tell them?

15   A.    Yes, same sort of -- same statement I just

16   gave basically.

17   Q.    Basically the same thing?  And did you see

18   who did this to the woman laying on the sidewalk?

19   A.    No.

20   Q.    And just one last question, this is 15 years

21   ago, right, I mean, 1993?  How do you remember

22   that night in particular?

23   A.    Well, anytime something that's major as a
```

```
 1      human being laying there dead or hurt or something

 2      like that, major, you have a tendency to kind of

 3      remember that type of thing, you know.  It is a --

 4      it was a tragedy, you know, so -- but, you know,

 5      like to put it all in perspective to remember

 6      something, you know, of 15 years ago, you have to

 7      really jog your memory and work it out, that's

 8      what I just, you know --

 9      Q.    This is what you remember?

10      A.    Yeah.

11            MR. LOISEL:    Thank you, sir.  Nothing

12       further.

13            THE WITNESS:   Okay.

14            THE COURT:    Just a minute.  Cross?

15            MR. WINGATE:   Yes, would like to

16       approach for the 16(B)(1)(g) motion.

17            (WHEREUPON THE FOLLOWING DISCUSSION WAS

18       HELD AT THE BENCH.)

19            MR. LOISEL:    Judge, there are

20       inconsistencies but these reports were gone over

21       with the Defense Attorney on Friday and he took

22       notes on what these inconsistencies are, so he's

23       aware of what the inconsistencies are.
```

1          THE COURT:     You seen the statement?

2          MR. WINGATE:   I'm sorry?

3          THE COURT:     Have you seen the

4     statement?

5          MR. WINGATE:   I have two statements

6     purportedly from him and this one I would like to

7     see again.

8          MR. LOISEL:    I showed it to you.  You

9     looked at it on Friday.

10          MR. WINGATE:   Mike, I can see it again

11     today.  There is no problem.  I made a motion.

12          MR. LOISEL:    And you're aware of the

13     inconsistencies.  This is my one copy of the

14     report.  I can go make a copy.

15          MR. WINGATE:   I don't need to have it.

16     I can just look at it.  You can give it to the

17     Court and then --

18          MR. LOISEL:    Well, which date, what

19     report, 11-9-06?

20          MR. WINGATE:   '06, yes.

21          MR. LOISEL:    Judge, if I may, if we're

22     going to do this, I don't want to have the jury

23     see me handing them reports because it makes me

1    look like I'm trying to hide something and he's

2    already seen this report, and now going over it

3    like there's some big conspiracy.

4         MR. WINGATE:   Okay.  And Your Honor,

5    I'll indicate there were some inconsistencies in

6    the statement shown to us by the State of Ohio.

7         THE COURT:    Well, you can

8    cross-examine.

9         MR. LOISEL:   Judge, want to address how

10   we're going to do -- if this is going to happen

11   in the future, I don't know, I mean --

12        THE COURT:    Let's get done with this

13   witness and then we'll talk about it.

14        MR. LOISEL:   Very well.

15        (WHEREUPON THE PRECEDING DISCUSSION AT

16   THE BENCH CONCLUDED AND THE FOLLOWING PROCEEDINGS

17   WERE HELD.)

18                  -  -  -

19              CROSS-EXAMINATION

20   BY MR. WINGATE:

21   Q.   Mr. Craig, you told the Prosecutor that when

22   you arrived over on Paxton and E Street that you

23   believed you were going to see Johnny Ham?

1     A.     Yes.

2     Q.     And that's who's house you were going to?

3     A.     Yes.

4     Q.     All right.  And you did go into that house?

5     A.     Yes.

6     Q.     And you two left with your brother coming

7     out?

8     A.     Well, we were -- we came out the door, the

9     police was there by that time, you know, something

10    like that.  I guess they popped up and they were

11    all out there and so my car was in the front.

12           So in order for me to leave, they would

13    have to let me leave, but before I left, they

14    wanted -- they asked me what did I see and that's

15    what I told them on the statement, on the police

16    statement what I saw.

17    Q.     Now, when you talked to the police, you

18    tried to be as truthful as possible?

19    A.     Yes.

20    Q.     And to give them as much accurate

21    information as possible?

22    A.     Yes.

23    Q.     All right.  And as much detail as possible,

1    right?

2    A.    I would imagine so.

3    Q.    All right.  And you talked to the police

4    again; did you not?

5    A.    I believe I had a call or something like

6    that.  I don't. . .

7    Q.    You talked to this Detective right here?

8    A.    Uh-huh.

9    Q.    Did you come to the office?

10   A.    When?

11   Q.    When you talked to this Detective.

12   A.    I'm saying when.  Is there a date on that?

13   Q.    Yes.  November the 9th, 2006.

14   A.    Yes.

15   Q.    All right.  Yes, what?

16   A.    Yes, I think I did.

17   Q.    All right.  You came to his office?

18   A.    Yes, or on the phone or something, but we

19   talked.

20   Q.    Okay.  And at that time when you talked to

21   him, you were trying to be as truthful as

22   possible?

23   A.    Yes.

1    Q.    And tell him as much details as possible?

2    A.    Yes.

3    Q.    And as accurate as possible?

4    A.    Right.

5    Q.    All right.  And did you tell him that on the

6    night of December the 1st, 1993, that you were

7    inside the house with Scottie Burrell?

8    A.    That's his home.  That's why I said Scottie

9    Burrell, and at the time that he, in 2006, when he

10   popped that up at me, memory hadn't served me

11   correctly at that time.

12   Q.    Okay.

13   A.    Because it was so long ago.  I didn't really

14   think too much about the questioning of Detective

15   Burg about this case.

16   Q.    Detective Beavers.

17   A.    Beavers.

18   Q.    I understand all that, but you're not

19   listening to my question.

20   A.    Okay.

21   Q.    My question is did you tell him at that time

22   that you were inside a house with Scottie Burrell.

23   That's what I'm asking.

1     A.     I may have.

2     Q.     All right.

3     A.     Because, like I said, Scottie was the owner

4     of the home, and --

5     Q.     All right.

6     A.     -- and so much going on.

7     Q.     Right.  But you didn't say I was inside a

8     home owned by Scottie Burrell.  You said I was

9     inside a house with Scottie Burrell is what you

10    told him.

11    A.     I may have.

12    Q.     All right.  You then also told him, or did

13    you tell him that you walked outside and then saw

14    a female lying on the ground --

15    A.     Uh-huh.

16    Q.     -- with a large rock next to her?  Did you

17    tell him that?

18    A.     I may have, but go ahead.

19    Q.     Just hold on.

20    A.     Okay.

21    Q.     Now, as it relates to this time now, you're

22    saying -- or you just told this Prosecutor and you

23    told me that, you know, sometimes the memory fades

1    and you may not remember as well; do you recall

2    telling -- you have to answer.

3    A.    Oh, yes.

4    Q.    All right.  So when you say that, you said

5    one thing back in December the 1st of '93.  You

6    made another statement November 9th of 2006,

7    correct?

8    A.    Yes.

9    Q.    All right.  And you're now going back to the

10   first statement that you said, what you told the

11   Prosecutor?

12   A.    Right.

13   Q.    You came back to your first statement?

14   A.    Right.

15   Q.    Did you then have an opportunity to review

16   your statement?

17   A.    No.  I had the opportunity to review my

18   memory though.

19   Q.    Okay.  So you didn't review it when you went

20   to talk to the detective in November?

21   A.    No, not at that time because, like I said, I

22   wasn't that interested in trying to review my

23   memory on this case, because it wasn't -- it

```
1    wasn't -- I wasn't involved in it, so it wasn't no

2    big thing to me about trying to remember

3    everything.

4              So, when he came to me on that second

5    interview, I was just --

6    Q.    Telling him anything?

7    A.    Well, I was just answering as much as I

8    could to my -- the best of my recollection at that

9    time, but after I sat up and I thought about all

10   from that -- put the pieces together, all that --

11   Q.    Uh-huh.

12   A.    -- about my night and all that and

13   everything and the statement on the 9th on -- what

14   year was that?

15   Q.    '93.

16   A.    '93 would be the correct statement.

17   Q.    Okay.  And I just want to know this:  After

18   you sat back and reflected on this and jogged your

19   memory.  All right?

20   A.    Uh-huh.

21   Q.    And this after the statement in November of

22   2006, did you call this detective and say, Hey,

23   the stuff I told you about Scottie Burrell and
```

```
1    being in the house and walking out and seeing this

2    stuff is not right; did you do that?

3    A.    I didn't see that statement.  I don't even

4    remember, like I said, saying that to him like

5    you're putting it down on that second statement,

6    but I didn't call him, if that's the answer you

7    were --

8    Q.    Right.  That's the answer.  That was my

9    question.  After you told him what you told him on

10   November the 6th, you realized, like you said, you

11   didn't put any significance to it but you knew it

12   was different than what you said in '03, right --

13   I'm sorry -- '93?

14   A.    Like I said, after like, after I put my mind

15   and got to thinking about, because it was a long

16   time ago, you know, so much things happening in my

17   life, you know, I've been to jail, all that, and

18   work, and out of town, you know.  So that's

19   basically -- that first statement is basically my

20   what happened.

21   Q.    Right.

22             MR. WINGATE:   And may we approach?

23             THE COURT:     Sure.
```

1          (WHEREUPON THE FOLLOWING DISCUSSION WAS

2      HELD AT THE BENCH.)

3          MR. WINGATE:   I would indicate for the

4      record that we filed a motion for exculpatory and

5      impeachment materials as it relates to witnesses

6      pursuant to the rules of discovery.  This witness

7      has just indicated from the witness stand that he

8      has been incarcerated.  We have no idea for what

9      and I would like the record to reflect that we

10     were never provided that information by the State

11     of Ohio.

12         MR. LOISEL:    That's correct.  I can go

13     get a record run of this individual, if

14     Mr. Wingate wants it.  At this point I don't

15     think it is consequential to his testimony, but I

16     would be happy to provide that.

17         THE COURT:    Do you want to recall?

18         MR. LOISEL:    I don't have any questions

19     for him.  I can provide the record for him.

20     Well, it doesn't matter what I think.  I don't

21     know what it's going to show.

22         MR. WINGATE:  We would like to have the

23     prior record history, but we would also like the

1     right to recall him if necessary.

2              THE COURT:    I would give you the right

3     to recall.

4              MR. WINGATE:   All right.

5              (WHEREUPON THE PRECEDING DISCUSSION AT

6     THE BENCH CONCLUDED AND THE FOLLOWING PROCEEDINGS

7     WERE HELD.)

8              THE COURT:    Anything else?

9              MR. WINGATE:   Just one second.  No

10    further questions.

11             THE COURT:    Any redirect?

12             MR. LOISEL:    No, Judge.  Thank you.

13             THE COURT:    You're excused.  Thank you

14    very much.  Your next witness?

15             MR. LOISEL:    At this time the State of

16    Ohio calls Joe Niemiec, Sergeant Joe Niemiec.

17             THE COURT:    Call Joe Niemiec.

18                          -  -  -

19             SERGEANT JOSEPH NIEMIEC,

20    being first duly sworn by the Court, testified as

21    follows:

22             MR. WINGATE:   Can we approach?

23             THE COURT:    Would you give us your

1        name and spelling of your name, please?

2                THE WITNESS:   Joseph, first name.  Last

3        name Niemiec, N as in Nancy, I-E-M as in Mary,

4        I-E-C as in Charles.

5                THE COURT:     Thank you.

6                MR. WINGATE:   Your Honor, could we

7        approach for a second?

8                THE COURT:    Yeah.

9                (WHEREUPON THE FOLLOWING DISCUSSION WAS

10       HELD AT THE BENCH.)

11               MR. WINGATE:   The deputy has indicated

12       that Juror Number 2 was trying to get our

13       attention and no one has paid any attention.  I

14       don't know what they want, but the deputy sheriff

15       indicated that Juror Number 2 has been trying to

16       get the attention of the parties.

17               MR. MCELROY:   He has been looking toward

18       this way.

19               (WHEREUPON THE PRECEDING DISCUSSION AT

20       THE BENCH CONCLUDED AND THE FOLLOWING PROCEEDINGS

21       WERE HELD.)

22               THE COURT:     Mr. Montague.

23               MR. MONTAGUE:  Before we start this,

1      could I use the bathroom?

2              THE COURT:    Yeah.  Let's take a five

3      minute recess.  Don't discuss the case, neither

4      form or express an opinion about the case.  Let's

5      take five minutes.

6                      (RECESS TAKEN.)

7              MR. LOISEL:    Judge, may we approach?

8              THE COURT:    Sure.

9              (WHEREUPON THE FOLLOWING DISCUSSION WAS

10     HELD AT THE BENCH.)

11             MR. LOISEL:    Judge, now that the jury

12     is wanting to take a break, I wanted to see if we

13     could address the issue with respect to

14     Mr. Wingate asking the State for reports.  I know

15     he's not doing it -- I don't think he's doing it

16     with any malice.

17             MR. WINGATE:   No.

18             MR. LOISEL:    I know he has looked at

19     these reports and was able to take notes on these

20     reports, however, the appearance of me handing

21     him a report up here at the bench when we're

22     calling a witness may be negative from the jury,

23     so I was wondering if the Court could guide us as

1      to how you want to proceed if, in fact, he wants

2      to look at these reports that he's already seen

3      and taken notes.

4           MR. WINGATE:   The thing is this, Judge,

5      and from Defense standpoint normally the State

6      would provide copies, but that policy is over.

7      Yes, I take notes, but they are not verbatim

8      notes.  That is my reason for asking the

9      Prosecutor to let me see the notes.

10          THE COURT:    Well, the way the rule is

11     supposed to go is after the testimony, I'm

12     supposed to look at it, and I've never really

13     liked that rule because I don't know what -- you

14     guys know the case a lot better than I do and I

15     don't know what's inconsistent and what's not.

16          MR. WINGATE:   Right.

17          THE COURT:    The better rule is to have

18     modified open discovery and see where it is.  You

19     want to take a recess before or at the end of

20     each witness's testimony, how do you want to do

21     it?

22          MR. LOISEL:   I don't necessarily want

23     to take a recess, but I don't know.  I just have

1        one copy and my trial notebook, and to hand that

2        over up here, as I said, I think it looks strange

3        to the jury and they -- I don't want to give them

4        any other thoughts.  They are supposed to be

5        concentrating on the evidence, not me handing a

6        paper to the attorney at the bench.  If we have

7        an opportunity during the next break, I can make

8        some copies so that I can hand them to the

9        Defense Attorney prior to.

10              THE COURT:    That would be preferable.

11              MR. WINGATE:   Yeah.

12              MR. LOISEL:    Or if he makes a motion.

13        I don't -- if there are inconsistencies,

14        obviously he's allowed to get those reports.  If

15        they are not, then we can deal with it at that

16        point.

17              MR. WINGATE:   Well --

18              MR. LOISEL:    Nine times out of ten, I'm

19        going to give him the report.

20              MR. WINGATE:   If that's the situation,

21        fine, but it is not so much if there are

22        inconsistencies.  I get to see the report and

23        argue whether or not there are inconsistencies.

```
1              MR. LOISEL:    No.  Technically the Judge

2         has to determine whether they are inconsistent.

3         And if I think --

4              MR. WINGATE:    Then he ultimately makes

5         the decision.

6              MR. LOISEL:    Right.

7              MR. WINGATE:    But the rule says upon a

8         motion 16(B)(1)(g) --

9              MR. LOISEL:    Right.

10             MR. WINGATE:    -- the Court will get the

11        statements --

12             MR. LOISEL:    Right.

13             MR. WINGATE:    -- reports, with

14        Defense Counsel participating, which --

15             MR. LOISEL:    With Defense Counsel and

16        the Prosecutor participating, and if the Court

17        determines that there is an inconsistent

18        statement, then you are allowed to have the

19        statement.  No, you do not participate in the

20        actual --

21             MR. WINGATE:    Yes.

22             MR. LOISEL:    I have the rule right

23        there.
```

1          MR. WINGATE:    But you just heard the

2      Judge say how would he know.  We know the case

3      better, how would he know of any inconsistencies.

4          MR. LOISEL:    You can ask the Judge when

5      he's reviewing the report as to whether or not he

6      would have just heard the testimony from the

7      witness.  You can say, Judge, I think this is

8      inconsistent.

9          MR. WINGATE:    How would I know if you

10     don't give me the reports?

11         MR. LOISEL:    Then --

12         MR. WINGATE:    I should see the report.

13         MR. LOISEL:    The Judge is the one --

14         THE COURT:    I've heard this argument

15     before.

16         MR. LOISEL:    Judge, as I said, I'll

17     make copies.  If I know that there are

18     inconsistencies and I don't disagree, I'll hand

19     them over.  If I don't think there are

20     inconsistencies, then he's not, according to the

21     rules, allowed to have the reports until the

22     Court determines whether or not they are

23     inconsistent.

1          MR. WINGATE:   Then to make sure that my

2     client gets his right to effective assistance of

3     counsel on every witness, I'll make a 16(B)(1)(g)

4     motion and we'll come up here and make a

5     determination.  I don't think you have a right to

6     decide whether or not there are inconsistencies

7     to the --

8          THE COURT:    I've never liked the rule,

9     but the --

10         MR. LOISEL:    The rule states --

11         MR. WINGATE:   Let's look at the rule

12    again.

13         MR. LOISEL:    I can get it right now.

14         MR. WINGATE:   I know the 30 years of the

15    interpretation of the rule wasn't that the

16    Prosecutor determines whether there are

17    inconsistencies.

18         THE COURT:    I was a Defense Attorney,

19    I know.

20         MR. LOISEL:   16(B)(1)(g) indicates in

21    camera inspection of a witness' statement.  Upon

22    completion of a witness's direct examination at

23    trial, the Court on motion of the defendant shall

1 conduct an in camera inspection of the witness'

2 written or recorded statement with the

3 defense attorney and prosecutor present and

4 participating, to determine the existence of

5 inconsistencies, if any, between the testimony of

6 such witness and the prior statement.

7   If the Court determines that there are

8 inconsistencies exist, the statement shall be

9 given to the Defense Attorney.

10   I'm not arguing that you aren't allowed

11 to be part of the process, but the Court is the

12 one that determines if there are inconsistent

13 statements.

14   MR. WINGATE:   I never disagreed with

15 that.

16   MR. LOISEL:   You are asking for the

17 statement prior to me -- the Judge determining if

18 there are inconsistencies and that's not the

19 proper procedure.

20   MR. WINGATE:   And it is not the proper

21 procedure that you decide whether there are

22 inconsistencies.

23   MR. LOISEL:   Yes, it is.  We give it to

1   the Court.

2          MR. WINGATE:   You're right, Mike.  Okay?

3   But the fact of the matter is, there is no

4   effective participation by Defense Counsel to

5   argue whether or not there are any

6   inconsistencies in the report if the Court looks

7   at it and Defense Counsel doesn't have an

8   opportunity to look at it.

9          MR. LOISEL:   I understand that.  Take

10  that up with the legislature.  That's the way the

11  rule reads.  Just because you don't like it,

12  doesn't mean it is wrong.  You understand what

13  I'm saying?

14         MR. WINGATE:   I understand what you're

15  saying.  You feel you're not going to give me a

16  report because you don't think there are any

17  inconsistencies, then I'm going to object, we'll

18  be at the counter -- at the bench, I'm sorry.

19         MR. LOISEL:   What started this whole

20  thing is I don't want to have to come up, and I

21  don't think it's proper in front of the jury for

22  me to be handing him reports up here because it

23  has the impression that the State is attempting

 1      to hide information from the Defense Counsel,

 2      when in all actuality he's looked at these

 3      reports and taken notes.  So, that's what my

 4      query is, how does the Court wish us to proceed.

 5          THE COURT:    We can stop, you know.  It

 6      is really going to affect the flow of the case,

 7      but you want to follow the rule, we will.

 8          MR. LOISEL:    Well, as I indicated, he

 9      can make his motion and the State feels there are

10      inconsistencies, of course I'll give him the

11      reports, but if the State doesn't, then have in

12      camera inspection and go through the proper

13      procedures I guess.

14          THE COURT:    All right.

15          MR. WINGATE:    All right.  Oh, I'm sorry.

16      Ancillary to that, we would renew our motion that

17      the entire file belonging to the Prosecutor be

18      made and placed under seal to be a part of the

19      record in this case.  If there's an appeal --

20      inasmuch as the State is going to determine there

21      are inconsistencies, I've had too many cases or

22      aware of too many cases that have been sent back

23      by the Appellate Court relative to the State not

124

1     providing information to Defense Counsel.  So, if

2     the State is going to take a line of reasoning,

3     then we would renew our motion and ask the Court

4     to reconsider having the State make a copy of its

5     entire file and placed under seal with the Court.

6          MR. LOISEL:    Judge, we've responded to

7     that motion.  I believe the Court has ruled on

8     that motion.  The State is not determining

9     whether there are inconsistent statements.  The

10    Judge will be determining that.  So, I would

11    like -- I mean, you misstated what would happen.

12         THE COURT:    Your motion is in the

13    record.

14         MR. WINGATE:    All right.

15         (WHEREUPON THE PRECEDING DISCUSSION AT

16    THE BENCH CONCLUDED AND THE FOLLOWING PROCEEDINGS

17    WERE HELD.)

18                    (RECESS TAKEN.)

19         THE COURT:    Mr. Loisel, you may

20    proceed.

21         MR. LOISEL:    Thank you, Judge.

22                    -   -   -

23

DIRECT EXAMINATION

  BY MR. LOISEL:

Q.    Good morning, Sergeant.  Could you introduce yourself to us, please?

A.    Sergeant Joseph Niemiec, Toledo Police Department.

Q.    And, Sergeant, obviously you're employed with the Toledo Police Department.  How long have you been a member of the Toledo Police?

A.    In about a week it will be 25 years.

Q.    25 years, congratulations.  Now, you're a sergeant.  Explain what your duties are presently.

A.    I'm a supervisor on the midnight shift.  If there is a question about how a patrolman should proceed, they call me.  If a major incident that needs coordination of more than two police units, they call me.  I have the same function as any other police officer on the street.  I can make arrests, I can write tickets, and in addition to that, I'm the officer supervisor.  If there is a complaint, I'll handle that.

Q.    Now, I guess I got ahead of myself.  25 years ago, can you explain to us what you did,

1      your education to become a police officer?

2      A.    Start High School class of '73; Bachelor's

3      Degree of Administration from the University of

4      Toledo, 1981.  I spent six months in the Police

5      Academy, worked with several senior officers,

6      learned how to be a policeman.

7      Q.    Is that when you joined the Toledo Police

8      Department?

9      A.    In 1983.

10     Q.    Okay.  Did you work in any other departments

11     prior to '83?

12     A.    No, sir.  I was a dock foreman.

13     Q.    All right.  Now, in 1983 -- have you always

14     been a sergeant?

15     A.    No.  I was promoted to sergeant 10 years

16     ago.

17     Q.    And prior to 10 years ago, what were your

18     duties?

19     A.    I was a patrol officer, uniformed patrol.  I

20     spent my entire career in uniform patrol.

21     Q.    Okay.  So, back in 1993, were you a

22     uniformed patrol officer?

23     A.    Yes, sir, I was.

1    Q.    And do you recall responding to an incident

2    on or about December 1st of 1993 in the area of

3    Paxton and E Street here in Toledo?

4    A.    Yes, sir.  I responded to a woman down with

5    my partner at the time, Robert Schroeder.  We

6    responded to a woman down at Paxton and E.  We

7    arrived about seven or eight minutes, thereabouts,

8    after we received the call.  Detective Phil Cashen

9    beat us there by about a minute according to the

10   call logs.  We found a woman lying on the sidewalk

11   at that location.  She looked to be bleeding from

12   head injury.  She was unresponsive.  We conducted

13   what investigation we could and I wrote the crime

14   report of that incident.

15   Q.    Now, when you say you responded to a woman

16   down, what does that mean when you hear "a woman

17   down"?

18   A.    It could be anything.  A woman down could be

19   anything from a street person taking a nap, to a

20   drunk who passed out, to a victim of a serious

21   crime.

22   Q.    In this particular case, it was the latter?

23   A.    Latter.  It appeared to be a victim of a

1    serious crime.  A woman was, as I said, lying on

2    the sidewalk, unresponsive, bleeding from what

3    appeared to be a head injury.  Near the body was a

4    rock that they -- that one of the detectives

5    found.

6              MR. WINGATE:   I will object as to what

7     any other detective did.

8              MR. LOISEL:   Your Honor --

9              THE COURT:    He can testify to what he

10    observed.

11   A.    A detective found and pointed out blood on a

12   rock.

13   Q.    Officer, did you see a rock at the scene?

14   A.    There were several.  The incident in

15   question happened right near the intersection of

16   Paxton and E.  The rocks were in a line diagonal

17   from the corner of the house to the street corner.

18   The easiest way to describe it to the jury is like

19   tank traps, so if a car couldn't cut the corner

20   too short, they would run over the rocks.  It is

21   like for keeping people off your lawn.  And one of

22   the rocks apparently was moved and had blood stain

23   on it.

1          MR. WINGATE:   Your Honor, I would

2      object.  That is speculation.

3          THE COURT:    I think it is allowable.

4      Overruled.

5      Q.    So you saw a rock, you saw a woman.  What

6      was the race of this woman?

7      A.    Caucasian.

8      Q.    And approximately do you remember her size?

9      A.    A small woman.

10     Q.    And you said she was unresponsive?

11     A.    Yes, sir.

12     Q.    And approximately how long did she remain at

13     the scene, if you recall?

14     A.    Time enough where we would get the fire

15     department there, a life squad there to pack her

16     up and get her gone.  Less than 20 minutes.

17     Q.    Do you recall the identity, or did you ever

18     learn the identity of a woman on the sidewalk?

19     A.    Brenda Navarre.

20     Q.    And do you know what happened to

21     Brenda Navarre?

22     A.    I was told --

23         MR. WINGATE:   I will object.

1          THE COURT:     Yeah, that wasn't the

2     question.  Sustained.

3     Q.    Do you know what happened to Brenda Navarre?

4     A.    She died.

5          MR. WINGATE:   Your Honor, I will object

6     unless he knows from his personal observation,

7     not what someone told him.

8          MR. LOISEL:    The question was do you

9     know what happened.

10         THE COURT:     I'm going to allow it.

11    Overrule it.

12    Q.    Now, did you -- upon your arrival you said

13    Detective Cashen beat you by about a minute?

14    A.    Yes, sir.

15    Q.    Now, once you arrived, did you see anyone

16    else at the scene?

17    A.    There were the people I talked to, I talked

18    to a Mr. Sandifer and I talked to a Mr. Craig.

19    Mr. Sandifer lived at the second house off the

20    corner, 1229 Paxton.  Mr. Craig was coming to

21    visit Mr. Sandifer and he was the one who

22    discovered the woman on the sidewalk and had

23    Mr. Sandifer call us.

1          MR. WINGATE:   Objection.  Your Honor,

2     this is well beyond him testifying what Mr. Craig

3     was going to do or what Mr. Sandifer was going to

4     do.  That is nothing -- that is impermissible.

5     May we approach?

6          MR. LOISEL:   Judge, what's the

7     objection?

8          MR. WINGATE:   I'll tell him at the

9     bench.  I don't want to argue in front of the

10     jury.

11          THE COURT:   I'm going to allow it.

12     This is relevant background information at this

13     point.  You'll have an opportunity to certainly

14     on cross-examination.  Overruled.

15  Q.   So you talked to a couple of witnesses at

16  the scene?

17  A.   Yes, sir.

18  Q.   And you made a report with respect to that?

19  A.   Yes, sir.

20  Q.   And what, if anything, else did you do at

21  the scene that night?

22  A.   Assisted whatever -- it was 15 years ago.

23  And my memory isn't perfect.  If the detectives

132

1    wanted me to do anything, talk to anyone, see

2    anything, do anything, after the detectives arrive

3    on the scene, they are in charge, and I'm their

4    servant and I do what I'm told and if they said

5    hold the flashlight here, measure this, do that,

6    that's what I do.

7    Q.    So --

8    A.    And --

9    Q.    Once detectives get on the scene, you kind

10   of take orders at least back in 1993 that were

11   your duties, correct?

12   A.    Yes, sir, even a sergeant, after a detective

13   gets on the scene, he's still in charge.

14         MR. LOISEL:    Judge, may I approach the

15    witness?

16         THE COURT:    All right.  Use numbers

17    for State's exhibits and letters for Defendant's

18    exhibits.

19   Q.    Sergeant, I'm going to hand you what's been

20   marked as State's Exhibit 1.  Can you take that

21   look at that for me?

22   A.    Yes, sir.

23   Q.    Now, is that picture familiar to you?

133

1    A.    Yes, sir.  It is what we refer to as the

2    crime scene.

3    Q.    What does that picture show?

4    A.    It shows a blood stain on the sidewalk.  It

5    shows a rock near the blood stain.  It shows other

6    rocks in proximity to the house in the diagonal

7    pattern that I tried to talk about.  The only

8    thing I could tell you that you can't tell from

9    the picture is --

10          MR. WINGATE:    I will object to you

11     showing the picture to the jury.

12   A.    The only thing I can tell you --

13          THE COURT:    Qualify.

14   A.    Only thing you can't tell from the picture

15   is the distance from the sidewalk to the house is

16   probably less than 15 feet.  It's a relatively

17   small area.  It's close to the houses.

18   Q.    Everything is in close proximity?

19   A.    Yes.

20   Q.    And you described earlier you said like the

21   rocks just so the cars don't drive up on the lawn.

22   Does that picture accurately reflect the scene as

23   you remember it back in 1993?

1      A.     Yes, sir.

2             MR. LOISEL:     Thank you, Sergeant.

3       Nothing further.

4             THE COURT:     Cross.

5                           -   -   -

6                           CROSS-EXAMINATION

7       BY MR. WINGATE:

8      Q.     Sergeant Niemiec, do you know what time you

9      arrived at that scene?  I know you told the

10     Prosecutor seven eight minutes after you had

11     gotten the call.

12     A.     According to my report, the call came in at

13     2:02.  I believe the report states that I arrived

14     at 2:09.

15     Q.     Okay.

16     A.     2:08 because Phil Cashen arrived at 2:07 and

17     I was one minute later.

18     Q.     All right.

19            MR. LOISEL:     Judge, is that a.m. or

20      p.m.?

21            THE COURT:     That would be a.m.

22            MR. LOISEL:     Thank you.

23            MR. WINGATE:   No questions.  No further

1    questions.

2            THE COURT:     Officer, you are excused.

3    Thank you.  Who is your next witness?

4            MR. LOISEL:     Judge, can we approach on

5    the scheduling matter?

6            THE COURT:     Sure.

7            (WHEREUPON A DISCUSSION AT THE BENCH WAS

8    HELD OFF THE RECORD.)

9            MR. LOISEL:     State of Ohio calls Odetta

10   Scott.  They're bringing her down right now,

11   Judge.

12                        -   -   -

13                   ODETTA SCOTT,

14   being first duly sworn by the Court, testified as

15   follows:

16           THE COURT:     Give us your name and a

17   spelling of your name, please.

18           THE WITNESS:    Odetta Scott, O-D-E-T-T-A,

19   S-C-O-T-T, O-D-E-T-T-A, S-C-O-T-T.

20           THE COURT:     Thank you.

21                        -   -   -

22

23                   DIRECT EXAMINATION

1      BY MR. LOISEL:

2      Q.    Good morning, Ms. Scott.

3      A.    Good morning.

4      Q.    Ms. Scott, do you live here in Toledo?

5      A.    Yes.

6      Q.    And how long have you lived here?

7      A.    All my life.

8      Q.    And I know this is a dangerous question, but

9      how old are you?

10     A.    47.

11     Q.    So you've been here 47 years?

12     A.    Yes.

13     Q.    Now, where do you live presently?

14     A.    1834 Westland Gardens, Apartment 201.

15     Q.    And how long have you lived at that address?

16     A.    17 years.

17     Q.    So back in 1993 were you living at that

18     address?

19     A.    No, I wasn't.

20     Q.    Where were you living back in 1993; do you

21     remember?

22     A.    1115 Saint John.

23     Q.    1115 --

1    A.    Saint John.

2    Q.    -- Saint John?  That's here in Toledo,

3    right?

4    A.    Yes.

5    Q.    Now, do you remember an incident in December

6    of 1993 on Paxton and E Street in Toledo?

7    A.    Well, yes, it was late.

8    Q.    When you say late, what do you mean, in the

9    day?

10   A.    It was at night.

11   Q.    Okay.  So it was at night?

12   A.    Yes.

13   Q.    And tell us about what you remember from

14   that area on that night.

15   A.    I remember somebody arguing.  Me and my

16   friend was at -- me and my friend was out.

17   Q.    So you and your friend were out and you said

18   you heard someone arguing.  And where were you an

19   your friend when you heard this arguing?

20   A.    We were on Paxton.

21   Q.    And describe the argument.  What did you

22   hear?

23   A.    Cussing, B words.

```
 1              MR. WINGATE:   I'm sorry.  Could you keep

 2       you were voice up?  I can't hear you.

 3    A.     Oh, hearing B words.

 4    Q.     What do you mean when you say B words?

 5    A.     Bitch.

 6    Q.     Anything else, did you hear anything else?

 7    A.     They told us to get away.

 8    Q.     Now, you heard arguing.  Describe voices

 9    that were arguing.

10    A.     It was a lady and a man.

11    Q.     Could you tell the race of either the lady

12    or man by their voices?

13    A.     I think she was white he was black.  I

14    didn't see no faces.

15    Q.     Did you see any people where the argument

16    was coming from?

17    A.     Yeah, at a glance because I had been

18    drinking that night.

19    Q.     Okay.  But you did happen to see the people

20    that were arguing?

21    A.     I didn't actually see their faces, but I

22    heard it, me and her heard it.

23    Q.     Okay.  And you said you heard cussing and
```

1    the B word, and then what else did you hear?

2    A.    That's it.  We ran.

3    Q.    You said you heard someone say get out of

4    here?

5    A.    That --

6          MR. WINGATE:   Your Honor, I'm going to

7     object to the leading nature of the question.

8          THE COURT:    Sustained.

9    Q.    What else did you hear?

10   A.    Said go.  We ran.

11   Q.    Now, which individual, the male or female

12   said go?

13   A.    The male.

14   Q.    And you said -- I just want to make sure

15   we're clear -- you said it was a black male

16   voice --

17   A.    Yes.

18   Q.    -- and a white female voice?

19   A.    Yes.

20   Q.    Now, when you look, you said you glanced in

21   that direction, is that what you saw or do you not

22   remember?

23   A.    Vaguely.  I don't remember.  It's been so

1    long ago.

2    Q.    Okay.  Now, if I handed you a report of a

3    statement that you gave an officer back in 1993,

4    would that refresh your recollection?

5    A.    It might refresh my recollection, but

6    whatever I said or not, that's what it is.

7              MR. LOISEL:    Judge, can I approach?

8              THE COURT:    This is a case of past

9     recollection recorded; is that --

10             MR. LOISEL:    Yes, Your Honor.

11             MR. WINGATE:    May we approach?

12             THE COURT:    Sure.

13             (WHEREUPON THE FOLLOWING DISCUSSION WAS

14     HELD AT THE BENCH.)

15             MR. WINGATE:    You said you were going to

16     give her what?

17             THE COURT:    Wants to give her her

18     statement to refresh her recollection.

19             MR. WINGATE:    I just want to be sure

20     that it is not a police report narrative, and if

21     he's called a statement, I want to know whether

22     or not she's adopted it as a statement, because

23     I've had 20 arguments from the State of Ohio that

1    say if a police summary of what he said, and if

2    I'm not mistaken, in order for it to be a

3    statement of a particular witness, it has to be

4    that person's own statement and either she

5    adopted it or she authored it.

6              THE COURT:    That's right.

7              MR. WINGATE:   And if she did not do

8    that, then that is not her statement.

9              MR. LOISEL:    Judge, the report

10   indicates --

11             MR. WINGATE:   I would object.

12             MR. LOISEL:    The report indicates that

13   Odett states, and then it goes into her

14   statement.  I don't know what else the Court

15   wants from the report.  It says Odett states the

16   man reached up and picked up a rock and dropped

17   it.  That's her statement.  It says interview of

18   Odett Scott.

19             MR. WINGATE:   But she --

20             MR. MCELROY:   But she has to author or

21   adopt.

22             MR. LOISEL:    She can look at it.

23             THE COURT:    She can look at it and she

1    cannot testify -- she cannot read it.  She can --

2    she can't read it out loud.  She can read it and

3    then she can -- you can ask her questions.

4              MR. LOISEL:    Okay.

5              THE COURT:    If she says it refreshes

6    her recollection.

7              MR. LOISEL:    And, in fact, it is her

8    statement.  That's I think what they're trying to

9    make their point.

10             MR. WINGATE:    If it is, in fact, a

11   statement.

12             (WHEREUPON THE PRECEDING DISCUSSION AT

13   THE BENCH CONCLUDED AND THE FOLLOWING PROCEEDINGS

14   WERE HELD.)

15   BY MR. LOISEL:

16   Q.    Now, ma'am, do you remember making a

17   statement to the police back in '93?

18   A.    You showed me that yesterday.  I remember

19   saying that statement but, like I said, I didn't

20   see no faces.

21   Q.    But have you had an opportunity to look at

22   that statement, it would help refresh your

23   recollection of what you said, correct?

143

1     A.     I already looked at it yesterday.  It is not

2     going to change.

3     Q.     Okay.  Now, with respect to that statement,

4     what else do you remember from being at that

5     scene?

6     A.     That's it.

7     Q.     Well, you said the man said get out of here?

8     A.     We left, we ran.

9          MR. WINGATE:   Your Honor, I will object.

10    She said the man said go.

11         MR. LOISEL:   Fine.  I'll rephrase it.

12    The man said go.  Is that the only thing you

13    heard the man say?

14    A.     Yeah, we ran.

15    Q.     And where did you go?

16    A.     To 1115 Saint John.

17    Q.     Is that back to where you were living?

18    A.     Yes.

19    Q.     Now, did you ever find out what happened

20    that night with respect to the argument that you

21    heard?

22    A.     Did I ever find out what happened?

23    Q.     Yes.

1    A.    No.

2    Q.    Now, with respect to the argument, did you

3    see -- what did you see?  Describe to us what you

4    saw when you glanced over there.

5    A.    I just saw people.  I really couldn't see.

6    It was dark outside.  It was like 3:00 o'clock in

7    the morning.

8    Q.    I understand that.  But I just want you to

9    describe to us what you saw.  I understand it was

10   dark out.

11          MR. WINGATE:  Your Honor, I'm going to

12    object as to being asked and answered.  She said

13    she didn't see.

14   A.    I couldn't see.  It was dark and I was very

15   intoxicated.

16   Q.    Okay.  Did you see anything?

17          MR. WINGATE:   Your Honor, I will object

18    as to asked and answered.

19   A.    No, I'm sorry.

20   Q.    And when you got back to Saint John's, what

21   did you do?

22   A.    What did I do?

23   Q.    Yes.

```
1      A.    I went to bed.

2      Q.    I'm sorry?

3      A.    I went to bed.

4            MR. LOISEL:    Okay.  Thank you, ma'am.

5      Nothing further.

6            THE COURT:    Any cross?

7            MR. WINGATE:  Yes 16(B)(1)(g).  May we

8      approach?

9            (WHEREUPON THE FOLLOWING DISCUSSION WAS

10     HELD AT THE BENCH.)

11           THE COURT:    Want to take a recess?

12           MR. LOISEL:   I'm sorry, Judge?

13           THE COURT:    Do you want to take a

14     recess so we can look at the statement?

15           MR. LOISEL:   This is another statement

16     that he's already had an opportunity to take a

17     look at it.  I don't care.  He can look.  There

18     are inconsistencies.

19           MR. WINGATE:  I'm sorry, there are what?

20           MR. LOISEL:   There are inconsistencies,

21     but this is what I'm trying to avoid is me

22     handing him reports at the bench.

23           THE COURT:    That's what I'm saying.
```

146

1    Take a recess if you want.

2         MR. LOISEL:    Well, it's already here.

3    I'll go back and give him a blank copy.

4         THE COURT:    All right.

5         (WHEREUPON THE PRECEDING DISCUSSION AT

6    THE BENCH CONCLUDED AND THE FOLLOWING PROCEEDINGS

7    WERE HELD.)

8                        -  -  -

9                 CROSS-EXAMINATION

10   BY MR. WINGATE:

11   Q.   Ms. Scott, I really just have one question I

12   want to ask you, and it is relative to the Paxton

13   and E Street area where you were in.  Okay?

14   A.    Yes.

15   Q.    And the question is this:  Were you at that

16   time in 1993 going to the dope house of Scottie

17   Burrell, and you're not charged with anything,

18   you're not going to be charged with anything.  We

19   just want to --

20         MR. LOISEL:    Objection, Your Honor,

21    irrelevant.

22         THE COURT:    It is assuming a fact not

23    in evidence at this point.

1           MR. WINGATE:   No.  It.  All right.  I'll

2      do it a different way.

3      Q.    Do you recall telling a detective that you

4      were going to the dope house of Scottie Burrell on

5      Paxton; do you recall telling him that?

6      A.    No, I don't.  I do not recall using no

7      names.

8      Q.    Okay.  You may have said you were going to a

9      dope house, you just didn't use the name; would

10     that be fair?

11          MR. LOISEL:   Objection, Your Honor.

12          THE COURT:   Sustained.

13     Q.    Do you recall saying that you were going to

14     a dope house but not mentioning a name?

15     A.    Vaguely, yes.

16     Q.    Okay.

17          MR. WINGATE:   Thank you very much, no

18      further questions.

19          THE COURT:   Any redirect?

20          MR. LOISEL:   Can I just have a moment,

21      Judge, please?

22                         -  -  -

23                   REDIRECT EXAMINATION

1      BY MR. LOISEL:

2      Q.    Ms. Scott, the Defense Attorney asked you if

3      you recall telling the detective that you were

4      going to the dope house, right?  Do you remember

5      he just asked you that question?

6      A.    Did he just ask me that question?

7      Q.    Correct.

8      A.    Yes, he did.

9      Q.    Do you recall telling the detective anything

10     else?

11     A.    It's been too long ago.

12     Q.    So you don't recall, or it's been too long?

13     A.    It's been too long, period.

14     Q.    What's been too long?

15     A.    For the incident that happened.  I mean, I

16     don't know what I told.  Whatever I said, whatever

17     you got is best with me.  That's what -- I don't

18     know nothing else.  That's -- I was very

19     intoxicated and I was high.

20            MR. LOISEL:    Judge, at this point,

21      again, I would ask that this witness review her

22      statement to refresh her recollection.

23            MR. WINGATE:   And, Your Honor, we would

1    object.  She's -- may we approach?

2              (WHEREUPON THE FOLLOWING DISCUSSION WAS

3    HELD AT THE BENCH.)

4              MR. WINGATE:   Your Honor, to get to the

5    point, he asked her on direct examination would

6    it refresh her recollection.  She said no.  She

7    said she had looked at it yesterday.  She didn't

8    recall.  He's repeating the question and it is

9    outside the scope of redirect examination because

10   I only asked one question.

11             MR. LOISEL:   Judge, his question he

12   asked this witness was does she recall talking to

13   a detective and did she go to a dope house.

14             MR. WINGATE:   That was one specific

15   question.

16             MR. LOISEL:   And it revolves around

17   what she told the detective.  She just indicated

18   I said what I said to the cops back then.  I

19   think that it is fair game for the State to ask

20   her if her statement refreshes her recollection.

21             THE COURT:    She's -- her testimony

22   stands.  She doesn't recall what happened that

23   night.  Let's go with that.

1          (WHEREUPON THE PRECEDING DISCUSSION AT

2     THE BENCH CONCLUDED AND THE FOLLOWING PROCEEDINGS

3     WERE HELD.)

4          MR. LOISEL:     Thank you, ma'am.  Nothing

5     further.

6          THE COURT:     You may step down.  Who is

7     your next witness?

8          MR. LOISEL:     Judge, can we approach?

9          (WHEREUPON A DISCUSSION AT THE BENCH WAS

10    HELD OFF THE RECORD.)

11         THE COURT:     We're going to take the

12    noon recess.  We have some other scheduling

13    matters that we need to address, so we'll have

14    you back here at 2:00 o'clock.  Do not discuss

15    this case among yourselves, nor with anyone else.

16    Do not allow anyone to discuss the case in your

17    presence.  Neither form or express an opinion

18    about the case until the case has been submitted

19    to you.  See you back here at 2:00 o'clock.  In

20    recess.

21               (LUNCH RECESS TAKEN.)

22          (WHEREUPON THE FOLLOWING DISCUSSION WAS

23    HELD OUTSIDE THE PRESENCE OF THE JURY.)

1            THE COURT:    Next witness is going to

2    be Ms. Wilson; -- Mrs. Wilson; is that correct?

3            MR. LOISEL:    State's understanding that

4    at this time the Court wants to inquire with

5    respect to Rule 601 competency.  That is my

6    understanding, Judge.

7            THE COURT:    Right.

8            MR. LOISEL:    Yes.  She is available.  I

9    can go get her.  We're prepared to go forward.

10           THE COURT:    Okay.

11           MR. WINGATE:   Mike, before you go --

12           (WHEREUPON A DISCUSSION WAS HELD OFF THE

13   RECORD.)

14           MR. LOISEL:    Judge, Mr. Frey is here if

15   the Court would like to proceed with the

16   initial --

17           THE COURT:    Give me just a minute

18   here.  All right.  We're on the record and I

19   understand the next witness is Janet Wilson, who

20   is the, as I understand it, the spouse of the

21   Defendant Robert Wilson.  She was appointed

22   separate counsel, Mr. Frey, to represent her on

23   the privilege issue.  Mr. Frey is present in

1      court.  And as I understand it, under 601(B), the

2      issue of competency first must be determined and

3      then if competency is established, the next

4      question deals with the question of immunity and

5      privilege and exception to that privilege.  So,

6      at this point we're going to deal with the issue

7      of competency.  Is Ms. Wilson here?

8             MR. LOISEL:    She is, Judge.  Just for

9      practical purposes, once she -- whether she

10     elects to testify or not testify, then she will

11     be free to go; is that my --

12            THE COURT:    Well, was she going to be

13     your next witness?

14            MR. LOISEL:    Well, I mean, not free to

15     go, but for the purposes of whatever argument we

16     may proceed on with respect to privilege or that

17     kind of thing, she doesn't need to be here for

18     that, does she?

19            THE COURT:    Not unless her attorney

20     wants her here.

21                          -  -  -

22

23                    JANET WILSON,

1      being first duly sworn by the Court, testified as

2      Follows:

3                         EXAMINATION

4      BY THE COURT:

5      Q.    Will you give us your name, please?

6      A.    Janet I. Wilson.

7      Q.    Okay.  Ms. Wilson, I understand that you are

8      the next witness that the State expects to call in

9      this case, and we have a few questions that we

10     need to ask of you at this time.  One of these

11     questions deals with the issue of your competency

12     as a witness, and I have been told, and I am to

13     understand that you are currently the wife of the

14     Defendant Mr. Robert Wilson, the Defendant in this

15     case; is that correct?

16     A.    Yes, sir.

17     Q.    Are you still married to the Defendant?

18     A.    Yes, sir.

19     Q.    And do you understand, and I suspect that

20     you've been told by several people including your

21     own attorney, that there is a spousal immunity

22     privilege under Evidence Rule 601(B) that if you

23     wish not to testify against your husband, you can

154

1    make that election; do you understand that right?

2    A.    Yes, sir.

3    Q.    And do you at this time wish to waive that

4    privilege and that immunity and testify in this

5    case?

6    A.    Yes, sir.

7            THE COURT:    All right.  Mr. Loisel, do

8     you have any follow-up questions you want to ask?

9            MR. LOISEL:    No, Judge.  As per case

10    law, I think the Court as a preliminary matter

11    must inquire and the Court's done that and the

12    answer has been clearly given, so there's nothing

13    further from the State, Judge.

14            THE COURT:    Any follow-up questions?

15            MR. WINGATE:    The only thing I would

16    follow up with is:

17                          -   -   -

18                       EXAMINATION

19    BY MR. WINGATE:

20    Q.    Mrs. Wilson, in December of 1993 were you

21    married to Robert Wilson?

22    A.    Yes, sir.

23            MR. WINGATE:    Okay.  And I know the

1      Court had inquired, but specifically as to that

2      time frame.

3              THE COURT:    That's all we have at the

4      present time, if you will step out, please.  All

5      right.  The witness has indicated that she is

6      competent or is willing to testify, and the Court

7      will make a ruling that she is competent to

8      testify from her side of the equation.

9              The next question is whether the

10     Defendant will be waiving that or standing on his

11     rights as well.  Do I understand, Mr. Wingate,

12     that your client is going to be objecting to this

13     witness's testimony?

14             MR. WINGATE:   Yes, he is, Your Honor,

15     and he would be pursuant to statute I want to say

16     29 -- just one second -- 2945.42, we will be

17     asserting our spousal privilege relative to the

18     communications and acts during the course of this

19     marriage and coverture as it relates to

20     Mrs. Janet Wilson and Mr. Robert Wilson.

21             THE COURT:    All right.  We will need

22     her to commence her testimony; is that correct?

23             MR. LOISEL:   I believe she would be the

1    State's next witness, that's correct, Judge.

2           THE COURT:     And do we need to

3    establish, first, whether there is an exception

4    to the general rule as established by 2945.42?

5           MR. LOISEL:    Well, I would leave that

6    up to the Court.  Obviously the Defense has just

7    provided this case, the State v. Sandoval,

8    S-A-N-D-O-V-A-L.  The State has had a moment just

9    to look at it.  I haven't had a chance to read it

10   thoroughly.  The State has case law according to

11   Sandoval.  It appears maybe the Court should look

12   in camera as to what the testimony will be from

13   this witness and make a ruling at that point, but

14   I haven't had a chance to see if Sandoval is a

15   6th District Court -- 6th District Court case.  I

16   have some State Supreme Court cases.  I thought

17   we were going to do this at 2:00 o'clock, so I

18   have those cases downstairs.

19          THE COURT:     I understand, Mr. Wingate,

20   you've got an arraignment in a capital case?

21          MR. WINGATE:   Right across the hall,

22   Your Honor.

23          THE COURT:     All right.  We'll recess

1     these proceedings and recommence at 2:00 o'clock,

2     or as soon as you can get back.

3                     (RECESS TAKEN.)

4             THE COURT:     All right.  We are on the

5     record.  The Court has just found the next

6     witness, Ms. Janet Wilson to be competent.  We

7     still have the spousal privilege issue, and it is

8     my understanding that the State is going to

9     assert is that some of the statements that they

10    wish to elicit from this witness have -- were

11    made in the presence of third parties; is that

12    correct?

13            MR. LOISEL:     Well, that's one of the

14    contentions, Judge.  There are others.  I mean,

15    other reasons why the State feels some of this

16    testimony should be allowed.

17            THE COURT:     Over and above the waiver

18    of privilege?

19            MR. LOISEL:     Well, the Defendant is

20    asserting his privilege, and I think that -- I

21    mean, I can go through on the record what the

22    State from point A to point M where we think the

23    State should be allowed to adopt -- or allowed to

1    introduce certain evidence.

2          THE COURT:     Ms. Wilson is here.

3    Ms. Wilson, you are still under oath.

4          THE WITNESS:   Yes, sir.

5          THE COURT:     Sit up here.  First of

6    all, want to make an argue at this point,

7    Mr. Loisel, or not?

8          MR. LOISEL:    Well, Judge, I guess the

9    State is unsure how we're proceeding at this

10   point with the witness here.

11         THE COURT:     What I intend to instruct

12   this witness is that any statements that she is

13   going to testify to that were made by the

14   Defendant had to have been made in the presence

15   of a third party, and any testimony or any

16   questioning that you would have would be the

17   establishment of that basis.  That's what I would

18   propose to proceed.

19         MR. LOISEL:    Okay.  Well, that's

20   obviously one of the State's arguments, however,

21   what is determinative of a third party is one

22   issue that I think we need to address.

23         THE COURT:     What is your contention?

1              MR. LOISEL:    Well, Judge, the State

2     believes that this witness would testify as to a

3     car ride where they drove by the scene with the

4     Defendant at a late -- after -- I think the Court

5     is aware that one of the contentions is that the

6     Defendant and this witness drove around getting

7     rid of clothes that the Defendant wore during the

8     time of the murder.

9              THE COURT:    All right.

10             MR. LOISEL:    It is also the State's

11     belief that this witness will testify to the fact

12     that they drove, after they did this, by the

13     scene at Paxton where police were still present

14     as well as emergency personnel and third party

15     bystanders.

16             So, the State's argument is that that is

17     in the known presence of third parties.  You can

18     inquire further of this witness as to the

19     proximity of these people, but I think that's

20     subject for the State to inquire when this

21     witness does testify.

22             THE COURT:    Well, let's establish

23     first the parameters of the privilege.  Just

1    reading over some of the cases that have been

2    provided, the most recent one that I've been

3    aware of is the State versus Sandoval case.  The

4    privilege seems to include and encompass not only

5    oral communications, but also conduct; am I

6    correct?

7              MR. WINGATE:   Yes.

8              MR. LOISEL:    Judge, I would indicate

9    that, yes, after reading that case, it does

10   appear that some conduct is considered with

11   respect to the privilege, however, I think that

12   that case can be distinguished somewhat.  I

13   understand that.

14             THE COURT:    Let's get to it.  Have you

15   read the Sandoval case?

16             MR. LOISEL:    I did, Judge.

17             THE COURT:    What's your comment?

18             MR. LOISEL:    I think it is

19   distinguishable because what they ruled was

20   privileged and inadmissible at the 6th District

21   level was the fact that she drove the Defendant

22   to the murder scene and from the murder scene.

23   This case is different.  Our case does not

1      involve driving him to or from the murder scene.

2      And the only driving around, and maybe it is not

3      going to be allowable, but the difference is

4      driving around with the Defendant and their

5      getting rid of clothes at various locations.

6            So, I think there is a distinguishing

7      factor from driving someone to and from a murder

8      scene as opposed to driving around with someone

9      getting rid of clothes where possible third party

10     is present.

11           I understand it is -- well, I would leave

12     it at that.  I think there is a distinguishing

13     factor in that between the Sandoval case and the

14     case at bar.

15           THE COURT:    Mr. Wingate.

16           MR. WINGATE:   Your Honor, there is no

17     distinguishing matter in this case.  I think the

18     circumstances and facts that are in this

19     particular case are on all fours with the

20     Sandoval decision.  You're talking about the

21     spousal privilege applying to communications and

22     acts done within the coverture of the

23     relationship between husband and wife.  As the

1          Prosecutor seems to make nice of the fact that,

2     well, in the Sandoval case the wife drove him to

3     and from the crime scene.  I don't think it is

4     the act that the Court looked at, but it was the

5     relationship, understanding that you're talking

6     about husband and wife in a vehicle driving

7     around, that is what's protected under the

8     Sandoval decision.  It doesn't matter whether she

9     drove him to the crime scene or away from the

10    crime scene, it doesn't matter if she drove him

11    around to various areas in the city to, as the

12    State is alleging, dispose of evidence of the

13    crime.  The import of Sandoval is all the same,

14    that this is an act that is committed within the

15    coverture of the relationship and is thus

16    excluded because of the spousal privilege.

17          So, I think that even though the State is

18    trying to make an effort to distinguish Sandoval

19    from this case, State v. Wilson, this case is on

20    all fours with Sandoval, and the State v.

21    Sandoval ruled that these acts are excluded under

22    the spousal privilege.

23          THE COURT:    Any response?

1          MR. LOISEL:   Yes, Judge, if I may.  If

2     you would read the Sandoval decision, I'm sure

3     you have, it indicates that based on all of these

4     facts, those include driving the Defendant to and

5     from the murder scene.  It doesn't say based on

6     facts in general.  It is based on all these

7     facts.  So, I would beg to differ with

8     Mr. Wingate's interpretation of the facts and the

9     ruling in that case.

10          Secondly, Judge, you can look in the

11     Sandoval case where it relies on Rahman and

12     VanHoy.  In -- if you give me just one moment.

13     In State v. VanHoy, it also indicates with

14     respect to the marital privilege that if what is

15     said or done by either spouse has no relation to

16     their mutual trust and confidence as husband and

17     wife, then the reason for secrecy ceases.

18          So, the case that they're relying on

19     relies on another case that says if what's said

20     or done doesn't matter for the mutual trust of

21     the relationship, then the reason for the secrecy

22     ceases.  So, it is a double-edged sword with

23     respect to the Sandoval decision, Judge.

164

1            Additionally, in the Supreme Court in

2     State v. Mowrey, the State of Ohio adopted a

3     balancing test.  State v. Mowery, 1 Ohio St. 3d

4     192:  The balancing test to determine whether the

5     privilege against adverse spousal testimony

6     promotes sufficiently important interests to

7     outweigh the need for probative evidence in the

8     administration of criminal justice.

9            So, I think that the Court, along with

10    Sandoval case, along with VanHoy, needs to keep

11    that in mind that the Supreme Court of Ohio has

12    adopted this balancing test.  Again, it says:

13    Whether the privilege against adverse spousal

14    testimony promotes sufficiently the important

15    interests to outweigh the need for probative

16    evidence in the administration of criminal

17    justice.

18            So, again, Judge, I think that the State

19    has it broken down into five separate acts, if it

20    may, as to how the night went with the Defendant

21    and his wife.  She initially, and, again, this is

22    what the State intends this witness to testify

23    to, that initially he contacts her, asks her to

1      drive by the crime scene; she does that to go to

2      a house, the Defendant's sister's house where she

3      is said to be present; the witness will then

4      testify as to what took place at that house; they

5      then drove around getting rid of the evidence

6      from the earlier murder; they then drove back by

7      the scene and ultimately ended up at her son's

8      house where he was obviously present and they

9      stayed the night.

10             So, I understand that the Court is trying

11     to make sure that this witness doesn't testify to

12     things that are privileged, but I think needs to

13     keep in mind the balancing test as well as the

14     differences in the cases.

15             MR. WINGATE:   Your Honor, I can only say

16     that I'm looking at Sandoval and it says

17     specifically:  We agree with appellate that

18     Heather should not have been allowed to testify

19     as to driving appellant either to the El Rancho

20     restaurant or the river because they were alone

21     during that time and one can infer that appellant

22     intended those acts and communications to be

23     confidential.

1              It says that:  As to the parking at the
2      gas station, though Heather testified that the
3      gas station was open and there were people
4      around, in this case even though people were
5      around, there is no evidence that these people
6      were anywhere near the side of the building where
7      Heather parked, that these people were around
8      when appellant returned to their car, or that the
9      presence of these people was known to appellant.
10     Privilege does not apply where an act or
11     communication done in the presence of a third
12     party competent to testify.
13             The Court went on to say that Heather
14     testified that it was dark, as it was in this
15     case, at the time.  Based on all the facts, we
16     cannot say that appellant did not intend for his
17     acts to be confidential.
18             If the State is relying upon the fact
19     that they are riding around in the car, it is
20     late at night, it is just those two, it is dark
21     out, that is consistent with Sandoval.  Any
22     communications occurring between the two at that
23     time would be excluded because of Sandoval.  And

1    if the communications are excluded, then the acts

2    would also be excluded.

3            Based upon the information that the State

4    has provided us there's certain acts that were

5    comitted, according to the information provided

6    us by the State of Ohio, while Mrs. Wilson was

7    driving Mr. Robert Wilson around, certain acts

8    committed upon the I-280 bridge.  Again, and she

9    said there must have been someone around to see

10   us.  Light traffic.  It doesn't hinge upon the

11   fact whether or not other people were around.  It

12   depends upon whether or not there was an

13   expectation of privacy between Mr. Wilson and

14   Mrs. Wilson, and I'm saying that based upon the

15   case law enunciated in Sandoval by this 6th

16   District Court of Appeals, it would exclude what

17   the State is seeking to enter into evidence.

18           Your Honor, I will say it is my

19   understanding from the State that Mrs. Wilson got

20   involved in this matter from a phone call that

21   she allegedly received, and I'm going to assume

22   that it is a fact, that she received a phone call

23   from Mr. Wilson to come over to the sister's

1    house.  That would be excluded.  That is from its

2    inception that the spousal privilege would apply.

3    A phone conversation between husband and wife,

4    that would be excluded.

5          You then talk about observations that

6    would have been made or certain conduct done by

7    Mr. Wilson at the house of his sister, with the

8    sister being upstairs, and at least this witness

9    indicating in one of her statements that after or

10   as they were leaving, the sister came down and

11   said good-bye.  Again, an expectation of privacy.

12   Spousal privilege applies.  It would be excluded.

13         I think that there needs to be an inquiry

14   made so that we will know before we let this jury

15   hear what Mrs. Wilson has to say, because as to

16   the statements provided to us by the State of

17   Ohio, there is a great deal which is covered by

18   the spousal privilege and would be excluded under

19   the Sandoval test enunciated by the 6th District.

20         THE COURT:    Well, I'll be honest with

21   you, ever since law school, which was back in the

22   Middle Ages I guess, I always understood that

23   privilege whether it is between penitent husband

1    and wife or whatever dealt with the relationship

2    rather than the conduct.  And although I may not

3    be happy about it, I believe that privilege does

4    attach and is applicable in the present case

5    here, so I'm going to allow some questioning of

6    this witness at this time.

7         There is an exception, which is

8    recognized about statements that were made or

9    conduct that occurred in the presence of third

10   parties.  You will be allowed to question this

11   witness to establish a basis for third party

12   presence, and the witness will be instructed and

13   hereby is instructed that any testimony she gives

14   with respect to statements made by the Defendant

15   or conduct that she observed by the Defendant

16   must have occurred in the presence of a third

17   party before she will be allowed to testify as to

18   those matters.

19        MR. LOISEL:    I'm not sure what we're --

20   what are we doing right now, Judge?

21        THE COURT:    I'm going to call the jury

22   back in and you will be allowed to question this

23   witness.  You may proceed.

```
1                MR. LOISEL:   Okay.  I didn't know.

2          That's fine.  Thank you.

3                THE COURT:    All right.

4                (WHEREUPON THE PRECEDING DISCUSSION

5          OUTSIDE THE PRESENCE OF THE JURY CONCLUDED AND

6          THE FOLLOWING PROCEEDINGS WERE HELD.)

7                THE COURT:    Members of the jury, at

8          this time you will hear the testimony of

9          Ms. Janet Wilson.  You should be advised that

10         Ms. Wilson has participated in some testimony

11         prior to your presence here and she is currently

12         under oath.  The State's attorney, you may

13         proceed with his examination.

14               MR. LOISEL:   Judge, pursuant to the

15         Court's hearing that we just finished up, can I

16         just have a minute or two?  I need to try to work

17         on this outline to proceed.

18               THE COURT:    Sure.

19                          -  -  -

20                     DIRECT EXAMINATION

21         BY MR. LOISEL:

22         Q.    Good afternoon, ma'am.

23         A.    Hello.
```

171

1      Q.      Keep you were voice up.  Could you introduce

2      yourself to us?

3      A.      Janet I. Wilson.

4      Q.      And I do this with everyone, Ms. Wilson.

5      How old are you?

6      A.      54.

7      Q.      And do you currently live in Toledo?

8      A.      Yes and no.

9      Q.      In the area?

10     A.      Yes.

11     Q.      And do you know the Defendant Robert Wilson?

12     A.      Yes, he is my husband.

13     Q.      How long have you been married?

14     A.      June 26, 1992.

15     Q.      Is when you got married?

16     A.      Yes.

17     Q.      Was that here in Toledo?

18     A.      Yes.

19     Q.      And the person that you see in the courtroom

20     today, is that the same person that you married

21     back then?

22     A.      Yes.

23             MR. LOISEL:    Judge, I would ask just

1      that the record is clear that that is the same

2      individual.

3            THE COURT:     Yes, it is in the record.

4      Q.    Back in September of 2003 did you have an

5      opportunity to contact or meet with any Toledo

6      Police Department detectives?

7      A.    Yes, I called the cold cases and I met with

8      Detective Forrester and like officer, black

9      officer.  I always forget his name.

10     Q.    Do you remember when this was?

11     A.    All I know is sometime in September.

12     Q.    Of 2003?

13     A.    Yes.

14     Q.    And without getting into specifics, why did

15     you contact them?

16     A.    Because I don't know how to do it without

17     getting into specifics.

18     Q.    Well, what did you contact them about?

19     A.    The murder of Brenda Navarre.

20     Q.    And why did you contact them about the

21     murder of Brenda Navarre, just to talk to them

22     about it?

23     A.    Yes.

173

1    Q.    And when you talked to them back in 2003,

2    did you explain to them what you knew?

3    A.    Yes, I did.

4    Q.    Now, did you have -- I guess -- let me ask

5    you this:  When is the next time you had any

6    contact with the Toledo Police Department with

7    respect to the murder of Brenda Navarre?

8    A.    I talked to Lou Vasquez in 2005.

9    Q.    Now, you say Lou Vasquez, can you explain to

10   us who he is?

11   A.    Is a detective, crimes on persons.

12   Q.    For the Toledo Police Department?

13   A.    Yes.

14   Q.    And how long have you known

15   Detective Vasquez?

16   A.    Probably since I was about 19.

17   Q.    So you've known him for a long time?

18   A.    Yes.

19   Q.    Explain the situation, how you came in

20   contact with him to talk to him about the murder

21   of Brenda Navarre.

22   A.    My grandson got beat pretty bad and he was a

23   detective on the case.  I took my grandson down to

```
 1    the police station to -- for a photo array so he

 2    can make an identification of people that beat him

 3    up, and at the time there was a bulletin board or

 4    some kind of board with unsolved murders on it and

 5    I asked him was Brenda Navarre's picture up there

 6    because I didn't have my glasses on at the time.

 7    Q.    I'm sorry.  I didn't hear.  You asked him --

 8    A.    Was Brenda Navarre's picture up there.

 9    Q.    And was it?

10    A.    No.

11    Q.    Now, did you happen to talk to Lou Vasquez

12    or Detective Vasquez at that time about

13    Brenda Navarre's murder?

14    A.    No, he just gave me a card.

15    Q.    So that was in 2005?

16    A.    Yes.

17    Q.    And did you have an opportunity to talk to

18    Lou Vasquez after that?

19    A.    Yes.

20    Q.    And if you remember where did those

21    conversations take place?

22    A.    I had a bar called Brewski's on Detroit and

23    Sunset, and there was altercations going at the
```

```
 1      bar and he would come out about that and we just

 2      had led into other conversations about this.

 3      Q.    Other conversations about what?

 4      A.    About the Brenda Navarre murder.

 5      Q.    And did you ever talk to him on the

 6      telephone?

 7      A.    Yes.

 8      Q.    Now, at some point did you come downtown and

 9      talk to Detective Vasquez?

10      A.    Yes, I did.

11      Q.    And if you know, was that -- well, strike

12      that.

13            What was your purpose for coming downtown

14      to talk to Detective Vasquez?

15      A.    To make a statement about what I knew to --

16      there was a couple other people there, I don't

17      know who they were, a couple other detectives.

18      Q.    When you made the statement?

19      A.    Yes.

20      Q.    And you wanted to tell them what you knew

21      about what?

22      A.    About the murder.

23      Q.    And what did that information revolve around
```

176

1    or who did it revolve around?

2         MR. WINGATE:  I will object.

3         THE COURT:  I'm going to sustain it.

4    Q.  You came to give them information?

5    A.  Yes.

6    Q.  And so in June of 2005 you gave them that

7    information?

8         MR. WINGATE:  Your Honor, I'm going to

9    object to the leading nature of the questions.

10        THE COURT:  He's going to have to have

11    some leeway.

12        MR. WINGATE:  All right.

13        THE COURT:  But in June of 2005, is

14    that before or after that conversation at the

15    bar?

16        MR. LOISEL:  That was after, as far as

17    I know.

18        THE COURT:  When did the conversation

19    in the bar occur?

20        MR. LOISEL:  I'm sorry, Judge?

21        THE COURT:  When did the conversation

22    at the bar occur?

23        MR. LOISEL:  I don't think there's any

1    specific time frame that this witness can

2    testify.  I think it was around the time but

3    prior to June of '05.

4         THE COURT:    All right.

5    Q.    The conversations with Detective Vasquez

6    when he came to the bar and/or on the phone, did

7    those occur before or after this conversation you

8    had down at the police station?

9    A.    They came before.

10   Q.    And then you came down to the police

11   station?

12   A.    Yes.

13   Q.    And you made a statement with respect to

14   what you knew about Brenda Navarre's homicide?

15   A.    Yes.

16   Q.    And after that did you have an opportunity

17   to talk to any other members of the Toledo Police

18   Department?

19   A.    Yes.  Bart Beavers and Ted Forrester came

20   out to my house a couple times.

21   Q.    And those are detectives with the Toledo

22   Police Department?

23   A.    Yes.

178

```
1        Q.      And what did they talk to you about?

2        A.      The same thing, about Brenda Navarre's

3    murder.

4        Q.      And you said they came out to your house a

5    couple of times?

6        A.      Yes.

7        Q.      Bart Beavers is the detective sitting right

8    here?

9        A.      Yes.

10       Q.      And you said Ted.  Is it Steve Forrester?

11       A.      Oh, yes.

12       Q.      Detective Steve Forrester.  It's okay.

13               Did you talk to Lou Vasquez any more

14   about the homicide?

15       A.      Yes.

16       Q.      And were those face to face, on the phone?

17   Or tell us about that.

18       A.      Most of them was on the phone.

19       Q.      Okay.  Now, at some point during these

20   conversations, was there any information or

21   mention of -- well, strike that.

22               Did you have another opportunity to talk

23   to any detectives with respect to this case in
```

1       August of 2006?

2       A.      Yes, I did.

3       Q.      And can you explain to us where that took

4       place?

5       A.      Well, the meeting, it took place downtown at

6       the Toledo Police Department.

7       Q.      And who was that meeting with?

8       A.      Steve Forrester.  I don't remember who was

9       all there.

10      Q.      Okay.  And I guess let me ask you this:  It

11      seems obvious, but I want to make sure the record

12      is clear, what was that conversation about?

13      A.      Well, a little while prior to that at my

14      house on South Street, Steve Forrester was saying

15      that if I -- because I wouldn't go downtown to

16      make a statement because I was scared, and he said

17      that if I came down and made a statement that he

18      could give me $5,000 dollars in Crime Stopper

19      money.

20      Q.      Okay.

21      A.      So then I went downtown, made my statement.

22      Then I asked him about a couple days later, maybe

23      that day, about the money and he said Oh, no, you

1    got to do more than that.

2    Q.    Okay.  Now, you indicated that you didn't

3    want to come downtown because you were scared.

4    What were you scared of?

5              MR. WINGATE:   I will object.

6              THE COURT:    Well, if she can answer

7     without revealing any communications or conduct

8     that she may have had with her husband, I will

9     allow her to answer.

10   Q.    What were you scared of?

11   A.    Repercussions.

12   Q.    What do you mean "repercussions"?

13   A.    Just about the whole case, if it was found

14   out that I was the one that brought this to the

15   attention of the Toledo Police Department.

16   Q.    And was the fact that you were scared as a

17   result of a conversation with the Defendant?

18             MR. WINGATE:   I will object.  I will

19    object.

20             THE COURT:    I understand your quandary

21    there, Mr. Loisel, but I'm going to have to

22    sustain that.

23   Q.    With respect to this fear, what did the fear

1    revolve around you?  Explain to us a little bit

2    more about this fear about coming downtown to make

3    a statement.

4    A.    Well, I didn't -- I was scared of any

5    repercussions that could happen because, like I

6    said, I would be bringing this to the police's

7    attention.  I don't know how else to explain it.

8    Q.    Okay.  And that is when Detective Forrester

9    indicated if you make a statement you get Crime

10   Stopper money?

11   A.    Yes.

12   Q.    And at some point, end of August 2006, you

13   make a statement?

14   A.    Yes.

15   Q.    And are you aware that at some point that

16   your husband was charged with murder?

17   A.    Yes.

18   Q.    And with that in mind, did you have

19   continuing conversations with the Toledo Police

20   Department or not?

21   A.    I had a couple.

22   Q.    And these conversations, what were they

23   pertaining to?

1    A.    Well, the one I remember the most is if I

2    didn't testify against Robert that I was going to

3    be charged with a crime.

4    Q.    And, in fact, were you charged with a crime?

5    A.    Yes, I was charged with obstruction of

6    justice.

7    Q.    And what does that crime revolve around,

8    what incident?

9              MR. WINGATE:   I will object.

10             MR. LOISEL:    Judge, how is this

11    objectionable?

12             MR. WINGATE:   May we approach?

13             (WHEREUPON THE FOLLOWING DISCUSSION WAS

14    HELD AT THE BENCH.)

15             MR. WINGATE:   Your Honor, what he wants

16    her to say is that this is revolved around the

17    fact that she had told the police that she drove

18    around with Robert and she disposed of evidence

19    from the crime, that is what the allegation of

20    obstructing justice is about and that is within

21    the purview of the spousal privilege.

22             MR. LOISEL:    Judge, she's been charged

23    with a crime, she can testify as to why she's

1    been charged with a crime.  I'm not asking her to

2    say specifically she drove around with her

3    husband, but it has to do with the murder of

4    Brenda Navarre.

5         THE COURT:    You're in the box here.

6         MR. LOISEL:    Judge, she can indicate

7    what the crime revolves around.  She doesn't have

8    to get into specifics with respect to her husband

9    or the actions.  She's charged with obstructing

10   justice with respect to the investigation of

11   Brenda Navarre.  That is not part of any spousal

12   testimony.

13        MR. WINGATE:    This is the problem, the

14   fact that she told you she was driving around

15   with him and disposing of property falls within

16   the spousal privilege.  You charged her with

17   that, but it doesn't penetrate the spousal

18   privilege that's there.  She can't testify to

19   that.

20        MR. LOISEL:    Spousal privilege

21   doesn't -- the tentacles of spousal privilege

22   doesn't go back in time.  She cannot testify as

23   to any spousal privilege here today.  The fact

1          that she's been charged with obstructing justice,

2          she can testify to the fact that it has to do

3          with the murder of Brenda Navarre.  There are no

4          specifics going to be given.  It doesn't have to

5          do with -- anything with her husband.

6                    THE COURT:    I'm going to sustain the

7          objection.  Hearsay exception is noted.  I

8          understand your box.

9                    (WHEREUPON THE PRECEDING DISCUSSION AT

10          THE BENCH CONCLUDED AND THE FOLLOWING PROCEEDINGS

11          WERE HELD.)

12          MR. LOISEL:

13          Q.    So you're charged with obstructing justice

14          you testified; is that correct?

15          A.    Yes.

16          Q.    And if you cooperate, what is your

17          understanding with respect to that charge?

18          A.    They're going to dismiss my charges.

19          Q.    Now, prior to you being charged with this

20          obstructing of justice, did you have an

21          opportunity to meet with Robert Wilson's attorney?

22          A.    Yes.

23          Q.    And during the course of that meeting --

1    strike that.

2              What was that meeting about?

3    A.    I was -- I didn't want Robert to know that I

4    was the one that contacted the police and when I

5    told them I was, I was trying to make myself a

6    cover story to stay on good terms with him, so I

7    came up with a story that said that I received a

8    letter.  I came up with this myself that I

9    received a letter from him to another girl and I

10   was all upset, that's why I contacted the police

11   like I did.

12   Q.    So, you told that to Attorney Wingate?

13   A.    Yes, I did.

14   Q.    And did you tell him that personally or was

15   that over the phone?

16   A.    No, I told him that personally in his

17   office.

18   Q.    And after you told him that, what else did

19   you tell him?

20   A.    I -- Ronnie asked me was it true and I said

21   no.

22   Q.    And when he says "was it true", what was he

23   referring to?

1      A.    My statement about the letter that I

2      received and all that.  He asked me was everything

3      true and I said no.  He said Do you love Robert,

4      and I said Yes.

5      Q.    So, I just want to make sure I have this

6      straight.  You went to his office and told him a

7      story?

8              MR. WINGATE:   Your Honor, I'm going to

9        object to the narration by the State and ask

10       questions.

11             THE COURT:    Well, there's some leeway

12       under Rule 611 to get background information.

13       So, I'm going to allow some limited leading to

14       get the testimony out here.

15             MR. LOISEL:    Thank you, Judge.

16     Q.    What I want to make sure is you went down to

17     his office and told him this Dear John letter

18     story?

19     A.    Yes.

20     Q.    And when did you tell him that wasn't true?

21     A.    When I finished with it in the same meeting.

22     Q.    So during the same meeting -- that's what I

23     wanted to get to.  So during that same meeting you

1    told him it wasn't true?

2    A.    Yes.

3    Q.    Was anyone else present during that meeting?

4    A.    No.

5    Q.    And what, if anything, did Mr. Wingate do at

6    that point?

7    A.    We just -- I think we just left it like

8    that.  I'm almost sure it was over.

9    Q.    Now, did you have an opportunity to go back

10   to Mr. Wingate's office, or when is the last time

11   you had any contact with Mr. Wingate?

12         MR. WINGATE:  Your Honor, I'm going to

13   object.  May we approach?

14         (WHEREUPON THE FOLLOWING DISCUSSION WAS

15   HELD AT THE BENCH.)

16         MR. WINGATE:  Ask that -- I think we've

17   already had a hearing on this matter as to any

18   relationship that was established with

19   Janet Wilson and relevant to a statement she gave

20   me.  I think at this juncture the State's concern

21   was that it would put me in the posture of being

22   a particular witness or being a potential witness

23   in this case, and I think as far as relevancy, I

1    don't think this has any relevancy in this charge

2    against Robert Wilson.

3         MR. LOISEL:    Judge, I would beg to

4    differ.  Obviously we're all aware of the

5    previous hearing that we had.  You said this is

6    going to be a big gray area once we get to trial

7    with respect to her contact with Attorney

8    Wingate.  And I would also state for the record

9    that Attorney Wingate in his opening statement

10   referenced this letter.  So I think we need to

11   have some latitude with respect to -- if I could

12   finish my statement.

13        MR. WINGATE:    Go right ahead, Mike.

14        MR. LOISEL:    Thank you.  He referenced

15   this Dear John letter and that's all I'm doing

16   right now is eliciting testimony to explain this

17   Dear John letter that he talked about during his

18   opening statement.

19        MR. WINGATE:    Then this is what you need

20   to talk to her about, because if you're asking

21   her about the stuff she said to me not being true

22   has nothing to do with the letter.  The letter

23   was sent to Robert and given to Don Cameron.

1       That's what you can talk about.

2               THE COURT:    I'm going to allow the

3       questioning at this point.

4               (WHEREUPON THE PRECEDING DISCUSSION AT

5       THE BENCH CONCLUDED AND THE FOLLOWING PROCEEDINGS

6       WERE HELD.)

7       BY MR. LOISEL:

8       Q.    So with respect to this Dear John letter,

9       did you have more contact after that initial

10      meeting with Mr. Wingate?

11      A.    Yes, I had contact two other times.

12      Q.    And when did those occur?

13      A.    I have no idea.  One was with

14      Jeffery Helmick a couple weeks later after that.

15      Q.    And where was that?

16      A.    That was at Mr. Wingate's office.

17      Q.    And do you remember where the third one

18      occurred?

19      A.    Yes.  It was -- I was in a rehab after a

20      knee surgery.

21      Q.    And you had contact with Attorney Wingate?

22      A.    Yes, he came there.

23      Q.    Now, with respect to those two meetings,

1    what did they -- what were they centered upon or

2    what were they about?

3    A.    The letter that I wrote -- the letter I said

4    Robert wrote, which he never wrote.

5    Q.    So the meetings were about the supposed Dear

6    John letter?

7    A.    Yes.

8    Q.    And during those meetings what, if anything,

9    happened with respect to an affidavit?

10   A.    Well --

11          MR. WINGATE:   Your Honor, I'm going to

12    object to the leading nature of the question.

13          THE COURT:    I'm going to allow it.

14   A.    The one I had with Ronnie and Mr. Helmick, I

15   went over it again, the same letter lie that I

16   did, and Mr. Wingate said if I typed this up, will

17   you sign it.  And I said yes then, but then a

18   while later when I was at the rehab, he came out

19   there and I wouldn't sign it because it was a lie

20   and I know it was a lie and I just couldn't sign

21   it.

22   Q.    So how many times did you not sign the

23   affidavit?  How many times was it offered to you

1    to sign?

2    A.    That I said I would sign it once and then it

3    was offered to me once.

4    Q.    And you refused to sign it?

5    A.    Yes.

6    Q.    And this all has to do with this supposed

7    Dear John letter, correct?

8    A.    Yes.

9    Q.    No other meetings with Attorney Wingate?

10   A.    It was a three-way call, so another time,

11   but I can't imagine --

12   Q.    Okay.  And if you recall with respect to

13   that, do you remember the time frame when that was

14   happening?

15   A.    In February of last year I had my surgery so

16   it was then.

17   Q.    Okay.  And if you recall, you indicated you

18   were arrested for obstructing justice?

19   A.    Yes.

20   Q.    Do you remember the time frame when that

21   took place?

22   A.    That was last May.

23   Q.    May of 2007?

1    A.    Yes.

2    Q.    From May of 2007 until today, have you had

3    any more contact that you can remember with

4    respect to the Toledo Police or Attorney Wingate?

5    A.    Well, when I got arrested, after I got

6    arrested.

7    Q.    I'm not interested in that information.

8         MR. WINGATE:   I would object and ask

9    that she be allowed to answer the question.  You

10   said subsequent to May of '07.

11        MR. LOISEL:    Very well.

12   Q.    You said when you got arrested.  What

13   happened?

14   A.    That before they arrested me, they took me

15   to the Toledo Police Department to --

16   Q.    Who is they?

17   A.    The marshals, the federal marshals came to

18   my job.

19   Q.    And when you say they arrested you, just so

20   it is clear, what did they arrest you for?

21   A.    Obstruction of justice.

22   Q.    So, go ahead with your answer.

23   A.    The marshals took me to the Toledo Police

1    Department and had a conversation with the police,

2    and then they took me to the jail, and then I

3    called Ronnie Wingate's office and I told him I

4    was -- wait a minute.  I didn't call his office.

5              MR. WINGATE:   I'm going to object as to

6     relevancy.  The question was contact with TPD.

7              MR. LOISEL:   No, Your Honor.

8              THE COURT:   I'm going to allow this

9     line of questioning at this point.

10   Q.   So you -- go ahead.  Continue with what

11   you're saying, please.

12   A.    Just that I was in jail and I needed to get

13   out.

14   Q.    And so you had contact with Attorney Wingate

15   at that point is what you're saying?

16   A.    Yes.

17   Q.    And after that any more, that you can

18   remember, contact with either the Toledo Police

19   Department or Attorney Wingate?

20   A.    When we had a meeting here after Court one

21   day, talked to Toledo Police Department about my

22   testifying and about making a deal on my

23   testimony.

194

1    Q.    Okay.  And, in fact, the same deal that we

2    already talked about that if you cooperate, in

3    fact, your understanding is what?

4    A.    The same thing, that I would be -- but that

5    was going to be a second degree misdemeanor and I

6    was supposed to testify against Mr. Wingate, too.

7    Q.    With all that in mind, what I would like to

8    do at this point is direct your attention back to

9    December 1st of 1993.

10   A.    Yes.

11   Q.    At that point were you married to

12   Robert Wilson?

13   A.    Yes, I was.

14   Q.    And did you have contact with him on

15   Maher Street on the night or early morning of

16   December 1st, 1993?

17   A.    Yes, I did.

18   Q.    And explain to us how you went to that

19   address.

20             MR. WINGATE:   I will object.  I will

21    object.

22             THE COURT:    Well, as long as she does

23    not implicate any contact she had or course of

1       conduct she had as a result of a conversation she

2       may have had with her husband, I'm going to

3       sustain it, otherwise she can testify.

4    Q.    Where did you live at that point?

5    A.    4141 Hill Avenue.

6    Q.    And where is Maher Street?

7    A.    I'm sorry.  I lived at 1017 Parkside.

8    Q.    And where is Maher Street with respect to

9    Parkside?

10   A.    No, the north end.

11   Q.    And did you drive directly to Maher Street?

12   A.    No.

13   Q.    Explain the route that you took, please.

14            MR. WINGATE:   I'm going to object, Your

15        Honor.

16            MR. LOISEL:   Judge, this has nothing to

17        do with any conversation.

18            THE COURT:   I'm going to allow the

19        question.

20   Q.    Explain the route you took that night to

21   Maher Street, if you recall.

22   A.    I drove -- I don't know how I got there, but

23   I drove via Paxton and then around to Maher.

1      Q.    When you got to Maher Street, who was there?

2      A.    Robert and then his sister was upstairs.

3      Q.    And whose house is on Maher Street?

4      A.    Robert's sister, Dorothy.

5      Q.    And what is her last name?

6      A.    Harris.

7      Q.    Can you spell that for us?

8      A.    H-A-R-R-I-S.

9      Q.    Okay.  And at any point when you were over

10     there, did you have contact with her?

11     A.    We was getting ready to leave, she came down

12     and said bye.

13     Q.    And what were you doing at this point when

14     you saw her?

15     A.    Taking Robert some clothes.

16            MR. WINGATE:   Your Honor, I'm going to

17      object.  May we approach?

18            THE COURT:    Yeah.

19            (WHEREUPON THE FOLLOWING DISCUSSION WAS

20      HELD AT THE BENCH.)

21            MR. LOISEL:   Judge, I've established

22      that there was a third party.  I don't know

23      what's the objection.

1           MR. WINGATE:   The objection is as it

2      relates to the third party privilege as to who is

3      at the house.  She said Robert was there and his

4      sister was upstairs and asked if anything

5      happened and she said the sister came downstairs

6      and said good-bye as we were leaving.

7           MR. LOISEL:   Fine.  If the objection is

8      for me to clarify.  We'll clarify.  The question

9      was at that -- my intention for the question was

10     at that point when the third party is knowingly

11     present, which destroys any privilege, what was

12     happening.  I mean, I can phrase my question that

13     way if it is easier.

14          MR. WINGATE:   She said she came down and

15     said bye as they were leaving.  If you want the

16     talk about any observation, it wasn't about

17     bringing him any clothes, that would be within

18     the coverture of spousal privilege.  The sister

19     is upstairs, they're leaving out the door.

20     That's what she said.

21          MR. LOISEL:   Judge, I think the jury

22     and everyone can hear Mr. Wingate.

23          THE COURT:    Sustained.

```
 1                (WHEREUPON THE PRECEDING DISCUSSION AT

 2        THE BENCH CONCLUDED AND THE FOLLOWING PROCEEDINGS

 3        WERE HELD.)

 4      Q.    You indicated that the Defendant's sister

 5      said bye.  Where was she?

 6      A.    On the steps.

 7      Q.    And who were you with?

 8               MR. WINGATE:   I will object.

 9               THE COURT:     Sustained.

10               MR. LOISEL:    Judge, may we approach?

11               THE COURT:     No.  I'm going to reverse

12       myself.  I'm going to allow that question.

13      A.    Robert and I were leaving out of his

14      sister's house.

15      Q.    And at that point what did you have with

16      you?

17               MR. WINGATE:   I will object.

18               THE COURT:     I'm going to allow that.

19      Q.    Did you have anything with you?

20      A.    I didn't have anything.

21      Q.    Did the Defendant have anything with him?

22               MR. WINGATE:   Objection.

23               THE COURT:     I'm going to allow it.
```

1    Q.    What did the Defendant have with him?

2    A.    A brown paper bag and a garbage bag.

3    Q.    If you know, what was in the bag?

4         MR. WINGATE:    I will object.

5         THE COURT:     That's one step too far.

6     Sustained.

7    Q.    At that point you left?

8    A.    Yes.

9         MR. LOISEL:    Judge, can I just have one

10    moment to check something?

11   Q.    Where did you end up?  You left the

12   Maher Street address?

13   A.    Yes.

14   Q.    Where did you end up that evening?

15   A.    On South Street at my son Alfonzo's

16   apartment.

17   Q.    And who did you go there with?

18   A.    Robert.

19        MR. WINGATE:    I would object.

20        THE COURT:     I'm going to allow that

21    question.

22   Q.    So, who was at that -- was anyone else

23   present at that place?

```
 1      A.      Alfonzo.

 2      Q.      So Alfonzo, yourself, and the Defendant?

 3      A.      Yes.

 4      Q.      What did you do when you were there?

 5      A.      We slept.

 6      Q.      Was Alfonzo aware that you were there?

 7              MR. WINGATE:    Your Honor, I will object.

 8              THE COURT:     Yeah, she doesn't know

 9       what Alfonzo knew.

10              MR. LOISEL:    Very well.

11      Q.      Did you see Alfonzo when you were there?

12      A.      Yes.

13      Q.      So he was present?

14      A.      Yes.

15      Q.      What, if anything, did the Defendant do?

16      A.      Took a bath.

17      Q.      And you indicated that you stayed the night?

18              MR. WINGATE:    Objection.

19              THE COURT:     Yeah, this can be

20       construed as impinging on the spousal privilege.

21       I'm going to sustain it.

22              MR. LOISEL:    Judge, if I may approach

23       and explain.  Conduct is covered as well as oral
```

```
1     communications.
2                (WHEREUPON THE FOLLOWING DISCUSSION WAS
3     HELD AT THE BENCH.)
4                MR. LOISEL:   Judge, I think it is clear
5     that a third party is present, it destroys the
6     privilege she just indicated.
7                THE COURT:   You can ask her if he took
8     the bath in the presence of a third party.
9                MR. WINGATE:   Your Honor, I'm going to
10    ask that any objections, could we please approach
11    the bench and discuss them as opposed to arguing
12    them in front of the jury?
13               THE COURT:   Yeah.
14               (WHEREUPON THE PRECEDING DISCUSSION AT
15    THE BENCH CONCLUDED AND THE FOLLOWING PROCEEDINGS
16    WERE HELD.)
17    Q.   At some point did you leave that residence?
18    A.   Yes, in the morning.
19               MR. LOISEL:   Thank you, Mrs. Wilson.
20    Nothing further.
21               MR. WINGATE:   I'm sorry.  Just one
22    second.
23                         -  -  -
```

```
 1                    CROSS-EXAMINATION

 2       BY MR. WINGATE:

 3       Q.    All right.  Mrs. Wilson, do you mind if I

 4       call you Janet?

 5       A.    No.

 6       Q.    We've known each other for a while; is that

 7       correct?

 8       A.    Yes.

 9       Q.    Years as a matter of fact?

10       A.    Yes.

11       Q.    I want to start off by asking the first

12       question.  There was never, ever a Dear John

13       letter in my office; is that correct?

14       A.    Never.

15       Q.    All right.  What you're making reference to

16       is you talking to me, me taking notes and then

17       typing it up in the form of a statement; is that

18       correct?

19       A.    Yes.

20       Q.    All right.  And as you said, I asked you

21       whether or not you would be willing to sign it; is

22       that correct?

23       A.    Yes.
```

1      Q.      You indicated that you would?

2      A.      Yes.

3      Q.      And you wanted to talk to your attorney

4      first?

5      A.      Yes.

6      Q.      And as it relates to that statement, you

7      underwent surgery for your knee?

8      A.      Yes.

9      Q.      This is after the conversation relative --

10     after the interview at my office after you had met

11     with -- and it wasn't Jeff Helmick, but it was

12     Mr. McElroy.

13     A.      Oh, okay.

14     Q.      Do you remember?

15     A.      Yes.

16     Q.      All right.  Sometime after that you

17     underwent surgery for your knee?

18     A.      Yes.

19     Q.      And you contacted me to let me know where

20     you were?

21     A.      Yes.

22     Q.      At the rehab center?

23     A.      Yes.

```
1     Q.    And I said I would come see you; is that
2   correct?
3     A.    Yes.
4     Q.    And as it relates to that statement, I read
5   it back to you?  You have to answer.
6     A.    Yes, I'm sorry.
7     Q.    And even though you said it was not true,
8   you even corrected some of the mistakes that were
9   in it; is that correct?
10    A.    Yes, I did.
11    Q.    All right.  Things that I had put down
12  mistakenly and typed up, you said, No, that's not
13  right and corrected me?
14    A.    Yes.
15    Q.    Okay.  Now, as it relates to your
16  involvement in this matter, two things.  You were
17  paid $5,000 dollars for a statement; is that
18  right?
19    A.    Yes.
20    Q.    Prior to you getting that $5,000 dollars,
21  you hadn't made a statement; is that correct?
22    A.    No, I had made statements.
23    Q.    And that was to?
```

```
 1     A.     Just different detectives.

 2     Q.     Do you remember which detectives they were?

 3     A.     Bart Beavers.

 4     Q.     This (indicating)?

 5     A.     Yes.

 6     Q.     The one that was seated here?

 7     A.     Yes.

 8     Q.     Okay.

 9     A.     Steve Forrester, Lou Vasquez.

10     Q.     All right.  And now these statements that

11     you had made, you told them, I'm not coming down

12     to grand jury, right?

13     A.     Yes.

14     Q.     I'm not going to do that, right?

15     A.     Yes.

16     Q.     And you were informed that if you could get

17     an indictment, I have 50 crisp $100 dollar bills

18     for you; is that correct?

19     A.     Yes.

20     Q.     Okay.  You were having problems with your

21     bar, financial problems with Brewski's, right?

22     A.     Yes.

23     Q.     Financial need?
```

1      A.    Yes.

2      Q.    You saw this as a way to help yourself; is

3      that correct?

4      A.    Yes.

5      Q.    You have to answer for the record.

6      A.    Yes.

7      Q.    All right.  So you decided that, okay, I'll

8      get the money?

9      A.    Yes.

10     Q.    Okay.  Now, upon getting the money, you gave

11     a statement; is that correct?

12     A.    Yes.

13     Q.    After giving that statement, Mr. -- to the

14     grand jury, Mr. Wilson was indicted?

15     A.    Yes.

16     Q.    Now, I was not the first attorney to

17     represent him?

18     A.    No.

19     Q.    All right.  As it relates to that other

20     attorney, you wrote a letter --

21            Now, when the Prosecutor is talking about

22     a Dear John letter, there is no such thing as a

23     Dear John letter; is that correct?

1       A.      Yes.

2       Q.      What happened was you wrote a letter to

3       Robert?

4       A.      Yes.

5       Q.      Correct?

6       A.      Yes.

7       Q.      And I'll hand you what's been marked

8       composite -- I'm sorry.  I would like to have this

9       marked as a composite exhibit.

10              THE COURT:      A?

11              MR. WINGATE:    Yep, Defendant's Composite

12       Exhibit A and it is consisting of five pages.

13              MR. LOISEL:     Judge, at this point I

14       need to ask for a recess.  This is the first time

15       I've ever seen this letter.

16              THE COURT:      All right.  Going to take

17       a 10 minute recess, members of the jury.  You are

18       not to discuss this case nor form or express an

19       opinion about the case.  We'll be in recess for

20       10 minutes.

21                      (RECESS TAKEN.)

22              THE COURT:      Please proceed.

23       BY MR. WINGATE:

1    Q.    I'll hand you what's been marked for

2    identification purposes as Defendant's Composite

3    Exhibit A and ask you to look at that and see if

4    you recognize what that is.

5    A.    This is a letter that I wrote after Robert's

6    indictment.

7    Q.    And you wrote that letter -- you wrote that

8    letter saying that you had lied on Robert; did you

9    not?

10   A.    Yes, I did.

11   Q.    And you told him in that letter, did you say

12   that you had lied to the grand jury?

13   A.    Yes, I did.

14   Q.    And that you regretted it?

15   A.    Yes, I did.

16   Q.    Did you also tell him that it had hurt you

17   because you had gotten a letter that was intended

18   for a female by the name of Crissy?

19   A.    Yes.

20   Q.    And in that letter, talked about leaving you

21   to go with her?

22   A.    Yes.

23   Q.    And having kids?

1      A.      Yep.

2      Q.      All right.  And as it relates to the

3      Prosecutor asking you questions, you're telling

4      this jury that that letter was a lie?

5      A.      Yes.

6      Q.      So that was not the truth?

7      A.      No, it wasn't.

8      Q.      Now, when you talked to me at my office, did

9      you tell me that Detective Forrester and

10     Detective Beavers had been coming by your house

11     wanting to get a statement?

12     A.      Yes.

13     Q.      Did you say that but that you weren't

14     interested in doing that so you kept putting them

15     off?

16     A.      Yes.

17     Q.      Did you tell them that -- or did you tell me

18     that you were -- kept playing up the fear factor

19     about how you were afraid and things like that?

20     A.      I told you I was afraid.

21     Q.      Okay.  Did you also talk about the Crissy

22     letter with me?

23     A.      Yeah, that's the letter we talked about.

```
 1      Q.     Okay.  So, then did you say in that letter

 2      to Robert, Hell hath no furry like a woman

 3      scorned?

 4      A.     Yes, I did.

 5      Q.     Same thing you told me in the office,

 6      correct?

 7      A.     Yes.

 8      Q.     At my office, did you tell me that

 9      Detective Forrester said if you made a statement,

10      he would give you 50 crisp $100 dollar bills?

11             MR. LOISEL:    Objection, Your Honor.

12       It's been asked and answered.

13             MR. WINGATE:   It's preparatory.

14             THE COURT:    I'll allow it.

15      A.     Yes.

16      Q.     All right.  Although you told the Prosecutor

17      what you said to me was not true, that was in the

18      statement that I wrote, right?

19      A.     Yes.

20      Q.     So that part of the statement was true?

21      A.     Yes.

22      Q.     You talked about owning Brewski's and having

23      financial problems with that on the verge of ruin.
```

1      Did you talk to me in the office about that?

2      A.    Yes.

3      Q.    That was also in this statement, wasn't it?

4      A.    I don't remember.

5            MR. LOISEL:    Judge, if we could have

6       that marked.  I don't know what he's referring

7       to.

8            MR. WINGATE:    I'll have it marked.

9            THE COURT:    This will be Defendant's

10     Exhibit B?

11           MR. WINGATE:    Yes.

12     Q.    I refer you to -- hand you what's been

13     marked as Defendant's Exhibit B and ask you to

14     look at the second paragraph.

15     A.    Yes.

16     Q.    Okay.  Now --

17           THE COURT:    Why don't we identify that

18      letter as to what it is.

19           MR. WINGATE:    Okay.

20     Q.    And let me just ask a couple of preparatory

21     questions before we get -- when you talked to me

22     in my office, I took notes, correct?

23     A.    Yes.

1    Q.    And subsequently reduced those notes to a

2    typewritten statement, correct?

3    A.    Yes.

4    Q.    And Defendant's exhibit, what I just handed

5    you, does that represent the notes taken from my

6    interview?

7              MR. LOISEL:    Objection, Your Honor.

8     How does she know what notes Attorney Wingate

9     took in his office?

10              MR. WINGATE:   She knew what she told me.

11              MR. LOISEL:    Is that a response?

12              MR. WINGATE:   Yep.

13              THE COURT:    She can testify as to what

14     it appears to be to her.

15              MR. WINGATE:   Thank you.

16    A.    This appears to be the interview.

17    Q.    Okay.

18    A.    With Mr. Wingate.

19    Q.    Okay.  Now, we were talking about the second

20    paragraph, Page 2.  And the question that I asked

21    was, did you tell me that you were having

22    financial problems with your bar Brewski's on the

23    verge of ruin?

1      A.    Yes.

2      Q.    Was that true?

3      A.    Yes.

4      Q.    So that was true in this statement?

5      A.    Yes.

6      Q.    Okay.  And I'll ask you to look at the third

7      paragraph.  You talk about Detective Forrester,

8      $5,000 dollars you testifying if you made a

9      statement and that's contained in this statement;

10     is it not?

11     A.    Yes, it is.

12     Q.    And did you tell me that?

13     A.    Yes.

14     Q.    That was true also, wasn't it?

15     A.    Yes.

16     Q.    Did you also tell me that you saw the $5,000

17     dollars as an opportunity to help yourself

18     financially?

19     A.    Yes.

20     Q.    Okay.  And that's in the statement?

21     A.    Yes.

22     Q.    That's also true, isn't it?

23     A.    Yes.

1     Q.    Did you tell me that on the day you went in

2     front of the grand jury that you were asked

3     about -- before you went in there, Detective

4     Beavers -- I'm sorry -- Detective Vasquez,

5     Beavers, Forrester and a Prosecutor were present,

6     did you tell me that?

7     A.    Yes.

8     Q.    That was true also, wasn't it?

9     A.    They was sitting there?

10    Q.    Yes.

11    A.    Yes.

12    Q.    And that was contained in the statement that

13    you gave me?

14    A.    Yes.

15    Q.    They wanted to talk to you about that

16    statement, but I think -- did you tell me you

17    asked Where is the money?  Did you tell me that?

18    A.    That wasn't when I went to the grand jury.

19    That was after I made a statement.

20    Q.    Okay.  And I'll ask you to look at the fifth

21    paragraph on Page 2.

22    A.    That it was still made after that.

23    Q.    That's fine.  That's fine.  At the time that

1    you're in front of the grand jury, were you asked

2    the question about testifying at that time and

3    about when you would get your money?

4    A.   I knew it would be after that.

5    Q.   I understand.  But my question is did you

6    tell me that and is that contained in the report?

7    A.   That's contained in the report.

8    Q.   Okay.  Now, the next question I have for you

9    is that the homicide of Brenda Navarre occurred in

10    1993; is that correct?

11    A.   Yes.

12    Q.   Okay.  And from 1993 until 2003 when you

13    made the first contact or made a statement to a

14    police officer, there's been all kinds of talk in

15    the street about Brenda Navarre's homicide; had it

16    not?

17    A.   Yes.

18    Q.   And did you tell me that in your statement

19    about word on the street about that homicide, you

20    had heard a lot?

21    A.   Yes.

22    Q.   You heard, and let me just ask you this and

23    clarify it if I'm wrong:  Word on the street was

1    that Brenda Navarre had been a snitch, correct?

2    A.    Yes.

3    Q.    And that's why she died, right?

4    A.    Yes.

5    Q.    Now, I'm going to hand you the document

6    again and ask you to look at the last paragraph.

7           MR. LOISEL:    Which document are we

8    referring to?

9           MR. WINGATE:   Defendant's Exhibit B.

10   Q.    Top of the page.

11   A.    Yes.

12   Q.    Okay.  As it relates to that, did you tell

13   me that at the grand jury you had asked about the

14   money from Crime Stopper.  Did you tell me that?

15   A.    But it was after.

16   Q.    I said after the grand jury.

17   A.    Oh, yes.

18   Q.    Okay.  You did tell me that?

19   A.    Yes.

20   Q.    That's in the statement?

21   A.    Yes.

22   Q.    That's true also, correct?

23   A.    Uh-huh.

1    Q.    Did you also tell me that you were told to

2    talk to Detective Forrester and you felt you were

3    being given the runaround?

4    A.    Yes.

5    Q.    That's in the statement?

6    A.    Yes.

7    Q.    That's also true, isn't it?

8    A.    Yes.

9    Q.    As it relates to your charge of obstructing

10    justice, you were charged with obstructing justice

11    at a hearing in this court where you indicated you

12    would not testify; is that correct?

13    A.    Yes.

14            MR. LOISEL:    Objection, Your Honor.

15            THE COURT:    What basis?

16            MR. LOISEL:    Relevance.

17            THE COURT:    Overruled.

18    Q.    As a matter of fact, this courtroom,

19    correct?

20    A.    Yes.

21    Q.    Okay.  And you went home.  And let me back

22    that up.

23         You were told if you didn't testify, they

1     were going to have you arrested, they were going

2     to put a high bond on you and they were going to

3     keep you in jail, didn't they?

4     A.     Yes.

5     Q.     That night were you arrested?

6     A.     Yes.

7     Q.     Were you kept in jail for a period of time?

8     A.     Yes.

9     Q.     You were then charged with obstructing

10    justice?

11    A.     Yes.

12    Q.     And that's what you were arrested for,

13    correct?

14    A.     Yes.

15    Q.     Felony of the third degree?

16    A.     Yes.

17    Q.     You're looking at one, two, three, four,

18    five years in prison; is that correct?

19    A.     Yes.

20    Q.     First deal that they offered you, the State

21    of Ohio reduced it down to a misdemeanor?

22    A.     Yes.

23    Q.     Second degree at most you would be looking

1    at, if you went to jail, would be 90 days,

2    correct?

3    A.    I didn't know.

4    Q.    Your attorney didn't inform you of that?

5    A.    No.

6    Q.    But as of today's date, upon you testifying,

7    your case is going to be dismissed?

8    A.    Yes.

9          MR. WINGATE:    Just one second, Your

10    Honor.  I may be finished.

11    Q.    Mr. Wilson has been incarcerated as a result

12    of the charge that was filed against him; is that

13    correct, Robert was arrested?

14    A.    Yes.

15    Q.    Yeah, charged with this offense.

16          Would it be fair to say that up until the

17    11th of August, 2008, that you have visited him on

18    a regular basis at the county jail?

19    A.    Yes.

20          MR. WINGATE:    Nothing further.

21          THE COURT:    Redirect.

22          MR. LOISEL:    Thank you, Judge.

23                    -  -  -

1                    REDIRECT EXAMINATION

2        BY MR. LOISEL:

3        Q.    All right, Ms. Wilson -- Mrs. Wilson.  With

4        respect to the letter, I believe it is Defendant's

5        Exhibit A, you never showed that to me, correct?

6        A.    No.

7        Q.    You didn't make a copy of it to keep,

8        correct?

9        A.    No.

10       Q.    So you and I didn't have an opportunity to

11       go through that letter line by line like you just

12       did with Mr. Wingate, correct?

13       A.    No.

14       Q.    Now, I want to talk to you about this what's

15       referred to as Defendant's Exhibit B.  It is

16       entitled Interview of Janet Wilson.  And

17       Mr. Wingate just went through it with you picking

18       out various facts that you indicate were true?

19       A.    Yes.

20       Q.    Correct?

21       A.    Yes.

22       Q.    Now, with respect to this, we could go

23       through it line by line, but there are statements

1      in this affidavit or this Interview of Janet

2      Wilson, whatever you want to call it, that are

3      incorrect; is that true?

4      A.    Yes.

5      Q.    Could you describe to us what portions of

6      that affidavit are incorrect?

7      A.    I don't have it in front of me, I --

8           MR. LOISEL:    Well, may I approach,

9       Judge?

10          THE COURT:    Yes.

11     Q.    Here.  I'm going to hand you what's been

12     marked as State's -- Defendant's Exhibit B.  Take

13     a look at that, if you would, please.  And if you

14     could read over that first paragraph, please.

15     A.    In 2003 --

16          MR. WINGATE:    I would object.

17     Q.    You don't have to read it out loud, but if

18     you could just read it over, please.

19          With respect to that paragraph, is that

20     entire paragraph true or false?

21     A.    False.

22     Q.    Can you read over to yourself the third

23     paragraph beginning with "prior to me calling."

```
1      A.     False.

2      Q.     So that paragraph is false?

3      A.     Yes.

4      Q.     What about the next paragraph?

5      A.     It's true and false.

6      Q.     Are we referring to the paragraph that

7      begins "In 2003"?

8      A.     Yes.

9      Q.     So, there's true and false in that

10     paragraph?

11     A.     Yes.

12     Q.     What is that paragraph talking about?

13     A.     The girl, Crissy.

14     Q.     So tell us what is true and false about that

15     information.

16     A.     I didn't receive a letter, and Robert was

17     seeing a girl Crissy while he was on the streets

18     and while he was in jail.

19     Q.     So some of that is true and some of it is

20     false?

21     A.     Yes.

22     Q.     How about the next paragraph beginning with

23     "I heard."
```

```
1     A.    The first part the true.

2     Q.    And what does the first part talk about?

3     A.    About the talk in the streets about the

4     Brenda Navarre murder, the second part is false.

5     Q.    What's the second part?

6     A.    When it says I was lying to the police about

7     the murder.  I did say the rest.  I did add that

8     to my letter.

9     Q.    So, I mean, we can go through the entirety

10    of that exhibit --

11    A.    Yes.

12    Q.    -- but let me ask you this general question:

13    With respect to the rest of that exhibit,

14    Defendant's Exhibit B, does it go along the same

15    lines as to what you just talked about, some true,

16    some false, some true, some false?

17    A.    Yes, sir.

18    Q.    And at any time did the Defense Attorney

19    Wingate ask you to sign that statement?

20    A.    Yes.

21    Q.    When did he ask you to sign that statement?

22    A.    At the hospital -- at the rehab.

23    Q.    So, he came out to the rehab center where
```

224

1     you were in February; is that correct?

2     A.     Yes.

3     Q.     Of 2007?

4     A.     Yes.

5     Q.     And he asked you to sign that affidavit?

6     A.     Yes.

7     Q.     Did you?

8     A.     No.

9     Q.     Why not?

10    A.     Because it had some lies in it.

11    Q.     So you refused to sign it?

12    A.     Yes.

13    Q.     Now, let's talk about Defendant's Exhibit A.

14    You're familiar with that.  That's a letter you

15    wrote?

16    A.     Yes.

17    Q.     And who did you write that letter to?

18    A.     I wrote it to Robert.

19    Q.     With respect to what's true and what's false

20    about that letter, can you tell us is it entirely

21    true?

22    A.     No.

23    Q.     Is it entirely false?

```
1       A.      No, it is not entirely false.

2       Q.      I'm sorry?

3       A.      No, it is not entirely false.

4       Q.      So, again, same thing.  Some of it has some

5       truism, some of it -- some false?

6       A.      Yes.

7       Q.      Now, Mr. Wingate asked you about some

8       meetings that you had with respect to Detective

9       Forrester and Detective Beavers where there was

10      some talk about the Crime Stopper money, correct?

11      A.      Yes.

12      Q.      When did you learn about Crime Stopper

13      money?

14      A.      About the third or fourth time that

15      Mr. Forrester was over to the house.

16      Q.      So you had testified earlier that that was

17      sometime in maybe 2005, 2006?

18      A.      Yes, 2005.

19      Q.      And let me just make sure.  When did you

20      first talk to Sergeant Forrester about what you

21      testified earlier?

22      A.      2003.

23      Q.      In 2003 you talked to him?
```

```
1     A.    Yes.

2     Q.    And when did you first then make your

3     statement to Detective Vasquez?

4     A.    2005.  I think June.

5     Q.    In June?

6     A.    Yes.

7     Q.    And was that consistent with what you had

8     told Detective Forrester?

9              MR. WINGATE:   I'm going to object to the

10       leading nature, that's all.

11              THE COURT:    I'll allow it.

12    A.    Yes.

13    Q.    So the statement you made to

14    Detective Vasquez in June of '05 was consistent

15    with what you had told Sergeant Forrester in 2003?

16    A.    Yes.

17    Q.    Had you been offered $5,000 dollars in 2003?

18    A.    No.

19    Q.    When you made that initial statement in

20    2005, had you been offered $5,000 dollars?

21    A.    No.

22    Q.    When you made those statements to

23    Sergeant Forrester and Detective Vasquez prior to
```

```
 1      learning about the Crime Stopper money, what was

 2      your intention with respect to testifying?

 3      A.    I -- could you repeat that?

 4       (WHEREUPON THE RECORD READ BACK BY THE COURT

 5       REPORTER.)

 6      A.    Well, I felt that Brenda's mother should

 7      know.

 8              MR. WINGATE:   Your Honor, I'm going to

 9       object.

10              MR. LOISEL:    What basis?

11              MR. WINGATE:   May we approach?

12              THE COURT:     I'm going to overrule your

13       objection at this point.

14              MR. WINGATE:  Okay.

15      Q.    So you felt Brenda's mother should know.

16      Explain that statement.  I'm not sure what you

17      mean.

18              MR. WINGATE:   I'll object and ask to

19       approach, Your Honor.

20              THE COURT:     She's already been joined

21       not to testify to any communications she may have

22       had with respect to her husband.

23      A.    I felt she should know who -- should know
```

1    why her daughter was killed.

2    Q.    Now, did you intend to testify when you

3    initially contacted the police?

4    A.    No.

5    Q.    What about the second time you talked to the

6    police, did you intend to testify?

7    A.    No.

8    Q.    Was your story the same when you talked to

9    them those first two times?

10   A.    Yes.

11   Q.    And eventually you went to grand jury; is

12   that correct?

13   A.    Yes.

14   Q.    And was your testimony consistent with what

15   you told us here today --

16   A.    Yes.

17   Q.    -- about what happened back in December of

18   1993?

19   A.    Yes.

20            MR. LOISEL:    Just one minute, Judge.

21     Thank you, Mrs. Wilson.  Nothing further.

22            THE COURT:    Any further cross?

23            MR. WINGATE:    Yes.

1                      CROSS-EXAMINATION

2       BY MR. WINGATE:

3       Q.     You did not have an opportunity to discuss

4       that letter with Mr. Loisel because the letter was

5       first in possession of Mr. Cameron and then in my

6       possession; is that correct?

7       A.     Yes.

8       Q.     And you didn't have any copies of it; is

9       that correct?

10      A.     No.

11      Q.     As it relates to -- and the Prosecutor took

12      you through Paragraph 1, Paragraph 3, Paragraph 4,

13      Paragraph 5 of Defendant's Exhibit B, and you

14      responded to him by saying part true, part false;

15      is that correct?

16      A.     Yes.

17      Q.     All right.  Matter of fact, you told him the

18      entire document is part true, part false --

19      A.     Yes.

20      Q.     -- is that correct?

21             You said the same thing about the letter

22      that you had written; is that correct?

23      A.     Yes.

1    Q.    Part true, part false --

2    A.    Yes.

3    Q.    -- is that correct?

4         And would it be fair to say that you have

5    the ability to put true and false statements

6    together to come up with a convincing story; would

7    that be true?

8    A.    Yes.

9    Q.    As a matter of fact, in that document, did

10   you say, "I used some of the information that I

11   heard in the streets and made up some details to

12   convince Lou I was telling the truth."  Did you

13   tell me that?

14   A.    I said that.

15   Q.    And as far as the Prosecutor asking you why

16   did you finally decide to testify, we agree you

17   were paid $5,000 dollars?

18   A.    Yes.

19   Q.    And you also indicated to the Prosecutor you

20   wanted the mother to know?

21   A.    Yes.

22   Q.    All right.  And would it be fair to say that

23   for over a decade from 1993, it didn't matter

1    whether she knew or not?  I'll rephrase the

2    question and ask it differently.  Okay?

3              From 1994, '95, '96, '97, '98, '99, 2000,

4    2001, 2002, and a portion of 2003, you didn't come

5    forward with any information; is that correct?

6    A.    No, sir.

7    Q.    And finally as it relates to that statement,

8    the Prosecutor asked and you said that you refused

9    to sign that document because it was a lie; is

10   that correct?

11   A.    Some of it was, yes.

12   Q.    Some of it was, some of it wasn't?

13   A.    Yes.

14   Q.    But in talking to me you indicated you made

15   some corrections on it, that lie, you made some

16   corrections on it to make them accurate; is that

17   correct?

18   A.    Yes.

19   Q.    And you said you wanted to talk to your

20   attorney?

21   A.    Yes.

22   Q.    Okay.

23             MR. WINGATE:   Nothing further.

1                         -  -  -

2                  FURTHER REDIRECT EXAMINATION

3        BY MR. LOISEL:

4        Q.    Mr. Wingate dramatically ran off the years

5        from the time of --

6                  MR. WINGATE:    Objection.

7                  THE COURT:     I will allow it.

8        Q.    From the time of the murder from 1993 to

9        2003.  He asked why you didn't come forward from

10       '94, '95, '96, up until 2003 when you did finally

11       come forward.  Why didn't you come forward

12       earlier?

13                 MR. WINGATE:    I don't think that was my

14        question.

15                 THE COURT:     I'll allow it.

16       A.    I couldn't live with it no more.  I didn't

17       come forward.  It just -- it -- I just finally

18       couldn't live with it no more.

19       Q.    Live with what?

20       A.    The knowledge of a murder.

21                 MR. LOISEL:    Thank you.  No further

22        questions.

23                 THE COURT:     Cross?

1          MR. WINGATE:    Nothing further.

2          THE COURT:    You are excused.  Thank

3     you.  Who is your next witness?

4          MR. LOISEL:    Judge, if we could

5     approach on a scheduling matter.

6          (WHEREUPON A DISCUSSION AT THE BENCH WAS

7     HELD OFF THE RECORD.)

8          MR. LOISEL:    Judge, may I just have two

9     minutes.  This witness is a little out of order.

10    I need to get something.

11         THE COURT:    All right.  The jury can

12    stand up and stretch.  We can take a little break

13    here.

14         MR. LOISEL:    Sorry for the delay,

15    Judge.  I apologize.

16                   -  -  -

17              OFFICER ROBERT MALONE,

18    being first duly sworn by the Court, testified as

19    follows:

20         THE COURT:    Please give us your name

21    and spelling of your name.

22         THE WITNESS:  Robert A. Malone,

23    M-A-L-O-N-E.

```
 1              THE COURT:     Thank you.

 2                         -  -  -

 3                    DIRECT EXAMINATION

 4      BY MR. LOISEL:

 5      Q.    Good afternoon, Officer.

 6      A.    Good afternoon.

 7      Q.    How are you today?

 8      A.    Great.

 9      Q.    Can you introduce yourself to the jury?

10      A.    Ladies and gentlemen, I'm Officer Malone,

11      Toledo Police Department.

12      Q.    And Officer Malone, how long have you been a

13      member of the Toledo Police Department?

14      A.    32 years.

15      Q.    And in what capacity -- well, let me ask you

16      this:  With respect to training and education, can

17      you give us a little bit of background as to going

18      up to or being a police officer?

19      A.    Well, I went through a 20 week academy and

20      graduated that and we hit the street November

21      of --

22      Q.    I'm sorry?

23      A.    Hit the street in November of '76.
```

1     Q.     November of '76?

2            And when you say you hit the street, you

3     were patrol officer or road officer?

4     A.     Yes.

5     Q.     I think it is clear, but explain to us what

6     a road officer does.

7     A.     Respond to radio calls, calls from service

8     and citizens, traffic control, anything and

9     everything.

10    Q.     And are you currently a road officer at this

11    point in time?

12    A.     I'm assigned to the traffic section at this

13    time.

14    Q.     And are you assigned to different sections

15    throughout your career or how does that work?

16    A.     Yes.  Throughout my career I was assigned to

17    field operations, which is the road patrol; and

18    went to background and recruiting; and went back

19    to field operations; and then I went into the

20    traffic section where I've been the last -- where

21    I've been the last 12 years.

22    Q.     I'm sorry.  What was that?

23    A.     I've been there the last 12 years.

236

```
1      Q.    Were you working for the Toledo Police --

2      obviously you were back in 1993, but were you a

3      member of the Toledo Police Department?

4      A.    Yes, I was.

5      Q.    What section were you back then?

6      A.    Working field operations at that time, and I

7      was doing traffic injury accident investigation.

8      Q.    Okay.  And do you recall responding to a

9      scene at Paxton and E Street --

10     A.    Yes, sir.

11     Q.    -- on or about December 1st, 1993?

12     A.    Yes.

13     Q.    And is that here in Toledo, Ohio?

14     A.    Yes, it is.

15     Q.    And tell us what you remember about that

16     night.

17     A.    Very little actually.  It was so long ago.

18     It was cold and I was sent there to assist the

19     crews on the scene, the detectives, take

20     photographs of the crime scene.

21     Q.    And do you remember taking photographs of

22     the crime scene?

23     A.    Yes.
```

1    Q.    And was that part of your duty as a road

2    officer, to help the detectives with respect to

3    taking photographs?

4    A.    It was part of my duties as my assignment,

5    the tech's investigation.  We were working

6    nightshift and normally at that particular time

7    they didn't have evidence techs working in the

8    evenings, so they used the accident investigators

9    if they just needed photographs of the crime

10   scenes taken.

11             MR. LOISEL:    Judge, may I approach?

12             THE COURT:    Yes.

13             MR. LOISEL:    Let me put these back in

14    order.  I apologize.

15   Q.    Officer, with respect to that night, you

16   indicated that was a long time ago, right?

17   A.    It was.

18   Q.    Do you remember what the scene was back at

19   Paxton and E Street back in 1993?

20   A.    Well, the thing that sticks out in my mind

21   was supposedly there was a felonious assault

22   involving a female victim and a large rock.

23   Q.    Okay.  And do you remember what the call was

1      that you responded to going to that scene?

2      A.     My call was just an assist call.

3      Q.     Okay.

4      A.     That's all.  I didn't even hear the original

5      call come in.

6      Q.     So you get a call to assist and you respond

7      to that area?

8      A.     Yes.

9      Q.     Do you recall what you did when you got to

10     that scene that night?

11     A.     I took the photographs.

12     Q.     Okay.

13     A.     And that was it.

14     Q.     Okay.  Did you talk to anybody?

15     A.     No.

16     Q.     Did you just --

17     A.     Well, it was -- as far as police officers

18     were concerned?  Yes, I talked to some police

19     officers.

20     Q.     You didn't talk to -- interview any

21     witnesses or anything like that?

22     A.     No.

23     Q.     All right.  Officer, I'm going to hand you

1     what's been marked as State's Exhibit 2 and I

2     would ask you to take a look at that and see if

3     you recognize that.

4     A.     It looks like the rock that I took the

5     picture of that was lying --

6     Q.     And that was from the scene back in 1993?

7     A.     Yes.

8     Q.     Officer, I'm going to show you what's been

9     marked as State's Exhibit 3.  Can you take a look

10    at that for me, please.

11    A.     That's a temporary parking restriction sign

12    for leaf pickup lying in the sidewalk.  It appears

13    it was lying next to the large pool of blood on

14    the sidewalk.

15    Q.     And do you recognize that photo?

16    A.     Uh-huh.

17    Q.     And is that fair and accurate representation

18    of what you saw back at that night in 1993?

19    A.     Yes, it is.

20    Q.     I'm sorry?

21    A.     Yes.

22    Q.     Okay.  I'm going to hand you what's been

23    marked as State's Exhibit 4.  Would you look at

1    that for me, please.

2    A.    Large pool of blood lying beside the large

3    rock that's supposedly I was told that's where the

4    victim --

5              MR. WINGATE:   I will object as to what

6     he was told.

7              THE COURT:    Sustained.

8    A.    Okay.

9    Q.    Well, what do you see?  What's in the

10   picture?

11   A.    It is a large pool of blood and the large

12   rock taken together side by side.

13   Q.    And that's, again, from the scene of Paxton

14   and E Street?

15   A.    Yes, it is.

16   Q.    Is that a fair and accurate representation

17   of what you saw that night?

18   A.    To the best of my knowledge, yes.

19   Q.    Okay.  We're going to do this for each one.

20   State's Exhibit 5.  Can you look at that for me.

21   A.    This is a photograph of a large rock, large

22   rock is in the foreground, pool of blood is in the

23   rear.  Same photograph at a different angle.

241

1    Q.    And, again, do this for the record.  Does

2    that appear to be substantially the same or the

3    same scene that you photographed back in 1993?

4    A.    It appears to be, yes.

5          MR. LOISEL:    May I have just a minute,

6    Judge?

7    Q.    All right.  Get to this a little quicker

8    now.  Officer, I hand you what's been marked as

9    State's 6 through 11.  If you would take a look at

10   those photos for me.

11   A.    Number 6 shows a large pool of blood taken

12   lying on the sidewalk with the temporary no

13   parking sign in the rear.

14   Q.    Okay.  And 7?

15   A.    7 is a large rock sitting on a two-wheel

16   hauler.  Appears to be the rock from the scene, I

17   guess.

18   Q.    Okay.  Number 8?

19   A.    Is a different angle photograph of the same

20   rock.

21   Q.    Number 9?

22   A.    Same thing, same rock, different angle.

23   Q.    Okay.  Number 10?

1    A.    Number 10 is a photograph of the large rock

2    at the scene before it was removed showing rock

3    only with blood spatters on it.

4    Q.    And Number 11?

5    A.    Number 11 is another picture photograph

6    depicting the blood and the large rock lying

7    together side by side.

8    Q.    Side by side?  I'm sorry.  I didn't mean to

9    cut you off.

10   A.    On the sidewalk at the scene.

11   Q.    And I'll ask you generally with respect to

12   these exhibits, State's 6 through 11 that you just

13   describe, do those appear to be or are they the

14   same pictures that you took of the scene back in

15   1993?

16   A.    Do they appear to be --

17   Q.    Do they accurately represent what you saw

18   back in 1993?

19   A.    Yes.

20        MR. LOISEL:    Thank you, is Officer.

21    Nothing further.

22        THE COURT:    Cross.

23        MR. WINGATE:    We have no questions.

1          THE COURT:     Officer, you are excused.

2     Thank you.

3          THE WITNESS:   Thank you.

4          THE COURT:     Do you want to call it a

5     day?

6          MR. LOISEL:    Judge, can we approach?

7          THE COURT:     Sure.

8          (WHEREUPON THE FOLLOWING DISCUSSION WAS

9     HELD AT THE BENCH.)

10          MR. LOISEL:    Judge, I understand we're

11    getting close to calling it quits, but as I

12    indicated before, this witness Alfonzo Davis is

13    the State's next witness.  He's been here both

14    days taking off work.  If there's any way we

15    could attempt to get him on today.  Mr. Wingate

16    indicated that he may want to talk to him

17    tomorrow, but is there any way that we can at

18    least start the examination today since he's been

19    here?

20          THE COURT:     I don't care.  Get it

21    started.

22          MR. LOISEL:    I mean, if there's any way

23    we could finish, that would obviously be the

1    State's preference.  I don't know how long you

2    want to go.

3              THE COURT:    We'll have to see.  Go

4    ahead and call your witness.

5              (WHEREUPON THE PRECEDING DISCUSSION AT

6    THE BENCH CONCLUDED AND THE FOLLOWING PROCEEDINGS

7    WERE HELD.)

8              MR. LOISEL:    State would call Alfonzo

9    Davis.

10                        -   -   -

11                   ALFONZO DAVIS,

12   being first duly sworn by the Court, testified as

13   follows:

14             THE COURT:    Would you give us you're

15   name and spelling of your name, please.

16             THE WITNESS:  Alfonzo Davis,

17   A-L-F-O-N-Z-O, D-A-V-I-S.

18             THE COURT:    All right.

19             MR. LOISEL:    Thank you, Judge.

20                        -   -   -

21                   DIRECT EXAMINATION

22   BY MR. LOISEL

23   Q.   Mr. Davis, you live here in Toledo?

1       A.      Yes.

2       Q.      And are you familiar with Robert Wilson?

3       A.      Yes.

4       Q.      How do you know Robert Wilson?

5       A.      My mother's husband.

6       Q.      So what's your mother's name?

7       A.      Janet Wilson.

8       Q.      And is he your father or are you a blood

9       relation?

10      A.      No.

11      Q.      So he's your stepfather?

12      A.      I guess you would call it that.

13      Q.      Okay.  And how long have you known the

14      Defendant?  I'm sorry.  Do you see Mr. Wilson here

15      in the courtroom?

16      A.      Yes.

17      Q.      And can you point to him and describe what

18      he's wearing?  What is he wearing?

19      A.      Oh, gray jumpsuit.

20              THE COURT:      The record will reflect

21       that the witness has identified the Defendant.

22      Q.      Now, I asked you and I got ahead of myself.

23      How long have you known Mr. Wilson?

246

```
 1     A.    Been a while.  I don't know exactly how
 2     long, but been say about 16 years or so, something
 3     like that.
 4     Q.    Okay.  So how old are you?
 5     A.    How old am I?  33.
 6     Q.    So about half of your life you've known him?
 7     A.    Yep.
 8     Q.    Now, would you say what kind of a
 9     relationship do you have with the Defendant?
10     A.    That depends.  I mean --
11     Q.    Are you close with him?
12     A.    He's okay guy.  I mean, but as far as my
13     mother's husband, that's a different story.
14     Q.    What do you mean?
15     A.    Just, he's a nice guy, but being my mother's
16     husband I prefer him not to be.
17     Q.    Okay.  Fair enough.  Now, do you remember
18     having contact with Mr. Wilson and your mother
19     back in 1993, the night in December?
20     A.    To the best of my knowledge, yes.
21     Q.    Now, obviously that's 15, 14 and a half some
22     odd years ago, right?  Why do you remember one
23     night in December of 1993?
```

1    A.    Only night that they stayed at our house.

2    Q.    And who was it that stayed at your house?

3    A.    My mother and Robert Wilson.

4    Q.    He never stayed at your house before that?

5    A.    Not at this house, no.

6    Q.    He never stayed at that house after that?

7    A.    Not that I can recall.

8    Q.    Now, with respect to that night back in

9    December, did you ever have a conversation with

10   the Defendant about what took place on that night?

11   A.    Vaguely.

12   Q.    Do you recall when that conversation took

13   place?

14   A.    Not what day it took place.

15   Q.    I mean, was it close to that night in

16   December, was it a month later, years later?

17   A.    Oh, no, years later.

18   Q.    Years later?

19   A.    Yes.

20   Q.    And can you tell us about that conversation?

21   A.    Well, we was riding around and some stuff

22   happened with my brother and me.  Somebody got

23   killed and my brother told the paper this and that

```
 1      and roughly he said Snitch bitches die.

 2      Q.     Who said that?

 3      A.     Robert Wilson.

 4      Q.     He said Snitch bitches die?

 5      A.     Yeah.

 6      Q.     And did he say anything else with respect to

 7      that comment?

 8      A.     To the best of my knowledge, not that I

 9      could recall.

10      Q.     What else did you two talk about while you

11      were in the car?

12      A.     I don't recall everything.  I don't -- that

13      was a long time ago.

14      Q.     But you recall that part of the

15      conversation?

16      A.     Yeah.  Yes, I do, because it was about some

17      stuff that we went through, me and my brother, and

18      a friend of ours got killed.

19      Q.     And how did that relate to your conversation

20      then with Mr. Wilson?

21      A.     Because my brother snitched on the guys that

22      killed him and he said That's what happens, snitch

23      bitches get killed.
```

1    Q.    Now, with respect to the investigation of

2    Brenda Navarre, did you ever have an

3    investigation?

4    A.    I'm sorry?

5    Q.    Did you ever -- with respect to the

6    Brenda Navarre murder, did you ever have a chance

7    to talk to Toledo Police Officers?

8    A.    Just at my house.

9    Q.    Do you remember when that took place?

10    A.    A couple years ago, September two years ago

11    or so.

12    Q.    Okay.  Do you recall who you talked to?

13    A.    Not their names, no, but the guy sitting

14    next to you and another guy.

15    Q.    If I told you his name was

16    Detective Beavers, does that ring any bells?

17    A.    Not really, no.

18    Q.    But he talked to you?

19    A.    Yes.

20    Q.    And another guy?

21    A.    Yes.

22    Q.    And this took place at your house?

23    A.    Yes.

1    Q.    Now, when you talked to them, did you talk

2    to him about the conversation we just talked

3    about?

4    A.    Yes.

5    Q.    You told him about the conversation that you

6    had with the Defendant?

7    A.    Yes.

8    Q.    And do you recall telling them more specific

9    information --

10          MR. WINGATE:   I'm going to object.

11   Q.    -- on that date?

12          MR. WINGATE:   I'm going to object.  May

13    we approach?

14          (WHEREUPON THE FOLLOWING DISCUSSION WAS

15    HELD AT THE BENCH.)

16          MR. WINGATE:   Judge, the objection is

17    that I think at this juncture as on direct

18    examination he's attempting to cross-examine this

19    witness.  This is his witness.  This is the one

20    he called.

21          MR. LOISEL:   Judge, the jury can hear

22    everything Mr. Wingate says.  I ask that he not

23    talk too loud.  I don't think he's doing it on

1    purpose.

2         What I'm trying to establish is that his

3    statement back then was clearer and more precise

4    with what Robert Wilson said.  I had a feeling he

5    may do this, so I'm trying to establish some

6    surprise and affirmative damage with respect to

7    this witness.  I mean, we can go through the

8    rules with respect to him.  I believe it is

9    803 -- I'm sorry -- 607 about the State's ability

10   to then cross-examine this witness.  So I'm just

11   trying to get to the base of what he talked about

12   with the police because he gave them a different

13   statement back in 2006.

14         MR. WINGATE:   Well, the thing is this --

15         MR. LOISEL:    If I could show surprise

16   and affirmative damage, this is the first time he

17   told me -- didn't say what he told me he said.

18   He has previously told me different statements.

19   This isn't the first time.  I've not heard that.

20   He's not mentioning those statements.  It comes

21   as a surprise.  It is affirmative damage because

22   he makes statements privy -- I'm sorry -- he

23   makes specific statements attributable to

1      Robert Wilson.

2            MR. WINGATE:   Even from the witness

3      stand he's made statements attributable to

4      Robert Wilson.  He said, Robert Wilson, Snitch

5      bitches die.  I guess the problem --

6            THE COURT:     These statements that were

7      to Defendant?

8            MR. LOISEL:    Sure.

9            THE COURT:     Are you sure?

10           MR. LOISEL:    Yes.

11           MR. WINGATE:   But the other thing,

12     Judge, is if you're calling them statements,

13     again, we go back to whether or not they have

14     been adopted or authored by this particular

15     person, whether he's even seen what was written

16     in the report.  The Prosecutor is now calling it

17     a statement and I guess Mike is just in a long

18     line of prosecutors who, when it comes to

19     divulging a prior 16(B)(1)(g) request as a

20     statement, it becomes a narrative.  It is what

21     the detective wrote.  If he, the witness, has not

22     seen or authored, then it cannot be a statement.

23     So, how can you impeach him for the purposes of

 1     turning over with something that's not a

 2     statement but now that I want to impeach him, it

 3     is a statement.  They just can't have it both

 4     ways.

 5          MR. LOISEL:   What I can do is show it

 6     to him.  If he adopts it as his statement, then

 7     it just dovetails into --

 8          THE COURT:   I'm going to allow it.

 9     You can show it to him and see if it refreshes

10     his recollection.

11          MR. WINGATE:   Note our objection because

12     it is not a statement.

13          (WHEREUPON THE PRECEDING DISCUSSION AT

14     THE BENCH CONCLUDED AND THE FOLLOWING PROCEEDINGS

15     WERE HELD.)

16     BY MR. LOISEL:

17     Q.    Mr. Davis, at this point if I had an

18     opportunity, I'm going to show you a previous

19     statement that you made to the detective when they

20     came out to your house.

21     A.    Yes.

22     Q.    If you could take a look at that and see if

23     that refreshes your recollection?

1    MR. WINGATE:   Could we see -- may we

2  approach?

3    (WHEREUPON THE FOLLOWING DISCUSSION WAS

4  HELD AT THE BENCH.)

5    MR. WINGATE:   We would like to see the

6  document that's being given, if you don't mind.

7    THE COURT:    You have an opportunity to

8  review it after he's had an opportunity to see,

9  whether it refreshes his recollection or not.

10    MR. WINGATE:   Your Honor, I guess what

11  I'm getting to is there are two parts to this

12  statement and I don't believe that the part --

13  part of it is not this particular witnesses.

14    THE COURT:    We'll see.

15    (WHEREUPON THE PRECEDING DISCUSSION AT

16  THE BENCH CONCLUDED AND THE FOLLOWING PROCEEDINGS

17  WERE HELD.)

18    THE COURT:    I'm going to allow him

19  to -- the question is does it refresh your

20  recollection or not.  Don't say what it says.

21  A.    Okay.  Okay.  Yes, it does.

22  Q.    Did you have a chance to look at both pages?

23  A.    Yes, I did.

1      Q.     And that does refresh your recollection --

2      A.     Yes.

3      Q.     -- as to what you said to the detectives

4      back on looks like September 7th, 2006?

5      A.     Yes.

6      Q.     Now, let me ask you, do you recall with more

7      specificity what you talked about with those

8      detectives back then?

9      A.     Which part?  We talked about where we lived,

10      where we stayed, and when we drove around in the

11      car.

12      Q.     With respect to the conversation that you

13      had with Robert Wilson.  I'm sorry.  You're

14      correct.

15            Do you recall now with more specificity

16      that conversation that you had with Robert Wilson?

17      A.     Yes, that he had to do what he had to do.

18      Q.     Well, you read the statement, correct?

19      A.     Yes, I did.

20      Q.     What did he have to do?

21      A.     He had to kill the snitch bitch.  I mean,

22      that's what he said.  I never heard a name before.

23      The only time I heard a name was from my mother.

1      Q.      Now, do you know with respect to that

2    conversation how he killed the snitch bitch?

3      A.      Dropped a brick on her head.

4      Q.      And he told you that back around 1995?

5      A.      To the best of my knowledge, yes.

6      Q.      Okay.

7              MR. LOISEL:      Nothing further.   Thank

8    you.

9              THE COURT:      Mr. Wingate.

10             MR. WINGATE:   Yes, may we approach?

11             THE COURT:      Sure.

12             (WHEREUPON THE FOLLOWING DISCUSSION WAS

13    HELD AT THE BENCH.)

14             MR. WINGATE:   First we would like to see

15    the statement that he gave him to refresh his

16    recollection.

17             MR. LOISEL:     Okay.

18             THE COURT:      Go ahead.   Do you want to

19    take a minute?

20             MR. WINGATE:   Yes.

21             THE COURT:      Go ahead.

22             MR. LOISEL:     For the purposes of the

23    record I suppose we should probably have this

1    marked, or I can do that in open court or here.

2                 MR. WINGATE:    What?

3                 MR. MCELROY:    It is the only --

4                 MR. LOISEL:    To have this marked so we

5    know.

6                 THE COURT:    That would be State's

7    Exhibit 12?

8                 MR. LOISEL:    Yes.

9                 (WHEREUPON THE PRECEDING DISCUSSION AT

10   THE BENCH CONCLUDED AND THE FOLLOWING PROCEEDINGS

11   WERE HELD.)

12                            -  -  -

13                    CROSS-EXAMINATION

14   BY MR. WINGATE:

15   Q.    All right, Mr. Davis.  As it relates to the

16   statement that you just gave, you said it occurred

17   in 1995?

18   A.    I don't remember the date.

19   Q.    All right.  But now you don't remember when

20   this conversation took place?

21   A.    It was a long time ago, no, I don't.

22   Q.    All right.  A long time ago a conversation

23   took place and you were told this, right?

258

1    A.    Yes.

2    Q.    Okay.  And you talked to the detectives on

3    September the 7th of 2006, correct?

4    A.    Yes.

5    Q.    All right.  And I'll ask you to look at the

6    last line, last sentence on Page 1 of that

7    exhibit.  Have you had a chance to read it?

8    A.    Yes.

9    Q.    All right.  Could I have it back?

10          On September the 6th -- I'm sorry.

11   September the 7th, 2006, your mother told you that

12   he had dropped a rock on a girls head that was

13   snitching, right?

14   A.    Yes.

15   Q.    That's what's in that report, right?

16   A.    Yes.

17   Q.    She's the one that gave you that

18   information?

19   A.    Probably, to the best of my knowledge.  I'm

20   not for sure.  It was so long ago, both of them

21   were.

22   Q.    Right.  And I understand that.  And you and

23   I had an opportunity to talk, correct?

1    A.    Yes.

2    Q.    And you love your mother?

3    A.    Yes, I do.

4    Q.    A lot?

5    A.    Yes, I do.

6    Q.    Can't say the same for Robert?

7    A.    Nope.

8    Q.    All right.  We're being up front.  And with

9    Robert, like him as a person but he's not the one

10   for your mother?

11   A.    No.

12   Q.    And you have problems with that?

13   A.    Yes.

14   Q.    And as far as the statement he dropped a

15   rock on the head of the girl that was snitching,

16   that came from Janet Wilson, your mother, correct?

17   A.    To the best of my knowledge I --

18   Q.    Well, all I'm saying is this is what you

19   told the detective --

20   A.    To the best of my knowledge, yes.

21   Q.    -- right, on September the 7th, 2006?

22         MR. WINGATE:   Just one second.  Your

23   Honor, could we approach for a second?  I need

1        some information read back to me.

2                        (OFF THE RECORD.)

3        BY MR. WINGATE:

4        Q.    And as it relates -- and we've talked

5        before, right?

6        A.    Right.

7        Q.    And although it was a brief conversation and

8        at the time you told me about marijuana -- and

9        you're not charged with anything, there won't be

10       any charges coming.  But you talked to me about

11       the amount of marijuana you was smoking at the

12       time, correct --

13       A.    Yes.

14       Q.    -- or during that period of time?

15              And when the Prosecutor asked you the

16       question about him, meaning Robert Wilson, telling

17       you about a snitch bitch in 1995, that didn't

18       occur, did it?

19       A.    I don't know when it happened.

20       Q.    All right.  As a matter of fact, let me just

21       ask it this way in conjunction with anything your

22       mother had told you about a rock being dropped --

23              MR. LOISEL:    Objection, Your Honor.

1       It's been asked and answered.

2              THE COURT:    Overruled.

3    Q.    About a rock being dropped on someone's

4    head, and you don't know when she told you that;

5    is that correct?

6    A.    Yes.

7    Q.    All right.  And as a matter of fact, that

8    could be the source of your information that you

9    are testifying to today, correct?

10   A.    I'm not for sure.

11             MR. WINGATE:   We have no further

12    questions.

13             THE COURT:    Redirect?

14             MR. LOISEL:   Just briefly.  Thank you,

15    Judge.  May I approach?

16                           -   -   -

17                     REDIRECT EXAMINATION

18    BY MR. LOISEL:

19   Q.    Mr. Davis, Attorney Wingate asked you to

20    look at the --

21   A.    I seen it.

22   Q.    -- the last line of the first page of

23    State's Exhibit 12; do you recall that?

1      A.      Yes.

2      Q.      Can you look on Page 2, the fourth line down

3      and look at that for me, please.  Have you had a

4      cans to look at it?

5      A.      Yes.

6      Q.      Now, Mr. Wingate asked you whether or not it

7      is your recollection or your mother's recollection

8      about the Defendant talking about dropping a rock

9      on a snitch bitch.

10     A.      Yes.

11     Q.      That second page, what do you indicate

12     there?

13             MR. WINGATE:    Object, Your Honor.

14             THE COURT:     This is the officer's

15      statement of the witness's statement -- or

16      officer writing up of the witness's statement; is

17      that correct?

18             MR. LOISEL:    Yes.

19             THE WITNESS:   Yes.

20             MR. LOISEL:    And it refers to --

21      Mr. Wingate pointed him to a statement that was

22      attributable to his mother.

23             THE COURT:     Isn't that hearsay?

1              MR. LOISEL:   He's opened the door with

2      respect to any statement with that

3      supplemental --

4              MR. WINGATE:   May we approach?

5              THE COURT:    No.  You can talk right

6      there.

7              MR. WINGATE:   Well, Your Honor, as far

8      as the State saying I opened the door, that is

9      not correct.  The State didn't object.  I'm

10     objecting.  It is hearsay and I'm asking that it

11     be not allowed.

12             THE COURT:    I understand that it was

13     the Defendant's statement, but now I understand

14     it is the mother's statement, so it is clearly

15     hearsay.  Is there an exception you're aware of?

16             MR. LOISEL:   Your Honor, it is the

17     Defendant's -- same that he used to refresh his

18     recollection.

19             THE COURT:    He said it was his

20     mother's statement.

21             MR. LOISEL:   Well, that's what

22     Mr. Wingate wants the jury to believe.

23             MR. WINGATE:   Your Honor, I will object

264

1      to that and ask for a mistrial because it is

2      prosecutorial misconduct.

3              MR. LOISEL:    It is not.  Judge, if you

4      recall the line of questioning, he asked him to

5      look at the bottom and look at the statement

6      attributable to his mother and I'm asking him to

7      look further into his statement and it is not

8      attributable to his mother, so I'm trying to

9      correct that.

10             THE COURT:    You can't impeach your own

11     witness.  Sustained.

12             MR. LOISEL:    Fine.  Nothing further.

13             THE COURT:    Anything else?

14             MR. WINGATE:   No.

15             THE COURT:    All right.  We're going to

16     take a recess for the day.  At this time, members

17     of the jury, you will not discuss this case among

18     yourselves, nor with anyone else.  Do not allow

19     anyone to discuss this case in your presence, or

20     form any opinions until the case has been

21     submitted to you.  What time do you want to start

22     tomorrow morning?

23             MR. WINGATE:   9:00.

1                 MR. LOISEL:    That's fine, Judge.

2                 THE COURT:    All right.  See you back

3      here at 9:00 o'clock.  We're in recess.

4                 (WHEREUPON COURT ADJOURNED FOR THE DAY ON

5      SEPTEMBER 3, 2008, AT 4:50 P.M.)

6                            -   -   -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1

2

3                    **C E R T I F I C A T E**

4

5

6

7                    I, THE UNDERSIGNED, HEREBY CERTIFY

8    THAT THE ABOVE AND FOREGOING IS A TRUE AND

9    COMPLETE TRANSCRIPT OF THE PROCEEDINGS HAD IN THE

10   TRIAL OF THE ABOVE-ENTITLED CAUSE.

11

12

13

14

15

16                              _____

17                              Stacey L. McDevitt, RPR

18                                   Official Court

19          Reporter

20

21

22

23

## $

**$100** [3] - 38:10, 205:17, 210:10
**$30** [1] - 82:17, 82:21
**$5,000** [8] - 179:18, 204:17, 204:20, 213:8, 213:16, 226:17, 226:20, 230:17
**$60** [1] - 83:18

### '

**'03** [1] - 111:12
**'05** [2] - 177:3, 226:14
**'06** [1] - 103:20
**'07** [2] - 64:6, 192:10
**'08** [1] - 64:6
**'73** [1] - 126:2
**'76** [2] - 234:23, 235:1
**'83** [1] - 126:11
**'85** [1] - 41:6
**'93** [5] - 109:5, 110:15, 110:16, 111:13, 142:17
**'94** [2] - 7:19, 232:10
**'95** [2] - 231:3, 232:10
**'96** [2] - 231:3, 232:10
**'97** [1] - 231:3
**'98** [1] - 231:3
**'99** [1] - 231:3

## 1

**1** [5] - 2:9, 132:20, 164:3, 229:12, 258:6
**10** [12] - 2:13, 58:21, 76:6, 76:7, 76:10, 77:9, 126:15, 126:17, 207:17, 207:20, 241:23, 242:1
**1017** [1] - 195:7
**104** [1] - 2:3
**11** [5] - 2:14, 241:9, 242:4, 242:5, 242:12
**11-9-06** [1] - 103:19
**110** [6] - 29:14, 30:4, 30:10, 31:16, 33:19, 34:8
**1115** [3] - 136:22, 136:23, 143:16
**11th** [3] - 49:18, 49:19, 219:17
**12** [5] - 2:14, 235:21, 235:23, 257:7, 261:23
**1229** [1] - 130:20
**125** [1] - 2:4
**12th** [4] - 49:18, 49:19, 49:22, 50:15,

**132** [1] - 2:9
**134** [1] - 2:4
**136** [1] - 2:4
**14** [1] - 246:21
**146** [1] - 2:4
**148** [1] - 2:4
**15** [7] - 52:18, 84:18, 101:20, 102:6, 131:22, 133:16, 246:21
**153/170** [1] - 2:5
**154/202** [1] - 2:5
**16** [1] - 246:2
**16(B)(1)(g** [5] - 102:16, 118:8, 120:3, 120:20, 252:19
**16(B)(1)(g)** [1] - 145:7
**16th** [3] - 49:21, 77:19, 90:20
**17** [1] - 136:16
**18** [1] - 39:17
**1834** [1] - 136:14
**19** [2] - 55:18, 173:16
**19(B)(1)(L** [1] - 64:4
**192** [1] - 164:4
**1981** [1] - 126:4
**1983** [2] - 126:9, 126:13
**1985** [1] - 41:14
**1990** [2] - 80:12, 80:13
**1991** [7] - 41:18, 41:23, 80:12, 80:13, 80:15, 80:18, 82:6
**1992** [1] - 171:14
**1993** [67] - 7:18, 9:23, 11:18, 11:21, 12:6, 30:10, 30:22, 32:8, 32:17, 33:6, 33:18, 34:5, 34:11, 34:21, 35:8, 36:2, 39:16, 42:8, 42:10, 42:11, 43:16, 46:3, 47:12, 49:20, 49:21, 49:22, 50:15, 50:23, 53:3, 72:4, 72:8, 72:9, 80:13, 85:18, 90:21, 96:15, 96:19, 100:13, 101:21, 107:6, 126:21, 127:2, 132:10, 133:23, 136:17, 136:20, 137:6, 140:3, 146:16, 154:20, 194:9, 194:16, 215:10, 215:12, 228:18, 230:23, 232:8, 236:2, 236:11, 237:19, 239:6, 239:18, 241:3, 242:15, 242:18, 246:19, 246:23
**1994** [2] - 32:17, 231:3
**1995** [3] - 256:4,

77:19, 77:20, 90:20
**1997** [1] - 41:20
**1998** [1] - 10:12
**1st** [10] - 30:9, 30:22, 72:8, 96:19, 107:6, 109:5, 127:2, 194:9, 194:16, 236:11

## 2

**2** [8] - 1:6, 2:9, 114:12, 114:15, 212:20, 214:21, 239:1, 262:2
**20** [3] - 129:16, 140:23, 234:19
**2000** [2] - 34:20, 231:3
**2001** [1] - 231:4
**2002** [1] - 231:4
**2003** [21] - 33:10, 33:11, 35:8, 36:2, 36:8, 36:16, 37:14, 38:1, 172:4, 172:12, 173:1, 215:12, 221:15, 222:7, 225:22, 225:23, 226:15, 226:17, 231:4, 232:9, 232:10
**2005** [9] - 38:3, 173:8, 174:15, 176:6, 176:13, 225:17, 225:18, 226:4, 226:20
**2006** [15] - 33:11, 34:12, 38:5, 106:13, 107:9, 109:6, 110:22, 179:1, 181:12, 225:17, 251:13, 255:4, 258:3, 258:1, 259:21
**2007** [6] - 8:21, 34:21, 34:23, 191:23, 192:2, 224:3
**2008** [4] - 1:9, 3:1, 219:17, 265:5
**201** [1] - 136:14
**208** [1] - 2:16
**21** [1] - 58:20
**211** [1] - 2:16
**213-4477** [1] - 1:21
**220** [1] - 2:5
**229** [1] - 2:5
**23** [1] - 41:5
**232** [1] - 2:5
**234** [1] - 2:5
**239** [2] - 2:9, 2:10
**240** [2] - 2:10, 2:11
**241** [3] - 2:11, 2:12, 2:12
**242** [3] - 2:13, 2:13, 2:14
**245** [1] - 2:6
**25** [3] - 125:10, 125:11, 125:22
**257** [1] - 2:6
**26** [1] - 171:14
**261** [1] - 2:6

257:17, 260:17
**266** [2] - 2:14
**29** [1] - 155:16
**2945.42** [2] - 155:16, 156:4
**2:00** [4] - 150:14, 150:19, 156:17, 157:1
**2:02** [1] - 134:13
**2:07** [1] - 134:16
**2:08** [1] - 134:16
**2:09** [1] - 134:14
**2nd** [2] - 30:10, 72:9

## 3

**3** [7] - 1:9, 2:10, 3:1, 3:2, 229:12, 239:9, 265:5
**30** [1] - 120:14
**32** [1] - 234:14
**323** [1] - 57:22
**33** [2] - 55:18, 246:5
**3:00** [1] - 144:6
**3d** [3] - 55:18, 57:21, 57:22, 164:3

## 4

**4** [4] - 1:6, 2:10, 229:12, 239:23
**40** [1] - 2:3
**403** [1] - 18:1
**403(A** [2] - 7:4, 8:14
**404** [4] - 4:7, 17:3, 17:13, 88:3
**404(b** [15] - 3:16, 3:17, 5:8, 7:3, 7:9, 8:12, 8:13, 11:4, 11:9, 12:9, 13:3, 16:20, 17:23, 66:3, 94:14
**404(b)** [2] - 4:12, 9:19
**4141** [1] - 195:5
**419** [1] - 1:21
**43624** [1] - 1:21
**47** [4] - 96:4, 96:5, 136:10, 136:11
**4:50** [1] - 265:5

## 5

**5** [3] - 2:11, 229:13, 240:20
**50** [3] - 38:10, 205:17, 210:10
**514** [1] - 58:21
**54** [1] - 171:6

## 6

**6** [4] - 2:11, 241:9, 241:11, 242:12
**601** [1] - 151:5
**601(B** [2] - 152:1, 153:22

**607** [1] - 251:9
**611** [2] - 44:23, 186:12
**670** [1] - 57:21
**6th** [2] - 12:15, 111:10, 156:15, 160:20, 167:15, 168:19, 258:10

## 7

**7** [3] - 2:12, 241:14, 241:15
**700** [1] - 1:21
**73** [1] - 57:22
**75** [1] - 2:3
**7th** [4] - 255:4, 258:3, 258:11, 259:21

## 8

**8** [2] - 2:12, 241:18
**80** [1] - 57:21
**803** [2] - 51:15, 251:9
**803(3** [10] - 53:9, 55:8, 55:14, 55:17, 55:20, 58:4, 58:12, 60:11, 62:23, 67:20
**803(3)** [7] - 51:16, 51:22, 55:7, 59:23, 60:22, 65:14, 68:15
**8:50** [1] - 3:3

## 9

**9** [2] - 2:13, 241:21
**90** [1] - 219:1
**911** [4] - 98:2, 98:3, 100:7, 100:10
**93** [1] - 2:3
**94** [1] - 2:3
**9:00** [2] - 264:23, 265:3
**9th** [3] - 106:13, 109:6, 110:13

## A

**a.m** [2] - 134:19, 134:21
**A.M** [1] - 3:3
**abeyance** [1] - 8:23
**ability** [2] - 230:5, 251:9
**able** [2] - 37:3, 115:19
**ABOVE** [2] - 266:8, 266:10
**ABOVE-ENTITLED** [1] - 266:10
**absence** [1] - 11:14
**Absolutely** [6] - 65:20, 72:18, 76:20, 77:2, 80:6, 82:15

1

**absolutely** [1] - 65:22

**academy** [3] - 41:14, 41:18, 234:19

**Academy** [1] - 126:5

**accept** [1] - 54:20

**accepted** [1] - 70:3

**accident** [3] - 11:14, 236:7, 237:8

**accompany** [1] - 78:5

**According** [1] - 134:12

**according** [8] - 55:14, 55:16, 55:17, 66:16, 119:20, 127:9, 156:10, 167:5

**accuracy** [1] - 26:4

**accurate** [6] - 13:20, 105:20, 107:3, 231:16, 239:17, 240:16

**accurately** [2] - 133:22, 242:17

**act** [5] - 12:13, 15:16, 162:4, 162:14, 166:10

**acted** [4] - 11:7, 11:17, 12:7, 13:6

**acting** [2] - 13:21, 87:18

**action** [1] - 29:16

**actions** [3] - 58:16, 60:5, 183:9

**active** [1] - 24:3

**activity** [2] - 12:8, 44:19

**acts** [28] - 4:7, 4:9, 5:10, 5:12, 5:14, 5:15, 6:6, 6:15, 7:10, 7:17, 9:11, 9:15, 9:17, 14:4, 15:1, 16:11, 62:13, 94:11, 94:20, 155:18, 161:22, 162:21, 164:19, 165:22, 166:17, 167:1, 167:4, 167:7

**actual** [1] - 118:20

**actuality** [1] - 123:2

**AD** [1] - 2:8

**Adams** [1] - 1:21

**add** [3] - 45:1, 63:11, 223:7

**addition** [1] - 125:19

**additional** [6] - 21:12, 22:21, 28:4, 28:7, 41:12, 50:20

**Additionally** [3] - 12:11, 16:18, 164:1

**additionally** [3] - 42:6, 46:5, 74:10

**address** [18] - 3:10, 9:5, 21:22, 28:22, 28:23, 34:1, 35:22, 52:11, 56:15, 71:13, 104:9, 115:13, 136:15, 136:18,

150:13, 158:22, 194:19, 199:12

**addressed** [1] - 42:7

**adequately** [2] - 5:13, 7:12

**ADJOURNED** [1] - 265:4

**administration** [2] - 164:8, 164:16

**Administration** [1] - 126:3

**admiss** [1] - 4:21

**admissibility** [3] - 4:16, 4:18, 5:5

**admissible** [13] - 7:6, 7:19, 9:12, 9:15, 10:22, 10:23, 11:11, 13:3, 55:16, 58:3, 58:11, 58:19, 60:7

**admission** [2] - 24:19, 58:12

**admit** [1] - 54:4

**admitted** [5] - 13:9, 15:14, 15:18, 24:22, 33:5

**admitting** [1] - 11:6

**adopt** [2] - 141:21, 157:23

**adopted** [5] - 140:22, 141:5, 164:2, 164:12, 252:14

**adopts** [1] - 253:6

**advantage** [1] - 63:18

**adverse** [2] - 164:5, 164:13

**advise** [2] - 22:8, 61:7

**advised** [1] - 170:9

**Afari** [1] - 89:6

**affect** [1] - 123:6

**affidavit** [5] - 190:9, 190:23, 221:1, 221:6, 224:5

**aforementioned** [1] - 1:9

**afraid** [9] - 54:19, 59:3, 59:4, 59:21, 61:2, 209:19, 209:20

**afternoon** [3] - 170:22, 234:5, 234:6

**Ages** [1] - 168:22

**ago** [20] - 84:18, 101:21, 102:6, 107:13, 111:16, 125:23, 126:16, 126:17, 131:22, 140:1, 148:11, 236:17, 237:16, 246:22, 248:13, 249:10, 257:21, 257:22, 258:20

**agree** [4] - 14:1, 24:18, 165:17, 230:16

**agreement** [1] - 24:19

**ahead** [13] - 57:13,

82:20, 83:16, 97:14, 108:18, 125:22, 188:13, 192:22, 193:10, 244:4, 245:22, 256:18, 256:21

**Alfonzo** [11] - 2:6, 2:14, 33:3, 200:1, 200:2, 200:6, 200:9, 200:11, 243:12, 244:8, 244:16

**ALFONZO** [2] - 244:11, 244:17

**Alfonzo's** [1] - 199:15

**alive** [1] - 31:9

**allegation** [1] - 182:19

**alleged** [6] - 6:23, 10:15, 10:19, 15:20, 16:11, 77:18

**allegedly** [1] - 167:21

**alleging** [4] - 7:22, 14:10, 87:7, 162:12

**alleviating** [1] - 47:10

**allow** [38] - 17:12, 17:19, 35:18, 44:6, 44:21, 45:12, 52:14, 54:20, 63:8, 66:21, 68:13, 70:10, 71:1, 73:9, 73:13, 88:4, 97:12, 130:10, 131:11, 150:16, 169:5, 180:9, 186:13, 189:2, 190:13, 193:8, 195:18, 198:12, 198:18, 198:23, 199:20, 210:14, 226:11, 232:7, 232:15, 253:8, 254:18, 264:18

**Allow** [1] - 88:3

**allowable** [3] - 37:6, 129:3, 161:3

**allowances** [1] - 86:8

**allowed** [32] - 12:14, 12:18, 15:17, 17:14, 22:2, 22:7, 37:9, 45:1, 60:19, 60:20, 61:5, 61:8, 63:15, 65:14, 67:20, 68:10, 86:8, 94:13, 117:14, 118:18, 119:21, 121:10, 157:16, 157:23, 165:18, 169:10, 169:17, 169:22, 192:9, 263:11

**allowing** [2] - 12:19, 70:8

**allows** [4] - 11:9, 12:10, 55:22

**almost** [2] - 13:17, 187:8

**alone** [2] - 6:6, 165:20

**altercations** [1] - 174:23

**ambush** [2] - 65:3, 66:17

**amount** [2] - 83:17, 260:11

**anal** [1] - 32:23

**analysis** [1] - 35:1

**Ancillary** [1] - 123:16

**AND** [28] - 18:8, 19:20, 37:18, 43:12, 45:15, 52:8, 68:7, 71:15, 88:6, 93:1, 104:16, 113:6, 114:20, 124:16, 142:13, 146:6, 150:2, 170:5, 184:10, 189:5, 198:2, 201:15, 244:6, 253:14, 254:16, 257:10, 266:8

**Andre** [1] - 88:19

**angle** [3] - 240:23, 241:19, 241:22

**anonymous** [1] - 46:22

**answer** [18] - 25:4, 25:5, 25:6, 25:8, 25:9, 25:13, 45:18, 74:17, 109:2, 111:6, 111:8, 154:12, 180:6, 180:9, 192:9, 192:22, 204:5, 206:5

**answered** [4] - 144:12, 144:18, 210:12, 261:1

**answering** [1] - 110:7

**anticipate** [1] - 24:6

**anticipated** [2] - 54:14, 60:15

**anticipating** [1] - 35:14

**anytime** [1] - 101:23

**anyway** [1] - 22:5

**anyways** [1] - 52:6

**Apanovitch** [4] - 55:17, 58:4, 58:20, 60:8

**apartment** [1] - 199:16

**Apartment** [1] - 136:14

**APNOVITCH** [1] - 55:18

**apologize** [2] - 233:15, 237:14

**appeal** [1] - 123:19

**Appeals** [1] - 167:16

**appear** [6] - 73:12, 99:21, 160:10, 241:2, 242:13, 242:16

**appearance** [3] - 25:22, 73:8, 115:20

**APPEARANCES** [1] - 1:13

**appeared** [5] - 73:8,

85:2, 92:11, 127:23, 128:3

**appellant** [10] - 55:16, 58:3, 58:7, 59:19, 59:21, 165:19, 165:21, 166:8, 166:9, 166:16

**appellate** [1] - 165:17

**Appellate** [3] - 11:5, 15:13, 123:23

**applicable** [2] - 14:9, 14:15, 59:23, 169:4

**applies** [2] - 4:23, 168:12

**apply** [8] - 4:10, 14:5, 20:11, 22:22, 25:20, 166:10, 168:2

**applying** [1] - 161:21

**Applying** [1] - 26:8

**appointed** [1] - 151:21

**Approach** [1] - 87:2

**approach** [40] - 19:4, 19:5, 36:19, 42:18, 44:9, 51:6, 69:5, 86:22, 91:20, 102:16, 111:22, 113:22, 114:7, 115:7, 131:5, 132:14, 135:4, 140:7, 140:11, 145:8, 149:1, 150:8, 182:12, 187:13, 196:17, 198:10, 200:22, 201:10, 221:8, 227:11, 227:19, 233:5, 237:11, 243:6, 250:13, 254:2, 256:10, 259:23, 261:15, 263:4

**approximate** [1] - 49:17

**April** [1] - 90:20

**area** [11] - 96:19, 97:20, 99:2, 100:4, 127:2, 133:17, 137:14, 146:13, 171:9, 188:6, 238:7

**areas** [2] - 91:10, 162:11

**argue** [13] - 13:15, 24:7, 37:8, 70:4, 71:3, 87:20, 92:21, 117:23, 122:5, 131:9, 158:6

**argued** [4] - 13:5, 15:16, 17:4, 17:15

**argues** [1] - 13:18

**arguing** [11] - 31:13, 53:9, 70:17, 121:10, 137:15, 137:18, 137:19, 138:8, 138:9, 138:20, 201:11

**argument** [10] - 14:7, 37:1, 65:18, 119:14, 137:21, 138:15, 143:20, 144:2, 152:15, 159:16

**arguments** [5] -

20:17, 22:20, 28:6,
140:23, 158:20
**arraignment** [1] -
156:20
**array** [1] - 174:1
**arrest** [1] - 192:20
**arrested** [11] - 49:12,
191:18, 192:5, 192:6,
192:12, 192:14,
192:19, 218:1, 218:5,
218:12, 219:13
**arrests** [1] - 125:19
**arrival** [1] - 130:12
**arrive** [1] - 132:2
**arrived** [7] - 82:7,
104:22, 127:7,
130:15, 134:9,
134:13, 134:16
**article** [3] - 18:14,
19:14, 19:23
**articles** [3] - 18:16,
18:18, 19:15
**articulate** [1] - 37:7
**ascertain** [1] - 60:18
**assault** [1] - 237:21
**assert** [1] - 157:9
**asserted** [5] - 63:5,
69:23, 70:8, 70:20,
71:7
**asserting** [2] -
155:17, 157:20
**assign** [1] - 26:8
**assigned** [6] - 41:16,
41:19, 42:4, 235:12,
235:14, 235:16
**assignment** [1] -
237:4
**assist** [1] - 236:18,
238:2, 238:6
**assistance** [7] -
27:22, 46:17, 47:4,
47:9, 50:21, 87:17,
120:2
**Assistant** [1] - 1:14
**Assisted** [1] -
131:22
**associated** [1] -
87:11
**associates** [1] -
41:11
**assume** [3] - 10:13,
51:9, 167:21
**assuming** [1] -
146:22
**assumption** [1] - 8:8
**AT** [50] - 19:7, 19:19,
36:22, 37:17, 42:21,
43:11, 44:12, 45:14,
51:8, 52:7, 69:7,
71:14, 87:4, 88:5,
91:22, 92:23, 102:18,
104:15, 112:2, 113:5,
114:10, 114:19,
115:10, 124:15,
135:7, 140:14,
142:12, 145:10,
146:5, 149:3, 150:1,

150:9, 182:14, 184:9,
187:15, 189:4,
196:20, 198:1, 201:3,
201:14, 233:6, 243:9,
244:5, 250:15,
253:13, 254:4,
254:15, 256:13,
257:9, 265:5
**attach** [1] - 169:4
**attempt** [5] - 21:8,
21:11, 21:14, 28:19,
243:15
**attempting** [3] -
89:21, 122:23, 250:18
**attention** [7] - 24:20,
114:13, 114:16,
180:15, 181:7, 194:8
**attentive** [1] - 20:4
**Attorney** [17] - 67:7,
102:21, 117:9,
120:18, 121:9, 148:2,
185:12, 188:7, 188:9,
189:21, 191:9, 192:4,
193:14, 193:19,
212:8, 223:18, 261:19
**attorney** [14] - 23:10,
24:15, 28:23, 117:6,
121:3, 152:19,
153:21, 170:12,
184:21, 203:3,
206:16, 206:20,
219:4, 231:20
**attorneys** [4] - 21:5,
24:3, 24:11, 24:18
**Attorneys** [1] - 64:2
**attributable** [5] -
251:23, 252:3,
262:22, 264:6, 264:8
**August** [6] - 49:22,
50:14, 77:20, 179:1,
181:12, 219:17
**aunt's** [1] - 100:20
**auspices** [1] - 65:1
**author** [1] - 141:20
**authored** [3] - 141:5,
252:14, 252:22
**availability** [2] -
55:20, 56:17
**available** [8] - 6:13,
6:19, 7:15, 8:15,
14:23, 15:3, 68:18,
151:8
**Avenue** [1] - 195:5
**avoid** [1] - 145:21
**aware** [19] - 7:2,
13:10, 16:23, 27:4,
37:1, 66:11, 84:6,
85:19, 86:2, 86:5,
102:23, 103:12,
123:22, 159:5, 160:3,
181:15, 188:4, 200:6,
263:15

**B**

**Bachelor's** [1] -
126:2

**BACK** [1] - 227:4
**background** [5] -
45:1, 131:12, 186:12,
234:17, 235:18
**backs** [1] - 9:10
**bad** [7] - 5:11, 7:11,
12:13, 62:13, 94:2,
94:11, 173:22
**bag** [3] - 199:2,
199:3
**Bailiff** [2] - 21:10,
21:20
**balancing** [4] -
164:3, 164:4, 164:12,
165:13
**Bankston** [1] - 88:23
**bar** [9] - 161:14,
174:22, 175:1,
176:15, 176:19,
176:22, 177:6,
205:21, 212:22
**BARBER** [1] - 1:5
**Barber** [1] - 1:10
**barely** [1] - 31:9
**Barnett** [1] - 31:19
**Bart** [3] - 177:19,
178:7, 205:3
**base** [1] - 251:11
**Based** [2] - 166:15,
167:3
**based** [12] - 18:21,
53:4, 54:14, 59:9,
59:12, 64:11, 66:23,
77:12, 163:3, 163:5,
163:6, 167:14
**basis** [4] - 26:15,
43:1, 71:2, 158:17,
169:11, 217:15,
219:18, 227:10
**bath** [2] - 200:16,
201:8
**bathroom** [1] - 115:1
**BE** [1] - 1:8
**beat** [5] - 15:11,
127:9, 130:13,
173:22, 174:2
**beaten** [1] - 31:3
**Beavers** [13] - 33:7,
34:23, 76:17, 107:16,
107:17, 177:19,
178:7, 205:3, 209:10,
214:4, 214:5, 225:9,
249:16
**became** [4] - 41:21,
42:1, 42:3, 66:11
**become** [4] - 64:1,
83:22, 85:19, 126:1
**becomes** [1] -
252:20
**bed** [2] - 145:1,
145:3
**beg** [2] - 163:7,
188:3
**begin** [1] - 22:16
**beginning** [3] -
80:13, 221:23, 222:22
**begins** [1] - 222:7

**behalf** [3] - 1:14,
1:17, 68:21
**behavior** [1] - 13:7
**belief** [2] - 7:23,
159:11
**believes** [2] - 66:19,
159:2
**bells** [1] - 249:16
**belonging** [1] -
123:17
**Bench** [1] - 9:8
**BENCH** [49] - 19:7,
19:20, 36:22, 37:18,
42:21, 43:12, 44:12,
45:15, 51:8, 52:8,
69:7, 71:15, 87:4,
88:6, 91:22, 93:1,
102:18, 104:16,
112:2, 113:6, 114:10,
114:20, 115:10,
124:16, 135:7,
140:14, 142:13,
145:10, 146:6, 149:3,
150:2, 150:9, 182:14,
184:10, 187:15,
189:5, 196:20, 198:2,
201:3, 201:15, 233:6,
243:9, 244:6, 250:15,
253:14, 254:4,
254:16, 256:13,
257:10
**bench** [6] - 115:21,
117:6, 122:18, 131:9,
145:22, 201:11
**beside** [1] - 240:2
**best** [9] - 110:8,
148:17, 240:18,
246:20, 248:8, 256:5,
258:19, 259:17,
259:20
**better** [7] - 39:4,
39:5, 39:13, 39:19,
116:14, 116:17, 119:3
**between** [16] -
16:16, 26:22, 31:13,
33:11, 36:1, 77:23,
90:22, 90:23, 97:6,
121:5, 161:13,
161:23, 166:22,
167:13, 168:3, 168:23
**beyond** [1] - 131:2
**bias** [1] - 26:5
**big** [5] - 17:9, 97:7,
104:3, 110:2, 188:6
**bikes** [1] - 98:20
**Bill** [1] - 40:6
**bills** [3] - 38:10,
205:17, 210:10
**bit** [4] - 41:9, 62:21,
181:1, 234:17
**Bitch** [1] - 138:5
**bitch** [4] - 255:21,
256:2, 260:17, 262:9
**bitches** [2] - 248:1,
248:4, 248:23, 252:5
**black** [5] - 31:2,
31:13, 138:13,

139:15, 172:8
**Blade** [3] - 18:15,
18:19, 19:23
**blah** [3] - 98:8
**blank** [1] - 146:3
**bleeding** [2] -
127:11, 128:2
**blond** [1] - 99:16
**blood** [16] - 31:10,
97:20, 100:1, 100:2,
128:11, 128:22,
133:4, 133:5, 239:13,
240:2, 240:11,
240:22, 241:11,
242:3, 242:6, 245:8
**blunt** [1] - 32:5
**board** [2] - 174:3,
174:4
**bodily** [1] - 55:10
**body** [5] - 32:22,
97:7, 97:21, 99:17,
128:3
**boils** [1] - 14:7
**bond** [1] - 218:2
**Bonneville** [1] -
98:22
**bottom** [1] - 264:5
**boulder** [8] - 31:16,
33:19, 34:8, 97:8,
97:10, 97:17, 99:9
**box** [2] - 183:5,
184:8
**break** [3] - 115:12,
117:7, 233:12
**Brenda** [81] - 7:23,
8:2, 10:1, 11:21,
12:21, 14:17, 16:22,
29:15, 29:17, 29:19,
29:21, 30:1, 30:8,
30:13, 30:15, 30:16,
30:19, 31:9, 31:17,
31:21, 32:4, 32:22,
33:20, 46:7, 46:10,
46:11, 47:1, 47:12,
47:23, 48:8, 48:11,
49:16, 50:8, 50:14,
51:12, 51:17, 53:3,
53:22, 67:17, 71:20,
72:5, 72:12, 72:17,
75:3, 75:5, 75:14,
76:21, 78:1, 78:16,
78:20, 79:7, 79:17,
86:18, 87:12, 87:18,
88:10, 89:17, 91:1,
92:2, 129:19, 129:21,
130:3, 172:19,
172:21, 173:7,
173:21, 174:5, 174:8,
174:13, 175:4,
177:14, 178:2, 183:4,
183:11, 184:3, 215:9,
215:15, 216:1, 223:4,
249:2, 249:6
**Brenda's** [2] - 227:6,
227:15
**Brewski's** [4] -
174:22, 205:21,
210:22, 212:22

3

**brick** [1] - 256:3
**bridge** [1] - 167:8
**brief** [2] - 12:23, 86:13, 260:7
**briefly** [4] - 41:8, 91:19, 261:14
**bring** [1] - 30:21
**bringing** [3] - 135:10, 181:6, 197:17
**broken** [1] - 164:19
**Broom** [1] - 5:6
**brother** [7] - 97:2, 98:15, 105:6, 247:22, 247:23, 248:17, 248:21
**brother's** [1] - 98:17
**brought** [3] - 10:21, 24:20, 180:14
**brown** [1] - 199:2
**buddy's** [1] - 101:6
**building** [1] - 166:6
**bulletin** [1] - 174:3
**Burg** [1] - 107:15
**Burrell** [10] - 84:20, 88:15, 107:7, 107:9, 107:22, 108:8, 108:9, 110:23, 146:17, 147:4
**business** [1] - 94:4
**buttress** [1] - 34:14
**buy** [12] - 30:15, 82:18, 82:19, 82:21, 82:22, 83:2, 83:7, 83:17, 90:3, 90:5, 91:9
**buys** [7] - 10:3, 77:17, 83:12, 83:13, 89:17, 91:10, 93:8
**BY** [32] - 40:19, 43:14, 45:17, 73:15, 75:11, 79:6, 81:15, 93:5, 95:19, 104:20, 125:2, 134:7, 136:1, 142:15, 146:10, 148:1, 153:4, 154:19, 170:21, 189:7, 202:2, 207:23, 220:2, 227:4, 229:2, 232:3, 234:4, 244:22, 253:16, 257:14, 260:3, 261:18
**bye** [5] - 168:11, 196:12, 197:6, 197:15, 198:5
**bystanders** [1] - 159:15

## C

**C-R-A-I-G** [1] - 95:16
**camera** [4] - 120:21, 121:1, 123:12, 156:12
**Cameron** [2] - 188:23, 229:5
**cannot** [9] - 17:17, 39:2, 60:17, 84:19, 142:1, 166:16, 183:22, 252:22
**cans** [1] - 262:4

**capacity** [6] - 46:9, 75:21, 76:12, 80:9, 90:7, 234:15
**capital** [1] - 156:20
**car** [11] - 78:5, 79:10, 91:12, 99:8, 105:11, 128:19, 159:3, 166:8, 166:19, 248:11, 255:11
**card** [1] - 174:14
**care** [5] - 12:5, 14:20, 20:2, 145:17, 243:20
**career** [3] - 126:20, 235:15, 235:16
**cars** [1] - 133:21
**case** [142] - 4:6, 4:10, 4:20, 5:8, 5:15, 5:17, 6:3, 6:5, 7:3, 8:4, 9:5, 9:13, 10:11, 10:12, 10:13, 11:15, 11:16, 12:19, 14:6, 14:8, 14:16, 14:22, 15:12, 15:22, 17:4, 17:8, 17:10, 17:15, 17:19, 20:5, 20:8, 20:14, 20:18, 20:23, 21:3, 21:8, 21:12, 22:22, 23:10, 24:8, 24:13, 24:14, 25:16, 27:18, 28:1, 29:4, 32:8, 32:11, 32:14, 32:17, 33:10, 34:3, 34:4, 34:10, 38:23, 39:7, 39:21, 39:22, 47:1, 48:7, 52:13, 52:15, 52:16, 52:17, 55:14, 56:1, 58:8, 58:22, 59:6, 59:9, 59:13, 60:1, 60:4, 60:12, 60:13, 61:12, 63:7, 63:17, 66:6, 66:15, 67:10, 79:2, 84:4, 86:10, 86:20, 93:16, 107:15, 109:23, 115:3, 115:4, 116:14, 119:2, 123:6, 123:19, 127:22, 140:8, 150:15, 150:16, 150:18, 153:9, 153:15, 154:5, 154:9, 156:7, 156:10, 156:15, 156:20, 160:3, 160:9, 160:12, 160:15, 160:23, 161:13, 161:14, 161:17, 161:19, 162:2, 162:19, 163:9, 163:11, 163:18, 163:19, 164:10, 166:4, 166:15, 167:15, 169:4, 173:23, 178:23, 180:13, 187:23, 207:18, 207:19, 219:7, 264:17, 264:19, 264:20
**CASE** [1] - 1:3

**cases** [35] - 7:18, 9:6, 9:7, 9:9, 12:3, 12:12, 12:16, 14:18, 49:3, 55:6, 55:19, 57:10, 76:3, 77:1, 77:5, 77:10, 81:8, 81:9, 81:19, 81:20, 81:21, 84:13, 89:14, 89:15, 89:16, 90:12, 90:15, 123:21, 123:22, 156:16, 156:18, 160:1, 165:14, 172:7
**Cashen** [3] - 127:8, 130:13, 134:16
**Caucasian** [1] - 129:7
**CAUSE** [1] - 266:10
**caused** [1] - 31:22
**causing** [1] - 33:20
**cautionary** [4] - 17:11, 61:22, 68:16, 69:8
**cautious** [2] - 17:11, 45:11
**ceases** [2] - 163:17, 163:22
**cement** [1] - 99:20
**center** [2] - 203:22, 223:23
**centered** [1] - 190:1
**certain** [10] - 4:22, 5:19, 13:10, 13:19, 17:21, 63:1, 158:1, 167:4, 167:7, 168:6
**certainly** [7] - 5:2, 6:19, 27:4, 62:14, 89:23, 91:11, 131:13
**CERTIFY** [1] - 266:7
**cetera** [1] - 55:10
**chambers** [2] - 36:23, 52:23
**chance** [7] - 19:11, 84:11, 156:9, 156:14, 249:6, 254:22, 258:7
**change** [1] - 143:2
**character** [1] - 94:17
**charge** [10] - 7:14, 15:16, 38:9, 69:9, 132:3, 132:13, 184:17, 188:1, 217:9, 219:12
**charged** [18] - 12:2, 146:17, 146:18, 181:16, 182:3, 182:4, 182:5, 182:22, 183:1, 183:9, 183:16, 184:1, 184:13, 184:19, 217:10, 218:9, 219:15, 260:9
**charges** [15] - 6:16, 7:18, 15:5, 38:19, 39:6, 39:18, 47:7, 50:11, 61:23, 75:18, 84:2, 84:5, 184:18, 260:10
**Charles** [2] - 98:18,

114:4
**check** [1] - 199:10
**chick** [1] - 37:22
**child** [2] - 37:23
**CI** [2] - 47:17, 49:2
**circumstances** [5] - 9:9, 26:6, 61:11, 63:7, 161:18
**Circumstantial** [1] - 29:20
**citations** [1] - 60:11
**cited** [2] - 57:21, 57:22
**citing** [1] - 60:8
**citizens** [1] - 235:8
**city** [1] - 162:11
**claiming** [1] - 81:8
**claims** [2] - 28:14, 28:16
**clarify** [4] - 81:13, 197:8, 215:23
**class** [1] - 126:2
**classified** [1] - 83:12
**clear** [11] - 8:19, 49:14, 51:22, 81:6, 101:2, 139:15, 172:1, 179:12, 192:20, 201:4, 235:5
**clearer** [1] - 251:3
**clearly** [7] - 51:12, 54:8, 56:10, 58:18, 60:6, 154:12, 263:14
**Clearly** [1] - 60:14
**client** [2] - 120:2, 155:12
**close** [5] - 133:17, 133:18, 243:11, 246:11, 247:15
**closer** [2] - 11:4, 59:16
**closing** [2] - 22:20, 28:6
**clothes** [5] - 159:7, 161:5, 161:9, 196:15, 197:17
**cocaine** [1] - 48:20
**cold** [4] - 32:17, 33:10, 172:7, 236:18
**collected** [1] - 34:10
**Collected** [1] - 34:11
**coming** [12] - 36:3, 70:1, 100:4, 100:17, 105:6, 130:20, 138:16, 175:13, 181:2, 205:11, 209:10, 260:10
**comitted** [1] - 167:5
**commence** [2] - 24:9, 155:22
**comment** [2] - 160:17, 248:7
**commit** [1] - 15:15
**committed** [6] - 9:17, 14:4, 16:11, 87:7, 162:14, 167:8
**COMMON** [1] - 1:1
**common** [5] - 13:4,

13:8, 15:17, 15:18, 15:23
**Common** [2] - 1:11, 1:20
**commonly** [1] - 27:2
**commonsense** [1] - 39:10
**communication** [1] - 166:11
**communications** [9] - 155:18, 160:5, 161:21, 165:22, 166:22, 167:1, 180:7, 201:1, 227:21
**compel** [1] - 6:3
**competency** [5] - 151:5, 152:2, 152:3, 152:7, 153:11
**competent** [4] - 155:6, 155:7, 157:6, 166:12
**complaint** [1] - 125:21
**COMPLETE** [1] - 266:9
**completely** [1] - 25:9
**completion** [1] - 120:22
**composite** [2] - 207:8, 207:9
**Composite** [2] - 207:11, 208:2
**compressed** [1] - 31:23
**concentrating** [1] - 117:5
**concern** [3] - 5:9, 7:8, 187:20
**concerned** [3] - 58:11, 77:8, 238:18
**concerning** [5] - 26:3, 55:15, 58:2, 58:16, 86:10
**concerns** [2] - 27:9, 46:20
**concise** [1] - 28:13
**conclude** [1] - 27:11
**CONCLUDED** [26] - 18:8, 19:20, 37:18, 43:12, 45:15, 52:8, 68:7, 71:15, 88:6, 93:1, 104:16, 113:6, 114:20, 124:16, 142:13, 146:6, 150:2, 170:5, 184:10, 189:5, 198:2, 201:15, 244:6, 253:14, 254:16, 257:10
**concluded** [1] - 28:6
**concludes** [1] - 27:20
**conclusion** [4] - 23:2, 23:13, 23:22, 39:23
**conclusively** [1] - 24:22
**condition** [1] - 60:22

4

5

conduct [13] - 11:8,
20:12, 28:10, 94:18,
121:1, 160:5, 160:10,
168:6, 169:2, 169:9,
169:15, 180:7, 195:1
Conduct [1] - 200:23
conducted [3] -
44:15, 87:17, 127:12
conducting [1] -
86:17
confidence [1] -
163:16
confidential [43] -
5:21, 5:22, 6:8, 10:1,
11:23, 14:18, 16:23,
46:12, 46:14, 46:16,
46:20, 46:21, 47:2,
47:13, 47:15, 48:1,
49:1, 49:7, 49:8, 50:8,
54:2, 75:22, 76:4,
76:13, 76:22, 77:6,
77:14, 79:16, 79:20,
80:9, 81:18, 82:6,
83:23, 87:18, 88:10,
89:11, 90:4, 90:8,
90:14, 93:15, 94:3,
165:23, 166:17
conformity [5] -
11:8, 11:17, 12:8,
13:7, 13:21
confront [2] - 51:13,
55:2
confronted [1] - 55:1
congratulations [1]
- 125:11
conjunction [1] -
260:21
connection [1] -
23:5
consequential [1] -
112:15
consider [7] - 4:14,
5:10, 23:19, 24:14,
25:10, 27:8, 94:17
consideration [1] -
4:15
considered [2] -
25:12, 160:10
considering [3] -
22:18, 27:7, 27:23
consistent [4] -
166:21, 226:7,
226:14, 228:14
consisting [1] -
207:12
conspiracy [1] -
104:3
construe [1] - 5:4
construed [3] - 4:18,
4:22, 200:20
consummated [1] -
39:2
contact [27] - 46:7,
50:13, 50:16, 50:18,
72:15, 75:2, 75:15,
172:5, 172:15,
172:18, 172:20,

173:6, 173:20,
187:11, 188:7, 189:9,
189:11, 189:21,
192:3, 193:6, 193:14,
193:18, 194:14,
194:23, 196:10,
215:13, 246:18
contacted [4] -
185:4, 185:10,
203:19, 228:3
contacts [2] - 36:16,
164:23
contained [4] -
213:9, 214:12, 215:6,
215:7
contends [1] - 70:19
contention [4] -
5:18, 8:11, 158:23
contentions [2] -
157:14, 159:5
Continue [1] -
193:10
continuing [1] -
181:19
contravenes [1] -
70:10
control [2] - 21:2,
235:8
controlled [7] -
82:18, 82:19, 82:21,
83:7, 89:17, 90:3
conversation [29] -
61:7, 63:5, 64:9, 74:1,
75:4, 168:3, 176:14,
176:18, 176:21,
177:7, 179:12,
180:17, 193:1, 195:1,
195:17, 203:9, 247:9,
247:12, 247:20,
248:15, 248:19,
250:2, 250:5, 255:12,
255:16, 256:2,
257:20, 257:22, 260:7
conversations [7] -
174:21, 175:2, 175:3,
177:5, 178:20,
181:19, 181:22
conveyed [1] - 21:22
Convictions [1] -
16:15
convictions [2] -
6:23, 16:13
convince [1] -
230:12
convincing [1] -
230:6
cooperate [2] -
184:16, 194:2
coordination [1] -
125:16
cop [1] - 78:17
copies [8] - 56:2,
57:11, 57:13, 57:18,
116:6, 117:8, 119:17,
229:8
cops [1] - 149:18
copy [6] - 103:13,

103:14, 117:1, 124:4,
146:3, 220:7
corner [6] - 31:4,
97:4, 128:17, 128:19,
130:20
Coroner's [2] -
31:19, 32:23
correct [102] - 9:1,
41:7, 43:7, 43:8,
47:14, 53:4, 53:5,
73:17, 75:23, 76:14,
76:15, 77:15, 78:3,
78:9, 78:10, 78:13,
78:14, 79:11, 79:13,
79:14, 80:5, 80:11,
80:14, 80:20, 81:1,
81:12, 82:1, 82:3,
82:8, 82:11, 83:9,
83:15, 85:3, 85:4,
85:11, 89:12, 90:6,
93:20, 93:21, 99:10,
109:7, 110:16,
112:12, 132:11,
142:23, 151:2,
153:15, 155:22,
156:1, 157:12, 160:6,
184:14, 191:7, 202:7,
202:13, 202:18,
202:22, 204:2, 204:9,
204:21, 205:18,
206:3, 206:11,
206:23, 210:6,
211:22, 212:2,
215:10, 216:1,
216:22, 217:12,
217:19, 218:13,
218:18, 219:2,
219:13, 220:5, 220:8,
220:12, 224:1,
225:10, 228:12,
229:6, 229:9, 229:15,
229:20, 229:22,
230:3, 231:5, 231:10,
231:17, 255:14,
255:18, 258:3,
258:23, 259:16,
260:12, 261:5, 261:9,
262:17, 263:9, 264:9
Correct [3] - 148:7,
207:5, 220:20
corrected [2] -
204:8, 204:13
corrections [2] -
231:15, 231:16
correctly [2] - 58:1,
107:11
couch [2] - 73:7,
73:11
Counsel [20] - 9:1,
10:14, 22:20, 28:4,
28:12, 28:17, 29:6,
32:21, 37:2, 37:7,
56:9, 64:18, 70:4,
92:14, 118:14,
118:15, 122:4, 122:7,
123:1, 124:1
counsel [2] - 120:3,
151:22

counter [1] - 122:18
COUNTY [1] - 1:1
county [1] - 219:18
County [4] - 1:11,
1:14, 1:20, 48:17
couple [12] - 9:4,
93:8, 131:15, 175:16,
175:17, 177:20,
178:5, 179:22,
181:21, 189:14,
211:20, 249:10
course [2] - 18:13,
20:12, 21:6, 22:2,
24:16, 28:5, 28:10,
35:21, 39:3, 54:21,
62:18, 76:11, 89:22,
123:10, 155:18,
184:23, 194:23
court [7] - 13:9,
45:22, 58:1, 58:5,
152:1, 217:11, 257:1
COURT [269] - 1:1,
3:6, 3:17, 3:23, 4:3,
8:16, 12:22, 13:5,
15:9, 16:13, 17:2,
18:1, 18:5, 18:10,
19:17, 19:22, 27:20,
29:3, 33:21, 35:16,
35:18, 36:20, 37:15,
40:3, 40:7, 40:12,
40:16, 42:19, 43:6,
43:9, 44:6, 44:10,
44:23, 45:11, 51:9,
52:2, 52:6, 52:10,
52:22, 53:7, 53:14,
53:18, 56:5, 56:11,
56:13, 57:13, 60:9,
61:4, 62:4, 62:8,
62:14, 62:20, 63:3,
65:12, 65:20, 65:22,
66:4, 66:21, 67:8,
67:16, 68:1, 68:4,
68:9, 69:18, 70:15,
70:22, 71:8, 71:13,
71:17, 73:5, 73:7,
73:11, 73:22, 74:16,
75:8, 79:5, 81:5,
81:12, 81:14, 86:7,
86:23, 87:2, 88:3,
91:18, 92:10, 92:17,
94:7, 94:9, 95:4, 95:8,
95:13, 95:17, 97:12,
102:14, 103:1, 103:3,
104:7, 104:12,
111:23, 112:17,
113:2, 113:8, 113:11,
113:13, 113:17,
113:23, 114:5, 114:8,
114:22, 115:2, 115:8,
116:10, 116:17,
117:10, 119:14,
120:8, 120:18, 123:5,
123:14, 124:12,
124:19, 128:9, 129:3,
130:1, 130:10,
131:11, 132:16,
133:13, 134:4,
134:21, 135:2, 135:6,

135:16, 135:20,
139:8, 140:8, 140:12,
140:17, 141:6,
141:23, 142:5, 145:6,
145:11, 145:13,
145:23, 146:4,
146:22, 147:12,
147:19, 149:21,
150:6, 150:11, 151:1,
151:7, 151:10,
151:17, 152:12,
152:19, 153:4, 154:7,
154:14, 155:3,
155:21, 156:2,
156:19, 156:23,
157:4, 157:17, 158:2,
158:5, 158:11,
158:23, 159:9,
159:22, 160:14,
160:17, 161:15,
162:23, 168:20,
169:21, 170:3, 170:7,
170:18, 172:3, 176:3,
176:10, 176:13,
176:18, 176:21,
177:4, 180:6, 180:20,
183:5, 184:6, 186:11,
189:2, 190:13, 193:8,
194:22, 195:18,
196:18, 197:23,
198:9, 198:11,
198:18, 198:23,
199:5, 199:20, 200:8,
200:19, 201:7,
201:13, 207:10,
207:16, 207:22,
210:14, 211:9,
211:17, 212:13,
217:15, 217:17,
219:21, 221:10,
226:11, 227:4,
227:12, 227:20,
228:22, 232:7,
232:15, 232:23,
233:2, 233:11,
233:20, 234:1,
237:12, 240:7,
242:22, 243:1, 243:4,
243:7, 243:20, 244:3,
244:14, 244:18,
245:20, 252:6, 252:9,
253:8, 254:7, 254:14,
254:18, 256:9,
256:11, 256:18,
256:21, 257:6, 261:2,
261:13, 262:14,
262:23, 263:5,
263:12, 263:19,
264:10, 264:13,
264:15, 265:2, 265:4
Court [96] - 1:11,
1:20, 4:14, 5:7, 7:2,
7:9, 9:9, 9:14, 10:17,
10:20, 10:21, 11:5,
12:14, 12:16, 13:10,
15:13, 16:8, 16:9,
19:13, 21:9, 21:20,
21:21, 21:22, 25:7,

33:23, 37:1, 37:5, 37:9, 39:8, 40:10, 53:16, 55:6, 55:19, 56:7, 57:23, 58:8, 58:22, 59:6, 59:10, 59:13, 60:4, 61:21, 62:2, 62:6, 62:18, 63:13, 63:14, 64:16, 67:15, 69:16, 71:5, 81:16, 87:5, 95:11, 103:17, 113:20, 115:23, 118:10, 118:16, 119:22, 120:23, 121:7, 121:11, 122:1, 122:6, 123:4, 123:23, 124:3, 124:5, 124:7, 135:14, 141:14, 151:4, 151:15, 153:1, 154:10, 155:1, 155:6, 156:6, 156:11, 156:15, 156:16, 157:5, 159:4, 162:4, 164:1, 164:9, 164:11, 165:10, 166:13, 167:16, 193:20, 233:18, 244:12, 266:18

**Court's** [4] - 5:3, 29:7, 154:11, 170:15
**Courthouse** [1] - 1:20
**COURTROOM** [1] - 3:2
**courtroom** [5] - 18:22, 21:13, 171:19, 217:18, 245:15
**Courts** [1] - 5:8
**cover** [1] - 185:6
**covered** [2] - 168:17, 200:23
**covering** [1] - 22:21
**coverture** [4] - 155:19, 161:22, 162:15, 197:18
**CR** [1] - 2:2
**CR06-3339** [1] - 1:3
**crack** [1] - 48:20
**Craig** [8] - 2:3, 95:7, 95:8, 95:15, 104:21, 130:18, 130:20, 131:2
**CRAIG** [1] - 95:10
**credibility** [1] - 25:15
**crews** [1] - 236:19
**Crime** [10] - 36:3, 38:7, 87:8, 179:18, 181:9, 216:14, 225:10, 225:12, 227:1
**crime** [21] - 15:15, 46:18, 127:13, 127:21, 128:1, 133:2, 162:3, 162:9, 162:10, 162:13, 165:1, 182:3, 182:4, 182:7, 182:19, 182:23, 183:1, 183:7, 236:20, 236:22, 237:9
**crimes** [1] - 173:11

**Crimes** [1] - 41:21
**criminal** [8] - 38:19, 39:18, 41:13, 44:19, 50:11, 61:23, 164:8, 164:16
**crisp** [3] - 38:10, 205:17, 210:10
**Crissy** [4] - 208:18, 209:21, 222:13, 222:17
**CROSS** [7] - 75:10, 104:19, 134:6, 146:9, 202:1, 229:1, 257:13
**cross** [14] - 55:2, 56:16, 64:19, 65:11, 68:19, 70:5, 75:8, 86:7, 104:8, 131:14, 145:6, 228:22, 250:18, 251:10
**Cross** [4] - 102:14, 134:4, 232:23, 242:22
**cross-examination** [3] - 68:19, 86:7, 131:14
**CROSS-EXAMINATION** [7] - 75:10, 104:19, 134:6, 146:9, 202:1, 229:1, 257:13
**cross-examine** [8] - 55:2, 56:16, 64:19, 65:11, 70:5, 104:8, 250:18, 251:10
**crucial** [1] - 3:11
**crying** [4] - 72:22, 73:3, 85:2, 85:3
**curative** [1] - 35:23, 61:17
**Cussing** [1] - 137:23
**cussing** [1] - 138:23
**cut** [2] - 128:19, 242:9

**D**

**D-A-V-I-S** [1] - 244:17
**daily** [1] - 25:21
**damage** [3] - 251:6, 251:16, 251:21
**dangerous** [3] - 77:14, 94:3, 136:8
**dark** [5] - 144:6, 144:10, 144:14, 166:14, 166:20
**date** [5] - 103:18, 106:12, 219:6, 250:11, 257:18
**dates** [2] - 49:15, 49:17
**daughter** [1] - 228:1
**Dave** [1] - 88:17
**Davis** [2] - 2:6, 2:14, 33:3, 60:12, 60:13, 243:12, 244:9, 244:16, 244:23, 253:17, 257:15,

261:19
**DAVIS** [1] - 244:11
**DAY** [1] - 265:4
**days** [5] - 44:16, 58:16, 179:22, 219:1, 243:14
**dead** [3] - 15:11, 32:22, 102:1
**deal** [11] - 30:3, 39:1, 39:5, 63:19, 117:15, 152:6, 168:17, 193:22, 194:1, 218:20
**dealing** [4] - 7:4, 11:18, 12:6, 14:22
**deals** [3] - 94:12, 152:4, 153:11
**dealt** [1] - 169:1
**Dear** [9] - 186:17, 188:15, 188:17, 189:8, 190:5, 191:7, 202:12, 206:22, 206:23
**death** [5] - 31:22, 32:6, 33:20, 85:16, 85:20
**decade** [1] - 230:23
**deceased** [1] - 54:23
**decedent** [1] - 16:17
**December** [22] - 11:21, 30:9, 30:10, 30:22, 72:8, 72:9, 85:18, 96:19, 107:6, 109:5, 127:2, 137:5, 154:20, 194:9, 194:16, 228:17, 236:11, 246:19, 246:23, 247:9, 247:16
**decide** [11] - 22:4, 22:13, 23:5, 24:12, 25:14, 25:17, 26:14, 61:11, 120:6, 121:21, 230:16
**decided** [1] - 206:7
**decision** [9] - 16:8, 18:21, 20:20, 23:8, 118:5, 161:20, 162:8, 163:2, 163:23
**declarant** [1] - 70:18
**declarant's** [5] - 52:1, 55:9, 55:15, 55:21, 58:13
**declaration** [1] - 51:23
**deem** [1] - 26:10
**defendant** [1] - 120:23
**DEFENDANT** [1] - 1:6
**Defendant** [79] - 1:17, 5:11, 9:16, 10:3, 10:7, 11:1, 11:20, 12:1, 12:2, 12:6, 12:20, 14:3, 14:11, 14:13, 16:10, 16:17, 16:23, 29:19, 29:23, 30:1, 30:8, 30:15, 30:18, 33:2, 33:4,

42:12, 43:17, 43:18, 44:1, 45:4, 45:21, 46:6, 47:19, 47:22, 48:12, 48:19, 49:16, 50:3, 51:16, 51:20, 54:1, 54:4, 54:7, 57:5, 61:3, 64:2, 65:6, 81:10, 94:13, 94:18, 151:21, 153:14, 153:17, 155:10, 157:19, 158:14, 159:4, 159:6, 159:7, 160:21, 161:4, 163:4, 164:20, 169:14, 169:15, 171:11, 180:17, 198:21, 199:1, 200:2, 200:15, 245:14, 245:21, 246:9, 247:10, 250:6, 252:7, 262:8
**Defendant's** [21] - 30:2, 43:3, 65:19, 66:14, 132:17, 165:2, 198:4, 207:11, 208:2, 211:9, 211:13, 212:4, 216:9, 220:4, 220:15, 221:12, 223:14, 224:13, 229:13, 263:13, 263:17
**DEFENDANT'S** [2] - 2:7, 2:15
**Defense** [28] - 5:23, 7:17, 9:1, 10:14, 37:7, 56:9, 57:6, 64:18, 64:23, 65:10, 67:7, 70:4, 92:1, 92:14, 102:21, 116:5, 117:9, 118:14, 118:15, 120:18, 121:9, 122:4, 122:7, 123:1, 124:1, 148:2, 156:6, 223:18
**defense** [1] - 121:3
**defenses** [2] - 28:14, 28:16
**definition** [1] - 70:18
**Degree** [1] - 126:3
**degree** [3] - 194:5, 218:15, 218:23
**delay** [1] - 233:14
**deliberations** [1] - 24:10
**demands** [1] - 17:14
**demeanor** [1] - 72:20
**Demoris** [1] - 88:23
**denies** [1] - 54:21
**department** [5] - 38:2, 38:6, 46:15, 76:17, 129:15
**Department** [20] - 41:2, 41:4, 125:6, 125:8, 126:8, 172:6, 173:6, 173:12, 177:18, 177:22, 179:6, 180:15, 181:20, 192:15, 193:1, 193:19, 193:21, 234:11,

234:13, 236:3
**departments** [1] - 126:10
**depicting** [1] - 242:6
**depositions** [1] - 27:17
**deputy** [2] - 114:11, 114:14
**describe** [7] - 99:12, 128:18, 137:21, 144:9, 221:5, 242:13, 245:17
**Describe** [2] - 138:8, 144:3
**described** [1] - 133:20
**description** [1] - 99:18
**descriptions** [1] - 28:13
**desire** [1] - 21:3
**desires** [2] - 9:10, 12:16
**destroyed** [2] - 34:11, 34:12
**destroys** [2] - 197:11, 201:5
**detail** [2] - 43:20, 105:23
**details** [3] - 37:12, 107:1, 230:11
**DETECTIVE** [1] - 40:9
**Detective** [64] - 2:3, 9:22, 9:23, 11:19, 12:18, 16:21, 30:6, 30:12, 33:7, 34:23, 40:6, 40:7, 40:14, 40:20, 40:23, 41:23, 43:15, 45:18, 53:1, 53:11, 53:17, 59:1, 59:20, 71:19, 75:6, 75:12, 76:17, 78:9, 78:11, 79:9, 91:1, 91:3, 92:5, 93:6, 93:9, 94:6, 106:7, 106:11, 107:14, 107:16, 127:8, 130:13, 172:8, 173:15, 174:12, 175:9, 175:14, 177:5, 178:12, 181:8, 209:9, 209:10, 210:9, 213:7, 214:3, 214:4, 217:2, 225:8, 225:9, 226:3, 226:8, 226:14, 226:23, 249:16
**detective** [28] - 10:4, 16:16, 41:1, 41:19, 41:21, 42:1, 42:3, 76:16, 77:13, 79:8, 79:19, 79:22, 109:20, 110:22, 128:7, 128:11, 132:12, 147:3, 148:3, 148:9, 149:13, 149:17, 173:11, 173:23, 178:7, 252:21, 253:19, 259:19

**detectives** [18] - 32:8, 77:1, 83:14, 128:4, 131:23, 132:2, 132:9, 172:6, 175:17, 177:21, 178:23, 205:1, 205:2, 236:19, 237:2, 255:3, 255:8, 258:2

**determination** [1] - 120:5

**determinative** [1] - 158:21

**determine** [6] - 23:6, 63:6, 118:2, 121:4, 123:20, 164:4

**determined** [1] - 152:2

**determines** [5] - 118:17, 119:22, 120:16, 121:7, 121:12

**determining** [5] - 4:16, 25:19, 121:17, 124:8, 124:10

**Detroit** [1] - 174:22

**develops** [1] - 35:20

**Dexter** [1] - 96:9

**diagonal** [2] - 128:16, 133:6

**die** [3] - 248:1, 248:4, 252:5

**died** [5] - 29:17, 30:9, 32:5, 130:4, 216:3

**differ** [2] - 163:7, 188:4

**difference** [1] - 161:3

**differences** [1] - 165:14

**different** [18] - 22:9, 77:1, 81:20, 90:12, 90:16, 92:4, 111:12, 147:2, 160:23, 205:1, 235:14, 240:23, 241:19, 241:22, 246:13, 251:12, 251:18

**Different** [2] - 81:21, 90:15

**differently** [2] - 27:6, 231:2

**difficult** [1] - 20:13

**dire** [1] - 39:14

**direct** [8] - 83:2, 83:12, 83:13, 83:17, 120:22, 149:5, 194:8, 250:17

**DIRECT** [7] - 40:18, 95:18, 125:1, 135:23, 170:20, 234:3, 244:21

**direction** [1] - 139:21

**directly** [4] - 11:22, 33:17, 55:6, 195:11

**disagree** [1] - 119:18

**disagreed** [1] - 121:14

**disbelieve** [3] - 25:18, 26:12, 27:2

**disclosure** [2] - 6:3, 6:4

**discoverable** [1] - 66:16

**discovered** [1] - 130:22

**discovery** [4] - 63:22, 65:2, 112:6, 116:18

**discrepancies** [1] - 26:22

**discrepancy** [2] - 27:7, 27:9

**discuss** [16] - 20:5, 20:7, 20:14, 20:18, 20:23, 21:8, 52:13, 52:15, 115:3, 150:14, 150:16, 201:11, 207:18, 229:3, 264:17, 264:19

**discussed** [1] - 74:23

**discussion** [1] - 4:19

**DISCUSSION** [56] - 3:4, 18:7, 19:6, 19:19, 36:21, 37:17, 42:20, 43:11, 44:11, 45:14, 51:7, 52:7, 52:20, 68:6, 69:6, 71:14, 87:3, 88:5, 91:21, 92:23, 102:17, 104:15, 112:1, 113:5, 114:9, 114:19, 115:9, 124:15, 135:7, 140:13, 142:12, 145:9, 146:5, 149:2, 150:1, 150:9, 150:22, 151:12, 170:4, 182:13, 184:9, 187:14, 189:4, 196:19, 198:1, 201:2, 201:14, 233:6, 243:8, 244:5, 250:14, 253:13, 254:3, 254:15, 256:12, 257:9

**dismiss** [1] - 184:18

**dismissed** [1] - 219:7

**disobedience** [1] - 21:17

**dispose** [1] - 162:12

**disposed** [1] - 182:18

**disposing** [1] - 183:15

**disregard** [1] - 25:9

**distance** [1] - 133:15

**distinguish** [1] - 162:18

**distinguishable** [1] - 160:19

**distinguished** [2] - 11:16, 160:12

**distinguishing** [3] - 161:6, 161:12, 161:17

**distract** [1] - 22:5

**district** [1] - 10:12

**District** [2] - 12:15, 156:15, 160:20, 167:16, 168:19

**divorce** [1] - 36:12

**divulging** [1] - 252:19

**DNA** [4] - 32:21, 33:2, 34:17, 35:1

**dock** [1] - 126:12

**document** [6] - 216:5, 216:7, 229:18, 230:9, 231:9, 254:6

**dollar** [3] - 38:10, 205:17, 210:10

**dollars** [11] - 82:18, 82:21, 83:19, 179:18, 204:17, 204:20, 213:8, 213:17, 226:17, 226:20, 230:17

**Don** [1] - 188:23

**done** [7] - 104:12, 154:11, 161:22, 163:15, 163:20, 166:11, 168:6

**door** [8] - 15:23, 92:1, 92:8, 98:6, 105:8, 197:19, 263:1, 263:8

**dope** [6] - 146:16, 147:4, 147:9, 147:14, 148:4, 149:13

**Dorothy** [1] - 196:4

**double** [1] - 163:22

**double-edged** [1] - 163:22

**dovetails** [1] - 253:7

**down** [30] - 12:14, 14:7, 38:3, 38:4, 38:8, 63:16, 74:2, 97:3, 100:11, 111:5, 127:4, 127:6, 127:16, 127:17, 127:18, 135:10, 150:6, 164:19, 168:10, 173:23, 177:8, 177:10, 179:17, 186:16, 196:11, 197:14, 204:11, 205:11, 218:21, 262:2

**downstairs** [2] - 156:18, 197:5

**downtown** [7] - 175:8, 175:13, 179:5, 179:15, 179:21, 180:3, 181:2

**Dr** [1] - 31:19

**dramatically** [1] - 232:4

**drinking** [2] - 100:22, 138:18

**drive** [3] - 133:21, 165:1, 195:11

**driving** [13] - 98:20, 98:22, 98:23, 161:1,

161:2, 161:4, 161:7, 161:8, 162:6, 163:4, 165:19, 167:7, 183:14

**drop** [1] - 30:4

**Dropped** [1] - 256:3

**dropped** [8] - 29:14, 30:11, 33:19, 141:16, 258:12, 259:14, 260:22, 261:3

**dropping** [1] - 262:8

**drove** [14] - 159:3, 159:6, 159:12, 160:21, 162:2, 162:9, 162:10, 165:5, 165:6, 182:17, 183:2, 195:22, 195:23, 255:10

**drug** [15] - 11:18, 12:2, 14:21, 16:16, 29:22, 30:7, 42:5, 42:17, 46:20, 62:1, 69:9, 79:2, 87:11, 94:12

**drugs** [5] - 7:1, 12:6, 30:15, 48:3, 49:2

**Drugs** [1] - 43:22

**drunk** [1] - 127:20

**Due** [1] - 52:6

**duly** [7] - 40:10, 95:11, 113:20, 135:14, 153:1, 233:18, 244:12

**during** [26] - 18:13, 21:5, 22:2, 24:16, 28:5, 28:10, 28:22, 35:21, 37:10, 51:17, 59:22, 62:11, 72:11, 93:16, 117:7, 155:18, 159:7, 165:21, 178:19, 184:23, 186:22, 186:23, 187:3, 188:17, 190:8, 260:14

**duties** [5] - 42:2, 125:12, 126:18, 132:11, 237:4

**duty** [7] - 22:23, 23:1, 23:4, 23:6, 24:12, 25:14, 237:1

# E

**early** [2] - 85:18, 194:15

**easier** [1] - 197:13

**easiest** [1] - 128:18

**east** [1] - 48:16

**edged** [1] - 163:22

**education** [3] - 41:9, 126:1, 234:16

**effect** [2] - 23:6, 43:3

**effective** [2] - 120:2, 122:4

**effort** [1] - 162:18

**eight** [6] - 9:6, 12:12, 87:10, 87:13, 127:7, 134:10

**either** [10] - 38:22, 49:18, 64:3, 65:6, 65:7, 138:11, 141:4, 163:15, 165:19, 193:18

**El** [1] - 165:19

**election** [1] - 154:1

**elects** [1] - 152:10

**elicit** [2] - 15:2, 157:10

**elicited** [1] - 61:20

**eliciting** [1] - 188:16

**emergency** [1] - 159:14

**emotion** [2] - 55:9, 58:14

**emotional** [1] - 60:21

**employed** [1] - 125:7

**encompass** [1] - 160:4

**end** [10] - 50:23, 53:21, 62:5, 69:13, 72:3, 116:19, 181:12, 195:10, 199:11, 199:14

**ended** [2] - 12:2, 165:7

**enforcement** [2] - 33:9, 41:11

**engaged** [1] - 94:19

**ensure** [2] - 58:5, 59:18

**enter** [1] - 167:17

**entire** [5] - 123:17, 124:5, 126:20, 221:20, 229:18

**entirely** [4] - 224:20, 224:23, 225:1, 225:3

**entirety** [1] - 223:9

**ENTITLED** [1] - 266:10

**entitled** [1] - 220:16

**enumerated** [2] - 9:18, 16:19

**enunciated** [2] - 167:15, 168:19

**equation** [1] - 155:8

**erroneously** [1] - 27:3

**Esquire** [3] - 1:15, 1:17, 1:18

**essentially** [2] - 9:2, 11:7

**establish** [5] - 156:3, 159:22, 169:11, 251:2, 251:5

**established** [5] - 24:23, 152:3, 156:4, 187:18, 196:21

**establishment** [1] - 158:17

**et** [1] - 55:10

**evening** [1] - 199:14

**evenings** [1] - 237:8

**event** [1] - 21:18

**eventually** [1] -

8

228:11
**everywhere** [1] - 98:7
**evidence** [84] - 4:8, 4:17, 6:21, 6:22, 7:5, 7:15, 8:5, 8:9, 8:10, 8:15, 8:22, 9:3, 9:11, 9:15, 9:16, 9:18, 10:5, 10:18, 11:6, 11:10, 12:13, 13:2, 15:13, 16:6, 16:10, 16:19, 20:17, 22:18, 22:19, 23:3, 23:7, 23:13, 23:15, 23:23, 24:13, 24:15, 25:1, 25:12, 26:17, 26:18, 27:14, 27:23, 28:3, 28:6, 28:15, 28:18, 28:20, 29:11, 29:20, 33:15, 33:18, 34:2, 34:3, 34:7, 34:9, 34:10, 34:13, 34:15, 34:18, 34:20, 35:5, 35:7, 35:19, 39:21, 39:22, 61:19, 63:16, 63:23, 64:13, 65:6, 68:20, 117:5, 146:23, 158:1, 162:12, 164:7, 164:16, 165:5, 166:5, 167:17, 182:18, 237:7
**Evidence** [8] - 9:19, 16:20, 58:12, 60:11, 64:4, 68:15, 94:14, 153:22
**evidentiary** [1] - 52:10
**exactly** [5] - 46:13, 52:3, 67:13, 92:20, 246:1
**EXAMINATION** [21] - 40:18, 75:10, 93:4, 95:18, 104:19, 125:1, 134:6, 135:23, 146:9, 147:23, 153:3, 154:18, 170:20, 202:1, 220:1, 229:1, 232:2, 234:3, 244:21, 257:13, 261:17
**examination** [9] - 68:19, 86:7, 120:22, 131:14, 149:5, 149:9, 170:13, 243:18, 250:18
**examine** [8] - 55:2, 56:16, 64:19, 65:11, 70:5, 104:8, 250:18, 251:10
**example** [1] - 82:23
**examples** [1] - 12:13
**except** [1] - 37:13
**exception** [26] - 4:9, 14:9, 14:14, 14:15, 17:13, 17:20, 24:17, 37:16, 45:13, 51:15, 51:16, 51:22, 53:9, 54:9, 54:17, 55:12, 55:13, 59:11, 67:22, 70:1, 70:8, 152:5,

156:3, 169:7, 184:7, 263:15
**exceptions** [6] - 4:11, 14:5, 14:9, 18:2, 58:20, 60:7
**excess** [1] - 39:17
**excessively** [1] - 17:17
**excited** [1] - 54:19
**exclude** [2] - 9:3, 167:16
**excluded** [12] - 35:2, 59:5, 59:12, 162:16, 162:21, 166:23, 167:1, 167:2, 168:1, 168:4, 168:12, 168:18
**exclusive** [2] - 23:4, 25:14
**exculpatory** [1] - 112:4
**excused** [5] - 95:2, 113:13, 135:2, 233:2, 243:1
**exhibit** [5] - 207:9, 212:4, 223:10, 223:13, 258:7
**Exhibit** [18] - 132:20, 207:12, 208:3, 211:10, 211:13, 216:9, 220:5, 220:15, 221:12, 223:14, 224:13, 229:13, 239:1, 239:9, 239:23, 240:20, 257:7, 261:23
**EXHIBITS** [2] - 2:8, 2:15
**exhibits** [3] - 132:17, 132:18, 242:12
**exist** [1] - 121:8
**existence** [1] - 121:4
**existing** [4] - 52:1, 55:9, 58:13, 60:21
**expand** [1] - 3:14
**expect** [3] - 28:15, 28:19, 29:6
**expectation** [2] - 167:13, 168:11
**expected** [1] - 29:4
**expects** [1] - 153:8
**experience** [2] - 13:17, 21:18
**experienced** [2] - 36:14, 38:4
**experiences** [1] - 21:1
**Explain** [6] - 125:12, 173:19, 181:1, 195:13, 195:20, 227:16
**explain** [19] - 20:20, 21:20, 42:2, 46:13, 47:21, 60:1, 60:2, 60:5, 82:19, 94:14, 125:23, 173:2, 173:9, 179:3, 181:7, 188:16, 194:18, 200:23, 235:5
**explained** [2] -

64:17, 83:6
**explaining** [3] - 37:4, 58:17, 63:8
**Explains** [1] - 70:22
**express** [5] - 20:8, 52:16, 115:4, 150:17, 207:18
**expressed** [3] - 58:7, 59:19, 64:11
**extensive** [1] - 31:21
**extensively** [1] - 17:4
**extent** [1] - 59:3
**extreme** [1] - 83:19

**F**

**face** [2] - 178:16
**faces** [3] - 138:14, 138:21, 142:20
**fact** [53] - 5:16, 10:7, 11:22, 13:13, 17:6, 18:13, 22:13, 23:5, 23:21, 24:18, 24:19, 24:21, 25:1, 26:14, 26:21, 27:5, 27:9, 30:8, 35:20, 54:12, 58:6, 59:19, 61:17, 65:14, 65:15, 67:10, 69:1, 87:12, 116:1, 122:3, 142:7, 142:10, 146:22, 159:11, 160:21, 162:1, 166:18, 167:11, 167:22, 180:16, 182:4, 182:17, 183:14, 183:23, 184:2, 194:1, 194:3, 202:9, 217:18, 229:17, 230:9, 260:20, 261:7
**factor** [3] - 161:7, 161:13, 209:18
**facts** [14] - 9:8, 10:15, 17:16, 26:6, 27:3, 61:11, 63:7, 161:18, 163:4, 163:6, 163:7, 163:8, 166:15, 220:18
**Facts** [1] - 17:16
**fade** [1] - 39:16
**fades** [1] - 108:23
**Fair** [1] - 246:17
**fair** [14] - 20:4, 43:4, 67:12, 76:2, 77:6, 79:15, 79:17, 147:10, 149:19, 219:16, 230:4, 230:22, 239:17, 240:16
**fairly** [1] - 87:19
**falls** [1] - 183:15
**false** [18] - 221:20, 222:2, 222:5, 222:9, 222:14, 222:20, 223:4, 223:16, 224:19, 224:23, 225:1, 225:3, 225:5,

229:14, 229:18, 230:1, 230:5
**False** [2] - 221:21, 222:1
**familiar** [11] - 10:11, 10:14, 15:12, 84:21, 84:22, 87:16, 89:9, 96:10, 132:23, 224:14, 245:2
**family** [1] - 20:21
**far** [17] - 68:1, 76:3, 76:11, 76:21, 77:8, 77:17, 78:15, 87:16, 90:19, 176:16, 187:23, 199:5, 230:15, 238:17, 246:12, 259:14, 263:7
**father** [1] - 245:8
**favorable** [2] - 64:2, 65:6
**favors** [1] - 27:15
**fear** [11] - 5:12, 7:7, 55:16, 58:3, 58:7, 59:19, 64:10, 180:23, 181:2, 209:18
**fearful** [8] - 53:23, 54:2, 55:21, 58:11, 59:3, 60:2, 67:21, 67:23
**February** [3] - 64:5, 191:15, 224:1
**federal** [1] - 192:17
**feet** [1] - 133:16
**felonies** [1] - 38:20
**felonious** [1] - 237:21
**Felony** [1] - 218:15
**felony** [2] - 12:2, 39:6
**felt** [4] - 217:2, 227:6, 227:15, 227:23
**female** [10] - 31:2, 31:14, 36:11, 99:14, 108:14, 139:11, 139:18, 208:18, 237:22
**few** [6] - 3:9, 3:18, 18:23, 48:8, 86:13, 153:9
**field** [4] - 41:16, 235:17, 235:19, 236:6
**fifth** [1] - 214:20
**file** [3] - 38:18, 123:17, 124:5
**filed** [7] - 8:20, 38:20, 63:21, 64:6, 75:19, 112:4, 219:12
**filing** [1] - 85:9
**final** [4] - 24:9, 26:17, 50:22, 62:22
**finally** [7] - 20:9, 20:15, 24:7, 230:16, 231:7, 232:10, 232:17
**financial** [4] - 38:3, 205:21, 210:23, 212:22
**Financial** [1] -

205:23
**financially** [1] - 213:18
**fine** [6] - 52:5, 117:21, 170:2, 214:23, 265:1
**Fine** [3] - 143:11, 197:7, 264:12
**finish** [1] - 188:12, 243:23
**finished** [4] - 86:12, 170:15, 186:21, 219:10
**fire** [1] - 129:14
**first** [36] - 28:23, 40:4, 40:10, 49:17, 61:20, 72:11, 83:10, 95:11, 100:11, 109:10, 109:13, 111:19, 113:20, 114:2, 135:14, 152:2, 153:1, 156:3, 159:23, 202:11, 203:4, 206:16, 207:14, 215:13, 221:14, 223:1, 223:2, 225:20, 226:2, 228:9, 229:5, 233:18, 244:12, 251:16, 251:19, 261:22
**First** [4] - 23:4, 158:5, 218:20, 256:14
**fit** [1] - 62:19
**five** [17] - 39:12, 76:2, 77:9, 81:8, 81:19, 81:20, 84:13, 89:10, 89:14, 90:12, 92:4, 92:9, 115:2, 115:5, 164:19, 207:12, 218:18
**flashlight** [1] - 132:5
**flow** [1] - 123:6
**follow** [8] - 16:9, 22:17, 23:1, 28:8, 123:7, 154:8, 154:14, 154:16
**follow-up** [2] - 154:8, 154:14
**FOLLOWING** [52] - 3:4, 18:9, 19:6, 19:20, 36:21, 37:18, 42:20, 43:12, 44:11, 45:15, 51:7, 52:8, 52:20, 68:8, 69:6, 71:15, 87:3, 88:6, 91:21, 93:1, 102:17, 104:16, 112:1, 113:6, 114:9, 114:20, 115:9, 124:16, 140:13, 142:13, 145:9, 146:6, 149:2, 150:2, 150:22, 170:6, 182:13, 184:10, 187:14, 189:5, 196:19, 198:2, 201:2, 201:15, 243:8, 244:6, 250:14, 253:14, 254:3, 254:16, 256:12,

257:10

**following** [5] - 1:11, 66:18, 66:19, 86:15, 88:8

**follows** [6] - 40:11, 95:12, 113:21, 135:15, 233:19, 244:13

**Follows** [1] - 153:2

**FOR** [1] - 265:4

**force** [2] - 26:18, 32:5

**FOREGOING** [1] - 266:8

**foreground** [1] - 240:22

**foreman** [2] - 126:12

**forget** [2] - 27:3, 172:9

**forgive** [1] - 14:12

**form** [9] - 20:8, 35:23, 52:16, 94:17, 115:4, 150:17, 202:17, 207:18, 264:20

**Forrester** [19] - 172:8, 177:19, 178:10, 178:12, 179:8, 179:14, 181:8, 205:9, 209:9, 210:9, 213:7, 214:5, 217:2, 225:9, 225:15, 225:20, 226:8, 226:15, 226:23

**forward** [8] - 30:21, 50:9, 151:9, 231:5, 232:9, 232:11, 232:17

**Foster's** [2] - 58:9, 58:15

**foundation** [3] - 5:10, 44:4, 45:4

**four** [2] - 39:12, 218:17

**fours** [2] - 161:19, 162:20

**fourth** [2] - 225:14, 262:2

**fracture** [1] - 31:23

**frame** [4] - 155:2, 177:1, 191:13, 191:20

**frankness** [1] - 26:4

**frantic** [8] - 72:22, 73:3, 73:6, 73:12, 73:20, 74:12, 85:2

**Frazier** [5] - 57:19, 57:22, 57:23, 59:16, 88:21

**FRD** [1] - 2:2

**free** [2] - 152:11, 152:14

**Frey** [3] - 151:14, 151:22, 151:23

**Friday** [2] - 102:21, 103:9

**friend** [5] - 137:16, 137:17, 137:19, 248:18

**friends** [1] - 20:21

**front** [13] - 10:20, 32:1, 55:7, 97:3, 99:4, 105:11, 122:21, 131:9, 201:12, 214:2, 215:1, 221:7, 259:8

**Front** [1] - 48:16

**function** [1] - 125:17

**furry** [2] - 38:1, 210:2

**FURTHER** [1] - 232:2

**future** [2] - 19:15, 104:11

## G

**gained** [1] - 50:7

**gambling** [1] - 42:7

**game** [1] - 149:19

**garbage** [1] - 199:2

**Gardens** [1] - 136:14

**Garth** [1] - 88:13

**gas** [2] - 166:2, 166:3

**general** [8] - 10:23, 11:1, 15:15, 16:2, 49:1, 156:4, 163:6, 223:12

**generally** [5] - 15:18, 49:3, 83:18, 89:18, 242:11

**Generally** [1] - 49:6

**gentlemen** [5] - 29:10, 33:14, 33:23, 68:9, 234:10

**girl** [1] - 185:9, 222:13, 222:17, 259:15

**girls** [1] - 258:12

**gist** [2] - 61:6, 61:13

**given** [15] - 6:4, 9:5, 18:12, 25:6, 28:10, 54:16, 65:8, 80:21, 87:9, 121:9, 154:12, 184:4, 188:23, 217:3, 254:6

**glance** [1] - 138:17

**glanced** [2] - 139:20, 144:4

**glasses** [2] - 99:15, 174:6

**good-bye** [2] - 168:11, 197:6

**graduated** [1] - 234:20

**graduation** [1] - 41:17

**grand** [11] - 38:8, 66:12, 205:12, 206:14, 208:12, 214:2, 214:18, 215:1, 216:13, 216:16, 228:11

**grandson** [2] - 173:22, 173:23

**grants** [1] - 25:7

**gray** [2] - 188:6, 245:19

**Great** [1] - 234:8

**great** [4] - 58:5, 59:17, 63:19, 168:17

**ground** [1] - 108:14

**grounds** [1] - 18:1

**guess** [15] - 9:1, 80:1, 98:4, 105:10, 123:13, 125:22, 158:8, 168:22, 173:4, 179:10, 241:17, 245:12, 252:5, 252:17, 254:10

**guide** [1] - 115:23

**guilt** [5] - 64:3, 65:7, 65:19, 66:2, 66:13

**guilty** [3] - 7:13, 7:14, 40:1

**gushing** [1] - 31:10

**guy** [5] - 246:12, 246:15, 249:13, 249:14, 249:20

**guys** [3] - 100:17, 116:14, 248:21

## H

**H-A-R-R-I-S** [1] - 196:8

**HAD** [1] - 266:9

**hair** [1] - 99:16

**half** [2] - 246:6, 246:21

**hall** [1] - 156:21

**Ham** [4] - 98:5, 98:16, 99:7, 104:23

**hand** [15] - 20:1, 21:19, 39:18, 117:1, 117:8, 119:18, 132:19, 207:7, 208:1, 211:12, 216:5, 221:11, 238:23, 239:22, 241:8

**handed** [3] - 22:1, 140:2, 212:4

**handing** [5] - 103:23, 115:20, 117:5, 122:22, 145:22

**handle** [1] - 125:21

**happy** [2] - 112:16, 169:3

**hard** [1] - 63:21

**Harris** [1] - 196:6

**hath** [2] - 38:1, 210:2

**hauler** [1] - 241:16

**head** [16] - 29:15, 30:4, 30:11, 31:10, 32:1, 32:2, 32:5, 33:20, 100:4, 127:12, 128:3, 256:3, 258:12, 259:15, 261:4

**health** [1] - 55:10

**hear** [36] - 18:22, 22:15, 24:8, 24:14, 25:4, 26:2, 27:6, 28:1, 30:16, 31:6, 31:18,

32:7, 32:9, 32:11, 32:20, 33:1, 33:3, 33:7, 33:8, 33:13, 33:15, 33:16, 45:18, 68:10, 127:16, 137:22, 138:2, 138:6, 139:1, 139:9, 168:15, 170:8, 174:7, 197:22, 238:4, 250:21

**heard** [26] - 22:19, 28:9, 31:13, 32:16, 62:12, 73:16, 94:10, 119:1, 119:6, 119:14, 137:18, 137:19, 138:8, 138:22, 138:23, 139:3, 143:13, 143:21, 215:20, 215:22, 222:23, 230:11, 251:19, 255:22, 255:23

**hearing** [7] - 8:19, 28:11, 138:3, 170:15, 187:17, 188:5, 217:11

**hearsay** [27] - 51:9, 51:13, 51:15, 53:4, 54:8, 54:9, 54:17, 55:11, 55:12, 58:18, 59:12, 60:6, 60:15, 67:22, 69:22, 70:6, 70:10, 70:14, 70:15, 70:16, 70:17, 70:21, 71:6, 262:23, 263:10, 263:15

**Hearsay** [1] - 184:7

**Heather** [4] - 165:18, 166:2, 166:7, 166:13

**held** [3] - 1:12, 8:23, 9:14

**HELD** [56] - 3:5, 18:9, 19:7, 19:21, 36:22, 37:19, 42:21, 43:13, 44:12, 45:16, 51:8, 52:9, 52:21, 68:8, 69:7, 71:16, 87:4, 88:7, 91:22, 93:2, 102:18, 104:17, 112:2, 113:7, 114:10, 114:21, 115:10, 124:17, 135:8, 140:14, 142:14, 145:10, 146:7, 149:3, 150:3, 150:10, 150:23, 151:12, 170:6, 182:14, 184:11, 187:15, 189:6, 196:20, 198:3, 201:3, 201:16, 233:7, 243:9, 244:7, 250:15, 253:15, 254:4, 254:17, 256:13, 257:11

**Hell** [2] - 38:1, 210:2

**Hello** [1] - 170:23

**Helmick** [3] - 189:14, 190:14, 203:11

**help** [6] - 69:16, 100:12, 142:22,

206:2, 213:17, 237:2

**helpful** [1] - 22:17

**HEREBY** [1] - 266:7

**hereby** [1] - 169:13

**hide** [2] - 104:1, 123:1

**High** [1] - 126:2

**high** [2] - 148:19, 218:2

**highly** [2] - 21:13, 44:20

**Hill** [1] - 195:5

**hinge** [1] - 167:10

**hired** [1] - 41:13

**history** [1] - 112:23

**hit** [4] - 97:10, 97:16, 234:20, 235:2

**Hit** [1] - 234:23

**hold** [3] - 49:10, 108:19, 132:5

**home** [5] - 21:4, 107:8, 108:4, 108:8, 217:21

**homicide** [1] - 31:15, 32:6, 34:5, 36:5, 36:6, 86:10, 177:14, 178:14, 215:9, 215:15, 215:19

**honest** [1] - 168:20

**Honor** [64] - 3:15, 18:4, 35:10, 36:18, 42:22, 44:8, 51:10, 53:6, 56:4, 57:17, 58:23, 61:16, 63:11, 64:21, 78:23, 84:10, 86:4, 86:19, 87:1, 87:5, 95:3, 104:4, 114:6, 128:8, 129:1, 130:5, 131:1, 139:6, 140:10, 143:9, 144:11, 144:17, 146:20, 147:11, 148:23, 149:4, 155:14, 156:22, 161:16, 165:15, 167:18, 176:8, 182:15, 186:8, 187:12, 190:11, 193:7, 195:15, 196:16, 200:7, 201:9, 210:11, 212:7, 217:14, 219:10, 227:8, 227:19, 254:10, 259:23, 260:23, 262:13, 263:7, 263:16, 263:23

**Honorable** [1] - 1:10

**hope** [1] - 27:21

**hopes** [2] - 47:10, 49:11

**horse** [1] - 15:11

**hospital** [1] - 223:22

**house** [50] - 83:1, 90:5, 97:4, 97:5, 98:4, 99:4, 99:6, 100:20, 101:6, 105:2, 105:4, 107:7, 107:22, 108:9,

111:1, 128:17, 130:19, 133:6, 133:15, 146:16, 147:4, 147:9, 147:14, 148:4, 149:13, 165:2, 165:4, 165:8, 168:1, 168:7, 177:20, 178:4, 179:14, 196:3, 197:3, 198:14, 209:10, 225:15, 247:1, 247:2, 247:4, 247:5, 247:6, 249:8, 249:22, 253:20
**houses** [2] - 97:6, 133:17
**human** [1] - 102:1
**hurt** [3] - 100:11, 102:1, 208:16
**husband** [17] - 153:23, 161:23, 162:6, 163:16, 168:3, 168:23, 171:12, 180:8, 181:16, 183:3, 183:8, 184:5, 195:2, 227:22, 245:5, 246:13, 246:16
**hysterectomy** [1] - 36:15
**hysterical** [4] - 53:23, 54:3, 72:23, 92:12

**I**

**I-280** [1] - 167:8
**i.e** [1] - 58:3
**ID** [3] - 2:8, 15:19
**idea** [4] - 23:13, 35:16, 112:8, 189:13
**identification** [2] - 174:2, 208:2
**identified** [2] - 35:4, 245:21
**identify** [3] - 45:4, 45:6, 211:17
**identity** [11] - 11:13, 13:11, 49:8, 49:9, 79:16, 80:4, 93:20, 93:23, 94:1, 129:17, 129:18
**IEC** [1] - 114:4
**IEM** [1] - 114:3
**ignore** [1] - 23:18
**imagine** [2] - 106:2, 191:11
**immediately** [2] - 21:10, 49:3
**immunity** [3] - 152:4, 153:21, 154:4
**impact** [1] - 27:10
**impeach** [3] - 252:23, 253:2, 264:10
**impeachment** [1] - 112:5
**impermissible** [1] - 131:4
**impinging** [1] - 200:20

**implicate** [1] - 194:23
**imply** [2] - 44:17, 46:21
**import** [1] - 162:13
**importance** [1] - 24:1
**important** [9] - 4:12, 5:16, 20:3, 27:9, 66:5, 66:6, 67:10, 164:6, 164:14
**impression** [1] - 122:23
**improper** [3] - 11:6, 21:13, 54:5
**improperly** [1] - 15:14
**imputed** [2] - 8:7, 57:2
**IN** [2] - 1:1, 266:9
**inadmissible** [1] - 160:20
**inasmuch** [1] - 123:20
**incarcerated** [2] - 112:8, 219:11
**incentive** [1] - 83:22
**inception** [1] - 168:2
**incident** [16] - 10:20, 21:9, 27:6, 49:13, 72:7, 74:9, 74:22, 75:1, 96:18, 125:15, 127:1, 127:14, 128:14, 137:5, 148:15, 182:8
**incidents** [1] - 10:15
**include** [3] - 25:21, 160:4, 163:4
**including** [1] - 153:20
**inconsistencies** [23] - 102:20, 102:22, 102:23, 103:13, 104:5, 117:13, 117:22, 117:23, 119:3, 119:18, 119:20, 120:6, 120:17, 121:5, 121:8, 121:18, 121:22, 122:6, 122:17, 123:10, 123:21, 145:18, 145:20
**inconsistent** [7] - 116:15, 118:2, 118:17, 119:8, 119:23, 121:12, 124:9
**incorrect** [3] - 57:9, 221:3, 221:6
**incorrectly** [1] - 35:14
**inculpatory** [1] - 56:10
**Inculpatory** [1] - 56:11
**incumbent** [1] - 65:2
**independent** [1] - 6:10

**indicate** [11] - 57:17, 59:20, 59:21, 67:16, 92:22, 104:5, 112:3, 160:8, 183:6, 220:18, 262:11
**indicated** [37] - 33:23, 34:1, 34:8, 37:20, 42:8, 49:23, 54:1, 61:21, 63:12, 66:10, 73:19, 79:9, 81:6, 82:5, 86:5, 87:6, 93:18, 101:5, 112:7, 114:11, 114:15, 123:8, 149:17, 155:5, 180:2, 181:9, 191:17, 198:4, 200:17, 201:6, 203:1, 217:11, 230:19, 231:14, 237:16, 243:12, 243:16
**indicates** [8] - 59:16, 60:4, 70:6, 120:20, 141:10, 141:12, 163:3, 163:13
**indicating** [8] - 36:12, 53:22, 59:1, 59:2, 64:9, 85:1, 168:9, 205:4
**indict** [1] - 49:3
**indicted** [1] - 206:14
**indicting** [1] - 50:6
**indictment** [3] - 38:14, 205:17, 208:6
**individual** [9] - 16:2, 22:11, 23:17, 46:1, 83:22, 90:11, 112:13, 139:11, 172:2
**individuals** [9] - 84:12, 87:10, 87:14, 89:10, 89:13, 89:23, 90:13, 90:16, 90:18
**infer** [2] - 92:3, 165:21
**inference** [3] - 39:4, 92:13, 92:18
**inferred** [1] - 23:16
**inflection** [2] - 72:20, 73:19
**influenced** [1] - 23:8
**inform** [1] - 219:4
**informant** [56] - 5:21, 5:22, 6:3, 6:9, 6:12, 6:15, 6:21, 8:3, 8:4, 10:2, 11:23, 14:18, 17:1, 46:14, 46:16, 46:21, 46:23, 47:2, 47:13, 47:16, 48:1, 49:2, 49:7, 49:8, 50:8, 54:2, 54:14, 75:22, 76:4, 76:13, 76:14, 76:18, 76:22, 77:6, 77:14, 79:17, 79:21, 80:10, 80:16, 80:19, 80:22, 81:3, 81:18, 82:7, 83:18, 83:20, 83:23, 86:18, 87:18, 88:11, 89:12, 90:4, 90:8, 90:14,

93:15, 94:3
**informant's** [1] - 6:4
**Informants** [1] - 47:3
**informants** [4] - 46:12, 47:4, 80:1, 82:9
**information** [48] - 21:12, 32:15, 32:21, 33:11, 33:13, 33:16, 45:1, 46:17, 50:7, 50:20, 59:8, 63:13, 63:22, 63:23, 64:7, 64:23, 65:18, 66:3, 66:8, 66:23, 67:3, 67:8, 68:22, 74:7, 80:21, 85:5, 85:15, 86:9, 105:21, 112:10, 123:1, 124:1, 131:12, 167:3, 167:5, 175:23, 176:4, 176:7, 178:20, 186:12, 192:7, 222:15, 230:10, 231:5, 250:9, 258:18, 260:1, 261:8
**informed** [1] - 205:16
**inherently** [2] - 5:11, 7:11
**initial** [3] - 151:16, 189:9, 226:19
**injured** [1] - 99:21
**injuries** [4] - 31:21, 31:22, 32:2, 32:5
**injury** [4] - 32:1, 127:12, 128:3, 236:7
**innocence** [3] - 65:19, 66:2, 66:13
**inquire** [5] - 19:13, 151:4, 154:11, 159:18, 159:20
**inquired** [1] - 155:1
**inquiring** [1] - 81:17
**inquiry** [1] - 168:13
**inside** [4] - 107:7, 107:22, 108:7, 108:9
**inspection** [3] - 120:21, 121:1, 123:12
**instance** [1] - 15:21
**instances** [1] - 55:22
**instinct** [1] - 100:11
**instruct** [5] - 22:23, 62:7, 63:2, 69:13, 158:11
**instructed** [3] - 68:21, 169:12, 169:13
**instruction** [13] - 17:12, 18:11, 20:10, 20:22, 23:18, 23:19, 35:23, 60:17, 61:18, 61:22, 62:3, 68:17, 69:9
**instructions** [17] - 18:23, 22:17, 22:21, 23:11, 23:12, 23:20, 23:22, 24:2, 24:9, 27:21, 28:2, 28:4, 28:7, 28:9, 62:11,

69:19, 94:23
**intelligence** [1] - 26:5
**intend** [8] - 16:6, 54:4, 60:16, 62:6, 158:11, 166:16, 228:2, 228:6
**intended** [4] - 23:15, 36:11, 165:22, 208:17
**intending** [1] - 62:2
**intends** [9] - 9:20, 9:21, 10:5, 11:19, 16:7, 29:13, 29:18, 164:22
**intent** [5] - 4:10, 8:22, 11:13, 12:9, 15:21
**intention** [2] - 197:9, 227:2
**intentions** [1] - 37:12
**interest** [1] - 26:5
**interested** [3] - 109:22, 192:7, 209:14
**interests** [2] - 164:6, 164:15
**interpretation** [2] - 120:15, 163:8
**intersection** [1] - 128:15
**interview** [6] - 110:5, 141:17, 203:10, 212:6, 212:16, 238:20
**Interview** [3] - 2:16, 220:16, 221:1
**intoxicated** [2] - 144:15, 148:19
**introduce** [6] - 6:17, 15:6, 125:3, 158:1, 171:1, 234:9
**introduction** [1] - 64:12
**investigate** [2] - 21:11, 42:12
**investigated** [1] - 32:14
**investigating** [1] - 46:18
**investigation** [26] - 30:7, 33:9, 33:12, 42:16, 43:16, 43:21, 44:15, 46:2, 46:6, 47:18, 47:22, 84:14, 85:20, 85:23, 86:3, 86:6, 87:16, 87:22, 88:9, 127:13, 183:10, 236:7, 237:5, 249:1, 249:3
**investigations** [4] - 42:6, 76:19, 86:16, 92:16
**investigators** [1] - 237:8
**involve** [4] - 43:6, 81:9, 94:12, 161:1
**involved** [23] - 9:22, 36:4, 36:6, 43:16,

46:2, 47:18, 47:21, 47:23, 76:3, 76:8, 76:11, 77:4, 77:10, 77:18, 81:7, 81:18, 84:12, 84:14, 85:22, 87:11, 88:9, 110:1, 167:20

**involvement** [4] - 77:9, 77:12, 81:17, 204:16

**involving** [7] - 7:17, 43:17, 77:19, 82:2, 83:13, 85:20, 237:22

**Involving** [1] - 90:16

**irrelevant** [2] - 87:21, 146:21

**irrespective** [1] - 22:12

**IS** [1] - 266:8

**issue** [24] - 3:17, 4:13, 4:14, 7:3, 13:12, 13:14, 13:16, 15:21, 17:3, 17:7, 22:13, 26:14, 26:16, 26:20, 52:11, 56:6, 94:22, 115:13, 151:23, 152:2, 152:6, 153:11, 157:7, 158:22

**issues** [1] - 17:5

**IT** [1] - 1:8

**itself** [2] - 7:9, 25:11

**J**

**jail** [9] - 38:21, 111:17, 193:2, 193:12, 218:3, 218:7, 219:1, 219:18, 222:18

**James** [2] - 1:10, 89:2

**JANET** [1] - 152:23

**Janet** [17] - 2:5, 2:16, 2:16, 35:7, 37:21, 151:19, 153:6, 155:20, 157:6, 170:9, 171:3, 187:19, 202:4, 220:16, 221:1, 245:7, 259:16

**Jeff** [1] - 203:11

**Jeffery** [1] - 189:14

**job** [1] - 192:18

**Joe** [1] - 113:16, 113:17

**jog** [1] - 102:7

**jogged** [1] - 110:18

**John** [14] - 88:13, 136:22, 137:1, 137:2, 143:16, 186:17, 188:15, 188:17, 189:8, 190:6, 191:7, 202:12, 206:22, 206:23

**John's** [1] - 144:20

**Johnny** [4] - 98:4, 98:15, 99:7, 104:23

**joined** [2] - 126:7, 227:20

joint [1] - 19:9

**Joint** [1] - 19:10

**JOSEPH** [1] - 113:19

**Joseph** [2] - 114:2, 125:5

**journalize** [1] - 85:10

**Judge** [118] - 7:20, 7:21, 8:18, 10:9, 10:21, 12:4, 12:11, 13:1, 15:7, 16:5, 17:21, 22:23, 27:19, 29:2, 29:10, 36:23, 37:11, 40:5, 44:13, 53:13, 55:5, 56:23, 57:12, 59:15, 59:17, 62:10, 62:22, 64:14, 65:17, 66:9, 67:5, 67:19, 69:4, 69:11, 69:20, 73:10, 87:20, 91:19, 91:23, 102:19, 103:21, 104:9, 113:12, 115:7, 115:11, 116:4, 118:1, 119:2, 119:4, 119:7, 119:13, 119:16, 121:17, 124:6, 124:10, 124:21, 131:6, 132:14, 134:19, 135:4, 135:11, 140:7, 141:9, 145:12, 147:21, 148:20, 149:11, 150:8, 151:6, 151:14, 152:8, 154:9, 154:13, 156:1, 157:14, 158:8, 159:1, 160:8, 160:16, 163:1, 163:10, 163:23, 164:18, 169:20, 170:14, 171:23, 176:20, 182:10, 182:22, 183:6, 186:15, 188:3, 195:16, 196:21, 197:21, 198:10, 199:9, 200:22, 201:4, 207:13, 211:5, 219:22, 221:9, 228:20, 233:4, 233:8, 233:15, 237:11, 241:6, 243:6, 243:10, 244:19, 250:16, 250:21, 252:12, 261:15, 264:3, 265:1

**JUDGE** [1] - 1:5

**judging** [1] - 26:17

**judgment** [1] - 22:11

**jumpsuit** [1] - 245:19

**juncture** [3] - 42:23, 187:20, 250:17

**June** [16] - 8:21, 49:18, 49:19, 49:20, 77:19, 90:20, 171:14, 176:6, 176:13, 177:3, 226:4, 226:5, 226:14

**juror** [1] - 21:1

**Juror** [2] - 114:12, 114:15

jurors [1] - 25:13

**jury** [55] - 5:9, 7:10, 12:5, 14:21, 17:12, 17:15, 18:11, 20:3, 22:8, 38:8, 39:22, 52:23, 60:16, 61:7, 62:7, 62:11, 62:21, 64:13, 66:12, 68:10, 69:13, 69:17, 71:11, 77:5, 83:6, 94:9, 103:22, 115:11, 115:22, 117:3, 122:21, 128:18, 131:10, 133:11, 168:14, 169:21, 170:7, 197:21, 201:12, 205:12, 206:14, 207:17, 208:12, 209:4, 214:2, 214:18, 215:1, 216:13, 216:16, 228:11, 233:11, 234:9, 250:21, 263:22, 264:17

**JURY** [7] - 3:5, 18:8, 19:3, 52:21, 68:7, 150:23, 170:5

**justice** [15] - 17:14, 41:13, 164:8, 164:17, 182:6, 182:20, 183:10, 184:1, 184:13, 184:20, 191:18, 192:21, 217:10, 218:10

**K**

**Kantura** [6] - 78:9, 78:11, 79:9, 91:1, 91:3, 93:9

**keep** [6] - 28:2, 138:1, 164:10, 165:13, 218:3, 220:7

**Keep** [1] - 171:1

**keeping** [1] - 128:21

**kept** [3] - 209:14, 209:18, 218:7

**kids** [2] - 36:14, 208:23

**kill** [3] - 11:20, 12:20, 255:21

**killed** [6] - 228:1, 247:23, 248:18, 248:22, 248:23, 256:2

**kind** [6] - 15:15, 102:2, 132:9, 152:17, 174:4, 246:8

**kinds** [1] - 215:14

**knee** [3] - 189:20, 203:7, 203:17

**knowing** [1] - 76:1

**knowingly** [1] - 197:10

**knowledge** [15] - 6:2, 6:10, 8:6, 10:7, 11:13, 57:2, 232:20, 240:18, 246:20,

248:8, 256:5, 258:19, 259:17, 259:20

**known** [17] - 8:3, 44:17, 44:18, 45:7, 46:23, 48:2, 63:23, 64:1, 75:14, 159:17, 166:9, 173:14, 173:17, 202:6, 245:13, 245:23, 246:6

**knows** [4] - 12:5, 14:21, 33:4, 130:6

**L**

**lab** [1] - 35:1

**lack** [2] - 17:6, 26:4

**Ladies** [2] - 68:9, 234:10

**ladies** [3] - 29:10, 33:14, 33:22

**lady** [4] - 97:5, 97:22, 138:10, 138:11

**laid** [1] - 31:16

**Laid** [1] - 99:20

**large** [14] - 31:16, 83:19, 108:16, 237:22, 239:13, 240:2, 240:11, 240:21, 241:11, 241:15, 242:1, 242:6

**Large** [1] - 240:2

**last** [17] - 9:7, 24:8, 36:15, 50:14, 75:4, 101:20, 187:10, 191:15, 191:22, 196:5, 216:6, 235:20, 235:21, 235:23, 258:6, 261:22

**Last** [1] - 114:2

**Lastly** [1] - 14:19

**late** [4] - 137:7, 137:8, 159:4, 166:20

**latitude** [1] - 188:11

**latter** [1] - 127:22

**Latter** [1] - 127:23

**law** [19] - 4:6, 9:5, 20:9, 20:17, 22:21, 22:23, 23:1, 28:7, 33:8, 41:11, 55:14, 58:10, 59:10, 59:13, 60:1, 154:10, 156:10, 167:15, 168:21

**lawn** [1] - 128:21, 133:21

**laws** [1] - 56:1

**laying** [6] - 29:15, 44:4, 45:3, 97:7, 97:8, 99:19, 99:20, 100:10, 101:18, 102:1

**leading** [5] - 139:7, 176:9, 186:13, 190:12, 226:10

**leads** [1] - 32:18

**leaf** [1] - 239:12

**learn** [2] - 129:18, 225:12

**learned** [1] - 126:6

**learning** [1] - 227:1

**least** [16] - 10:2, 17:14, 17:18, 30:14, 39:12, 51:18, 77:9, 79:12, 80:8, 81:19, 87:10, 89:9, 90:12, 132:10, 168:8, 243:18

**leave** [7] - 67:17, 105:12, 105:13, 156:5, 161:11, 196:11, 201:17

**leaving** [6] - 168:10, 197:6, 197:15, 197:19, 198:13, 208:20

**led** [1] - 175:2

**leeway** [3] - 88:4, 176:11, 186:11

**left** [7] - 31:23, 105:6, 105:13, 143:8, 187:7, 199:7, 199:11

**legally** [1] - 94:11

**legislature** [1] - 122:10

**legitimately** [1] - 64:23

**lengths** [2] - 58:5, 59:17

**Less** [1] - 129:16

**less** [1] - 133:16

**letter** [46] - 36:10, 36:11, 36:12, 37:20, 185:8, 185:9, 186:1, 186:17, 188:10, 188:15, 188:17, 188:22, 189:8, 190:3, 190:6, 190:15, 191:7, 202:13, 206:20, 206:22, 206:23, 207:2, 207:15, 208:5, 208:7, 208:8, 208:11, 208:17, 208:20, 209:4, 209:22, 209:23, 210:1, 211:18, 220:4, 220:11, 222:16, 223:8, 224:14, 224:17, 224:20, 229:4, 229:21

**Letter** [1] - 2:16

**letters** [1] - 132:17

**level** [1] - 160:21

**lewd** [3] - 11:3, 11:8, 16:3

**liberty** [1] - 60:10

**lie** [6] - 190:15, 190:19, 190:20, 209:4, 231:9, 231:15

**lied** [3] - 27:12, 208:8, 208:12

**lies** [1] - 224:10

**life** [8] - 66:7, 94:4, 96:2, 96:15, 111:17, 129:15, 136:7, 246:6

**Light** [1] - 167:10

**light** [2] - 67:10, 94:21

12

likely [1] - 33:8
Likewise [1] - 21:6
Limine [3] - 3:13, 4:7, 9:3
limited [5] - 13:17, 37:9, 68:11, 68:13, 186:13
line [13] - 71:22, 124:2, 128:16, 193:9, 220:11, 220:23, 252:18, 258:6, 261:22, 262:2, 264:4
lines [1] - 223:15
list [1] - 88:9
listen [1] - 28:3
listening [5] - 22:18, 27:22, 39:20, 39:21, 107:19
live [9] - 95:22, 96:8, 136:4, 136:13, 171:7, 195:4, 232:16, 232:18, 244:23
Live [1] - 232:19
lived [8] - 96:1, 96:5, 96:14, 130:19, 136:6, 136:15, 195:7, 255:9
lives [1] - 25:21
living [5] - 96:15, 100:20, 136:17, 136:20, 143:17
location [1] - 127:11
locations [1] - 161:5
logs [1] - 127:10
Loisel [12] - 1:15, 4:6, 5:18, 8:17, 29:1, 40:3, 71:18, 124:19, 154:7, 158:7, 180:21, 229:4
LOISEL [238] - 8:18, 15:7, 15:10, 16:15, 18:4, 19:5, 19:10, 27:19, 29:2, 29:9, 35:10, 36:18, 36:23, 40:5, 40:19, 43:8, 43:14, 44:4, 45:3, 45:8, 45:17, 51:15, 52:5, 53:13, 53:16, 53:19, 55:5, 56:2, 56:14, 56:21, 57:4, 57:9, 57:11, 59:15, 62:10, 62:16, 62:22, 64:14, 65:17, 65:21, 66:1, 66:9, 67:5, 67:13, 67:19, 68:3, 69:11, 69:20, 70:16, 71:3, 71:10, 73:10, 73:14, 73:15, 73:23, 75:6, 78:23, 86:4, 86:19, 87:20, 91:19, 91:23, 92:13, 92:19, 93:5, 94:6, 95:6, 95:19, 102:11, 102:19, 103:8, 103:12, 103:18, 103:21, 104:9, 104:14, 112:12, 112:18, 113:12, 113:15, 115:7,

115:11, 115:18, 116:22, 117:12, 117:18, 118:1, 118:6, 118:9, 118:12, 118:15, 118:22, 119:4, 119:11, 119:13, 119:16, 120:10, 120:13, 120:20, 121:16, 121:23, 122:9, 122:19, 123:8, 124:6, 124:21, 125:2, 128:8, 130:8, 131:6, 132:14, 134:2, 134:19, 134:22, 135:4, 135:9, 136:1, 140:7, 140:10, 141:9, 141:12, 141:22, 142:4, 142:7, 142:15, 143:11, 145:4, 145:12, 145:15, 145:20, 146:2, 146:20, 147:11, 147:20, 148:1, 148:20, 149:11, 149:16, 150:4, 150:8, 151:3, 151:8, 151:14, 152:8, 152:14, 154:9, 155:23, 156:5, 157:13, 157:19, 158:8, 158:19, 159:1, 159:10, 160:8, 160:16, 160:18, 163:1, 169:19, 170:1, 170:14, 170:21, 171:23, 176:16, 176:20, 176:23, 182:10, 182:22, 183:6, 183:20, 184:12, 186:15, 188:3, 188:14, 189:7, 192:11, 193:7, 195:16, 196:21, 197:7, 197:21, 198:10, 199:9, 200:10, 200:22, 201:4, 201:19, 207:13, 210:11, 211:5, 212:7, 212:11, 216:7, 217:14, 217:16, 219:22, 220:2, 221:8, 227:10, 228:20, 232:3, 232:21, 233:4, 233:8, 233:14, 234:4, 237:11, 237:13, 241:5, 242:20, 243:6, 243:10, 243:22, 244:8, 244:19, 244:22, 250:21, 251:15, 252:8, 252:10, 253:5, 253:16, 256:7, 256:17, 256:22, 257:4, 257:8, 260:23, 261:14, 261:18, 262:18, 262:20, 263:1, 263:16,

263:21, 264:3, 264:12, 265:1
look [41] - 11:4, 59:15, 70:6, 103:16, 104:1, 116:2, 116:12, 120:11, 122:8, 132:21, 139:20, 141:22, 141:23, 142:21, 145:14, 145:17, 156:9, 156:11, 163:10, 208:3, 211:14, 213:6, 214:20, 216:6, 221:13, 239:2, 239:9, 239:23, 240:20, 241:9, 253:22, 254:22, 258:5, 261:20, 262:2, 262:3, 262:4, 264:5, 264:7
looked [14] - 9:6, 17:5, 97:9, 97:14, 97:16, 97:20, 100:3, 103:9, 115:18, 123:2, 127:11, 143:1, 149:7, 162:4
looking [6] - 17:8, 60:10, 114:17, 165:16, 218:17, 218:23
looks [4] - 117:2, 122:6, 239:4, 255:4
lost [1] - 14:12
Lou [7] - 173:8, 173:9, 174:11, 174:18, 178:13, 205:9, 230:12
loud [3] - 142:2, 221:17, 250:23
love [2] - 186:3, 259:2
Lowe [1] - 9:14
LUCAS [1] - 1:1
Lucas [4] - 1:11, 1:14, 1:20, 48:16
LUNCH [1] - 150:21
lure [2] - 11:2, 16:3
lying [10] - 108:14, 127:10, 128:1, 223:6, 239:5, 239:12, 239:13, 240:2, 241:12, 242:6

## M

M-A-L-O-N-E [1] - 233:23
ma'am [4] - 142:16, 145:4, 150:4, 170:22
Maher [9] - 194:15, 195:6, 195:8, 195:11, 195:21, 195:23, 196:1, 196:3, 199:12
Main [1] - 48:16
major [3] - 101:23, 102:2, 125:15
male [6] - 31:2, 31:14, 35:3, 139:11,

139:13, 139:15
malice [1] - 115:16
MALONE [1] - 233:17
Malone [4] - 2:5, 233:22, 234:10, 234:12
man [10] - 29:14, 33:19, 97:22, 138:10, 138:12, 141:16, 143:7, 143:10, 143:12, 143:13
manner [3] - 25:23, 32:6, 74:12
marijuana [2] - 260:8, 260:11
marital [1] - 163:14
marked [14] - 132:20, 207:7, 207:9, 208:1, 211:6, 211:8, 211:13, 221:12, 239:1, 239:9, 239:23, 241:8, 257:1, 257:4
marriage [1] - 155:19
married [7] - 36:13, 153:17, 154:21, 171:13, 171:15, 171:20, 194:11
marrying [1] - 37:22
marshals [3] - 192:17, 192:23
Mary [1] - 114:3
material [4] - 64:2, 65:7, 65:18, 66:1
materials [2] - 63:20, 112:5
matter [34] - 4:23, 21:20, 21:23, 43:2, 55:13, 60:17, 61:9, 63:4, 68:23, 69:1, 69:23, 70:3, 70:7, 70:20, 71:7, 71:12, 112:20, 122:3, 135:5, 154:10, 161:17, 162:8, 162:10, 163:20, 167:20, 187:17, 202:9, 204:16, 217:18, 230:9, 230:23, 233:5, 260:20, 261:7
Matter [1] - 229:17
matters [3] - 47:9, 150:13, 169:18
McDevitt [2] - 1:20, 266:17
McDonald's [1] - 48:15
MCELROY [13] - 4:1, 4:4, 12:23, 17:21, 56:7, 56:12, 56:23, 57:7, 69:15, 70:13, 114:17, 141:20, 257:3
McElroy [3] - 1:18, 3:23, 8:16, 12:22, 17:20, 203:12
mean [25] - 27:1,

63:13, 101:21, 104:11, 122:12, 124:11, 127:16, 137:8, 138:4, 148:15, 152:14, 157:14, 157:21, 180:12, 197:12, 223:9, 227:17, 242:8, 243:22, 246:10, 246:12, 246:14, 247:15, 251:7, 255:21
meaning [2] - 25:13, 260:16
means [2] - 25:16, 74:8
measure [1] - 132:5
meet [2] - 172:5, 184:21
meeting [10] - 179:5, 179:7, 184:23, 185:2, 186:21, 186:22, 186:23, 187:3, 189:10, 193:20
meetings [5] - 189:23, 190:5, 190:8, 191:9, 225:8
member [4] - 41:10, 125:9, 234:13, 236:3
members [4] - 18:10, 177:17, 207:17, 264:16
Members [3] - 20:3, 94:9, 170:7
memorialize [1] - 74:3
memorialized [4] - 64:20, 64:22, 66:10, 74:14
memories [1] - 39:15
memory [8] - 26:4, 102:7, 107:10, 108:23, 109:18, 109:23, 110:19, 131:23
mental [1] - 60:21
mention [1] - 178:21
mentioned [6] - 5:22, 10:10, 17:3, 32:21, 62:23, 84:1
mentioning [2] - 147:14, 251:20
merely [1] - 26:15
message [1] - 21:21
met [2] - 172:7, 203:10
Metro [2] - 41:19, 82:5
Michael [1] - 1:15
Middle [1] - 168:22
midnight [1] - 125:13
might [2] - 25:5, 140:5
Mike [5] - 103:10, 122:2, 151:11, 188:13, 252:17

**mind** [20] - 9:4,
12:17, 22:5, 28:2,
51:17, 51:21, 52:1,
54:19, 55:9, 55:15,
58:2, 58:14, 111:14,
164:11, 165:13,
181:18, 194:7, 202:3,
237:20, 254:6

**minute** [12] - 102:14,
115:3, 127:9, 130:13,
134:17, 151:17,
170:16, 193:4,
207:17, 228:20,
241:5, 256:19

**minutes** [8] - 18:6,
52:18, 115:5, 127:7,
129:16, 134:10,
207:20, 233:9

**misconduct** [4] -
10:16, 10:19, 15:14,
264:2

**misdemeanor** [2] -
194:5, 218:21

**misstated** [1] -
124:11

**misstatements** [1] -
35:21

**mistake** [3] - 11:14,
13:11, 17:6

**mistaken** [1] - 141:2

**mistakenly** [2] -
37:21, 204:12

**mistakes** [1] - 204:8

**mistrial** [1] - 264:1

**misunderstand** [1] -
80:8

**modified** [1] -
116:18

**modus** [1] - 17:6

**moment** [6] - 7:20,
21:2, 147:20, 156:8,
163:12, 199:10

**money** [14] - 38:13,
38:17, 39:18, 179:19,
179:23, 181:10,
206:8, 206:10,
214:17, 215:3,
216:14, 225:10,
225:13, 227:1

**monitor** [1] - 29:7

**Montague** [1] -
114:22

**MONTAGUE** [1] -
114:23

**month** [1] - 247:16

**months** [3] - 41:15,
49:11, 126:4

**morning** [17] - 8:20,
18:10, 19:16, 20:1,
29:9, 33:22, 40:20,
40:21, 95:20, 95:21,
125:3, 136:2, 136:3,
144:7, 194:15,
201:18, 264:22

**Most** [1] - 178:18

**most** [6] - 5:16, 42:4,
60:3, 160:2, 182:1,

**mostly** [1] - 47:4

**mother** [14] - 227:6,
227:15, 230:20,
246:18, 247:3,
255:23, 258:11,
259:2, 259:10,
259:16, 260:22,
262:22, 264:6, 264:8

**mother's** [7] - 245:5,
245:6, 246:13,
246:15, 262:7,
263:14, 263:20

**motion** [24] - 3:9,
3:14, 4:15, 6:2, 8:20,
19:9, 19:10, 25:7,
63:21, 64:6, 64:14,
102:16, 103:11,
112:4, 117:12, 118:8,
120:4, 120:23, 123:9,
123:16, 124:3, 124:7,
124:8, 124:12

**Motion** [3] - 3:13,
4:7, 9:2

**motions** [2] - 3:9,
5:8

**motive** [29] - 4:10,
5:20, 6:7, 8:12, 9:12,
11:12, 11:20, 11:22,
12:13, 12:15, 12:20,
13:15, 13:18, 14:10,
14:14, 14:15, 15:21,
16:20, 17:9, 63:9,
65:21, 65:23, 66:14,
70:22, 87:6, 87:13,
87:14, 88:2, 94:22

**Motive** [2] - 66:4,
67:9

**mouth** [1] - 74:8

**move** [1] - 19:8

**moved** [1] - 128:22

**Mowery** [1] - 164:3

**Mowrey** [1] - 164:2

**MR** [468] - 3:15, 3:18,
4:1, 4:4, 8:18, 12:23,
13:6, 15:7, 15:10,
16:15, 17:21, 18:4,
19:4, 19:5, 19:8,
19:10, 19:12, 19:18,
27:19, 29:2, 29:9,
33:22, 35:10, 35:13,
35:17, 36:1, 36:18,
36:23, 37:11, 37:20,
40:5, 40:19, 42:18,
42:22, 43:8, 43:14,
44:3, 44:4, 44:5, 44:8,
44:13, 45:3, 45:5,
45:8, 45:10, 45:17,
51:5, 51:10, 51:15,
52:5, 53:5, 53:13,
53:16, 53:19, 54:6,
55:5, 55:23, 56:2,
56:3, 56:7, 56:12,
56:14, 56:18, 56:21,
56:23, 57:4, 57:7,
57:9, 57:10, 57:11,
57:17, 59:15, 60:3,
61:1, 61:15, 62:5,

62:10, 62:16, 62:22,
63:10, 64:14, 64:21,
65:17, 65:21, 66:1,
66:9, 67:5, 67:13,
67:19, 68:3, 69:4,
69:8, 69:11, 69:15,
69:20, 70:13, 70:16,
71:3, 71:10, 73:2,
73:10, 73:14, 73:15,
73:21, 73:23, 74:13,
75:6, 75:11, 78:23,
79:3, 79:6, 81:11,
81:13, 81:15, 84:9,
86:4, 86:11, 86:19,
86:22, 87:1, 87:5,
87:20, 87:23, 91:17,
91:19, 91:23, 92:13,
92:19, 92:22, 93:5,
94:6, 94:8, 95:6,
95:19, 97:11, 102:11,
102:15, 102:19,
103:2, 103:5, 103:8,
103:10, 103:12,
103:15, 103:18,
103:20, 103:21,
104:4, 104:9, 104:14,
104:20, 111:22,
112:3, 112:12,
112:18, 112:22,
113:4, 113:9, 113:12,
113:15, 113:22,
114:6, 114:11,
114:17, 114:23,
115:7, 115:11,
115:17, 115:18,
116:4, 116:16,
116:22, 117:11,
117:12, 117:17,
117:18, 117:20,
118:1, 118:4, 118:6,
118:7, 118:9, 118:10,
118:12, 118:13,
118:15, 118:21,
118:22, 119:1, 119:4,
119:9, 119:11,
119:12, 119:13,
119:16, 120:1,
120:10, 120:11,
120:13, 120:14,
120:20, 121:14,
121:16, 121:20,
121:23, 122:2, 122:9,
122:14, 122:19,
123:8, 123:15, 124:6,
124:14, 124:21,
125:2, 128:6, 128:8,
129:1, 129:23, 130:5,
130:8, 131:1, 131:6,
131:8, 132:14,
133:10, 134:2, 134:7,
134:19, 134:22,
134:23, 135:4, 135:9,
136:1, 138:1, 139:6,
140:7, 140:10,
140:11, 140:15,
140:19, 141:7, 141:9,
141:11, 141:12,
141:19, 141:20,

141:22, 142:4, 142:7,
142:10, 142:15,
143:9, 143:11,
144:11, 144:17,
145:4, 145:7, 145:12,
145:15, 145:19,
145:20, 146:2,
146:10, 146:20,
147:1, 147:11,
147:17, 147:20,
148:1, 148:20,
148:23, 149:4,
149:11, 149:14,
149:16, 150:4, 150:8,
151:3, 151:8, 151:11,
151:14, 152:8,
152:14, 154:9,
154:15, 154:19,
154:23, 155:14,
155:23, 156:5,
156:21, 157:13,
157:19, 158:8,
158:19, 159:1,
159:10, 160:7, 160:8,
160:16, 160:18,
161:16, 163:1,
161:15, 169:19,
170:1, 170:14,
170:21, 171:23,
176:2, 176:8, 176:12,
176:16, 176:20,
176:23, 180:5,
180:18, 182:9,
182:10, 182:12,
182:15, 182:22,
183:6, 183:13,
183:20, 184:12,
186:8, 186:15,
187:12, 187:16,
188:3, 188:13,
188:14, 188:19,
189:7, 190:11, 192:8,
192:11, 193:5, 193:7,
194:20, 195:14,
195:16, 196:16,
196:21, 197:1, 197:7,
197:14, 197:21,
198:8, 198:10,
198:17, 198:22,
199:4, 199:9, 199:19,
200:7, 200:10,
200:18, 200:22,
201:4, 201:9, 201:19,
201:21, 202:2,
207:11, 207:13,
207:23, 210:11,
210:13, 211:5, 211:8,
211:11, 211:19,
212:7, 212:10,
212:11, 212:12,
212:15, 216:7, 216:9,
217:14, 217:16,
219:9, 219:20,
219:22, 220:2, 221:8,
221:16, 226:9, 227:8,
227:10, 227:11,
227:14, 227:18,
228:20, 228:23,

229:2, 231:23, 232:3,
232:6, 232:13,
232:21, 233:1, 233:4,
233:8, 233:14, 234:4,
237:11, 237:13,
240:5, 241:5, 242:20,
242:23, 243:6,
243:10, 243:22,
244:8, 244:19,
244:22, 250:10,
250:12, 250:16,
250:21, 251:14,
251:15, 252:2, 252:8,
252:10, 252:11,
253:5, 253:11,
253:16, 254:1, 254:5,
254:10, 256:7,
256:10, 256:14,
256:17, 256:20,
256:22, 257:2, 257:3,
257:4, 257:8, 257:14,
259:22, 260:3,
260:23, 261:11,
261:14, 261:18,
262:13, 262:18,
262:20, 263:1, 263:4,
263:7, 263:16,
263:21, 263:23,
264:3, 264:12,
264:14, 264:23, 265:1

**multiple** [1] - 91:9

**Munn** [1] - 88:19

**murder** [24] - 58:17,
159:8, 160:22, 161:1,
161:7, 163:5, 165:6,
172:19, 172:21,
173:7, 173:20,
174:13, 175:4,
175:22, 178:3,
181:16, 183:3, 184:3,
223:4, 223:7, 232:8,
232:20, 249:6

**murdered** [1] - 72:6

**murders** [1] - 174:4

**must** [17] - 4:17, 8:3,
14:2, 14:5, 20:20,
21:7, 23:6, 23:7,
23:15, 23:16, 24:14,
25:4, 25:17, 152:2,
154:11, 167:9, 169:16

**mutual** [2] - 163:16,
163:20

---

# N

**name** [35] - 6:4,
32:12, 36:4, 36:5,
36:6, 40:12, 40:13,
40:14, 40:22, 47:15,
67:3, 84:20, 95:14,
98:17, 114:1, 114:2,
114:3, 135:16,
135:17, 147:9,
147:14, 153:5, 172:9,
196:5, 208:18,
233:20, 233:21,
244:15, 245:6,

249:15, 255:22, 255:23

**names** [11] - 32:10, 84:11, 86:16, 87:10, 87:16, 87:21, 88:9, 89:8, 89:20, 147:7, 249:13

**Nancy** [1] - 114:3
**nap** [1] - 127:19
**Narcotics** [8] - 9:23, 41:20, 42:1, 42:3, 42:9, 46:19, 76:12, 77:13

**narcotics** [6] - 42:5, 48:5, 48:6, 48:11, 48:18, 82:22
**narration** [1] - 186:9
**narrative** [2] - 140:20, 252:20
**natural** [1] - 21:3
**nature** [9] - 3:13, 5:1, 42:15, 51:4, 55:21, 139:7, 176:9, 190:12, 226:10

**Navarre** [92] - 6:8, 6:11, 6:20, 7:23, 8:2, 8:7, 10:1, 10:6, 11:21, 12:21, 14:17, 16:22, 29:17, 29:19, 29:21, 30:1, 30:8, 30:13, 30:15, 30:16, 30:19, 31:9, 31:17, 31:21, 32:4, 34:19, 43:7, 46:7, 46:10, 46:11, 47:1, 47:12, 47:23, 48:8, 48:11, 49:16, 50:8, 50:14, 51:12, 53:3, 53:22, 54:23, 59:2, 64:10, 66:23, 67:17, 68:13, 68:18, 71:20, 72:6, 72:10, 72:12, 72:17, 75:3, 75:5, 75:14, 76:21, 78:1, 78:5, 78:16, 78:20, 79:7, 79:17, 81:7, 82:12, 83:9, 84:4, 84:12, 86:18, 87:12, 87:18, 88:10, 89:11, 89:17, 91:1, 92:2, 129:19, 129:21, 130:3, 172:19, 172:21, 173:7, 173:21, 175:4, 183:4, 183:11, 184:3, 215:9, 216:1, 223:4, 249:2, 249:6

**Navarre's** [11] - 29:15, 32:22, 33:20, 51:17, 81:17, 174:7, 174:8, 174:13, 177:14, 178:2, 215:15
**Near** [1] - 128:3
**near** [4] - 97:9, 128:15, 133:5, 166:6
**necessarily** [3] - 27:1, 62:17, 116:22
**necessary** [2] - 20:19, 113:1

**necessity** [1] - 24:23
**need** [25] - 13:18, 52:11, 53:11, 68:1, 74:21, 78:16, 78:20, 79:18, 98:1, 103:15, 150:13, 152:17, 153:10, 155:21, 156:2, 158:22, 164:7, 164:15, 170:16, 188:10, 188:19, 205:23, 207:14, 233:10, 259:23

**needed** [3] - 79:1, 193:12, 237:9
**needs** [4] - 4:14, 125:16, 164:10, 165:12, 168:13
**negate** [1] - 87:23
**negative** [1] - 115:22
**negotiated** [1] - 39:1
**Neil** [1] - 1:18
**never** [11] - 83:7, 112:10, 116:12, 120:8, 121:14, 190:4, 202:12, 220:5, 247:4, 247:6, 255:22

**Never** [4] - 34:21, 34:22, 36:6, 202:14
**new** [2] - 21:16, 37:22
**newspaper** [1] - 18:16
**Next** [1] - 151:1
**next** [24] - 31:17, 95:4, 97:6, 101:6, 108:16, 113:14, 117:7, 135:3, 150:7, 151:19, 152:3, 152:13, 153:8, 155:9, 156:1, 157:5, 173:5, 215:8, 222:4, 222:22, 233:3, 239:13, 243:13, 249:14

**nice** [2] - 162:1, 246:15
**Niemiec** [7] - 2:4, 113:16, 113:17, 114:3, 125:5, 134:8
**NIEMIEC** [1] - 113:19
**night** [39] - 9:7, 30:22, 31:1, 31:11, 33:18, 96:22, 97:1, 98:11, 98:14, 100:16, 101:3, 101:22, 107:6, 110:12, 131:21, 137:10, 137:11, 137:14, 138:18, 143:20, 149:23, 164:20, 165:9, 166:20, 194:15, 195:20, 200:17, 218:5, 236:16, 237:15, 238:10, 239:18, 240:17, 246:19, 246:23, 247:1, 247:8, 247:10, 247:15

**nightshift** [1] - 237:6
**Nine** [1] - 117:18
**NO** [1] - 1:3
**none** [3] - 13:11, 23:15, 32:18
**noon** [1] - 150:12
**normally** [2] - 116:5, 237:6
**Norman** [1] - 88:21
**north** [1] - 195:10
**Note** [1] - 253:11
**note** [2] - 18:14, 61:16

**notebook** [1] - 117:1
**noted** [9] - 5:6, 5:8, 17:20, 18:2, 37:16, 45:13, 56:23, 71:8, 184:7
**notepads** [1] - 22:1
**notes** [22] - 17:5, 22:2, 22:3, 22:4, 22:6, 22:7, 22:10, 22:13, 22:16, 102:22, 115:19, 116:3, 116:7, 116:8, 116:9, 123:3, 202:16, 211:22, 212:1, 212:5, 212:8
**nothing** [12] - 6:17, 14:16, 15:4, 75:7, 87:21, 94:1, 131:4, 148:18, 154:12, 188:22, 195:16
**Nothing** [14] - 91:17, 94:8, 102:11, 134:3, 145:5, 150:4, 201:20, 219:20, 228:21, 231:23, 233:1, 242:21, 256:7, 264:12
**notice** [1] - 8:21
**November** [12] - 50:23, 53:21, 72:4, 85:1, 106:13, 109:6, 109:20, 110:21, 111:10, 234:20, 234:23, 235:1
**number** [4] - 26:15, 26:19, 77:5, 82:4
**Number** [9] - 114:12, 114:15, 241:11, 241:18, 241:21, 241:23, 242:1, 242:4, 242:5
**numbers** [1] - 132:16

## O

**o'clock** [6] - 144:6, 150:14, 150:19, 156:17, 157:1, 265:3
**oath** [3] - 26:12, 158:3, 170:12
**OB** [1] - 2:8
**Object** [1] - 262:13
**object** [51] - 44:3, 44:5, 51:5, 51:6, 64:12, 69:12, 73:2,

73:21, 74:13, 97:11, 122:17, 128:6, 129:2, 129:23, 130:5, 133:10, 139:7, 141:11, 143:9, 144:12, 144:17, 149:1, 176:2, 176:9, 180:5, 180:18, 180:19, 182:9, 186:9, 187:13, 190:12, 192:8, 193:5, 194:20, 194:21, 195:14, 196:17, 198:8, 198:17, 199:4, 199:19, 200:7, 221:16, 226:9, 227:9, 227:18, 240:5, 250:10, 250:12, 263:9, 263:23

**objecting** [3] - 17:22, 155:12, 263:10
**Objection** [15] - 35:10, 36:18, 78:23, 86:4, 86:19, 131:1, 146:20, 147:11, 198:22, 200:18, 210:11, 212:7, 217:14, 232:6, 260:23
**objection** [17] - 25:2, 25:6, 42:23, 43:5, 43:10, 53:4, 54:6, 58:23, 71:8, 131:7, 184:7, 196:23, 197:1, 197:7, 227:13, 250:16, 253:11
**objectionable** [1] - 182:11
**objections** [3] - 24:7, 61:16, 201:10
**obligation** [1] - 57:5
**observation** [3] - 90:20, 130:6, 197:16
**observations** [1] - 168:5
**observe** [1] - 48:21
**observed** [6] - 77:20, 78:1, 79:10, 90:23, 128:10, 169:15
**observing** [2] - 48:13, 91:10
**obstructing** [9] - 182:20, 183:9, 184:1, 184:13, 184:20, 191:18, 217:9, 217:10, 218:9
**Obstruction** [1] - 192:21
**obstruction** [1] - 182:5
**obtain** [2] - 21:12, 49:2
**obvious** [1] - 179:11
**Obviously** [3] - 40:22, 156:6, 188:4
**obviously** [13] - 10:11, 15:12, 37:1, 56:15, 62:18, 96:14, 117:14, 125:7,

158:20, 165:8, 236:2, 243:23, 246:21
**occasion** [2] - 42:12, 63:15

**occasions** [2] - 48:8, 50:4
**occur** [2] - 176:19, 176:22, 177:7, 189:12, 260:18
**occurred** [9] - 74:10, 74:23, 75:1, 83:7, 169:9, 169:16, 189:18, 215:9, 257:16
**occurring** [1] - 166:22
**odd** [1] - 246:22
**Odett** [3] - 141:13, 141:15, 141:18
**Odetta** [3] - 2:4, 135:9, 135:18
**ODETTA** [3] - 135:13, 135:18, 135:19
**OF** [12] - 1:1, 1:2, 1:6, 3:5, 18:8, 52:21, 68:7, 150:23, 170:5, 266:9, 266:10
**OFF** [6] - 3:22, 135:8, 150:10, 151:12, 233:7, 260:2
**offense** [3] - 40:1, 87:8, 219:15
**offenses** [2] - 62:1, 69:10
**offered** [13] - 8:5, 8:10, 14:16, 15:22, 69:22, 70:7, 71:6, 71:11, 190:23, 191:3, 218:20, 226:17, 226:20
**offering** [2] - 55:12, 59:6
**offhand** [1] - 84:18
**office** [20] - 11:2, 16:3, 57:2, 106:9, 106:17, 185:17, 186:6, 186:17, 187:10, 189:16, 193:3, 193:4, 202:13, 203:10, 209:8, 210:5, 210:8, 211:1, 211:22, 212:9
**Office** [2] - 31:19, 32:23
**Officer** [13] - 2:5, 53:1, 128:13, 135:2, 234:5, 234:10, 234:12, 237:15, 238:23, 239:8, 241:8, 242:20, 243:1
**OFFICER** [1] - 233:17
**officer** [24] - 31:7, 44:18, 49:9, 57:1, 78:5, 82:23, 83:8, 91:2, 125:18, 125:20, 126:1, 126:19, 126:22, 140:3, 172:8,

14

172:9, 215:14, 234:18, 235:3, 235:6, 235:10, 237:2, 262:16
**officer's** [1] - 262:14
**Officers** [2] - 31:7, 249:7
**officers** [9] - 31:15, 33:9, 48:9, 91:8, 91:10, 93:11, 126:5, 238:17, 238:19
**Official** [1] - 1:20, 266:18
**often** [2] - 27:6, 82:9
**oftentimes** [1] - 47:3
**Ohio** [29] - 1:21, 5:7, 6:1, 6:11, 14:20, 23:1, 31:5, 48:17, 54:16, 55:18, 57:8, 57:21, 57:22, 60:11, 63:20, 64:3, 95:6, 104:6, 112:11, 113:16, 135:9, 140:23, 164:2, 164:3, 164:11, 167:6, 168:17, 218:21, 236:13
**OHIO** [2] - 1:1, 1:2
**old** [6] - 96:3, 97:5, 136:9, 171:5, 246:4, 246:5
**ON** [1] - 265:4
**once** [7] - 28:22, 33:14, 130:15, 152:9, 188:6, 191:2, 191:3
**Once** [1] - 132:9
**One** [4] - 7:21, 62:22, 153:10, 189:13
**one** [86] - 9:15, 9:18, 13:13, 14:5, 14:8, 16:19, 18:11, 26:20, 27:10, 31:7, 32:12, 34:4, 34:6, 34:14, 35:6, 36:4, 36:9, 39:9, 39:23, 44:14, 46:11, 49:18, 49:20, 49:21, 63:10, 63:15, 67:11, 69:4, 81:23, 83:2, 82:23, 84:9, 86:11, 87:7, 87:13, 88:2, 90:11, 91:11, 91:16, 93:6, 101:20, 103:6, 103:13, 109:5, 113:9, 114:13, 117:1, 119:13, 121:12, 128:4, 128:21, 130:21, 134:17, 146:11, 149:10, 149:14, 155:16, 157:13, 158:20, 158:21, 159:5, 160:2, 163:12, 165:21, 168:9, 180:14, 182:1, 185:4, 189:17, 190:14, 193:20, 199:5, 199:9, 201:21, 205:6, 218:17, 219:9, 228:20, 240:19, 246:22, 250:19, 258:17, 259:9, 259:22

**oozing** [1] - 100:3
**open** [3] - 116:18, 166:3, 257:1
**opened** [4] - 92:1, 92:8, 263:1, 263:8
**opening** [13] - 3:10, 3:12, 20:16, 22:15, 24:5, 28:12, 28:22, 35:19, 35:21, 37:10, 54:15, 188:9, 188:18
**operandi** [1] - 17:7
**operations** [4] - 41:16, 235:17, 235:19, 236:6
**opinion** [1] - 20:8, 32:4, 52:16, 115:4, 150:17, 207:19
**opinions** [1] - 264:20
**opportunity** [33] - 4:5, 8:1, 11:12, 26:1, 33:15, 51:13, 55:2, 56:16, 57:15, 63:16, 64:18, 65:10, 78:12, 109:15, 109:17, 117:7, 122:8, 131:13, 142:21, 145:16, 172:5, 174:17, 177:16, 178:22, 184:21, 187:9, 213:17, 220:10, 229:3, 253:18, 254:7, 254:8, 258:23
**opposed** [3] - 19:14, 161:8, 201:11
**oral** [2] - 160:5, 200:23
**order** [9] - 16:8, 20:18, 24:1, 49:7, 79:15, 105:12, 141:2, 233:9, 237:14
**orderly** [1] - 28:13
**orders** [3] - 16:8, 21:15, 132:10
**original** [1] - 238:4
**other-acts** [2] - 9:11, 9:15
**otherwise** [1] - 195:3
**ought** [1] - 52:2
**outline** [1] - 55:20, 170:17
**Outside** [2] - 79:7, 81:23
**outside** [7] - 21:13, 52:11, 52:23, 89:9, 108:13, 144:6, 149:9
**OUTSIDE** [1] - 3:5, 18:8, 52:21, 68:7, 150:23, 170:5
**outweigh** [2] - 164:7, 164:15
**outweighed** [2] - 7:7, 43:2
**overall** [3] - 27:10, 76:9, 89:15
**overcome** [1] - 61:18

**overlooked** [1] - 20:11
**overriding** [2] - 5:9, 7:8
**Overrule** [1] - 130:11
**overrule** [3] - 37:15, 43:10, 227:12
**Overruled** [6] - 44:7, 88:4, 129:4, 131:14, 217:17, 261:2
**overstep** [1] - 67:15
**own** [5] - 22:11, 68:21, 141:4, 153:21, 264:10
**owned** [1] - 108:8
**owner** [1] - 108:3
**owning** [1] - 210:22

---

**P**

**p.m** [1] - 134:20
**P.M** [1] - 265:5
**pack** [1] - 129:15
**Page** [5] - 58:21, 212:20, 214:21, 258:6, 262:2
**page** [2] - 216:10, 261:22, 262:11
**pages** [2] - 207:12, 254:22
**paid** [13] - 47:3, 47:5, 82:10, 82:12, 82:14, 82:17, 83:18, 83:20, 83:23, 114:13, 204:17, 230:17
**PANEL** [1] - 19:3
**panned** [1] - 32:18
**paper** [6] - 18:17, 18:19, 18:23, 117:6, 199:2, 247:23
**Paragraph** [4] - 229:12, 229:13
**paragraph** [15] - 211:14, 212:20, 213:7, 214:21, 216:6, 221:14, 221:19, 221:20, 221:23, 222:2, 222:4, 222:6, 222:10, 222:12, 222:22
**parameters** [1] - 159:23
**parked** [1] - 166:7
**parking** [3] - 166:1, 239:11, 241:13
**Parkside** [2] - 195:7, 195:9
**Part** [1] - 230:1
**part** [24] - 10:18, 17:9, 66:5, 66:6, 86:16, 121:11, 123:18, 183:11, 210:20, 223:1, 223:2, 223:4, 223:5, 229:14, 229:18, 230:1, 237:1, 237:4, 248:14, 254:12, 254:13, 255:9

**participants** [1] - 21:6
**participate** [1] - 118:19
**participated** [1] - 170:10
**participating** [3] - 118:14, 118:16, 121:4
**participation** [1] - 122:4
**particular** [21] - 8:4, 9:12, 11:15, 13:16, 14:6, 14:18, 15:22, 23:17, 25:18, 46:18, 48:7, 63:17, 89:18, 101:22, 127:22, 141:3, 161:19, 187:22, 237:6, 252:14, 254:13
**particulars** [1] - 27:16
**parties** [6] - 21:5, 24:3, 114:16, 157:11, 159:17, 169:10
**partner** [1] - 127:5
**parts** [1] - 254:11
**party** [14] - 23:9, 66:14, 158:15, 158:21, 159:14, 161:9, 166:12, 169:11, 169:17, 196:22, 197:2, 197:10, 201:5, 201:8
**partying** [1] - 100:17
**pass** [2] - 85:5, 85:15
**passage** [1] - 27:4
**passed** [3] - 72:9, 74:8, 127:20
**passes** [1] - 7:3
**passion** [1] - 23:9
**past** [1] - 140:8
**patrol** [6] - 126:19, 126:20, 126:22, 235:3, 235:17
**patrolman** [1] - 125:14
**pattern** [1] - 133:7
**Pawlicki** [1] - 88:17
**Paxton** [17] - 31:4, 96:20, 97:3, 104:22, 127:3, 127:6, 128:16, 130:20, 137:6, 137:20, 146:12, 147:5, 159:13, 195:23, 236:9, 237:19, 240:13
**Pelok** [12] - 4:19, 4:22, 4:23, 10:10, 13:1, 13:2, 13:10, 13:20, 15:11, 15:19, 17:3, 17:5
**penalty** [1] - 21:16
**pending** [3] - 39:5, 39:18, 47:8
**penetrate** [1] - 183:17

**penitent** [1] - 168:23
**people** [22] - 27:2, 31:13, 32:15, 50:21, 84:16, 89:19, 92:4, 128:21, 130:17, 138:15, 138:19, 144:5, 153:20, 159:19, 166:3, 166:4, 166:5, 166:7, 166:9, 167:11, 174:2, 175:16
**per** [2] - 16:7, 154:9
**perfect** [1] - 131:23
**perhaps** [7] - 4:13, 47:10, 48:5, 50:20, 50:21, 89:22
**Perhaps** [1] - 20:13
**period** [4] - 44:18, 148:13, 218:7, 260:14
**periodic** [1] - 50:16
**periodically** [1] - 74:11
**Periodically** [1] - 50:19
**permit** [1] - 20:6
**permits** [1] - 58:12
**perpetrator** [1] - 15:20
**person** [13] - 5:11, 7:11, 46:16, 46:21, 49:12, 54:22, 97:1, 99:12, 127:19, 171:19, 171:21, 252:15, 259:9
**person's** [1] - 141:4
**personal** [3] - 21:19, 22:3, 130:6
**personally** [7] - 10:4, 48:21, 50:1, 76:8, 77:20, 185:14, 185:16
**personnel** [1] - 159:14
**persons** [3] - 27:5, 48:2, 173:11
**Persons** [1] - 41:21
**perspective** [1] - 102:5
**pertaining** [1] - 181:23
**petite** [1] - 99:15
**Phil** [2] - 127:8, 134:16
**phone** [32] - 51:18, 53:21, 54:3, 56:9, 59:1, 59:22, 61:14, 68:12, 68:14, 70:23, 71:20, 72:2, 72:12, 72:14, 72:21, 72:23, 73:17, 74:23, 75:2, 75:3, 85:1, 92:2, 92:5, 92:10, 106:18, 167:20, 167:22, 168:3, 177:6, 178:16, 178:18, 185:15
**Photo** [11] - 2:9, 2:9, 2:10, 2:10, 2:11, 2:11, 2:12, 2:12, 2:13, 2:13,

16

2:14

**photo** [2] - 174:1, 239:15

**photograph** [5] - 240:21, 240:23, 241:19, 242:1, 242:5

**photographed** [1] - 241:3

**photographs** [5] - 236:20, 236:21, 237:3, 237:9, 238:11

**photos** [1] - 241:10

**phrase** [1] - 197:12

**physical** [8] - 34:7, 34:9, 34:13, 34:15, 34:18, 35:5, 60:22, 99:18

**picked** [1] - 141:16

**picking** [1] - 220:17

**pickup** [1] - 239:12

**picture** [11] - 132:23, 133:3, 133:9, 133:11, 133:14, 133:22, 174:5, 174:8, 239:5, 240:10, 242:5

**pictures** [1] - 242:14

**pieces** [1] - 110:10

**place** [25] - 6:16, 48:14, 48:15, 72:7, 77:18, 77:21, 78:12, 78:18, 79:10, 90:21, 90:23, 96:19, 165:4, 174:21, 179:4, 179:5, 191:21, 199:23, 247:10, 247:13, 247:14, 249:9, 249:22, 257:20, 257:23

**placed** [2] - 123:18, 124:5

**PLAINTIFF** [1] - 1:3

**Plaintiff** [1] - 1:14

**plan** [11] - 4:11, 5:1, 9:20, 10:23, 11:13, 13:4, 13:8, 13:21, 15:17, 15:18, 16:1

**planning** [1] - 96:23

**play** [1] - 3:12

**playing** [1] - 209:18

**PLEAS** [1] - 1:1

**Pleas** [2] - 1:11, 1:20

**plural** [1] - 86:16

**point** [65] - 3:14, 8:23, 14:19, 23:17, 33:17, 35:15, 36:10, 37:16, 44:20, 53:8, 55:4, 55:6, 60:14, 62:6, 62:15, 62:17, 67:14, 68:16, 68:17, 69:2, 69:21, 70:23, 71:5, 74:9, 74:21, 78:4, 80:16, 80:19, 99:19, 100:5, 112:14, 117:16, 131:13, 142:9, 146:23, 148:20, 149:5, 152:6, 156:13, 157:22,

158:6, 158:10, 175:8, 178:19, 181:12, 181:15, 187:6, 189:3, 193:9, 193:15, 194:8, 194:11, 195:4, 196:9, 196:13, 197:10, 198:15, 199:7, 201:17, 207:13, 227:13, 235:11, 245:17, 253:17

**pointed** [3] - 90:11, 128:11, 262:21

**Police** [29] - 29:22, 31:6, 41:1, 41:4, 41:10, 41:14, 125:5, 125:8, 125:9, 126:4, 126:7, 172:6, 173:6, 173:12, 177:17, 177:22, 179:6, 180:15, 181:19, 192:4, 192:15, 192:23, 193:18, 193:21, 234:11, 234:13, 236:1, 236:3, 249:7

**police** [44] - 5:23, 30:2, 34:11, 36:16, 38:2, 38:6, 44:18, 46:14, 48:4, 48:9, 56:10, 57:1, 74:3, 91:9, 93:11, 98:6, 101:8, 101:11, 105:9, 105:15, 105:17, 106:3, 125:16, 125:18, 126:1, 140:20, 141:1, 142:17, 159:13, 174:1, 177:8, 177:10, 182:17, 185:4, 185:10, 193:1, 215:14, 223:6, 228:3, 228:6, 234:18, 238:17, 238:18, 251:12

**police's** [1] - 181:6

**policeman** [1] - 126:6

**policy** [1] - 116:6

**pool** [5] - 239:13, 240:2, 240:11, 240:22, 241:11

**popped** [2] - 105:10, 107:10

**porch** [1] - 97:23

**portion** [1] - 231:4

**portions** [1] - 221:5

**position** [6] - 9:11, 14:11, 14:13, 59:7, 62:11, 77:14

**positive** [1] - 72:16

**possession** [2] - 229:5, 229:6

**possible** [9] - 84:3, 94:5, 105:18, 105:21, 105:23, 106:22, 107:1, 107:3, 161:9

**posture** [1] - 187:21

**potential** [2] - 86:2,

187:22

**potentially** [1] - 39:12

**pound** [6] - 29:14, 30:4, 30:10, 31:16, 33:19, 34:8

**practical** [1] - 152:9

**PRECEDING** [26] - 18:7, 19:19, 37:17, 43:11, 45:14, 52:7, 68:6, 71:14, 88:5, 92:23, 104:15, 113:5, 114:19, 124:15, 142:12, 146:5, 150:1, 170:4, 184:9, 189:4, 198:1, 201:14, 244:5, 253:13, 254:15, 257:9

**precise** [1] - 251:3

**precisely** [1] - 13:9

**prefer** [1] - 246:16

**preferable** [1] - 117:10

**preference** [1] - 244:1

**prejudice** [2] - 7:8, 23:9

**prejudicial** [2] - 17:17, 43:2, 44:20, 55:4, 61:19

**preliminary** [2] - 27:21, 154:10

**preparation** [1] - 11:13

**preparatory** [2] - 210:13, 211:20

**prepared** [1] - 151:9

**presence** [16] - 20:7, 52:12, 52:15, 52:23, 150:17, 157:11, 158:14, 159:17, 166:9, 166:11, 169:9, 169:12, 169:16, 170:11, 201:8, 264:19

**PRESENCE** [6] - 3:5, 18:8, 52:21, 68:7, 150:23, 170:5

**present** [19] - 34:6, 70:19, 82:23, 91:3, 91:6, 121:3, 151:23, 155:4, 159:13, 161:10, 165:3, 165:8, 169:4, 187:3, 197:11, 199:23, 200:13, 201:5, 214:5

**presented** [2] - 17:15, 22:14

**presently** [2] - 125:12, 136:13

**pretty** [2] - 96:13, 173:22

**preview** [2] - 28:19, 29:12

**previous** [5] - 5:14, 5:15, 13:7, 188:5, 253:18

**previously** [3] - 63:12, 64:6, 251:18

**primarily** [5] - 42:5, 46:19, 47:4, 83:3, 83:12

**principal** [1] - 23:13

**prison** [1] - 218:18

**privacy** [2] - 167:13, 168:11

**privilege** [35] - 151:23, 152:5, 152:16, 153:22, 154:4, 155:17, 157:7, 157:18, 157:20, 159:23, 160:4, 160:11, 161:21, 162:16, 162:22, 163:14, 164:5, 164:13, 168:2, 168:12, 168:18, 168:23, 169:3, 182:21, 183:16, 183:18, 183:20, 183:21, 183:23, 197:2, 197:11, 197:18, 200:20, 201:6

**Privilege** [1] - 166:10

**privileged** [2] - 160:20, 165:12

**privy** [2] - 86:9, 251:22

**probability** [1] - 27:15

**probative** [7] - 6:22, 7:6, 7:16, 8:10, 43:1, 164:7, 164:15

**problem** [6] - 20:2, 21:19, 44:13, 103:11, 183:13, 252:5

**problems** [6] - 47:11, 205:20, 205:21, 210:23, 212:22, 259:12

**procedure** [2] - 121:19, 121:21

**procedures** [1] - 123:13

**proceed** [15] - 3:21, 67:14, 69:3, 71:17, 116:1, 123:4, 124:20, 125:15, 151:15, 152:16, 158:18, 169:23, 170:13, 170:17, 207:22

**proceeding** [1] - 158:9

**PROCEEDINGS** [27] - 18:9, 19:20, 37:18, 43:12, 45:15, 52:8, 68:8, 71:15, 88:6, 93:1, 104:16, 113:6, 114:20, 124:16, 142:13, 146:6, 150:2, 170:6, 184:10, 189:5, 198:2, 201:15, 244:6, 253:14, 254:16, 257:10, 266:9

**proceedings** [2] - 1:12, 157:1

**process** [1] - 121:11

**produce** [2] - 10:5, 28:15

**produced** [1] - 64:8

**proffer** [3] - 53:13, 53:16, 56:18

**program** [2] - 38:7, 38:9

**progress** [1] - 39:11

**promoted** [1] - 126:15

**promotes** [2] - 164:6, 164:14

**prong** [4] - 13:23, 14:2, 14:4, 16:18

**proof** [2] - 11:12, 14:3

**propensity** [3] - 11:2, 15:15, 16:2

**proper** [8] - 26:10, 62:17, 69:12, 69:16, 121:19, 121:20, 122:21, 123:12

**property** [1] - 183:15

**propose** [1] - 158:18

**proposes** [1] - 57:20

**proposition** [4] - 4:21, 5:2, 57:20, 88:1

**Prosecuting** [1] - 64:1

**prosecutor** [1] - 121:3

**Prosecutor** [30] - 1:14, 3:19, 34:1, 34:17, 35:13, 39:14, 45:9, 63:14, 75:13, 75:16, 83:21, 104:21, 108:22, 109:11, 116:9, 118:16, 120:16, 123:17, 134:10, 162:1, 206:21, 209:3, 210:16, 214:5, 229:11, 230:15, 230:19, 231:8, 252:16, 260:15

**Prosecutor's** [1] - 57:2

**prosecutorial** [1] - 264:2

**prosecutors** [1] - 252:18

**prostitution** [1] - 42:6

**protect** [7] - 49:7, 79:16, 80:4, 93:19, 93:22, 94:1, 94:4

**protected** [1] - 162:7

**prove** [4] - 9:18, 13:18, 16:19, 26:21

**proved** [1] - 24:23

**provide** [5] - 4:7, 47:9, 112:16, 112:19, 116:6

**provided** [12] - 3:19, 4:6, 4:12, 9:7, 57:18, 59:10, 112:10, 156:7,

**provides** [1] - 46:17
**providing** [2] - 50:20, 124:1
**proximity** [3] - 133:6, 133:18, 159:19
**publicity** [1] - 18:12
**pulled** [3] - 97:2, 97:3, 99:2
**punish** [1] - 7:12
**punished** [3] - 5:13, 5:14, 7:12
**punishment** [2] - 64:3, 65:7
**purchase** [5] - 48:5, 48:6, 48:11, 50:14, 82:22
**purchases** [1] - 49:15
**purchasing** [1] - 48:19
**purportedly** [1] - 103:6
**purpose** [6] - 12:7, 25:10, 63:8, 94:21, 175:13, 251:1
**purposes** [10] - 9:19, 11:3, 11:12, 16:4, 16:20, 152:9, 152:15, 208:2, 252:23, 256:22
**pursuant** [6] - 58:4, 63:22, 64:3, 112:6, 155:15, 170:14
**purview** [1] - 182:21
**put** [12] - 28:20, 74:2, 74:20, 102:5, 110:10, 111:11, 111:14, 187:21, 204:11, 218:2, 230:5, 237:13
**putting** [2] - 111:5, 209:14

**Q**

**Qualify** [1] - 133:13
**qualifying** [1] - 60:16
**quandary** [1] - 180:20
**quantities** [1] - 83:19
**Quanza** [1] - 89:4
**query** [1] - 123:4
**questioned** [1] - 15:19
**questioning** [8] - 71:22, 92:9, 107:14, 158:16, 169:5, 189:3, 193:9, 264:4
**questions** [20] - 23:5, 25:19, 86:13, 112:18, 113:10, 134:23, 135:1, 142:3, 147:18, 153:9, 153:11, 154:8,

160:2, 167:4, 167:5, 168:16
**quicker** [1] - 241:7
**quits** [1] - 243:11

**R**

**race** [2] - 129:6, 138:11
**radio** [1] - 235:7
**Rahman** [1] - 163:11
**raise** [1] - 21:19
**Raise** [1] - 20:1
**raised** [1] - 19:22
**ran** [5] - 139:2, 139:10, 143:8, 143:14, 232:4
**Rancho** [1] - 165:19
**rate** [1] - 82:17
**rather** [3] - 3:11, 23:19, 169:2
**Rather** [1] - 26:16
**RC** [1] - 2:2
**RD** [1] - 2:2
**reached** [1] - 141:16
**READ** [1] - 227:4
**read** [22] - 5:3, 18:17, 18:22, 19:14, 19:15, 19:16, 20:10, 66:11, 142:1, 142:2, 156:9, 160:15, 163:2, 204:4, 221:14, 221:17, 221:18, 221:22, 255:18, 258:7, 260:1
**reading** [7] - 13:20, 18:15, 18:20, 58:21, 66:18, 160:1, 160:9
**reads** [1] - 122:11
**ready** [4] - 3:20, 4:6, 18:3, 196:11
**realized** [1] - 111:10
**Really** [1] - 67:4
**really** [10] - 16:1, 17:7, 67:9, 102:7, 107:13, 116:12, 123:6, 144:5, 146:11, 249:17
**realm** [1] - 46:19
**rear** [2] - 240:23, 241:13
**reason** [11] - 17:2, 25:6, 39:11, 59:9, 70:23, 80:4, 83:21, 87:6, 116:8, 163:17, 163:21
**reasonableness** [1] - 26:1
**reasoning** [1] - 124:2
**reasons** [3] - 58:18, 60:6, 157:15
**REC** [1] - 2:8
**receive** [4] - 20:16, 20:19, 39:5, 222:16

**received** [2] - 6:1, 31:22, 32:10, 36:10, 37:21, 50:22, 53:21, 59:1, 64:7, 66:22, 67:17, 68:12, 68:22, 71:20, 72:2, 84:23, 92:6, 127:8, 167:21, 167:22, 185:7, 185:9, 186:2
**recent** [2] - 60:3, 160:2
**RECESS** [7] - 52:19, 57:16, 115:6, 124:18, 150:21, 157:3, 207:21
**recess** [19] - 20:11, 52:3, 52:6, 52:12, 52:17, 115:3, 116:19, 116:23, 145:11, 145:14, 146:1, 150:12, 150:20, 156:23, 207:14, 207:17, 207:19, 264:16, 265:3
**recognize** [4] - 45:21, 208:4, 239:3, 239:15
**recognized** [3] - 58:19, 60:7, 169:8
**recollect** [1] - 27:3
**recollection** [20] - 22:9, 110:8, 140:4, 140:5, 140:9, 140:18, 142:6, 142:23, 148:22, 149:6, 149:20, 253:10, 253:23, 254:9, 254:20, 255:1, 256:16, 262:7, 263:18
**recollections** [1] - 22:12
**recommence** [1] - 157:1
**reconsider** [1] - 124:4
**record** [29] - 3:7, 4:2, 4:3, 8:19, 10:18, 17:22, 40:23, 57:14, 61:16, 71:9, 92:20, 112:4, 112:9, 112:13, 112:19, 112:23, 123:19, 124:13, 151:18, 157:5, 157:21, 172:1, 172:3, 179:11, 188:8, 206:5, 241:1, 245:20, 256:23
**RECORD** [7] - 3:22, 135:8, 150:10, 151:13, 227:4, 233:7, 260:2
**recorded** [2] - 121:2, 140:9
**recruiting** [1] - 235:18
**rectal** [1] - 34:19
**redirect** [4] - 91:18, 113:11, 147:19, 149:9
**Redirect** [2] - 219:21, 261:13

**REDIRECT** [5] - 93:4, 147:23, 220:1, 232:2, 261:17
**reduced** [2] - 212:1, 218:21
**refer** [2] - 133:1, 211:12
**reference** [1] - 202:15
**referenced** [3] - 14:1, 188:10, 188:14
**referred** [1] - 220:15
**referring** [5] - 89:15, 185:23, 211:6, 216:8, 222:6
**refers** [1] - 262:20
**reflect** [2] - 112:9, 133:22, 245:20
**reflected** [1] - 110:18
**refresh** [10] - 140:4, 140:5, 140:18, 142:22, 148:22, 149:6, 254:19, 255:1, 256:15, 263:17
**refreshes** [5] - 142:5, 149:20, 253:9, 253:23, 254:9
**refused** [3] - 191:4, 224:11, 231:8
**regard** [7] - 6:15, 13:20, 13:23, 24:21, 43:17, 68:14, 94:23
**regarding** [6] - 5:8, 30:7, 56:9, 92:3, 92:4, 92:6
**regardless** [1] - 26:18
**regretted** [1] - 208:14
**regular** [1] - 219:18
**rehab** [5] - 189:19, 190:18, 203:22, 223:22, 223:23
**reject** [1] - 27:13
**rejuvenated** [1] - 33:12
**relate** [1] - 248:19
**relates** [17] - 11:22, 81:16, 108:21, 112:5, 155:19, 197:2, 203:6, 204:4, 204:15, 206:19, 209:2, 216:12, 217:9, 229:11, 231:7, 257:15, 260:4
**relation** [3] - 23:20, 163:15, 245:9
**relationship** [8] - 30:13, 161:23, 162:5, 162:15, 163:21, 169:1, 187:18, 246:9
**relative** [8] - 24:1, 61:23, 63:17, 64:10, 123:23, 146:12, 155:17, 203:9
**relatively** [1] -

133:16
**released** [1] - 20:22
**releases** [1] - 57:12
**relevance** [1] - 86:20
**Relevance** [2] - 79:1, 217:16
**relevancy** [3] - 187:23, 188:1, 193:6
**relevant** [8] - 5:16, 7:4, 7:5, 17:16, 86:23, 87:19, 131:12, 187:19
**relies** [1] - 163:11, 163:19
**rely** [1] - 22:11
**relying** [2] - 163:18, 166:18
**remain** [2] - 46:22, 129:12
**remained** [1] - 34:20
**Remember** [1] - 24:11
**remember** [44] - 49:15, 98:13, 100:16, 101:13, 101:21, 102:3, 102:5, 102:9, 109:1, 110:2, 111:4, 129:8, 133:23, 136:21, 137:5, 137:13, 137:15, 139:22, 139:23, 142:16, 142:18, 143:4, 148:4, 172:10, 174:20, 179:8, 182:1, 189:17, 191:13, 191:20, 192:3, 193:18, 203:14, 205:2, 211:4, 236:15, 236:21, 237:18, 237:23, 246:17, 246:22, 249:9, 257:18, 257:19
**REMEMBERED** [1] - 1:8
**remind** [1] - 28:17
**removed** [1] - 242:2
**renew** [3] - 43:4, 123:16, 124:3
**renewing** [1] - 42:23
**repeat** [2] - 45:19, 227:3
**repeated** [1] - 23:14
**repeating** [1] - 149:8
**Repercussions** [1] - 180:11
**repercussions** [2] - 180:12, 181:5
**Rephrase** [1] - 73:5
**rephrase** [3] - 79:3, 143:11, 231:1
**report** [35] - 5:23, 21:9, 29:5, 64:8, 66:10, 74:2, 74:3, 74:4, 74:15, 74:20, 74:22, 85:9, 103:14, 103:19, 104:2, 115:21, 117:19, 117:22, 119:5,

119:12, 122:6,
126:14, 127:14,
131:18, 134:12,
134:13, 140:2,
140:20, 141:9,
141:12, 141:15,
215:6, 215:7, 252:16,
258:15

**Reporter** [3] - 1:20,
21:21, 266:18
**REPORTER** [1] -
227:5
**reports** [18] - 36:3,
36:4, 85:13, 87:9,
102:20, 103:23,
115:14, 115:19,
115:20, 116:2,
117:14, 118:13,
119:10, 119:21,
122:22, 123:3,
123:11, 145:22
**represent** [4] -
151:22, 206:17,
212:5, 242:17
**representation** [3] -
43:9, 239:17, 240:16
**request** [2] - 64:4,
252:19
**requested** [2] -
34:23, 65:1
**require** [1] - 21:16
**required** [3] - 20:10,
21:1, 26:10
**residence** [2] -
89:19, 201:17
**residences** [1] -
89:21
**respect** [81] - 8:21,
12:4, 12:19, 15:10,
16:5, 18:2, 29:7,
32:10, 32:16, 35:11,
37:2, 37:6, 41:10,
46:5, 55:7, 55:20,
59:23, 60:20, 61:13,
65:17, 66:20, 67:20,
68:11, 68:20, 69:20,
72:21, 74:1, 86:20,
87:22, 92:1, 92:8,
92:15, 94:10, 94:19,
115:13, 131:18,
143:3, 143:20, 144:2,
151:5, 152:16,
160:11, 163:14,
163:23, 169:14,
173:7, 177:13,
178:23, 180:23,
183:8, 183:10,
184:17, 188:7,
188:11, 189:8,
189:23, 190:9,
191:12, 192:4, 195:8,
220:4, 220:22,
221:19, 223:13,
224:19, 225:8, 227:2,
227:22, 234:16,
237:2, 237:15,
242:11, 247:8, 248:6,
249:1, 249:5, 251:6,

251:8, 255:12, 256:1,
263:2
**Respond** [1] - 235:7
**respond** [4] - 15:8,
56:4, 56:14, 238:6
**responded** [7] -
31:8, 124:6, 127:4,
127:6, 127:15,
229:14, 238:1
**responding** [2] -
127:1, 236:8
**response** [4] -
12:23, 68:11, 162:23,
212:11
**rest** [2] - 223:7,
223:13
**restaurant** [1] -
165:20
**restriction** [1] -
239:11
**result** [7] - 29:16,
30:10, 34:18, 50:7,
180:17, 195:1, 219:11
**results** [1] - 35:2
**retelling** [1] - 39:13
**returned** [1] - 166:8
**returning** [1] - 7:8
**reveal** [1] - 65:3
**revealed** [2] - 65:13,
66:8
**revealing** [1] - 180:7
**reverse** [1] - 198:11
**reversed** [1] - 11:5,
13:11, 13:22
**review** [11] - 4:5,
4:20, 56:3, 57:15,
63:16, 109:15,
109:17, 109:19,
109:22, 148:21, 254:8
**reviewing** [1] - 119:5
**revive** [1] - 100:5
**revolve** [5] - 43:21,
175:23, 176:1, 181:1,
182:7
**revolved** [1] - 182:16
**revolves** [3] - 55:8,
149:16, 183:7
**Reynolds** [6] -
57:19, 57:21, 58:9,
58:22, 59:14, 60:4
**Reynolds's** [1] -
58:16
**Rice** [1] - 89:2
**rid** [4] - 159:7, 161:5,
161:9, 165:5
**ride** [1] - 159:3
**riding** [3] - 98:20,
166:19, 247:21
**rights** [3] - 43:3,
67:6, 155:11
**ring** [1] - 249:16
**river** [1] - 165:20
**road** [5] - 235:3,
235:6, 235:10,
235:17, 237:1
**ROBERT** [2] - 1:5,
233:17

**Robert** [59] - 1:17,
32:12, 33:17, 35:2,
36:7, 36:9, 42:12,
44:17, 54:13, 63:18,
77:19, 78:1, 78:15,
86:21, 87:7, 87:22,
90:22, 90:23, 127:5,
151:21, 153:14,
154:21, 155:20,
167:7, 171:11, 182:2,
182:18, 184:21,
185:3, 186:3, 188:2,
188:23, 190:4,
194:12, 196:2,
196:15, 197:3,
198:13, 199:18,
207:3, 208:8, 210:2,
219:13, 222:16,
224:18, 233:22,
245:2, 245:4, 247:3,
248:3, 251:4, 252:1,
252:4, 255:13,
255:16, 259:6, 259:9,
260:16
**Robert's** [2] - 196:4,
208:5
**rock** [29] - 29:14,
30:4, 30:11, 31:16,
108:16, 128:4,
128:12, 128:13,
129:5, 133:5, 141:16,
237:22, 239:4, 240:3,
240:12, 240:21,
240:22, 241:15,
241:16, 241:20,
241:22, 242:1, 242:2,
242:6, 258:12,
259:15, 260:22,
261:3, 262:8
**rocket** [1] - 65:4
**rocks** [5] - 128:16,
128:20, 128:22,
133:6, 133:21
**ROGER** [2] - 95:10,
95:15
**Roger** [4] - 2:3, 95:7,
95:8, 95:15
**roles** [1] - 24:4
**Ronnie** [4] - 1:17,
185:20, 190:14, 193:3
**room** [2] - 22:8, 29:5
**rope** [1] - 45:12
**roughly** [1] - 248:1
**route** [2] - 195:13,
195:20
**RPR** [2] - 1:20,
266:17
**ruin** [2] - 210:23,
212:23
**rule** [26] - 4:17, 4:21,
5:4, 11:10, 20:20,
24:17, 54:17, 58:20,
59:12, 60:8, 67:21,
67:22, 69:15, 70:6,
116:10, 116:13,
116:17, 118:7,
118:22, 120:8,
120:10, 120:11,

120:15, 122:11,
123:7, 156:4
**Rule** [11] - 9:19,
11:9, 16:20, 44:23,
58:12, 59:23, 68:15,
94:14, 151:5, 153:22,
186:12
**ruled** [7] - 10:22,
58:1, 64:16, 66:5,
124:7, 160:19, 162:21
**rules** [11] - 15:13,
63:22, 65:1, 66:16,
66:18, 66:19, 70:10,
112:6, 119:21, 251:8
**Rules** [1] - 64:4
**ruling** [10] - 3:11,
8:22, 17:22, 29:7,
32:3, 37:5, 67:15,
155:7, 156:13, 163:9
**rulings** [1] - 18:3
**run** [2] - 112:13,
128:20
**runaround** [1] -
217:3
**Russell** [1] - 100:20

**S**

**S-A-N-D-O-V-A-L** [1]
- 156:8
**S-C-O-T-T** [1] -
135:19
**S-E-Y-M-O-U-R** [1] -
40:15
**Saint** [5] - 136:22,
137:1, 137:2, 143:16,
144:20
**sales** [5] - 10:3,
16:16, 44:15, 50:1,
77:18
**Sandifer** [5] -
130:18, 130:19,
130:21, 130:23, 131:3
**Sandoval** [22] -
156:7, 156:11,
156:14, 160:3,
160:15, 161:13,
161:20, 162:2, 162:8,
162:13, 162:18,
162:20, 162:21,
163:2, 163:11,
163:23, 164:10,
165:16, 166:21,
166:23, 167:15,
168:19
**sat** [2] - 110:9,
110:18
**sated** [1] - 71:10
**savagely** [1] - 31:3
**save** [2] - 18:18
**Save** [1] - 18:19
**saw** [20] - 31:1,
31:12, 50:3, 97:21,
99:9, 101:2, 105:16,
108:13, 129:5,
139:21, 144:4, 144:5,
144:9, 196:14, 206:2,

213:16, 239:18,
240:17, 242:17
**scared** [8] - 58:18,
60:6, 179:16, 180:3,
180:4, 180:10,
180:16, 181:4
**scene** [40] - 31:8,
31:15, 128:13,
129:13, 130:16,
131:16, 131:21,
132:3, 132:9, 132:13,
133:2, 133:22, 134:9,
143:5, 159:3, 159:13,
160:22, 161:1, 161:8,
162:3, 162:9, 162:10,
163:5, 165:1, 165:7,
236:9, 236:19,
236:20, 236:22,
237:18, 238:1,
238:10, 239:6,
240:13, 241:3,
241:16, 242:2,
242:10, 242:14
**scenes** [1] - 237:10
**scheduling** [3] -
135:5, 150:12, 233:5
**scheme** [8] - 4:11,
5:1, 13:4, 13:8, 13:21,
15:17, 15:18, 15:23
**school** [1] - 168:21
**School** [1] - 126:2
**Schroeder** [1] -
127:5
**scientist** [1] - 65:5
**scope** [1] - 149:9
**scorned** [2] - 38:1,
210:3
**SCOTT** [2] - 135:13,
135:19
**Scott** [8] - 2:4,
135:10, 135:18,
136:2, 136:4, 141:18,
146:11, 148:2
**Scottie** [11] - 84:20,
88:15, 107:7, 107:8,
107:22, 108:3, 108:8,
108:9, 110:23,
146:16, 147:4
**seal** [2] - 123:18,
124:5
**search** [2] - 48:7,
89:22
**seated** [1] - 205:6
**Second** [2] - 61:21,
218:23
**second** [29] - 3:8,
14:4, 16:18, 49:18,
49:20, 83:2, 84:9,
86:11, 91:16, 98:10,
99:4, 99:6, 110:4,
111:5, 113:9, 114:7,
130:19, 155:16,
194:5, 201:22,
211:14, 212:19,
219:9, 223:4, 223:5,
228:5, 259:22,
259:23, 262:11
**secondly** [1] - 16:5

19

**Secondly** [1] - 163:10

**seconds** [1] - 3:19

**secrecy** [2] - 163:17, 163:21

**section** [5] - 41:22, 42:1, 235:12, 235:20, 236:5

**sections** [1] - 235:14

**See** [4] - 86:15, 88:8, 150:19, 265:2

**see** [56] - 19:23, 24:13, 26:2, 27:6, 39:11, 50:19, 52:3, 65:12, 70:11, 78:12, 97:2, 100:6, 100:10, 101:17, 103:7, 103:10, 103:23, 104:23, 105:14, 111:3, 115:12, 116:9, 116:18, 117:22, 119:12, 128:13, 130:15, 132:1, 138:14, 138:15, 138:19, 138:21, 142:20, 144:3, 144:5, 144:13, 144:14, 144:16, 156:14, 167:9, 171:19, 200:11, 204:1, 208:3, 239:2, 240:9, 244:3, 245:14, 253:9, 253:22, 254:1, 254:5, 254:8, 254:14, 256:14

**seeing** [2] - 111:1, 222:17

**seeking** [2] - 15:5, 167:17

**selling** [1] - 48:3

**semen** [1] - 34:18

**send** [1] - 82:23

**sending** [1] - 90:4

**senior** [1] - 126:5

**sensation** [2] - 55:10, 58:14

**sent** [4] - 35:1, 123:22, 188:23, 236:18

**sentence** [2] - 23:17, 258:6

**separate** [3] - 50:4, 151:22, 164:19

**separation** [2] - 19:8, 29:2

**SEPTEMBER** [2] - 3:1, 265:5

**September** [11] - 1:9, 41:13, 49:21, 172:4, 172:11, 249:10, 255:4, 258:3, 258:10, 258:11, 259:21

**Sergeant** [11] - 2:4, 113:16, 125:3, 125:5, 125:7, 132:19, 134:2, 134:8, 225:20, 226:15, 226:23

**SERGEANT** [1] - 113:19

**sergeant** [5] - 31:8, 125:12, 126:14, 126:15, 132:12

**serious** [2] - 127:20, 128:1

**servant** [1] - 132:4

**serve** [1] - 5:10

**served** [5] - 6:8, 6:11, 6:14, 6:21, 107:10

**service** [1] - 235:7

**set** [3] - 29:8, 48:3, 48:4

**seven** [2] - 127:7, 134:10

**Several** [1] - 36:5

**several** [7] - 49:10, 49:11, 87:10, 91:8, 126:5, 128:14, 153:20

**severe** [1] - 32:1

**sexual** [1] - 10:16

**SEYMOUR** [1] - 40:9

**Seymour** [15] - 2:3, 9:22, 11:19, 12:18, 16:21, 30:6, 30:12, 40:6, 40:7, 40:15, 53:1, 59:20, 64:7, 75:12

**shall** [2] - 120:23, 121:8

**shape** [1] - 94:17

**share** [1] - 55:23

**shared** [4] - 65:15, 65:16, 67:3, 67:9

**shedding** [1] - 94:21

**sheriff** [1] - 114:14

**shift** [1] - 125:13

**short** [2] - 52:12, 128:20

**shortly** [1] - 15:9

**show** [39] - 6:7, 6:8, 6:9, 6:18, 8:5, 8:12, 9:11, 10:23, 11:1, 11:7, 11:17, 11:19, 12:9, 12:15, 12:19, 14:16, 15:14, 15:17, 16:1, 16:6, 16:7, 16:11, 16:22, 29:13, 29:14, 29:18, 29:20, 32:4, 33:18, 34:3, 34:9, 35:7, 112:21, 133:3, 239:8, 251:15, 253:5, 253:9, 253:18

**showed** [4] - 35:2, 103:8, 142:18, 220:5

**showing** [3] - 12:7, 133:11, 242:2

**shown** [1] - 104:6

**shows** [6] - 9:16, 16:10, 133:4, 133:5, 241:11

**sic** [1] - 90:21

**Side** [1] - 242:8

**side** [12] - 26:16, 26:19, 28:21, 31:23,

32:2, 155:8, 166:6, 240:12, 242:7, 242:8

**side's** [1] - 28:14

**sidewalk** [18] - 29:16, 31:3, 31:9, 31:17, 99:9, 99:13, 100:18, 101:18, 127:10, 128:2, 129:18, 130:22, 133:4, 133:15, 239:12, 239:14, 241:12, 242:10

**sign** [15] - 190:17, 190:19, 190:20, 190:22, 191:1, 191:2, 191:4, 202:21, 223:19, 223:21, 224:5, 224:11, 231:9, 239:11, 241:13

**significance** [2] - 23:23, 111:11

**significant** [1] - 56:6

**simply** [6] - 7:23, 8:6, 8:8, 25:16, 26:11, 54:18

**single** [1] - 23:16

**sister** [10] - 58:10, 168:7, 168:8, 168:10, 196:2, 196:4, 197:4, 197:5, 197:18, 198:4

**sister's** [3] - 165:2, 167:23, 198:14

**sister-in-law** [1] - 58:10

**Sit** [1] - 158:5

**sitting** [6] - 97:19, 99:19, 178:7, 214:9, 241:15, 249:13

**situation** [2] - 117:20, 173:19

**six** [3] - 41:15, 41:20, 126:14

**size** [1] - 129:8

**Skiba** [2] - 58:7, 59:19

**Skiba's** [1] - 58:2

**skull** [1] - 31:23

**slept** [1] - 200:5

**small** [4] - 18:14, 99:17, 129:9, 133:17

**smoking** [1] - 260:11

**snitch** [10] - 8:8, 10:8, 15:3, 47:17, 216:1, 248:22, 255:21, 256:2, 260:17, 262:9

**Snitch** [3] - 248:1, 248:4, 252:4

**snitched** [2] - 11:23, 248:21

**snitching** [2] - 258:13, 259:15

**sole** [1] - 25:14

**solely** [2] - 24:13, 94:21

**solving** [1] - 46:17

**someone** [11] -

19:14, 30:3, 74:11, 83:1, 99:9, 130:7, 137:18, 139:3, 161:7, 161:8, 167:9

**sometime** [3] - 33:10, 172:11, 225:17

**Sometime** [1] - 203:16

**sometimes** [2] - 90:17, 108:23

**Sometimes** [3] - 47:7, 47:8

**somewhat** [1] - 160:12

**somewhere** [1] - 97:8

**son** [2] - 58:10, 199:15

**son's** [1] - 165:7

**soon** [2] - 36:12, 157:2

**Sorry** [1] - 233:14

**sorry** [34] - 34:21, 45:19, 49:19, 49:22, 73:10, 78:20, 83:16, 103:2, 111:13, 122:18, 123:15, 138:1, 144:19, 145:2, 145:12, 145:19, 174:7, 176:20, 195:7, 201:21, 204:6, 207:8, 214:4, 225:2, 234:22, 235:22, 239:20, 242:8, 245:14, 249:4, 251:9, 251:22, 255:13, 258:10

**sort** [2] - 28:21, 101:15

**sound** [4] - 84:20, 84:22, 87:16, 89:8

**source** [1] - 261:8

**South** [2] - 179:14, 199:15

**spatters** [1] - 242:3

**speaking** [2] - 7:21, 49:6

**specific** [7] - 6:15, 7:13, 49:13, 149:14, 177:1, 250:8, 251:23

**specifically** [6] - 5:17, 12:10, 89:13, 155:1, 165:17, 183:2

**specificity** [2] - 255:7, 255:15

**specifics** [4] - 172:14, 172:17, 183:8, 184:4

**speculate** [1] - 25:4

**speculation** [1] - 129:2

**spell** [1] - 196:7

**spelling** [6] - 40:13, 95:14, 114:1, 135:17, 233:21, 244:15

**spent** [2] - 126:4, 126:20

**spousal** [18] -

153:21, 155:17, 157:7, 161:21, 162:16, 162:22, 164:5, 164:13, 168:2, 168:18, 182:21, 183:11, 183:16, 183:17, 183:21, 183:23, 197:18, 200:20

**Spousal** [2] - 168:12, 183:20

**spouse** [2] - 151:20, 163:15

**squad** [1] - 129:15

**Squad** [3] - 74:10, 80:15, 80:18

**St** [5] - 55:18, 57:21, 57:22, 164:3

**Stacey** [2] - 1:20, 266:17

**stack** [1] - 3:20

**stain** [2] - 128:22, 133:4, 133:5

**stand** [4] - 25:23, 112:7, 233:12, 252:3

**standard** [2] - 4:16, 82:17

**standing** [2] - 99:19, 155:10

**standpoint** [1] - 116:5

**stands** [2] - 5:2, 149:22

**Start** [1] - 126:2

**start** [4] - 18:6, 75:12, 114:23, 202:11, 243:18, 264:21

**started** [2] - 122:19, 243:21

**state** [9] - 51:17, 51:21, 52:1, 54:18, 55:9, 55:15, 58:2, 58:13, 188:8

**STATE** [1] - 1:2

**State** [131] - 3:8, 4:19, 5:6, 6:1, 6:11, 6:17, 7:22, 8:1, 8:20, 9:4, 9:6, 9:19, 9:21, 10:5, 10:10, 11:5, 11:18, 12:5, 12:10, 12:17, 13:1, 13:16, 13:17, 13:19, 14:1, 14:10, 14:20, 14:23, 15:5, 15:16, 16:7, 17:18, 29:12, 29:13, 29:18, 30:5, 30:21, 34:6, 34:7, 34:16, 37:9, 40:6, 53:8, 54:3, 54:16, 55:17, 57:5, 57:7, 57:18, 57:19, 57:20, 57:22, 57:23, 58:4, 58:9, 58:22, 59:6, 59:10, 59:13, 59:16, 60:12, 63:20, 64:22, 65:2, 65:9, 66:11, 66:15, 66:16, 66:17, 67:6, 67:14,

67:19, 69:23, 70:19, 87:9, 95:6, 104:6, 112:10, 113:15, 115:14, 116:5, 122:23, 123:9, 123:11, 123:20, 123:23, 124:2, 124:4, 124:8, 135:9, 140:23, 149:19, 153:8, 154:13, 156:7, 156:8, 156:10, 156:16, 157:8, 157:15, 157:22, 157:23, 158:9, 159:1, 159:20, 160:3, 162:12, 162:17, 162:19, 162:20, 163:13, 164:2, 164:3, 164:18, 164:22, 166:18, 167:3, 167:6, 167:17, 167:19, 168:16, 186:9, 218:20, 244:8, 263:8, 263:9

**STATE'S** [2] - 2:2, 2:8

**State's** [30] - 4:8, 5:17, 9:10, 28:23, 38:23, 39:7, 39:8, 53:19, 62:11, 132:17, 132:20, 151:3, 156:1, 158:20, 159:10, 159:16, 170:12, 187:20, 221:12, 239:1, 239:9, 239:23, 240:20, 241:9, 242:12, 243:13, 244:1, 251:9, 257:6, 261:23

**statement** [155] - 10:5, 24:15, 35:19, 35:22, 36:17, 37:13, 37:14, 38:2, 38:6, 39:19, 51:23, 53:2, 53:10, 53:12, 54:4, 54:7, 54:10, 54:12, 54:15, 54:20, 55:1, 55:8, 55:22, 56:8, 56:10, 56:20, 57:1, 57:4, 58:13, 60:18, 65:13, 68:16, 68:20, 68:22, 69:2, 69:22, 70:5, 70:9, 70:11, 70:18, 75:13, 101:13, 101:15, 103:1, 103:4, 104:6, 105:15, 105:16, 109:6, 109:10, 109:13, 109:16, 110:13, 110:16, 110:21, 111:3, 111:5, 111:19, 118:18, 118:19, 120:21, 121:2, 121:6, 121:8, 121:17, 140:3, 140:18, 140:21, 140:22, 141:3, 141:4, 141:8, 141:14, 141:17, 142:8, 142:11, 142:17,

142:19, 142:22, 143:3, 145:14, 145:15, 148:22, 149:20, 175:15, 175:18, 177:13, 179:16, 179:17, 179:21, 181:3, 181:9, 181:13, 186:1, 187:19, 188:9, 188:12, 188:18, 202:17, 203:6, 204:4, 204:17, 204:21, 206:11, 206:13, 209:11, 210:9, 210:18, 210:20, 211:3, 212:2, 213:4, 213:9, 213:20, 214:12, 214:16, 214:19, 215:13, 215:18, 216:20, 217:5, 223:19, 223:21, 226:3, 226:13, 226:19, 227:16, 231:7, 251:3, 251:13, 252:17, 252:20, 252:22, 253:2, 253:3, 253:6, 253:12, 253:19, 254:12, 255:18, 256:15, 257:16, 259:14, 262:15, 262:16, 262:21, 263:2, 263:13, 263:14, 263:20, 264:5, 264:7

**Statement** [1] - 2:14

**statements** [40] - 3:10, 3:12, 20:16, 22:15, 24:5, 28:3, 28:12, 28:17, 28:22, 39:11, 55:14, 56:1, 58:2, 58:10, 58:15, 58:17, 60:5, 64:19, 103:5, 118:11, 121:13, 124:9, 157:9, 158:12, 168:9, 168:16, 169:8, 169:14, 204:22, 205:10, 220:23, 226:22, 230:5, 251:18, 251:20, 251:22, 251:23, 252:3, 252:6, 252:12

**states** [1] - 11:10, 57:23, 120:10, 134:13, 141:13, 141:15

**station** [5] - 166:2, 166:3, 174:1, 177:8, 177:11

**statute** [3] - 4:17, 5:3, 155:15

**stay** [3] - 50:13, 97:5, 185:6

**stayed** [7] - 165:9, 200:17, 247:1, 247:2, 247:4, 247:6, 255:10

**stems** [1] - 8:20

**step** [4] - 24:8, 150:6, 155:4, 199:5

**stepfather** [2] - 33:4, 245:11

**steps** [1] - 198:6

**Steve** [5] - 178:10, 178:12, 179:8, 179:14, 205:9

**Stewart** [1] - 60:12

**sticks** [1] - 237:20

**still** [13] - 7:3, 14:11, 14:13, 31:7, 31:20, 70:13, 90:7, 132:13, 153:17, 157:7, 158:3, 159:13, 214:22

**stipulated** [1] - 24:21

**stipulation** [1] - 24:19

**stone** [1] - 97:8

**stop** [3] - 83:4, 99:3, 123:5

**Stopper** [10] - 36:3, 36:4, 38:7, 87:8, 179:18, 181:10, 216:14, 225:10, 225:12, 227:1

**story** [7] - 185:6, 185:7, 186:7, 186:18, 228:8, 230:6, 246:13

**straight** [1] - 186:6

**strange** [1] - 117:2

**straw** [1] - 36:15

**Street** [21] - 1:21, 31:4, 96:20, 100:21, 104:22, 127:3, 137:6, 146:13, 179:14, 194:15, 195:6, 195:8, 195:11, 195:21, 196:1, 196:3, 199:12, 199:15, 236:9, 237:19, 240:14

**street** [11] - 47:17, 78:2, 125:18, 127:19, 128:17, 215:15, 215:19, 215:23, 234:20, 234:23, 235:2

**streets** [6] - 41:16, 41:17, 96:12, 222:17, 223:3, 230:11

**stretch** [1] - 233:12

**strict** [2] - 4:17, 17:11

**strictly** [2] - 4:22, 5:4

**strike** [7] - 9:20, 25:8, 30:17, 45:20, 175:11, 178:21, 185:1

**structure** [1] - 28:21

**stuff** [5] - 110:23, 111:2, 188:21, 247:21, 248:17

**subject** [4] - 68:19, 84:14, 84:15, 159:20

**subjected** [1] - 7:4

**submitted** [6] - 20:9, 20:15, 52:17, 94:20, 150:18, 264:21

**subsequent** [1] - 192:10

**subsequently** [3] - 48:6, 85:8, 212:1

**substantial** [3] - 9:16, 14:3, 16:10

**substantially** [2] - 7:7, 241:2

**sufficient** [2] - 26:21, 61:18

**sufficiently** [2] - 164:6, 164:14

**suggestion** [1] - 5:17

**suggests** [1] - 60:1

**summary** [1] - 141:1

**summer** [1] - 41:18

**Sunset** [1] - 174:23

**supervisor** [2] - 125:13, 125:20

**supplemental** [3] - 59:7, 74:4, 263:3

**supplied** [2] - 5:23, 56:8

**supply** [1] - 25:13

**support** [1] - 28:15

**supports** [1] - 57:20

**suppose** [1] - 256:23

**supposed** [7] - 28:13, 116:11, 116:12, 117:4, 190:5, 191:6, 194:6

**supposedly** [2] - 237:21, 240:3

**Supreme** [15] - 5:7, 9:14, 12:14, 16:7, 16:9, 55:5, 55:19, 58:8, 58:21, 59:5, 59:13, 60:3, 156:16, 164:1, 164:11

**surfaced** [1] - 32:10

**surgery** [4] - 189:20, 191:15, 203:7, 203:17

**surprise** [3] - 251:6, 251:15, 251:21

**surrounding** [2] - 26:7, 91:10

**suspect** [2] - 32:18, 153:19

**suspected** [1] - 48:2

**suspects** [1] - 86:3

**sustain** [3] - 176:3, 180:22, 184:6, 195:3, 200:21

**sustained** [1] - 25:3

**Sustained** [10] - 73:22, 74:16, 130:2, 139:8, 147:12, 197:23, 198:9, 199:6, 240:7, 264:11

**swab** [1] - 32:23, 33:1, 34:19

**sword** [1] - 163:22

**sworn** [8] - 19:2, 40:10, 95:11, 113:20, 135:14, 153:1, 233:18, 244:12

**SWORN** [1] - 19:3

**sympathy** [1] - 23:8

**synopsis** [2] - 12:16, 20:10

**T**

**TAKEN** [7] - 52:19, 57:16, 115:6, 124:18, 150:21, 157:3, 207:21

**tank** [1] - 128:19

**task** [1] - 42:4

**tech's** [1] - 237:5

**Technically** [1] - 118:1

**techs** [1] - 237:7

**Ted** [2] - 177:19, 178:10

**telephone** [2] - 61:6, 175:6

**temporary** [2] - 239:11, 241:12

**ten** [8] - 81:8, 81:19, 81:20, 84:13, 89:10, 89:14, 90:12, 117:18

**tend** [3] - 6:6, 6:7, 39:16

**tendency** [1] - 102:2

**tends** [3] - 9:18, 16:19, 87:23

**tentacles** [1] - 183:21

**term** [1] - 47:17

**terms** [3] - 73:7, 73:12, 185:6

**terrified** [2] - 73:1, 73:4

**test** [10] - 8:13, 13:23, 14:2, 26:17, 55:3, 164:3, 164:4, 164:12, 165:13, 168:19

**tested** [2] - 34:21, 34:22

**testified** [17] - 26:3, 40:10, 58:6, 59:18, 79:1, 92:10, 95:11, 113:20, 135:14, 153:1, 166:2, 166:14, 184:14, 225:16, 225:21, 233:18, 244:12

**testifies** [3] - 38:12, 38:13, 39:3

**testify** [59] - 25:15, 26:16, 35:12, 37:3, 37:5, 38:3, 38:5, 38:8, 38:11, 38:16, 38:17, 38:18, 38:21, 44:21, 51:11, 51:19, 52:4, 53:12, 53:17, 53:20, 54:22, 61:6, 66:22, 78:22, 93:15, 93:19, 128:9, 142:1, 152:10, 153:23, 154:4, 155:6, 155:8, 158:13, 159:2, 159:11, 159:21,

164:22, 165:4,
165:11, 165:18,
166:12, 169:17,
177:2, 182:2, 182:23,
183:18, 183:22,
184:2, 194:6, 195:3,
212:13, 217:12,
217:23, 227:21,
228:2, 228:6, 230:16
  **testifying** [12] -
25:23, 54:10, 54:11,
64:8, 65:9, 131:2,
193:22, 213:8, 215:2,
219:6, 227:2, 261:9
  **testimony** [60] -
6:13, 6:19, 14:23,
15:3, 16:21, 17:19,
26:1, 26:7, 26:9,
26:11, 26:13, 26:20,
26:22, 26:23, 27:8,
27:11, 27:12, 27:14,
27:16, 32:3, 39:4,
43:1, 60:14, 60:15,
60:20, 61:13, 62:6,
62:12, 62:13, 64:16,
64:17, 68:14, 73:6,
88:3, 94:10, 94:13,
94:16, 94:20, 95:1,
112:15, 116:11,
116:20, 119:6, 121:5,
149:21, 155:13,
155:22, 156:12,
157:16, 158:15,
164:5, 164:14,
169:13, 170:8,
170:10, 183:12,
186:14, 188:16,
193:23, 228:14
  **tests** [5] - 13:13,
25:20, 25:21, 26:8,
39:10
  **THAT** [1] - 266:8
  **THE** [431] - 1:1, 3:4,
3:5, 3:6, 3:17, 3:22,
3:23, 4:3, 8:16, 12:22,
13:5, 15:9, 16:13,
17:2, 18:1, 18:5, 18:7,
18:8, 18:9, 18:10,
19:6, 19:7, 19:17,
19:19, 19:20, 19:22,
27:20, 29:3, 33:21,
35:16, 35:18, 36:20,
36:21, 36:22, 37:15,
37:17, 37:18, 40:3,
40:7, 40:12, 40:14,
40:16, 42:19, 42:20,
42:21, 43:6, 43:9,
43:11, 43:12, 44:6,
44:10, 44:11, 44:12,
44:23, 45:11, 45:14,
45:15, 51:7, 51:8,
51:9, 52:2, 52:6, 52:7,
52:8, 52:10, 52:20,
52:21, 52:22, 53:7,
53:14, 53:18, 56:5,
56:11, 56:13, 57:13,
60:9, 61:4, 62:4, 62:8,
62:14, 62:20, 63:3,

65:12, 65:20, 65:22,
66:4, 66:21, 67:8,
67:16, 68:1, 68:4,
68:6, 68:7, 68:8, 68:9,
69:6, 69:7, 69:18,
70:15, 70:22, 71:8,
71:13, 71:14, 71:15,
71:17, 73:5, 73:7,
73:11, 73:22, 74:16,
75:8, 79:5, 81:5,
81:12, 81:14, 86:7,
86:23, 87:2, 87:3,
87:4, 88:3, 88:5, 88:6,
91:18, 91:21, 91:22,
92:10, 92:17, 92:23,
93:1, 94:7, 94:9, 95:3,
95:4, 95:8, 95:13,
95:15, 95:17, 97:12,
102:13, 102:14,
102:17, 102:18,
103:1, 103:3, 104:7,
104:12, 104:15,
104:16, 111:23,
112:1, 112:2, 112:17,
113:2, 113:5, 113:6,
113:8, 113:11,
113:13, 113:17,
113:23, 114:2, 114:5,
114:8, 114:9, 114:10,
114:19, 114:20,
114:22, 115:2, 115:8,
115:9, 115:10,
116:10, 116:17,
117:10, 119:14,
120:8, 120:18, 123:5,
123:14, 124:12,
124:15, 124:16,
124:19, 128:9, 129:3,
130:1, 130:10,
131:11, 132:16,
133:13, 134:4,
134:21, 135:2, 135:6,
135:7, 135:8, 135:16,
135:18, 135:20,
139:8, 140:8, 140:12,
140:13, 140:14,
140:17, 141:6,
141:23, 142:5,
142:12, 142:13,
145:6, 145:9, 145:10,
145:11, 145:13,
145:23, 146:4, 146:5,
146:6, 146:22,
147:12, 147:19,
149:2, 149:3, 149:21,
150:1, 150:2, 150:6,
150:9, 150:10,
150:11, 150:22,
150:23, 151:1, 151:7,
151:10, 151:12,
151:17, 152:12,
152:19, 153:4, 154:7,
154:14, 155:3,
155:21, 156:2,
156:19, 156:23,
157:4, 157:17, 158:2,
158:4, 158:5, 158:11,
158:23, 159:9,

159:22, 160:14,
160:17, 161:15,
162:23, 168:20,
169:21, 170:3, 170:4,
170:5, 170:6, 170:7,
170:18, 172:3, 176:3,
176:10, 176:13,
176:18, 176:21,
177:4, 180:6, 180:20,
182:13, 182:14,
183:5, 184:6, 184:9,
184:10, 186:11,
187:14, 187:15,
189:2, 189:4, 189:5,
190:13, 193:8,
194:22, 195:18,
196:18, 196:19,
196:20, 197:23,
198:1, 198:2, 198:9,
198:11, 198:18,
198:23, 199:5,
199:20, 200:8,
200:19, 201:2, 201:3,
201:7, 201:13,
201:14, 201:15,
207:10, 207:16,
207:22, 210:14,
211:9, 211:17,
212:13, 217:15,
217:17, 219:21,
221:10, 226:11,
227:4, 227:12,
227:20, 228:22,
232:7, 232:15,
232:23, 233:2, 233:6,
233:7, 233:11,
233:20, 233:22,
234:1, 237:12, 240:7,
242:22, 243:1, 243:3,
243:4, 243:7, 243:8,
243:9, 243:20, 244:3,
244:5, 244:6, 244:14,
244:16, 244:18,
245:20, 250:14,
250:15, 252:6, 252:9,
253:8, 253:13,
253:14, 254:3, 254:4,
254:7, 254:14,
254:15, 254:16,
254:18, 256:9,
256:11, 256:12,
256:13, 256:18,
256:21, 257:6, 257:9,
257:10, 260:2, 261:2,
261:13, 262:14,
262:19, 262:23,
263:5, 263:12,
263:19, 264:10,
264:13, 264:15,
265:2, 265:4, 266:7,
266:8, 266:9, 266:10
  **thereabouts** [1] -
127:7
  **therefore** [2] - 23:16,
66:15
  **thereon** [1] - 23:15
  **thinking** [1] - 111:15
  **thinks** [1] - 37:4

**third** [21] - 49:21,
157:11, 158:15,
158:21, 159:14,
159:17, 161:9,
166:11, 169:9,
169:11, 169:16,
189:17, 196:22,
197:2, 197:10, 201:5,
201:8, 213:6, 218:15,
221:22, 225:14
  **thoroughly** [1] -
156:10
  **thoughts** [1] - 117:4
  **three** [20] - 10:3,
30:14, 50:4, 62:1,
72:13, 75:14, 76:1,
76:23, 77:3, 80:8,
91:4, 91:6, 91:7,
94:11, 94:12, 94:19,
191:10, 218:17
  **Three** [1] - 48:13
  **three-way** [1] -
191:10
  **threshold** [1] - 4:13
  **Throughout** [1] -
235:16
  **throughout** [4] -
4:14, 20:4, 20:12,
235:15
  **tickets** [1] - 125:19
  **tips** [1] - 32:9
  **today** [12] - 9:2,
18:15, 45:22, 103:11,
171:20, 183:23,
192:2, 228:15, 234:7,
243:15, 243:18, 261:9
  **today's** [1] - 219:6
  **together** [6] - 26:6,
28:8, 110:10, 230:6,
240:12, 242:7
  **Toledo** [46] - 1:21,
29:22, 31:4, 31:6,
41:1, 41:3, 41:10,
41:12, 41:14, 48:16,
95:22, 96:1, 96:6,
96:10, 96:20, 125:5,
125:8, 125:9, 126:4,
126:7, 127:3, 136:4,
137:2, 137:6, 171:7,
171:17, 172:5, 173:6,
173:12, 177:17,
177:21, 179:6,
180:15, 181:19,
192:4, 192:15,
192:23, 193:18,
193:21, 234:11,
234:13, 236:1, 236:3,
236:13, 244:23, 249:7
  **tomorrow** [2] -
243:17, 264:22
  **took** [33] - 6:16,
48:8, 48:15, 72:7,
77:18, 90:21, 90:23,
96:19, 102:21, 165:4,
173:23, 179:3, 179:5,
191:21, 192:14,
192:23, 193:2,
195:13, 195:20,

201:7, 211:22, 212:9,
229:11, 238:11,
239:4, 242:14,
247:10, 247:12,
247:14, 249:9,
249:22, 257:20,
257:23
  **Took** [1] - 200:16
  **Top** [1] - 216:10
  **toward** [2] - 23:9,
114:17
  **town** [1] - 111:18
  **TPD** [1] - 193:6
  **trades** [1] - 87:11
  **Traditionally** [1] -
91:8
  **traffic** [5] - 167:10,
235:8, 235:12,
235:20, 236:7
  **trafficking** [4] - 7:1,
42:5, 42:17, 46:20
  **tragedy** [1] - 102:4
  **train** [1] - 14:12
  **training** [2] - 41:9,
234:16
  **transaction** [5] -
78:12, 78:18, 79:10,
90:21, 90:22
  **transactions** [6] -
29:23, 30:14, 48:22,
77:21, 79:13, 79:19
  **transcript** [1] - 66:12
  **TRANSCRIPT** [1] -
266:9
  **traps** [1] - 128:19
  **TRIAL** [1] - 266:10
  **trial** [34] - 1:8, 3:8,
10:21, 13:9, 13:12,
13:16, 13:17, 18:13,
18:19, 18:20, 20:4,
20:21, 21:6, 21:7,
21:16, 22:3, 24:4,
24:16, 28:5, 28:10,
37:8, 39:2, 43:4, 58:1,
58:5, 59:17, 63:18,
65:3, 65:9, 66:17,
69:14, 117:1, 120:23,
188:6
  **trials** [1] - 36:9
  **tribulations** [1] -
36:9
  **tried** [5] - 15:23,
32:15, 100:9, 105:18,
133:7
  **trivial** [1] - 27:10
  **TRUE** [1] - 266:8
  **true** [34] - 65:15,
185:20, 185:22,
186:3, 186:20, 187:1,
188:21, 204:7,
210:17, 210:20,
213:2, 213:4, 213:14,
213:22, 214:8,
216:22, 217:7,
220:18, 221:3,
221:20, 222:5, 222:9,
222:14, 222:19,

**truism** [1] - 225:5
**trust** [2] - 163:16, 163:20
**truth** [16] - 27:15, 55:13, 60:17, 61:8, 61:10, 63:4, 68:23, 69:1, 69:23, 70:3, 70:7, 70:20, 71:7, 71:11, 209:6, 230:12
**truthful** [2] - 105:18, 106:21
**truthfulness** [4] - 25:20, 39:10, 54:11, 55:3
**try** [4] - 93:18, 100:5, 100:11, 170:16
**trying** [25] - 10:16, 11:7, 11:17, 12:8, 16:1, 66:17, 92:3, 92:14, 93:19, 93:22, 104:1, 106:21, 109:22, 110:2, 114:12, 114:15, 142:8, 145:21, 162:18, 165:10, 185:5, 251:2, 251:5, 251:11, 264:8
**Trying** [1] - 94:1
**turned** [2] - 97:2, 97:3
**turning** [1] - 253:1
**two** [38] - 9:17, 10:15, 10:19, 13:23, 14:2, 18:5, 27:5, 31:13, 41:12, 55:5, 55:18, 72:13, 75:14, 76:1, 76:23, 77:3, 79:12, 80:8, 91:3, 91:5, 91:6, 97:6, 103:5, 105:6, 125:16, 166:20, 166:22, 170:16, 189:11, 189:23, 204:16, 218:17, 228:9, 233:8, 241:15, 248:10, 249:10, 254:11
**two-wheel** [1] - 241:15
**type** [1] - 102:3
**typed** [2] - 190:16, 204:12
**typewritten** [1] - 212:2
**typical** [1] - 48:1
**typically** [1] - 49:9
**typing** [1] - 202:17

**U**

**ultimately** [2] - 118:4, 165:7
**unable** [1] - 37:23

**under** [29] - 8:12, 8:14, 13:3, 17:13, 26:12, 51:22, 58:11, 58:19, 59:5, 60:7, 60:10, 60:22, 65:1, 65:14, 68:14, 70:1, 84:13, 94:14, 123:18, 124:5, 152:1, 153:22, 158:3, 162:7, 162:21, 168:18, 170:12, 186:12
**Under** [1] - 44:23
**undercover** [5] - 49:9, 78:4, 78:17, 79:8, 91:2
**underlying** [2] - 6:16, 15:5
**UNDERSIGNED** [1] - 266:7
**understood** [1] - 168:22
**underwent** [2] - 203:7, 203:17
**undue** [1] - 23:14
**unfair** [1] - 20:18
**uniform** [1] - 126:20
**uniformed** [2] - 126:19, 126:22
**Unit** [4] - 41:20, 42:9, 76:12, 82:6
**units** [1] - 125:16
**University** [2] - 41:12, 126:3
**unknown** [1] - 35:3
**unless** [3] - 27:14, 130:6, 152:19
**unresponsive** [3] - 127:12, 128:2, 129:10
**unsolved** [1] - 174:4
**unsure** [1] - 158:9
**up** [54] - 9:10, 12:2, 36:20, 42:11, 48:3, 48:4, 60:10, 63:6, 97:3, 98:10, 99:2, 101:5, 105:10, 107:10, 110:9, 115:21, 117:2, 120:4, 122:10, 122:20, 122:22, 129:16, 133:21, 138:2, 141:16, 154:8, 154:14, 154:16, 156:6, 158:5, 165:7, 170:15, 171:1, 174:3, 174:5, 174:8, 185:7, 185:8, 190:16, 199:11, 199:14, 202:17, 204:12, 209:18, 217:22, 219:16, 230:6, 230:11, 232:10, 233:12, 234:18, 259:8, 262:16
**upset** [2] - 39:15, 185:10
**upstairs** [1] - 168:8, 196:2, 197:4, 197:19

**utilize** [4] - 34:13, 48:4, 76:13, 76:18
**utilized** [3] - 80:22, 89:11, 90:13
**utilizing** [1] - 88:10

**V**

**vaginal** [2] - 33:1, 34:19
**Vaguely** [3] - 139:23, 147:15, 247:11
**value** [4] - 7:6, 23:7, 43:1, 61:19
**VanHoy** [3] - 163:12, 163:13, 164:10
**various** [3] - 161:5, 162:11, 220:18
**varying** [1] - 23:14
**Vasquez** [15] - 173:8, 173:9, 173:15, 174:11, 174:12, 174:18, 175:9, 175:14, 177:5, 178:13, 205:9, 214:4, 226:3, 226:14, 226:23
**vehicle** [1] - 162:6
**verbatim** [1] - 116:7
**verdict** [2] - 32:3
**verge** [2] - 210:23, 212:23
**verify** [1] - 32:15
**versus** [2] - 3:8, 160:3
**via** [1] - 195:23
**Vice** [13] - 9:22, 41:19, 42:1, 42:3, 42:4, 42:9, 46:19, 74:10, 76:12, 77:13, 80:15, 80:18, 82:5
**victim** [7] - 5:20, 9:23, 30:9, 127:20, 127:23, 237:22, 240:4
**view** [2] - 5:3, 7:16
**viewed** [3] - 10:4, 16:16, 50:1
**violation** [1] - 21:15
**visit** [2] - 99:5, 130:21
**visited** [1] - 219:17
**voice** [5] - 73:17, 138:2, 139:16, 139:18, 171:1
**voices** [2] - 138:8, 138:12
**voir** [1] - 39:14
**VOLUME** [1] - 1:6

**W**

**wait** [1] - 193:4
**waive** [1] - 154:3
**waiver** [1] - 157:17
**waiving** [1] - 155:10
**walk** [1] - 83:1
**walked** [1] - 108:13

**walking** [2] - 98:19, 111:1
**Wants** [1] - 140:17
**wants** [7] - 112:14, 116:1, 141:15, 151:4, 152:20, 182:15, 263:22
**warrant** [1] - 89:22
**warranted** [1] - 85:9
**warrants** [2] - 48:7, 49:10
**WAS** [30] - 3:4, 19:6, 36:21, 42:20, 44:11, 51:7, 52:20, 69:6, 87:3, 91:21, 102:17, 112:1, 114:9, 115:9, 135:7, 140:13, 145:9, 149:2, 150:9, 150:22, 151:12, 182:13, 187:14, 196:19, 201:2, 233:6, 243:8, 250:14, 254:3, 256:12
**watched** [1] - 30:14
**ways** [2] - 23:14, 253:4
**wearing** [1] - 245:18
**week** [2] - 125:10, 234:19
**weekend** [1] - 66:12
**weeks** [2] - 49:10, 189:14
**weight** [2] - 26:9, 26:18
**Weissenberger** [1] - 60:10
**WERE** [26] - 18:9, 19:21, 37:19, 43:13, 45:16, 52:9, 68:8, 71:16, 88:7, 93:2, 104:17, 113:7, 114:21, 124:17, 142:14, 146:7, 150:3, 170:6, 184:11, 189:6, 198:3, 201:16, 244:7, 253:15, 254:17, 257:11
**Westland** [1] - 136:14
**wheel** [1] - 241:15
**WHEREUPON** [58] - 3:4, 18:7, 19:6, 19:19, 36:21, 37:17, 42:20, 43:11, 44:11, 45:14, 51:7, 52:7, 52:20, 68:6, 69:6, 71:14, 87:3, 88:5, 91:21, 92:23, 102:17, 104:15, 112:1, 113:5, 114:9, 114:19, 115:9, 124:15, 135:7, 140:13, 142:12, 145:9, 146:5, 149:2, 150:1, 150:9, 150:22, 151:12, 170:4, 182:13, 184:9, 187:14, 189:4, 196:19, 198:1, 201:2, 201:14, 227:4, 233:6,

**white** [5] - 31:2, 99:14, 138:13, 139:18
**whole** [6] - 67:21, 67:22, 69:21, 96:15, 122:19, 180:13
**wife** [8] - 153:13, 161:23, 162:2, 162:6, 163:17, 164:21, 168:3, 169:1
**willfully** [1] - 27:12
**WILLIAM** [1] - 40:9
**William** [2] - 40:15, 202:21
**willing** [2] - 155:6, 202:21
**WILSON** [2] - 1:5, 152:23
**Wilson** [110] - 1:17, 2:5, 2:16, 2:16, 3:9, 5:21, 6:7, 6:9, 6:12, 6:14, 6:20, 7:10, 8:3, 8:7, 14:17, 15:1, 33:17, 35:2, 35:7, 35:8, 35:11, 36:2, 36:7, 36:8, 36:14, 37:2, 38:4, 38:11, 38:15, 38:20, 39:1, 39:13, 39:17, 40:1, 42:13, 44:17, 54:13, 54:21, 77:19, 78:1, 78:15, 82:2, 83:8, 83:14, 86:21, 87:7, 87:22, 89:10, 90:22, 90:23, 91:14, 151:2, 151:19, 151:21, 152:7, 153:6, 153:7, 153:14, 154:20, 154:21, 155:20, 157:6, 158:2, 158:3, 162:19, 167:6, 167:7, 167:13, 167:14, 167:19, 167:23, 168:7, 168:15, 170:9, 170:10, 171:3, 171:4, 171:11, 187:19, 188:2, 194:12, 201:19, 202:3, 206:14, 219:11, 220:3, 220:16, 221:2, 228:21, 245:2, 245:4, 245:7, 245:14, 245:23, 246:18, 247:3, 248:3, 248:20, 251:4, 252:1, 252:4, 255:13, 255:16, 259:16, 260:16
**Wilson's** [6] - 6:23, 14:21, 32:12, 63:18, 67:2, 184:21
**Wingate** [41] - 1:17, 3:13, 4:4, 7:22, 33:21, 56:16, 81:5, 93:7, 112:14, 115:14, 155:11, 156:19, 161:15, 185:12,

23

187:5, 187:11, 188:8,
188:9, 189:10,
189:21, 190:16,
191:9, 192:4, 193:14,
193:19, 194:6,
197:22, 212:8,
212:18, 220:12,
220:17, 223:19,
225:7, 232:4, 243:15,
250:22, 256:9,
261:19, 262:6,
262:21, 263:22

**WINGATE** [216] -
3:15, 3:18, 13:6, 19:4,
19:8, 19:12, 19:18,
33:22, 35:13, 35:17,
36:1, 37:11, 37:20,
42:18, 42:22, 44:3,
44:5, 44:8, 44:13,
45:5, 45:10, 51:5,
51:10, 53:5, 54:6,
55:23, 56:3, 56:18,
57:10, 57:17, 60:3,
61:1, 61:15, 62:5,
63:10, 64:21, 69:4,
69:8, 73:2, 73:21,
74:13, 75:11, 79:3,
79:6, 81:11, 81:13,
81:15, 84:9, 86:11,
86:22, 87:1, 87:5,
87:23, 91:17, 92:22,
94:8, 97:11, 102:15,
103:2, 103:5, 103:10,
103:15, 103:20,
104:4, 104:20,
111:22, 112:3,
112:22, 113:4, 113:9,
113:22, 114:6,
114:11, 115:17,
116:4, 116:16,
117:11, 117:17,
117:20, 118:4, 118:7,
118:10, 118:13,
118:21, 119:1, 119:9,
119:12, 120:1,
120:11, 120:14,
121:14, 121:20,
122:2, 122:14,
123:15, 124:14,
128:6, 129:1, 129:23,
130:5, 131:1, 131:8,
133:10, 134:7,
134:23, 138:1, 139:6,
140:11, 140:15,
140:19, 141:7,
141:11, 141:19,
142:10, 143:9,
144:11, 144:17,
145:7, 145:19,
146:10, 147:1,
147:17, 148:23,
149:4, 149:14,
151:11, 154:15,
154:19, 154:23,
155:14, 156:21,
160:7, 161:16,
165:15, 176:2, 176:8,
176:12, 180:5,

180:18, 182:9,
182:12, 182:15,
183:13, 186:8,
187:12, 187:16,
188:13, 188:19,
190:11, 192:8, 193:5,
194:20, 195:14,
196:16, 197:1,
197:14, 198:8,
198:17, 198:22,
199:4, 199:19, 200:7,
200:18, 201:9,
201:21, 202:2,
207:11, 207:23,
210:13, 211:8,
211:11, 211:19,
212:10, 212:12,
212:15, 216:9, 219:9,
219:20, 221:16,
226:9, 227:8, 227:11,
227:14, 227:18,
228:23, 229:2,
231:23, 232:6,
232:13, 233:1, 240:5,
242:23, 250:10,
250:12, 250:16,
251:14, 252:2,
252:11, 253:11,
254:1, 254:5, 254:10,
256:10, 256:14,
256:20, 257:2,
257:14, 259:22,
260:3, 261:11,
262:13, 263:4, 263:7,
263:23, 264:14,
264:23

**Wingate's** [4] -
163:8, 187:10,
189:16, 193:3
**wish** [5] - 18:11,
123:4, 153:23, 154:3,
157:10
**wishes** [1] - 46:22
**wit** [1] - 1:12
**WITNESS** [11] -
40:14, 95:3, 95:15,
102:13, 114:2,
135:18, 158:4,
233:22, 243:3,
244:16, 262:19
**witness** [90] - 23:9,
25:18, 25:22, 26:9,
26:11, 26:14, 26:20,
27:2, 27:11, 29:5,
34:4, 34:6, 34:14,
35:6, 39:9, 40:4,
44:21, 51:20, 52:3,
56:15, 56:17, 56:22,
61:5, 61:20, 64:17,
65:9, 66:22, 67:11,
68:11, 78:15, 79:18,
79:21, 81:7, 95:5,
104:13, 112:6, 112:7,
113:14, 115:22,
119:7, 120:3, 121:6,
132:15, 135:3, 141:3,
148:21, 149:12,
150:7, 151:1, 151:19,

152:13, 153:8,
153:12, 155:5, 156:1,
156:13, 157:6,
157:10, 158:10,
158:12, 159:2, 159:6,
159:11, 159:18,
159:21, 164:22,
165:3, 165:11, 168:8,
169:6, 169:11,
169:12, 169:23,
177:1, 187:22, 233:3,
233:9, 243:12,
243:13, 244:4,
245:21, 250:19,
251:7, 251:10, 252:2,
252:21, 264:11
**witness'** [2] -
120:21, 121:1
**witness's** [7] -
26:22, 27:8, 116:20,
120:22, 155:13,
262:15, 262:16
**witnessed** [1] -
78:18
**WITNESSES** [2] -
2:2, 2:7
**witnesses** [23] -
6:13, 19:9, 21:5, 24:6,
24:12, 25:15, 26:15,
26:19, 27:5, 29:3,
30:22, 31:12, 39:8,
39:15, 51:14, 58:6,
59:18, 79:13, 80:2,
112:5, 131:15,
238:21, 254:13
**woes** [1] - 38:4
**woman** [19] - 38:1,
99:17, 100:6, 100:8,
100:18, 101:18,
127:4, 127:6, 127:10,
127:15, 127:16,
127:18, 128:1, 129:5,
129:6, 129:9, 129:18,
130:22, 210:2
**women** [2] - 11:2,
16:3
**wondering** [1] -
115:23
**Word** [1] - 215:23
**word** [3] - 74:8,
139:1, 215:19
**words** [4] - 46:22,
137:23, 138:3, 138:4
**wore** [1] - 159:7
**world** [1] - 30:2
**write** [2] - 125:19,
224:17
**writing** [1] - 262:16
**written** [4] - 94:23,
121:2, 229:22, 252:15
**wrote** [13] - 127:13,
190:3, 190:4, 206:20,
207:2, 208:5, 208:7,
210:18, 224:15,
224:18, 252:21
**Wyatt** [1] - 89:4

**Y**

**year** [2] - 110:14,
191:15
**Years** [2] - 202:9,
247:18
**years** [35] - 10:19,
39:17, 41:5, 41:12,
41:20, 72:14, 75:15,
76:2, 77:3, 80:8, 81:2,
84:18, 96:5, 101:20,
102:6, 120:14,
125:10, 125:11,
125:23, 126:15,
126:17, 131:22,
136:11, 136:16,
218:18, 232:4,
234:14, 235:21,
235:23, 246:2,
246:22, 247:16,
247:17, 249:10
**yesterday** [6] - 4:19,
10:10, 17:3, 142:18,
143:1, 149:7
**young** [2] - 11:2,
16:3
**yourself** [8] - 20:5,
125:4, 171:2, 200:2,
206:2, 213:17,
221:22, 234:9
**yourselves** [5] -
20:14, 20:19, 52:14,
150:15, 264:18