**IN THE COURT OF COMMON PLEAS OF
LUCAS COUNTY, OHIO**

STATE OF OHIO,          )          EXHIBIT 16
                        )
          PLAINTIFF,    ) CASE NO. CR06-3339
                        )
v.                      )
                        ) JUDGE BARBER
ROBERT WILSON           
                        
          DEFENDANT.    ███████████

                    -  -  -

          BE IT REMEMBERED, that in the trial of

the aforementioned cause on September 4, 2008,

before the Honorable James E. Barber, in the

Lucas County Court of Common Pleas, the following

proceedings were held, to wit:

APPEARANCES:

On behalf of the Plaintiff:
Assistant Lucas County Prosecutor,
Michael Loisel, Esquire

                    -  -  -


On behalf of the Defendant, Robert Wilson:
Ronnie L. Wingate, Esquire
Neil S. McElroy, Esquire

                    -  -  -

 Stacey L. McDevitt, RPR, Official Court Reporter
     Lucas County Common Pleas Courthouse,
     700 Adams Street, Toledo, Ohio 43624
              (419) 213-4477
                    -  -  -

1                    I N D E X

2

        STATE'S WITNESSES              D    CR   RD   RC
3       Dr. Scala-Barnett             11   34   37
        Detective Beavers             39   56   92   100
4       Sergeant Vasquez             106  111

5       DEFENDANT'S WITNESSES
        --
6       STATE'S EXHIBITS             ID    AD   OB   REC
        1, Photo                          115
7       2, Photo                          115
        3, Photo                          115
8       4, Photo                          115
        5, Photo                     33   115
9       6, Photo                          115
        7, Photo                     33   115  116  116
10      8, Photo                     33   115  116  116
        9, Photo                          115  116  116
11      10, Photo                         115
        11, Photo                         115
12      12, Statement of Alfonzo Davis - withdraw pg. 117
        13, Coroner's Case Summary   16   115
13      14, Coroner's Report of Autopsy16  115
        15, Toxicology Report        17   115
14      16, Photo                    22   115  117  117
        17, Photo                    23   115  117  117
15      18, Photo                    24   115  117  117
        19, Photo                    25   115  117  117
16      20, Photo                    27   115  117  117
        21, Photo                    30   115  117  117
17      22, Photo                    30   115  117  117
        23, Photo                    17   115
18      24, LabCorp Analysis         53   119       119
        25, BCI&I Lab Report         54   119       119
19
        DEFENDANT'S EXHIBITS
20      A, Letter By Janet Wilson
        B, Interview of Janet Wilson
21
        COURT'S EXHIBITS
22      1, Question.................6

23      STATE RESTS............................119
        DEFENSE RESTS..........................125

3

1                                    SEPTEMBER 4, 2008

2                                    COURTROOM #3

3                                    9:18 A.M.

4              (WHEREUPON THE FOLLOWING DISCUSSION WAS

5         HELD OUTSIDE THE PRESENCE OF THE JURY.)

6              THE COURT:    All right.  We are back on

7         the record in chambers about to commence the

8         third day of trial in the Robert Wilson case.

9         Just note, just got a note from the criminal

10        Bailiff indicating that she had received a note

11        from one from one of the jurors, shared a copy of

12        that note with Counsel, and I guess I would ask

13        the attorneys how you want me to respond to this

14        note.

15             MR. WINGATE:   Before you start, Mike, do

16        we know which juror it was?

17             MS. JOHNSON:   It is written on it Juror

18        Number 2, Al --

19             MR. MCELROY:   Al Montague.

20             THE COURT:    Yes, Juror Number 2, Al

21        Montague.

22             MR. LOISEL:   Well, I mean with respect

23        to this, Judge, I will ask that it be marked and

4

1    be made a Court exhibit so it can be kept for the

2    record.  At this point, I mean, we haven't even

3    begun deliberations yet.  I don't think it is

4    proper for the Court, and I think the Defense

5    would agree to respond, just indicate that you

6    received a question and we can't respond at this

7    time.  I mean, I don't know how you want to

8    phrase it, but we can't answer his questions.

9              THE COURT:    I understand that.  Do you

10   want to instruct the Bailiff just to tell the

11   juror that we received the note and we can't

12   respond at this point?

13             MR. LOISEL:    I mean, I think that's the

14   gist that we have to tell them.  I don't know

15   what Defense Counsel thinks, but, yeah, something

16   along those lines.

17             MR. WINGATE:    That would be fine.  Can I

18   see the note?

19             THE COURT:    Sure.

20             MR. WINGATE:    Yeah, Your Honor, that

21   would be fine just to instruct the Bailiff to

22   tell the juror that we received a note but we

23   can't respond to it.

5

1           THE COURT:    All right.  Ms. Johnson,

2     you heard --

3           MS. JOHNSON:   I did.  Would you like for

4     me to do that now?

5           THE COURT:    No.  Wait until we're done

6     here.

7           MR. LOISEL:   Judge, for purposes of the

8     record, do you want to do that when the jury is

9     seated or would you rather do it as part of the

10    record that you can indicate that the Court

11    received a question from --

12          THE COURT:    I can do it myself right

13    from the bench if you want.

14          MR. LOISEL:   I think it would be more,

15    again, for the purposes of the record I think

16    that would be better than having the Bailiff just

17    tell the jurors.

18          THE COURT:    Sure, I could do it right

19    from the bench just before we get started.

20          MR. MCELROY:   That may raise an issue

21    when they get back there, not that the jurors are

22    not going to discuss that question with the

23    jurors anyway, but it may raise an issue that

1      makes a big deal of, well, what question did you

2      ask, why can't you answer it.  And maybe we could

3      just bring him in.

4           THE COURT:    No.  I'm just going to

5      tell the panel that I received a note and we

6      can't respond.

7           MR. LOISEL:    Correct me if I am wrong,

8      but I think essentially the reason you can't

9      answer this question is it is not the proper

10     time.  You will instruct them that, I mean, at

11     some point they can ask questions, but they

12     haven't received the case yet and, therefore, it

13     is improper for them to begin asking questions

14     until they receive the entire case.  I mean,

15     that's ultimately -- I don't know if you want to

16     read the question into the record so it is clear.

17          THE COURT:    I'm just going to mark

18     this as a Court's Exhibit Number 1.

19          MR. LOISEL:    Very well.

20          THE COURT:    What else do we have at

21     this point?

22          MR. LOISEL:    Judge, the first witness

23     State intends to call is the Deputy Coroner,

```
 1      Dr. Diane Scala-Barnett.  She has
 2      approximately -- well, the State intends to show
 3      one, two, three, four, five, six, approximately
 4      seven photographs from the autopsy.  I've shared
 5      those with Defense Counsel.  I would ask that we
 6      be allowed to publish those to the jury for the
 7      purposes of her benefit to explain what each
 8      picture depicts.
 9              THE COURT:     Once she's identified
10      them --
11              MR. LOISEL:     Yes.
12              THE COURT:     -- and qualified them.
13              MR. LOISEL:     Obviously, yes.
14              MR. WINGATE:   But procedurally you're
15      not putting it up on the screen and then going
16      through her identifying them.  Are you showing
17      her that picture first?  How do you intend to do
18      it?
19              MR. LOISEL:    Well, I can do it however
20      the Court desires.  I can show her the picture,
21      say Are you familiar with this picture?  Yes.
22      I'm assuming she would say yes.  What does it
23      depict?  The whole idea is so that she doesn't
```

1    have to explain it twice, once while looking at

2    the picture and once while it is being published

3    to the jury.  She can authenticate them.  Are you

4    familiar with these pictures?  Yes.  Do they

5    appear to be in substantially the same condition

6    or the condition as when you saw them or took

7    them back in 1993?  And I think if she can

8    authenticate them -- authenticate each and every

9    picture prior to publishing them, that's

10   obviously the State's request at this point.  I

11   mean, obviously she's going to authenticate them.

12        MR. WINGATE:   Your Honor -- could I see

13   them again, Mike?

14        MR. LOISEL:   Yes.

15        MR. WINGATE:   I'm sorry.

16        MR. LOISEL:   I have explained to

17   Attorney Wingate that these pictures, and

18   obviously the Court can make its final ruling,

19   are not duplicative and I believe she will

20   testify as to the importance of each picture as

21   to why it is relevant in this particular case.

22        MR. WINGATE:   Your Honor, I would, and I

23   understand I can anticipate the Court's ruling,

9

```
1        but for the record we would object to the

2        publishing of the photographs inasmuch as they

3        are somewhat gruesome and inflammatory and I

4        believe that it would be prejudicial against

5        Mr. Wilson to have them shown to a jury.

6                THE COURT:    All right.  Well, I

7        certainly understand your objection.  I've been

8        in your chair on that issue before.  So I'm going

9        to overrule your objection, the exception is

10       noted, and I'm going to allow you to publish

11       those.  Once they are qualified and

12       authenticated, I will allow you to publish them

13       to the jury.  What else we got?

14               MR. LOISEL:    I don't think there are

15       any other matters that need to be addressed at

16       this point, Judge.

17               THE COURT:    Okay.  We anticipate

18       getting done tomorrow, right?

19               MR. WINGATE:    Yes.  No question.

20               MR. LOISEL:    Judge, well, as we

21       discussed before, we're optimistic.  Hope to get

22       done today but that is yet to be determined.  But

23       the State intends to, if things go as expected,
```

1     to be finished with its case in chief prior to

2     lunch today.

3               THE COURT:    Well, it is 9:25.  All

4     right.  Let's go do it.

5               (WHEREUPON THE PRECEDING DISCUSSION

6     OUTSIDE THE PRESENCE OF THE JURY CONCLUDED AND

7     THE FOLLOWING PROCEEDINGS WERE HELD.)

8               THE COURT:    Before we get started, I

9     guess we should indicate I bid all of you good

10    morning, and just before we get started with the

11    testimony of the day, I should put on the record

12    here that I did receive a note from one of the

13    jurors, and I would only respond that there will

14    be a time when questions can be asked after all

15    the case has been presented, so until that time,

16    kind of keep your questions in mind and when the

17    proper time comes, you can reduce them to

18    writing.  Mr. Loisel.

19              MR. LOISEL:    Thank you, Judge.  At this

20    time the State of Ohio called

21    Dr. Diane Scala-Barnett.

22              THE COURT:    Call Dr. Barnett.

23                             -  -  -

1                    DIANE SCALA-BARNETT, M.D.,

2        being first duly sworn by the Court, testified as

3        follows:

4                THE COURT:    Just give us your name and

5        spelling of your name.

6                THE WITNESS:   It's Diane, D-I-A-N-E,

7        last name is hyphenated S-C-A-L-A--B-A-R-N-E-T-T.

8                        DIRECT EXAMINATION

9        BY MR. LOISEL:

10       Q.    Good morning, Doctor.

11       A.    Good morning.

12       Q.    Obviously the jury just heard your name.

13       Can you introduce yourself to the jury and where

14       you work.

15       A.    I work at the Lucas County Coroner's Office.

16       I'm a physician, forensic pathologist, and a

17       deputy coroner.

18       Q.    Now, Doctor, can you explain to us your

19       occupation and what are the duties that are

20       entailed with your job?

21       A.    Well, basically every day I perform

22       autopsies to determine the cause and manner of

23       death.  We issue death certificates and verdicts

12

1     to document those findings.  We sometimes go to

2     scenes with our investigators and we testify in

3     court sometimes like today.  Basically I do that

4     as the majority of my job.  I also teach medical

5     students who are rotating through pathology and as

6     an elective at the Coroner's Office, so we teach

7     forensic pathology.

8     Q.    Okay.  And I guess before we get too far

9     ahead of ourselves, can you give us a little bit

10    of history with respect to your education and

11    background?

12    A.    In a nutshell my educational background is

13    high school graduate; four years of college; a

14    year of graduate school; four years of medical

15    school; a year of internship; four years of

16    pathology residency; and a year of fellowship

17    training in forensic pathology.

18    Q.    And with respect to that education, do you

19    hold any licenses or are you on any boards or

20    committees?

21    A.    I'm licensed to practice medicine in the

22    states of Ohio and Illinois.  I'm doubly board

23    certified in pathology and forensic pathology.

13

1    Q.    And tell us what it means to be board

2    certified.

3    A.    That means you have completed the required

4    testing and that makes you eligible to sit for

5    board examination to prove competency in your

6    field of expertise, and when you have successfully

7    passed that exam, that means you are board

8    certified.

9    Q.    And how long, you may have already said

10   this, how long have you been a coroner?

11   A.    I've been Deputy Coroner --

12   Q.    Deputy Coroner -- I'm sorry.

13   A.    -- since 1985.

14   Q.    And is that when you received your board

15   certification?

16   A.    No.  I received it later.  I had -- I

17   believe I had only one board when I started.  I

18   got my forensic boards later.

19   Q.    And can you explain to us essentially you

20   said board certified in forensic pathology.  Can

21   you explain to us, you may have already done a

22   little bit, forensic pathology?  What is forensic

23   pathology?

14

```
 1      A.      Well, you know, the pathologist is usually
 2      the doctor that stays in the basement and looks
 3      through microscope all day, and they are the ones
 4      that diagnose disease and they look at tissues
 5      under microscope, but there is a subspecialty in
 6      pathology that deals with medical legal medicine
 7      which is forensic pathology, and we are the
 8      doctors that determine the cause and manner of
 9      death by performing autopsies and considering what
10      the scene investigation is or what the
11      circumstances surrounding the death are.
12      Q.      Now, you were working in this capacity back
13      in 1993, correct?
14      A.      Yes, I was working at the Lucas County
15      Coroner's Office, uh-huh.
16      Q.      Do you recall performing an autopsy on or
17      about December 3rd of 1993 on one Brenda Navarre?
18      A.      I didn't recall it until I reviewed it.
19      Q.      So, you had a chance to review -- what did
20      you review?
21      A.      I reviewed our chart that we have and all of
22      my original notes and the autopsy protocol.  I
23      also have in this chart the hospital records from
```

1     her admission, and the toxicology results, and the

2     investigator's report.

3     Q.    And when you conduct an autopsy, do you make

4     a record of that autopsy?  You just explained what

5     you reviewed, but do you make a record of each and

6     every autopsy that you perform?

7     A.    Yes.

8     Q.    And what are -- again, what are included

9     within your reports?

10    A.    Generally what's included is there's a body

11    diagram where we take all of our notes during the

12    process.  We may have several diagrams.  From

13    these diagrams and notes we dictate an autopsy

14    protocol which, you know, is the formal report.

15    And in that body of the report you have the

16    external examination, the internal examination,

17    any injuries that occurred externally and

18    internally, any natural diseases that the person

19    may have had and also as part of that report, we

20    incorporate toxicology findings when we receive

21    those from the toxicology lab.

22    Q.    And are those kept -- and where are those

23    records kept?

1   A.   These record are secured actually at the

2   Coroner's Office.

3   Q.   They are made every day part of your

4   business?

5   A.   Yes.

6        MR. LOISEL:   Judge, may I approach the

7   witness?

8        THE COURT:   Yes.

9   Q.   Doctor, I'm going to hand you what's been

10  marked previously as State's Exhibit 13, 14 and

11  15.  If you could take a look at those for me,

12  please.

13  A.   Okay.

14  Q.   And are you familiar with --

15  A.   Yes.

16  Q.   -- State's Exhibits 13, 14 and 15?

17  A.   Yes.

18  Q.   Could you explain what State's Exhibit 13

19  is?

20  A.   State's Exhibit 13 is actually the case

21  summary which is the very first page of the

22  autopsy report.  State's Exhibit 14 is the body of

23  the report which describes all of the findings

1    that we just talked about, internal, external.

2    That is a five page report.  And then the State's

3    Exhibit 15 is a copy of the toxicology report.

4            MR. LOISEL:    And, Judge, may I

5     approach?

6            THE COURT:    Sure.

7    Q.    And, Doctor, I apologize this is out of

8    order number wise, but I would like to ask you to

9    look at State's Exhibit 23 as well.  Are you

10   familiar with what that is?

11   A.    Yes.

12   Q.    What is that?

13   A.    State's Exhibit 23 is a copy of the

14   Coroner's Verdict that is issued in every case by

15   the coroner.

16   Q.    So that document -- was that document

17   prepared by you?

18   A.    I'm sorry, what?

19   Q.    I turned my back on you, I apologize.  Was

20   that document prepared by you?

21   A.    It is actually prepared by the office.  Once

22   the autopsy is completed and signed out, the

23   coroner prepares it and signs it.  It is actually

1    prepared on the computer from the findings and he

2    signs it.

3    Q.    Now, Doctor, a couple of more questions

4    before we get to the autopsy that you performed

5    back in 1993.  Let me ask you this:  On average,

6    and I don't know if you can give us a number,

7    approximately how many autopsies do you perform in

8    a year?

9    A.    A year?

10   Q.    Well, we can break it down.  If you prefer

11   to do it a month, you can tell me.

12   A.    I prefer -- well that depends.  Our job is

13   kind of seasonal if you want to know the truth.

14   We have many more autopsies around the summer and

15   holidays, but the numbers can change, but the last

16   time I counted I have performed over 8,000

17   autopsies.

18   Q.    And with respect to those autopsies, have

19   you ever had an opportunity to testify in court?

20   A.    Many times, yes.

21   Q.    And can you put a number on it?

22   A.    Hundreds.

23            THE COURT:    Let me just interject

19

1      here.  Who, in fact, is the coroner for Lucas

2      County?

3                THE WITNESS:   It is Dr. James Patrick.

4                THE COURT:    Dr. Patrick.  Okay.  Thank

5      you.

6                MR. LOISEL:    Judge, at this time I

7      would ask that Dr. Barnett --

8                MR. WINGATE:   I'm sorry?

9                MR. MCELROY:   We are sorry.  Go ahead,

10     Mike.

11               MR. LOISEL:    -- be found to be an

12     expert in the field of pathology.

13               THE COURT:    No objection?

14               MR. WINGATE:   No objection.

15               THE COURT:    So ruled.

16               MR. LOISEL:    Thank you.

17     Q.    Now, Doctor, can you explain to us, you did

18     an autopsy on one Brenda Navarre back in 1993 of

19     approximately December 3rd, correct?

20     A.    Correct.

21     Q.    And you had to review your notes to

22     familiarize --

23     A.    Correct.

20

1     Q.     -- yourself, correct?

2            Can you tell us first of all what you do

3     when you perform an autopsy?

4     A.     Basically an autopsy is divided into three

5     parts.  The first part of the autopsy is an

6     external exam where all of the external surfaces

7     of the body are viewed.  Any injuries that have

8     occurred are documented on that body diagram that

9     I showed you, and we even document identifying

10    marks like scars and tattoos and surgeries and

11    anything that's seen externally, all of the

12    injuries.  Pictures are taken, clothed and

13    unclothed.

14           And then when we finish that document,

15    the internal portion of the autopsy begins and

16    there is a Y shaped incision made.  All of the

17    internal organs are removed and examined

18    individually.  If there are any wounds or wound

19    tracks involving the internal organs, those are

20    all documented and photographed.  And during that

21    time we also sample body fluids for drugs and

22    poisons and that's usually blood, urine, bile and

23    gastric contents, if those are available.

```
1              The last part of the autopsy, if

2      necessary, it is not always necessary, we retain

3      small pieces of tissue and we examine them under

4      microscope.

5      Q.    And did you perform such an autopsy in this

6      particular case?

7      A.    I did.

8              MR. LOISEL:    And, Judge, may I

9       approach?

10             THE COURT:    Sure.

11     Q.    Doctor, I'm going to hand you what has

12     previously been marked at State's Exhibit 16

13     through 22.  If you can just look at those for me,

14     please.

15     A.    Yes.

16     Q.    Are you familiar with what those are?

17     A.    Yes.

18     Q.    And without going into detail, what do those

19     pictures depict?

20     A.    These are actual autopsy photographs that

21     depict Ms. Navarre's appearance at the Coroner's

22     Office prior to the autopsy.  It shows the

23     external -- some of the external injuries, and
```

22

1    then also some of the internal injuries to the

2    head.

3    Q.    And do those pictures appear to be, or are

4    they in the same condition as they were when they

5    were taken back in 1993?

6    A.    Yes, sir.

7              MR. LOISEL:    With that in mind, at this

8     point, Judge, I'm going to direct the coroner --

9     or the Deputy Coroner to refer to these exhibits

10    which will be shown on the screen.

11             THE COURT:    All right.

12             MR. LOISEL:    And I want to caution you

13    that some of these pictures are not very

14    pleasant, but it has to do with respect to the

15    autopsy as to what Dr. Barnett did back in 1993.

16             So, Doctor, I'm going to show you on the

17    screen what's been marked as State's Exhibit 16.

18    Q.    You said you are familiar with that picture.

19    What does that picture depict?

20    A.    That is the appearance of Ms. Navarre as she

21    was received in our office.  The placard across

22    her chest is our autopsy from that year, which was

23    61393.  She is wearing a hospital gown still

23

1    because she has just come from the hospital after

2    her death, and she still has in the breathing tube

3    and the endogastric tube, those haven't been

4    removed yet, but that's how she appeared when we

5    received her.

6    Q.    And, Doctor, I will now show you what's been

7    marked as State's Exhibit 17.  Can you explain to

8    us what that is?

9    A.    This is a close-up photograph of

10    Ms. Navarre's face.  Do you want me to start

11    discussing the injuries or --

12    Q.    Yes.  That was my next question.  What is

13    the significance of this photograph?  What does it

14    tell you?

15    A.    Do you happen to have a pointer?

16    Q.    I do not.

17         MR. LOISEL:    Would that aid you in your

18     ability to describe --

19    A.    I guess I can go over there.  I just didn't

20    want to be in the way.  All right.  This is a

21    close-up photograph, you're looking straight on to

22    her face and you can see that she has a very long

23    suture injury across the forehead.  This at one

24

1    time when she arrived had been opened but they

2    sutured it together, brought the skin margins

3    together and you'll notice that there is a lot of

4    abrasion around this wound.  All this dark brown

5    discoloration is where the skin was abraded.  This

6    laceration actually extends onto the upper eyelid

7    where they've also sutured it and it is also

8    abraded.  Her eyes are very bruised and sort of

9    protruding a little bit.  This doesn't mean

10   because her eyes are black that she was punched in

11   her eyes, that's not what that means.  But

12   whenever you have an impact to the forehead, the

13   blood can suffuse down into the eyelids and become

14   very red and bruised but it is from a different

15   mechanism.  There is also an injury that -- oh.

16   Okay.  I can do that.

17          On this side of her head there were more

18   injuries which extended actually on the left side

19   which extended out over and into the ear and the

20   ear had been sutured.  It was also abraded on this

21   area.  I think we can go to the next one.

22   Q.    The next picture is State's Exhibit 18.

23   A.    Okay.  Now you're looking at the right side

25

1       of her head and as you can see, there is a little

2       bit of abrasion, a little bit of bruise.  Some of

3       these are actually paralleled so there's a little

4       pattern to them, but nothing like the opposite

5       side where there was more of an impact.  So you

6       have extensive injury to this side, you have

7       extensive injury to this side.  I believe this

8       side of the head, which is pretty much spared of

9       injury, was actually down on the ground, and this

10      blood in her ear is just clotted blood that has

11      come from a skull fracture which we'll talk about.

12      Q.    I'll show you what's been marked as State's

13      Exhibit 19.

14      A.    Okay.  Now you're looking at the front

15      again.  You can see that these abrasions extend

16      out onto the cheek on both sides and actually this

17      bone right here, your cheekbone, it is called your

18      zygomatic arch, and it is Injury Number 25 on our

19      protocol, was fractured, this whole cheekbone.

20      Q.    And that's on the left side of her face

21      you're indicating?

22      A.    It is on the left side of the face, and

23      unfortunately we don't have a good photograph on

26

1    the left side of her face, but this was all

2    lacerated and abraded over the ear, and it looks

3    just like this but on the side.  I have it drawn

4    on my body diagram, and so that was also sutured

5    in here around the ear and in front of the ear.

6    Q.    Now, before we go to the next exhibit, which

7    will take us into the internal aspect of the

8    autopsy.  You've just explained to us through

9    pictures the injuries or the damage done to

10   Ms. Navarre.  What were your findings within your

11   report without going into you said Number 25 on

12   your report, can you tell us generally what you

13   found when you did your external examination of

14   her head?

15   A.    There were, I believe, 18 total injuries to

16   the external surface of her body, but not all 18

17   of them are just head.  I believe that the last

18   four or five of the 18 are random bruises on her

19   legs and arms, but the majority of the injuries to

20   the head go to Number 14.  So, there's 14

21   injuries, abrasions, lacerations like I've showed

22   you that number up to 14.

23   Q.    And those are included within your report

27

1       and that's been previously marked, correct?

2       A.      Correct.

3       Q.      Thank you, Doctor.  If we may go to the next

4       exhibit.  And then as you explained after you're

5       done with an external autopsy, you do an internal

6       autopsy, correct?

7       A.      Correct.

8       Q.      And before we get to State's Exhibit 20,

9       describe what you do.  You said you cut a V in

10      their chest.  What else do you do to get to the

11      innards of someone to determine what their

12      injuries are?

13      A.      How do you get to the internal?

14      Q.      Yes.

15      A.      Through the Y shaped incision.  You open the

16      chest cavity, take off the sternum.  The internal

17      organs are removed.  For the head you have to

18      make, it's called an intermastoid incision.  It

19      goes from ear to ear and the scalp is reflected

20      downward so that the skull is exposed and then we

21      open the skull.

22      Q.      And does that allow you then to do the

23      internal autopsy?

28

```
 1     A.     That allows you to see the inside of the
 2     skull, otherwise you would never get to the brain.
 3     Q.     With that I would like you to take a look at
 4     State's Exhibit 20 and ask you to tell us what
 5     that depicts.
 6     A.     You are looking at the top of the skull
 7     after it's been taken off, and you'll see that
 8     there's a V cut here.  That's cut by us in order
 9     to lift the top of the calvarium off, but what
10     you're seeing here is a depressed skull fracture
11     and that is over the left side of your temple
12     area.  This is actually a pretty large depressed
13     skull fracture.
14     Q.     And, Doctor, before -- I'm sorry to
15     interrupt, but explain to us what a depressed
16     skull fracture is.
17     A.     I was just about to do that.
18     Q.     Okay.
19     A.     When you have an impact, the skull sometimes
20     gives and sometimes doesn't depending on your age,
21     et cetera.  Babies have more flexible skulls than
22     adults obviously, but when there's an impact and
23     the skull doesn't give, it causes -- it can cause
```

29

1     a skull fracture and there's a certain kind of

2     fracture called a depressed fracture where the

3     whole plate is pushed in.  It fractures but it is

4     also pushed in.  This is actually a medical

5     emergency because these people have to get to

6     surgery very quickly because that changes the

7     intercranial pressure inside your skull and can be

8     very dangerous.

9     Q.    And that's you indicated in the lower

10    portion?

11    A.    This is the depressed skull fracture right

12    here, and that's on the left side in this area.

13    Q.    Is there anything else significant about

14    this particular exhibit?

15    A.    No.  It just -- this is hemorrhage, which

16    would be the outer table of the skull where your

17    muscle is.  It is called subgaleal.  The galeal

18    tissue is the hemorrhage under the scalp -- tissue

19    under the scalp.

20    Q.    When you say hemorrhage, what does that

21    mean?

22    A.    Collection of blood.

23    Q.    Next, Doctor, show you what's been marked as

30

1      State's Exhibit Number 21.  Can you explain to us

2      the significance of that photo?

3      A.    Okay.  You take that bone I just showed you

4      that was sitting here, you take that off.  You've

5      taken the brain out.  Now you're looking at the

6      shelf, the bottom shelf of the skull where your

7      brain sits.  And the depressed skull fracture I

8      just showed you would have been in this area.

9      This is her left side, but what has happened is

10     because you have an impact that came in this

11     direction from the left, it sent the forces across

12     the base of the skull, and so this is all

13     fractured right here across the base like a

14     clamshell.  It is called a hinge fracture, like a

15     clamshell.  You could just go like this and it

16     would open and close (indicating).

17          In addition there are fractures of this

18     orbital plate where this is -- where your eyes are

19     under here in this bony encasement and this is all

20     fractured.  So, she has what we call basilar, base

21     of the skull, basilar skull fractures.

22     Q.    And, finally, Doctor, I'm going to show you

23     what's been marked as State's Exhibit Number 22.

1    What does that tell you?

2    A.   This is her left hand.  She had an injury

3    here that had been sutured and there's bruising

4    around it.  I can't tell you if that is a

5    laceration or if it is a cut wound because now the

6    edges have changed from the suturing, but it is a

7    repaired injury.

8    Q.   And you indicated this is on her left hand?

9    A.   Yes.

10    Q.   I believe that's all the photos, Doctor, if

11    you want to take a seat.  Thank you.

12    Now, you indicated that there was a

13    depressed skull fracture on the left side of

14    Ms. Navarre's skull, correct?

15    A.   Correct.

16    Q.   Can you explain how people in general

17    receive these types of injuries?

18    A.   The hinge fracture that we talked about, the

19    clamshell, which goes across the base of the

20    skull, we routinely see this injury in high speed

21    automobile accidents when there's an acute impact

22    and the head hits the side of the driver's window

23    or door, and those forces go right across the base

32

1    of the skull.  You have to have a lateral impact

2    for a hinge.

3    Q.    And, I'm sorry, I spoke with respect to the

4    hinge fracture.  Is there a general way that

5    people can receive depressed skull fractures, or

6    are they too numerous?

7    A.    A depressed fracture is from any localized

8    impact.

9    Q.    And it could be from any object?

10   A.    It could be from any object.  When I say

11   localized, I mean the majority of the pressure or

12   the force is coming in one localized area, so that

13   bone pushes in, but you can see it with many

14   different kinds of weapons, I mean. . .

15   Q.    Now, with respect to the injuries sustained

16   by Brenda Navarre prior to her death, the photo

17   when the original -- or first photos showed an

18   injury to her forehead, is it evidence there was

19   an impact on her forehead as well?

20   A.    If that was only a split of the scalp from

21   this impact, you wouldn't have abrasion around it.

22   Q.    And abrasion means like the bruising and the

23   redness?

1    A.    That dark (indicating), so this most likely

2    is a second impact.

3            MR. LOISEL:    Judge, may I approach the

4     witness?

5            THE COURT:    Sure.

6    Q.    Doctor, I'm going to show you what has been

7    previously marked as State's Exhibit -- State's

8    Exhibits 5, 7 and 8.  Could you take a look at

9    those for me, please.

10   A.    Okay.

11   Q.    And what do those photos depict?

12   A.    It looks like a boulder, rock, a big rock.

13   Q.    Now, have you ever seen that rock before?

14   A.    No.

15   Q.    You were just talking about the hinge

16   fracture as well as a depressed skull fracture.

17   Is it a possibility that an impact with a rock

18   such as that could cause those injuries?

19   A.    Yes, but for a different mechanism.

20   Q.    Tell us, please.

21   A.    Remember when we just talked about the high

22   speed automobile accident, the head hitting the

23   inside of the door?  Well, you would not get a

1    rock like this size at high speed, it would be

2    impossible to throw this fast, but it is the sheer

3    weight of it that does that kind of injury.

4    Q.    So the injuries that you just described, are

5    they consistent with being hit by a rock such as

6    that size and nature?

7    A.    It would be consistent with that, yes.

8    Q.    And, Doctor, one final question, do you have

9    an opinion within a reasonable degree of medical

10   certainty as to the manner and means of

11   Brenda Navarre's death?

12   A.    Yes.  It's my opinion that Brenda Navarre

13   died of blunt force injuries of the head.

14            MR. LOISEL:    Thank you, Doctor.

15                       -  -  -

16                   CROSS-EXAMINATION

17    BY MR. WINGATE:

18   Q.    Good morning, Dr. Barnett.

19   A.    Good morning, Mr. Wingate.

20   Q.    How are you?

21   A.    I'm pretty good.  And you?

22   Q.    Good to see you again.  I'm doing all right.

23   Few questions, not many.  Okay?

```
 1              As it relates to your role as the
 2     forensic pathologist, in addition to conducting
 3     this examination, the forensic pathology exam,
 4     internal, external, you also collect evidence; is
 5     that correct?
 6     A.     Collect evidence from the body, if it's
 7     there, yes.
 8     Q.     And the evidence that you collect, you will
 9     then turn over to the police department or the
10     investigating agency at that time?
11     A.     Yes, sir.
12     Q.     All right.  And in this case on the day of
13     the autopsy, you collected evidence consisting of
14     rectal and vaginal swabs?  You have to answer.
15     A.     I'm trying to find that page.
16     Q.     Page 5.
17     A.     Okay.
18     Q.     Rectal and vaginal swabs, underpants, blood
19     sample; is that correct?
20     A.     Correct.
21     Q.     And you at that time of the autopsy gave it
22     to Detective Chad Culpert?
23     A.     Yes, sir.
```

36

1    Q.    And, of course, for the purposes of analysis

2    or whatever they wanted to do with it as part of

3    the investigation?

4    A.    Correct.  They usually request from me what

5    evidence they want collected and I collect it.

6    Q.    All right.  I'm going to hand you -- may I

7    see your autopsy first?

8    A.    These are the State's exhibits.

9    Q.    I'm handing you what's been marked for

10   identification as State's Exhibit 15.

11   A.    Yes.

12   Q.    And that is also a part of your report; is

13   that correct?

14   A.    It is.

15   Q.    And that is what?

16   A.    This is actually two pages.  It's both the

17   antemortem and the postmortem toxicology report.

18   Q.    All right.  And on that you indicate -- let

19   me see if we're on the same page.  All right.  On

20   the first page of that two page report it

21   indicates that autopsy findings, case history,

22   head injuries, homicide, crack cocaine addict; is

23   that correct?

37

1       A.      Yes.

2       Q.      And this was part of the findings?

3       A.      This was the information that was supplied

4       to us that she -- by the hospital and by the

5       investigators, and so when I have a history of

6       drug abuse, I try and include that on the

7       toxicology report.

8       Q.      One final question.  Now, you indicated that

9       you did give the evidence that you had obtained to

10      a Detective Chad Culpert at the time of the

11      autopsy, correct?

12      A.      I did, and he gave me a receipt for it.

13      Q.      Was he present during the entire autopsy

14      from beginning to end?

15      A.      Yes, because these are his pictures that

16      he's -- part of the pictures we used are his

17      pictures that he took.

18              MR. WINGATE:    Okay.  Nothing further.

19              THE COURT:     Redirect?

20                           -  -  -

21                      REDIRECT EXAMINATION

22      BY MR. LOISEL:

23      Q.      With respect to the toxicology report, I

38

1    believe it is State's Exhibit 15, what were your

2    findings on that particular report with respect to

3    Brenda Navarre?

4    A.    The antemortem specimen, antemortem means

5    before death.  The blood specimen that they

6    collected at the hospital, that one tested

7    positive for benzoylecgonine.  Benzoylecgonine is

8    the primary metabolite of cocaine, which means

9    that Ms. Navarre used cocaine 24 to 36 hours

10   before her death, or before her admission I should

11   say, and then the postmortem toxicology sample

12   that I sent from my exam showed only the

13   resuscitation drug lidocaine, and by that time the

14   benzoylecgonine had already left her system.

15   Q.    What does that indicate to you?

16   A.    Well, you metabolize it, so after a while

17   you won't see it anymore, but when she was

18   admitted, she had used cocaine and still had the

19   metabolite in her system.

20   Q.    Now, did this benzoylecgonine in any way

21   contribute to her death?

22   A.    No.

23         MR. LOISEL:    Thank you.

39

```
1              MR. WINGATE:   I have nothing further.

2              THE COURT:     Doctor, thank you very

3      much.  Call your next witness.

4              MR. LOISEL:    Thank you, Judge.  At this

5      time the State calls Detective Bart Beavers.

6              THE COURT:     Call Detective Beavers.

7                        -   -   -

8                  DETECTIVE ROBERT BEAVERS,

9      being first duly sworn by the Court, testified as

10     follows:

11             THE COURT:     Please give us your name

12     and spelling of your name.

13             THE WITNESS:  My first name is Bart,

14     B-A-R-T.  Last name is Beavers, B-E-A-V-E-R-S.

15             THE COURT:     Thank you.

16                      DIRECT EXAMINATION

17     BY MR. LOISEL:

18     Q.    Good morning, Detective.

19     A.    Good morning, sir.

20     Q.    Where do you work, Detective?

21     A.    I'm employed by the City of Toledo.  I'm a

22     Toledo Police Officer.  I am a detective currently

23     with the Cold Case Unit.  I have 25 years of
```

1    experience.  Actually in about five days it will

2    be 25 full years.  I worked initially for the

3    first two or three years on the street and then I

4    was assigned to the Vice Metro Unit for

5    approximately eight years and then after that

6    point I had been assigned to the investigative

7    services or the adult investigations unit working

8    crimes against persons, crimes against property,

9    from theft cases to sexual assault cases, homicide

10   cases.  I spent three years over at joint

11   terrorism task force, working computer crimes

12   unit, and most recently probably March of 2006

13   I've been with the cold case homicide unit.

14   Q.    Now, Detective, with respect to, I've asked

15   every police officer, what is your educational

16   background before you joined the police

17   department?

18   A.    Well, I have a high school diploma and I'm

19   about 20 hours short of my bachelor's degree at

20   Lourdes College.

21   Q.    And before you went to join the police

22   force, did you go to the academy?

23   A.    I did.  I went through roughly a six month

41

1     training process through the Toledo Police

2     Academy.

3     Q.    And you indicated that you've had a number

4     of positions during your tenure at the Toledo

5     Police Department.  Currently where are you

6     assigned?

7     A.    Currently assigned to the Cold Case Homicide

8     Unit.  There are three of us assigned.

9     Sergeant Forrester is the supervisor of the unit,

10    I'm the lone Toledo Police detective, and then

11    there's also an investigator that works for the

12    Lucas County Prosecutor's Office that is a retired

13    Toledo Police detective and that would be

14    Investigator Tom Ross.

15    Q.    And you worked on this case involving the

16    homicide of Brenda Navarre, correct?

17    A.    Yes, I did.

18    Q.    Can you explain to us when you began your

19    involvement with this particular case?

20    A.    My involvement, as I previously stated, it

21    was about March of 2006 when I joined the unit and

22    it was -- I had come from working a different

23    shift in the Detective Bureau and I was asked by

42

```
1        Sergeant Forrester to go with him to interview

2        Janet Wilson regarding a case that they had

3        previously looked at and that would have been

4        summer of 2006, July, August roughly.

5        Q.    And did you have an opportunity to talk to

6        Mrs. Wilson?

7        A.    I did, yes.

8        Q.    Was it the same Mrs. Wilson that testified

9        yesterday?

10       A.    That is correct.

11       Q.    Did you talk to her?

12       A.    I did.  Sergeant Forrester and I had

13       probably a half hour, 45 minute conversation with

14       her.

15       Q.    Do you recall where that took place?

16       A.    That would have been her residence on South

17       Street right near South and Reynolds.

18       Q.    And this was the first contact you had with

19       this case?

20       A.    First contact I had, yes.

21       Q.    And with respect to this particular case,

22       obviously you're a member of the Cold Case Unit.

23       Common sense would tell us that it is a cold case,
```

1 correct?

2 A. That is correct.

3 Q. Do you know when this case or when the

4 homicide occurred?

5 A. That would have been December 1st.  The

6 actual offense occurred December 1st of 1993, and

7 then she passed about a day later.

8 Q. And were you a part of that original

9 investigation?

10 A. I was not.

11 Q. Do you recall where you were working in

12 December of 1993?

13 A. I do.  I was working -- in December of '93 I

14 would have probably just left the Vice Unit and I

15 was in some -- in a training course and working

16 the crime analysis unit just before going to the

17 Detective Bureau.  So I worked 1985 to '93 in the

18 Vice Metro Unit.

19 Q. You were in the Vice Metro Unit.  You

20 obviously heard the testimony of

21 Detective Seymour, right?

22 A. I did, yes.

23 Q. He was familiar with Brenda Navarre.  Were

44

1    you familiar with Brenda Navarre in the Vice Unit?

2    A.    I was not.  I was -- I worked the day shift

3    liquor and enforcement, anything that would happen

4    during the day shift hours, not drug

5    investigations at that time.

6    Q.    So you became involved in approximately you

7    said May of 2006?

8    A.    It would have been the summer of 2006, July,

9    August, in that time frame.

10   Q.    And did you have an opportunity when you

11   became involved in this case to look at prior

12   police reports involving the homicide of

13   Brenda Navarre?

14   A.    I did.  We have in the Cold Case Unit, we

15   look at a lot of old cases.  We have almost 300

16   going back into the 1970's.  So, we will take the

17   case, look at the paperwork, the reports that were

18   done, look at the evidence that we have just to

19   get a feel because we weren't around in 1993 to

20   conduct the investigation.  So, we have to see how

21   the investigation progressed and just generally

22   learn about the facts of the case.

23   Q.    And did you do that with respect to this

1      case?

2      A.    I did, yes.

3      Q.    And were you able to look at old reports

4      involving this particular case?

5      A.    Yes, I did.

6      Q.    With regard to those reports, to your

7      knowledge were there any suspects back in 1993

8      with respect to this murder?

9      A.    There were a number of tips that came in in

10     1993, Crime Stopper tips, tips that they would

11     call the office and have -- you know -- be written

12     down on a piece of paper and passed on to the

13     investigator that got placed into the file.  So,

14     yes, there were several names and information that

15     was received by the police department and the

16     original investigators at that time.

17     Q.    And after you had a chance to review that

18     file, did anything pan out with respect to any of

19     those tips back in 1993?

20     A.    They did not.

21     Q.    In fact, do you recall when this case was

22     indicted?

23     A.    This case was indicted October of 2006, I

46

1    believe.

2    Q.    Now, you indicated that you talked to

3    Brenda Navarre the summer of 2006.  Explain --

4              MR. WINGATE:   Objection.

5    Q.    I'm sorry.  I apologize.  You talked to

6    Janet Wilson --

7    A.    Yes.

8    Q.    -- not Brenda Navarre -- I'm sorry.  I

9    apologize -- in the summer of 2006.

10             What else did you do with respect to the

11   investigation leading up to the indictment in this

12   particular case?

13   A.    Well, we -- obviously I took a look at the

14   case file.  We had other interviews with

15   Janet Wilson with respect to this case.  We talked

16   to her sons, Alfonzo and -- Alfonzo Davis, Lamont

17   Fonseca.  I believe I talked to Lamont prior to --

18   I definitely talked to Alfonzo at that time and we

19   just -- I continued to look for evidence, look for

20   -- you know -- and conduct those interviews.

21   Q.    Now, with respect to looking for evidence,

22   was there any evidence from the original

23   investigation available to you in 2006?

```
 1     A.     Unfortunately, no.  When we went down to the

 2     property room where this evidence is maintained,

 3     the evidence that was originally taken in by

 4     detectives, including that large 110 pound rock

 5     had been destroyed and it was destroyed in

 6     February of 2006.

 7            So, when I went down or Sergeant

 8     Forrester went down to look to see if there was

 9     any physical evidence stored in the property room,

10     there was no indication.  That evidence had been

11     destroyed, so. . .

12     Q.     Did you investigate as to why it had been

13     destroyed?

14     A.     I did.

15     Q.     And what did you find out?

16     A.     Well, the case was originally listed as a

17     felonious assault.  Typically if somebody -- if

18     this is ruled a homicide in a relatively short

19     period of time, the placard or the information

20     that's contained on the evidence tags as well as

21     the log that the property room carries is going to

22     be listed as a homicide or a murder.  In this

23     case, the placard that was on the evidence that
```

1    was on the property room log indicated that it was

2    a felonious assault.

3         So, the individual who went down to the

4    property -- or originally handled the evidence

5    from evidentiary standpoint was the one that

6    actually destroyed the evidence, mistakenly

7    thinking it was a felonious assault and not a

8    homicide.

9         MR. WINGATE:   I will object as to what

10    he thought.

11         THE COURT:    Sustained.

12    Q.   Nonetheless this evidence was no longer

13    available for any testing or anything of that

14    nature?

15    A.   No, no longer available.

16    Q.   Now, you indicated that you talked to

17    Janet Wilson.  Do you recall approximately how

18    many times you talked to Janet Wilson?

19    A.   Personally, you know, I probably talked to

20    her seven or eight times regarding the case, and

21    matters specific to the case probably three or

22    four times.

23    Q.   And with respect to those conversations that

49

1    you had with her pertaining to the case, were her

2    statements to you consistent?

3         MR. WINGATE:   Your Honor, I'm going to

4    object.  May we approach?

5         THE COURT:    Sure.

6         (WHEREUPON THE FOLLOWING DISCUSSION WAS

7    HELD AT THE BENCH.)

8         MR. WINGATE:   First of all, we don't

9    know what the statements were.  I think at this

10   juncture he's calling upon this officer to

11   substitute the opinion of the -- or from the

12   jurors function by testing the credibility of a

13   witness as far as asking whether or not these

14   statements were consistent.  We don't have --

15   have never seen the statements.  We don't know

16   what they are, so I don't know how he could

17   attest to statements being consistent when he's

18   basically substituting his opinion for the role

19   of the juror.  These are statements that no one

20   else has heard, no one else will probably here in

21   this case, so I think it is improper and it is

22   misleading at this point.

23        MR. LOISEL:   Judge, I'm not trying to

50

1      substitute anything.  He testified that he talked

2      to a witness in the case three or four times

3      pertaining to the facts surrounding the case.

4      I'm just asking him if those conversation were

5      consistent.  I'm not asking him to get into any

6      of the facts or surrounding those.  Mr. Wingate

7      can obviously cross him with respect to those

8      conversations, if he so desires.

9              THE COURT:    Objection is overruled.

10             MR. WINGATE:   I don't know what the

11     conversations were.

12             (WHEREUPON THE PRECEDING DISCUSSION AT

13     THE BENCH CONCLUDED AND THE FOLLOWING PROCEEDINGS

14     WERE HELD.)

15             THE COURT:    Overruled.

16     Q.    My question again with respect to the three

17     or four conversations that you had with

18     Janet Wilson pertaining to what happened back in

19     1993, were her statements to you consistent?

20     A.    Yes.

21     Q.    And you obviously heard her testimony here

22     in court, correct?

23     A.    Yes.

```
1      Q.     Was her testimony consistent with what she

2      told you during those three or four conversations?

3      A.     Yes.

4      Q.     At some point, Detective, did you become

5      aware that there had been anal and vaginal swabs

6      taken as just was referred to by the coroner?

7      A.     Yes, I did.

8      Q.     And when -- describe to us how you came to

9      find that information out.

10     A.     The regional crime lab that's housed in the

11     Toledo Police Department is somewhat of a separate

12     entity from the property room.  The regional crime

13     lab had a freezer down in the basement area that

14     they had stored biological evidence, if you will,

15     from various cases in that particular freezer.

16     There was an audit that was conducted of that that

17     we had -- that I had no idea that this particular

18     evidence had existed.

19            So, once I took a look at this audit, I

20     took a look at my active cases, and with this case

21     being one of them, I noticed that there was an

22     entry for a vaginal swab and anal swab and some

23     blood standards.
```

1          So, I went down to that freezer to take a

2     look and see if, in fact, that was -- they don't

3     log these -- they don't log that, at least they

4     didn't at this time but that's changed at this

5     time.  They didn't log it in the property room or

6     show up on the property room printout because the

7     lab was separate.

8          So, I went down to look to see what the

9     disposition of that evidence was and it was not in

10    the freezer.  So, I checked with the crime lab and

11    I found out that those particular items of

12    evidence were signed out by my supervisor in 2005

13    for this -- he had signed it out and placed it

14    into a locked area.  So, further investigation

15    located those swabs as well as the blood

16    standards.

17    Q.    And upon discovery and you finding these

18    swabs and samples, what did you do at that point?

19    A.    Immediately contacted the Court and sent

20    those standards -- or request for analysis down to

21    BCI&I, their lab in Bowling Green, to have those

22    analyzed.

23    Q.    And to your knowledge, were those samples

53

1      tested and analyzed?

2      A.    They sent them on to North Carolina.   North

3      Carolina conducted a DNA analysis of those

4      standards.   Yes, they were analyzed.

5      Q.    And with respect to the vaginal swabs, do

6      you know if it matched the standards sent to them

7      of the Defendant?

8      A.    They did not.   The vaginal swabs indicated

9      the presence of an unknown male DNA and it was not

10     Robert Wilson.

11            MR. LOISEL:    Juge, may I approach?

12            THE COURT:    Sure.

13     Q.    Now, Detective, I'm going to hand you what's

14     been marked as State's Exhibit 24 and 25.   I

15     believe there is a stipulation as to their

16     authenticity with respect to what these are.

17            Can you just look at them?  First,

18     Exhibit 24, without telling us what's contained in

19     that report, do you know what that is?

20     A.    It is a certificate of analysis supplied to

21     me from LabCorp.  Actually it was supplied to

22     BCI&I and it was forwarded to me, a copy was

23     forwarded to me regarding the analysis of the

54

1    swabs and standards that we submitted.

2    Q.    And when you say LabCorp, is that the lab in

3    North Carolina that you were previously referring

4    to?

5    A.    Yes, that's correct.

6    Q.    And if you could, what is State's Exhibit

7    25?

8    A.    State's Exhibit 25 is a report from BCI that

9    indicates that the evidence was submitted, and I'm

10   referring evidence as to the rectal, vaginal, and

11   DNA standards of the victim and Mr. Wilson and

12   taken by our lab personnel on February 6th, 2008.

13   Q.    As I said, you've obviously been here for

14   the testimony, are you aware of any Crime Stopper

15   money that was given in this particular case?

16   A.    Yes, I am.

17   Q.    And do you know when that money was issued

18   and to who it was issued to?

19   A.    The money was issued October of 2006 and the

20   money was issued to Janet Wilson.

21   Q.    And with respect to Crime Stopper in

22   general, when is money given to individuals, or

23   for what reason?  I'm sorry.

1    A.    Money is given to individuals for providing

2    information that leads to the arrest of somebody

3    that committed the crime.

4    Q.    And do you know how much was given and to

5    whom?

6    A.    $5,000 dollars was given to Janet Wilson.

7    Q.    And now you indicated also that you had some

8    conversations with I believe Lamont Fonseca and

9    Alfonzo Davis; is that correct?

10   A.    Yes.

11   Q.    And who is Lamont Fonseca?

12   A.    Lamont Fonseca is Janet Wilson's son.

13   Q.    And you were here for Alfonzo Davis's

14   testimony, correct?

15   A.    I was.

16   Q.    And was his testimony consistent with the

17   conversation that you had previously had with him?

18          MR. WINGATE:   Again, we're going to

19    object.

20          THE COURT:    I'm going to allow it.

21   A.    Yes.

22          MR. LOISEL:   Thank you, Detective.

23    Nothing further.

```
 1              THE COURT:     Cross -- let me stop you

 2       here.  Does the jury want to take a break, 15

 3       minute break?  Okay.  Let's -- before we get to

 4       the cross-examination, let's take a 15 minute

 5       recess.  Members of the jury, do not talk to

 6       anyone about the case and do not form or express

 7       an opinion about the case.  Court is in recess.

 8                         (RECESS TAKEN.)

 9                       CROSS-EXAMINATION

10       BY MR. WINGATE:

11       Q.    Good morning, Detective Beavers.

12       A.    Good morning, Mr. Wingate.

13       Q.    You became involved in this case summer June

14       or July of 2006?

15       A.    That is correct.

16       Q.    As part of the cold case file; is that

17       correct?

18       A.    Yes, as a result of my assignment to the

19       Cold Case Unit, yes.

20       Q.    And I think you indicated that you,

21       Detective Forrester and Tom Ross?

22       A.    Yes.

23       Q.    That would be the retired detective who
```

1      works with the Prosecutor's Office?

2      A.     Yes.

3      Q.     Comprised this Cold Case Unit?

4      A.     Yes.

5      Q.     All right.  And Detective Forrester is also

6      in charge of the Crime Stopper program?

7      A.     Yes, it is actually sergeant.  He is my boss

8      and part of his duties include Crime Stopper

9      program.

10     Q.     And he was serving in that capacity at that

11     time?

12     A.     He was, yes.

13     Q.     And he was the one that authorized $5,000

14     dollars be paid to Janet Wilson?

15     A.     Actually the Crime Stopper board authorizes

16     the money to be paid.

17     Q.     And you heard Janet Wilson say that he was

18     told -- that she was told I can give you 50 crisp

19     $100 dollar bills by Detective Forrester; do you

20     recall that?

21     A.     Yes.

22     Q.     And that's what she was paid, wasn't she?

23     A.     That is correct.

58

```
 1     Q.    Now, in your involvement in this case you

 2     indicated that you had an opportunity to look at

 3     police reports to see how the investigation

 4     progressed.  You looked at that report, you went

 5     over the Crime Stopper reports relative as to your

 6     participant as investigator in this homicide of

 7     Brenda Navarre; is that correct?

 8     A.    Yes, that is correct.

 9     Q.    And in that -- and the Crime Stopper reports

10     came in over a period of two or three years after

11     the homicide in '93?

12     A.    Well, the majority of them came in, you

13     know, within a close proximity date wise of when

14     the homicide occurred, but they continued to

15     trickle in, yes.

16     Q.    And inasmuch as the majority of them came in

17     within a short period of time of the homicide, you

18     received a description of the suspect being 6'1,

19     6'2, didn't you?

20           MR. LOISEL:    Objection, Your Honor,

21      hearsay.

22     Q.    I'll ask the question a different way.  In

23     the review of your reports, did you come across a
```

1     description of the individual as being 6'1 or 6'2?

2     A.    There were varying reports, some of which

3     said 6'1, 6'2.

4     Q.    Did any ever say anything under six feet?

5               MR. LOISEL:    Objection, Your Honor, it

6      is hearsay.

7               MR. WINGATE:    I'll rephrase the

8      question.

9     Q.    Did you come across anything in your reports

10    indicating less than six feet tall?

11              MR. LOISEL:    Objection, hearsay.

12              THE COURT:    I'm going to allow it.

13    A.    I would have to review the reports, but I --

14    each individual Crime Stopper I don't know what

15    the descriptions were.  There were some that said

16    six foot, 6'1.  If there were any less, I don't

17    recall.

18    Q.    Let me just ask this --

19    A.    Okay.

20    Q.    -- set aside the Crime Stopper reports for

21    right now.  Talking about the police reports you

22    reviewed.  Did you get any police report -- did

23    you review any police report wherein you had a

1    description of this individual, this suspect being

2    less than 6'1?

3         MR. LOISEL:    Objection, Your Honor.  It

4    is hearsay.  He's trying to get to the truth of

5    the matter asserted as someone else stated.

6         THE COURT:    This is part of his

7    investigation and part of his protocol in the

8    investigation.  I think it is appropriate,

9    overruled.

10   A.    Yes, the initial reports listed 6'1, six

11   foot, 6'1.

12   Q.    Now, I understand that.  But this is my

13   question:  Did you ever get anything indicating

14   less than 6'1, 6'2?  That's what I'm asking.

15   A.    Yes.

16   Q.    All right.  You got reports saying how tall

17   was the individual?

18   A.    Saying -- I'm sorry.  I don't understand the

19   question.

20   Q.    I guess what I'm asking you is this:  Do you

21   have any police reports -- did you review as part

22   of your protocol any of the police reports which

23   indicated that the suspect was less than 6'1 or

61

1    6'2?

2    A.    Yes.

3    Q.    All right.  And what was the height?

4    A.    The height would have been, once we received

5    the information from Janet Wilson in 2003 and I

6    was reviewing those reports, those were less than

7    six.

8           MR. LOISEL:    Judge, if he could finish

9      the answer to the question.

10    Q.    Okay.  Now -- okay.  You want to talk about

11    Janet Wilson.  You're talking about -- what

12    reports are you talking about relative to

13    Janet Wilson?

14    A.    When Janet Wilson came to the police and

15    stated that Robert --

16    Q.    Hold on.

17    A.    I'm sorry.

18    Q.    Thank you very much.  Gave a statement.

19    A.    When Janet Wilson gave a statement and

20    Robert Wilson was listed as a suspect at that

21    time, the reports that show when you run

22    through -- when you look at an individual and

23    there are that individual's height/weight

62

1    characteristics are known to be less than six

2    foot, 6'1.

3    Q.    Well, let me just ask this.  Okay?

4    A.    Okay.

5    Q.    Now, let's talk about before you talk to

6    Janet Wilson was 2006, right?

7    A.    That's when I talked to Janet Wilson, yes.

8    Q.    All right.  Now, what I'm asking you about

9    was the Crime Stopper reports and the police

10   reports prior to Janet Wilson, because we're going

11   to get to Janet Wilson.

12   A.    Okay.

13   Q.    And your answer is there were no reports

14   indicating that the suspect was less than 6'1 or

15   6'2; is that correct?

16   A.    Prior to 2003, yes.

17   Q.    Right.  Prior to 2003.  And that would have

18   been with Janet Wilson, and those reports came

19   from people who actually saw the assailant, didn't

20   it?

21   A.    They came from the original people that were

22   at the original scene, yes.

23   Q.    People who saw the assault?

```
 1              MR. LOISEL:    Objection, Your Honor.
 2       This is hearsay.  He's getting into statements of
 3       other individuals.
 4              THE COURT:    I'm going to sustain that.
 5       That assumes facts not in evidence.
 6    Q.    Did you review a report of an alleged
 7    eyewitness indicating the height of the
 8    individual, 6'1, 6'2?
 9    A.    Yes.
10    Q.    Okay.  You talked to Odett Scott --
11    A.    I did, yes.
12    Q.    -- correct?
13           You talked to Lisa Mays who was with her
14    also, correct?
15    A.    I did not know.
16    Q.    You reviewed a report of Lisa Mays who was
17    with Odett Scott; is that correct?
18    A.    Yes, that's correct.
19    Q.    All right.  Let's just talk about
20    Mrs. Wilson.  You say you generally had seven,
21    eight conversations with her; is that correct?
22    A.    Approximately, yes.
23    Q.    And you had three or four whereby you talk
```

64

1    about a statement; is that correct?

2    A.    Either a full statement or portions thereof,

3    yes.

4    Q.    Okay.  And let me just say this, let's just

5    lead up to that.  All right?

6         Janet Wilson would tell you something and

7    say I'm not going to cooperate; is that correct?

8    She would go back and forth?

9         MR. LOISEL:    Objection, Your Honor,

10    hearsay.

11         MR. WINGATE:   She testified.

12         MR. LOISEL:    He's asking about

13    out-of-court statements and the truth of their

14    matter asserted.

15         MR. WINGATE:   Your Honor, Mrs. Wilson

16    testified as to her relationship with the police,

17    Your Honor.

18         THE COURT:    I'm going to allow some

19    leeway here.

20         MR. WINGATE:   All right.

21    Q.    She would vacilate on whether she was going

22    to cooperate, was not going to cooperate; is that

23    correct?

65

```
 1      A.    Yes.

 2      Q.    All right.  Say she was -- say she's not

 3      going to do it; is that correct?

 4      A.    Yes.

 5      Q.    As a matter of fact, she indicated at one

 6      point I'm not testifying, didn't she?

 7      A.    Yes.

 8      Q.    And she was arrested and charged with

 9      obstructing justice; is that correct?

10      A.    That's correct, yes, sir.

11      Q.    All right.  And prior to that, prior to that

12      day that she was arrested, Mrs. Wilson had

13      contacted the Court complaining about Toledo

14      Police and you were ordered to have no contact

15      with her; is that correct?

16            MR. LOISEL:    Objection, Your Honor.

17       Objection, Your Honor.

18            THE COURT:    Wait a minute.  Can I see

19       Counsel up here?

20            (WHEREUPON THE FOLLOWING DISCUSSION WAS

21       HELD AT THE BENCH.)

22            THE COURT:    First of all, what's your

23       objection.
```

66

1          MR. LOISEL:    Judge, first of all it is

2     irrelevant.  Second of all, it is hearsay.  He's

3     trying to get in information through this witness

4     of what Janet Wilson did or didn't do in

5     contacting the Court.  That's hearsay as to what

6     Janet Wilson did or did not say or talked to the

7     Court.

8          MR. MCELROY:    What she did is not

9     hearsay, Judge.

10          THE COURT:    That's what I understand.

11     The conduct is not hearsay.

12          MR. LOISEL:    He's asking her did she

13     contact the Court complaining about Toledo Police

14     Officers harassing her.  That goes directly as to

15     what her statement is and truth of the matter

16     asserted, out-of-court statement.

17          MR. MCELROY:    It is not offered for

18     truth.  It is matter for impact.

19          THE COURT:    I'm going to overrule your

20     objection.  I'm going to advise Mr. Wingate, you

21     may be opening some doors here.  You should be

22     careful.

23          MR. WINGATE:    Okay.  I intend to, Your

1      Honor.

2                  THE COURT:     All right.

3                  (WHEREUPON THE PRECEDING DISCUSSION AT

4        THE BENCH CONCLUDED AND THE FOLLOWING PROCEEDINGS

5        WERE HELD.)

6        BY MR. WINGATE:

7        Q.     Did you hear my question?

8        A.     No.  I'm just waiting for your question.

9        Q.     All right.  I thought -- my question is

10       simply this:  As a result of a phone call by

11       Janet Wilson, Toledo Police were ordered to have

12       no contact with Janet Wilson; is that correct?

13       A.     I don't think that was the verbiage that was

14       used in the order.

15       Q.     All right.  Let's change the verbiage a

16       little bit.

17                 Toledo Police ordered not to have any

18       contact with Janet Wilson, nor Defense Counsel?

19       A.     Yes.

20       Q.     Both of us, both sides ordered to have no

21       contact with Janet Wilson, correct --

22       A.     Yes.

23       Q.     -- as a result of police -- her phone call

68

1    complaining about police officers, correct?

2    A.    I don't know if that was as a result of

3    that.

4    Q.    I understand that.  And the same day that

5    you -- that that order was issued to have no

6    contact with her, Janet Wilson was arrested?

7    A.    She was arrested that afternoon, yes.

8    Q.    After she left the courthouse and went to

9    work?

10   A.    That is correct, sir.

11   Q.    Now, as it relates to your investigation,

12   and you did tell the Prosecutor that you know it

13   was an going investigation and the investigation

14   continued.  Did you come across a report prior to

15   Janet Wilson indicating that a possible eyewitness

16   recognized the voice of the assailant?

17          MR. LOISEL:    Objection, Your Honor.

18    Hearsay.

19          THE COURT:    This is cross-examination.

20    I'm going to allow it.

21   A.    Yes.

22   Q.    What follow up was done relative to that?

23   A.    It was -- again, at that time it wasn't my

69

1    case.

2    Q.    All right.  But you've subsequently looked

3    over the file and I think you indicated that you

4    saw how the -- saw how the investigation

5    progressed; isn't that what you told the

6    Prosecutor?

7    A.    Yes.

8    Q.    All right.  So, as it relates to a potential

9    witness recognizing the voice of the assailant of

10   Mrs. Navarre, was there any indication that that

11   was followed up on?

12   A.    No, sir.

13   Q.    As a matter of fact, there was a name given

14   to that voice?

15        MR. LOISEL:    Objection, Your Honor.

16    May we approach?

17        MR. WINGATE:   I'll rephrase the

18    question.  Let me rephrase it.

19        THE COURT:    All right.

20   Q.    Did the reports that you reviewed, and I'm

21   not asking the name, the reports that you reviewed

22   relative to recognizing the voice also indicate a

23   name?

1      A.     Yes, it did.

2      Q.     All right.  It wasn't Robert Wilson, was it?

3      A.     It was not.

4      Q.     And no follow up on that investigation?

5      A.     I can't say there was no follow up done.

6      There was no report that indicated that there was

7      follow up.

8      Q.     All right.  As it relates to that night, did

9      you review or report indicating that a van had

10     been stopped, a suspect van had been stopped?

11              MR. LOISEL:     Objection, Your Honor.

12              THE COURT:     If this witness knows, he

13      can testify.

14     Q.     Did you review a report?

15     A.     Was there a report that indicated that?

16     Yes.

17     Q.     All right.  And within that van, bloody

18     sweater was located.  Did you run across a report

19     indicating that?

20     A.     Yes.

21     Q.     Same report, isn't it?

22     A.     Yes, sir.

23     Q.     As a result of you seeing how the

71

1   investigation progressed, was there any follow up

2   on that?

3   A.    The bloody sweater was submitted to the lab

4   for analysis.

5   Q.    And do you have an analysis?

6   A.    We do not.

7   Q.    Do you know if Mrs. Navarre was wearing a

8   sweater that night?

9   A.    I don't know.

10  Q.    And because of there being no analysis, you

11  cannot say whether this was or was not her sweater

12  or was or was not evidence of that incident; is

13  that correct?

14  A.    I could not say that, yes.

15  Q.    Now, in your investigation or your

16  involvement in this case, did you come across a

17  report and specifically the one involving

18  Roger Craig who testified here?

19  A.    Uh-huh.

20  Q.    And it indicated felonious assault charge,

21  and detectives on the scene, and evidence

22  technician on the scene, Cashen, Koury, Sergeant

23  Dunham and Culpert.  Did you come across that

1 report?

2 A. Yes.

3 Q. All right.  So that report will indicate

4 that Mr. Culpert was there -- or

5 Detective Culpert, Chad Culpert was there at the

6 scene when the body was located, correct?

7 A. Yes.

8 Q. Similar to the first?

9 A. Well, I think the body was already at the

10 hospital but he was at the scene.

11 Q. And it was called a felonious assault at

12 that time; is that correct?

13 A. It was, yes.

14 Q. All right.  And you heard the testimony

15 of -- I'm sorry -- Dr. Barnett indicating the

16 evidence that she took from the body of

17 Brenda Navarre was given to Chad Culpert.  You

18 heard that testimony?

19 A. Yes, sir.

20 Q. That is the same Chad Culpert that was at

21 the scene, felonious assault?

22 A. Yes, sir.

23 Q. All right.  And inasmuch as he's there and

1      you saw the photographs where the skull, the scalp

2      was pulled back, the skull is open, the brain

3      removed, would it be fair to say that Mrs. Navarre

4      was now a homicide, not a felonious assault?

5      A.     At what point?  I'm sorry.

6      Q.     At the point he's getting the evidence from

7      the autopsy.

8      A.     No, sir -- oh, from the autopsy?

9      Q.     Yes.

10     A.     Yeah, that would be correct, yeah.

11     Q.     And that would be on December the 2nd, 1993?

12     A.     I believe so, yes, sir.

13     Q.     The date of the autopsy?

14     A.     Uh-huh.

15     Q.     And the Chad Culpert at the scene taking

16     photographs, felonious assault, the Chad Culpert

17     that received the evidence from Dr. Barnett at the

18     autopsy is the same Chad Culpert that ordered the

19     destruction of the evidence; is that correct?

20     A.     Yes, that's correct.

21     Q.     And as far as Mr. Wilson is concerned, there

22     could have been fiber evidence or trace evidence

23     on the clothes, on the boulder which could have

74

1    shown whether he did or did not have anything to

2    do with this offense; is that correct?

3    A.    Yes, sir, could have been evidence on the

4    boulder and clothing.

5    Q.    And that's gone?

6    A.    Yes, that is gone.

7    Q.    But by the same token, from the State's

8    points of view evidence which could corroborate or

9    indicate that he may have had something to do with

10   this is gone; is that correct?

11   A.    That is correct.

12   Q.    And would it be fair to say that when you

13   started receiving -- I'm sorry -- the Crime

14   Stopper reports that you received indicated

15   potential suspect dropped a rock on her head.  Did

16   you come across Crime Stopper reports that said

17   that?

18   A.    Some did, yeah.

19   Q.    And this would have been prior to 2003 when

20   you talked to Janet Wilson; is that correct?

21   A.    Yes.

22   Q.    And when Janet said that she had heard on

23   the streets what had happened to Janet Wilson,

1       that would be -- I'm sorry -- when she --

2               When Janet Wilson testified that she had

3       heard on the streets what had happened to

4       Brenda Navarre, that would be consistent with the

5       Crime Stopper reports that you reviewed prior to

6       talking to Janet Wilson; is that correct?

7       A.    It is a long question.

8       Q.    Well, you want me to rephrase it?

9       A.    Okay.

10      Q.    Okay.  Janet Wilson said -- made a statement

11      to you; is that correct?

12      A.    Yes.

13      Q.    All right.  And you said she testified

14      consistent; is that correct?

15      A.    Yes, sir.

16      Q.    You got Crime Stopper reports saying that a

17      rock was dropped on her head; is that correct --

18      A.    That's correct.

19      Q.    -- prior to you talking to Mrs. Wilson, the

20      dates on these Crime Stopper reports?

21      A.    Yes, that's correct.

22      Q.    All right.  And all I'm saying is her saying

23      to you that she had heard in the streets what had

1    happened to Brenda Navarre, that would be

2    consistent with the Crime Stopper reports that you

3    received prior to talking to her indicating what

4    had happened to Janet -- to Brenda Navarre,

5    correct?

6    A.    With respect to a rock being dropped on her

7    head, yes.

8    Q.    Okay.  And let me just ask this:  In one

9    of -- did you come across a Crime Stopper report

10   which -- let me rephrase that.

11        Did you review Crime Stopper reports more

12   than one implicating at least one individual?

13   A.    Yes.

14   Q.    It wasn't Robert, was it?

15   A.    That's correct.

16   Q.    Was there follow up on that?

17   A.    Yes.

18   Q.    And what follow up was done?

19   A.    There was follow up at the time that -- at

20   least in one of the instances that facts that were

21   portrayed weren't consistent with what had

22   occurred, but there was follow up also done by

23   myself and Investigator Ross where we interviewed

1    that individual and an individual that was

2    supposedly with him that day.

3    Q.    And you're talking specifically about

4    Scottie Burrell?

5    A.    Scottie Burrell, yes, sir.

6    Q.    What about Andre Munn?

7    A.    I'm not aware of that.

8    Q.    Aware of follow up?

9    A.    The follow-up, no.  I'm not saying that

10   there wasn't any done, but I'm not -- I didn't do

11   the follow-up on Andre Munn.

12   Q.    Right.  And --

13          MR. LOISEL:    Objection, Your Honor.

14    May I see what he's handing the witness?

15          THE COURT:    Sure.

16   Q.    And I've marked it up, but I'm handing you

17   Crime Stopper report, see if that was one of the

18   reports that you reviewed.  And I'll refer you to

19   the second page.

20   A.    Yes, I'm familiar with all of the pages.

21   Q.    All right.  And so would you agree with me

22   that you had one Crime Stopper report of a

23   particular individual that his name had come up on

78

1      several occasions; is that correct?

2      A.     Yes.

3      Q.     All right.  What investigation was done

4      relative to that individual --

5      A.     Well.

6      Q.     -- if you know?

7      A.     Well, the -- again, the reports that I

8      reviewed may not be indicative of the

9      investigation that was done and could be testified

10     to by others that completed that investigation.

11     Q.     All right.

12     A.     Okay.

13     Q.     So, then, in other words, if that was the

14     perpetrator of the crime, to the best of your

15     knowledge, no investigation has incurred or any

16     follow up occurred based upon what you have?

17     A.     The reports -- based on the reports.

18              MR. LOISEL:    Objection, Your Honor.

19       This calls for speculation.

20              THE COURT:    I'm going to sustain that.

21       That's too far.

22              MR. WINGATE:   All right.

23     Q.     Are you aware of any follow up based upon

1      that Crime Stopper report of that particular

2      individual?

3      A.     Solely based on the reports, no.

4      Q.     Okay.  Now, as it relates to -- and as you

5      reviewed the Crime Stopper reports itself,

6      information may come in and the information is

7      graded on a scale of 1 to 10; is that correct?

8      A.     The value of the information is graded on a

9      scale of 1 to 10.

10     Q.     Thank you.  And, again, it's scaled on how

11     helpful the information may or may not be to the

12     investigation; is that correct?

13     A.     Well, that --

14            MR. LOISEL:    Objection, Your Honor.  If

15     I may see what he's referring to.  Judge, can we

16     approach?

17            THE COURT:    Sure.

18            (WHEREUPON THE FOLLOWING DISCUSSION WAS

19     HELD AT THE BENCH.)

20            MR. LOISEL:    Judge, renew my objection

21     with respect to hearsay.  This essentially is

22     double hearsay.  He's handing him reports of

23     another officer who is relating information from

1      a third individual.  He can ask him if he's

2      familiar with these reports and what they say,

3      but he hands them to him.  He's asking him to

4      look at double hearsay.  It is not his report.

5      If he wants to call the officer who authored

6      these reports, that is the proper way to get the

7      information not through a third party.

8              MR. WINGATE:   I'm not trying to get the

9      information in.  I'm trying to find out about the

10     grading of information that's provided.  He's

11     indicating he looked over it and I'm asking him

12     specifically the phrase says, On the below scale,

13     how helpful was this Crime Stopper information to

14     the investigation.  I'm asking about not how

15     helpful it was, but is he aware of the scale, the

16     grading scale of the information that's --

17             THE COURT:    You've already established

18     that information.  That's sustained.

19             MR. WINGATE:   All right.

20             (WHEREUPON THE PRECEDING DISCUSSION AT

21     THE BENCH CONCLUDED AND THE FOLLOWING PROCEEDINGS

22     WERE HELD.)

23             THE COURT:    Sustained.

1    Q.    Now, you testified that the information that

2    comes in is graded on a scale as to how helpful it

3    may be to the investigation?

4              MR. LOISEL:    Objection, Your Honor.  It

5     is asked and answered.

6              MR. WINGATE:    This is a preparatory

7     question.

8              THE COURT:    Overruled.

9    A.    Based on the -- yes, based on the value of

10    the information received.

11    Q.    Did you come across in your investigation

12    any information that was rated at least a five on

13    a scale of one to ten?

14    A.    Possibly.  I haven't I'm not familiar with

15    that specific Crime Stopper.

16    Q.    There was some you didn't review?

17    A.    I reviewed them but there were several Crime

18    Stoppers, I can't remember all of them.

19    Q.    Okay.  I understand.  Would you or did you

20    consider follow up on information that was rated

21    five or above helpful?

22    A.    Without seeing the specific Crime Stopper, I

23    can't say.

```
1     Q.    I'm going to hand you what's been marked as
2     State's Exhibit -- I'm sorry -- Crime Stopper
3     report.
4               MR. LOISEL:    Objection, Your Honor,
5      this is hearsay.  It goes directly to the issue.
6               THE COURT:    I'm going to sustain it.
7      This is hearsay on hearsay.
8               MR. WINGATE:   Your Honor, may we
9      approach?  That is not what it is being offered
10     for.
11              THE COURT:    I'm going to sustained the
12     objection.  He can testify to the grading system
13     and that's as far as you can go.
14              MR. WINGATE:   That's all I'm asking.
15              THE COURT:    You've already established
16      that.
17              MR. WINGATE:   All right.
18     Q.    Now, as far as a grading system or five of
19     five or above, do you know if any of the Crime
20     Stopper reports that had a grading of five or
21     above were followed up on?
22              MR. LOISEL:    Objection, Your Honor.  It
23      has been asked and answered.
```

83

1          THE COURT:     If the witness knows, he

2      can answer.  If he doesn't, he doesn't.

3      A.     I don't know.

4      Q.     You don't know?

5      A.     No.

6      Q.     All right.  So then when you say that you

7      looked at prior police reports, Crime Stopper

8      reports to see how the investigation progressed,

9      five or above, you don't know what happened with

10     those?

11     A.     That's correct.

12     Q.     And that's a pretty strong rating on a scale

13     of five to ten, isn't it -- on one to ten?  I'm

14     sorry.

15     A.     Again, it is determined on the individual

16     Crime Stopper.

17     Q.     I understand that, but as an investigating

18     detective, scale of one to ten, one is low, ten is

19     the highest and you have reports where there is a

20     five.  Okay?

21     A.     That --

22     Q.     That would be something you want to follow

23     up on, isn't I?

84

1    A.    That five is assigned or determined on the

2    form by the investigating detective at that time.

3    I wasn't the investigating detective.  He put that

4    five down, therefore, he's the one that determines

5    the amount of investigation that goes into that.

6    Q.    And I don't dispute that, but now I'm asking

7    Detective Bart Beavers if you rate the information

8    you received on a scale of one to ten as a five,

9    that would be something you would want to follow

10   up on, wouldn't it?

11   A.    Well, my five might be different than your

12   five.  There's no set --

13   Q.    You're misunderstanding me.  Okay?  Forget

14   about me or forget about whoever set that five.

15   I'm talking about Detective Bart Beavers received

16   information about a homicide rated a five.  Is

17   that something you would not follow up --

18           MR. LOISEL:    Objection, Your Honor.

19           THE COURT:    This is getting too far

20    afield.  Sustained.

21   Q.    As it relates to Janet Wilson, did you

22   follow up on information that she provided you?

23   A.    Yes.

1     Q.    And as it relates to this case, no physical

2    evidence whatsoever to corroborate what she said,

3    correct?

4    A.    Correct.

5    Q.    Just her word?

6    A.    Yes.

7    Q.    And as far as her word, you heard her from

8    this witness stand say some of it was true, some

9    of it was a lie as far as her statement to me,

10    correct?

11    A.    Are you referring to a statement to you?

12    Q.    Yes.

13    A.    Yes.

14    Q.    And you also heard her say that she told me

15    that she took the information that she heard from

16    the street, made up some stuff to convince the

17    detectives.  Did you hear her say that from that

18    witness stand under oath?

19    A.    I did.

20           MR. WINGATE:   Just one second, Your

21    Honor.  I may be finished.

22    Q.    Detective Beavers, did you in your role as

23    investigator in this case in reviewing the reports

86

```
1     and the Crime Stopper receive -- review any

2     reports of possible suspects who were also drug

3     dealers?

4     A.    Yes.

5     Q.    More than two or three?

6     A.    I can't say that, but there were some that

7     were drug dealers.

8     Q.    And in all of the Crime Stopper reports that

9     you received, none ever included the name of

10    Robert Wilson, did it?

11           MR. LOISEL:    Objection, Your Honor.

12     That goes to hearsay.

13           MR. WINGATE:   I'll rephrase it a

14     different way.

15    Q.    Based upon your review of all the Crime

16    Stopper reports, did you see the name of

17    Robert Wilson?

18           MR. LOISEL:    Objection, Your Honor.

19     Still hearsay.  He's going to the truth of the

20     matter asserted.

21           THE COURT:    No.  I'm going to allow

22     it.

23    A.    Yes.
```

1     Q.    All right.  Would you like to show me the

2     report?

3     A.    Uh-huh.

4          MR. WINGATE:   Your Honor, could I have

5      just one second, please?

6          THE COURT:    Do you want to show it to

7      Mr. Loisel?

8          MR. WINGATE:   Oh, yeah.

9          MR. LOISEL:    I'm aware of it.

10    Q.    Detective Beavers, all of the Crime Stopper

11    reports that you had in this case provided to the

12    State of Ohio, is that correct, as part of the

13    investigation, you gave to the Prosecutor; is that

14    correct?

15    A.    Yes.

16    Q.    All right.  And pursuant to the rules of

17    discovery that you're aware of, they were given to

18    me?

19    A.    Yes.

20    Q.    This report you did not turn in until

21    Tuesday of this week; is that correct?

22         MR. LOISEL:    Your Honor, that has no

23     relevance as to when this was turned over to the

1      Defense Attorney.  It was turned over to the

2      Defense Attorney.

3                  THE COURT:     I'm going to allow it.

4      Q.     This report was not given to the State to

5      give to Defense Counsel until Tuesday?

6      A.     The report was referenced in my supplemental

7      report and the report was given to Mr. Loisel at

8      his request and it was given to you on Tuesday,

9      yes.

10     Q.     That's the only time it was given, right?

11     And could I see your supplemental report that you

12     indicate it was referenced to?

13     A.     Yes, Page 2.  It is under evidence.

14                 MR. WINGATE:   Your Honor, could we have

15     just one second?  Your Honor, could we approach?

16                 (WHEREUPON THE FOLLOWING DISCUSSION WAS

17     HELD AT THE BENCH.)

18                 MR. WINGATE:   This is what I'm having a

19     problem with (indicating).

20                 THE COURT:     Okay.  I understand.  All

21     right.

22                 MR. LOISEL:    Judge, if we may,

23     depending on what the question is, what was or

89

1      was not provided in discovery is not an issue for

2      this jury to determine.  It is not for their

3      consideration.  If Mr. Wingate has an issue with

4      respect to discovery, he needs to talk to the

5      Bench about it.  He just can't put it out in

6      front of the jury.  There are rulings and

7      regulations that go along with discovery.  If he

8      thinks the State violated those rules, that is

9      not for consideration in this trial.  It is not

10     evidence in this trial.

11           THE COURT:    He can inquire of this

12     witness whatever he knows.  Facts are facts, you

13     know.

14           MR. LOISEL:    Well, I understand.

15     That's fine, but I'm going to --

16           THE COURT:    Okay.

17           (WHEREUPON THE PRECEDING DISCUSSION AT

18     THE BENCH CONCLUDED AND THE FOLLOWING PROCEEDINGS

19     WERE HELD.)

20     Q.    I'm sorry.  Could I see the entire report

21     that you've referenced?  Maybe I just need the

22     front page.  All right.  Now, this report that

23     you're saying this page --

1      A.     Yes.

2      Q.     -- where you reference the report is dated

3      11-6-06; is that correct?

4      A.     Yes.

5      Q.     November the 6th of 2006, you've referenced

6      this police report?

7      A.     Could I see the report just to make sure of

8      my dates?

9      Q.     Yes.

10     A.     That was the date I typed the report,

11     11-6-06.

12     Q.     And that is the date that you referenced

13     that Crime Stopper report; is that correct?

14     A.     In that section, yes.

15     Q.     All right.  And it wasn't given to --

16            MR. LOISEL:   Objection, Your Honor.  It

17      goes -- may we approach?

18            THE COURT:    No.  I'm going to allow

19      this question.  Overruled.

20     Q.     You gave it to the Prosecutor, who in turn

21     gave it to me on Tuesday, September the 2nd?

22     A.     Is that a question?

23     Q.     Yes.

1     A.     Yes.

2     Q.     So, for over a year you've had this report?

3     A.     I've had it, yes.

4     Q.     And when all of the other references from

5     Crime Stopper never mentioning Mr. Wilson were

6     turned over, this one you maintained?

7     A.     Apparently the Prosecutor didn't get it the

8     first time, so he called and asked for the report.

9     It wasn't anything intentional, but he did not

10    have the report.

11    Q.     I'm not saying it was intentional.  Okay?

12    A.     Okay.

13    Q.     I'm saying that you maintained it until

14    September the 2nd.

15    A.     I did.

16    Q.     Would it be fair to say that you took the

17    time to go through all of the reports, police

18    reports, Crime Stopper reports and you turned

19    those over to the Prosecutor, everything but one?

20    A.     That I know of.  It was inadvertent.

21    Q.     Did I give you the report back?

22    A.     Yes.

23    Q.     Let me see that for a second.  And without

1    saying what that report said, that Crime Stopper

2    is not consistent with the facts of the homicide

3    of Brenda Navarre, is it?

4    A.    That is correct.

5    Q.    Just one second.  I may be finished.

6         MR. WINGATE:    Nothing further.

7         THE COURT:    Redirect.

8         MR. LOISEL:    Thank you.

9                    -  -  -

10                REDIRECT EXAMINATION

11    BY MR. LOISEL:

12    Q.    Detective, there's obviously a lot to talk

13    about these tips.  With respect to Crime Stopper

14    tips, is it a challenge as a cold case detective

15    to try to resurrect old cases?

16    A.    Yes.

17    Q.    And with respect to cold cases, in general,

18    are there other tips in cold cases?

19    A.    Yes.

20    Q.    And with respect to tips in cold cases and

21    cases that happen now, do tips always pan out?

22    A.    No.

23    Q.    Sometimes do tips give you good information?

1    A.    Sometimes, yes.

2    Q.    What kind of other information can tips give

3    you?

4    A.    They can give us information not only who

5    committed the crime, but who may be witnesses to

6    the crime, where evidence may be found as far as

7    location of where evidence or a body in a case of

8    a homicide.  So, there are a lot of different

9    types of information that tips will give us.

10   Q.    And is the information always relevant?

11   A.    No.

12   Q.    Sometimes do the tips have nothing to do

13   with the actual event that they are trying to tip

14   on?

15   A.    Actually the majority of the tips

16   unfortunately are that.

17   Q.    What do you mean "are that"?

18   A.    Are tips that may not be relevant, that

19   people may read something in the paper and give

20   information based on what they hear or see on the

21   street.  It is information that can't be

22   substantiated.

23   Q.    Now, with respect to this investigation,

1    Mr. Wingate asked you a number of questions about

2    the tips, and did you review them from the

3    original investigators.  Do you remember that line

4    of questioning?

5    A.    Yes.

6    Q.    And to your knowledge did that investigator

7    follow up on any and all information that he had

8    at the time?

9    A.    There were Crime Stopper disposition forms

10   with the majority of the tips, yes.

11   Q.    And if you know, as a result of all of those

12   tips and the information and the follow-up, was a

13   suspect developed back in the 1990's?

14   A.    No.

15   Q.    So what conclusion does that lead you to?

16   A.    That the investigator back in the 1990's did

17   not develop a good suspect on the homicide of

18   Brenda Navarre.

19   Q.    Let's jump forward to this tip that

20   Mr. Wingate is talking about.  Did that tip give

21   you any pertinent information with respect to this

22   investigation?

23   A.    No.  The tip itself had case facts that were

```
 1    not even close to being consistent with the
 2    homicide that occurred.
 3    Q.    So, that in a long line of other tips were
 4    relatively useless?
 5    A.    Correct.
 6    Q.    That tip didn't lead you to the Defendant,
 7    did it?
 8    A.    No.
 9    Q.    What did?
10    A.    Janet Wilson.
11    Q.    Finally, with respect to these reports and
12    the tips and the investigation that preceded back
13    in the 1990's, specifically 1993 forward, did you
14    author any of those reports?
15    A.    From '93 --
16    Q.    To 2006 when you came on this case.
17    A.    I did not.
18    Q.    So the information, whatever it may have
19    been, you were not privy to, correct?
20    A.    Correct.  That's correct.
21    Q.    You -- had you gotten the information, you
22    may have proceeded differently possibly, correct?
23    A.    Every investigator has their own style, yes.
```

1 I possibly could have proceeded in a different

2 fashion.

3 Q. Just a couple of other things.  Do recall

4 the line of questioning with respect to

5 Mr. Wingate and there was a court proceedings

6 where you were ordered along with the State of

7 Ohio and Defense Counsel not to have any contact

8 with Janet Wilson?  Do you recall that line of

9 questioning?

10 A. I do, yes.

11 Q. And Mr. Wingate asked you, in fact, you had

12 contact with her later that day when she was

13 arrested, correct?

14   MR. WINGATE:  I would object.  I did not

15 ask that question.  I asked was she arrested.

16   THE COURT:  I recall that question.

17   MR. WINGATE:  I asked was she arrested.

18 Q. Do you recall that line of questioning?

19 A. That she was arrested, yes.

20 Q. If you're aware, did Attorney Wingate

21 violate that order and contact Janet Wilson?

22   MR. WINGATE:  I'm going to object and

23 ask that we approach.

1          MR. LOISEL:    He opened the door, Judge.

2          MR. WINGATE:    Mike, you know -- may we

3     approach, Your Honor?

4          THE COURT:    Come on up.

5          (WHEREUPON THE FOLLOWING DISCUSSION WAS

6     HELD AT THE BENCH.)

7          MR. WINGATE:    First of all, I have never

8     implied that he violated anything.  What she had

9     said on the witness stand was that she was

10    threatened.

11         MR. LOISEL:    Judge --

12         THE COURT:    The testimony was that the

13    marshals arrested her, so I don't know if this

14    witness had any contact.  I don't recall any

15    testimony about that.

16         MR. LOISEL:    Well, I apologize.  I

17    think -- I thought that there was.

18         MR. WINGATE:    No.

19         THE COURT:    He didn't say he did.

20    They arrested her, so I'm going to sustain the

21    objection.

22         (WHEREUPON THE PRECEDING DISCUSSION AT

23    THE BENCH CONCLUDED AND THE FOLLOWING PROCEEDINGS

98

1       WERE HELD.)

2                   MR. WINGATE:    Sustained, Your Honor?

3                   THE COURT:     Sustained.

4       Q.    And in addition to -- I'm going back and

5       jumping around a little bit -- all these tips,

6       Mr. Wingate asked you about a van and bloody

7       sweater, correct?

8       A.    Yes.

9       Q.    With respect to your review of the

10      information in this investigation, did that bloody

11      sweater or any investigation into the bloody

12      sweater or the van help you develop any suspects

13      with respect to the homicide of Brenda Navarre?

14      A.    The reports from the investigation back then

15      do not indicate that it helped develop any

16      suspects.

17                  MR. LOISEL:    If I may just have a

18       moment, Judge.

19      Q.    Mr. Wingate asked you also about

20      Chad Culpert and the destruction of evidence,

21      correct?

22      A.    Yes.

23      Q.    If you had your way, would you like to have

1      that evidence still available to you?

2      A.    Absolutely, yes, I would.

3      Q.    Why?

4      A.    Because there's the ability through new

5      sciences, DNA, and the applicability to law

6      enforcement and our investigations to obtain DNA

7      from, for example, the rock or touch DNA from the

8      clothing.  That would be something that we would

9      really like to have.

10     Q.    And as Mr. Wingate said, possible evidence

11     from the evidence that had been destroyed could

12     either implicate the Defendant or vindicate him,

13     correct?

14     A.    Yes, that's correct.

15     Q.    But it is not available to us?

16     A.    That is correct, not available.

17     Q.    And finally, Mr. Wingate asked you with

18     respect to your conversations with Janet Wilson,

19     that aside from her work, she has nothing else to

20     corroborate what she told you; do you remember

21     that question?  I believe it was a question in

22     that realm.

23     A.    Aside from her word?

1    Q.    Yes.

2    A.    I thought you said work.

3    Q.    Her word.

4    A.    No.  That's not correct.  The statement that

5    her son Alfonzo Davis made to me corroborated what

6    she told me.

7    Q.    And Brenda Navarre is dead, correct?

8    A.    Yes, that's correct.  And the information

9    that she provided me was consistent with the facts

10   that I know of the crime.

11        MR. LOISEL:    Thank you, Detective.

12    Nothing further.

13                    -  -  -

14               RECROSS EXAMINATION

15    BY MR. WINGATE:

16   Q.    First question I have is this:  You say the

17   son corroborated the information what

18   Janet Wilson --

19        THE COURT:    Did you hear.

20   Q.    Did you hear Janet Wilson -- I'm sorry --

21   Alfonzo testify from that seat that you're seated

22   in and say I don't know if Robert told me or my

23   mom told me.  Did you recall her saying that --

1    him saying that?

2    A.    Yes.

3    Q.    All right.  So, if she told him that, would

4    you agree with me, common sense and reason if he

5    repeats what she says, corroborates what she said?

6    A.    Also said what Robert told him.

7         MR. WINGATE:   Your Honor, I'll ask that

8     that response be stricken as non-responsive.

9    Q.    My question to you --

10         MR. LOISEL:    Is there a ruling?

11         THE COURT:    I believe it was

12    responsive.  Overruled.

13   Q.    All right.  Did you hear him from the

14   witness stand -- I understand what you're saying.

15   The question I'm asking you is did you hear him

16   from that witness stand under oath say both to me

17   and to the Prosecutor that I don't know whether it

18   was my mother or Robert that said these things; do

19   you recall that?

20   A.    I recall that, yes, sir.

21   Q.    You recalled in the police report he says

22   that his mother told him those things; do you

23   recall that?

1    A.    His mother did tell him those things.

2    Q.    All right.  So then for you to sit here and

3    say that he corroborated what she said, common

4    sense and reason would say if she's the source and

5    he repeats it --

6              MR. LOISEL:    Objection.  Calls for

7     speculation.

8              THE COURT:    It is argumentative.

9     Sustained.

10   Q.    As it relates to the Prosecutor talking

11   about good Crime Stopper reports, bad Crime

12   Stopper reports, and you said the majority of the

13   tips are not -- may not be relevant; is that

14   correct?

15   A.    That is correct.

16   Q.    All right.  But in this particular case you

17   had Crime Stopper reports that at least mentioned

18   one name on several occasions; is that correct?

19   A.    Yes.

20   Q.    You had police reports that gave you a

21   height and a name of a potential suspect; is that

22   correct?

23   A.    Actually I reviewed reports that did that,

1     yes.

2     Q.    Yes.  And to the best of -- and we're

3     talking about through the 1990's, to the best of

4     your knowledge, none of these were followed up on;

5     is that correct?

6     A.    I can't say that.

7     Q.    All right.  Can you say they were?

8     A.    I can say that I looked at reports that

9     indicated that some were followed up on and the

10    disposition formed, and others silent on, but I

11    did not conduct those investigations.

12    Q.    And the one -- I know you didn't conduct the

13    investigations, but he asked you about the 1990's

14    and whether or not a suspect was developed.  You

15    had names and descriptions and you can't say

16    whether these reports were followed up on or not?

17    That's what I'm asking.

18    A.    Collectively I can't say that.

19    Q.    All right.  And as a matter of fact, you

20    even had one that had a voice recognition and --

21           MR. LOISEL:    Objection, Your Honor.

22     This goes beyond the scope.

23           THE COURT:    I'm going to sustain it.

104

1    Q.    As it relates to the van with the bloody

2    sweater, you said that didn't generate anything,

3    any follow up; is that right?

4    A.    There was a submission to the lab of that

5    bloody sweater.  There's no response to -- or

6    there was no written response to that submission.

7    Q.    So would you agree with me then at that

8    point the ball was dropped in that case?

9    A.    I can't say that.  I don't know what the

10   investigators did at that time.  No, as far as the

11   reports were concerned.

12   Q.    It is 15 years later, do you have anything

13   in that file indicating that there was a follow up

14   with an analysis and a result taken as a result of

15   the request for an analysis of that bloody

16   sweater?

17   A.    I do not have that result.

18   Q.    Although there was a request; is that

19   correct?

20   A.    Yes, that's correct.

21   Q.    And so when you tell the Prosecutor that in

22   1990 you had no suspects, you did have suspects?

23           MR. LOISEL:    Objection, Your Honor, he

1    didn't do anything.

2              THE COURT:      Sustained.

3    Q.    Let me rephrase.   In the 1990's when you say

4    no suspects were developed, the reports that you

5    have indicate that there were suspects; is that

6    correct?

7    A.    The Crime Stopper reports indicates

8    suspects, yes.

9    Q.    And police reports?

10   A.    Yes.

11             MR. WINGATE:    Nothing further.

12             THE COURT:      Any redirect?

13             MR. LOISEL:     Just one moment, Judge.

14    Nothing further, thank you, Judge.

15             THE COURT:      Thank you officer.

16             THE WITNESS:    Thanks, Judge.

17             THE COURT:      Who is your next witness?

18             MR. LOISEL:     Judge, I believe we can

19    probably have a relatively short witness.

20             THE COURT:      All right.   Just take one

21    more witness and then we'll recess for the

22    morning.

23             MR. LOISEL:     Your Honor, at this time

1      the State calls Detective Lou Vasquez.

2                  THE COURT:    Call Detective Vasquez.

3                          -   -   -

4                  SERGEANT LOIS VASQUEZ,

5      being first duly sworn by the Court, testified as

6      follows:

7                  THE COURT:    Be seated here, sir.

8      Please give us your name and spelling of your

9      name.

10                 THE WITNESS:   Lou Vasquez,

11     V-A-S-Q-U-E-Z.

12                 THE COURT:    Thank you.

13                      DIRECT EXAMINATION

14     BY MR. LOISEL:

15     Q.    Afternoon, sir.  Can you -- still morning

16     but it is almost there.  Can you introduce

17     yourself to us, please?

18     A.    I'm Lou Vasquez.  I'm a sergeant with the

19     Toledo Police Department and I work investigative

20     services on the midnight shift.

21     Q.    I called you detective.  Explain to us,

22     Sergeant, what are your duties presently?

23     A.    I supervise the detectives, person

1    detectives on the night shift.  We handled all the

2    shootings, murders, homicides, home invasions,

3    burglaries, anything that happens on the midnight

4    shift.

5    Q.    Now, just by way of background, how long

6    have you been a member of the Toledo Police

7    Department?

8    A.    I'm in my 37th year.

9    Q.    And I don't want to go through all 37 years,

10   but can you briefly tell us the different areas

11   you've worked in the police department?

12   A.    Well, I've worked patrol, I worked the

13   Communications Bureau and spent most of my career

14   working the Metro Drug Task Force.

15   Q.    And when did you finish with that portion of

16   your career?

17   A.    Approximately eight years ago.

18   Q.    And what did you do after that?

19   A.    And then worked communications for a few

20   years and then went into investigative services.

21   Q.    Where you are currently?

22   A.    Yes.

23   Q.    And with respect to your duties as a Toledo

1       Police Officer, did you ever have contact with

2       Janet Wilson regarding the homicide of

3       Brenda Navarre?

4       A.    Yes, I did.

5       Q.    Can you explain to us without going into

6       detail when that contact first happened?

7       A.    Well, back in June of 2005, I was involved

8       in an investigation involving her grandson who was

9       a victim of a robbery.  At that time she owned a

10      bar at the corner of Central and Isabella and her

11      grandson was robbed in front of that bar.

12      Q.    And so you had contact with her?

13      A.    Yes, she came in with her grandson during

14      that investigation and more or less for emotional

15      and moral support for her grandson.

16      Q.    And did you talk to her then?  How did the

17      homicide of Brenda Navarre come to light?

18      A.    Well, shortly thereafter she called me on

19      the phone and told me that.

20            MR. WINGATE:   I will object.

21            THE COURT:    Yeah, sustained.

22      Q.    Without telling us what she said, when is

23      the next time you had contact with her?

1    A.    A few days later.

2    Q.    And what was it regarding?

3    A.    In regards to the murder of Brenda Navarre.

4    Q.    And how did this communication take place?

5    A.    Over the phone.

6    Q.    And did you talk to her about the

7    Brenda Navarre homicide?

8    A.    Yes, I did.

9          MR. WINGATE:   Your Honor, I will object.

10          THE COURT:    Well, that's a proper

11     question, but that's about as for as without

12     going into the merits of that conversation.

13          MR. LOISEL:   Of course.

14    Q.    You did talk to her about the homicide of

15    Brenda Navarre?

16    A.    Yes.

17    Q.    And let me ask you this:  How many

18    conversations -- well, did you have any more

19    conversations with her regarding the homicide of

20    Brenda Navarre?

21    A.    About a dozen conversations.

22    Q.    And if you can recall the -- if you can

23    recall the specifics, where did these

1    conversations take place?

2    A.    Well, some of them were over the phone, some

3    of them were at her bar.  She owned another bar

4    called Brewski's on North Detroit.  We had

5    conversations there, and then some of them were in

6    person where I would meet her on the street.

7    Q.    And, again, without getting into the

8    specifics of these conversations, what did they

9    revolve around?

10    A.    Around the homicide of Brenda Navarre.

11    Q.    And at some point did you have a

12    conversation with her at the 212 or at the Toledo

13    Police Department across the street?

14    A.    Yes, I did.

15    Q.    And who was present for that conversation,

16    if you recall?

17    A.    Well, it was myself and I believe

18    Investigator Tom Ross and Bart Beavers --

19    Detective Bart Beavers.

20    Q.    And I don't want to sound redundant, but

21    what did that conversation revolve around?

22    A.    The murder of Brenda Navarre.

23    Q.    And was there anyone else at that

1    conversation in June of 2005 aside from the people

2    that you just mentioned?

3    A.    No.

4    Q.    And just one final question, Detective.

5    With respect to these conversations, were they

6    consistent with the first contact you had until

7    the last contact you had with Janet Wilson?

8    A.    Yes, the story was always the same.

9         MR. LOISEL:    Thank you, Detective.

10    Nothing further.

11         MR. WINGATE:   Just one second, Your

12    Honor.

13                        -  -  -

14                   CROSS-EXAMINATION

15    BY MR. WINGATE:

16    Q.    Just a couple of questions,

17    Sergeant Vasquez.  The first bar you indicated

18    that she owned a Brewski's bar; is that correct?

19    A.    That's correct.

20    Q.    Does she still own it?

21    A.    No.

22    Q.    Having financial problems?

23    A.    That's correct.

1    Q.    Okay.  And she was paid $5,000 dollars to

2    appear before the grand jury; is that correct?

3            MR. LOISEL:    Objection, Your Honor.

4     She did not get paid $5,000 dollars to appear

5     before the grand jury.  That is a

6     mischaracterization of the evidence.

7            THE COURT:    Sustained.

8    Q.    Prior to her being offered 50 crisp $100

9    dollar bills, did she appear before the grand

10   jury?

11           MR. LOISEL:    Objection, Your Honor.

12    This witness doesn't even know if she was offered

13    that money.  He was not able to respond.

14           THE COURT:    He can ask and the witness

15    can answer.

16   A.    I don't know anything about what she was

17   paid or the series of evidence on --

18   Q.    Let me stop you.  But you do know she was

19   paid?

20   A.    No, I don't.

21   Q.    You don't know that?

22   A.    No.

23   Q.    All right.  And as it relates to the first

```
1    conversation in '05, wasn't until October,

2    November of '06; is that correct, before she went

3    before the grand jury?

4    A.    I don't recall when she went to the grand

5    jury.

6    Q.    Well you know it wasn't in '05, correct?

7    A.    That's correct.

8    Q.    And you know it wasn't in the first six

9    months of '06?

10   A.    That's correct.

11   Q.    And you do know that Steve Forrester,

12   Sergeant Steve Forrester is in charge of the Crime

13   Stopper program?

14   A.    Yes.

15   Q.    And he is the individual that can allocate

16   money or dispense money to individuals?

17   A.    Yes.

18   Q.    And he was involved in conversations with

19   Mrs. Wilson; is that right?

20   A.    Yes.

21   Q.    And conversations prior to her appearing

22   before the grand jury?

23   A.    I don't know the sequence of events there,
```

1      sir.

2              MR. WINGATE:   All right.  Nothing

3      further.

4              THE COURT:    Anything else?

5              MR. LOISEL:   No, Judge.  Thank you.

6              THE COURT:    Thank you very much.  You

7      are excused.  Can I see Counsel up here?

8              (WHEREUPON A DISCUSSION AT THE BENCH WAS

9      HELD OFF THE RECORD.)

10             THE COURT:    All right.  Ladies and

11     gentlemen of the jury, at this time we'll take

12     the noon recess.  We'll reconvene these

13     proceedings at 1:15.  Again, do not discuss this

14     case among yourselves, nor with anyone else.  Do

15     not form or express an opinion about the case

16     until the case has been submitted to you.  We'll

17     be in recess.

18                     (LUNCH RECESS TAKEN.)

19             (WHEREUPON THE FOLLOWING DISCUSSION WAS

20     HELD OUTSIDE THE PRESENCE OF THE JURY.)

21             THE COURT:    All right.  We're in

22     chambers ready to commence this afternoon's

23     session.  And, Mr. Loisel, I understand that you

1    have a motion or want to rest; is that correct?

2         MR. LOISEL:    Judge, at this point after

3    having an opportunity to look through, and I'll

4    do this obviously in open court, but there's some

5    motions and procedural things that need to go on,

6    but, yes, at this point the State intends to rest

7    and I didn't know if the Court wants to address

8    motions subject to the admittance of the State's

9    Exhibits I believe 1 through 23.

10         THE COURT:    Well, let's go through

11    the exhibits first.  Do you want to get your

12    list?  All right.  Going through what I have is

13    we have State's Exhibit 1 is a picture of the

14    scene that was testified to by Detective Niemiec.

15    Is there going to be an objection to that?

16         MR. WINGATE:    No.

17         MR. LOISEL:    It is Officer Niemiec,

18    correct, that's who you're referring to as

19    sergeant.

20         THE COURT:    Yeah.

21         MR. LOISEL:    Okay.

22         THE COURT:    Exhibit 2 are various

23    pictures that were testified to by

1      Officer Malone.  2 through 11, are there going to

2      be objections to those exhibits?

3            MR. WINGATE:   7, 8 and 9 are photographs

4      just of the rock on the hand truck or -- yeah,

5      the hand truck I think they call them.  I would

6      object on the grounds of duplicity and one would

7      be sufficient.  No objection to 2 through 6.

8            MR. LOISEL:   Judge, I would just

9      indicate, and I can look at the actual exhibits,

10     the purpose for their admission is to show

11     different --

12           THE COURT:   As I recall the testimony

13     of the witness, he indicated these were various

14     views, so I don't believe even if they are

15     duplicative, I don't believe they're prejudicial

16     and I'll allow them in.

17           Next we have State's Exhibit 12 are

18     statements.  Is that Mr. Davis's statement?

19           MR. WINGATE:   No, I don't think he was

20     going to admit that, although he had it marked.

21     It is a police report.

22           MR. LOISEL:   Yes, that's what it is.

23     It is Detective Beavers' report.

1          THE COURT:     Which included a statement

2     that Mr. Davis had made?

3          MR. LOISEL:     Correct.  We would

4     withdraw it at this time, Judge.

5          THE COURT:     All right.  Exhibit 12

6     will be withdrawn.  13 through 22, 13, 14 and 15

7     are various reports of Doctor --

8          MR. WINGATE:     Barnett.

9          THE COURT:     -- Barnett.  Any

10    objection?

11         MR. WINGATE:     To 12 -- 13, 14, 15?

12         THE COURT:     Right.

13         MR. WINGATE:     No objection.

14         THE COURT:     And then pictures 16

15    through 22 are various autopsy reports and

16    photos.

17         MR. WINGATE:     We would maintain our

18    objection previously that is the prejudicial

19    effect outweighs any probative value, and I think

20    it is prejudicial against the Defendant

21    Mr. Wilson, so we would object to those.

22         THE COURT:     Your objection is noted

23    and overruled.  Exception noted.  Those will come

1        in.

2                    MR. LOISEL:    Just so we're clear,

3        Judge, weren't those previously admitted this

4        morning?

5                    THE COURT:    That is correct.  Your

6        objection is restated again.

7                    MR. WINGATE:   Yes.

8                    THE COURT:    And ruling is reaffirmed.

9                    State's Exhibit 23 is the Coroner's

10       Verdict.  Any objection?

11                   MR. WINGATE:   No objection.

12                   THE COURT:    24 is the certificate of

13       analysis by the lab.

14                   MR. WINGATE:   No objection.

15                   THE COURT:    And 25 is the report from

16       BCI.

17                   MR. WINGATE:   No objection.

18                   THE COURT:    I believe that's all the

19       State's exhibits; is that correct?

20                   MR. LOISEL:    Yes, Judge.

21                   THE COURT:    Are you going to be

22       resting at this time?

23                   MR. LOISEL:    Yes, Judge.

1           THE COURT:    Okay.  State rests.  Any

2      motions?

3           MR. WINGATE:   Yes, Your Honor.  We would

4      make a Rule 29 motion indicating at this juncture

5      it is incumbent upon the State of Ohio in viewing

6      the light most favorable to the State to

7      introduce evidence whereby reasonable minds could

8      conclude that Mr. Wilson is guilty of this

9      offense of murder that is purposely causing the

10     death of Ms. Brenda Navarre.  I believe the State

11     failed to meet that burden based on the evidence

12     adduced, and I would ask the Court for judgment

13     of acquittal, directed verdict.

14           THE COURT:    Mr. Loisel.

15           MR. LOISEL:   Judge, I think with

16     respect to the Rule 29 motion, as Mr. Wingate

17     indicated, it has to be thought about in the

18     light most favorable to the State.  The State has

19     to put on a prima facie case with respect to this

20     Defendant's guilt.  I believe there's enough

21     testimony and evidence put in front of this jury

22     where reasonable minds could differ and allow

23     them to consider the evidence, therefore, I think

1      the Rule 29 motion should be denied.

2            THE COURT:     Certainly a lot of this

3      evidence would be characterized as

4      circumstantial, but I believe there's enough at

5      this point to go to the jury on a prima facie

6      basis, so I'm going to allow the case to go to

7      the jury at this point and the motion is

8      overruled but the exception is noted.  Are you

9      ready to go?

10           MR. WINGATE:   Yes.

11           THE COURT:     You have any witnesses?

12           MR. WINGATE:   Could you give us maybe

13     about five minutes?  We need to confer, could we

14     go back outside?

15           THE COURT:     Sure.

16                   (OFF THE RECORD.)

17           MR. WINGATE:   Back on the record.

18           THE COURT:     Back on the record.

19           MR. WINGATE:   Your Honor, I would --

20     I'll indicate pursuant to discussions with

21     Mr. Wilson and co-counsel, Mr. McElroy, we will

22     not be presenting any evidence and we'll renew

23     our motion for a Rule 29 judgment of acquittal.

```
 1              I'll indicate whereas the State correctly

 2      stated that it was the State should at least

 3      present a prima facie case relative to the

 4      evidence in this matter, and that the -- at the

 5      close of its case, that is the burden; however,

 6      at the close of the entire case with the Defense

 7      aspect and us not presenting any evidence, the

 8      burden now rises to proof beyond a reasonable

 9      doubt.  I think at this juncture based upon the

10      evidence that has been adduced from this witness

11      stand that the State had not met its burden

12      whereby reasonable minds could conclude beyond a

13      reasonable doubt that Mr. Robert Wilson is guilty

14      of murder, that is purposely cause the death of

15      Brenda Navarre, and as such ask the Court for

16      Rule 29, judgment of acquittal.

17              MR. LOISEL:   Judge, at this point the

18      State does not have to prove the case beyond a

19      reasonable doubt.  We have to be able to submit

20      to the jury for their deliberation to decide

21      whether it is proven beyond a reasonable doubt.

22      With that in mind we ask that this motion be

23      denied.
```

1          THE COURT:    I think the jury is going

2     to have to make that determination as to whether

3     proof beyond a reasonable doubt has been attained

4     or not.  I'm going to overrule your motion at

5     this point and we'll let the jury deal with it.

6     How are we fixed for argument at this point?  And

7     instructions, have you had an opportunity to --

8          MR. LOISEL:    Judge, I don't know if

9     Ms. Johnson has had an opportunity to.

10          THE COURT:    She gave me a rough draft.

11     Do you want to take a look at it and see if

12     you --

13          MR. LOISEL:    As I stated earlier,

14     Judge, and I think obviously everyone has their

15     own input.  I would prefer to get this case to

16     the jury today.  I know that they would be able

17     to at least hear closing arguments.  I don't know

18     what Defense Counsel's thoughts are, but if an

19     acceptable rendition of the jury instructions can

20     be put together in a reasonable amount of time, I

21     don't know why we couldn't proceed today with

22     closing.

23          MR. WINGATE:    Your Honor, I'll quite

1    frankly indicate that I'm not in a position to go

2    forward.  Had I known, we would -- I would have

3    worked on closing arguments over the lunch break,

4    but I did not with the understanding that the

5    Court had concluded or felt that we would be

6    proceeding to closing argument and finishing this

7    case tomorrow morning.  That's what I would be in

8    a posture to do at that time.  I'm not available

9    now.

10           THE COURT:    Well, it is now 20 minutes

11   to 2:00 or 25 minutes to 2:00.  We're going to

12   have to go through these instructions and that

13   will take a little while.  I think that I would

14   prefer to just spend some time going over these

15   arguments this afternoon.  I'll release the jury

16   early, have them back here first thing in the

17   morning.  You'll know what the instructions are

18   going to be at that point.  You'll be able to

19   tailor your arguments accordingly, so I'm going

20   to release the jury early today and then we'll

21   work on these instructions.

22           MR. WINGATE:    All right.

23           THE COURT:    All right.  So, let's go

124

1      back on the record, let the jury go and we'll

2      come back at what, 9:00 o'clock tomorrow morning?

3            MR. WINGATE:    That's fine.

4            MR. LOISEL:    Well, with respect to

5      releasing the jury, obviously the State needs to

6      rest and Defense needs to rest before we do that,

7      right?

8            THE COURT:    We'll do it on the

9      record -- or we'll do it in front of the jury.

10     Okay.  Very good.

11            (WHEREUPON THE PRECEDING DISCUSSION

12     OUTSIDE THE PRESENCE OF THE JURY CONCLUDED AND

13     THE FOLLOWING PROCEEDINGS WERE HELD.)

14            THE COURT:    Mr. Loisel.

15            MR. LOISEL:    Thank you, Judge.  At this

16     point, the State of Ohio rests.  We would ask

17     that State's Exhibits 1 through 11 be admitted

18     into evidence as well as State's Exhibits 13

19     through 25 at this point.

20            THE COURT:    All right.

21            MR. LOISEL:    We would withdraw State's

22     Exhibit 12.

23            THE COURT:    All right.  Pursuant to

1          the Court's previous rulings, those exhibits will

2          come in.  Mr. Wingate.

3                  MR. WINGATE:   Yes, Your Honor.  I'll

4          indicate on behalf of Mr. Wilson and Mr. McElroy,

5          we will not present any evidence and we will

6          rest.

7                  THE COURT:    All right.  The Defendant

8          rests.  Ladies and gentlemen of the jury, at this

9          time all of the evidence that you will be hearing

10         in this case is now in.  The next stage in this

11         process will be the coming up with a set of final

12         instructions.  This is a serious case and there

13         are a number of things that the Court and the

14         attorneys are going to have to go over to

15         formulate a proper set of instructions.  That

16         typically takes a while and then after that has

17         been agreed upon, the attorneys will have an

18         opportunity to address you in closing arguments.

19         Due to the fact that we're now in mid afternoon,

20         we're going to recess these proceedings today.

21         The attorneys and I will be working the rest of

22         this afternoon, but you folks will return

23         tomorrow at 9:00 o'clock, at which time you will

1      hear the final arguments of Counsel and the final

2      instructions by the Court and then you can

3      commence with your deliberations.

4            So, again, do not discuss this case among

5      yourselves, nor with anyone else, including

6      spouses and significant others.  Again, we'll

7      remind you that you should avoid reading The

8      Blade or any other newspaper tonight and we'll

9      see you fresh and early in the morning, at which

10     time, the case I expect will be handed to you

11     before -- a little before noon.  Anything else at

12     this time?

13           MR. WINGATE:   Nothing further.

14           THE COURT:    All right.  We'll be in

15     recess.

16                      (RECESS TAKEN.)

17           (WHEREUPON THE FOLLOWING DISCUSSION WAS

18     HELD OUTSIDE THE PRESENCE OF THE JURY.)

19           THE COURT:    Back on the record.  Let

20     the record reflect that we are in chambers going

21     over proposed instructions and procedures.

22     Preparatory to the final arguments of Counsel,

23     and the Defendant has indicated that it was his

1    intention to introduce his two exhibits before

2    resting since those items were in the State's

3    possession.  It slipped his mind.  Do you want to

4    move those exhibits at this time, Mr. --

5         MR. WINGATE:   We do, Your Honor,

6    Defendant's Exhibits A and B into evidence.

7         THE COURT:    Mr. Loisel.

8         MR. LOISEL:    Well, Judge, I was going

9    to bring this to the Court's attention.  They

10   weren't in the State's possession.  All exhibits

11   were in chambers when we were discussing those

12   exhibits.  The State will object.  Obviously

13   Defense Counsel has rested and this case has been

14   presented, however, as I said, the State was

15   going to bring this to the Court's attention and

16   Mr. Wingate's attention due to the fact of not

17   admitting these two items would probably lead to

18   argument for ineffective assistance of Counsel

19   later on down the line, so ultimately these

20   exhibits probably do need to be admitted but we

21   need to object as --

22        THE COURT:    I'm going to allow you to

23   reopen your case solely for the purpose of moving

1       those exhibits.  Are there objections to the

2       exhibits themselves?

3             MR. LOISEL:   Not with respect to

4       Exhibit A, which I think is the letter written by

5       Janet Wilson.  With respect to Exhibit B, I don't

6       think it was ever authenticated as to being in

7       the same condition or substantially the same

8       condition as it was when she was presented it by

9       Attorney Wingate back whenever it was presented

10      to her.

11            MR. WINGATE:   Your Honor, I'll indicate

12      from the witness stand I actually gave her the

13      exhibit.  She looked at it.  We went through the

14      various paragraphs of it.  The Prosecutor, as a

15      matter of fact in his redirect examination

16      covered the paragraphs that I had not spoke of,

17      and the witness from the witness stand attested

18      to each one of the statements saying -- or each

19      one of the paragraphs contained in the entirety

20      of the document saying that it was containing

21      true and false statements.

22            So, she did recognize it, and was aware

23      of it.  She even indicated that it was gone over

1       with her at the rehab center and that there were

2       corrections that she made to the document,

3       however, she still could not sign it at that

4       time.  So, recognizing accepting the --

5       recognized the document, accepting the

6       information containing therein as being --

7       contained therein as being accurate and true,

8       testified to by this witness.

9              THE COURT:     This was a document that

10      had your changes noted on it?

11             MR. WINGATE:   Changes that she had

12      instructed me to make, yes.

13             THE COURT:     Well, certainly a lot of

14      testimony about that particular exhibit.  I'm a

15      little troubled by the fact that these are notes

16      that you prepared rather than the witness,

17      although I -- in light of the testimony about

18      that document, it appears that she did adopt

19      those statements in the sense that you prepared

20      those at her -- you prepared those at -- as a

21      memorialization of her statements and she did

22      adopt that as an accurate representation as you

23      stated.  It is a hearsay document.  I'm going to

1      let A in.  I'm going to let you argue B but I'm

2      not going to admit B.  You can -- and you'll both

3      have copies available.  You'll be able to use

4      that for argument purposes.

5              MR. MCELROY:   Judge, with regard to B, I

6      think or it is the Defendant's position that none

7      of the statements in that document are offered to

8      prove the truth of any matters asserted, just

9      that they were said by Janet Wilson.  I think

10     both parties have admitted --

11             MR. LOISEL:    No.

12             THE COURT:    I'm going to allow you to

13     put whatever spin on it you want.  You can waive

14     it in front of the jury and you can read from it,

15     but it is not going to go in.  It is a document,

16     so -- okay.  Anything else?

17             MR. LOISEL:    No.  Are we going to

18     then -- when can we expect a final copy of the

19     jury instructions I guess?

20             THE COURT:    Well, I don't have a

21     bailiff in here.  As soon as she can type it up,

22     why we'll -- do you want to come in at 8:30

23     tomorrow morning and just take a look at them?

1          MR. LOISEL:   Well, I would assume if

2     there's a way that we can get them before the end

3     of the day and obviously --

4          THE COURT:    We can try.

5          MR. LOISEL:   And obviously no -- why

6     don't -- State's suggestion is if there are any

7     problems, obviously we can come to the Court

8     first thing in the morning, but --

9          THE COURT:    We'll trying to get them

10    to you before you leave today.

11         MR. WINGATE:   The only other thing from

12    the Defense is we would, again, renew our motion

13    that a complete copy of the Prosecutor's file be

14    made and turned over to the Court and sealed for

15    appellate purposes in the event there is a

16    conviction in this case.

17         Again, as the Court is aware, we had at

18    least one situation at the initial stages of the

19    trial wherein there were statements.

20    Specifically Detective Seymour would have

21    attested to that phone conversation that was

22    made -- purportedly made by Brenda Navarre

23    indicating frantic crying, that was never

1    produced for Defense Counsel, even though State

2    was aware of it and we had made a request that

3    this information be made pursuant to discovery

4    supplied to us.

5         More importantly, at the end of the

6    trial, Detective Beavers talked about a Crime

7    Stopper report which listed the name of

8    Robert Wilson as a potential suspect.  That was

9    not supplied to Defense Counsel until September

10   the 2nd, the day of trial, although that document

11   had been, in fact, in the possession of Detective

12   Beavers for a period of time.  I would

13   respectfully ask the Court, even though they may

14   be considered minor, I can't point to anything

15   that may be major because I don't have the

16   Prosecutor's file.  But for the purposes of

17   appeal and protecting the rights of Mr. Wilson, I

18   would respectfully ask the Court to revisit the

19   matter of having the State provide a complete

20   copy of its file for appellate purposes and

21   sealed for appellate purposes in this case.

22   Indicating, again, as we did with the motion when

23   we filed it, that it is not an extraordinary

1    request because it has been granted in at least

2    two other matters here in this Lucas County

3    Courthouse, one before the Honorable Charles

4    Wittenberg, and one before I believe it was

5    Judge Dartt -- no, I'm sorry.  I take that back.

6    It was three judge panel, State of Ohio versus

7    Harmon.  The Honorable Charles Doneghy as chief

8    judge on the three judge panel, Judge Bowman was

9    the other, and I can't remember the third Judge

10   at this time, and I do apologize, but that

11   request had been granted in this matter in at

12   least two different occasions and I would

13   respectfully ask the Court to do the same.

14          MR. LOISEL:     Judge, this matter has

15   been addressed by this Court with respect to

16   Attorney Wingate's renewed -- renewed motion to

17   have the Prosecutor's file sealed and made

18   available for appellate purposes.  This Court has

19   already ruled on that particular motion.

20   Mr. Wingate previously cited the two other cases

21   in his 25 years of practice he's had this happen

22   in two other cases and the Court still denied

23   that motion.  He points to two things that

1    happened in this particular trial.  One where a

2    statement of a witness was not made available to

3    him, and by the rules of the Criminal Rules of

4    Evidence, that statement does not have to be made

5    available to him, A, until that witness testifies

6    and, B, it is not material to the Defendant's

7    guilt or innocence.  That statement was merely

8    part of motive.  So, realistically, the State

9    argues that that statement never had to be

10   divulged to the Defendant.

11        Be that as it may, the other issue that

12   was brought forward this morning with respect to

13   a Crime Stopper tip, that was provided to

14   Mr. Wingate as soon as the State received that.

15   He couches his request -- strike that.

16        He asks that the Prosecutor's file be

17   sealed and we would just ask that that motion be

18   denied once again.

19        THE COURT:    I'm going to think on it.

20   All right.  We'll come back tomorrow.

21        MR. WINGATE:   You want us here at 8:30?

22        THE COURT:    I'll be here at 8:30 and

23   take a look at the final draft.

1                    MR. LOISEL:    Judge, I may not be

2          available until quarter after 9:00 tomorrow.

3                    THE COURT:    That's fine.

4                    MR. WINGATE:    That's fine.

5                    THE COURT:    Thank you very much.

6                    (WHEREUPON COURT ADJOURNED FOR THE DAY ON

7          SEPTEMBER 4, 2008.)

8                               -   -   -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

136

1

2                        **C E R T I F I C A T E**

3

4

5

6                       I, THE UNDERSIGNED, HEREBY CERTIFY

7       THAT THE ABOVE AND FOREGOING IS A TRUE AND

8       COMPLETE TRANSCRIPT OF THE PROCEEDINGS HAD IN THE

9       TRIAL OF THE ABOVE-ENTITLED CAUSE.

10

11

12

13

14

15                               _____

16                               Stacey L. McDevitt, RPR

17                                    Official Court

18              Reporter

19

20

21

22

23

1

## $

**$100** [2] - 57:19, 112:8
**$5,000** [4] - 55:6, 57:13, 112:1, 112:4

**'**

**'05** [2] - 113:1, 113:6
**'06** [2] - 113:2, 113:9
**'93** [2] - 43:13, 43:17, 58:11, 95:15

## 1

**1** [8] - 2:6, 2:22, 6:18, 79:7, 79:9, 115:9, 115:13, 124:17
**10** [3] - 2:11, 79:7, 79:9
**100** [1] - 2:3
**106** [1] - 2:4
**11** [4] - 2:3, 2:11, 116:1, 124:17
**11-6-06** [2] - 90:3, 90:11
**110** [1] - 47:4
**111** [1] - 2:4
**115** [22] - 2:6, 2:7, 2:7, 2:8, 2:8, 2:9, 2:9, 2:10, 2:10, 2:11, 2:11, 2:12, 2:13, 2:13, 2:14, 2:14, 2:15, 2:15, 2:16, 2:16, 2:17, 2:17
**116** [6] - 2:9, 2:10, 2:10
**117** [15] - 2:12, 2:14, 2:14, 2:15, 2:15, 2:16, 2:16, 2:17
**119** [2] - 2:18, 2:18
**12** [5] - 2:12, 116:17, 117:5, 117:11, 124:22
**13** [9] - 2:12, 16:10, 16:16, 16:18, 16:20, 117:6, 117:11, 124:18
**14** [9] - 2:13, 16:10, 16:16, 16:22, 26:20, 26:22, 117:6, 117:11
**15** [11] - 2:13, 16:11, 16:16, 17:3, 36:10, 38:1, 56:2, 56:4, 104:12, 117:6, 117:11
**16** [5] - 2:12, 2:14, 21:12, 22:17, 117:14
**17** [4] - 2:13, 2:14, 2:17, 23:7
**18** [5] - 2:15, 24:22, 26:15, 26:16, 26:18
**19** [2] - 2:15, 25:13
**1970's** [1] - 44:16
**1985** [2] - 13:13, 43:17
**1990** [1] - 104:22
**1990's** [6] - 94:13,

94:16, 95:13, 103:3, 103:13, 105:3
**1993** [16] - 8:7, 14:13, 14:17, 18:5, 19:18, 22:5, 22:15, 43:6, 43:12, 44:19, 45:7, 45:10, 45:19, 50:19, 73:11, 95:13
**1:15** [1] - 114:13
**1st** [2] - 43:5, 43:6

## 2

**2** [7] - 2:7, 3:18, 3:20, 88:13, 115:22, 116:1, 116:7
**20** [5] - 2:16, 27:8, 28:4, 40:19, 123:10
**2003** [4] - 61:5, 62:16, 62:17, 74:19
**2005** [3] - 52:12, 108:7, 111:1
**2006** [15] - 40:12, 41:21, 42:4, 44:7, 44:8, 45:23, 46:3, 46:9, 46:23, 47:6, 54:19, 56:14, 62:6, 90:5, 95:16
**2008** [4] - 1:9, 3:1, 54:12, 135:7
**21** [2] - 2:16, 30:1
**212** [1] - 110:12
**213-4477** [1] - 1:21
**22** [6] - 2:14, 2:17, 21:13, 30:23, 117:6, 117:15
**23** [6] - 2:14, 2:17, 17:9, 17:13, 115:9, 118:9
**24** [6] - 2:15, 2:18, 38:9, 53:14, 53:18, 118:12
**25** [13] - 2:15, 2:18, 25:18, 26:11, 39:23, 40:2, 53:14, 54:7, 54:8, 118:15, 123:11, 124:19, 133:21
**27** [1] - 2:16
**29** [5] - 119:4, 119:16, 120:1, 120:23, 121:16
**2:00** [2] - 123:11
**2nd** [4] - 73:11, 90:21, 91:14, 132:10

## 3

**3** [3] - 1:6, 2:7, 3:2
**30** [2] - 2:16, 2:17
**300** [1] - 44:15
**33** [3] - 2:8, 2:9, 2:10
**34** [1] - 2:3
**36** [1] - 38:9
**37** [2] - 2:3, 107:9
**37th** [1] - 107:8
**39** [1] - 2:3

**3rd** [2] - 14:17, 19:19

## 4

**4** [5] - 1:6, 1:9, 2:8, 3:1, 135:7
**419** [1] - 1:21
**43624** [1] - 1:21
**45** [1] - 42:13

## 5

**5** [3] - 2:8, 33:8, 35:16
**50** [2] - 57:18, 112:8
**53** [1] - 2:18
**54** [1] - 2:18
**56** [1] - 2:3

## 6

**6** [2] - 2:9, 116:7
**6'1** [12] - 58:18, 59:1, 59:3, 59:16, 60:2, 60:10, 60:11, 60:14, 60:23, 62:2, 62:14, 63:8
**6'2** [7] - 58:19, 59:1, 59:3, 60:14, 61:1, 62:15, 63:8
**61393** [1] - 22:23
**6th** [2] - 54:12, 90:5

## 7

**7** [3] - 2:9, 33:8, 116:3
**700** [1] - 1:21

## 8

**8** [3] - 2:10, 33:8, 116:3
**8,000** [1] - 18:16
**8:30** [3] - 130:22, 134:21, 134:22

## 9

**9** [2] - 2:10, 116:3
**92** [1] - 2:3
**9:00** [3] - 124:2, 125:23, 135:2
**9:18** [1] - 3:3
**9:25** [1] - 10:3

## A

**A.M** [1] - 3:3
**ability** [2] - 23:18, 99:4
**able** [6] - 45:3, 112:13, 121:19,

122:16, 123:18, 130:3
**ABOVE** [2] - 136:7, 136:9
**ABOVE-ENTITLED** [1] - 136:9
**abraded** [4] - 24:5, 24:8, 24:20, 26:2
**abrasion** [4] - 24:4, 25:2, 32:21, 32:22
**abrasions** [2] - 25:15, 26:21
**Absolutely** [1] - 99:2
**abuse** [1] - 37:6
**academy** [1] - 40:22
**Academy** [1] - 41:2
**acceptable** [1] - 122:19
**accepting** [2] - 129:4, 129:5
**accident** [1] - 33:22
**accidents** [1] - 31:21
**accordingly** [1] - 123:19
**accurate** [2] - 129:7, 129:22
**acquittal** [3] - 119:13, 120:23, 121:16
**active** [1] - 51:20
**actual** [4] - 21:20, 43:6, 93:13, 116:9
**acute** [1] - 31:21
**AD** [1] - 2:6
**Adams** [1] - 1:21
**addict** [1] - 36:22
**addition** [3] - 30:17, 35:2, 98:4
**address** [2] - 115:7, 125:18
**addressed** [2] - 9:15, 133:15
**adduced** [2] - 119:12, 121:10
**ADJOURNED** [1] - 135:6
**admission** [3] - 15:1, 38:10, 116:10
**admit** [2] - 116:20, 130:2
**admittance** [1] - 115:8
**admitted** [5] - 38:18, 118:3, 124:17, 127:20, 130:10
**admitting** [1] - 127:17
**adopt** [2] - 129:18, 129:22
**adult** [1] - 40:7
**adults** [1] - 28:22
**advise** [1] - 66:20
**afield** [1] - 84:20
**aforementioned** [1] - 1:9
**Afternoon** [1] - 106:15
**afternoon** [4] - 68:7,

123:15, 125:19, 125:22
**afternoon's** [1] - 114:22
**age** [1] - 28:20
**agency** [1] - 35:10
**ago** [1] - 107:17
**agree** [4] - 4:5, 77:21, 101:4, 104:7
**agreed** [2] - 125:17
**ahead** [2] - 12:9, 19:9
**aid** [1] - 23:17
**AI** [3] - 3:18, 3:19, 3:20
**Alfonzo** [8] - 2:12, 46:16, 46:18, 55:9, 55:13, 100:5, 100:21
**alleged** [1] - 63:6
**allocate** [1] - 113:15
**allow** [15] - 9:10, 9:12, 27:22, 55:20, 59:12, 64:18, 68:20, 86:21, 88:3, 90:18, 116:16, 119:22, 120:6, 127:22, 130:12
**allowed** [1] - 7:6
**allows** [1] - 28:1
**almost** [2] - 44:15, 106:16
**amount** [2] - 84:5, 122:20
**anal** [1] - 51:5, 51:22
**analysis** [12] - 36:1, 43:16, 52:20, 53:3, 53:20, 53:23, 71:4, 71:5, 71:10, 104:14, 104:15, 118:13
**Analysis** [1] - 2:18
**analyzed** [3] - 52:22, 53:1, 53:4
**AND** [9] - 10:6, 50:13, 67:4, 80:21, 89:18, 97:23, 124:12, 136:7
**Andre** [2] - 77:6, 77:11
**answer** [8] - 4:8, 6:2, 6:9, 35:14, 61:9, 62:13, 83:2, 112:15
**answered** [2] - 81:5, 82:23
**antemortem** [3] - 36:17, 38:4
**anticipate** [2] - 8:23, 9:17
**anyway** [1] - 5:23
**apologize** [6] - 17:7, 17:19, 46:5, 46:9, 97:16, 133:10
**appeal** [1] - 132:17
**appear** [5] - 8:5, 22:3, 112:2, 112:4, 112:9
**appearance** [2] - 21:21, 22:20
**APPEARANCES** [1]

- 1:13
**appeared** [1] - 23:4
**appearing** [1] - 113:21
**appellate** [4] - 131:15, 132:20, 132:21, 133:18
**applicability** [1] - 99:5
**approach** [13] - 16:6, 17:5, 21:9, 33:3, 49:4, 53:11, 69:16, 79:16, 82:9, 88:15, 90:17, 96:23, 97:3
**appropriate** [1] - 60:8
**arch** [1] - 25:18
**area** [7] - 24:21, 28:12, 29:12, 30:8, 32:12, 51:13, 52:14
**areas** [1] - 107:10
**argue** [1] - 130:1
**argues** [1] - 134:9
**argument** [4] - 122:6, 123:6, 127:18, 130:4
**argumentative** [1] - 102:8
**arguments** [7] - 122:17, 123:3, 123:15, 123:19, 125:18, 126:1, 126:22
**arms** [1] - 26:19
**arrest** [1] - 55:2
**arrested** [10] - 65:8, 65:12, 68:6, 68:7, 96:13, 96:15, 96:17, 96:19, 97:13, 97:20
**arrived** [1] - 24:1
**Aside** [1] - 99:23
**aside** [3] - 59:20, 99:19, 111:1
**aspect** [2] - 26:7, 121:7
**assailant** [3] - 62:19, 68:16, 69:9
**assault** [10] - 40:9, 47:17, 48:2, 48:7, 62:23, 71:20, 72:11, 72:21, 73:4, 73:16
**asserted** [5] - 60:5, 64:14, 66:16, 86:20, 130:8
**assigned** [6] - 40:4, 40:6, 41:6, 41:7, 41:8, 84:1
**assignment** [1] - 56:18
**assistance** [1] - 127:18
**Assistant** [1] - 1:14
**assume** [1] - 131:1
**assumes** [1] - 63:5
**assuming** [1] - 7:22
**AT** [1] - 49:7, 50:12, 65:21, 67:3, 79:19, 80:20, 88:17, 89:17,

- 1:13
97:6, 97:22, 114:8
**attained** [1] - 122:3
**attention** [3] - 127:9, 127:15, 127:16
**attest** [1] - 49:17
**attested** [2] - 128:17, 131:21
**Attorney** [6] - 8:17, 88:1, 88:2, 96:20, 128:9, 133:16
**attorneys** [4] - 3:13, 125:14, 125:17, 125:21
**audit** [2] - 51:16, 51:19
**August** [2] - 42:4, 44:9
**authenticate** [4] - 8:3, 8:8, 8:11
**authenticated** [2] - 9:12, 128:6
**authenticity** [1] - 53:16
**author** [1] - 95:14
**authored** [1] - 80:5
**authorized** [1] - 57:13
**authorizes** [1] - 57:15
**automobile** [2] - 31:21, 33:22
**autopsies** [1] - 11:22, 14:9, 18:7, 18:14, 18:17, 18:18
**autopsy** [36] - 7:4, 14:16, 14:22, 15:3, 15:4, 15:6, 15:13, 16:22, 17:22, 18:4, 19:18, 20:3, 20:4, 20:5, 20:15, 21:11, 21:5, 21:20, 21:22, 22:15, 22:22, 26:8, 27:5, 27:6, 27:23, 35:13, 35:21, 36:7, 36:21, 37:11, 37:13, 73:7, 73:8, 73:13, 73:18, 117:15
**Autopsy16** [1] - 2:13
**available** [13] - 20:23, 46:23, 48:13, 48:15, 99:1, 99:15, 99:16, 123:8, 130:3, 133:18, 134:2, 134:5, 135:2
**average** [1] - 18:5
**avoid** [1] - 126:7
**aware** [11] - 51:5, 54:14, 77:7, 78:23, 80:15, 87:9, 87:17, 96:20, 128:22, 131:17, 132:2
**Aware** [1] - 77:8

**B**

**B-A-R-T** [1] - 39:14
**B-E-A-V-E-R-S** [1] -

39:14
**Babies** [1] - 28:21
**bachelor's** [1] - 40:19
**background** [4] - 12:11, 12:12, 40:16, 107:5
**bad** [1] - 102:11
**Bailiff** [4] - 3:10, 4:10, 4:21, 5:16
**bailiff** [1] - 130:21
**ball** [1] - 104:8
**bar** [6] - 108:10, 108:11, 110:3, 111:17, 111:18
**BARBER** [1] - 1:5
**Barber** [1] - 1:10
**BARNETT** [1] - 11:1
**Barnett** [11] - 2:3, 7:1, 10:21, 10:22, 19:7, 22:15, 34:18, 72:15, 73:17, 117:8, 117:9
**Bart** [6] - 39:5, 39:13, 84:7, 84:15, 110:18, 110:19
**base** [5] - 30:12, 30:13, 30:20, 31:19, 31:23
**Based** [2] - 81:9, 86:15
**based** [8] - 78:16, 78:17, 78:23, 79:3, 81:9, 93:20, 119:11, 121:9
**basement** [2] - 14:2, 51:13
**basilar** [2] - 30:20, 30:21
**basis** [1] - 120:6
**BCI** [2] - 54:8, 118:16
**BCI&I** [3] - 2:18, 52:21, 53:22
**BE** [1] - 1:8
**Beavers** [13] - 2:3, 39:5, 39:6, 39:14, 56:11, 84:7, 84:15, 85:22, 87:10, 110:18, 110:19, 132:6, 132:12
**BEAVERS** [1] - 39:8
**Beavers'** [1] - 116:23
**became** [3] - 44:6, 44:11, 56:13
**become** [2] - 24:13, 51:4
**began** [1] - 41:18
**begin** [1] - 6:13
**beginning** [1] - 37:14
**begins** [1] - 20:15
**begun** [1] - 4:3
**behalf** [3] - 1:14, 1:17, 125:4
**below** [1] - 80:12
**BENCH** [11] - 49:7, 50:13, 65:21, 67:4,

79:19, 80:21, 88:17, 89:18, 97:6, 97:23, 114:8
**bench** [2] - 5:13, 5:19
**Bench** [1] - 89:5
**benefit** [1] - 7:7
**benzoylecgonine** [3] - 38:7, 38:14, 38:20
**Benzoylecgonine** [1] - 38:7
**best** [3] - 78:14, 103:2, 103:3
**better** [1] - 5:16
**beyond** [6] - 103:22, 121:8, 121:12, 121:18, 121:21, 122:3
**bid** [1] - 10:9
**big** [2] - 6:1, 33:12
**bile** [1] - 20:22
**bills** [1] - 57:19, 112:9
**biological** [1] - 51:14
**bit** [7] - 12:9, 13:22, 24:9, 25:2, 67:16, 98:5
**black** [1] - 24:10
**Blade** [1] - 126:8
**blood** [9] - 20:22, 24:13, 25:10, 29:22, 35:18, 38:5, 51:23, 52:15
**bloody** [8] - 70:17, 71:3, 98:6, 98:10, 98:11, 104:1, 104:5, 104:15
**blunt** [1] - 34:13
**board** [8] - 12:22, 13:1, 13:5, 13:7, 13:14, 13:17, 13:20, 57:15
**boards** [2] - 12:19, 13:18
**body** [13] - 15:10, 15:15, 16:22, 20:7, 20:8, 20:21, 26:4, 26:16, 35:6, 72:6, 72:9, 72:16, 93:7
**bone** [3] - 25:17, 30:3, 32:13
**bony** [1] - 30:19
**boss** [1] - 57:7
**bottom** [1] - 30:6
**boulder** [3] - 33:12, 73:23, 74:4
**Bowling** [1] - 52:21
**Bowman** [1] - 133:8
**brain** [4] - 28:2, 30:5, 30:7, 73:2
**break** [4] - 18:10, 56:2, 56:3, 123:3
**breathing** [1] - 23:2
**Brenda** [32] - 14:17, 19:18, 32:16, 34:11, 34:12, 38:3, 41:16,

43:23, 44:1, 44:13, 46:3, 46:8, 58:7, 72:17, 75:4, 76:1, 76:4, 92:3, 94:18, 98:13, 100:7, 108:3, 108:17, 109:3, 109:7, 109:15, 109:20, 110:10, 110:22, 119:10, 121:15, 131:22
**Brewski's** [2] - 110:4, 111:18
**briefly** [1] - 107:10
**bring** [3] - 6:3, 127:9, 127:15
**brought** [2] - 24:2, 134:12
**brown** [1] - 24:4
**bruise** [1] - 25:2
**bruised** [2] - 24:8, 24:14
**bruises** [1] - 26:18
**bruising** [2] - 31:3, 32:22
**burden** [4] - 119:11, 121:5, 121:8, 121:11
**Bureau** [2] - 41:23, 43:17, 107:13
**burglaries** [1] - 107:3
**Burrell** [2] - 77:4, 77:5
**business** [1] - 16:4
**BY** [10] - 11:9, 34:17, 37:22, 39:17, 56:10, 67:6, 92:11, 100:15, 106:14, 111:15

**C**

**calvarium** [1] - 28:9
**cannot** [1] - 71:11
**capacity** [2] - 14:12, 57:10
**career** [2] - 107:13, 107:16
**careful** [1] - 66:22
**Carolina** [3] - 53:2, 53:3, 54:3
**carries** [1] - 47:21
**Case** [7] - 2:12, 39:23, 41:7, 42:22, 44:14, 56:19, 57:3
**case** [74] - 3:8, 6:12, 6:14, 8:21, 10:1, 10:15, 16:20, 17:14, 21:6, 35:12, 36:21, 40:13, 41:15, 41:19, 42:2, 42:19, 42:21, 42:23, 43:3, 44:11, 44:17, 44:22, 45:1, 45:4, 45:21, 45:23, 46:12, 46:14, 46:15, 47:16, 47:23, 48:20, 48:21, 49:1, 49:21, 50:2, 50:3, 51:20, 54:15, 56:6, 56:7,

56:13, 56:16, 58:1, 69:1, 71:16, 85:1, 85:23, 87:11, 92:14, 93:7, 94:23, 95:16, 102:16, 104:8, 114:14, 114:15, 114:16, 119:19, 120:6, 121:3, 121:5, 121:6, 121:18, 122:15, 123:7, 125:10, 125:12, 126:4, 126:10, 127:13, 127:23, 131:16, 132:21

**CASE** [1] - 1:3

**cases** [13] - 40:9, 40:10, 44:15, 51:15, 51:20, 92:15, 92:17, 92:18, 92:20, 92:21, 133:20, 133:22

**Cashen** [1] - 71:22

**CAUSE** [1] - 136:9

**causes** [1] - 28:23

**causing** [1] - 119:9

**caution** [1] - 22:12

**cavity** [1] - 27:16

**center** [1] - 129:1

**Central** [1] - 108:10

**certain** [1] - 29:1

**Certainly** [1] - 120:2

**certainly** [2] - 9:7, 129:13

**certainty** [1] - 34:10

**certificate** [2] - 53:20, 118:12

**certificates** [1] - 11:23

**certification** [1] - 13:15

**certified** [4] - 12:23, 13:2, 13:8, 13:20

**CERTIFY** [1] - 136:6

**cetera** [1] - 28:21

**Chad** [9] - 35:22, 37:10, 72:5, 72:17, 72:20, 73:15, 73:16, 73:18, 98:20

**chair** [1] - 9:8

**challenge** [1] - 92:14

**chambers** [4] - 3:7, 114:22, 126:20, 127:11

**chance** [2] - 14:19, 45:17

**change** [2] - 18:15, 67:15

**changed** [2] - 31:6, 52:4

**Changes** [1] - 129:11

**changes** [2] - 29:6, 129:10

**characteristics** [1] - 62:1

**characterized** [1] - 120:3

**charge** [3] - 57:6,

71:20, 113:12

**charged** [1] - 65:8

**Charles** [2] - 133:3, 133:7

**chart** [2] - 14:21, 14:23

**checked** [1] - 52:10

**cheek** [1] - 25:16

**cheekbone** [2] - 25:17, 25:19

**chest** [3] - 22:22, 27:10, 27:16

**chief** [2] - 10:1, 133:7

**circumstances** [1] - 14:11

**circumstantial** [1] - 120:4

**cited** [1] - 133:20

**City** [1] - 39:21

**clamshell** [3] - 30:14, 30:15, 31:19

**clear** [2] - 6:16, 118:2

**close** [7] - 23:9, 23:21, 30:16, 58:13, 95:1, 121:5, 121:6

**close-up** [2] - 23:9, 23:21

**closing** [5] - 122:17, 122:22, 123:3, 123:6, 125:18

**clothed** [1] - 20:12

**clothes** [1] - 73:23

**clothing** [2] - 74:4, 99:8

**clotted** [1] - 25:10

**co** [1] - 120:21

**co-counsel** [1] - 120:21

**cocaine** [4] - 36:22, 38:8, 38:9, 38:18

**Cold** [6] - 39:23, 41:7, 42:22, 44:14, 56:19, 57:3

**cold** [7] - 40:13, 42:23, 56:16, 92:14, 92:17, 92:18, 92:20

**collect** [3] - 35:4, 35:8, 36:5

**Collect** [1] - 35:6

**collected** [3] - 35:13, 36:5, 38:6

**Collection** [1] - 29:22

**Collectively** [1] - 103:18

**college** [1] - 12:13

**College** [1] - 40:20

**coming** [2] - 32:12, 125:11

**commence** [3] - 3:7, 114:22, 126:3

**committed** [2] - 55:3, 93:5

**committees** [1] - 12:20

**common** [2] - 101:4, 102:3

**COMMON** [1] - 1:1

**Common** [3] - 1:11, 1:20, 42:23

**communication** [1] - 109:4

**Communications** [1] - 107:13

**communications** [1] - 107:19

**competency** [1] - 13:5

**complaining** [3] - 65:13, 66:13, 68:1

**COMPLETE** [1] - 136:8

**complete** [2] - 131:13, 132:19

**completed** [3] - 13:3, 17:22, 78:10

**Comprised** [1] - 57:3

**computer** [2] - 18:1, 40:11

**concerned** [2] - 73:21, 104:11

**conclude** [2] - 119:8, 121:12

**CONCLUDED** [7] - 10:6, 50:13, 67:4, 80:21, 89:18, 97:23, 124:12

**concluded** [1] - 123:5

**conclusion** [1] - 94:15

**condition** [5] - 8:5, 8:6, 22:4, 128:7, 128:8

**conduct** [6] - 15:3, 44:20, 46:20, 66:11, 103:11, 103:12

**conducted** [2] - 51:16, 53:3

**conducting** [1] - 35:2

**confer** [1] - 120:13

**consider** [2] - 81:20, 119:23

**consideration** [2] - 89:3, 89:9

**considered** [1] - 132:14

**considering** [1] - 14:9

**consistent** [17] - 34:5, 34:7, 49:2, 49:14, 49:17, 50:5, 50:19, 51:1, 55:16, 75:4, 75:14, 76:2, 76:21, 92:2, 95:1, 100:9, 111:6

**consisting** [1] - 35:13

**contact** [18] - 42:18, 42:20, 65:14, 66:13, 67:12, 67:18, 67:21,

68:6, 96:7, 96:12, 96:21, 97:14, 108:1, 108:6, 108:12, 108:23, 111:6, 111:7

**contacted** [2] - 52:19, 65:13

**contacting** [1] - 66:5

**contained** [4] - 47:20, 53:18, 128:19, 129:7

**containing** [2] - 128:20, 129:6

**contents** [1] - 20:23

**continued** [3] - 46:19, 58:14, 68:14

**contribute** [1] - 38:21

**conversation** [10] - 42:13, 50:4, 55:17, 109:12, 110:12, 110:15, 110:21, 111:1, 113:1, 131:21

**conversations** [17] - 48:23, 50:8, 50:11, 50:17, 51:2, 55:8, 63:21, 99:18, 109:18, 109:19, 109:21, 110:1, 110:5, 110:8, 111:5, 113:18, 113:21

**conviction** [1] - 131:16

**convince** [1] - 85:16

**cooperate** [3] - 64:7, 64:22

**copies** [1] - 130:3

**copy** [7] - 3:11, 17:3, 17:13, 53:22, 130:18, 131:13, 132:20

**corner** [1] - 108:10

**Coroner** [4] - 6:23, 13:11, 13:12, 22:9

**coroner** [7] - 11:17, 13:10, 17:15, 17:23, 19:1, 22:8, 51:6

**Coroner's** [9] - 2:12, 2:13, 11:15, 12:6, 14:15, 16:2, 17:14, 21:21, 118:9

**Correct** [12] - 6:7, 19:20, 19:23, 27:2, 27:7, 31:15, 35:20, 36:4, 85:4, 95:5, 95:20, 117:3

**correct** [103] - 14:13, 19:19, 20:1, 27:1, 27:6, 31:14, 35:5, 35:19, 36:13, 36:23, 37:11, 41:16, 42:10, 43:1, 43:2, 50:22, 54:5, 55:9, 55:14, 56:15, 56:17, 57:23, 58:7, 58:8, 62:15, 63:12, 63:14, 63:17, 63:18, 63:21, 64:1, 64:7, 64:23, 65:3, 65:9, 65:10, 65:15, 67:12, 67:21, 68:1, 68:10, 71:13, 72:6,

72:12, 73:10, 73:19, 73:20, 74:2, 74:10, 74:11, 74:20, 75:6, 75:11, 75:14, 75:17, 75:18, 75:21, 76:5, 76:15, 78:1, 79:7, 79:12, 83:11, 85:3, 85:10, 87:12, 87:14, 87:21, 90:3, 90:13, 92:4, 95:19, 95:20, 95:22, 96:13, 98:7, 98:21, 99:13, 99:14, 99:16, 100:4, 100:7, 100:8, 102:14, 102:15, 102:18, 102:22, 103:5, 104:19, 104:20, 105:6, 111:18, 111:19, 111:23, 112:2, 113:2, 113:6, 113:7, 113:10, 115:1, 115:18, 118:5, 118:19

**corrections** [1] - 129:2

**correctly** [1] - 121:1

**corroborate** [3] - 74:8, 85:2, 99:20

**corroborated** [3] - 100:5, 100:17, 102:3

**corroborates** [1] - 101:5

**couches** [1] - 134:15

**counsel** [1] - 120:21

**Counsel** [14] - 3:12, 4:15, 7:5, 65:19, 67:18, 88:5, 96:7, 114:7, 126:1, 126:22, 127:13, 127:18, 132:1, 132:9

**Counsel's** [1] - 122:18

**counted** [1] - 18:16

**COUNTY** [1] - 1:1

**County** [8] - 1:11, 1:14, 1:20, 10:15, 14:14, 19:2, 41:12, 133:2

**couple** [3] - 18:3, 96:3, 111:16

**course** [3] - 36:1, 43:15, 109:13

**COURT** [143] - 1:1, 3:6, 3:20, 4:9, 4:19, 5:1, 5:5, 5:12, 5:18, 6:4, 6:17, 6:20, 7:9, 7:12, 9:6, 9:17, 10:3, 10:8, 10:22, 11:4, 16:8, 17:6, 18:23, 19:4, 19:13, 19:15, 21:10, 22:11, 33:5, 37:19, 39:2, 39:6, 39:11, 39:15, 48:11, 49:5, 50:9, 50:15, 53:12, 55:20, 56:1, 59:12, 60:6, 63:4, 64:18, 65:18, 65:22, 66:10, 66:19, 67:2, 68:19, 69:19, 70:12,

3

4

77:15, 78:20, 79:17, 80:17, 80:23, 81:8, 82:6, 82:11, 82:15, 83:1, 84:19, 86:21, 87:6, 88:3, 88:20, 89:11, 89:16, 90:18, 92:7, 96:16, 97:4, 97:12, 97:19, 98:3, 100:19, 101:11, 102:8, 103:23, 105:2, 105:12, 105:15, 105:17, 105:20, 106:2, 106:7, 106:12, 108:21, 109:10, 112:7, 112:14, 114:4, 114:6, 114:10, 114:21, 115:10, 115:20, 115:22, 116:12, 117:1, 117:5, 117:9, 117:12, 117:14, 117:22, 118:5, 118:8, 118:12, 118:15, 118:18, 118:21, 119:1, 119:14, 120:2, 120:11, 120:15, 120:18, 122:1, 122:10, 123:10, 123:23, 124:8, 124:14, 124:20, 124:23, 125:7, 126:14, 126:19, 127:7, 127:22, 129:9, 129:13, 130:12, 130:20, 131:4, 131:9, 134:19, 134:22, 135:3, 135:5, 135:6

**court** [7] - 12:3, 18:19, 50:22, 64:13, 66:16, 96:5, 115:4

**Court** [32] - 1:11, 1:20, 4:1, 4:4, 5:10, 7:20, 8:18, 11:2, 39:9, 52:19, 56:7, 65:13, 66:5, 66:7, 66:13, 106:5, 115:7, 119:12, 121:15, 123:5, 125:13, 126:2, 131:7, 131:14, 131:17, 132:13, 132:18, 133:13, 133:15, 133:18, 133:22, 136:17

**Court's** [5] - 6:18, 8:23, 125:1, 127:9, 127:15

**COURT'S** [1] - 2:21

**courthouse** [1] - 68:8

**Courthouse** [2] - 1:20, 133:3

**COURTROOM** [1] - 3:2

**covered** [1] - 128:16

**CR** [1] - 2:2

**CR06-3339** [1] - 1:3

**crack** [1] - 36:22

**Craig** [1] - 71:18

**credibility** [1] - 49:12

**crime** [9] - 43:16, 51:10, 51:12, 52:10, 55:3, 78:14, 93:5, 93:6, 100:10

**Crime** [48] - 45:10, 54:14, 54:21, 57:6, 57:8, 57:15, 58:5, 58:9, 59:14, 59:20, 62:9, 74:13, 74:16, 75:5, 75:16, 75:20, 76:2, 76:9, 76:11, 77:17, 77:22, 79:1, 79:5, 80:13, 81:15, 81:17, 81:22, 82:2, 82:19, 83:7, 83:16, 86:1, 86:8, 86:15, 87:10, 90:13, 91:5, 91:18, 92:1, 92:13, 94:9, 102:11, 102:17, 105:7, 113:12, 132:6, 134:13

**crimes** [3] - 40:8, 40:11

**criminal** [1] - 3:9

**Criminal** [1] - 134:3

**crisp** [2] - 57:18, 112:8

**cross** [3] - 50:7, 56:4, 68:19

**CROSS** [3] - 34:16, 56:9, 111:14

**Cross** [1] - 56:1

**CROSS-EXAMINATION** [3] - 34:16, 56:9, 111:14

**cross-examination** [2] - 56:4, 68:19

**crying** [1] - 131:23

**Culpert** [12] - 35:22, 37:10, 71:23, 72:4, 72:5, 72:17, 72:20, 73:15, 73:16, 73:18, 98:20

**cut** [4] - 27:9, 28:8, 31:5

**D**

**damage** [1] - 26:9

**dangerous** [1] - 29:8

**dark** [2] - 24:4, 33:1

**Dartt** [1] - 135:5

**date** [4] - 58:13, 73:13, 90:10, 90:12

**dated** [1] - 90:2

**dates** [2] - 75:20, 90:8

**Davis** [5] - 2:12, 46:16, 55:9, 100:5, 117:2

**Davis's** [2] - 55:13, 116:18

**DAY** [1] - 135:6

**days** [2] - 40:1, 109:1

**dead** [1] - 100:7

**deal** [2] - 6:1, 122:5

**dealers** [2] - 86:3, 86:7

**deals** [1] - 14:6

**death** [12] - 11:23, 14:9, 14:11, 23:2, 32:16, 34:11, 38:5, 38:10, 38:21, 119:10, 121:14

**December** [7] - 14:17, 19:19, 43:5, 43:6, 43:12, 43:13, 73:11

**decide** [1] - 121:20

**DEFENDANT** [1] - 1:6

**Defendant** [8] - 1:17, 53:7, 95:6, 99:12, 117:20, 125:7, 126:23, 134:10

**DEFENDANT'S** [2] - 2:5, 2:19

**Defendant's** [4] - 119:20, 127:6, 130:6, 134:6

**Defense** [15] - 4:4, 4:15, 7:5, 67:18, 88:1, 88:2, 88:5, 96:7, 121:6, 122:18, 124:6, 127:13, 131:12, 132:1, 132:9

**DEFENSE** [1] - 2:23

**definitely** [1] - 46:18

**degree** [2] - 34:9, 40:19

**deliberation** [1] - 121:20

**deliberations** [2] - 4:3, 126:3

**denied** [4] - 120:1, 121:23, 133:22, 134:18

**department** [4] - 35:9, 40:17, 45:15, 107:11

**Department** [5] - 41:5, 51:11, 106:19, 107:7, 110:13

**depict** [5] - 7:23, 21:19, 21:21, 22:19, 33:11

**depicts** [2] - 7:8, 28:5

**depressed** [10] - 28:10, 28:12, 28:15, 29:2, 29:11, 30:7, 31:13, 32:5, 32:7, 33:16

**Deputy** [4] - 6:23, 13:11, 13:12, 22:9

**deputy** [1] - 11:17

**describe** [2] - 23:18, 27:9, 51:8

**described** [1] - 34:4

**describes** [1] - 16:23

**description** [3] -

**dead** [1] - 100:7

**descriptions** [2] - 59:15, 103:15

**desires** [2] - 7:20, 50:8

**destroyed** [6] - 47:5, 47:11, 47:13, 48:6, 99:11

**destruction** [2] - 73:19, 98:20

**detail** [2] - 21:18, 108:6

**Detective** [35] - 2:3, 35:22, 37:10, 39:5, 39:6, 39:18, 39:20, 40:14, 41:23, 43:17, 43:21, 51:4, 53:13, 55:22, 56:11, 56:21, 57:5, 57:19, 72:5, 84:7, 84:15, 85:22, 87:10, 92:12, 100:11, 106:1, 106:2, 110:19, 111:4, 111:9, 115:14, 116:23, 131:20, 132:6, 132:11

**DETECTIVE** [1] - 39:8

**detective** [9] - 39:22, 41:10, 41:13, 56:23, 83:18, 84:2, 84:3, 92:14, 106:21

**detectives** [5] - 47:4, 71:21, 85:17, 106:23, 107:1

**determination** [1] - 122:2

**determine** [4] - 11:22, 14:8, 27:11, 89:2

**determined** [3] - 9:22, 83:15, 84:1

**determines** [1] - 84:4

**Detroit** [1] - 110:4

**develop** [3] - 94:17, 98:12, 98:15

**developed** [3] - 94:13, 103:14, 105:4

**diagnose** [1] - 14:4

**diagram** [3] - 15:11, 20:8, 26:4

**diagrams** [2] - 15:12, 15:13

**DIANE** [1] - 11:1, 11:6

**Diane** [3] - 7:1, 10:21, 11:6

**dictate** [1] - 15:13

**died** [1] - 34:13

**differ** [1] - 119:22

**different** [12] - 24:14, 32:14, 33:19, 41:22, 58:22, 84:11, 86:14, 93:8, 96:1, 107:10, 116:11, 133:12

**differently** [1] -

**58:18, 59:1, 60:1**

**diploma** [1] - 40:18

**direct** [1] - 22:8

**DIRECT** [3] - 11:8, 39:16, 106:13

**directed** [1] - 119:13

**direction** [1] - 30:11

**directly** [2] - 66:14, 82:5

**discoloration** [1] - 24:5

**discovery** [6] - 52:17, 87:17, 89:1, 89:4, 89:7, 132:3

**discuss** [2] - 5:22, 114:13, 126:4

**discussed** [1] - 9:21

**discussing** [2] - 23:11, 127:11

**DISCUSSION** [16] - 3:4, 10:5, 49:6, 50:12, 65:20, 67:3, 79:18, 80:20, 88:16, 89:17, 97:5, 97:22, 114:8, 114:19, 124:11, 126:17

**discussions** [1] - 120:20

**disease** [1] - 14:4

**diseases** [1] - 15:18

**dispense** [1] - 113:16

**disposition** [3] - 52:9, 94:9, 103:10

**dispute** [1] - 84:6

**divided** [1] - 20:4

**divulged** [1] - 134:10

**DNA** [6] - 53:3, 53:9, 54:11, 99:5, 99:6, 99:7

**doctor** [1] - 14:2

**Doctor** [9] - 11:10, 11:18, 16:9, 17:7, 18:3, 19:17, 21:11, 22:16, 23:6, 27:3, 28:14, 29:23, 30:22, 31:10, 33:6, 34:8, 34:14, 39:2, 117:7

**doctors** [1] - 14:8

**document** [15] - 12:1, 17:16, 17:20, 20:9, 20:14, 128:20, 129:2, 129:5, 129:9, 129:18, 129:23, 130:7, 130:15, 132:10

**documented** [2] - 20:8, 20:20

**dollar** [1] - 57:19, 112:9

**dollars** [4] - 55:6, 57:14, 112:1, 112:4

**done** [14] - 5:5, 9:18, 9:22, 13:21, 26:9, 27:5, 44:18, 68:22, 70:5, 76:18, 76:22, 77:10, 78:3, 78:9

**Doneghy** [1] - 133:7

5

door [3] - 31:23, 33:23, 97:1
doors [1] - 66:21
double [2] - 79:22, 80:4
doubly [1] - 12:22
doubt [5] - 121:9, 121:13, 121:19, 121:21, 122:3
down [14] - 18:10, 24:13, 25:9, 45:12, 47:1, 47:7, 47:8, 48:3, 51:13, 52:1, 52:8, 52:20, 84:4, 127:19
downward [1] - 27:20
dozen [1] - 109:21
Dr [11] - 2:3, 7:1, 10:21, 10:22, 19:3, 19:4, 19:7, 22:15, 34:18, 72:15, 73:17
draft [1] - 122:10, 134:23
drawn [1] - 26:3
driver's [1] - 31:22
dropped [4] - 74:15, 75:17, 76:6, 104:8
drug [5] - 37:6, 38:13, 44:4, 86:2, 86:7
Drug [1] - 107:14
drugs [1] - 20:21
Due [1] - 125:19
due [1] - 127:16
duly [3] - 11:2, 39:9, 106:5
Dunham [1] - 71:23
duplicative [2] - 8:19, 116:15
duplicity [1] - 116:6
during [7] - 15:11, 20:20, 37:13, 41:4, 44:4, 51:2, 108:13
duties [4] - 11:19, 57:8, 106:22, 107:23

**E**

ear [8] - 24:19, 24:20, 25:10, 26:2, 26:5, 27:19
early [3] - 123:16, 123:20, 126:9
edges [1] - 31:6
education [2] - 12:10, 12:18
educational [2] - 12:12, 40:15
effect [1] - 117:19
eight [4] - 40:5, 48:20, 63:21, 107:17
Either [1] - 64:2
either [1] - 99:12
elective [1] - 12:6
eligible [1] - 13:4
emergency [1] -

29:5
emotional [1] - 108:14
employed [1] - 39:21
encasement [1] - 30:19
end [2] - 37:14, 131:2, 132:5
endogastric [1] - 23:3
enforcement [2] - 44:3, 99:6
entailed [1] - 11:20
entire [4] - 6:14, 37:13, 89:20, 121:6
entirety [1] - 128:19
ENTITLED [1] - 136:9
entity [1] - 51:12
entry [1] - 51:22
Esquire [3] - 1:15, 1:17, 1:18
essentially [3] - 6:8, 13:19, 79:21
established [2] - 80:17, 82:15
et [1] - 28:21
event [2] - 93:13, 131:15
events [1] - 113:23
evidence [61] - 32:18, 35:4, 35:6, 35:8, 35:13, 36:5, 37:9, 44:18, 46:19, 46:21, 46:22, 47:2, 47:3, 47:9, 47:10, 47:20, 47:23, 48:4, 48:6, 48:12, 51:14, 51:18, 52:9, 52:12, 52:9, 54:10, 63:5, 71:12, 71:21, 72:16, 73:6, 73:17, 73:19, 73:22, 74:3, 74:8, 85:2, 88:13, 89:10, 93:6, 93:7, 98:20, 99:1, 99:10, 99:11, 112:6, 112:17, 119:7, 119:11, 119:21, 119:23, 120:3, 120:22, 121:4, 121:7, 121:10, 124:18, 125:5, 125:9, 127:6
Evidence [1] - 134:4
evidentiary [1] - 48:5
exam [4] - 13:7, 20:6, 35:3, 38:12
EXAMINATION [9] - 11:8, 34:16, 37:21, 39:16, 56:9, 92:10, 100:14, 106:13, 111:14
examination [8] - 13:5, 15:16, 26:13, 35:3, 56:4, 68:19, 128:15
examine [1] - 21:3

examined [1] - 20:17
example [1] - 99:7
exception [2] - 9:9, 120:8
Exception [1] - 117:23
excused [1] - 114:7
exhibit [6] - 4:1, 26:6, 27:4, 29:14, 128:13, 129:14
Exhibit [33] - 6:18, 16:10, 16:18, 16:20, 16:22, 17:3, 17:9, 17:13, 21:12, 22:17, 23:7, 24:22, 25:13, 27:8, 28:4, 30:1, 30:23, 33:7, 36:10, 38:1, 53:14, 53:18, 54:6, 54:8, 82:2, 115:13, 115:22, 116:17, 117:5, 118:9, 124:22, 128:4, 128:5
exhibits [14] - 22:9, 36:8, 115:11, 116:2, 116:9, 118:19, 125:1, 127:1, 127:4, 127:10, 127:12, 127:20, 128:1, 128:2
Exhibits [6] - 16:16, 33:8, 115:9, 124:17, 124:18, 127:6
EXHIBITS [3] - 2:6, 2:19, 2:21
existed [1] - 51:18
expect [2] - 126:10, 130:18
expected [1] - 9:23
experience [1] - 40:1
expert [1] - 19:12
expertise [1] - 13:6
Explain [2] - 46:3, 106:21
explain [13] - 7:7, 8:1, 11:18, 13:19, 13:21, 16:18, 19:17, 23:7, 28:15, 30:1, 31:16, 41:18, 108:5
explained [4] - 8:16, 15:4, 26:8, 27:4
exposed [1] - 27:20
express [2] - 56:6, 114:15
extend [1] - 25:15
extended [2] - 24:18, 24:19
extends [1] - 24:6
extensive [2] - 25:6, 25:7
external [10] - 15:16, 17:1, 20:6, 21:23, 26:13, 26:16, 27:5, 35:4
externally [2] - 15:17, 20:11
extraordinary [1] - 132:23
eyelid [1] - 24:6

eyelids [1] - 24:13
eyes [4] - 24:8, 24:10, 24:11, 30:18
eyewitness [2] - 63:7, 68:15

**F**

face [5] - 23:10, 23:22, 25:20, 25:22, 26:1
facie [3] - 119:19, 120:5, 121:3
fact [12] - 19:1, 45:21, 52:2, 65:5, 69:13, 96:11, 103:19, 125:19, 127:16, 128:15, 129:15, 132:11
Facts [1] - 89:12
facts [9] - 44:22, 50:3, 50:6, 63:5, 76:20, 89:12, 92:2, 94:23, 100:9
failed [1] - 119:11
fair [3] - 73:3, 74:12, 91:16
false [1] - 128:21
familiar [11] - 7:21, 8:4, 16:14, 17:10, 21:16, 22:18, 43:23, 44:1, 77:20, 80:2, 81:14
familiarize [1] - 19:22
far [11] - 12:8, 49:13, 73:21, 78:21, 82:13, 82:18, 84:19, 85:7, 85:9, 93:6, 104:10
fashion [1] - 96:2
fast [1] - 34:2
favorable [2] - 119:6, 119:18
February [2] - 47:6, 54:12
feet [2] - 59:4, 59:10
fellowship [1] - 12:16
felonious [8] - 47:17, 48:2, 48:7, 71:20, 72:11, 72:21, 73:4, 73:16
felt [1] - 123:5
Few [1] - 34:23
few [2] - 107:19, 109:1
fiber [1] - 73:22
field [2] - 13:6, 19:12
file [1] - 45:13, 45:18, 46:14, 56:16, 69:3, 104:13, 131:13, 132:16, 132:20, 133:17, 134:16
filed [1] - 132:23
final [10] - 8:18, 34:8, 37:8, 111:4, 125:11, 126:1,

126:22, 130:18, 134:23
finally [2] - 30:22, 99:17
Finally [1] - 95:11
financial [1] - 111:22
findings [8] - 12:1, 15:20, 16:23, 18:1, 26:10, 36:21, 37:2, 38:2
fine [6] - 4:17, 4:21, 89:15, 124:3, 135:3, 135:4
finish [3] - 20:14, 61:8, 107:15
finished [3] - 10:1, 85:21, 92:5
finishing [1] - 123:6
First [6] - 42:20, 49:8, 53:17, 65:22, 97:7, 100:16
first [20] - 6:22, 7:17, 11:2, 16:21, 20:2, 20:5, 32:17, 36:7, 36:20, 39:9, 39:13, 40:3, 42:18, 66:1, 72:8, 91:8, 106:5, 108:6, 111:6, 111:17, 112:23, 113:8, 115:11, 123:16, 131:8
five [20] - 7:3, 17:2, 26:18, 40:1, 81:12, 81:21, 82:18, 82:19, 82:20, 83:9, 83:13, 83:20, 84:1, 84:4, 84:8, 84:11, 84:12, 84:14, 84:16, 120:13
fixed [1] - 122:6
flexible [1] - 28:21
fluids [1] - 20:21
folks [1] - 125:22
follow [23] - 68:22, 70:4, 70:5, 70:7, 71:1, 76:16, 76:18, 76:19, 76:22, 77:8, 77:9, 77:11, 78:16, 78:23, 81:20, 83:22, 84:9, 84:17, 84:22, 94:7, 94:12, 104:3, 104:13
follow-up [3] - 77:9, 77:11, 94:12
followed [5] - 69:11, 82:21, 103:4, 103:9, 103:16
FOLLOWING [15] - 3:4, 10:7, 49:6, 50:13, 65:20, 67:4, 79:18, 80:21, 88:16, 89:18, 97:5, 97:23, 114:19, 124:13, 126:17
following [1] - 1:11
follows [3] - 11:3, 39:10, 106:6
Fonseca [4] - 46:17, 55:8, 55:11, 55:12
foot [3] - 59:16, 60:11, 62:2

6

FOR [1] - 135:6
Force [1] - 107:14
force [4] - 32:12, 34:13, 40:11, 40:22
forces [2] - 30:11, 31:23
FOREGOING [1] - 136:7
forehead [1] - 23:23, 24:12, 32:18, 32:19
forensic [11] - 11:16, 12:7, 12:17, 12:23, 13:18, 13:20, 13:22, 14:7, 35:2, 35:3
Forget [1] - 84:13
forget [1] - 84:14
form [3] - 56:6, 84:2, 114:15
formal [1] - 15:14
formed [1] - 103:10
forms [1] - 94:9
formulate [1] - 125:15
Forrester [9] - 41:9, 42:1, 42:12, 47:8, 56:21, 57:5, 57:19, 113:11, 113:12
forth [1] - 64:8
forward [4] - 94:19, 95:13, 123:2, 134:12
forwarded [2] - 53:22, 53:23
four [10] - 7:3, 12:13, 12:14, 12:15, 26:18, 48:22, 50:2, 50:17, 51:2, 63:23
fracture [1] - 25:11, 28:10, 28:13, 28:16, 29:1, 29:2, 29:11, 30:7, 30:14, 31:13, 31:18, 32:4, 32:7, 33:16
fractured [3] - 25:19, 30:13, 30:20
fractures [1] - 29:3, 30:17, 30:21, 32:5
frame [1] - 44:9
frankly [1] - 123:1
frantic [1] - 131:23
freezer [4] - 51:13, 51:15, 52:1, 52:10
fresh [1] - 126:9
front [8] - 25:14, 26:5, 89:6, 89:22, 108:11, 119:21, 124:9, 130:14
full [2] - 40:2, 64:2
function [1] - 49:12

**G**

galeal [1] - 29:17
gastric [1] - 20:23
general [4] - 31:16, 32:4, 54:22, 92:17
generally [3] - 26:12,
44:21, 63:20
Generally [1] - 15:10
generate [1] - 104:2
gentlemen [2] - 114:11, 125:8
gist [1] - 4:14
given [13] - 54:15, 54:22, 55:1, 55:4, 55:6, 69:13, 72:17, 87:17, 88:4, 88:7, 88:8, 88:10, 90:15
gown [1] - 22:23
graded [3] - 79:7, 79:8, 81:2
grading [5] - 80:10, 80:16, 82:12, 82:18, 82:20
graduate [2] - 12:13, 12:14
grand [6] - 112:2, 112:5, 112:9, 113:3, 113:4, 113:22
grandson [4] - 108:8, 108:11, 108:13, 108:15
granted [2] - 133:1, 133:11
Green [1] - 52:21
ground [1] - 25:9
grounds [1] - 116:6
gruesome [1] - 9:3
guess [6] - 3:12, 10:9, 12:8, 23:19, 60:20, 130:19
guilt [2] - 119:20, 134:7
guilty [2] - 119:8, 121:13

**H**

HAD [1] - 136:8
half [1] - 42:13
hand [9] - 16:9, 21:11, 31:2, 31:8, 36:6, 53:13, 82:1, 116:4, 116:5
handed [1] - 126:10
handing [1] - 36:9, 77:14, 77:16, 79:22
handled [1] - 48:4, 107:1
hands [1] - 80:3
harassing [1] - 66:14
Harmon [1] - 133:7
head [15] - 22:2, 24:17, 25:1, 25:8, 26:14, 26:17, 26:20, 27:17, 31:22, 33:22, 34:13, 36:22, 74:15, 75:17, 76:7
hear [9] - 67:7, 85:17, 93:20, 100:19, 100:20, 101:13, 101:15, 122:17, 126:1
heard [14] - 5:2,
11:12, 43:20, 49:20, 50:21, 57:17, 72:14, 72:18, 74:22, 75:3, 75:23, 85:7, 85:14, 85:15
hearing [1] - 125:9
Hearsay [1] - 68:18
hearsay [19] - 58:21, 59:6, 59:11, 60:4, 63:2, 64:10, 66:2, 66:5, 66:9, 66:11, 79:21, 79:22, 80:4, 82:5, 82:7, 86:12, 86:19, 129:23
height [4] - 61:3, 61:4, 63:7, 102:21
height/weight [1] - 61:23
held [1] - 1:12
HELD [16] - 3:5, 10:7, 49:7, 50:14, 65:21, 67:5, 79:19, 80:22, 88:17, 89:19, 97:6, 98:1, 114:9, 114:20, 124:13, 126:18
help [1] - 98:12
helped [1] - 98:15
helpful [5] - 79:11, 80:13, 80:15, 81:2, 81:21
hemorrhage [3] - 29:15, 29:18, 29:20
HEREBY [1] - 136:6
high [5] - 12:13, 31:20, 33:21, 34:1, 40:18
highest [1] - 83:19
hinge [5] - 30:14, 31:18, 32:2, 32:4, 33:15
history [3] - 12:10, 36:21, 37:5
hit [1] - 34:5
hits [1] - 31:22
hitting [1] - 33:22
hold [1] - 12:19
Hold [1] - 61:16
holidays [1] - 18:15
home [1] - 107:2
homicide [26] - 36:22, 40:9, 40:13, 41:16, 43:4, 44:12, 47:18, 47:22, 48:8, 58:6, 58:11, 58:14, 58:17, 73:4, 84:16, 92:2, 93:8, 94:17, 95:2, 98:13, 108:2, 108:17, 109:7, 109:14, 109:19, 110:10
Homicide [1] - 41:7
homicides [1] - 107:2
Honor [49] - 4:20, 8:12, 8:22, 49:3, 58:20, 59:5, 60:3,
63:1, 64:9, 64:15, 64:17, 65:16, 65:17, 67:1, 68:17, 69:15, 70:11, 77:13, 78:18, 79:14, 81:4, 82:4, 82:8, 82:22, 84:18, 85:21, 86:11, 86:18, 87:4, 87:22, 88:14, 88:15, 90:16, 97:3, 98:2, 101:7, 103:21, 104:23, 105:23, 109:9, 111:12, 112:3, 112:11, 119:3, 120:19, 122:23, 125:3, 127:5, 128:11
Honorable [3] - 1:10, 133:3, 133:7
Hope [1] - 9:21
hospital [6] - 14:23, 22:23, 23:1, 37:4, 38:6, 72:10
hour [1] - 42:13
hours [3] - 38:9, 40:19, 44:4
housed [1] - 51:10
Hundreds [1] - 18:22
hyphenated [1] - 11:7

**I**

ID [1] - 2:6
idea [2] - 7:23, 51:17
identification [1] - 36:10
identified [1] - 7:9
identifying [2] - 7:16, 20:9
Illinois [1] - 12:22
Immediately [1] - 52:19
impact [13] - 24:12, 25:5, 28:19, 28:22, 30:10, 31:21, 32:1, 32:8, 32:19, 32:21, 33:2, 33:17, 66:18
implicate [1] - 99:12
implicating [1] - 76:12
implied [1] - 97:8
importance [1] - 8:20
importantly [1] - 132:5
impossible [1] - 34:2
improper [2] - 6:13, 49:21
IN [2] - 1:1, 136:8
inadvertent [1] - 91:20
inasmuch [1] - 9:2, 58:16, 72:23
incident [1] - 71:12
incision [3] - 20:16, 27:15, 27:18
include [2] - 37:6, 57:8
included [5] - 15:8, 15:10, 26:23, 86:9, 117:1
including [2] - 47:4, 126:5
incorporate [1] - 15:20
incumbent [1] - 119:5
incurred [1] - 78:15
indicate [17] - 4:5, 5:10, 10:9, 36:18, 38:15, 69:22, 72:3, 74:9, 88:12, 98:15, 105:5, 116:9, 120:20, 121:1, 123:1, 125:4, 128:11
indicated [25] - 29:9, 31:8, 31:12, 37:8, 41:3, 46:2, 48:1, 48:16, 53:8, 55:7, 56:20, 58:2, 60:23, 65:5, 69:3, 70:6, 70:15, 71:20, 74:14, 103:9, 111:17, 116:13, 119:17, 126:23, 128:23
indicates [3] - 36:21, 54:9, 105:7
indicating [16] - 3:10, 25:21, 33:1, 59:10, 60:13, 62:14, 63:7, 68:15, 70:9, 70:19, 72:15, 76:3, 80:11, 104:13, 119:4, 131:23
Indicating [1] - 132:22
indicating [2] - 30:16, 88:19
indication [2] - 47:10, 69:10
indicative [1] - 78:8
indicted [2] - 45:22, 45:23
indictment [1] - 46:11
individual [16] - 48:3, 59:1, 59:14, 60:1, 60:17, 61:22, 63:8, 76:12, 77:1, 77:23, 78:4, 79:2, 80:1, 83:15, 113:15
individual's [1] - 61:23
individually [1] - 20:18
individuals [4] - 54:22, 55:1, 63:3, 113:16
ineffective [1] - 127:18
inflammatory [1] - 9:3
information [43] - 37:3, 45:14, 47:19, 51:9, 55:2, 61:5, 66:3,

79:6, 79:8, 79:11, 79:23, 80:7, 80:9, 80:10, 80:13, 80:16, 80:18, 81:1, 81:10, 81:12, 81:20, 84:7, 84:16, 84:22, 85:15, 92:23, 93:2, 93:4, 93:9, 93:10, 93:20, 93:21, 94:7, 94:12, 94:21, 95:18, 95:21, 98:10, 100:8, 100:17, 129:6, 132:3

**initial** [2] - 60:10, 131:18

**injuries** [18] - 15:17, 20:7, 20:12, 21:23, 22:1, 23:11, 24:18, 26:9, 26:15, 26:19, 26:21, 27:12, 31:17, 32:15, 33:18, 34:4, 34:13, 36:22

**Injury** [1] - 25:18

**injury** [10] - 23:23, 24:15, 25:6, 25:7, 25:9, 31:2, 31:7, 31:20, 32:18, 34:3

**innards** [1] - 27:11

**innocence** [1] - 134:7

**input** [1] - 122:15

**inquire** [1] - 89:11

**inside** [3] - 28:1, 29:7, 33:23

**instances** [1] - 76:20

**instruct** [3] - 4:10, 4:21, 6:10

**instructed** [1] - 129:12

**instructions** [10] - 122:7, 122:19, 123:12, 123:17, 123:21, 125:12, 125:15, 126:2, 126:21, 130:19

**intend** [2] - 7:17, 66:23

**intends** [4] - 6:23, 7:2, 9:23, 115:6

**intention** [1] - 127:1

**intentional** [2] - 91:9, 91:11

**intercranial** [1] - 29:7

**interject** [1] - 18:23

**intermastoid** [1] - 27:18

**internal** [12] - 15:16, 17:1, 20:15, 20:17, 20:19, 22:1, 26:7, 27:5, 27:13, 27:16, 27:23, 35:4

**internally** [1] - 15:18

**internship** [1] - 12:15

**interrupt** [1] - 28:15

**Interview** [1] - 2:20

**interview** [1] - 42:1

**interviewed** [1] - 76:23

**interviews** [2] - 46:14, 46:20

**introduce** [1] - 11:13, 106:16, 119:7, 127:1

**invasions** [1] - 107:2

**investigate** [1] - 47:12

**investigating** [4] - 35:10, 83:17, 84:2, 84:3

**investigation** [37] - 14:10, 36:3, 43:9, 44:20, 44:21, 46:11, 46:23, 52:14, 58:3, 60:7, 60:8, 68:11, 68:13, 69:4, 70:4, 71:1, 71:15, 78:3, 78:9, 78:10, 78:15, 79:12, 80:14, 81:3, 81:11, 83:8, 84:5, 87:13, 93:23, 94:22, 95:12, 98:10, 98:11, 98:14, 108:8, 108:14

**investigations** [5] - 40:7, 44:5, 99:6, 103:11, 103:13

**investigative** [3] - 40:6, 106:19, 107:20

**investigator** [7] - 41:11, 45:13, 58:6, 85:23, 94:6, 94:16, 95:23

**Investigator** [3] - 41:14, 76:23, 110:18

**investigator's** [1] - 15:2

**investigators** [5] - 12:2, 37:5, 45:16, 94:3, 104:10

**involved** [5] - 44:6, 44:11, 56:13, 108:7, 113:18

**involvement** [4] - 41:19, 41:20, 58:1, 71:16

**involving** [6] - 20:19, 41:15, 44:12, 45:4, 71:17, 108:8

**irrelevant** [1] - 66:2

**IS** [1] - 136:7

**Isabella** [1] - 108:10

**issue** [8] - 5:20, 5:23, 9:8, 11:23, 82:5, 89:1, 89:3, 134:11

**issued** [6] - 17:14, 54:7, 54:18, 54:19, 54:20, 68:5

**IT** [1] - 1:8

**items** [3] - 52:11, 127:2, 127:17

**itself** [2] - 79:5, 94:23

# J

**James** [2] - 1:10, 19:3

**Janet** [50] - 2:20, 2:20, 42:2, 46:6, 46:15, 48:17, 48:18, 50:18, 54:20, 55:6, 55:12, 57:14, 57:17, 61:5, 61:11, 61:13, 61:14, 61:19, 62:6, 62:7, 62:10, 62:11, 62:18, 64:6, 66:4, 66:6, 67:11, 67:12, 67:18, 67:21, 68:6, 68:15, 74:20, 74:22, 74:23, 75:2, 75:6, 75:10, 76:4, 84:21, 95:10, 96:8, 96:21, 99:18, 100:18, 100:20, 108:2, 111:7, 128:5, 130:9

**job** [3] - 11:20, 12:4, 18:12

**Johnson** [2] - 5:1, 122:9

**JOHNSON** [2] - 3:17, 5:3

**join** [1] - 40:21

**joined** [2] - 40:16, 41:21

**joint** [1] - 40:10

**judge** [3] - 133:6, 133:8

**JUDGE** [1] - 1:5

**Judge** [46] - 3:23, 5:7, 6:22, 9:16, 9:20, 10:19, 16:6, 17:4, 19:6, 21:8, 22:8, 33:3, 39:4, 49:23, 61:8, 66:1, 66:9, 79:15, 79:20, 88:22, 97:1, 97:11, 98:18, 105:13, 105:14, 105:16, 105:18, 114:5, 115:2, 116:8, 117:4, 118:3, 118:20, 118:23, 119:15, 121:17, 122:8, 122:14, 124:15, 127:8, 130:5, 133:5, 133:8, 133:9, 133:14, 135:1

**judgment** [2] - 119:12, 120:23, 121:16

**Juge** [1] - 53:11

**July** [3] - 42:4, 44:8, 56:14

**jump** [1] - 94:19

**jumping** [1] - 98:5

**juncture** [3] - 49:10, 119:4, 121:9

**June** [3] - 56:13, 108:7, 111:1

**juror** [4] - 3:16, 4:11, 4:22, 49:19

**Juror** [2] - 3:17, 3:20

**jurors** [6] - 3:11, 5:17, 5:21, 5:23, 10:13, 49:12

**jury** [34] - 5:8, 7:6, 8:3, 9:5, 9:13, 11:12, 11:13, 56:2, 56:5, 89:2, 89:6, 112:2, 112:5, 112:10, 113:3, 113:5, 113:22, 114:11, 119:21, 120:5, 120:7, 121:20, 122:1, 122:5, 122:16, 122:19, 123:15, 123:20, 124:1, 124:5, 124:9, 125:8, 130:14, 130:19

**JURY** [5] - 3:5, 10:6, 114:20, 124:12, 126:18

**justice** [1] - 65:9

# K

**keep** [1] - 10:16

**kept** [3] - 4:1, 15:22, 15:23

**kind** [5] - 10:16, 18:13, 29:1, 34:3, 93:2

**kinds** [1] - 32:14

**knowledge** [5] - 45:7, 52:23, 78:15, 94:6, 103:4

**known** [2] - 62:1, 123:2

**knows** [3] - 70:12, 83:1, 89:12

**Koury** [1] - 71:22

# L

**lab** [11] - 15:21, 51:10, 51:13, 52:7, 52:10, 52:21, 54:2, 54:12, 71:3, 104:4, 118:13

**Lab** [1] - 2:18

**LabCorp** [3] - 2:18, 53:21, 54:2

**lacerated** [1] - 26:2

**laceration** [2] - 24:6, 31:5

**lacerations** [1] - 26:21

**Ladies** [2] - 114:10, 125:8

**Lamont** [5] - 46:16, 46:17, 55:8, 55:11, 55:12

**large** [2] - 28:12, 47:4

**Last** [1] - 39:14

**last** [5] - 11:7, 18:15, 21:1, 26:17, 111:7

**lateral** [1] - 32:1

**law** [1] - 99:5

**lead** [4] - 64:5, 94:15, 95:6, 127:17

**leading** [1] - 46:11

**leads** [1] - 55:2

**learn** [1] - 44:22

**least** [10] - 52:3, 76:12, 76:20, 81:12, 102:17, 121:2, 122:17, 131:18, 133:1, 133:12

**leave** [1] - 131:10

**leeway** [1] - 64:19

**left** [14] - 24:18, 25:20, 25:22, 26:1, 28:11, 29:12, 30:9, 30:11, 31:2, 31:8, 31:13, 38:14, 43:14, 68:8

**legal** [1] - 14:6

**legs** [1] - 26:19

**less** [9] - 59:10, 59:16, 60:2, 60:14, 60:23, 61:6, 62:1, 62:14, 108:14

**letter** [1] - 128:4

**Letter** [1] - 2:20

**licensed** [1] - 12:21

**licenses** [1] - 12:19

**lidocaine** [1] - 38:13

**lie** [1] - 85:9

**lift** [1] - 28:9

**light** [4] - 108:17, 119:6, 119:18, 129:17

**likely** [1] - 33:1

**line** [6] - 94:3, 95:3, 96:4, 96:8, 96:18, 127:19

**lines** [1] - 4:16

**liquor** [1] - 44:3

**Lisa** [2] - 63:13, 63:16

**list** [1] - 115:12

**listed** [5] - 47:16, 47:22, 60:10, 61:20, 132:7

**localized** [3] - 32:7, 32:11, 32:12

**located** [2] - 52:15, 70:18, 72:6

**location** [1] - 93:7

**locked** [1] - 52:14

**log** [5] - 47:21, 48:1, 52:3, 52:5

**LOIS** [1] - 106:4

**LOISEL** [107] - 3:22, 4:13, 5:7, 5:14, 6:7, 6:19, 6:22, 7:11, 7:13, 7:19, 8:14, 8:16, 9:14, 9:20, 10:19, 11:9, 16:6, 17:4, 19:6, 19:11, 19:16, 21:8, 22:7, 22:12, 23:17, 33:3, 34:14, 37:22, 38:23, 39:4, 39:17, 49:23, 53:11, 55:22, 58:20, 59:5, 59:11, 60:3, 61:8, 63:1, 64:9,

64:12, 65:16, 66:1, 66:12, 68:17, 69:15, 70:11, 77:13, 78:18, 79:14, 79:20, 81:4, 82:4, 82:22, 84:18, 86:11, 86:18, 87:9, 87:22, 88:22, 89:14, 90:16, 92:8, 92:11, 97:1, 97:11, 97:16, 98:17, 100:11, 101:10, 102:6, 103:21, 104:23, 105:13, 105:18, 105:23, 106:14, 109:13, 111:9, 112:3, 112:11, 114:5, 115:2, 115:17, 115:21, 116:8, 116:22, 117:3, 118:2, 118:20, 118:23, 119:15, 121:17, 122:8, 122:13, 124:4, 124:21, 127:8, 128:3, 130:11, 130:17, 131:1, 131:5, 133:14, 135:1

**Loisel** [8] - 1:15, 10:18, 87:7, 88:7, 114:23, 119:14, 124:14, 127:7

**lone** [1] - 41:10

**look** [28] - 14:4, 16:11, 17:9, 21:13, 28:3, 33:8, 44:11, 44:15, 44:17, 44:18, 45:3, 46:13, 46:19, 47:8, 51:19, 51:20, 52:2, 52:8, 53:17, 58:2, 61:22, 80:4, 115:3, 116:9, 122:11, 130:23, 134:23

**looked** [7] - 42:3, 58:4, 69:2, 80:11, 83:7, 103:8, 128:13

**looking** [7] - 8:1, 23:21, 24:23, 25:14, 28:6, 30:5, 46:21

**looks** [3] - 14:2, 26:2, 33:12

**Lou** [3] - 106:1, 106:10, 106:18

**Lourdes** [1] - 40:20

**low** [1] - 83:18

**lower** [1] - 29:9

**LUCAS** [1] - 1:1

**Lucas** [8] - 1:11, 1:14, 1:20, 11:15, 14:14, 19:1, 41:12, 133:2

**lunch** [2] - 10:2, 123:3

**LUNCH** [1] - 114:18

---

## M

**M.D** [1] - 11:1

**maintain** [1] - 117:17

**maintained** [3] - 47:2, 91:6, 91:13

**major** [1] - 132:15

**majority** [8] - 12:4, 26:19, 32:11, 58:12, 58:16, 93:15, 94:10, 102:12

**male** [1] - 53:9

**Malone** [1] - 116:1

**manner** [1] - 11:22, 14:8, 34:10

**March** [2] - 40:12, 41:21

**margins** [1] - 24:2

**mark** [1] - 6:17

**marked** [5] - 3:23, 16:10, 21:12, 22:17, 23:7, 25:12, 27:1, 29:23, 30:23, 33:7, 36:9, 53:14, 77:16, 82:1, 116:20

**marks** [1] - 20:10

**marshals** [1] - 97:13

**matched** [1] - 53:6

**material** [1] - 134:6

**matter** [13] - 60:5, 64:14, 65:5, 66:15, 66:18, 69:13, 86:20, 103:19, 121:4, 128:15, 132:19, 133:11, 133:14

**matters** [4] - 9:15, 48:21, 130:8, 133:2

**Mays** [2] - 63:13, 63:16

**McDevitt** [2] - 1:20, 136:16

**MCELROY** [6] - 3:19, 5:20, 19:9, 66:8, 66:17, 130:5

**McElroy** [3] - 1:18, 120:21, 125:4

**mean** [12] - 3:22, 4:2, 4:7, 4:13, 6:10, 6:14, 8:11, 24:9, 29:21, 32:11, 32:14, 93:17

**means** [8] - 13:1, 13:3, 13:7, 24:11, 32:22, 34:10, 38:4, 38:8

**mechanism** [2] - 24:15, 33:19

**medical** [5] - 12:4, 12:14, 14:6, 29:4, 34:9

**medicine** [2] - 12:21, 14:6

**meet** [2] - 110:6, 119:11

**member** [2] - 42:22, 107:6

**Members** [1] - 56:5

**memorialization** [1] - 129:21

**mentioned** [2] - 102:17, 111:2

**mentioning** [1] - 91:5

**merely** [1] - 134:7

**merits** [1] - 109:12

**met** [1] - 121:11

**metabolite** [2] - 38:8, 38:19

**metabolize** [1] - 38:16

**Metro** [1] - 40:4, 43:18, 43:19, 107:14

**Michael** [1] - 1:15

**microscope** [3] - 14:3, 14:5, 21:4

**mid** [1] - 125:19

**midnight** [2] - 106:20, 107:3

**might** [1] - 84:11

**Mike** [4] - 3:15, 8:13, 19:10, 97:2

**mind** [4] - 10:16, 22:7, 121:22, 127:3

**minds** [3] - 119:7, 119:22, 121:12

**minor** [1] - 132:14

**minute** [4] - 42:13, 56:3, 56:4, 65:18

**minutes** [3] - 120:13, 123:10, 123:11

**mischaracterization** [1] - 112:6

**misleading** [1] - 49:22

**mistakenly** [1] - 48:6

**misunderstanding** [1] - 84:13

**mom** [1] - 100:23

**moment** [2] - 98:18, 105:13

**Money** [1] - 55:1

**money** [9] - 54:15, 54:17, 54:19, 54:20, 54:22, 57:16, 112:13, 113:16

**Montague** [2] - 3:19, 3:21

**month** [2] - 18:11, 40:23

**months** [1] - 113:9

**moral** [1] - 108:15

**morning** [19] - 10:10, 11:10, 11:11, 34:18, 34:19, 39:18, 39:19, 56:11, 56:12, 105:22, 106:15, 118:4, 123:7, 123:17, 124:2, 126:9, 130:23, 131:8, 134:12

**most** [5] - 33:1, 40:12, 107:13, 119:6, 119:18

**mother** [3] - 101:18, 101:22, 102:1

**motion** [14] - 115:1, 119:4, 119:16, 120:1, 120:7, 120:23, 121:22, 122:4,

131:12, 132:22, 133:16, 133:19, 133:23, 134:17

**motions** [3] - 115:5, 115:8, 119:2

**motive** [1] - 134:8

**move** [1] - 127:4

**moving** [1] - 127:23

**MR** [196] - 3:15, 3:19, 3:22, 4:13, 4:17, 4:20, 5:7, 5:14, 5:20, 6:7, 6:19, 6:22, 7:11, 7:13, 7:14, 7:19, 8:12, 8:14, 8:15, 8:16, 8:22, 9:14, 9:19, 9:20, 10:19, 11:9, 16:6, 17:4, 19:6, 19:8, 19:9, 19:11, 19:14, 19:16, 21:8, 22:7, 22:12, 23:17, 33:3, 34:14, 34:17, 37:18, 37:22, 38:23, 39:1, 39:4, 39:17, 46:4, 48:9, 49:3, 49:8, 49:23, 50:10, 53:11, 55:18, 55:22, 56:10, 58:20, 59:5, 59:7, 59:11, 60:3, 61:8, 63:1, 64:9, 64:11, 64:12, 64:15, 64:20, 65:16, 66:1, 66:8, 66:12, 66:17, 66:23, 67:6, 68:17, 69:15, 69:17, 70:11, 77:13, 78:18, 78:22, 79:14, 79:20, 80:8, 80:19, 81:4, 81:6, 82:4, 82:8, 82:14, 82:17, 82:22, 84:18, 85:20, 86:11, 86:13, 86:18, 87:4, 87:8, 87:9, 87:22, 88:14, 88:18, 88:22, 89:14, 90:16, 92:6, 92:8, 92:11, 96:14, 96:17, 96:22, 97:1, 97:2, 97:7, 97:11, 97:16, 97:18, 98:2, 98:17, 100:11, 100:15, 101:7, 101:10, 102:6, 103:21, 104:23, 105:11, 105:13, 105:18, 105:23, 106:14, 108:20, 109:9, 109:13, 111:9, 111:11, 111:15, 112:3, 112:11, 114:2, 114:5, 115:2, 115:16, 115:17, 115:21, 116:3, 116:8, 116:19, 116:22, 117:3, 117:8, 117:11, 117:13, 117:17, 118:2, 118:7, 118:11, 118:14, 118:17, 118:20, 118:23, 119:3, 119:15, 120:10, 120:12, 120:17, 120:19, 121:17,

122:8, 122:13, 122:23, 123:22, 124:3, 124:4, 124:15, 124:21, 125:3, 126:13, 127:5, 127:8, 128:3, 128:11, 129:11, 130:5, 130:11, 130:17, 131:1, 131:5, 131:11, 133:14, 134:21, 135:1, 135:4

**MS** [2] - 3:17, 5:3

**Munn** [2] - 77:6, 77:11

**murder** [6] - 45:8, 47:22, 109:3, 110:22, 119:9, 121:14

**murders** [1] - 107:2

**muscle** [1] - 29:17

---

## N

**name** [19] - 11:4, 11:5, 11:7, 11:12, 39:11, 39:12, 39:13, 39:14, 69:13, 69:21, 69:23, 77:23, 86:9, 86:16, 102:18, 102:21, 106:8, 106:9, 132:7

**names** [2] - 45:14, 103:15

**natural** [1] - 15:18

**nature** [2] - 34:6, 48:14

**Navarre** [37] - 14:17, 19:18, 22:20, 26:10, 32:16, 34:12, 38:3, 38:9, 41:16, 43:23, 44:1, 44:13, 46:3, 46:8, 58:7, 69:10, 71:7, 72:17, 73:3, 75:4, 76:1, 76:4, 92:3, 94:18, 98:13, 100:7, 108:3, 108:17, 109:3, 109:7, 109:15, 109:20, 110:10, 110:22, 119:10, 121:15, 131:22

**Navarre's** [4] - 21:21, 23:10, 31:14, 34:11

**near** [1] - 42:17

**necessary** [2] - 21:2

**need** [6] - 9:15, 89:21, 115:5, 120:13, 127:20, 127:21

**needs** [3] - 89:4, 124:5, 124:6

**Neil** [1] - 1:18

**never** [6] - 28:2, 49:15, 91:5, 97:7, 131:23, 134:9

**new** [1] - 99:4

**newspaper** [1] - 126:8

**next** [9] - 23:12,

24:21, 24:22, 26:6, 27:3, 39:3, 105:17, 108:23, 125:10

**Next** [2] - 29:23, 116:17

**Niemiec** [2] - 115:14, 115:17

**night** [3] - 70:8, 71:8, 107:1

**NO** [1] - 1:3

**non** [1] - 101:8

**non-responsive** [1] - 101:8

**none** [3] - 86:9, 103:4, 130:6

**Nonetheless** [1] - 48:12

**noon** [2] - 114:12, 126:11

**North** [4] - 53:2, 54:3, 110:4

**note** [10] - 3:9, 3:10, 3:12, 3:14, 4:11, 4:18, 4:22, 6:5, 10:12

**noted** [5] - 9:10, 117:22, 117:23, 120:8, 129:10

**notes** [5] - 14:22, 15:11, 15:13, 19:21, 129:15

**Nothing** [9] - 37:18, 55:23, 92:6, 100:12, 105:11, 105:14, 111:10, 114:2, 126:13

**nothing** [4] - 25:4, 39:1, 93:12, 99:19

**notice** [1] - 24:3

**noticed** [1] - 51:21

**November** [2] - 90:5, 113:2

**number** [8] - 17:8, 18:6, 18:21, 26:22, 41:3, 45:9, 94:1, 125:13

**Number** [8] - 3:18, 3:20, 6:18, 25:18, 26:11, 26:20, 30:1, 30:23

**numbers** [1] - 18:15

**numerous** [1] - 32:6

**nutshell** [1] - 12:12

**O**

**o'clock** [2] - 124:2, 125:23

**oath** [2] - 85:18, 101:16

**OB** [1] - 2:6

**object** [14] - 9:1, 32:9, 32:10, 48:9, 49:4, 55:19, 96:14, 96:22, 108:20, 109:9, 116:6, 117:21, 127:12, 127:21

**Objection** [28] - 46:4, 50:9, 58:20,

59:5, 59:11, 60:3, 63:1, 64:9, 65:16, 65:17, 68:17, 69:15, 70:11, 77:13, 78:18, 79:14, 81:4, 82:4, 82:22, 84:18, 86:11, 86:18, 90:16, 102:6, 103:21, 104:23, 112:3, 112:11

**objection** [20] - 9:7, 9:9, 19:13, 19:14, 65:23, 66:20, 79:20, 82:12, 97:21, 115:15, 116:7, 117:10, 117:13, 117:18, 117:22, 118:6, 118:10, 118:11, 118:14, 118:17

**objections** [2] - 116:2, 128:1

**obstructing** [1] - 65:9

**obtain** [1] - 99:6

**obtained** [1] - 37:9

**Obviously** [2] - 7:13, 11:12, 127:12

**obviously** [17] - 8:10, 8:11, 8:18, 28:22, 42:22, 43:20, 46:13, 50:7, 50:21, 54:13, 92:12, 115:4, 122:14, 124:5, 131:3, 131:5, 131:7

**occasions** [3] - 78:1, 102:18, 133:12

**occupation** [1] - 11:19

**occurred** [8] - 15:17, 20:8, 43:4, 43:6, 58:14, 76:22, 78:16, 95:2

**October** [3] - 45:23, 54:19, 113:1

**Odett** [2] - 63:10, 63:17

**OF** [11] - 1:1, 1:2, 1:6, 3:5, 10:6, 114:20, 124:12, 126:18, 136:8, 136:9

**OFF** [2] - 114:9, 120:16

**offense** [3] - 43:6, 74:2, 119:9

**offered** [5] - 66:17, 82:9, 112:8, 112:12, 130:7

**office** [3] - 17:21, 22:21, 45:11

**Office** [7] - 11:15, 12:6, 14:15, 16:2, 21:22, 41:12, 57:1

**Officer** [4] - 39:22, 108:1, 115:17, 116:1

**Officers** [5] - 40:15, 49:10, 79:23, 80:5, 105:15

**Officers** [1] - 66:14

**officers** [1] - 68:1

**Official** [1] - 1:20, 136:17

**Ohio** [8] - 1:21, 10:20, 12:22, 87:12, 96:7, 119:5, 124:16, 133:6

**OHIO** [2] - 1:1, 1:2

**old** [3] - 44:15, 45:3, 92:15

**ON** [1] - 135:6

**Once** [3] - 7:9, 9:11, 17:21

**once** [5] - 8:1, 8:2, 51:19, 61:4, 134:18

**One** [2] - 37:8, 134:1

**one** [50] - 3:11, 7:3, 10:12, 13:17, 14:17, 19:18, 23:23, 24:21, 32:12, 34:8, 38:6, 48:5, 49:19, 49:20, 51:21, 57:13, 65:5, 71:17, 76:8, 76:12, 76:20, 77:17, 77:22, 81:13, 83:13, 83:18, 84:4, 84:8, 85:20, 87:5, 88:15, 91:6, 91:19, 92:5, 102:18, 103:12, 103:20, 105:13, 105:20, 111:4, 111:11, 116:6, 128:18, 128:19, 131:18, 133:3, 133:4

**ones** [1] - 14:3

**open** [5] - 27:15, 27:21, 30:16, 73:2, 115:4

**opened** [2] - 24:1, 97:1

**opening** [1] - 66:21

**opinion** [6] - 34:9, 34:12, 49:11, 49:18, 56:7, 114:15

**opportunity** [8] - 18:19, 42:5, 44:10, 58:2, 115:3, 122:7, 122:9, 125:18

**opposite** [1] - 25:4

**optimistic** [1] - 9:21

**orbital** [1] - 30:18

**order** [5] - 17:8, 28:8, 67:14, 68:5, 96:21

**ordered** [6] - 65:14, 67:11, 67:17, 67:20, 73:18, 96:6

**organs** [2] - 20:17, 20:19, 27:17

**original** [8] - 14:22, 32:17, 43:8, 45:16, 46:22, 62:21, 62:22, 94:3

**originally** [3] - 47:3, 47:16, 48:4

**otherwise** [1] - 28:2

**ourselves** [1] - 12:9

**out-of-court** [2] -

64:13, 66:16

**outer** [1] - 29:16

**OUTSIDE** [5] - 3:5, 10:6, 114:20, 124:12, 126:18

**outside** [1] - 120:14

**outweighs** [1] - 117:19

**overrule** [3] - 9:9, 66:19, 122:4

**overruled** [4] - 50:9, 60:9, 117:23, 120:8

**Overruled** [4] - 50:15, 81:8, 90:19, 101:12

**own** [1] - 95:23, 111:20, 122:15

**owned** [2] - 108:9, 110:3, 111:18

**P**

**Page** [2] - 35:16, 88:13

**page** [9] - 16:21, 17:2, 35:15, 36:19, 36:20, 77:19, 89:22, 89:23

**pages** [2] - 36:16, 77:20

**paid** [7] - 57:14, 57:16, 57:22, 112:1, 112:4, 112:17, 112:19

**pan** [2] - 45:18, 92:21

**panel** [2] - 6:5, 133:6, 133:8

**paper** [2] - 45:12, 93:19

**paperwork** [1] - 44:17

**paragraphs** [3] - 128:14, 128:16, 128:19

**paralleled** [1] - 25:3

**part** [17] - 5:9, 15:19, 16:3, 20:5, 21:1, 36:2, 36:12, 37:2, 37:16, 43:8, 56:16, 57:8, 60:6, 60:7, 60:21, 87:12, 134:8

**participant** [1] - 58:6

**particular** [18] - 8:21, 21:6, 29:14, 38:2, 41:19, 42:21, 45:4, 46:12, 51:15, 51:17, 52:11, 54:15, 77:23, 79:1, 102:16, 129:14, 133:19, 134:1

**parties** [1] - 130:10

**parts** [1] - 20:5

**party** [1] - 80:7

**passed** [3] - 13:7, 43:7, 45:12

**pathologist** [3] - 11:16, 14:1, 35:2

**pathology** [13] -

12:5, 12:7, 12:16, 12:17, 12:23, 13:20, 13:22, 13:23, 14:6, 14:7, 19:12, 35:3

**Patrick** [2] - 19:3, 19:4

**patrol** [1] - 107:12

**pattern** [1] - 25:4

**People** [1] - 62:23

**people** [7] - 29:5, 31:16, 32:5, 62:19, 62:21, 93:19, 111:1

**perform** [5] - 11:21, 15:6, 18:7, 20:3, 21:5

**performed** [2] - 18:4, 18:16

**performing** [2] - 14:9, 14:16

**period** [4] - 47:19, 58:10, 58:17, 132:12

**perpetrator** [1] - 78:14

**person** [3] - 15:18, 106:23, 110:6

**Personally** [1] - 48:19

**personnel** [1] - 54:12

**persons** [1] - 40:8

**pertaining** [3] - 49:1, 50:3, 50:18

**pertinent** [1] - 94:21

**pg** [1] - 2:12

**phone** [6] - 67:10, 67:23, 108:19, 109:5, 110:2, 131:21

**photo** [2] - 30:2, 32:16

**Photo** [19] - 2:6, 2:7, 2:7, 2:8, 2:8, 2:9, 2:9, 2:10, 2:10, 2:11, 2:11, 2:14, 2:14, 2:15, 2:15, 2:16, 2:16, 2:17, 2:17

**photograph** [4] - 23:9, 23:13, 23:21, 25:23

**photographed** [1] - 20:20

**photographs** [6] - 7:4, 9:2, 21:20, 73:1, 73:16, 116:3

**photos** [4] - 31:10, 32:17, 33:11, 117:16

**phrase** [2] - 4:8, 80:12

**physical** [2] - 47:9, 85:1

**physician** [1] - 11:16

**picture** [11] - 7:8, 7:17, 7:20, 7:21, 8:2, 8:9, 8:20, 22:18, 22:19, 24:22, 115:13

**Pictures** [1] - 20:12

**pictures** [11] - 8:4, 8:17, 21:19, 22:3, 22:13, 26:9, 37:15, 37:16, 37:17, 115:23,

9

117:14

**piece** [1] - 45:12
**pieces** [1] - 21:3
**placard** [3] - 22:21, 47:19, 47:23
**place** [3] - 42:15, 109:4, 110:1
**placed** [2] - 45:13, 52:13
**PLAINTIFF** [1] - 1:3
**Plaintiff** [1] - 1:14
**plate** [2] - 29:3, 30:18
**PLEAS** [1] - 1:1
**Pleas** [2] - 1:11, 1:20
**pleasant** [1] - 22:14
**point** [27] - 4:2, 4:12, 6:11, 6:21, 8:10, 9:16, 22:8, 40:6, 49:22, 51:4, 52:18, 65:6, 73:5, 73:6, 104:8, 110:11, 115:2, 115:6, 120:5, 120:7, 121:17, 122:5, 122:6, 123:18, 124:16, 124:19, 132:14
**pointer** [1] - 23:15
**points** [2] - 74:8, 133:23
**poisons** [1] - 20:22
**police** [25] - 35:9, 40:15, 40:16, 40:21, 44:12, 45:15, 58:3, 59:21, 59:22, 59:23, 60:21, 60:22, 61:14, 62:9, 64:16, 67:23, 68:1, 83:7, 90:6, 91:17, 101:21, 102:20, 105:9, 107:11, 116:21
**Police** [14] - 39:22, 41:1, 41:5, 41:10, 41:13, 51:11, 65:14, 66:13, 67:11, 67:17, 106:19, 107:6, 108:1, 110:13
**portion** [3] - 20:15, 29:10, 107:15
**portions** [1] - 64:2
**portrayed** [1] - 76:21
**position** [2] - 123:1, 130:6
**positions** [1] - 41:4
**positive** [1] - 38:7
**possession** [3] - 127:3, 127:10, 132:11
**possibility** [1] - 33:17
**possible** [3] - 68:15, 86:2, 99:10
**Possibly** [1] - 81:14
**possibly** [2] - 95:22, 96:1
**postmortem** [2] - 36:17, 38:11
**posture** [1] - 123:8
**potential** [4] - 69:8,

74:15, 102:21, 132:8
**pound** [1] - 47:4
**practice** [2] - 12:21, 133:21
**preceded** [1] - 95:12
**PRECEDING** [7] - 10:5, 50:12, 67:3, 80:20, 89:17, 97:22, 124:11
**prefer** [4] - 18:10, 18:12, 122:15, 123:14
**prejudicial** [4] - 9:4, 116:15, 117:18, 117:20
**preparatory** [1] - 81:6
**Preparatory** [1] - 126:22
**prepared** [7] - 17:17, 17:20, 17:21, 18:1, 129:16, 129:19, 129:20
**prepares** [1] - 17:23
**PRESENCE** [5] - 3:5, 10:6, 114:20, 124:12, 126:18
**presence** [1] - 53:9
**present** [4] - 37:13, 110:15, 121:3, 125:5
**presented** [4] - 10:15, 127:14, 128:8, 128:9
**presenting** [2] - 120:22, 121:7
**presently** [1] - 106:22
**pressure** [2] - 29:7, 32:11
**pretty** [4] - 25:8, 28:12, 34:21, 83:12
**previous** [1] - 125:1
**previously** [11] - 16:10, 21:12, 27:1, 33:7, 41:20, 42:3, 54:3, 55:17, 117:18, 118:3, 133:20
**prima** [1] - 119:19, 120:5, 121:3
**primary** [1] - 38:8
**printout** [1] - 52:6
**privy** [1] - 95:19
**probative** [1] - 117:19
**problem** [1] - 88:19
**problems** [2] - 111:22, 131:7
**procedural** [1] - 115:5
**procedurally** [1] - 7:14
**procedures** [1] - 126:21
**proceed** [1] - 122:21
**proceeded** [2] - 95:22, 96:1
**proceeding** [1] - 123:6

**PROCEEDINGS** [8] - 10:7, 50:13, 67:4, 80:21, 89:18, 97:23, 124:13, 136:8
**proceedings** [4] - 1:12, 96:5, 114:13, 125:20
**process** [3] - 15:12, 41:1, 125:11
**produced** [1] - 132:1
**program** [3] - 57:6, 57:9, 113:13
**progressed** [5] - 44:21, 58:4, 69:5, 71:1, 83:8
**proof** [2] - 121:8, 122:3
**proper** [6] - 4:4, 6:9, 10:17, 80:6, 109:10, 125:15
**property** [9] - 40:8, 47:2, 47:9, 47:21, 48:1, 48:4, 51:12, 52:5, 52:6
**proposed** [1] - 126:21
**Prosecutor** [11] - 1:14, 68:12, 69:6, 87:13, 90:20, 91:7, 91:19, 101:17, 102:10, 104:21, 128:14
**Prosecutor's** [6] - 41:12, 57:1, 131:13, 132:16, 133:17, 134:16
**protecting** [1] - 132:17
**protocol** [5] - 14:22, 15:14, 25:19, 60:7, 60:22
**protruding** [1] - 24:9
**prove** [3] - 13:5, 121:18, 130:8
**proven** [1] - 121:21
**provide** [1] - 132:19
**provided** [6] - 80:10, 84:22, 87:11, 89:1, 100:9, 134:13
**providing** [1] - 55:1
**proximity** [1] - 58:13
**publish** [3] - 7:6, 9:10, 9:12
**published** [1] - 8:2
**publishing** [2] - 8:9, 9:2
**pulled** [1] - 73:2
**punched** [1] - 24:10
**purportedly** [1] - 131:22
**purpose** [2] - 116:10, 127:23
**purposely** [1] - 119:9, 121:14
**purposes** [10] - 5:7, 5:15, 7:7, 36:1, 130:4, 131:15, 132:16,

132:20, 132:21, 133:18
**Pursuant** [1] - 124:23
**pursuant** [3] - 87:16, 120:20, 132:3
**pushed** [2] - 29:3, 29:4
**pushes** [1] - 32:13
**put** [8] - 10:11, 18:21, 84:3, 89:5, 119:19, 119:21, 122:20, 130:13
**putting** [1] - 7:15

---

**Q**

**qualified** [2] - 7:12, 9:11
**quarter** [1] - 135:2
**Question................
.6** [1] - 2:22
**questioning** [4] - 94:4, 96:4, 96:9, 96:18
**questions** [9] - 4:8, 6:11, 6:13, 10:14, 10:16, 18:3, 34:23, 94:1, 111:16
**quickly** [1] - 29:6
**quite** [1] - 122:23

---

**R**

**raise** [2] - 5:20, 5:23
**random** [1] - 26:18
**rate** [1] - 84:7
**rated** [3] - 81:12, 81:20, 84:16
**rather** [2] - 5:9, 129:16
**rating** [1] - 83:12
**RC** [1] - 2:2
**RD** [1] - 2:2
**read** [3] - 6:16, 93:19, 130:14
**reading** [1] - 126:7
**ready** [2] - 114:22, 120:9
**reaffirmed** [1] - 118:8
**realistically** [1] - 134:8
**really** [1] - 99:9
**realm** [1] - 99:22
**reason** [4] - 6:8, 54:23, 101:4, 102:4
**reasonable** [10] - 34:9, 119:7, 119:22, 121:8, 121:12, 121:13, 121:19, 121:21, 122:3, 122:20
**REC** [1] - 2:6
**recalled** [1] - 101:21
**receipt** [1] - 37:12
**receive** [6] - 6:14,

10:12, 15:20, 31:17, 32:5, 86:1
**received** [22] - 3:10, 4:6, 4:11, 4:22, 5:11, 6:5, 6:12, 13:14, 13:16, 22:21, 23:5, 45:15, 58:18, 61:4, 73:17, 74:14, 76:3, 81:10, 84:8, 84:15, 86:9, 134:14
**receiving** [1] - 74:13
**recently** [1] - 40:12
**recess** [7] - 56:5, 56:7, 105:21, 114:12, 114:17, 125:20, 126:15
**RECESS** [3] - 56:8, 114:18, 126:16
**recognition** [1] - 103:20
**recognize** [1] - 128:22
**recognized** [2] - 68:16, 129:5
**recognizing** [3] - 69:6, 69:22, 129:4
**reconvene** [1] - 114:12
**record** [17] - 3:7, 4:2, 5:8, 5:10, 5:15, 6:16, 9:1, 10:11, 15:4, 15:5, 16:1, 120:17, 120:18, 124:1, 124:9, 126:19, 126:20
**RECORD** [2] - 114:9, 120:16
**records** [2] - 14:23, 15:23
**RECROSS** [1] - 100:14
**rectal** [2] - 35:14, 54:10
**Rectal** [1] - 35:18
**red** [1] - 24:14
**Redirect** [2] - 37:19, 92:7
**redirect** [2] - 105:12, 128:15
**REDIRECT** [2] - 37:21, 92:10
**redness** [1] - 32:23
**reduce** [1] - 10:17
**redundant** [1] - 110:20
**refer** [2] - 22:9, 77:18
**reference** [1] - 90:2
**referenced** [5] - 88:6, 88:12, 89:21, 90:5, 90:12
**references** [1] - 91:4
**referred** [1] - 51:6
**referring** [5] - 54:3, 54:10, 79:15, 85:11, 115:18
**reflect** [1] - 126:20
**reflected** [1] - 27:19

10

**regard** [2] - 45:6, 130:5

**regarding** [6] - 42:2, 48:20, 53:23, 108:2, 109:2, 109:19

**regards** [1] - 109:3

**regional** [2] - 51:10, 51:12

**regulations** [1] - 89:7

**rehab** [1] - 129:1

**relates** [10] - 35:1, 68:11, 69:8, 70:8, 79:4, 84:21, 85:1, 102:10, 104:1, 112:23

**relating** [1] - 79:23

**relationship** [1] - 64:16

**relative** [6] - 58:5, 61:12, 68:22, 69:22, 78:4, 121:3

**relatively** [3] - 47:18, 95:4, 105:19

**release** [2] - 123:15, 123:20

**releasing** [1] - 124:5

**relevance** [1] - 87:23

**relevant** [4] - 8:21, 93:10, 93:18, 102:13

**remember** [4] - 81:18, 94:3, 99:20, 133:9

**Remember** [1] - 33:21

**REMEMBERED** [1] - 1:8

**remind** [1] - 126:7

**removed** [4] - 20:17, 23:4, 27:17, 73:3

**rendition** [1] - 122:19

**renew** [3] - 79:20, 120:22, 131:12

**renewed** [2] - 133:16

**reopen** [1] - 127:23

**repaired** [1] - 31:7

**repeats** [2] - 101:5, 102:5

**rephrase** [7] - 59:7, 69:17, 69:18, 75:8, 76:10, 86:13, 105:3

**Report** [3] - 2:13, 2:13, 2:18

**report** [64] - 15:2, 15:14, 15:15, 15:19, 16:22, 16:23, 17:2, 17:3, 26:11, 26:12, 26:23, 36:12, 36:17, 36:20, 37:7, 37:23, 38:2, 53:19, 54:8, 58:4, 59:22, 59:23, 63:6, 63:16, 68:14, 70:6, 70:9, 70:14, 70:15, 70:18, 70:21, 71:17, 72:1, 72:3, 76:9, 77:17, 77:22, 79:1, 80:4, 82:3, 87:2,

87:20, 88:4, 88:6, 88:7, 88:11, 89:20, 89:22, 90:2, 90:6, 90:7, 90:10, 90:13, 91:2, 91:8, 91:10, 91:21, 92:1, 101:21, 116:21, 116:23, 118:15, 132:7

**Reporter** [2] - 1:20, 136:17

**reports** [71] - 15:9, 44:12, 44:17, 45:3, 45:6, 58:3, 58:5, 58:9, 58:23, 59:2, 59:9, 59:13, 59:20, 59:21, 60:10, 60:16, 60:21, 60:22, 61:6, 61:12, 61:21, 62:9, 62:10, 62:13, 62:18, 69:20, 69:21, 74:14, 74:16, 75:5, 75:16, 75:20, 76:2, 76:11, 77:18, 78:7, 78:17, 79:3, 79:5, 79:22, 80:2, 80:6, 82:20, 83:7, 83:8, 83:19, 85:23, 86:2, 86:8, 86:16, 87:11, 91:17, 91:18, 95:11, 95:14, 98:14, 102:11, 102:12, 102:17, 102:20, 102:23, 103:8, 103:16, 104:11, 105:4, 105:7, 105:9, 117:7, 117:15

**representation** [1] - 129:22

**request** [10] - 8:10, 36:4, 52:20, 88:8, 104:15, 104:18, 132:2, 133:1, 133:11, 134:15

**required** [1] - 13:3

**residence** [1] - 42:16

**residency** [1] - 12:16

**respect** [45] - 3:22, 12:10, 12:18, 18:18, 22:14, 32:3, 32:15, 37:23, 38:2, 40:14, 42:21, 44:23, 45:8, 45:18, 46:10, 46:15, 46:21, 48:23, 50:7, 50:16, 53:5, 53:16, 54:21, 76:6, 79:21, 89:4, 92:13, 92:17, 92:20, 93:23, 94:21, 95:11, 96:4, 98:9, 98:13, 99:18, 107:23, 111:5, 119:16, 119:19, 124:4, 128:3, 128:5, 133:15, 134:12

**respectfully** [1] - 132:13, 132:18, 133:13

**respond** [8] - 3:13, 4:5, 4:6, 4:12, 4:23, 6:6, 10:13, 112:13

**response** [3] -

101:8, 104:5, 104:6

**responsive** [2] - 101:8, 101:12

**rest** [6] - 115:1, 115:6, 124:6, 125:6, 125:21

**restated** [1] - 118:6

**rested** [1] - 127:13

**resting** [2] - 118:22, 127:2

**rests** [3] - 119:1, 124:16, 125:8

**RESTS....................**
**.........119** [1] - 2:23

**RESTS....................**
**........125** [1] - 2:23

**result** [9] - 56:18, 67:10, 67:23, 68:2, 70:23, 94:11, 104:14, 104:17

**results** [1] - 15:1

**resurrect** [1] - 92:15

**resuscitation** [1] - 38:13

**retain** [1] - 21:2

**retired** [2] - 41:12, 56:23

**return** [1] - 125:22

**review** [17] - 14:19, 14:20, 19:21, 45:17, 58:23, 59:13, 59:23, 60:21, 63:6, 70:9, 70:14, 76:11, 81:16, 86:1, 86:15, 94:2, 98:9

**reviewed** [13] - 14:18, 14:21, 15:5, 59:22, 63:16, 69:20, 69:21, 75:5, 77:18, 78:8, 79:5, 81:17, 102:23

**reviewing** [1] - 61:6, 85:23

**revisit** [1] - 132:18

**revolve** [2] - 110:9, 110:21

**Reynolds** [1] - 42:17

**rights** [1] - 132:17

**rises** [1] - 121:8

**robbed** [1] - 108:11

**robbery** [1] - 108:9

**ROBERT** [2] - 1:5, 39:8

**Robert** [14] - 1:17, 3:8, 53:10, 61:15, 61:20, 70:2, 76:14, 86:10, 86:17, 100:22, 101:6, 101:18, 121:13, 132:8

**rock** [12] - 33:12, 33:13, 33:17, 34:1, 34:5, 47:4, 74:15, 75:17, 76:6, 99:7, 116:4

**Roger** [1] - 71:18

**role** [3] - 35:1, 49:18, 85:22

**Ronnie** [1] - 1:17

**room** [7] - 47:2, 47:9, 47:21, 48:1, 51:12, 52:5, 52:6

**Ross** [4] - 41:14, 56:21, 76:23, 110:18

**rotating** [1] - 12:5

**rough** [1] - 122:10

**roughly** [2] - 40:23, 42:4

**routinely** [1] - 31:20

**RPR** [2] - 1:20, 136:16

**Rule** [5] - 119:4, 119:16, 120:1, 120:23, 121:16

**ruled** [3] - 19:15, 47:18, 133:19

**rules** [3] - 87:16, 89:8, 134:3

**Rules** [1] - 134:3

**ruling** [4] - 8:18, 8:23, 101:10, 118:8

**rulings** [2] - 89:6, 125:1

**run** [2] - 61:21, 70:18

---

**S**

---

**S-C-A-L-A--B-A-R-N-E-T-T** [1] - 11:7

**sample** [3] - 20:21, 35:19, 38:11

**samples** [2] - 52:18, 52:23

**saw** [6] - 8:6, 62:19, 62:23, 69:4, 73:1

**Scala** [3] - 2:3, 7:1, 10:21

**SCALA** [1] - 11:1

**Scala-Barnett** [3] - 2:3, 7:1, 10:21

**SCALA-BARNETT** [1] - 11:1

**scale** [10] - 79:7, 79:9, 80:12, 80:15, 80:16, 81:2, 81:13, 83:12, 83:18, 84:8

**scaled** [1] - 79:10

**scalp** [5] - 27:19, 29:18, 29:19, 32:20, 73:1

**scars** [1] - 20:10

**scene** [9] - 14:10, 62:22, 71:21, 71:22, 72:6, 72:10, 72:21, 73:15, 115:14

**scenes** [1] - 12:2

**school** [4] - 12:13, 12:14, 12:15, 40:18

**sciences** [1] - 99:5

**scope** [1] - 103:22

**Scott** [2] - 63:10, 63:17

**Scottie** [2] - 77:4, 77:5

**screen** [3] - 7:15, 22:10, 22:17

**sealed** [4] - 131:14, 132:21, 133:17, 134:17

**seasonal** [1] - 18:13

**seat** [2] - 31:11, 100:21

**seated** [3] - 5:9, 100:21, 106:7

**second** [8] - 33:2, 77:19, 85:20, 87:5, 88:15, 91:23, 92:5, 111:11

**Second** [1] - 66:2

**section** [1] - 90:14

**secured** [1] - 16:1

**see** [32] - 4:18, 8:12, 23:22, 25:1, 25:15, 28:1, 28:7, 31:20, 32:13, 34:22, 36:7, 36:19, 38:17, 44:20, 47:8, 52:2, 52:8, 58:3, 65:18, 77:14, 77:17, 79:15, 83:8, 86:16, 88:11, 89:20, 90:7, 91:23, 93:20, 114:7, 122:11, 126:9

**seeing** [3] - 28:10, 70:23, 81:22

**sense** [4] - 42:23, 101:4, 102:4, 129:19

**sent** [5] - 30:11, 38:12, 52:19, 53:2, 53:6

**separate** [2] - 51:11, 52:7

**September** [4] - 1:9, 90:21, 91:14, 132:9

**SEPTEMBER** [2] - 3:1, 135:7

**sequence** [1] - 113:23

**SERGEANT** [1] - 106:4

**Sergeant** [9] - 2:4, 41:9, 42:1, 42:12, 47:7, 71:22, 106:22, 111:17, 113:12

**sergeant** [1] - 57:7, 106:18, 115:19

**series** [1] - 112:17

**serious** [1] - 125:12

**services** [2] - 40:7, 106:20, 107:20

**serving** [1] - 57:10

**session** [1] - 114:23

**set** [5] - 59:20, 84:12, 84:14, 125:11, 125:15

**seven** [3] - 7:4, 48:20, 63:20

**several** [5] - 15:12, 45:14, 78:1, 81:17, 102:18

**sexual** [1] - 40:9

**Seymour** [2] - 43:21,

131:20

**shaped** [2] - 20:16, 27:15

**shared** [2] - 3:11, 7:4

**sheer** [1] - 34:2

**shelf** [2] - 30:6

**shift** [6] - 41:23, 44:2, 44:4, 106:20, 107:1, 107:4

**shootings** [1] - 107:2

**short** [4] - 40:19, 47:18, 58:17, 105:19

**shortly** [1] - 108:18

**show** [13] - 7:2, 7:20, 22:16, 23:6, 25:12, 29:23, 30:22, 33:6, 52:6, 61:21, 87:1, 87:6, 116:10

**showed** [6] - 20:9, 26:21, 30:3, 30:8, 32:17, 38:12

**showing** [1] - 7:16

**shown** [3] - 9:5, 22:10, 74:1

**shows** [1] - 21:22

**side** [24] - 24:17, 24:18, 24:23, 25:5, 25:6, 25:7, 25:8, 25:20, 25:22, 26:1, 26:3, 28:11, 29:12, 30:9, 31:13, 31:22

**sides** [2] - 25:16, 67:20

**sign** [1] - 129:3

**signed** [3] - 17:22, 52:12, 52:13

**significance** [2] - 23:13, 30:2

**significant** [2] - 29:13, 126:6

**signs** [2] - 17:23, 18:2

**silent** [1] - 103:10

**Similar** [1] - 72:8

**simply** [1] - 67:10

**sit** [2] - 13:4, 102:2

**sits** [1] - 30:7

**sitting** [1] - 30:4

**situation** [1] - 131:18

**six** [9] - 7:3, 40:23, 59:4, 59:10, 59:16, 60:10, 61:7, 62:1, 113:8

**size** [2] - 34:1, 34:6

**skin** [2] - 24:2, 24:5

**skull** [27] - 25:11, 27:20, 27:21, 28:2, 28:6, 28:10, 28:13, 28:16, 28:19, 28:23, 29:1, 29:7, 29:11, 29:16, 30:6, 30:7, 30:12, 30:21, 31:13, 31:14, 31:20, 32:1, 32:5, 33:16, 73:1, 73:2

**skulls** [1] - 28:21

**slipped** [1] - 127:3

**small** [1] - 21:3

**solely** [1] - 127:23

**Solely** [1] - 79:3

**someone** [2] - 27:11, 60:5

**Sometimes** [3] - 92:23, 93:1, 93:12

**sometimes** [4] - 12:1, 12:3, 28:19, 28:20

**somewhat** [2] - 9:3, 51:11

**son** [3] - 55:12, 100:5, 100:17

**sons** [1] - 46:16

**soon** [2] - 130:21, 134:14

**sorry** [21] - 8:15, 13:12, 17:18, 19:8, 19:9, 28:14, 32:3, 46:5, 46:8, 54:23, 60:18, 61:17, 72:15, 73:5, 74:13, 75:1, 82:2, 83:14, 89:20, 100:20, 133:5

**sort** [1] - 24:8

**sound** [1] - 110:20

**source** [1] - 102:4

**South** [2] - 42:16, 42:17

**spared** [1] - 25:8

**specific** [3] - 48:21, 81:15, 81:22

**specifically** [4] - 71:17, 77:3, 80:12, 95:13

**Specifically** [1] - 131:20

**specifics** [2] - 109:23, 110:8

**specimen** [2] - 38:4, 38:5

**speculation** [2] - 78:19, 102:7

**speed** [3] - 31:20, 33:22, 34:1

**spelling** [3] - 11:5, 39:12, 106:8

**spend** [1] - 123:14

**spent** [2] - 40:10, 107:13

**spin** [1] - 130:13

**split** [1] - 32:20

**spouses** [1] - 126:6

**Stacey** [1] - 1:20, 136:16

**stage** [1] - 125:10

**stages** [1] - 131:18

**stand** [8] - 85:8, 85:18, 97:9, 101:14, 101:16, 121:11, 128:12, 128:17

**standards** [7] - 51:23, 52:16, 52:20, 53:4, 53:6, 54:1,

54:11

**standpoint** [1] - 48:5

**start** [2] - 3:15, 23:10

**started** [5] - 5:19, 10:8, 10:10, 13:17, 74:13

**STATE** [2] - 1:2, 2:23

**State** [30] - 6:23, 7:2, 9:23, 10:20, 39:5, 87:12, 88:4, 89:8, 96:6, 106:1, 115:6, 119:1, 119:5, 119:6, 119:10, 119:18, 121:1, 121:2, 121:11, 121:18, 124:5, 124:16, 127:12, 127:14, 132:1, 132:19, 133:6, 134:8, 134:14

**STATE'S** [2] - 2:2, 2:6

**State's** [39] - 8:10, 16:10, 16:16, 16:18, 16:20, 16:22, 17:2, 17:9, 17:13, 21:12, 22:17, 23:7, 24:22, 25:12, 27:8, 28:4, 30:1, 30:23, 33:7, 36:8, 36:10, 38:1, 53:14, 54:6, 54:8, 74:7, 82:2, 115:8, 115:13, 116:17, 118:9, 118:19, 124:17, 124:18, 124:21, 127:2, 127:10, 131:6

**statement** [16] - 61:18, 61:19, 64:1, 64:2, 66:15, 66:16, 75:10, 85:9, 85:11, 100:4, 116:18, 117:1, 134:2, 134:4, 134:7, 134:9

**Statement** [1] - 2:12

**statements** [16] - 49:2, 49:9, 49:14, 49:15, 49:17, 49:19, 50:19, 63:2, 64:13, 116:18, 128:18, 128:21, 129:19, 129:21, 130:7, 131:19

**states** [1] - 12:22

**stays** [1] - 14:2

**sternum** [1] - 27:16

**Steve** [2] - 113:11, 113:12

**still** [8] - 22:23, 23:2, 38:18, 99:1, 106:15, 111:20, 129:3, 133:22

**Still** [1] - 86:19

**stipulation** [1] - 53:15

**stop** [2] - 56:1, 112:18

**stopped** [2] - 70:10

**Stopper** [47] - 45:10, 54:14, 54:21, 57:6, 57:8, 57:15, 58:5,

58:9, 59:14, 59:20, 62:9, 74:14, 74:16, 75:5, 75:16, 75:20, 76:2, 76:9, 76:11, 77:17, 77:22, 79:1, 79:5, 80:13, 81:15, 81:22, 82:2, 82:20, 83:7, 83:16, 86:1, 86:8, 86:16, 87:10, 90:13, 91:5, 91:18, 92:1, 92:13, 94:9, 102:11, 102:12, 102:17, 105:7, 113:13, 132:7, 134:13

**Stoppers** [1] - 81:18

**stored** [2] - 47:9, 51:14

**story** [1] - 111:8

**straight** [1] - 23:21

**Street** [2] - 1:21, 42:17

**street** [5] - 40:3, 85:16, 93:21, 110:6, 110:13

**streets** [3] - 74:23, 75:3, 75:23

**stricken** [1] - 101:8

**strike** [1] - 134:15

**strong** [1] - 83:12

**students** [1] - 12:5

**stuff** [1] - 85:16

**style** [1] - 95:23

**subgaleal** [1] - 29:17

**subject** [1] - 115:8

**submission** [2] - 104:4, 104:6

**submit** [1] - 121:19

**submitted** [4] - 54:1, 54:9, 71:3, 114:16

**subsequently** [1] - 69:2

**subspecialty** [1] - 14:5

**substantially** [2] - 8:5, 128:7

**substantiated** [1] - 93:22

**substitute** [2] - 49:11, 50:1

**substituting** [1] - 49:18

**successfully** [1] - 13:6

**sufficient** [1] - 116:7

**suffuse** [1] - 24:13

**suggestion** [1] - 131:6

**summary** [1] - 16:21

**Summary** [1] - 2:12

**summer** [6] - 18:14, 42:4, 44:8, 46:3, 46:9, 56:13

**supervise** [1] - 106:23

**supervisor** [2] - 41:9, 52:12

**supplemental** [2] -

88:6, 88:11

**supplied** [5] - 37:3, 53:20, 53:21, 132:4, 132:9

**support** [1] - 108:15

**supposedly** [1] - 77:2

**surface** [1] - 26:16

**surfaces** [1] - 20:6

**surgeries** [1] - 20:10

**surgery** [1] - 29:6

**surrounding** [3] - 14:11, 50:3, 50:6

**suspect** [12] - 58:18, 60:1, 60:23, 61:20, 62:14, 70:10, 74:15, 94:13, 94:17, 102:21, 103:14, 132:8

**suspects** [9] - 45:7, 86:2, 98:12, 98:16, 104:22, 105:4, 105:5, 105:8

**sustain** [5] - 63:4, 78:20, 82:6, 97:20, 103:23

**Sustained** [8] - 48:11, 80:23, 84:20, 98:2, 98:3, 102:9, 105:2, 112:7

**sustained** [4] - 32:15, 80:18, 82:11, 108:21

**suture** [1] - 23:23

**sutured** [5] - 24:2, 24:7, 24:20, 26:4, 31:3

**suturing** [1] - 31:6

**swab** [1] - 51:22

**swabs** [8] - 35:14, 35:18, 51:5, 52:15, 52:18, 53:5, 53:8, 54:1

**sweater** [10] - 70:18, 71:3, 71:8, 71:11, 98:7, 98:11, 98:12, 104:2, 104:5, 104:16

**sworn** [1] - 11:2, 39:9, 106:5

**system** [4] - 38:14, 38:19, 82:12, 82:18

---

**T**

**table** [1] - 29:16

**tags** [1] - 47:20

**tailor** [1] - 123:19

**TAKEN** [3] - 56:8, 114:18, 106:19

**tall** [2] - 59:10, 60:16

**task** [1] - 40:11

**Task** [1] - 107:14

**tattoos** [1] - 20:10

**teach** [2] - 12:4, 12:6

**technician** [1] - 71:22

**temple** [1] - 28:11

**ten** [6] - 81:13,

83:13, 83:18, 84:8
**tenure** [1] - 41:4
**terrorism** [1] - 40:11
**tested** [2] - 38:6, 53:1
**testified** [15] - 11:2, 39:9, 42:8, 50:1, 64:11, 64:16, 71:18, 75:2, 75:13, 78:9, 81:1, 106:5, 115:14, 115:23, 129:8
**testifies** [1] - 134:5
**testify** [6] - 8:20, 12:2, 18:19, 70:13, 82:12, 100:21
**testifying** [1] - 65:6
**testimony** [15] - 10:11, 43:20, 50:21, 51:1, 54:14, 55:14, 55:16, 72:14, 72:18, 97:12, 97:15, 116:12, 119:21, 129:14, 129:17
**testing** [3] - 13:4, 48:13, 49:12
**THAT** [1] - 136:7
**THE** [198] - 1:1, 3:4, 3:5, 3:6, 3:20, 4:9, 4:19, 5:1, 5:5, 5:12, 5:18, 6:4, 6:17, 6:20, 7:9, 7:12, 9:6, 9:17, 10:3, 10:5, 10:6, 10:7, 10:8, 10:22, 11:4, 11:6, 16:8, 17:6, 18:23, 19:3, 19:4, 19:13, 19:15, 21:10, 22:11, 33:5, 37:19, 39:2, 39:6, 39:11, 39:13, 39:15, 48:11, 49:5, 49:6, 49:7, 50:9, 50:12, 50:13, 50:15, 53:12, 55:20, 56:1, 59:12, 60:6, 63:4, 64:18, 65:18, 65:20, 65:21, 65:22, 66:10, 66:19, 67:2, 67:3, 67:4, 68:19, 69:19, 70:12, 77:15, 78:20, 79:17, 79:18, 79:19, 80:17, 80:20, 80:21, 80:23, 81:8, 82:6, 82:11, 82:15, 83:1, 84:19, 86:21, 87:6, 88:3, 88:16, 88:17, 88:20, 89:11, 89:16, 89:17, 89:18, 90:18, 92:7, 96:16, 97:4, 97:5, 97:6, 97:12, 97:19, 97:22, 97:23, 98:3, 100:19, 101:11, 102:8, 103:23, 105:2, 105:12, 105:15, 105:16, 105:17, 105:20, 106:2, 106:7, 106:10, 106:12, 108:21, 109:10, 112:7, 112:14, 114:4, 114:6, 114:8, 114:9,

114:10, 114:19, 114:20, 114:21, 115:10, 115:20, 115:22, 116:12, 117:1, 117:5, 117:9, 117:12, 117:14, 117:22, 118:5, 118:8, 118:12, 118:15, 118:18, 118:21, 119:1, 119:14, 120:2, 120:11, 120:15, 120:16, 120:18, 122:1, 122:10, 123:10, 123:23, 124:8, 124:11, 124:12, 124:13, 124:14, 124:20, 124:23, 125:7, 126:14, 126:17, 126:18, 126:19, 127:7, 127:22, 129:9, 129:13, 130:12, 130:20, 131:4, 131:9, 134:19, 134:22, 135:3, 135:5, 135:6, 136:6, 136:7, 136:8, 136:9
**theft** [1] - 40:9
**themselves** [1] - 128:2
**thereafter** [1] - 108:18
**therefore** [3] - 6:12, 84:4, 119:23
**therein** [2] - 129:6, 129:7
**thereof** [1] - 64:2
**they've** [1] - 24:7
**thinking** [1] - 48:7
**thinks** [2] - 4:15, 89:8
**third** [4] - 3:8, 80:1, 80:7, 133:9
**thoughts** [1] - 122:18
**threatened** [1] - 97:10
**three** [14] - 7:3, 20:4, 40:3, 40:10, 41:8, 48:21, 50:2, 50:16, 51:2, 58:10, 63:23, 86:5, 133:6, 133:8
**throw** [1] - 34:2
**tip** [5] - 93:13, 94:19, 94:20, 94:23, 95:6, 134:13
**tips** [22] - 45:9, 45:10, 45:19, 92:13, 92:14, 92:18, 92:20, 92:21, 92:23, 93:2, 93:9, 93:12, 93:15, 93:18, 94:2, 94:10, 94:12, 95:3, 95:12, 98:5, 102:13
**tissue** [3] - 21:3, 29:18
**tissues** [1] - 14:4
**today** [8] - 9:22,

10:2, 12:3, 122:16, 122:21, 123:20, 125:20, 131:10
**together** [3] - 24:2, 24:3, 122:20
**token** [1] - 74:7
**Toledo** [16] - 1:21, 39:21, 39:22, 41:1, 41:4, 41:10, 41:13, 51:11, 65:13, 66:13, 67:11, 67:17, 106:19, 107:6, 107:23, 110:12
**Tom** [3] - 41:14, 56:21, 110:18
**tomorrow** [7] - 9:18, 123:7, 124:2, 125:23, 130:23, 134:20, 135:2
**tonight** [1] - 126:8
**took** [9] - 8:6, 37:17, 42:15, 46:13, 51:19, 51:20, 72:16, 85:15, 91:16
**top** [2] - 28:6, 28:9
**total** [1] - 26:15
**touch** [1] - 99:7
**toxicology** [8] - 15:1, 15:20, 15:21, 17:3, 36:17, 37:7, 37:23, 38:11
**Toxicology** [1] - 2:13
**trace** [1] - 73:22
**tracks** [1] - 20:19
**training** [3] - 12:17, 41:1, 43:15
**TRANSCRIPT** [1] - 136:8
**trial** [8] - 1:8, 3:8, 89:9, 89:10, 131:19, 132:6, 132:10, 134:1
**TRIAL** [1] - 136:9
**trickle** [1] - 58:15
**troubled** [1] - 129:15
**truck** [2] - 116:4, 116:5
**TRUE** [1] - 136:7
**true** [3] - 85:8, 128:21, 129:7
**truth** [7] - 18:13, 60:4, 64:13, 66:15, 66:18, 86:19, 130:8
**try** [3] - 37:6, 92:15, 131:4
**trying** [8] - 35:15, 49:23, 60:4, 66:3, 80:8, 80:9, 93:13, 131:9
**tube** [2] - 23:2, 23:3
**Tuesday** [4] - 87:21, 88:5, 88:8, 90:21
**turn** [3] - 35:9, 87:20, 90:20
**turned** [6] - 17:19, 87:23, 88:1, 91:6, 91:18, 131:14
**twice** [1] - 8:1
**two** [13] - 7:3, 36:16,

36:20, 40:3, 58:10, 86:5, 127:1, 127:17, 133:2, 133:12, 133:20, 133:22, 133:23
**type** [1] - 130:21
**typed** [1] - 90:10
**types** [2] - 31:17, 93:9
**Typically** [1] - 47:17
**typically** [1] - 125:16

## U

**ultimately** [2] - 6:15, 127:19
**unclothed** [1] - 20:13
**under** [9] - 14:5, 21:3, 29:18, 29:19, 30:19, 59:4, 85:18, 88:13, 101:16
**underpants** [1] - 35:18
**UNDERSIGNED** [1] - 136:6
**unfortunately** [2] - 25:23, 93:16
**Unfortunately** [1] - 47:1
**Unit** [11] - 39:23, 40:4, 41:8, 42:22, 43:14, 43:18, 43:19, 44:1, 44:14, 56:19, 57:3
**unit** [6] - 40:7, 40:12, 40:13, 41:9, 41:21, 43:16
**unknown** [1] - 53:9
**up** [43] - 7:15, 23:9, 23:21, 26:22, 46:11, 52:6, 64:5, 65:19, 68:22, 69:11, 70:4, 70:5, 70:7, 71:1, 76:16, 76:18, 76:19, 76:22, 77:8, 77:9, 77:11, 77:16, 77:23, 78:16, 78:23, 81:20, 82:21, 83:23, 84:10, 84:17, 84:22, 85:16, 94:7, 94:12, 97:4, 103:4, 103:9, 103:16, 104:3, 104:13, 114:7, 125:11, 130:21
**upper** [1] - 24:6
**urine** [1] - 20:22
**useless** [1] - 95:4

## V

**V-A-S-Q-U-E-Z** [1] - 106:11
**vacillate** [1] - 64:21
**vaginal** [7] - 35:14, 35:18, 51:5, 51:22, 53:5, 53:8, 54:10

**value** [3] - 79:8, 81:9, 117:19
**van** [6] - 70:9, 70:10, 70:17, 98:6, 98:12, 104:1
**various** [6] - 51:15, 115:22, 116:13, 117:7, 117:15, 128:14
**varying** [1] - 59:2
**VASQUEZ** [1] - 106:4
**Vasquez** [6] - 2:4, 106:1, 106:2, 106:10, 106:18, 111:17
**verbiage** [2] - 67:13, 67:15
**Verdict** [2] - 17:14, 118:10
**verdict** [1] - 119:13
**verdicts** [1] - 11:23
**versus** [1] - 133:6
**Vice** [5] - 40:4, 43:14, 43:18, 43:19, 44:1
**victim** [2] - 54:11, 108:9
**view** [1] - 74:8
**viewed** [1] - 20:7
**viewing** [1] - 119:5
**views** [1] - 116:14
**vindicate** [1] - 99:12
**violate** [1] - 96:21
**violated** [2] - 89:8, 97:8
**voice** [5] - 68:16, 69:9, 69:14, 69:22, 103:20
**VOLUME** [1] - 1:6

## W

**Wait** [2] - 5:5, 65:18
**waiting** [1] - 67:8
**waive** [1] - 130:13
**wants** [2] - 80:5, 115:7
**WAS** [9] - 3:4, 49:6, 65:20, 79:18, 88:16, 97:5, 114:8, 114:19, 126:17
**weapons** [1] - 32:14
**wearing** [2] - 22:23, 71:7
**week** [1] - 87:21
**weight** [1] - 34:3
**WERE** [7] - 10:7, 50:14, 67:5, 80:22, 89:19, 98:1, 124:13
**whatsoever** [1] - 85:2
**whereas** [1] - 121:1
**whereby** [3] - 63:23, 119:7, 121:12
**wherein** [2] - 59:23, 131:19
**WHEREUPON** [17] -

3:4, 10:5, 49:6, 50:12, 65:20, 67:3, 79:18, 80:20, 88:16, 89:17, 97:5, 97:22, 114:8, 114:19, 124:11, 126:17, 135:6

**whole** [3] - 7:23, 25:19, 29:3

**WILSON** [1] - 1:5

**Wilson** [72] - 1:17, 2:20, 2:20, 3:8, 9:5, 42:2, 42:6, 42:8, 46:6, 46:15, 48:17, 48:18, 50:18, 53:10, 54:11, 54:20, 55:6, 57:14, 57:17, 61:5, 61:11, 61:13, 61:14, 61:19, 61:20, 62:6, 62:7, 62:10, 62:11, 62:18, 63:20, 64:6, 64:15, 65:12, 66:4, 66:6, 67:11, 67:12, 67:18, 67:21, 68:6, 68:15, 70:2, 73:21, 74:20, 74:23, 75:2, 75:6, 75:10, 75:19, 84:21, 86:10, 86:17, 91:5, 95:10, 96:8, 96:21, 99:18, 100:18, 100:20, 108:2, 111:7, 113:19, 117:21, 119:8, 120:21, 121:13, 125:4, 128:5, 130:9, 132:8, 132:17

**Wilson's** [1] - 55:12

**window** [1] - 31:22

**Wingate** [21] - 1:17, 8:17, 34:19, 50:6, 56:12, 66:20, 89:3, 94:1, 94:20, 96:5, 96:11, 96:20, 98:6, 98:19, 99:10, 99:17, 119:16, 125:2, 128:9, 133:20, 134:14

**WINGATE** [83] - 3:15, 4:17, 4:20, 7:14, 8:12, 8:15, 8:22, 9:19, 19:8, 19:14, 34:17, 37:18, 39:1, 46:4, 48:9, 49:3, 49:8, 50:10, 55:18, 56:10, 59:7, 64:11, 64:15, 64:20, 66:23, 67:6, 69:17, 78:22, 80:8, 80:19, 81:6, 82:8, 82:14, 82:17, 85:20, 86:13, 87:4, 87:8, 88:14, 88:18, 92:6, 96:14, 96:17, 96:22, 97:2, 97:7, 97:18, 98:2, 100:15, 101:7, 105:11, 108:20, 109:9, 111:11, 111:15, 114:2, 115:16, 116:3, 116:19, 117:8, 117:11, 117:13, 117:17, 118:7,

118:11, 118:14, 118:17, 119:3, 120:10, 120:12, 120:17, 120:19, 122:23, 123:22, 124:3, 125:3, 126:13, 127:5, 128:11, 129:11, 131:11, 134:21, 135:4

**Wingate's** [2] - 127:16, 133:16

**wise** [2] - 17:8, 58:13

**wit** [1] - 1:12

**withdraw** [3] - 2:12, 117:4, 124:21

**withdrawn** [1] - 117:6

**WITNESS** [5] - 11:6, 19:3, 39:13, 105:16, 106:10

**witness** [32] - 6:22, 16:7, 33:4, 39:3, 49:13, 50:2, 66:3, 69:9, 70:12, 77:14, 83:1, 85:8, 85:18, 89:12, 97:9, 97:14, 101:14, 101:16, 105:17, 105:19, 105:21, 112:12, 112:14, 116:13, 121:10, 128:12, 128:17, 129:8, 129:16, 134:2, 134:5

**witnesses** [2] - 93:5, 120:11

**WITNESSES** [2] - 2:2, 2:5

**Wittenberg** [1] - 133:4

**word** [4] - 85:5, 85:7, 99:23, 100:3

**words** [1] - 78:13

**works** [2] - 41:11, 57:1

**wound** [3] - 20:18, 24:4, 31:5

**wounds** [1] - 20:18

**writing** [1] - 10:18

**written** [4] - 3:17, 45:11, 104:6, 128:4

## Y

**year** [8] - 12:14, 12:15, 12:16, 18:8, 18:9, 22:22, 91:2, 107:8

**years** [14] - 12:13, 12:14, 12:15, 39:23, 40:2, 40:3, 40:5, 40:10, 58:10, 104:12, 107:9, 107:17, 107:20, 133:21

**yesterday** [1] - 42:9

**yourself** [3] - 11:13, 20:1, 106:17

**yourselves** [2] -

114:14, 126:5

## Z

**zygomatic** [1] - 25:18