EXHIBIT 17

| | |
|---|---|
| STATE OF OHIO, | ) |
| | ) |
| PLAINTIFF, | ) CASE NO. CR06-3339 |
| | ) |
| v. | ) |
| | ) JUDGE BARBER |
| ROBERT WILSON | ) |
| | ) ███████████ |
| DEFENDANT. | ) |

- - -

BE IT REMEMBERED, that in the trial of

the aforementioned cause on September 5, 2008,

before the Honorable James E. Barber, in the

Lucas County Court of Common Pleas, the following

proceedings were held, to-wit:

APPEARANCES:

On behalf of the Plaintiff:
Assistant Lucas County Prosecutor,
Michael Loisel, Esquire

- - -

On behalf of the Defendant, Robert Wilson:
Ronnie L. Wingate, Esquire
Neil S. McElroy, Esquire

- - -

Stacey L. McDevitt, RPR, Official Court Reporter
Lucas County Common Pleas Courthouse,
700 Adams Street, Toledo, Ohio 43624
(419) 213-4477

- - -

1                        I N D E X

2

3

   <u>COURT'S EXHIBITS</u>
4
   1, Question
5  2, Shredded Question
   3, Handwritten Instruction
6  4, Jury Instructions

7
   FIRST CLOSING ARGUMENT BY MR. LOISEL........22
8  CLOSING ARGUMENT BY MR. WINGATE.............54
   SECOND CLOSING ARGUMENT BY MR. LOISEL.......77
9  JURY CHARGE.................................89
   VERDICT....................................108
10

11

12

13

14

15

16

17

18

19

20

21

22

23

1                                            SEPTEMBER 5, 2008

2                                            COURTROOM #3

3                                            9:21 A.M.

4         (WHEREUPON THE FOLLOWING DISCUSSION WAS

5     HELD OUTSIDE THE PRESENCE OF THE JURY.)

6         THE COURT:     Let's go on the record.

7         MR. LOISEL:     Do you waive your client's

8     presence for this?

9         MR. WINGATE:     Yes.

10        THE COURT:     We're on the record.  The

11    Defendant is not present.  His presence is waived

12    by the attorneys.  State is present going over

13    proposed instructions.  There has been a draft

14    proposal made that all of the attorneys have

15    copies of and we're considering, and I understand

16    that you have a motion you would like to make

17    with respect to the proposed eyewitness testimony

18    appearing on Page 6; is that correct, Mr. Loisel?

19        MR. LOISEL:     Yes, Judge.  We had

20    discussed this yesterday and the Court indicated

21    that it was going to include this and at that

22    time the State agreed after having a chance to

23    look at it in conjunction with the rest of the

1    jury instructions, this is the typical

2    instruction with respect to eyewitness testimony

3    or identifying witnesses testimony and their

4    ability to recollect, et cetera, et cetera.  I

5    mean, there's six factors.  I think I'm bringing

6    it to the Court's attention because I think it

7    may be confusing to the jurors.  There really is

8    only one witness that could be considered an

9    identifying witness.  I think Defense Counsel

10    will probably argue that she probably didn't

11    identify anything, so I just wanted to point out

12    to the Court that I think it may be confusing and

13    therefore would ask that it be removed and I

14    don't believe there's an objection from

15    Defense Counsel at this time.

16         MR. WINGATE:   No, there isn't.

17         THE COURT:    All right.  You would

18    propose then striking the fourth line beginning

19    "with some things" and all the way through six;

20    is that correct?

21         MR. LOISEL:    Yes, Judge.

22         MR. WINGATE:   Yes.

23         MR. MCELROY:   And I believe underneath

1    that.

2         THE COURT:    And -- right.  All the way

3    through "not guilty."

4         MR. LOISEL:    Yes, through Page 6.

5         THE COURT:    All right.

6         MR. LOISEL:    And --

7         THE COURT:    We'll strike all of that.

8         MR. LOISEL:    There was a minor addition

9    with respect to the handwritten instruction that

10   you made and there's no objection to that being

11   included on Page 5 by the Defense -- well, by the

12   State.  I don't want to speak for the Defense.

13        THE COURT:    All right.  Everything

14   else all right?  Oh, I was going to make that

15   minor change on Page 5, correct.  "Phone call

16   made by Brenda Navarre" add "to Detective Seymour

17   wherein" add "he testified she appeared to be

18   under stress.  Could not be considered for the

19   truth of that matter."  I'll make that addition.

20        MR. LOISEL:    No objection, Judge.

21        MR. WINGATE:    No objection.

22        THE COURT:    All right.  Okay.  We're

23   ready for oral argument?

1          MR. WINGATE:   No, we're not, Your Honor.

2     I was aware of the fact that there was some

3     questions brought in.  I would at least like to

4     see the questions.

5          THE COURT:     They got ripped up.

6     Allison, do you have those questions that were

7     brought in?

8          MS. FINN:      Oh, I don't.  I can get a

9     copy of.

10         THE COURT:     You ripped them up?

11         MS. FINN:      I ripped them up into

12    shreds.  I literally shredded them.  I shredded

13    them into a thousand pieces.  Do you want me to

14    get her -- she has an original, I believe.

15         MR. WINGATE:   She still has them?

16         MS. FINN:      This is the copy.  I told

17    her I wasn't giving her the copy back.  Do you

18    want --

19         THE COURT:     Let's go on the record

20    here first.  I should indicate that the Bailiff

21    was given a document from juror number --

22         MS. FINN:      12.

23         THE COURT:     12.  Wherein she indicated

1    she had written up a number of questions that she

2    wanted to be from Ms. Adele Karwacki.  She wanted

3    the Court to answer these questions and I believe

4    that would be during open session.  I instructed

5    the Bailiff to advise her that she misunderstood

6    any notes that was referenced in the initial

7    instructions to the jury were to be notes that

8    may be generated during the course of their

9    deliberations and that those questions would be

10   reduced to writing and passed to the Bailiff and

11   answered by the Court and Counsel.  And I

12   instructed the Bailiff to advise Ms. Karwacki of

13   that understanding.  And do I understand, the

14   Bailiff being Ms. French, did you have further

15   conversation with her?

16          MS. FINN:      Yes.

17          THE COURT:      What was the nature of

18   that conversation?

19          MS. FINN:      I explained exactly what

20   you told me, that she could not ask.  She had to

21   request the questions in writing at a specific

22   time.  When they're deliberating, they have to

23   knock on the door and the bailiff will have to

1    come get them, that they can't share those with

2    anyone in the jury room while she's sitting there

3    now and I was going to destroy that copy.  I

4    believe she may have a copy with her.

5              THE COURT:     And then you shredded this

6    document?

7              MS. FINN:     Yes.

8              THE COURT:     That brings you up.

9              MR. WINGATE:     All right.  That brings me

10   up.  But this is the question and concern that I

11   have:  I don't know if it was yesterday or the

12   day before yesterday we had a question from

13   Mr. Montague.  I believe he's Juror Number 2 --

14             MS. JOHNSON:     Yes.

15             MR. WINGATE:     --- in the jury box and

16   the question he phrased, and the way it was

17   phrased was he was aware that the wife cannot

18   testify against her husband and that he wanted to

19   know why the Prosecutor did not ask the

20   son-in-law -- the stepson about what was in the

21   bag, their appearance when they arrived at his

22   house.  The concern that is raised is that he has

23   now introduced into this matter a principal of

1    law that is not going to be instructed upon by

2    the Court, whether he is correct as to the

3    assessment of spousal privilege or whether he's

4    wrong about it.  The fact of the matter is he's

5    now inquiring about a principle that he will not

6    be instructed upon.  And in all likelihood, the

7    question that is raised in my mind is, one,

8    whether or not he had, before pending the

9    question and submitting it to the Court, had

10   discussed this matter with other jurors and

11   somehow tainted or either caused a taint to be

12   placed in that jury room relative to the other

13   jurors, and I think that at this juncture.  I

14   would ask that he be removed, one; or, two, at

15   least an inquiry be made of him as to whether or

16   not he has discussed his question with other

17   members of this panel; and at minimum, three,

18   that some type of instruction be provided

19   indicating that the law as it applies to this

20   case will come from the Court and only the Court,

21   and you're not to use your own interpretation of

22   other principles of law that you may be aware of

23   as it relates to a verdict that's going to be

1      rendered in this case.

2           That's a concern that I have.  I've given

3      it some thought when I initially read the letter

4      but didn't vocalize it, but after thinking about

5      it, I think that with this juror pending that

6      kind of question, at minimum the Court should

7      A -- well, the Court should get rid of him.  We

8      do have an alternate, but at the very least I

9      would also have the Court inquire whether or not

10     this question that he submitted was discussed

11     with other members of the panel because the issue

12     of spousal privilege will never come up as an

13     instruction in this case.

14          MR. LOISEL:    Judge, I don't think that

15     there's any reason to, A, dismiss him; or B, voir

16     dire him; or C add additional instructions.  This

17     case is fraught with issues with respect to the

18     spousal privilege.  Obviously the jurors could

19     sense when Mrs. Wilson was testifying that there

20     was something going on.  We can't control what

21     the jurors think.  If they have some outside

22     knowledge of the law, your instructions tell them

23     that they have to deal with the evidence and the

1    definitions in the law that you give them.  What

2    else can you tell them?  Just because he wrote a

3    question and presented it earlier with that

4    mindset that he -- I don't remember the exact

5    wording of it, I think Mr. Wingate's rendition

6    was relatively close.  Does that justification

7    dismiss him just because it is crossing his mind?

8    I don't believe it rises to that level.  So, I

9    would ask that you deny that request to have him

10   stricken and I think we also need to address

11   Ms. Karwacki with respect to the issue of her

12   note-taking.

13          THE COURT:    That first note from

14   Juror 2 has been marked as Court's Exhibit Number

15   1.  These shredded notes from --

16          MR. MCELROY:   Number 12, Ms. Karwacki.

17          THE COURT:    I'm going to designate

18   this as Court's Exhibit 2.  Give me a second and

19   I'll frame a little instruction to the jury where

20   I will emphasize they are to consider the law as

21   is given to them by the Court in arriving at

22   their decision.  I also may put on the record in

23   their presence that we did receive one inquiry

1    that I'm going to assume was not shared with

2    other parties and that that's not to be -- they

3    are to consider only the law as given to them by

4    the Court.  Let me -- give me a minute and I'll

5    draw up an instruction and give you a chance to

6    look at it, but I'm not going to dismiss this

7    juror.

8         MR. WINGATE:   Note our objection for the

9    record.

10         THE COURT:    Sure.

11         MR. WINGATE:   Because I don't think

12    assuming that he did not discuss it with other

13    members of the panel is at this juncture

14    appropriate, inasmuch as the case is now on the

15    verge of being presented to the jurors at the

16    close of the arguments by Counsel.

17         THE COURT:    All right.

18         MR. LOISEL:    Well, Judge, and I think

19    Mr. Wingate is correct, you can't assume.  I

20    think Mr. Wingate is correct when he says you

21    can't assume he discussed it with other people,

22    however, I think what the Court is planning on

23    doing in adding an additional instruction will

1    remedy whatever -- if there is any taint.  If

2    they discuss it, they discuss it.  When it is

3    time for them to discuss this case, you're going

4    to indicate to them that they can only consider

5    the law as given to them by the Court.  I don't

6    know what else they can do.  So I want to make

7    that point to the record.

8         MR. WINGATE:   Your Honor, I don't think

9    there's anything that would -- that there would

10   be anything wrong with at least inquiring of this

11   juror whether or not he discussed -- prior to

12   submitting that question discuss the matter with

13   any other panel members.

14        MR. LOISEL:   Judge, I don't think that

15   there's a necessity for that, for what it's

16   worth.

17        MR. WINGATE:   I think the State would

18   agree there is a necessity for a fair trial for

19   Mr. Robert Wilson.

20        MR. LOISEL:   I would agree that.

21        THE COURT:   Let's assume the worst.

22   Let's assume he comes in here and says, yeah, we

23   had discussion about spousal immunity.  At that

1     point what would be your suggestion?

2          MR. WINGATE:  Well, it depends on what

3     was discussed.  If they have at this juncture

4     discussed a principle of law and, this jury is

5     going back in their mind indicating that, okay,

6     well, she must have known something or she

7     couldn't testify against him, maybe she was with

8     him.  All of that is nothing but speculation,

9     Your Honor, and that taints that juror panel.  I

10     mean, it prevents him from getting a fair and

11     impartial juror.  If it comes to that point, I

12     think we would perhaps have to consider more

13     drastic means such as a mistrial, and I know the

14     Court may not want it, but I think the law would

15     dictate that that would occur.  We cannot have

16     jurors with pre-dispositions as to what the law

17     is in a case, and this is clearly been indicated

18     by the question submitted by Mr. Montague, Juror

19     Number 2, and this was well before the completion

20     of the evidence in this case and certainly well

21     before this Court is going to give any

22     instructions.

23          MR. LOISEL:  Judge, as the Court is

1      well aware, everyone comes into this process with

2      preconceived notions.  You instruct them to the

3      law, you tell them that this is the law you are

4      allowed to consider.  Any -- I mean, I don't know

5      how you want to frame it in the additional

6      instruction you're going to give them, but

7      there's no taint that has been attained due to

8      the fact that this juror wrote a question down.

9      You're going to make an instruction, I would like

10     to obviously know what that instruction may be.

11     But I believe that remedies any and all problems

12     that Mr. Wingate is referring to.

13          MR. WINGATE:   Mike, what you're missing

14     is, and we won't belabor the point, we'll finish

15     it up.  What you're missing is when the Court

16     asked them to set aside any preconceived notion

17     of the law, that's the law applicable to the

18     case.  What you have is a juror expressing a

19     principle of law that will not be instructed

20     upon, has nothing whatsoever to do with this

21     case, hasn't even been brought up.  It is what he

22     says.  He says I know that a wife can't testify

23     against her husband.  That's what he said.  And

1    he's talking about the principle of spousal

2    privilege, which has not come up from the State,

3    Defense, or the Court, and this is what he's

4    talking about.

5         MR. LOISEL:    So, anyone in that room

6    that knows the wife can't testify against the

7    husband, so, therefore, none of them talk about

8    it?  You know, it is an issue.  It's been out

9    there.  It is the pink elephant inside of the

10   room.  They all know it, and just because he says

11   it, he's not talking about a principle of law.

12   He's talking about a wife testifying against a

13   husband.

14        MR. WINGATE:    That's the principle,

15   Mike.

16        MR. LOISEL:    Well, it is a principle of

17   law when you want to talk about Ohio Revised Code

18   2945.42.  He just knows as many people do that

19   spouses can't testify against each other.  Does

20   that mean that he's tainted the entire jury

21   because of his knowledge?  Everyone probably has

22   that knowledge.  So, I disagree with you in that

23   respect.

1          THE COURT:    All right.  Give me a few

2     minutes and see if I can draft an instruction

3     that we can all live with.

4                    (RECESS TAKEN.)

5          THE COURT:    All right.  Let's go back

6     on the record.  I did craft a handwritten

7     instruction that I believe addresses the two

8     different notes that we've received during the

9     course of this trial.  Shared copies of the

10    proposed oral instruction that I'm going to be

11    giving them verbatim of what I've written out

12    here and we'll have that marked as Court's

13    Exhibit Number 3 as well.  Are there any

14    objections?

15         MR. WINGATE:    Your Honor, from

16    Defendant's standpoint, the only objection that I

17    have is on behalf of Mr. Wilson's request that

18    the language in the second paragraph would

19    include the following words:  "I am instructing

20    you that Ohio law provides that the jury must be

21    advised by the Court of all of the law that is or

22    may be necessary for its deliberation."

23         THE COURT:    That agreeable?

1    MR. LOISEL:    That's fine, Judge.  No

2    objection.

3    THE COURT:    I can do that.

4    MR. WINGATE:    All right.

5    THE COURT:    All right.  Let's go do

6    it.

7    MR. LOISEL:    Judge, I don't know.  I

8    think the one other issue, and I think that this

9    instruction probably takes care of it, but I just

10    want to make sure it is clear for the record, and

11    I don't know if we need to, as much as I hate to

12    even suggest it, talk to Juror Number 12.  She --

13    it appears, we had Court's Exhibit 2 that has

14    been previously marked of ripped up notes that

15    she had prepared at home.  With that in mind, it

16    appears that she probably has been considering

17    this evidence, whatever evidence she has received

18    up to this point without the other 11 jurors, and

19    I know that's part of the instruction that the

20    Court has given you, that you are not to consider

21    this case unless -- well, I don't know if you've

22    given that specific instruction, but I know when

23    they retire to deliberate, you tell them they

1      cannot consider this unless all 12 are present,

2      you know, if two go to lunch and 10 go somewhere

3      else, you have to all be together.  I don't know

4      if you want to inquire from her or just go

5      forward with this curative instruction that we've

6      just talked about.

7            THE COURT:    I believe that my

8      instructions to all of the jurors are -- is that

9      they are not to form nor express an opinion until

10     the case is finally submitted to them and I

11     don't -- and I would think the nature of these

12     questions in and of themselves speak to the

13     matter that she has not yet formed an opinion

14     because she's still seeking further information.

15           MR. LOISEL:    Very well.  Just wanted to

16     make sure we're all clear.

17           MR. MCELROY:    So has the -- or had the

18     Court reviewed those questions itself?

19           THE COURT:    I had not.

20           MR. LOISEL:    And for the record, I

21     would submit that the State of Ohio did not, and

22     it is my understanding that the Defense did not

23     review those questions either.

1          MR. MCELROY:    That is correct.

2          THE COURT:    All right.  Okay.  Let's

3      go do it.

4          (WHEREUPON THE PRECEDING DISCUSSION

5      OUTSIDE THE PRESENCE OF THE JURY CONCLUDED AND

6      THE FOLLOWING PROCEEDINGS WERE HELD.)

7          THE COURT:    Please be seated.  Good

8      morning, ladies and gentlemen of the jury.

9      Before we get started, I do have a special

10     instruction that I need to read at this time.

11     The Court is somewhat concerned about two

12     developments in this case.  The Court did receive

13     a note from a juror who asked about an

14     evidentiary matter as it relates to a principle

15     of Ohio law.  The Court also received a number of

16     questions from a juror that he or she would like

17     to have asked in open court.  I am instructing

18     you that Ohio law provides that the jury must be

19     advised by the Court of all the law that is or

20     may be necessary for its deliberations.  There

21     may be other law that is applicable to the

22     pretrial and trial proceedings, but which may not

23     be introduced to the jury because it would relate

1    to matters of privilege, irrelevance, or

2    extraneous matters that for a number of reasons

3    cannot go to the jury.

4         I'm also instructing to you that when I

5    mentioned you would later be allowed to present

6    written questions, I should have further stated

7    that those questions would be questions that

8    arose during the course of your deliberations.

9    All of the evidence that could legally be

10   presented to you has been introduced into the

11   case.  Again, I must advise you that you are

12   required to follow the instructions that are

13   given to you by the Court.

14        At this time you will be hearing the

15   final arguments of Counsel.  This is an

16   opportunity for the attorneys to comment upon the

17   evidence that has been received in the case.

18   They will be putting their spin on it, putting it

19   into some sort of package that they believe you

20   can use in your deliberations in arriving at your

21   verdict.

22        I, again, remind you that statements of

23   Counsel are not evidence.  Since the State does

1    have the burden of proof in this case, the

2    State's attorney will address you first, and he

3    will also address you last.  Mr. Loisel.

4            MR. LOISEL:    Thank you, Judge.  Good

5    morning, everyone.  As I'm sure Mr. Wingate

6    appreciates, and we appreciate your patience.

7    What do we know in this case?  It's quite simple.

8    Brenda Navarre told on Robert Wilson.  She

9    snitched on him.  So, what did he do?  He killed

10   her.  It is as simple as that and keep in mind,

11   he didn't just kill her, he made an example of

12   Brenda Navarre.  You snitch on me, this is what

13   happens to you.  You cooperate with the police,

14   get me in trouble, this is how you end up.

15   Didn't strangle her, didn't shoot her.  He

16   dropped 110 pound rock on her head.  Why do you

17   think he did that?  You heard from Alfonzo Davis

18   why he did it.  Had to do what he had to do.  You

19   don't do that to Robert Wilson and get away with

20   it, you die.  Brenda Navarre learned that the

21   hard way.  Much will be made as to what Janet

22   Wilson did or did not do in this case.

23           So, I ask you for a moment, let's

1    consider other information that we know in this

2    case, direct evidence that was told to you from

3    the witness stand.  I'm going to go through all

4    of this, but let's just consider for a moment

5    this little synopsis.  Detective Seymour was

6    using Brenda Navarre as a confidential informant,

7    as a snitch, no question about that.

8    Detective Seymour watched Brenda Navarre make

9    three buys from that man in the middle part of

10   1993.  She was a snitch.  She was corroborating

11   with police.  He got in trouble as a result of

12   that cooperation.

13        Detective Seymour told you about a

14   frantic phone call that he received days before

15   the rock was dropped on Brenda Navarre's head by

16   the Defendant.  The Judge is going to instruct

17   you on inferences, logical inferences that you

18   can make with respect to the evidence.  Well, I

19   submit to you why would Brenda Navarre call a

20   Toledo Police detective, and I want to make sure

21   I get this testimony right, she appeared to be

22   frantic and crying and two days later, two or

23   three days later she ends up dead at the hands of

1    Robert Wilson.  Why else would she have been

2    calling?  The gig was up.  She knew that Robert

3    knew, that's why she was calling.  She was scared

4    to death.  Detective Seymour told you that.

5         What else do we know?  Direct evidence,

6    December 1st, 1993, Brenda Navarre is found on a

7    sidewalk dying with blood rushing from her head

8    from a serious injury.  Giant rock laying next to

9    her on the sidewalk.

10        What else do we know?  December 1st,

11   1993, Janet Wilson just so happens to pick up

12   Robert Wilson at his sister's house that very

13   night and he had two bags with him.  Is that a

14   coincidence?  No coincidence.  You know why she

15   picked him up that night.  The evidence is clear

16   as to why she picked him up that night with two

17   bags.

18        December 2nd, 1993, Brenda Navarre died.

19   What did the coroner tell you?  Blunt force

20   trauma to her head here and here.  And is it

21   consistent with a rock being dropped on you?

22   Yes.  She told you about the hinge fracture

23   through the entire shelf of her face.  She told

1    your about the depressed skull fracture

2    consistent with a 100 pound rock being dropped on

3    your head.

4            Finally, what other direct evidence do we

5    have?  Alfonzo Davis, don't we, the Defendant's

6    stepson.  He kind of laughed when you said

7    stepfather, Yeah, I guess so.  You heard his

8    testimony.  This guy right here is not his

9    favorite guy, doesn't hate him but he's just not

10   the right guy for his mom.  No bias.  What reason

11   would he have to lie about what Robert Wilson

12   told him back in 1995 or so?  Doesn't have a

13   reason to lie.  He told you about the

14   conversation that he had with that man, and it is

15   not as though he talked to him out of the blue.

16   It is not although he said, Hey, Alfonzo, come

17   here, I need to tell you something.  Alfonzo told

18   you that he and his brother was involved in

19   something where his brother was a snitch.  Oh,

20   that rang some bells with this man, didn't it?

21   When he heard snitch, he said, Well, let me tell

22   you about snitches, you got to do what you got to

23   do.  What's that?  Alfonzo asks him.  You kill

1    snitch bitches.  Well, how did you do it?

2    Dropped a brick on her head.

3         Again, is that just a mere coincidence

4    that he's talking about this, about what he did

5    to Brenda Navarre and that's exactly how it

6    happened, or is that the admission?  I submit to

7    you that's exactly what happened.  He admitted to

8    Alfonzo Davis that night.

9         Mr. Wingate is going to talk to you

10   about, well, aren't you sure or are you not sure

11   if you heard that from your mother about the

12   brick being dropped on his head.  He said, Well,

13   maybe she told me, I don't know.  But remember my

14   question to him:  What did Robert say to you.

15   Dropped a brick on her head.

16        There's no question that he told him the

17   other two parts of that conversation, is there?

18   He did what he had to do.  He had to kill the

19   snitch bitch.

20        Now, obviously there was a lot more

21   testimony in this case, but I submit to you,

22   ladies and gentlemen, with just the evidence that

23   I just talked about, you have more than enough

1    proof beyond a reasonable doubt to convict that

2    man of murder, but it is not that simple, is it?

3    There are other things that need to be discussed.

4    Even when you look at the other things that need

5    to be discussed, everything somehow points back

6    to him.

7         I know defense attorneys like to say no

8    matter how many times you point at my client, he

9    is not guilty.  You know what?  You are the sole

10   judges of that.  Where does everything point?

11   Does it point off into space?  Does it point to

12   some third party?  No.  Amazingly it all points

13   back to him.

14        Now, just as what I'm telling you the

15   evidence has shown, Mr. Wingate will talk to you

16   about what he feels the evidence has shown.  And

17   I can tell you what he's going to talk about.

18   He's going to talk about, well, Janet Wilson

19   isn't telling the truth.  She lied on Robert.

20   That's what this is all about.  Alfonzo Davis,

21   he's not telling the truth either.  He's lying on

22   Robert.  Toledo Police, it is their fault.  Their

23   initial investigation, they should have found

1    somebody and found that person, it is their

2    fault.  They didn't do an adequate job.

3        Ladies and gentlemen, I submit to you

4    that he's going to try to make you believe that

5    this is some elaborate scheme by Janet Wilson to

6    frame Robert Wilson.  He may not say it in those

7    terms, but think about it, that's what he wants

8    you to think.  That's what he wants you to

9    believe.

10        Is it feasible that Janet Wilson for

11   $5,000 dollars after 15 years wanted to frame her

12   husband, that she waited 10 to 12 years and

13   that's when she decided, huh, okay, now it's

14   time.  I'm going to start this whole process in

15   motion.  I'm going to talk to detective --

16   Sergeant Vasquez, Sergeant Forrester, and Bart

17   Beavers, and we're going to get this all started

18   now, because, yeah, I've had enough of this.  I

19   want my $5,000 dollars.  I'm going to frame my

20   husband.  Or does it make sense that what she's

21   telling you is true.  All the evidence tells you

22   that what she says is true and we'll get back to

23   that.

1        Defendant's Exhibit A, the letter she

2    wrote to Robert Wilson while he was incarcerated.

3    He's going to waive it in front I don't have of

4    you and waive this letter and say it proves my

5    client's innocence.  She says in that letter that

6    I lied to the grand jury.  Janet Wilson, and as I

7    said, don't worry, we'll certainly get back to

8    that, but just remember when that letter

9    originated.  Keep that in mind when he's saying

10    you must believe what's in this letter because it

11    exonerates my client.

12        The only problem that Mr. Wingate faces

13    is that it ignores the evidence that we just

14    talked about, the fact that Brenda Navarre was a

15    snitch, the fact that she snitched on Robert

16    Wilson, the fact that Robert Wilson told his

17    stepson, I killed the snitch bitch by dropping a

18    brick on her head.  It ignores all of that.  He's

19    going to want you to focus on Janet Wilson's

20    letter and all these mystery suspects that the

21    Toledo Police had on these suspects in 1993.

22    Why?  Because that pulls your focus away from the

23    direct evidence that we just talked about.  It

1    pulls your focus away from the fact that the

2    evidence dictates that Robert Wilson murdered

3    Brenda Navarre.  And, again, don't take my word

4    for all this.

5         Let's at this point go through what we

6    heard.  These are my notes from each and every

7    witness.  And I've explained it, and I don't want

8    to be redundant, but it is important that you

9    consider what each and every witness had to say.

10   That's why you're here.  Remember back in voir

11   dire we talked about you are the judges of

12   credibility with respect to what you hear from

13   the witness stand?  You had an opportunity to

14   look at each and every witness, their demeanor,

15   how that sat in that witness chair, how they

16   talked to you, how clear they were with their

17   voice, their inflection, their ability to tell

18   you the truth.  Keep that in mind.

19        Detective Bill Seymour, three direct buys

20   between the deceased, Brenda Navarre, and the

21   Defendant back in 1993 May, June, and I believe

22   August.  Pretty compelling when you think about

23   it, especially as I said when you think about it

1    in conjunction with what the Defendant told

2    Alfonzo Davis, I had to do what I had to do.

3    What's that?  Kill the snitch bitch.  There's no

4    question Brenda Navarre was the snitch bitch Bill

5    Seymour told you.  It is not as though that

6    mysteriously came forward.  That is a fact that

7    can't be changed.  She snitched for the TPD and

8    the fact that Alfonzo told you what the Defendant

9    said, He killed the snitch bitch.  And it is not

10   as though Brenda Navarre died from, as I said,

11   strangulation, maybe a gunshot wound, being hit

12   by a car.  It just so happens that she died in

13   the exact manner that Robert Wilson said she did

14   back in 1995 to Alfonzo Davis.  She had a brick

15   dropped on her head, and you'll have a chance to

16   look at the pictures.  It is much more than a

17   brick, ladies and gentlemen, it is a boulder over

18   a hundred pounds.

19        What else did Detective Seymour tell you?

20   As I said, days before Brenda was killed, frantic

21   phone call, she was crying.  You can make logical

22   inferences.  Days later she ends up dead.  Why

23   would she call Detective Seymour if it weren't

1    for something to do about the case against

2    Robert Wilson?  It doesn't make sense.  Of course

3    she called him with respect to Robert Wilson.

4    Somehow he had found out that she was a snitch

5    and he took care of it.

6        You'll also hear an instruction with

7    respect to what Detective Seymour told you.  It

8    is called other acts evidence, and I believe the

9    Judge has already instructed you after

10   testifying, you can't consider that with respect

11   to the guilt or innocence of this man, but you

12   can consider it for motive.  That's exactly what

13   it is.  His motive to kill Brenda Navarre stemmed

14   from when he learned that she snitched on him.

15   And, finally, one other thing that's important

16   with respect to Detective Seymour.  What did he

17   say?  Mr. Wingate asked him about the

18   confidential informants, Do you typically like to

19   have them, and pardon me if I don't say the quote

20   exactly, but he asked him about a question about

21   Do you like to have confidential informants

22   testify in court.  No.  We like to try to keep

23   their identity hidden.  Huh, okay.  Remember his

1    answer to me when I said, Well, why?  What did he

2    say?  Police try not to use confidential

3    informants at trial to protect their identity.

4    Why?  To protect their life.  Being a

5    confidential informant is dangerous, and

6    Brenda Navarre found that out the hard way.

7    Robert Wilson made sure of it.

8        You have two scene witnesses, Odett Scott

9    and Roger Craig.  What does Roger Craig tell you?

10   Not much.  He tells you he came upon a scene and

11   there was a dying or dead white female, petite on

12   the sidewalk with a giant rock next to her head,

13   blood on the sidewalk.  Confirms what happened

14   that night.

15       Odett Scott you could barely hear what

16   she had to say, but what is important from her

17   testimony?  Remember what she said about the

18   voices that she heard, black male arguing with a

19   white female, Robert Wilson is a black male,

20   Brenda Navarre was a white female.  You may not

21   think that's important, but she was there.  She

22   was there that night just before Brenda Navarre

23   was killed and heard an argument between a black

1    male and a white female.  Granted, she didn't see

2    who did this, but you saw I kept trying to ask

3    her, Are you sure you didn't see.  What did you

4    see when you looked over there.  What did you

5    see.  She wouldn't say.  She just said a black

6    male and a white female arguing.  So, I'm not

7    trying to tell you that she identifies

8    Robert Wilson, but it eliminates everyone else

9    but black males.

10         Officer Malone, Sergeant Niemiec.  Again,

11   two responding officers.  What do they do?  They

12   set the scene.  They tell you that they responded

13   to Paxton and E Street which here in Toledo,

14   Lucas County, Ohio.  Remember when we talked

15   about elements?  I said, you know, the State of

16   Ohio have to prove A, B, and C.  That's one of

17   the elements, that this took place here in Lucas

18   County, Ohio, on or about December 1st through

19   December 3rd of 1993?  Remember my question:  Did

20   you respond to Paxton and E Street on or about

21   December 1st, 1993.  Officer Malone said Yes.

22   Officer Niemiec -- Sergeant Niemiec now said yes.

23         Those are two very important elements,

1 venue -- well, just one, venue. Here in Toledo,

2 Lucas County, Ohio and, I'm sorry -- two -- date,

3 time frame, December 1st through December 3rd,

4 1993.

5 They didn't see who was there. I'm not

6 pretending to say they have any idea who did

7 this, but that's where they responded to find

8 Brenda Navarre laying in this puddle of blood

9 with a rock next to her, dying. You heard their

10 testimony that they got her out of there as fast

11 as possible to try to get her medical attention.

12 One of them recalls, I believe it was

13 Sergeant Niemiec, Do you know what happened to

14 her? Yeah, she died. No question about that, is

15 there?

16 I've talked about a lot about Alfonzo

17 already, but next in line Alfonzo Davis. As I

18 said, he was candid, he said he loves his mom, is

19 that a bias? That's for you to decide. Is his

20 love for his mother so strong that he came in

21 here and lied to you ladies and gentlemen? Did

22 you get that from his testimony? Did you feel

23 that from the way he was talking to you? No.

1   You could see he didn't really want to be here in

2   the first place.  Not a pleasant thing to testify

3   against Robert Wilson.  He was very reluctant to

4   even tell about the conversation he had with

5   Robert Wilson.  Do you remember having a

6   conversation with Robert Wilson around back about

7   1995.  Kind of.  Not really.  Something about

8   snitches.  Well, if I showed you this statement

9   that you made to police back in 2006, would it

10  refresh your recollection?  I suppose.  I showed

11  it to him.  Does that refresh your recollection,

12  Mr. Davis.  Yes.  What did you and Mr. Wilson

13  talk about.  He said he had to do what he had to

14  do.  Mr. Davis, what do you mean by that.  Do you

15  know what he meant.  That he had to kill the

16  snitch bitch.  If you know, Mr. Davis, how did he

17  do that.  Again, dropped a brick on her head.

18  You heard him.  You saw him.  He's telling you

19  the truth, ladies and gentlemen, he has no reason

20  not to tell you the truth.

21          MR. WINGATE:    And I will object.

22          THE COURT:      Sustained.

23          MR. LOISEL:     You judge his credibility.

1    Remember what I said.  You saw him testify.  Did

2    it appear that he was telling you anything but

3    the truth?

4         MR. WINGATE:   Again, I will object.

5         THE COURT:    Issue of truth is for

6    the -- and the credibility is to the preface of

7    the jury.  Sustained.

8         MR. LOISEL:   Also one other thing you

9    need to consider is he told this to the police

10   years ago.  Information didn't come forward until

11   19 -- or 2006 when the police after having an

12   opportunity to talk to him said, Hey, let's get

13   together and we'll have a conversation.  So, what

14   did they do?  They got together.  Alfonzo Davis

15   told him what -- told them what he told you.  Was

16   he offered any money?  Did he get 50 crisp $100

17   dollar bills?  No.  He just told you what

18   Robert Wilson told him.

19        That brings us to the thick file

20   Brenda Navarre -- I'm sorry -- Janet Wilson.  As

21   I said, of all nights in all the years that she

22   was with this man, she remembers picking him up

23   on December 1st of 1993 at his sister's house

1          with two bags.  And as I mentioned before, is

2          that some cosmic coincidence that on the night

3          Brenda Navarre was brutally murdered,

4          Janet Wilson, the Defendant's wife, goes and

5          picks him up?  A couple of bags.  They ultimately

6          end up at Alfonzo Davis's house, spend the night.

7          Why is that memorable?  Because it had never

8          happened before.  I submit to you that the

9          evidence suggests that the Defendant didn't want

10         to go home that night.  He was hiding out.  Where

11         did he go?  Alfonzo Davis's house.  The one time

12         in his life he spent the night just so happens to

13         be on December 1st, 1993.

14             There's no getting around the fact that

15         she wrote a letter to Robert Wilson in 2006,

16         indicating that she lied to the grand jury, but

17         she told you why she did this.  She was scared.

18         She didn't know what was going to happen, but you

19         heard her say that letter was not truthful.  You

20         heard her talk to Attorney Wingate, that letter

21         is a lie.  Attorney Wingate and myself both went

22         through the letter and the affidavit, some of it

23         is true, some of it is not.

1          When she met with him years ago, she told

2     Defense Attorney that that letter was a lie.  She

3     told you, ladies and gentlemen, that that letter

4     was not truthful.  Sure, certain parts of it were

5     based in truth, but the gist of the letter was

6     not true, the gist that she lied to the grand

7     jury to set up her husband.  I'll admit, she

8     said, Yeah, I was having some tough times, bar,

9     financial situation, yeah, I needed money.  Who

10    of us -- strike that.

11         Who doesn't need money?  She was honest.

12    She told you, Yeah, I needed money.  Does that

13    mean she lied about it?  She also was very

14    candid.  She told you, yeah, I was charged.  I

15    wasn't going to cooperate.  The State of Ohio

16    charged me with obstructing justice.  Charge gets

17    dropped if she cooperates.

18         Attorney Wingate is going to say, well,

19    of course she's going to cooperate if not she's

20    going to go to prison.  She doesn't want to go to

21    jail because of this man.  Before you heard

22    Attorney Wingate say one, two, three, four, five

23    years is the penalty for obstructing justice.

1      She doesn't want to do that.  Hasn't the

2      Defendant put her through enough already?  Of

3      course she's going to cooperate.  She doesn't

4      want to get a felony for this man.

5           And finally, she admitted that that

6      affidavit was, again, partially true, partially

7      false, but you got to consider this:  Who

8      prepared this affidavit?  Robert Wilson's

9      attorney prepared it.  Robert Wilson's attorney,

10     his job is to defend his client.  So, what does

11     he do?  He knows that his client got a letter

12     from Janet Wilson saying that she lied to the

13     grand jury.  What does his attorney do?  Like any

14     good attorney, prepares an affidavit that says,

15     Janet, sign this if it is true, because if this

16     is true, Robert Wilson couldn't have done what

17     you say he did.  Notice the signature line.  It

18     is blank.  Janet Wilson wouldn't sign it.  You

19     heard her say why not, because it is not true.

20     Attorney Wingate attempted to have her sign that

21     on two separate occasions she testified to.

22          MR. WINGATE:  I will object.  She said

23     once at the rehab.

1          MR. LOISEL:    He prepared the affidavit

2     at his office, showed it to her, wouldn't sign

3     it, and then at the rehab center she wouldn't

4     sign it, two times.

5          MR. WINGATE:    Objection.

6          THE COURT:    Jury will have to rely on

7     its collective memory.

8          MR. LOISEL:    Again, you have to judge

9     her truthfulness, her candor on the stand.  Did

10    she appear honest to you?  What were her

11    responses?  Did they seem rehearsed, or did they

12    seem candid?

13         Finally she said something that was very

14    compelling.  Why after 10 years did you go talk

15    to Sergeant Forrester?  She had to get it off her

16    chest.  She couldn't live with it any longer.

17    She was down at Toledo Police, saw an unsolved

18    murder board.  It obviously evoked very emotional

19    memories.  She had to talk to someone.

20         And finally, yeah, she got $5,000

21    dollars, as I said, but what did

22    Detective Beavers tell you with respect to Crime

23    Stopper money?  It is not as though road

1       policeman can go out and say, huh, let's offer

2       this person $5,000 dollars to see if we can get

3       them to say what we want them to say, see if they

4       adopt a story we like so then we can arrest

5       someone.  No, it is not like that.  It has to go

6       in front of a board and be approved before you

7       can even offer it to somebody.  And when do you

8       get Crime Stopper money?  When it leads to an

9       arrest of the suspect.  That's exactly what

10      happened in this case.

11              You heard from Detective Vasquez, he told

12      you that he had talked to Janet Wilson back in

13      2005.  He had talked to her on a number of

14      occasions by phone at the bar, in person when her

15      grandson was robbed.  He talked to him -- I'm

16      sorry, he talked to Janet Wilson at that point.

17      Did she ever talk to you about the murder of

18      Brenda Navarre.  Yeah, many occasions.  Did she

19      ever give you an official statement.  Yep, June

20      of 2005.  Approximately how many times did you

21      talk to her?  He couldn't even give me a number.

22      But remember what he said at the end of his

23      testimony?  Every time he talked to

1    Brenda Navarre -- strike that, I apologize.

2         -- Janet Wilson about the murder of

3    Brenda Navarre, her story was consistent.  It

4    never changed.  Now Attorney Wingate will tell

5    you her story changed, he's got the letter.  Keep

6    in mind, we'll talk about that again, when that

7    letter was written.

8         Dr. Barnett had to show us some very

9    tough pictures to look at, but as I already told

10   you, what's the importance of her testimony?  A,

11   Brenda Navarre died.  Manner of death was

12   homicide, blunt force injury to the head.  But

13   the most compelling part of her testimony is she

14   explained to you all the injuries, talked about

15   the fractures.  Is it consistent with a rock

16   being dropped on your head?  Yes.  Look at that

17   in totality of the circumstances.  Look at that

18   in conjunction with all of the other information

19   that's been pointed out to you, all of the other

20   evidence that you are to consider.  Makes sense,

21   she died by a rock being dropped on her head by

22   this man.

23        Finally, we have Detective Beavers

1    testify.  Yes, there was evidence destroyed in

2    this particular case.  The rock is gone, clothes,

3    any physical evidence that may be at the scene

4    has been gone -- has been destroyed.  You've

5    heard from Detective Beavers that

6    Detective Culpert still thought this was a

7    felonious assault case.

8         MR. WINGATE:  We'll object.  That was

9    testified to and objected to and was sustained.

10        THE COURT:    I'm going to have the jury

11   rely on its collective memory on that point.

12        MR. LOISEL:    Regardless, it was

13   destroyed.  And my question to Detective Beavers

14   was, wouldn't you like to have that evidence

15   still.  Of course he would.  Why?  Because you

16   can still get trace evidence.  Maybe you can get

17   DNA off her clothes, off the rock, or off

18   something from the scene.  But you know what?

19   They don't have it.  It is unfortunate.  Would he

20   like to have it?  Sure.  Would the State of Ohio

21   like to have it?  Yes.  I'm sure the Defense

22   would like to have it, too, because that physical

23   evidence could have given us something, maybe

1    something to exonerate the Defendant, but also

2    something more, to prove his guilt.

3         I submit to you, you already have enough,

4    more than enough that proves beyond a reasonable

5    doubt that he's guilty of this crime.

6         So, yes, Detective Beavers does admit

7    that that evidence was destroyed.  DNA.  Yes,

8    even though DNA was not even really used in 1993,

9    they still collected evidence from her anus, from

10   her vagina, from her blood for comparison

11   purposes back then -- strike that.

12        It was used for other things than DNA but

13   now today, 2008, you can compare those things.

14   And what do they do?  They compared that DNA

15   taken from her vagina to that of Robert Wilson.

16   You can look at State's Exhibit, I believe 24 and

17   25, yeah, the DNA from her vagina does not match

18   Robert Wilson's DNA.  Has absolutely no

19   evidentiary value.  The only thing I tell you is

20   that Robert Wilson's DNA wasn't in her vagina.

21   That's what it tells you.  So the DNA matters

22   not.

23             There was testimony about the tip --

1    tips, importance of them.  This Detective did not

2    receive the tips.  He could not gauge their

3    importance.  He also told you that he had a

4    chance to talk to Janet Wilson on a number of

5    occasions and her statement to him was consistent

6    time and time again.

7          A thorough investigate was done in 1993.

8    He told you and no viable suspects were

9    developed.  Sure, he's willing to admit, and the

10   State of Ohio versus submits to you, yes, that a

11   number of tips were given back in 1993, six,

12   seven, eight different names, but I submit to

13   you, ladies and gentlemen, that the Toledo Police

14   Department did their job back in 1993.  They

15   investigated those tips to the best of their

16   ability and no one surfaced as a legitimate

17   suspect.  Therefore, what happens?  The case goes

18   cold.  When did the case revive?  Janet Wilson

19   came forward.  Detective Beavers even told you

20   Robert Wilson's name was not even considered back

21   in 1993.  It was not listed in any of those tips,

22   was it.  Detective Beavers, No.  Doesn't it make

23   sense that they didn't charge anyone back in 1993

1    with this crime because they didn't have the

2    information about the real killer back in 1993?

3    When did they get that evidence?  In 2003 when

4    Janet Wilson came forward.  His name never came

5    to light until 2003.  That's when the evidence

6    surfaced.  That's when the case was reopened,

7    that's when you develop the true suspect,

8    Robert Wilson.  And don't, again, take my word

9    for it.  Take that in consideration with the drug

10   investigation, the statements that Alfonzo made,

11   Janet Wilson's continuing statement in

12   implicating Robert Wilson.  The Toledo Police

13   finally got the evidence that they needed and

14   charged the real killer.  Ideally would it have

15   been nice to have that information from

16   Janet Wilson back in 1993?  Of course it would

17   have been.  It would have been great.  Wouldn't

18   have had to deal with this case for the next 15

19   years.  But they didn't, so they didn't charge

20   anybody until they got the evidence, and that's

21   what policemen do.  That's what detectives do.

22   They put cases together when they get a

23   sufficient amount of evidence and they charge

1   someone.  Unfortunately in this case it didn't

2   happen for 15 years, but it happened.  You ladies

3   and gentlemen have the evidence, and, as I said,

4   it all points right there.

5           One last thing before I finish up.

6   Defense Counsel is going to talk to you.  I'm

7   assuming he's going to talk to you about

8   Janet Wilson.  I've talked to you a lot about

9   Janet Wilson.  She's an important witness in this

10  case, but I want you to keep in mind, as I said,

11  he's going to wave the letter that she wrote to

12  Robert Wilson around.  He may read from the

13  letter.  I don't know what he's going to do from

14  the letter, but you can read the letter.  It's

15  been made part of evidence for your

16  consideration.  When you go back and deliberate,

17  you can look at that letter.  What does the

18  letter say?  Janet Wilson says to Robert in this

19  letter that I lied to the grand jury, I'm having

20  crazy feelings and thoughts.  Defense Attorney

21  Wingate says, well, you have to believe this

22  letter.  That's true.  Well, if that's the case

23  and you can only believe the -- why can you only

1    believe part of the letter?  He's going to say

2    she's truthful here when she writes the letter.

3    What about all the other information that

4    Janet Wilson is given, why can't that be true?

5    The reason that all the other stuff can't be true

6    is because it points right at Robert Wilson.

7         So, I don't want you to believe the stuff

8    that points at Robert Wilson, but I want you to

9    believe the stuff that doesn't point at

10   Robert Wilson.  You can't have it both ways.

11   You've got to consider it in its entirety, why

12   she wrote the letter.  She told you she was

13   scared.  Like I said, I'll get back to that.

14        Finally, ladies and gentlemen, as I said,

15   the State of Ohio has to prove beyond a

16   reasonable doubt each and every element of

17   murder.  We talked about it in opening.  Remember

18   I said A, B, C.  If we don't prove A or B or one

19   of the three, then you got to find not guilty,

20   but if you find that the State has proven all of

21   these elements beyond a reasonable doubt, it is

22   your duty to find the Defendant guilty.  What are

23   the elements?  That Robert Wilson on or between

1       December 1st and December 3rd, 1993, here in

2       Lucas County, Ohio, purposely caused the death of

3       another.  Four things.  The Judge is going to

4       give you definitions with respect to what

5       purposely means and causation.  But let's just

6       look at it in layman's terms.  Robert Wilson

7       caused the death, purposely caused the death of

8       another.  Ladies and gentlemen, I submit to you

9       that when you pick up a hundred pound rock and

10      drop it on someone's head, you're purposely

11      trying to cause their death.  There is no other

12      explanation as to why you would drop a hundred

13      pound rock on someone's head.  On or between

14      December 1st to December 3rd, 1993, there is no

15      question that that is when this took place.  The

16      Toledo Police told you that's when they

17      responded.  Deputy Coroner Scala-Barnett.

18              Told you that's when she conducted the

19      autopsy on December 3rd.  She told you that

20      Janet -- or Brenda Navarre passed on December

21      2nd.  No question here in Lucas County, Ohio.  As

22      I said before, Paxton and E Street.  Everyone

23      testified that that is here in Toledo Ohio, Lucas

1    County, Ohio.

2         So, that leaves us with Robert Wilson.

3    I've just spent the last 45 minutes or whatever

4    it may have been telling you the evidence points

5    directly at Robert Wilson.  It points at no one

6    else.  But, wait, wait, wait.  What about the

7    tips?  What about all these other names?  They

8    were investigated, and nothing came of them.

9    Everything in this case points to Robert Wilson

10   and that he on or between December 1st and

11   December 3rd, 1993, here in Lucas County, Ohio

12   purposely caused the death of Brenda Navarre.

13   The State of Ohio has proven that beyond a

14   reasonable doubt and it is your duty to find the

15   Defendant guilty.

16        THE COURT:     All right.  We'll take a

17   15 minute recess before you commence with further

18   final arguments here.  Again, do not discuss this

19   case among yourselves.  Do not allow anyone to

20   discuss this case in your presence.  Neither form

21   nor express an opinion about the case until the

22   case is finally submitted to you.  We'll recess

23   for 15 minutes.

1                    (RECESS TAKEN.)

2          MR. WINGATE:   Judge could we approach

3     before you bring the jury out?

4          (WHEREUPON THE FOLLOWING DISCUSSION WAS

5     HELD OUTSIDE THE PRESENCE OF THE JURY AT THE

6     BENCH.)

7          MR. MCELROY:   Judge, with reference to

8     the affidavit or statement that is Mrs. Wilson's

9     statement that Ronnie wrote and was not admitted

10    yesterday.

11         THE COURT:     Uh-huh.

12         MR. MCELROY:   That was --

13         MR. LOISEL:    That is Defendant's

14    Exhibit B.

15         MR. MCELROY:   Correct, Defendant's

16    Exhibit B.

17         THE COURT:     Right.

18         MR. MCELROY:   It was mentioned several

19    times during closing.  Again, it was acknowledged

20    by the State that she testified it is both true

21    and some of it is false.

22         THE COURT:     Uh-huh.

23         MR. MCELROY:   It is the Defendant's

 1       position it is not being offered to prove the

 2       truth of any of the statements in it.  It's being

 3       supplied just to show that they were saved.  And

 4       to give the jury some sort of reference about a

 5       reference point to make sense of the testimony

 6       she gave about, well, some of this is true and

 7       some of this is false, therefore, it would be

 8       outside of any hearsay and should be admitted.

 9              MR. LOISEL:    Judge, I think the Court

10       has made its ruling, but I'll leave it -- I would

11       ask you just to refer to your right, but I'll

12       leave it up to the Court at this point.

13              THE COURT:    If I remember correctly, I

14       ruled that you can read anything, make full

15       reference to it, but since it was a hearsay

16       document it was not to go to the jury.  I better

17       reaffirm that at this point, but you can

18       certainly --

19              MR. MCELROY:    But on the basis that it

20       is offered for the truth --

21              THE COURT:    On the basis that it is

22       hearsay.

23              MR. MCELROY:    Okay.

1          THE COURT:     Bring in the jury.

2          (WHEREUPON THE PRECEDING DISCUSSION AT

3     THE BENCH CONCLUDED AND THE FOLLOWING PROCEEDINGS

4     WERE HELD.)

5          THE COURT:     Ready to proceed.

6          MR. WINGATE:    Good morning, ladies and

7     gentlemen.  I know you're getting tired of

8     hearing us speak, and, of course, this is our

9     last opportunity.  When I say us, me

10     specifically, this will be the last opportunity

11     that I will have to address you.  To all intents

12     and purposes, when I sit down, nothing else I

13     will have to say.

14          Now, in voir dire the Prosecutor talked

15     about 50 objections from Mr. Wingate and maybe 10

16     from the State, and I know I may have exceeded my

17     quota, but you know, again, as I told you in voir

18     dire, I'm an advocate.  It is my responsibility

19     when I feel that the rules and regulations by

20     which we must abide have been violated, I object.

21     I apologize on my behalf.  Hold it against me,

22     fine, but just don't do it to Mr. Wilson in this

23     case, and I don't believe that you will.

1           Now, I want to start out by telling you

2       that one of the cornerstones of our criminal

3       justice system upon which it is built is the

4       principle that every individual charged with a

5       crime is presumed innocent.  That's first.

6           Another cornerstone is that in order to

7       remove this presumption of innocence, you, the

8       jury, the triers of fact, must be convinced

9       beyond a reasonable doubt as to each and every

10      element of the charge against that individual.

11          Now, these two principles are

12      interrelated and they are the pillars upon which

13      your verdict must be based.  I want you to keep

14      that in mind.  I'll also say to you that it is

15      unfortunate that we are here today.  It was

16      tragic what occurred in 1993, December the 1st.

17      It was tragic what happened to Brenda Navarre.

18      Now, my sympathy will go out to her family, and I

19      will say to you --

20          MR. LOISEL:    Objection, Your Honor.

21          THE COURT:     What basis?

22          MR. LOISEL:    Attorney Wingate's

23      sympathy has nothing to do with the facts in this

1    case.

2          THE COURT:     The jury will be

3    instructed that sympathy, they are not to

4    consider sympathy as a prejudice.

5          MR. WINGATE:     However, this Court will

6    tell you that you and your decision cannot be

7    based upon sympathy, bias, or prejudice.  The

8    Prosecutor has a habit of anticipating what I

9    will or will not say, but I'm going to tell you

10   now.  This case is not about me.  It is not about

11   me.  It is about the State of Ohio meeting its

12   burden of proof.  So, don't let the Prosecutor

13   sort of sway you to start looking at about what

14   Mr. Wingate said, Mr. Mr. Wingate didn't say.

15   Proof beyond a reasonable doubt, that's what he

16   has to do.  That's where that burden is.  It will

17   never shift to me.  It is not about me.

18          In voir dire the Prosecutor told you we

19   don't pick and choose our witnesses, and he's

20   right about that.  He also told you that memories

21   fade with the passage of time and, again, he's

22   right.  But despite these shortcomings that the

23   Prosecutor brought to your attention at the first

1    opportunity that he had to speak to you, I don't

2    want you to be fooled, because it doesn't matter

3    if memories are fresh.  It doesn't matter if

4    memories are faded.  It doesn't matter if the

5    witnesses are the pick of the litter, Saint

6    Benda -- sister, not a saint -- Sister Benda, the

7    juror that left.  It doesn't matter who, it

8    doesn't matter the burden, the standard in this

9    case is that the State must convince you beyond a

10   reasonable doubt in order to remove Mr. Wilson's

11   presumption of innocence.  That burden is the

12   same despite the nature of the witnesses, good or

13   bad; memories, good or bad.  It is the same.

14   Now, this is it is standard and that is the level

15   of proof that you said you would have the State

16   of Ohio meet.

17        Now, you are allowed to take notes during

18   this trial.  You saw and you heard the witnesses,

19   and I would like at this time to review with you

20   what I think the evidence has shown in this case

21   and what the State of Ohio has presented.

22        Now, as I told you in voir dire, there is

23   no physical evidence which indicate that

1    Mr. Wilson had anything to do with the death of

2    Brenda Navarre.  There is no trace evidence,

3    there is no fiber evidence, there is nothing.

4    Detective Culpert, Chad Culpert, collected the

5    evidence and later signed the paperwork to have

6    it destroyed.

7         Now, the Prosecutor wants you to believe

8    that it was a mistake.  It may have been, but the

9    fact that paperwork says felonious assault and

10   you're standing at an autopsy of an individual

11   watching it being performed, taking pictures and

12   are given the evidence at the close of the

13   autopsy, would clearly indicate that it is no

14   longer a felonious assault.  So, now the evidence

15   is destroyed.

16        Detective Beavers, as the Prosecutor told

17   you, said we would love to have physical evidence

18   with the advances in technology, body fluids,

19   trace evidence, fibers, it would be a great help,

20   and that's what the lead investigator said.  And

21   I will say to you, but physical evidence doesn't

22   always incriminate because, yes, anticipating

23   correctly, we would have loved to have had it,

1    too.  Because just like it could incriminate, it

2    can exonerate, but we don't have that, so we're

3    disadvantaged, but, again, what do we have?  The

4    presumption of innocence because we don't have to

5    prove our innocence to you, keep that in mind.

6         Now, as far as any test being conducted

7    on the evidence, don't know what it would reveal

8    without physical evidence.  Now, keep this in

9    mind, without any physical evidence, the State

10   sought to give you a motive as to why it believes

11   Robert Wilson perpetrated this crime.  It goes

12   back, and I'm only going to touch upon the

13   witnesses that I consider percipient in this

14   case.

15        Let's go back to Detective Seymour.  He

16   testified three drug sales involving

17   Robert Wilson and Brenda Navarre as the

18   confidential informant occurring in June and

19   August of 1993, but you heard Detective Seymour

20   also testify to the fact that Brenda Navarre was

21   involved in five to ten drug cases with him.  He

22   said he became involved with the Vice Drug Unit

23   in 1991, and Brenda Navarre had been a

1    confidential informant a couple of years prior to

2    that.  He couldn't tell you if she was, in fact,

3    working with other detectives.  Couldn't tell you

4    what other cases she may have been involved in,

5    but he did say this:  He said being a

6    confidential informant is a very dangerous

7    business.

8         Now, motive for Robert Wilson.  Motive

9    for anyone that would have sold drugs to

10   Brenda Navarre during this time frame, or at any

11   time frame.  Why?  Because it is a very dangerous

12   business.

13        And just like the Prosecutor can say to

14   you that, well, heard a black voice, heard a

15   white voice, so we know that it was a black male.

16   Then I guess any drug dealer doing a sale could

17   also be included as a suspect.  But, again, this

18   is for your thought because, again, the burden is

19   here.  It has to be beyond a reasonable doubt.

20        Detective Seymour, he testified that

21   Brenda Navarre called him near the end of

22   November of 1993 and she was frantic and crying.

23   Wasn't put in the report.  The significance of

1     this is he said it was passed on by word of mouth

2     and, again, common sense and reason, which you

3     didn't leave when you came into this jury room --

4     or into this courtroom would indicate that if

5     Detective Seymour in November of 1993 passed it

6     on by word of mouth that Brenda Navarre had

7     concerns for her safety because of Robert Wilson,

8     then in 1993, we have a suspect, but you don't

9     have that.  You don't have that.

10          Detective Beavers told you, and this is

11    what you have to listen to, it is all in

12    phraseology.  The State wants to put it one way.

13    Detective Beavers told you that from the witness

14    stand over here from 1993 until 2004 -- now, keep

15    that in mind, 2004.  2003 is when Janet surfaced

16    or came forward.  But from 1993 until 2004 there

17    was only one Crime Stopper report that mentioned

18    the name of Robert Wilson and what did he tell

19    you about the report?  He says that report was

20    inconsistent with the facts of this case.  No

21    credibility was given to it.  That's what he

22    testified to.  This is the detective.  This is

23    the detective.

1        So, now, Detective Beavers testified from

2    1993 --  again, now keep in mind until 2003 when

3    Janet Wilson surfaced, he had reviewed Crime

4    Stopper reports, some rated, because there are

5    ratings on those, some rated as high as five on a

6    scale of one to ten as to the helpfulness of the

7    information.

8        The reports wherein there were names of

9    certain individuals that had been reported

10   numerous times as a suspect, multiple occasions

11   that same name resurfaced as being involved with

12   the homicide of Brenda Navarre.  Not

13   Robert Wilson.  Not his name.  And he couldn't

14   tell you why they weren't followed up on.

15       At this point, the State tells you they

16   were followed up on.  You don't know that.  That

17   has never been proven to you.  No one has come in

18   here and said these high rated Crime Stopper

19   reports mentioning one individual on more than

20   one occasion was ever followed up on.  This

21   detective here told you I don't know.  I don't

22   know, so --

23       MR. LOISEL:   Objection, Your Honor.

1      He's misstating the evidence.

2          THE COURT:     Jury will have to recall

3      that from its collective memory.

4          MR. WINGATE:    Detective Beavers, and I

5      do know, testified that there were police reports

6      from eyewitnesses.  Eyewitnesses which he

7      reviewed when he got involved in this case, which

8      describe the person assaulting the woman as 6'1,

9      6'2.  Now, he tried to qualify it and tell you

10      oh, yeah, we got a report that it was somebody

11      less than that, but that was when Janet came

12      forward.  So when you excise Janet, the reports

13      that they're getting from eyewitnesses says 6'1

14      to 6'2 tall.

15          He told you there was a report stating

16      that a witness recognized the voice of the

17      assailant, the voice of the perpetrator, and she

18      gave a name to that voice.  Wasn't Robert Wilson.

19      Did you hear this detective tell you that that

20      was followed up on?  Was there DNA evidence taken

21      from that evidence to compare with that of

22      Brenda Navarre?  It wasn't done.  It wasn't done.

23      The significance, because the Prosecutor has sat

1    here and told you DNA, that's not important.

2    That's not important.  If it wasn't important --

3    if it was not important, you have DNA from 1993

4    to 2006.  You then go out and take a blood sample

5    from Mr. Robert Wilson and you test it.  Why?

6    Because the significance is if I can tie him into

7    it, we can put him at the scene, we know that he

8    had some contact with her.  That's the

9    significance of it.  But since it didn't show

10    that, the relevance of the DNA is insignificant.

11    It is insignificant.  All right.  Insignificant

12    for him.  Very important for us, because it shows

13    that Mr. Wilson had had no contact with her.

14    Again, DNA, physical evidence, nothing to show

15    that Mr. Wilson was involved in this incident.

16        More importantly -- this is what I think

17    is very important because Detective Beavers

18    testified from that witness stand, and he told

19    you from 1993 until 2003 when Janet talked to her

20    police friends, he had reviewed Crime Stopper

21    reports.  Now, keep this in mind, he had reviewed

22    Crime Stopper reports.  I don't want you to talk

23    about 2003.  I'll just maybe take it up to 2002.

1    From 1993 until 2002, he had reviewed Crime

2    Stopper reports indicating that the girl,

3    Brenda Navarre, was murdered because she was

4    snitching.  Detective Beavers under oath told you

5    the reports he reviewed said that she was

6    snitching and the individual, not Robert Wilson

7    named in the report, dropped a brick or rock on

8    her head.

9         Now, it wasn't Robert Wilson.  What's the

10   significance of that?  The word in the street

11   from 1993 until 2003 was that Brenda Navarre had

12   been murdered because she was snitching and a

13   brick or a rock had been dropped on her head.

14        This is the word out in the community.  I

15   stopped at 2002 because that next year that's

16   when Janet came forward and Janet testified.  She

17   came forward because she couldn't live with it

18   any longer and Mike Loisel asked her, With what.

19   And she said Knowledge of a murder.

20        Now, in 2003, Janet told you that she

21   can't live with it anymore.  The burden has

22   become too heavy to bear.  Now, did she cooperate

23   with the police?  She said I heard, and I'm going

1    to use this statement, Prosecutor -- and of

2    course it's already -- it is not true, but keep

3    this in mind:  "I use some of the information I

4    heard in the streets and made up some details to

5    convince Lou" -- that's Vasquez -- "I was telling

6    the truth."

7         Didn't sign it but when asked on the

8    witness stand, Did you tell me that.  Yes, I did.

9    So, my statement that -- notes that I took and

10   memorialized in a typewritten statement, she can

11   go through it and say some is true, some is

12   false, some is true, some is false.  The entire

13   statement is not truly false, nor is it

14   completely true.

15        But, ladies and gentlemen, she can

16   vacillate and manipulate facts from the witness

17   stand.  How do you know she's telling the truth?

18   And we're going to get to what she actually said

19   because that's significant, too, but how do you

20   know if anything she said was the truth?

21        As it relates to that -- and I'm going to

22   back up.  As it relates to that statement, did

23   she cooperate with the police when this burden

1    had become so great that she couldn't bear it?

2    This is what she said.  I had heard about the

3    murder of Brenda Navarre on the streets, I made

4    up some things so that the police would believe

5    me.

6         All right.  If that's not true, let's go

7    on the assumption that that's just a lie.  Okay?

8    Let's just talk about the burden being so great

9    that she couldn't bear it.  Was there an

10   opportunity in 2003 to go before the grand jury?

11   Yes.  In 2003 did she go to the grand jury?  No.

12        MR. LOISEL:    Objection, Your Honor.

13   Assumes facts not in evidence.

14        THE COURT:    It's in evidence.

15        MR. WINGATE:   That's right.

16        THE COURT:    Overruled.

17        MR. LOISEL:    Judge, there is no

18   evidence as to whether or not she did or did not

19   go to the grand jury in 2003.

20        THE COURT:    I believe -- my

21   recollection --

22        MR. WINGATE:   Yes.

23        THE COURT:     It is in the record, so

1     it is overruled.

2          MR. WINGATE:   Was there an opportunity

3     to go before the grand jury in 2003?  Yes.  Did

4     she go?  No.  What did she say?  No.  I played up

5     the fear factor with the police, telling them I

6     was afraid.  I played up the fear factor with the

7     police, telling them I was afraid.  The

8     Prosecutor stood here and told you, Oh, you see

9     this she wrote that letter because she was

10    afraid.  What did she tell you?  It couldn't have

11    been because of Robert Wilson, because she told

12    you from his arrest on this offense up until

13    August the 11th of 2008, she had been going over

14    to the jail every week to visit him.  That's what

15    she said.  But the Prosecutor wants you to

16    believe that Oh, she's afraid.  Of what?  I

17    played up the fear factor with the police,

18    telling them I was afraid.

19         Did she go in 2004 to relieve herself of

20    this heavy burden because the weight was so

21    great?  Did she go to give any time -- any type

22    of comfort to a hurting mother?  No.  In 2005,

23    did she go?  No.  Because what the Prosecutor

1    wants you to believe, she came forward because

2    the burden is so great, 2003.  Yet, in 2004,

3    2005, nothing.  2006 with a financially stressed

4    failing business, Brewski's, and the promise of

5    50 crisp $100 dollar bills, Janet Wilson appeared

6    before the grand jury.  I couldn't live with it

7    anymore.  Look at the letter she wrote, and I'm

8    not going to wave it in front of you.  All I'm

9    going to say is look at the letter she wrote.

10   You'll have it in evidence.  November 13th, 2006.

11   Read it.  She calls it a lie.  Look at it.

12   Crissy, the woman that's mentioned in the letter.

13   Prosecutor asked the question, Did she exist?

14   Yeah, she exists.  Was Robert involved with her,

15   Prosecutor's question; her answer, yes.  Read the

16   letter.

17        This woman who couldn't live with it

18   anymore.  In 2007 was arrested at her job after

19   leaving this court because she refused to testify

20   and cooperate with the State of Ohio.  She was

21   charged with a felony of the third degree up to

22   five years in prison, but she wants you to

23   believe I'm here today.  I came forward in '03

1    because I couldn't live with it anymore.  Guess

2    what?  If you testify, we'll dismiss the charges

3    against you.  You can keep the $5,000 dollars

4    that you probably already spent, so she

5    testified.  She testified before you because she

6    couldn't live with it anymore.

7        Now, this is what is crucial.  Let's look

8    at what she had to say.  That's very crucial.

9    You all said that I will decide this case based

10   upon the evidence adduced from that witness

11   stand.  And I remind you of this only because

12   what Janet Wilson testified to from that witness

13   stand did not beyond a reasonable doubt establish

14   that Robert Wilson did anything.  Look at your

15   notes.

16       Now, this is what's important.  It wasn't

17   what she didn't say, because common sense and

18   reason is going to tell you that you all focused

19   on, well, I'm concerned about what didn't she

20   say.  What does she know?  Was she pre-seasoned

21   saying stuff that she knew?  What did she see?

22   What did Robert tell her?  These may be questions

23   in your mind, but, ladies and gentlemen, although

1    the State of Ohio may want you to utilize

2    speculation, innuendo, hypothesis, assumptions,

3    that's not the standard.  It is proof beyond a

4    reasonable doubt.  That is not within your

5    province.  The evidence, if any, which convinces

6    you beyond a reasonable doubt must come from that

7    witness stand.  You cannot supply the facts to

8    fill in the gaps, the void that's in the State's

9    case.

10          So, you may come to the conclusion that

11   Janet had more to say, and you may be right, or

12   you may be wrong, but it is not up to

13   speculation.  It is what she said from that

14   witness stand.  The Court will give you the

15   instructions that you have to follow, and that is

16   the law that is to be applied in this case, not

17   what you think, not what you feel.  That is the

18   law.  Not speculation.  You cannot -- you cannot

19   fill in that void with your facts.  You cannot

20   supply the Prosecutor's case with facts that will

21   be consistent with his theory.  If he hadn't

22   given it to you, you cannot give it to him.

23   That's how our criminal justice system works.

1    You wouldn't want it to work that way for you,

2    and you cannot allow it to work that way against

3    Robert Wilson.  It is proof beyond a reasonable

4    doubt.

5            So, what did Janet know, if anything?

6    You don't know.  You must look at what she said

7    under oath from that witness stand, and none of

8    you are mind readers.  So, what did she say?  I

9    can take the truth and some false facts and I can

10   create a convincing statement.  She said that.

11   Robert was indicted, but the Court will tell you

12   that indictment is nothing more than a piece of

13   paper which apprises him of the charge against

14   him.  That's all that it is.  His plea of not

15   guilty puts into issue each and every allegation

16   contained in that complaint, and that's where you

17   come in as the trier of facts, from that witness

18   stand evidence beyond a reasonable doubt.

19   Because if you're going to say, well, he was

20   indicted, so she must have said something good,

21   then that's no better than saying he's siting

22   here between Mr. Neil McElroy and myself and he

23   must be guilty and you all said, no, I will give

1    him his presumption of innocence.  This is what

2    we're talking about, have you been convinced

3    beyond a reasonable doubt.

4         The only other percipient witness in this

5    case is Mr. Alfonzo Davis and that's the son of

6    Janet Wilson, and he told you, and keep in mind

7    after the Prosecutor gave him a police report,

8    asked him to look at it to see if that refreshed

9    his recollection, he said, Oh, Robert told me

10   that um, he killed Brenda Navarre, he dropped a

11   rock -- a brick on her head.  That's what he

12   said.

13        But, ladies and gentlemen, keep in mind

14   the word in the streets.  But more importantly,

15   it wasn't the word in the street that he was

16   repeating, because when I took the paperwork and

17   pointed out at the bottom of his report that

18   Janet Wilson had told him that Robert had done

19   this.  Janet had said this.  Janet.  And after

20   being shown that, Alfonzo told you, I don't know

21   who told me.  It could have been my mom.  It

22   could have been Robert.  But, ladies and

23   gentlemen, you have to be convinced beyond a

1    reasonable doubt that it was Robert because

2    that's what the State wants you to believe, that

3    it was Robert.  Have you been convinced beyond a

4    reasonable doubt?  I was smoking a lot of

5    marijuana back then.  I don't know when the

6    statement was made.  Prosecutor wants to lock you

7    into 1995.  I don't know when the statement was

8    made.  I love my mom and Robert is okay as a

9    person, but I don't care for him being with my

10   mom.  1995.  I don't know.  I don't know.

11        If you can't trust the messenger, then

12   how can you trust the message?  You're talking

13   proof beyond a reasonable doubt.  The only given

14   in this trial that we've talked about from voir

15   dire until this point is Mr. Robert Wilson's

16   presumption of innocence.  It remains with him

17   throughout this entire trial.  It goes with him

18   back in that jury deliberation room and it cannot

19   be removed unless and until you have been

20   convinced beyond a reasonable doubt.

21        And what is proof beyond a reasonable

22   doubt?  Proof beyond a reasonable doubt is proof

23   of such a nature that you, your ordinary person,

1    you would be willing to rely and act upon it in

2    the most important of your own affairs.  Would

3    you rely and act upon Janet Wilson?  Would you

4    rely and act upon Alfonzo Davis in the most

5    important -- the most important of your own

6    affairs?

7            So, now, no physical evidence.  DNA not

8    there.  Just the word of Janet Wilson to get an

9    indictment, and the State has given you even less

10   to try and convict this man.

11           Now, when I sit down and before I get

12   there, let me just say this because you all

13   talked about it in voir dire.  Robert Wilson

14   didn't testify.  Oh, we would have loved to hear

15   what he had to say.  Didn't testify.  The Court

16   told you and the Court will again tell you that

17   Robert has a constitutional right not to testify,

18   and if he chooses to exercise that right, you

19   cannot hold that against him in any form or

20   fashion.  He doesn't have to prove his innocence

21   to you.  Burden never shifts.

22           So, when I sit down, the Prosecutor is

23   going to tell you that Mr. Wingate said this,

1          Mr. Wingate said that, Mr. Wingate did this and

2          did that.  And after he's sufficiently torn down

3          the things I've said to you, I want each and

4          every one of you to go back and say based upon

5          the evidence that you have presented in this

6          trial, Mr. Prosecutor, where is the evidence that

7          rises to the level of proof beyond a reasonable

8          doubt.  Where is it?  Now, and since I don't see

9          it, I can't fill in the gaps.  My gut, intuition,

10         my gut instinct may tell me maybe he had

11         something to do with it.  My woman's intuition, I

12         think he did it.  Those are not the standards.

13         It is proof beyond a reasonable doubt.

14              Now, in voir dire, I asked each and every

15         one of you by name, are you the type of juror

16         that you would want seated on your case if you

17         were over there in the position of Mr. Wilson and

18         you all said that you were, and my final question

19         to you is this:  Would you let this type of

20         evidence convict you?  I think not.  You may not

21         like it, but we all said that a verdict of not

22         guilty is just as consistent with justice as a

23         verdict of guilty.

1        The State has not met its burden of

2   proof.  You may not like it, but it is your duty

3   and your responsibility to return a verdict of

4   not guilty.  And on behalf of Mr. McElroy and on

5   behalf of Mr. Wilson, I thank you.

6        THE COURT:     Mr. Loisel.

7        MR. LOISEL:     Thank you, Judge.

8   Mr. Wingate is correct, this is my opportunity

9   not to tear down what he just told you, but this

10  is my opportunity to respond to what he just told

11  you.  And I think the most important thing that

12  you must remember, and it is what he began his

13  argument with, this case is not about me, this

14  case is not about Ronnie Wingate, it is not about

15  this affidavit that I made.  This case is about

16  the evidence, whether the State of Ohio proved

17  this evidence beyond a reasonable doubt is

18  absolutely correct.  This case is not about

19  Ron Wingate, it is not about Mike Loisel.  The

20  case is about the evidence that you heard from

21  the stand.  But what did he spend the majority of

22  his argument doing?  He's telling you this case

23  is about Janet Wilson versus Robert Wilson.  You

1    can't believe Janet Wilson versus Robert Wilson,

2    so, therefore, you cannot believe beyond a

3    reasonable doubt the evidence. Well, ladies and

4    gentlemen, that's not the case. The case is the

5    State of Ohio versus Robert Wilson. You heard

6    the evidence. It's not one person versus

7    Robert Wilson, it's the totality of the

8    circumstances. Look at all of the evidence.

9         Would I like Janet Wilson to come here

10   and tell you A, B, C, D, E, F, G? Of course I

11   would, and like all of that to point directly to

12   Robert Wilson. She didn't do that. But the case

13   isn't solely about Janet Wilson, is it? You have

14   to remember, you've got Alfonzo Davis, you've got

15   Bill Seymour -- Detective Bill Seymour, you've

16   got Diane Barnett. I don't want to repeat what I

17   told you in my first close, but that is the

18   evidence you consider. You don't just consider

19   Janet Wilson versus Robert Wilson. You don't

20   just consider Alfonzo Davis versus Robert Wilson.

21   You consider all of the evidence. And all of the

22   evidence is convincing beyond a reasonable doubt

23   of this man's guilt, not because I'm telling you,

1       because the evidence tells you.

2               A couple of things I want to correct --

3       well, I want you to consider.  Mr. Wingate

4       indicated that the State of Ohio said the DNA is

5       insignificant.  No, the State of Ohio did not

6       indicate that the DNA was insignificant.  It is

7       very insignificant.

8               The State of Ohio submits to you that it

9       has no evidentiary value.  The only thing that

10      the DNA tells you is that Robert Wilson's DNA is

11      not -- was not in Brenda Navarre's vagina.

12      That's where the swab came from.  So, that is the

13      only thing you can consider.  That has nothing to

14      do with whether or not he dropped a rock on her

15      head.

16              Mr. Wingate made mention of motive.  He

17      talked about Bill Seymour indicating that

18      Brenda Navarre worked for him on other cases

19      aside from the case where she snitched, where she

20      bought drugs from Robert Wilson, thus getting an

21      indictment on drug charges.  There are other

22      people.  Well, you know what?  That very well may

23      be true that there are other people that she was

1    involved with, but you have to consider

2    everything within the evidence, consider it in

3    conjunction with all of the other evidence.

4    Brenda Navarre, her drug dealing days with the

5    Toledo Police is one thing to consider, but

6    consider that with the fact that the Defendant

7    told Alfonzo Davis he had to do what he had to

8    do.  You can't just put these on separate

9    islands.  You've got to think of everything

10   together.  So, she snitched on him.  She calls

11   Detective Seymour days before she's killed,

12   crying, hysterical.

13        The Defendant told Alfonzo Davis, yeah, I

14   don't know if it is 1995.  Alfonzo Davis didn't

15   know whether it was 1995, but he was sure that

16   the Defendant told him, I did what I had to do.

17   I killed the snitch bitch.

18        So, put that all together with the fact

19   that who is the snitch bitch.  Brenda Navarre.

20   Who got killed by a brick being dropped on her

21   head?  Brenda Navarre.  Who told Alfonzo Davis

22   that?  The Defendant did.  Now, Mr. Wingate says

23   remember I showed him his statement and he said,

1      Well, yeah, my mom told me that, too.

2           MR. WINGATE:   Objection.

3           MR. LOISEL:    I may have learned it from

4      my mother, the fact about the brick.  Mr. Wingate

5      didn't ask him, well, what about the other two

6      parts of that statement, because that doesn't

7      support his contention that Janet Wilson told him

8      this stuff, because remember I showed him the

9      report?  Does this refresh your recollection?

10     Yes.  What did you -- what did the Defendant say

11     to you?  I had to do what I had to do, kill the

12     snitch bitch, dropped a brick on her head.

13     That's the testimony that you received from

14     Alfonzo Davis.  That is the testimony he said the

15     Defendant told him those three things.

16          Mr. Wingate then said, Well, what about

17     this part that says you learned that from your

18     mother?  Well, I don't know if I learned that

19     from my mother.  I may have, I may not have.  It

20     doesn't matter.  He talked to the Defendant and

21     the Defendant told him what he did.

22          I could respond to each and every thing

23     that the Defense Attorney said, but I want to

1    focus on just a couple of other things.  Well, a

2    couple of things.  I don't want to go into each

3    and every item because we would be here for an

4    hour and you would be tired of hearing me talk.

5    Maybe you already are.

6          Crime Stopper money, he wants to make a

7    big deal, Brewski's, financial trouble.  Well, is

8    this, as I said in my first close, a scheme that

9    Janet Wilson concocted to extort money to get

10   money from the Toledo Police Department to frame

11   her husband?  Do you think that's what she's

12   doing, ladies and gentlemen?  Do you think that's

13   her motive, to frame him?  Of course it is not.

14   Crime Stopper money is given for information that

15   leads to an arrest.

16         Well, Mr. Wingate wants you to believe

17   that she testified for the State of Ohio because

18   she got this money, therefore, yeah, of course

19   she's going to say what the State wants her to

20   say.

21         Well, think about it.  What if they gave

22   them Crime Stopper money after they testified?

23   Then the argument is, well, they are withholding

1     that money until they testify in favor of the

2     State of Ohio.  It doesn't work that way.  It's

3     always before trial because it leads to the

4     arrest of a suspect.  Can't change that.  She's

5     not trying to frame her husband.  She's telling

6     you what she knows.

7          We already talked about the unsigned

8     affidavit.  Mr. Wingate mentioned it in his

9     close.  Janet Wilson is capable of putting things

10    together to convince Toledo Police.  But you know

11    what?  She said that wasn't true.  She refused to

12    sign that affidavit verifying its accuracy.  You

13    can't put any stock in that affidavit.  It was

14    prepared by the Defendant's attorney.  Of course

15    it is going to be favorable for his client.  Talk

16    about bias.

17         We look at the burden of proof.  The

18    State of Ohio -- it is the State of Ohio's burden

19    to show you -- to prove to you beyond a

20    reasonable doubt each and every element of this

21    crime.  We went over those.  The only question in

22    this case is the identity.  There's no question

23    Brenda Navarre was brutally murdered on December

1       1st of 1993 between the days of December 1st and

2       December 3rd.  There's no question that this

3       happened in Ohio -- Toledo, Lucas County, Ohio.

4       I'm sorry.

5              The only question revolves around the

6       identity of Robert Wilson.  If there were any

7       other viable suspects, don't you think Toledo

8       Police -- there were a number of detectives that

9       testified -- don't you think that Defense Counsel

10      would have asked those --

11             MR. WINGATE:   I will object.

12             THE COURT:     That's beyond the scope of

13      the evidence in this case.

14             MR. WINGATE:   Your Honor, could we

15      approach for a second -- just for a second?

16             (WHEREUPON THE FOLLOWING DISCUSSION WAS

17      HELD AT THE BENCH.)

18             MR. WINGATE:   Judge, in addition to

19      being outside of the scope of the evidence, it is

20      also shifting the burden over to the side of the

21      Defense and when he's asking, well, don't you

22      think Mr. Wingate would have.  That's shifting

23      the burden and I think it is improper.

1          THE COURT:     Objection is noted.

2          (WHEREUPON THE PRECEDING DISCUSSION AT

3     THE BENCH CONCLUDED AND THE FOLLOWING PROCEEDINGS

4     WERE HELD.)

5          MR. LOISEL:     No matter how many times I

6     tell you we've proven this case beyond a

7     reasonable doubt, it is not up to me.  It is up

8     to you.  The evidence tells you so.  When you

9     look at all of the evidence together that the

10    State of Ohio presented to you, it points to no

11    one else but Robert Wilson.  It doesn't point, as

12    I said, over there or over there.  It points to

13    Robert Wilson and no one else.

14          As we said, Toledo Police, they did their

15    due diligence.  They investigated back in 1993.

16    There were other people that were mentioned in

17    these tips, yes.  You can't hide behind that

18    fact.  You can't say oh, no, no, no, that didn't

19    happen.  It happened.  That's how police

20    investigations work.  They get information, they

21    work the case.  No viable suspect until

22    Janet Wilson came forward.

23          And finally, with respect to beyond a

1          reasonable doubt, the Defense Attorney only gives

2          you part of that definition when he says you must

3          rely upon it in the most important of your own

4          affairs.  Listen to the entire definition that

5          the Judge gives you.  That is your sworn duty to

6          listen to those definitions and apply them to the

7          facts in this case.  And when you listen to that

8          whole definition, you'll have no doubt in your

9          mind that the Defendant is guilty.

10              The last thing I'm going to talk to you

11         about, as I said I would, is the letter.  Because

12         although Mr. Wingate says it is not about the

13         State of Ohio versus Ronnie Wingate, he wants you

14         to believe that this case is all about

15         Janet Wilson and, yes, she is important, but it

16         is not, as I said, Janet Wilson versus Robert

17         Wilson.  It is the State of Ohio and all of the

18         evidence, including Janet Wilson versus

19         Robert Wilson.

20              Think about this letter.  You'll have a

21         chance to read it.  This is the one time her

22         story changed from 2003 to September 3rd of 2008

23         when she testified when she talked to you about

1      what she knew about the murder of Brenda Navarre.

2      She told you the truth.  She admitted that she

3      lied.  Does that mean you can't believe anything

4      else she says?  Yeah, I lied.  What if she got up

5      on that stand and vehemently denied lying?  You

6      have to judge her credibility for yourselves, and

7      I submit to you what did she tell you?  What does

8      the evidence tell you?  She told

9      Detective Forrester, Detective Ross,

10     Detective Beavers, Detective Vasquez time and

11     time again consistent information that led to the

12     arrest of the Defendant.  She told you what she

13     did that night, December 1st, 1993.  She went to

14     the Defendant's sister's house and picked him up.

15     Notice Defense Attorney didn't talk to you about

16     that, did he?  Because that's very compelling

17     evidence.  More importantly, consider when her

18     story changed.  The only time it changed is when

19     she knew that the Defendant would find out.

20             MR. WINGATE:    I will object.

21             THE COURT:      This is argument.

22             MR. LOISEL:     I submit to you that the

23     evidence suggests that the only time she changed

1    her story is when the Defendant found out that

2    Janet Wilson was the one that was cooperating

3    with police, that she was now the informant

4    against her husband.  The evidence tells you that

5    the only time her story changed was when she

6    realized there was no turning back.  She is now

7    in Brenda Navarre's shoes.  We all know what

8    happened to Brenda Navarre.  You all know what

9    happened when she snitched on Robert Wilson,

10   don't we?

11        Ladies and gentlemen, the evidence tells

12   you beyond a reasonable doubt that Robert Wilson

13   killed Brenda Navarre.  You know it.  The

14   evidence tells you.  The only time Janet Wilson's

15   story ever changed is when she realized she was

16   now Brenda Navarre.  And as I said, we know what

17   happened to Brenda Navarre.  Find this man

18   guilty, ladies and gentlemen.  Hold him to this

19   standard of proof beyond a reasonable doubt and

20   find him guilty of murdering Brenda Navarre.

21   Thank you.

22        THE COURT:    All right.  We're going to

23   recess for noon.  Reconvene these proceedings at

1    1:15.  For the last time, you are not to discuss

2    this case among yourselves, nor with anyone else.

3    Do not allow anyone to discuss this case in your

4    presence, neither form or express an opinion

5    about this case until the case is submitted to

6    you.  We will be back here at 1:15 at which time

7    you will hear the charge and you will commence

8    with your deliberations.  We'll be in recess.

9                    (LUNCH RECESS TAKEN.)

10          THE COURT:     Members of the jury, you

11   have heard the evidence and the arguments of

12   Counsel.  It is now the responsibility of the

13   Court to advise you of the law that is to be

14   applicable to this case.

15          The Court and jury have separate

16   functions.  You decide the disputed facts, and

17   the Court provides the instructions of law.  It

18   is your sworn duty to accept these instructions

19   and to apply the law as is given to you by the

20   Court.  You are not permitted to change the law,

21   nor to apply your own conception of what you

22   think the law is or should be.  A criminal case

23   begins with the filing of an indictment.  Let me

1    just make a parenthetical here.  I will be giving

2    you a written copy of these instructions, so you

3    can take notes if you wish, but you will have a

4    copy of these instructions with you in the jury

5    room.

6         The criminal case begins with the filing

7    of an indictment.  The indictment informs the

8    Defendant that he has been charged with an

9    offense.  The fact that it was filed may not be

10   considered for any other purpose.  The plea of

11   not guilty is a denial of the charge and puts in

12   issue all of the essential elements of each

13   offense charged.

14        Now, there's been a lot of discussion in

15   this case about burden of proof.  The Defendant

16   is presumed innocent unless his guilt is

17   established beyond a reasonable doubt.  The

18   Defendant must be acquitted unless the State

19   produces evidence which convinces you beyond a

20   reasonable doubt of every essential element of

21   the offense charged in the indictment.

22        What is reasonable doubt?  Reasonable

23   doubt is defined by statute and is as follows:

1    Reasonable doubt is present when, after you have

2    carefully considered and compared all of the

3    evidence, you cannot say you are firmly convinced

4    of the truth of the charge.  Reasonable doubt is

5    a doubt based on reason and common sense.

6    Reasonable doubt is not mere possible doubt,

7    because everything relating to human affairs or

8    depending on moral evidence is open to some

9    possible or imaginary doubt.  Proof beyond a

10   reasonable doubt is proof of such character that

11   an ordinary person would be willing to rely and

12   act upon it in the most important of his or her

13   own affairs.  Is evidence?

14         Evidence is all of the testimony received

15   from the witnesses, any exhibits admitted during

16   the trial, and any facts stipulated to by

17   Counsel.

18         Evidence may be of two kinds, either

19   direct or circumstantial, or both.  Direct

20   evidence is the testimony given by a witness who

21   has seen or heard the facts to which he or she

22   testifies.  It includes exhibits admitted into

23   evidence during the trial.  Circumstantial

1    evidence is the proof of facts or circumstances

2    by direct evidence from which you may reasonably

3    infer other related or connected facts which

4    naturally and logically follow according to the

5    common experiences of mankind.

6         To infer, or to make an inference, is to

7    reach a reasonable conclusion or deduction of

8    fact which you may, but you are not required to

9    make, from other facts which you find have been

10   established by direct evidence.  Whether an

11   inference is made rests entirely with you.

12   Direct evidence and circumstantial evidence are

13   of equal weight or probative value.

14        The evidence does not include the

15   indictment, opening statements, or closing

16   arguments of Counsel.

17        The opening statements and closing

18   arguments of Counsel are designed to assist you

19   and they are not evidence.

20        Statements or answers that were stricken

21   by the Court or which you were instructed to

22   disregard are not evidence, and must be treated

23   as though you never heard them.  You must not

1        speculate as to why the Court sustained the

2        objection to any question that was not answered

3        or what the answer to such a question might have

4        been.  You must not draw any inference or

5        speculate on the truth of any suggestion included

6        in a question that was not answered.

7            Now, the Court made certain rulings

8        regarding hearsay testimony and various

9        exceptions allowed by the law of evidence.  The

10       Court did instruct you that the phone call made

11       by Brenda Navarre to Detective Seymour, wherein

12       he testified she appeared to be under stress,

13       could not be considered for the truth of that

14       matter.  I believe I was in error in that ruling,

15       and you can give it such weight as you deem

16       appropriate.

17           You are the sole judges of the facts, the

18       credibility of the witnesses, and the weight of

19       the evidence.  To weigh the evidence, you must

20       consider the credibility of the witnesses.  To do

21       this, you will apply the tests of truthfulness

22       which you apply in your daily lives.  These tests

23       include the appearance of each witness upon the

1    witness stand; his or her manner of testifying;

2    the reasonableness of the testimony; the

3    opportunity he or she had to see, hear and know

4    the things concerning which he or she testified;

5    his or her accuracy of memory; frankness or lack

6    of it; intelligence; interest and bias, if any;

7    together with all of the facts and circumstances

8    surrounding the testimony.  Applying these tests,

9    you will assign to the testimony of each witness

10   such weight as you deem proper.  You are not

11   required to believe the testimony of any witness

12   simply because he or she was under oath.  You may

13   believe or disbelieve all or any part of the

14   testimony of any witness.  It is your province to

15   determine what testimony is worthy of belief and

16   what testimony is not worthy of belief.

17          In this case, the Defendant did not

18   testify.  It is not necessary that the Defendant

19   take the witness stand in his own defense.  He

20   has a constitutional right not to testify, if

21   that is his decision.  The fact that the

22   Defendant in this case did not testify must not

23   be considered for any purpose.

1        Generally a witness may not express an

2    opinion.  However, one who follows a profession

3    or special line of work may express his or her

4    opinion because of his or her education,

5    knowledge and experience.  Such testimony is

6    admitted for whatever assistance it may provide

7    to help you arrive at a just verdict.

8        However, as with other witnesses, upon

9    you alone rests the duty of what weight should be

10   given to the expert witness.  In determining its

11   weight, you must take or you may take into

12   consideration her skill, experience, knowledge,

13   veracity, familiarity with the facts of the case,

14   and the usual rules for testing credibility and

15   determining the weight to be given to the

16   testimony.

17       Now, evidence was received in this case

18   about the commission of certain crimes or wrongs

19   or other acts other than the offense of which the

20   Defendant is charged in this trial.  That

21   evidence was received only for a limited purpose.

22   It was not received, and you may not consider it,

23   to prove the character of the Defendant in order

1    to show that he acted in conformity or accordance

2    with that character.

3         If you find that the evidence of other

4    crimes, or wrongs, or acts is true and that the

5    Defendant committed them, you may consider that

6    evidence only for the purpose of deciding whether

7    it proves or provides proof on the issue of the

8    Defendant's motive to commit the offense charged

9    in the trial.

10        A number of exhibits and the testimony

11   relating to them have been introduced.  You may

12   consider whether the exhibits are the same

13   objects and in the same condition as originally

14   taken by the police officers.  And you will

15   determine what weight, if any, the exhibits

16   should receive in light of all of the evidence.

17        I will now discuss with you the issues in

18   this case.  The Defendant is charged with a crime

19   of murder.  Before you can find the Defendant

20   guilty of this charge, you must find beyond a

21   reasonable doubt that on or between the 1st day

22   of December, 1993 through the 3rd day of December

23   1993, in Lucas County, Ohio, the Defendant

1    purposely caused the death of another, to wit:

2    Brenda Navarre.

3         There are several elements to the offense

4    of murder, each of which must be proved beyond a

5    reasonable doubt before you can find the

6    Defendant guilty of this offense and they are as

7    follows:

8         It must be proved beyond a reasonable

9    doubt that the Defendant one, purposely; two,

10   caused another's death, to wit:  Brenda Navarre;

11   three, on or between the 1st day of December,

12   1993 through the 3rd day of December, 1993; and,

13   four, in Lucas County, Ohio.

14        The Court will now define the terms used

15   in this charge, first with respect to purposely.

16   Purpose is an essential element of the offense of

17   murder.  A person acts purposely when it is his

18   or her specific intention to cause a certain

19   result.  It must be established in this case that

20   at the time in question there was present in the

21   mind of the Defendant a specific intention to

22   cause the death of Brenda Navarre.

23        Purpose is a decision of the mind to do

1     an act with a conscious objective of producing a

2     specific result.  To do an act purposely is to do

3     it intentionally and not accidentally.  Purpose

4     and intent mean the same thing.  The purpose with

5     which a person does an act is known only to

6     himself or herself, unless he or she expresses it

7     to others or indicates it by his or her conduct.

8          The purpose with which a person does an

9     act is determined from the manner in which it is

10    done, the means or weapons used and all of the

11    other facts and circumstances in evidence.

12         Proof of motive is not required.  The

13    presence or absence of motive is one of the

14    circumstances bearing upon purpose.

15         Two, causation.  Cause is an essential

16    element of the offense of murder.  Cause is an

17    act which directly produces the death of another

18    and without which it would not have occurred.

19         Three, time.  That the offense charged

20    took place on or between the 1st day of December,

21    1993 through the 3rd day of December, 1993.  It

22    is not necessary that the State prove that the

23    offense was committed on the exact day as charged

1    in the indictment.  It is sufficient to prove

2    that the offense took place on a date reasonably

3    near the date claimed.

4         Lastly, four, venue.  That the offense

5    charged took place in Lucas County, Ohio.  The

6    right of this Court to try the Defendant depends

7    upon proof that the offense was committed in

8    Lucas County.

9         If you find that the State proved beyond

10   a reasonable doubt all of the essential elements

11   of the offense of murder, then your verdict must

12   be guilty.

13        If you find that the State failed to

14   prove beyond a reasonable doubt any one of the

15   essential elements of the offense of murder, then

16   your verdict must be not guilty.

17        You may not discuss or consider the

18   subject of punishment.  Your duty is confined to

19   the determination of the guilt or innocence of

20   the Defendant.  In the event you find the

21   Defendant guilty, then the duty to determine

22   proper punishment is placed, by law, upon the

23   Court.

1          You must not be influenced by any

2    consideration of sympathy or prejudice.  It is

3    your duty to carefully weigh the evidence, to

4    decide all disputed questions of fact, to apply

5    the instructions of the Court to your findings,

6    and to render your verdict accordingly.  In

7    fulfilling your duty, your efforts must be to

8    arrive at a just verdict.  Consider all of the

9    evidence and make your findings with intelligence

10   and impartiality, and without bias, sympathy or

11   prejudice, so that the State of Ohio and the

12   Defendant will feel that their case was fairly

13   and impartially tried.  If, during the course of

14   the trial, the Court has said or done anything

15   that you consider an indication of the Court's

16   view on the facts, you are instructed to

17   disregard it.

18          If during your deliberations you have a

19   question, the foreperson, and that is a person

20   that you will select, will put that question in

21   writing indicating specifically what is

22   requested.  Such question will then be delivered

23   to the Bailiff who will deliver it to the Court

1    and the attorneys.  After discussion, the answer

2    to that question will be placed on that note and

3    it will be returned to you.

4        Your initial conduct upon entering the

5    jury room is a matter of importance.  It is not

6    wise to immediately express a determination to

7    insist upon a certain verdict because if your

8    sense of pride is aroused, you may later hesitate

9    to change your position, even though you later

10   decide that it is wrong.

11       Deliberate with the objective of reaching

12   an agreement, if you can do so without disturbing

13   your own individual judgment.  Each of you must

14   decide this case for yourself, but you should do

15   so on after a discussion and consideration of the

16   case with your fellow jurors.  Do not hesitate to

17   change an opinion if convinced that it is wrong,

18   however, you should not surrender honest

19   convictions in order to be congenial or to reach

20   a verdict solely because of the opinions of the

21   other jurors.  After your verdict is announced

22   and made in open court, you may discuss this case

23   with anyone, but you are not required to do so.

1       Whether you decide to discuss this case

2       with Counsel or press or with anyone else after

3       you are discharged is a matter of your own free

4       choice.  The Court will place in your possession

5       the exhibits and the verdict form.

6       The foreman or forelady, whomever you

7       select, will retain possession of these records

8       and also any notes that you may have sent out and

9       have returned to you, including the verdict and

10      return them to the courtroom.  The foreperson

11      will see to it that your deliberations are

12      orderly and that each juror has the opportunity

13      to discuss the case and to cast his or her vote;

14      otherwise, the authority of the foreperson is the

15      same as that of any other juror.  Until your

16      verdict is announced in open court, you should

17      not disclose to anyone else the status of your

18      deliberations or the nature of your verdict.

19      After you retire, you should select a

20      foreman or a forewoman and this person will then

21      preside over your deliberations.  And whenever

22      all 12 --  I repeat, all 12 -- jurors agree upon

23      a verdict, you will then sign the verdict form in

1    ink and advise the Bailiff of your verdict by

2    knocking on the door.  You will then be returned

3    to the courtroom at which time your verdict will

4    be read in open court.

5         Now, let me discuss the verdict form with

6    you.  You will have this form with you in the

7    jury room.  It does have a caption, State of Ohio

8    versus Robert Wilson.  Case number CR-2006-3339.

9    And it states as follows:  We, the jury,

10   empaneled in the above entitled action having

11   been sworn well and truly to try and true

12   deliverance to make between the State of Ohio and

13   the Defendant Robert Wilson, and having been

14   fully advised of the premises for verdict, find

15   and say that we find the Defendant, and there's a

16   line there with an asterisk and the foreperson,

17   whomever you select, will insert either the word

18   guilty or the words not guilty as to all -- to

19   the verdict of all 12 of you of murder, in

20   purposely causing the death of Brenda Navarre, in

21   violation of Revised Code Section 2903.02(A) and

22   2929.02 as charged in the indictment.

23        And then there's a place for 12

1    signatures.  The foreperson will not insert the

2    words either either guilty or not guilty until

3    all 12 of you agree on what the verdict will be.

4    Once all 12 of you agree on what that verdict

5    will be, then you will each sign on one of the

6    lines that are provided, and there is a place for

7    12 signatures, and I will also ask that you print

8    your name after your signature so we can decipher

9    the signatures.

10        You will be allowed to take breaks.  If

11   you need to take a break, a smoking break, that's

12   fine.  I think you can step out in the hall.

13   Smoking areas are designated if you need to take

14   a smoking break.

15        I should caution you that you should not

16   be discussing the case except when all 12 jurors

17   are in the jury room together; otherwise, you

18   should not be discussing the case except when all

19   12 of you are together.  The jury room is a

20   non-smoking area.  If some of you wish to smoke,

21   you may separate to do so; however, you may not

22   discuss the case until all 12 jurors are present.

23   Thus if you separate briefly to smoke or if you

1    decide to take a break for dinner, you must not

2    discuss the case at that time, only in the jury

3    room.  And you may do this without the permission

4    of the Court.  Now, you basically run your own

5    show on that.

6         We do have the alternate, Ms. Meyer.  You

7    had been very attentive throughout these

8    proceedings, and I want to express to you my deep

9    appreciation for your willingness to participate

10   as an alternate.  In my case about a third of the

11   cases the alternate has to take the place on the

12   jury, but in this case it did not happen, so at

13   this time you will be released and you are free

14   to go.  You are certainly welcome to stay in the

15   courtroom and watch these proceedings if you

16   wish, but you are not required to stay.  I would

17   only ask that you not discuss this case with

18   anyone until the verdict is announced in open

19   court.

20             MS. MEYER:     Okay.

21             THE COURT:     See Counsel up here.

22             (WHEREUPON THE FOLLOWING DISCUSSION WAS

23   HELD AT THE BENCH.)

1          THE COURT:     Other than objections we

2     already dealt with, any other objections?

3          MR. LOISEL:     The only thing that

4     wasn't, and I didn't realize it before, is in

5     most instructions there's something that says

6     that the foreperson does not have any -- their

7     input isn't greater --

8          THE COURT:     It is in there.

9          MR. LOISEL:     I didn't hear it.

10          MR. WINGATE:    He read it.

11          MR. LOISEL:     Okay.

12          MR. MCELROY:     It outlines the duties of

13     the foreperson and says other than those things,

14     it is the same as --

15          MR. LOISEL:     That's the only thing I

16     had.   Nothing else from the State.

17          THE COURT:     Okay.

18          MR. WINGATE:     For us we would like to

19     renew our motion to have that Exhibit B submitted

20     to the jury and renew our motion for directed

21     verdict, judgment of acquittal after all the

22     evidence --

23          MR. MCELROY:     And seal the record.

1          THE COURT:     Do you want B to go in or

2     not?  It is double hearsay.

3          MR. WINGATE:    We ask that it be marked

4     and made a part of the Court's record.

5          MR. MCELROY:    Seal the file.

6          MR. WINGATE:    The only other thing was

7     did the Court want the outstanding or held in

8     abeyance motion to have the complete copy of the

9     Prosecutor's file made and made a part of the

10    record.

11         THE COURT:     How much trouble is that

12    going to be for you?

13         MR. LOISEL:    Judge, I think, like I

14    said, we already submitted our response to that

15    motion, we would just ask that you deny it.  I

16    mean, I don't know how much trouble putting it

17    together is.  The question I just think for the

18    reasons set forth in the State's previous motion

19    that it is not entitled to have this file sealed.

20         MR. MCELROY:    And I think, Judge, that

21    the argument isn't that trial counsel is entitled

22    to it.  The argument is that the Defendant, in

23    order for him -- assuming that it may be an

1     appeal --

2           THE COURT:    Let's do it this way:  If

3     there is a verdict of guilty, I'll issue it at

4     that time.

5           MR. LOISEL:    Very well.

6           THE COURT:    At this time then the jury

7     will retire and commence with their

8     deliberations.

9      (JURY COMMENCED DELIBERATIONS AT 1:50 P.M. AND

10            RETURNED A VERDICT AT 7:46 P.M.)

11          THE COURT:    Do we have a foreman or

12    forewoman?

13          MR. DROUILLARD:    (Indicating.)

14          THE COURT:    Mr. Foreman, have you

15    arrived at a verdict?

16          MR. DROUILLARD:    Yes, we have.

17          THE COURT:    Would you please hand the

18    verdict form to the Bailiff.  The Bailiff will

19    publish the verdict.  The Defendant will please

20    rise.

21          MS. JOHNSON:    State of Ohio versus

22    Robert Wilson, case number 2006-3339.  "We, the

23    jury, empaneled in the above entitled action,

1    having been sworn, well and truly to try and true

2    deliverance to make between the State of Ohio and

3    the Defendant Robert Wilson, and having been

4    fully advised of the premises for verdict find

5    and say that we find the Defendant guilty of

6    murder, causing the death of Brenda Navarre in

7    violation of RC 2903.02(A) and 2929.02 as charged

8    in the indictment." And signed by all 12 jurors.

9         THE COURT:     Do either Counsel wish to

10   poll the jury?

11        MR. WINGATE:   We would, Your Honor.

12        THE COURT:     All right.

13   Adele Karwacki, is that your verdict?

14        MS. KARWACKI:  Yes.

15        THE COURT:     Is it John Paul

16   Valiquette?  Is this your verdict?

17        MR. VALIQUETTE:    Yes.

18        THE COURT:     Mr. Joe Tomaselli, is this

19   your verdict?

20        MR. TOMASELLI: Yes.

21        THE COURT:     Mr. Casey Drouillard, is

22   this your verdict?

23        MR. DROUILLARD:    It is Drouillard.

1          THE COURT:     Is this your verdict?

2          MR. DROUILLARD:    Yes.

3          THE COURT:     Ms. Abernathy, is this

4     your verdict?

5          MS. ABERNATHY: Yes.

6          THE COURT:     Ms. Fults, is this your

7     verdict?

8          MS. FULTS:     Yes.

9          THE COURT:     Mr. Hiser, is this your

10    verdict?

11         MR. HISER:     Yes.

12         THE COURT:     Mr. Vasquez, is this your

13    verdict?

14         MR. VASQUEZ:   Yes, sir.

15         THE COURT:     Or Vasquez, this your

16    verdict?  Ms. Zajac, is this your verdict?

17         MS. ZAJAC:     Yes.

18         THE COURT:     Mr. Kinnebrew, is this

19    your verdict?

20         MR. KINNEBREW: Yes.

21         THE COURT:     Mr. Montague, is this your

22    verdict?

23         MR. MONTAGUE:  Yes.

1           THE COURT:      And Ms. Shumer, is this

2     your verdict?

3           MS. SHUMER:     Yes, sir.

4           THE COURT:      All right.  The verdict is

5     signed by all 12 jurors, all 12 jurors

6     concurring.  The Court accepts the verdict form,

7     orders it to be filed in the case.

8           Members of the jury, after you are

9     discharged, you may discuss your verdict and your

10    deliberations with others, but you are not

11    required to do so.  You must decide for yourself

12    whether or not you will discuss such matters.  In

13    any event, you should be careful of what you say.

14    You should make no statement verbal or in writing

15    unless you are sure that it is complete and

16    correct.  You should make no statement that you

17    would not be willing to make under oath in the

18    presence of the Court, the other jurors,

19    litigants, and their respective counsel.  If your

20    statements are to the press, remember that your

21    name and your statement may appear in print, in

22    which event you should be doubly cautious to be

23    sure that your statement is absolutely correct in

1       whole and in part because the press will only use

2       that part which the reporter considers

3       sufficiently newsworthy or challenging.

4            As jurors you have served as public

5       officers of this court.  When you are discharged

6       and I leave the bench, your services are

7       completed and you have all the rights to privacy

8       of private citizens.  It is the lawyers duty to

9       protect those rights and your desire not to talk

10      about the case, if that is your decision.  It is

11      improper and unethical for a lawyer or anyone

12      else to harass, entice or exert improper

13      influence on you for the purpose of getting you

14      to talk about the case.  If you retire to the

15      jury room for just one further moment, then I

16      will let you go.

17           (WHEREUPON THE FOLLOWING DISCUSSION WAS

18      HELD OUTSIDE THE PRESENCE OF THE JURY.)

19           THE COURT:    I would propose to proceed

20      to sentencing in two weeks.  Do you have the

21      time?

22           MS. JOHNSON:   Yes.

23           THE COURT:    I'll let you go ahead and

1    give us a time right now.

2          MS. JOHNSON:    We could do it on the

3    19th.

4          THE COURT:      19th of September?  What

5    time?  9:00 o'clock on the 17th?

6          MS. JOHNSON:    19th.

7          MR. WINGATE:    Your Honor, I'm not

8    available on the 19th, however, Mr. Wilson is

9    aware of the fact that there's only one sentence

10   that this Court can impose upon him, which would

11   be 15 to life, and he would rather proceed to

12   sentencing at this point.

13         THE COURT:      Well, I'm not prepared

14   really to sentence at this point.  I understand

15   that if there is a PSI, I would like to review

16   that unless you're willing to proceed.

17         MR. LOISEL:     Judge, as Mr. Wingate

18   indicated, as statute would indicate back in 1993

19   the punishment for this crime is 15 to life.

20   There is no -- this Court has no availability for

21   any other sentence.  The State is willing to

22   proceed at this time if the Court is comfortable.

23   If the Court is not comfortable, we understand.

1    We would like to go forward at this time as well.

2              THE COURT:     All right.  If both sides

3    agree to sentencing at this time, I'm going to

4    take two minutes and then we'll proceed to

5    sentencing.  I will be granting your motion for

6    the sealing of the record, so you will need to

7    have a record available under seal.  And take two

8    minutes and then we'll proceed to sentencing.

9              MR. WINGATE:    Judge, if we -- I'm not

10   available on the 19th.  If the Court wishes to do

11   the following week I would be, however, the

12   question is would the Court have Mr. Wilson sent

13   back to the Toledo Correctional Institution?  He

14   would rather go back and wait the time to be

15   brought back for sentencing.

16             THE COURT:     All right.

17             MR. WINGATE:    Then that's what we would

18   like to do.

19             THE COURT:     We'll set time to three

20   weeks then.

21             MR. WINGATE:    Then Mr. Wilson is ordered

22   returned to the Toledo Correctional Institute?

23             THE COURT:     Correct.

1          MR. WINGATE:    All right.

2          MR. LOISEL:    What specific date; do we

3     know?

4          THE COURT:    I'll have to get you the

5     date.  I have to check my calendar as well.  So

6     you can return the Defendant.

7          (WHEREUPON THE TRIAL OF THE CASE

8     CONCLUDED ON SEPTEMBER 5, 2008, AT 8:00 P.M.)

9                         -   -   -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1

2

3                **C E R T I F I C A T E**

4

5

6

7               I, THE UNDERSIGNED, HEREBY CERTIFY

8      THAT THE ABOVE AND FOREGOING IS A TRUE AND

9      COMPLETE TRANSCRIPT OF THE PROCEEDINGS HAD IN THE

10     TRIAL OF THE ABOVE-ENTITLED CAUSE.

11

12

13

14

15

16                              _____

17                              Stacey L. McDevitt, RPR

18                                    Official Court

19          Reporter

20

21

22

23

## $

**$100** [2] - 37:16, 69:5
**$5,000** [5] - 28:11, 28:19, 41:20, 42:2, 70:3

## '

**'03** [1] - 69:23

## 1

**1** [2] - 2:4, 11:15
**10** [4] - 19:2, 28:12, 41:14, 54:15
**100** [1] - 25:2
**11** [1] - 18:18
**110** [1] - 22:16
**11th** [1] - 68:13
**12** [19] - 6:22, 6:23, 11:16, 18:12, 19:1, 28:12, 102:22, 103:19, 103:23, 104:3, 104:4, 104:7, 104:16, 104:19, 104:22, 109:8, 111:5
**13th** [1] - 69:10
**15** [7] - 28:11, 47:18, 48:2, 51:17, 51:23, 113:11, 113:19
**17th** [1] - 113:5
**19** [1] - 37:11
**1991** [1] - 59:23
**1993** [44] - 23:10, 24:6, 24:11, 24:18, 29:21, 30:21, 34:19, 34:21, 35:4, 37:23, 38:13, 45:8, 46:7, 46:11, 46:14, 46:21, 46:23, 47:2, 47:16, 50:1, 50:14, 51:11, 55:16, 59:19, 60:22, 61:5, 61:8, 61:14, 61:16, 62:2, 64:3, 64:19, 65:1, 65:11, 84:1, 85:15, 87:13, 96:22, 96:23, 97:12, 98:21, 113:18
**1995** [7] - 25:12, 31:14, 36:7, 74:7, 74:10, 80:14, 80:15
**19th** [5] - 113:3, 113:4, 113:6, 113:8, 114:10
**1:15** [1] - 89:1, 89:6
**1:50** [1] - 108:9
**1st** [17] - 24:6, 24:10, 34:18, 34:21, 35:3, 37:23, 38:13, 50:1, 50:14, 51:10, 55:16, 84:1, 87:13, 96:21, 97:11, 98:20

## 2

**2** [6] - 2:5, 8:13, 11:14, 11:18, 14:19, 18:13
**2002** [3] - 64:23, 65:1, 65:15
**2003** [14] - 47:3, 47:5, 61:15, 62:2, 64:19, 64:23, 65:11, 65:20, 67:10, 67:11, 67:19, 68:3, 69:2, 86:22
**2004** [5] - 61:14, 61:15, 61:16, 68:19, 69:2
**2005** [4] - 42:13, 42:20, 68:22, 69:3
**2006** [3] - 36:9, 37:11, 38:15, 64:4, 69:10
**2006-3339** [1] - 108:22
**2007** [1] - 69:18
**2008** [6] - 1:9, 3:1, 45:13, 68:13, 86:22, 115:8
**213-4477** [1] - 1:21
**24** [1] - 45:16
**25** [1] - 45:17
**2903.02(A** [2] - 103:21, 109:7
**2929.02** [2] - 103:22, 109:7
**2945.42** [1] - 16:18
**2nd** [2] - 24:18, 50:21

## 3

**3** [3] - 2:5, 3:2, 17:13
**3rd** [11] - 34:19, 35:3, 50:1, 50:14, 50:19, 51:11, 84:2, 86:22, 96:22, 97:12, 98:21

## 4

**4** [3] - 1:6, 2:6
**419** [1] - 1:21
**43624** [1] - 1:21
**45** [1] - 51:3

## 5

**5** [5] - 1:9, 3:1, 5:11, 5:15, 115:8
**50** [3] - 37:16, 54:15, 69:5

## 6

**6** [2] - 3:18, 5:4
**6'1** [2] - 63:8, 63:13
**6'2** [2] - 63:9, 63:14

## 7

**700** [1] - 1:21
**7:46** [1] - 108:10

## 8

**8:00** [1] - 115:8

## 9

**9:00** [1] - 113:5
**9:21** [1] - 3:3

## A

**A.M** [1] - 3:3
**Abernathy** [1] - 110:3
**ABERNATHY** [1] - 110:5
**abeyance** [1] - 107:8
**abide** [1] - 54:20
**ability** [3] - 4:4, 30:17, 46:16
**ABOVE** [2] - 116:8, 116:10
**ABOVE-ENTITLED** [1] - 116:10
**absence** [1] - 98:13
**absolutely** [3] - 45:18, 77:18, 111:23
**accept** [1] - 89:18
**accepts** [1] - 111:6
**accidentally** [1] - 98:3
**accordance** [1] - 96:1
**according** [1] - 92:4
**accordingly** [1] - 100:6
**accuracy** [2] - 83:12, 94:5
**acknowledged** [1] - 52:19
**acquittal** [1] - 106:21
**acquitted** [1] - 90:18
**act** [9] - 75:1, 75:3, 75:4, 91:12, 98:1, 98:2, 98:5, 98:9, 98:17
**acted** [1] - 96:1
**action** [2] - 103:10, 108:23
**acts** [4] - 32:8, 95:19, 96:4, 97:17
**Adams** [1] - 1:21
**add** [3] - 5:16, 5:17, 10:16
**adding** [1] - 12:23
**addition** [3] - 5:8, 5:19, 84:18
**additional** [3] - 10:16, 12:23, 15:5
**address** [4] - 11:10, 22:2, 22:3, 54:11
**addresses** [1] - 17:7
**adduced** [1] - 70:10
**Adele** [2] - 7:2, 109:13
**adequate** [1] - 28:2
**admission** [1] - 26:6
**admit** [3] - 39:7, 45:6, 46:9
**admitted** [8] - 26:7, 40:5, 52:9, 53:8, 87:2, 91:15, 91:22, 95:6
**adopt** [1] - 42:4
**advances** [1] - 58:18
**advise** [7] - 7:5, 7:12, 21:11, 89:13, 103:1
**advised** [4] - 17:21, 20:19, 103:14, 109:4
**advocate** [1] - 54:18
**affairs** [5] - 75:2, 75:6, 86:4, 91:7, 91:13
**affidavit** [10] - 38:22, 40:6, 40:8, 40:14, 41:1, 52:8, 77:15, 83:8, 83:12, 83:13
**aforementioned** [1] - 1:9
**afraid** [5] - 68:6, 68:7, 68:10, 68:16, 68:18
**ago** [2] - 37:10, 39:1
**agree** [5] - 13:18, 13:20, 102:22, 104:3, 104:4, 114:3
**agreeable** [1] - 17:23
**agreed** [1] - 3:22
**agreement** [1] - 101:12
**ahead** [1] - 112:23
**Alfonso** [26] - 22:17, 25:5, 25:16, 25:17, 25:23, 26:8, 27:20, 31:2, 31:8, 31:14, 35:16, 35:17, 37:14, 38:6, 38:11, 47:10, 73:5, 73:20, 75:4, 78:14, 78:20, 80:7, 80:13, 80:14, 80:21, 81:14
**allegation** [1] - 72:15
**Allison** [1] - 6:6
**allow** [3] - 51:19, 72:2, 89:3
**allowed** [5] - 15:4, 21:5, 57:17, 93:9, 104:10
**alone** [1] - 95:9
**alternate** [4] - 10:8, 105:6, 105:10, 105:11
**Amazingly** [1] - 27:12
**amount** [1] - 47:23
**AND** [6] - 20:5, 54:3, 85:3, 108:9, 116:8
**announced** [3] - 101:21, 102:16, 105:18
**another's** [1] - 97:10
**answer** [5] - 7:3, 33:1, 69:15, 93:3, 101:1
**answered** [3] - 7:11, 93:2, 93:6
**answers** [1] - 92:20
**anticipating** [2] - 56:8, 58:22
**anus** [1] - 45:9
**apologize** [2] - 43:1, 54:21
**appeal** [1] - 108:1
**appear** [3] - 37:2, 41:10, 111:21
**appearance** [2] - 8:21, 93:23
**APPEARANCES** [1] - 1:13
**appeared** [4] - 5:17, 23:21, 69:5, 93:12
**appearing** [1] - 3:18
**applicable** [3] - 15:17, 20:21, 89:14
**applied** [1] - 71:16
**applies** [1] - 9:19
**apply** [8] - 86:6, 89:19, 89:21, 93:21, 93:22, 100:4
**Applying** [1] - 94:8
**appreciate** [1] - 22:6
**appreciates** [1] - 22:6
**appreciation** [1] - 105:9
**apprises** [1] - 72:13
**approach** [2] - 52:2, 84:15
**appropriate** [2] - 12:14, 93:16
**approved** [1] - 42:6
**area** [1] - 104:20
**areas** [1] - 104:13
**argue** [1] - 4:10
**arguing** [2] - 33:18, 34:6
**argument** [8] - 5:23, 33:23, 77:13, 77:22, 82:23, 87:21, 107:21, 107:22
**ARGUMENT** [3] - 2:7, 2:8, 2:8
**arguments** [6] - 12:16, 21:15, 51:18, 89:11, 92:16, 92:18
**arose** [1] - 21:8
**aroused** [1] - 101:8
**arrest** [6] - 42:4, 42:9, 68:12, 82:15, 83:4, 87:12
**arrested** [1] - 69:18

arrive [2] - 95:7, 100:8
arrived [2] - 8:21, 108:15
arriving [2] - 11:21, 21:20
aside [2] - 15:16, 79:19
assailant [1] - 63:17
assault [3] - 44:7, 58:9, 58:14
assaulting [1] - 63:8
assessment [1] - 9:3
assign [1] - 94:9
assist [1] - 92:18
assistance [1] - 95:6
Assistant [1] - 1:14
assume [5] - 12:1, 12:19, 12:21, 13:21, 13:22
Assumes [1] - 67:13
assuming [3] - 12:12, 48:7, 107:23
assumption [1] - 67:7
assumptions [1] - 71:2
asterisk [1] - 103:16
AT [8] - 52:5, 54:2, 84:17, 85:2, 105:23, 108:9, 108:10, 115:8
attained [1] - 15:7
attempted [1] - 40:20
attention [3] - 4:6, 35:11, 56:23
attentive [1] - 105:7
attorney [6] - 22:2, 40:9, 40:13, 40:14, 83:14
Attorney [12] - 38:20, 38:21, 39:2, 39:18, 39:22, 40:20, 43:4, 48:20, 55:22, 81:23, 86:1, 87:15
attorneys [5] - 3:12, 3:14, 21:16, 27:7, 101:1
August [3] - 30:22, 59:19, 68:13
authority [1] - 102:14
autopsy [3] - 50:19, 58:10, 58:13
availability [1] - 113:20
available [3] - 113:8, 114:7, 114:10
aware [5] - 6:2, 8:17, 9:22, 15:1, 113:9

**B**

bad [1] - 57:13
bag [1] - 8:21
bags [4] - 24:13, 24:17, 38:1, 38:5
bailiff [1] - 7:23
Bailiff [9] - 6:20, 7:5, 7:10, 7:12, 7:14, 100:23, 103:1, 108:18
bar [2] - 39:8, 42:14
BARBER [1] - 1:5
Barber [1] - 1:10
barely [1] - 33:15
Barnett [3] - 43:8, 50:17, 78:16
Bart [1] - 28:16
based [6] - 39:5, 55:13, 56:7, 70:9, 76:4, 91:5
basis [3] - 53:19, 53:21, 55:21
BE [1] - 1:8
bear [3] - 65:22, 67:1, 67:9
bearing [1] - 98:14
Beavers [16] - 28:17, 41:22, 43:23, 44:5, 44:13, 45:6, 46:19, 46:22, 58:16, 61:10, 61:13, 62:1, 63:4, 64:17, 65:4, 87:10
became [1] - 59:22
become [2] - 65:22, 67:1
began [1] - 77:12
beginning [1] - 4:18
begins [2] - 89:23, 90:6
behalf [6] - 1:14, 1:17, 17:17, 54:21, 77:4, 77:5
behind [1] - 85:17
belabor [1] - 15:14
belief [2] - 94:15, 94:16
believes [1] - 59:10
bells [1] - 25:20
bench [1] - 112:6
BENCH [5] - 52:6, 54:3, 84:17, 85:3, 105:23
Benda [2] - 57:6
best [1] - 46:15
better [2] - 53:16, 72:21
between [12] - 30:20, 33:23, 49:23, 50:13, 51:10, 72:22, 84:1, 96:21, 97:11, 98:20, 103:12, 109:2
beyond [40] - 27:1, 45:4, 49:15, 49:21, 51:13, 55:9, 56:15, 57:9, 60:19, 70:13, 71:3, 71:6, 72:3, 72:18, 73:3, 73:23, 74:3, 74:13, 74:20, 74:21, 74:22, 76:7, 76:13, 77:17, 78:2, 78:22, 83:19, 84:12, 85:6, 85:23, 88:12, 88:19, 90:17, 90:19, 91:9, 96:20, 97:4, 97:8, 99:9, 99:14
bias [6] - 25:10, 35:19, 56:7, 83:16, 94:6, 100:10
big [1] - 82:7
Bill [5] - 30:19, 31:4, 78:15, 79:17
bills [2] - 37:17, 69:5
bitch [9] - 26:19, 29:17, 31:3, 31:4, 31:9, 36:16, 80:17, 80:19, 81:12
bitches [1] - 26:1
black [7] - 33:18, 33:19, 33:23, 34:5, 34:9, 60:14, 60:15
blank [1] - 40:18
blood [5] - 24:7, 33:13, 35:8, 45:10, 64:4
blue [1] - 25:15
blunt [1] - 43:12
Blunt [1] - 24:19
board [2] - 41:18, 42:6
body [1] - 58:18
bottom [1] - 73:17
bought [1] - 79:20
boulder [1] - 31:17
box [1] - 8:15
break [4] - 104:11, 104:14, 105:1
breaks [1] - 104:10
Brenda [63] - 5:16, 22:8, 22:12, 22:20, 23:6, 23:8, 23:15, 23:19, 24:6, 24:18, 26:5, 29:14, 30:3, 30:20, 31:4, 31:10, 31:20, 32:13, 33:6, 33:20, 33:22, 35:8, 37:20, 38:3, 42:18, 43:1, 43:3, 43:11, 50:20, 51:12, 55:17, 58:2, 59:17, 59:20, 59:23, 60:10, 60:21, 61:6, 62:12, 63:22, 65:3, 65:11, 67:3, 73:10, 79:11, 79:18, 80:4, 80:19, 80:21, 83:23, 87:1, 88:7, 88:8, 88:13, 88:16, 88:17, 88:20, 93:11, 97:2, 97:10, 97:22, 103:20, 109:6
Brewski's [2] - 69:4, 82:7
brick [13] - 26:2, 26:12, 26:15, 29:18, 31:14, 31:17, 36:17, 65:7, 65:13, 73:11, 80:20, 81:4, 81:12
briefly [1] - 104:23
bring [1] - 52:3
Bring [1] - 54:1
bringing [1] - 4:5
brings [3] - 8:8, 8:9, 37:19
brother [2] - 25:18, 25:19
brought [5] - 6:3, 6:7, 15:21, 56:23, 114:15
brutally [2] - 38:3, 83:23
built [1] - 55:3
burden [17] - 22:1, 56:12, 56:16, 57:8, 57:11, 60:18, 65:21, 66:23, 67:8, 68:20, 69:2, 77:1, 83:17, 83:18, 84:20, 84:23, 90:15
Burden [1] - 75:21
business [3] - 60:7, 60:12, 69:4
buys [2] - 23:9, 30:19
BY [3] - 2:7, 2:8, 2:8

**C**

calendar [1] - 115:5
candid [3] - 35:18, 39:14, 41:12
candor [1] - 41:9
cannot [15] - 8:17, 14:15, 19:1, 21:3, 56:6, 71:7, 71:18, 71:19, 71:22, 72:2, 74:18, 75:19, 78:2, 91:3
capable [1] - 83:9
caption [1] - 103:7
car [1] - 31:12
care [3] - 18:9, 32:5, 74:9
careful [1] - 111:13
carefully [2] - 91:2, 100:3
case [97] - 9:20, 10:1, 10:13, 10:17, 12:14, 13:3, 14:17, 14:20, 15:18, 15:21, 18:21, 19:10, 20:12, 21:11, 21:17, 22:1, 22:7, 22:22, 23:2, 26:21, 32:1, 42:10, 44:2, 44:7, 46:17, 46:18, 47:6, 47:18, 48:1, 48:10, 48:22, 51:9, 51:19, 51:20, 51:21, 51:22, 54:23, 56:1, 56:10, 57:9, 57:20, 59:14, 61:20, 63:7, 70:9, 71:9, 71:16, 71:20, 73:5, 76:16, 77:13, 77:14, 77:15, 77:18, 77:20, 77:22, 78:4, 78:12, 79:19, 83:22, 84:13, 85:6, 85:21, 86:7, 86:14, 89:2, 89:3, 89:5, 89:14, 89:22, 90:6, 90:15, 94:17, 94:22, 95:13, 95:17, 96:18, 97:19, 100:12, 101:14, 101:16, 101:22, 102:1, 102:1, 102:13, 104:16, 104:18, 104:22, 105:2, 105:10, 105:12, 105:17, 108:22, 111:7, 112:10, 112:14
CASE [2] - 1:3, 115:7
Case [1] - 103:8
cases [2] - 47:22, 59:21, 60:4, 79:18, 105:11
Casey [1] - 109:21
cast [1] - 102:13
causation [2] - 50:5, 98:15
CAUSE [1] - 116:10
caused [7] - 9:11, 50:2, 50:7, 51:12, 97:1, 97:10
causing [1] - 103:20, 109:6
caution [1] - 104:15
cautious [1] - 111:22
center [1] - 41:3
certain [6] - 39:4, 62:9, 93:7, 95:18, 97:18, 101:7
certainly [4] - 14:20, 29:7, 53:18, 105:14
CERTIFY [1] - 116:7
cetera [2] - 4:4
Chad [1] - 58:4
chair [1] - 30:15
challenging [1] - 112:3
chance [5] - 3:22, 12:5, 31:15, 46:4, 86:21
change [5] - 5:15, 83:4, 89:20, 101:9, 101:17
changed [9] - 31:7, 43:4, 43:5, 86:22, 87:18, 87:23, 88:5, 88:15
character [3] - 91:10, 95:23, 96:2
Charge [1] - 39:16
charge [46] - 46:23, 47:19, 47:23, 55:10, 72:13, 89:7, 90:11, 91:4, 96:20, 97:15
CHARGE................
...............89 [1] - 2:9
charged [16] - 39:14, 39:16, 47:14, 55:4, 69:21, 90:8, 90:13, 90:21, 95:20, 96:8, 96:18, 98:19, 98:23,

99:5, 103:22, 109:7

**charges** [2] - 70:2, 79:21

**check** [1] - 115:5

**chest** [1] - 41:16

**choice** [1] - 102:4

**choose** [1] - 56:19

**chooses** [1] - 75:18

**circumstances** [6] - 43:17, 78:8, 92:1, 94:7, 98:11, 98:14

**circumstantial** [2] - 91:19, 92:12

**Circumstantial** [1] - 91:23

**citizens** [1] - 112:8

**claimed** [1] - 99:3

**clear** [4] - 18:10, 19:16, 24:15, 30:16

**clearly** [2] - 14:17, 58:13

**client** [5] - 27:8, 29:11, 40:10, 40:11, 83:15

**client's** [2] - 3:7, 29:5

**close** [1] - 11:6, 12:16, 58:12, 78:17, 82:8, 83:9

**CLOSING** [3] - 2:7, 2:8, 2:8

**closing** [3] - 52:19, 92:15, 92:17

**clothes** [2] - 44:2, 44:17

**Code** [2] - 16:17, 103:21

**coincidence** [4] - 24:14, 26:3, 38:2

**cold** [1] - 46:18

**collected** [2] - 45:9, 58:4

**collective** [3] - 41:7, 44:11, 63:3

**comfort** [1] - 68:22

**comfortable** [2] - 113:22, 113:23

**commence** [3] - 51:17, 89:7, 108:7

**COMMENCED** [1] - 108:9

**comment** [1] - 21:16

**commission** [1] - 95:18

**commit** [1] - 96:8

**committed** [3] - 96:5, 98:23, 99:7

**common** [4] - 61:2, 70:17, 91:5, 92:5

**COMMON** [1] - 1:1

**Common** [2] - 1:11, 1:20

**community** [1] - 65:14

**compare** [2] - 45:13, 63:21

**compared** [2] -

**comparison** [1] - 45:10

**compelling** [4] - 30:22, 41:14, 43:13, 87:16

**complaint** [1] - 72:16

**COMPLETE** [1] - 116:9

**complete** [2] - 107:8, 111:15

**completed** [1] - 112:7

**completely** [1] - 66:14

**completion** [1] - 14:19

**conception** [1] - 89:21

**concern** [2] - 8:10, 8:22, 10:2

**concerned** [2] - 20:11, 70:19

**concerning** [1] - 94:4

**concerns** [1] - 61:7

**CONCLUDED** [4] - 20:5, 54:3, 85:3, 115:8

**conclusion** [2] - 71:10, 92:7

**concocted** [1] - 82:9

**concurring** [1] - 111:6

**condition** [1] - 96:13

**conduct** [2] - 98:7, 101:4

**conducted** [2] - 50:18, 59:6

**confidential** [8] - 23:6, 32:18, 32:21, 33:2, 33:5, 59:18, 60:1, 60:6

**confined** [1] - 99:18

**Confirms** [1] - 33:13

**conformity** [1] - 96:1

**confusing** [2] - 4:7, 4:12

**congenial** [1] - 101:19

**conjunction** [4] - 3:23, 31:1, 43:18, 80:3

**connected** [1] - 92:3

**conscious** [1] - 98:1

**consider** [35] - 11:20, 12:3, 13:4, 14:12, 15:4, 18:20, 19:1, 23:1, 23:4, 30:9, 32:10, 32:12, 37:9, 40:7, 43:20, 49:11, 56:4, 59:13, 78:18, 78:20, 78:21, 79:3, 79:13, 80:1, 80:2, 80:5, 80:6, 87:17, 93:20, 95:22, 96:5,

96:12, 99:17, 100:15

**Consider** [1] - 100:8

**consideration** [5] - 47:9, 48:16, 95:12, 100:2, 101:15

**considered** [7] - 4:8, 5:18, 46:20, 90:10, 91:2, 93:13, 94:23

**considering** [2] - 3:15, 18:16

**considers** [1] - 112:2

**consistent** [8] - 24:21, 25:2, 43:3, 43:15, 46:5, 71:21, 76:22, 87:11

**constitutional** [2] - 75:17, 94:20

**contact** [2] - 64:8, 64:13

**contained** [1] - 72:16

**contention** [1] - 81:7

**continuing** [1] - 47:11

**control** [1] - 10:20

**conversation** [7] - 7:15, 7:18, 25:14, 26:17, 36:4, 36:6, 37:13

**convict** [2] - 27:1, 75:10, 76:20

**convictions** [1] - 101:19

**convince** [3] - 57:9, 66:5, 83:10

**convinced** [7] - 55:8, 73:2, 73:23, 74:3, 74:20, 91:3, 101:17

**convinces** [2] - 71:5, 90:19

**convincing** [2] - 72:10, 78:22

**cooperate** [7] - 22:13, 39:15, 39:19, 40:3, 65:22, 66:23, 69:20

**cooperates** [1] - 39:17

**cooperating** [1] - 88:2

**cooperation** [1] - 23:12

**copies** [2] - 3:15, 17:9

**copy** [8] - 6:9, 6:16, 6:17, 8:3, 8:4, 90:2, 90:4, 107:8

**cornerstone** [1] - 55:6

**cornerstones** [1] - 55:2

**Coroner** [1] - 50:17

**coroner** [1] - 24:19

**correct** [12] - 3:18, 4:20, 5:15, 9:2, 12:19, 12:20, 20:1, 77:8,

77:18, 79:2, 111:16, 111:23

**Correct** [2] - 52:15, 114:23

**Correctional** [2] - 114:13, 114:22

**correctly** [2] - 53:13, 58:23

**corroborating** [1] - 23:10

**cosmic** [1] - 38:2

**counsel** [2] - 107:21, 111:19

**Counsel** [15] - 4:9, 4:15, 7:11, 12:16, 21:15, 21:23, 48:6, 84:9, 89:12, 91:17, 92:16, 92:18, 102:2, 105:21, 109:9

**COUNTY** [1] - 1:1

**County** [15] - 1:11, 1:14, 1:20, 34:14, 34:18, 35:2, 50:2, 50:21, 51:1, 51:11, 84:3, 96:23, 97:13, 99:5, 99:8

**couple** [5] - 38:5, 60:1, 79:2, 82:1, 82:2

**course** [15] - 7:8, 17:9, 21:8, 32:2, 39:19, 40:3, 44:15, 47:16, 54:8, 66:2, 78:10, 82:13, 82:18, 83:14, 100:13

**court** [8] - 20:17, 32:22, 69:19, 101:22, 102:16, 103:4, 105:19, 112:5

**COURT** [90] - 1:1, 3:6, 3:10, 4:17, 5:2, 5:5, 5:7, 5:13, 5:22, 6:5, 6:10, 6:19, 6:23, 7:17, 8:5, 8:8, 11:13, 11:17, 12:10, 12:17, 13:21, 17:1, 17:5, 17:23, 18:3, 18:5, 19:7, 19:19, 20:2, 20:7, 36:22, 37:5, 41:6, 44:10, 51:16, 52:11, 52:17, 52:22, 53:13, 53:21, 54:1, 54:5, 55:21, 56:2, 63:2, 67:14, 67:16, 67:20, 67:23, 77:6, 84:12, 85:1, 87:21, 88:22, 89:10, 105:21, 106:1, 106:8, 106:17, 107:1, 107:11, 108:2, 108:6, 108:11, 108:14, 108:17, 109:9, 109:12, 109:15, 109:18, 109:21, 110:1, 110:3, 110:6, 110:9, 110:12, 110:15, 110:18, 110:21, 111:1, 111:4, 112:19, 112:23, 113:4, 113:13, 114:2,

114:16, 114:19, 114:23, 115:4

**Court** [63] - 1:11, 1:20, 3:20, 4:12, 7:3, 7:11, 9:2, 9:9, 9:20, 10:6, 10:7, 10:9, 11:21, 12:4, 12:22, 13:5, 14:14, 14:21, 14:23, 15:15, 16:3, 17:21, 18:20, 19:18, 20:11, 20:12, 20:15, 20:19, 21:13, 53:9, 53:12, 56:5, 71:14, 72:11, 75:15, 75:16, 89:13, 89:15, 89:17, 89:20, 92:21, 93:1, 93:7, 93:10, 97:14, 99:6, 99:23, 100:5, 100:14, 100:23, 102:4, 105:4, 107:7, 111:6, 111:18, 113:10, 113:20, 113:22, 113:23, 114:10, 114:12, 116:18

**Court's** [7] - 4:6, 11:14, 11:18, 17:12, 18:13, 100:15, 107:4

**COURT'S** [1] - 2:3

**Courthouse** [1] - 1:20

**COURTROOM** [1] - 3:2

**courtroom** [4] - 61:4, 102:10, 103:3, 105:15

**CR-2006-3339** [1] - 103:8

**CR06-3339** [1] - 1:3

**craft** [1] - 17:6

**Craig** [1] - 33:9

**crazy** [1] - 48:20

**create** [1] - 72:10

**credibility** [8] - 30:12, 36:23, 37:6, 61:21, 87:6, 93:18, 93:20, 95:14

**crime** [7] - 45:5, 47:1, 55:5, 59:11, 83:21, 96:18, 113:19

**Crime** [11] - 41:22, 42:8, 61:17, 62:3, 62:18, 64:20, 64:22, 65:1, 82:6, 82:14, 82:22

**crimes** [2] - 95:18, 96:4

**criminal** [4] - 55:2, 71:23, 89:22, 90:6

**crisp** [2] - 37:16, 69:5

**Crissy** [1] - 69:12

**crossing** [1] - 11:7

**crucial** [2] - 70:7, 70:8

**crying** [4] - 23:22, 31:21, 60:22, 80:12

**Culpert** [3] - 44:6, 58:4

**curative** [1] - 19:5

## D

**daily** [1] - 93:22
**dangerous** [3] - 33:5, 60:6, 60:11
**date** [5] - 35:2, 99:2, 99:3, 115:2, 115:5
**Davis** [20] - 22:17, 25:5, 26:8, 27:20, 31:2, 31:14, 35:17, 36:12, 36:14, 36:16, 37:14, 73:5, 75:4, 78:14, 78:20, 80:7, 80:13, 80:14, 80:21, 81:14
**Davis's** [2] - 38:6, 38:11
**Days** [1] - 31:22
**days** [7] - 23:14, 23:22, 23:23, 31:20, 80:4, 80:11, 84:1
**dead** [3] - 23:23, 31:22, 33:11
**deal** [3] - 10:23, 47:18, 82:7
**dealer** [1] - 60:16
**dealing** [1] - 80:4
**dealt** [1] - 106:2
**death** [14] - 24:4, 43:11, 50:2, 50:7, 50:11, 51:12, 58:1, 97:1, 97:10, 97:22, 98:17, 103:20, 109:6
**deceased** [1] - 30:20
**December** [29] - 24:6, 24:10, 24:18, 34:18, 34:19, 34:21, 35:3, 37:23, 38:13, 50:1, 50:14, 50:19, 50:20, 51:10, 51:11, 55:16, 83:23, 84:1, 84:2, 87:13, 96:22, 97:11, 97:12, 98:20, 98:21
**decide** [9] - 35:19, 70:9, 89:16, 100:4, 101:10, 101:14, 102:1, 105:1, 111:11
**decided** [1] - 28:13
**deciding** [1] - 96:6
**decipher** [1] - 104:8
**decision** [5] - 11:22, 56:6, 94:21, 97:23, 112:10
**deduction** [1] - 92:7
**deem** [2] - 93:15, 94:10
**deep** [1] - 105:8
**defend** [1] - 40:10
**DEFENDANT** [1] - 1:6
**Defendant** [49] - 1:17, 3:11, 23:16, 30:21, 31:1, 31:8, 38:9, 40:2, 45:1, 49:22, 51:15, 80:6, 80:13, 80:16, 80:22, 81:10, 81:15, 81:20, 81:21, 86:9, 87:12, 87:19, 88:1, 90:8, 90:15, 90:18, 94:17, 94:18, 94:22, 95:20, 95:23, 96:5, 96:18, 96:19, 96:23, 97:6, 97:9, 97:21, 99:6, 99:20, 99:21, 100:12, 103:13, 103:15, 107:22, 108:19, 109:3, 109:5, 115:6
**Defendant's** [10] - 17:16, 25:5, 29:1, 38:4, 52:13, 52:15, 52:23, 83:14, 87:14, 96:8
**defense** [2] - 27:7, 94:19
**Defense** [15] - 4:9, 4:15, 5:11, 5:12, 16:3, 19:22, 39:2, 44:21, 48:6, 48:20, 81:23, 84:9, 84:21, 86:1, 87:15
**define** [1] - 97:14
**defined** [1] - 90:23
**definition** [3] - 86:2, 86:4, 86:8
**definitions** [3] - 11:1, 50:4, 86:6
**degree** [1] - 69:21
**deliberate** [2] - 18:23, 48:16
**Deliberate** [1] - 101:11
**deliberating** [1] - 7:22
**deliberation** [2] - 17:22, 74:18
**DELIBERATIONS** [1] - 108:9
**deliberations** [11] - 7:9, 20:20, 21:8, 21:20, 89:8, 100:18, 102:11, 102:18, 102:21, 108:8, 111:10
**deliver** [1] - 100:23
**deliverance** [2] - 103:12, 109:2
**delivered** [1] - 100:22
**demeanor** [1] - 30:14
**denial** [1] - 90:11
**denied** [1] - 87:5
**deny** [2] - 11:9, 107:15
**Department** [2] - 46:14, 82:10
**depressed** [1] - 25:1
**Deputy** [1] - 50:17
**describe** [1] - 63:8

**designate** [1] - 11:17
**designated** [1] - 104:13
**designed** [1] - 92:18
**desire** [1] - 112:9
**despite** [2] - 56:22, 57:12
**destroy** [1] - 8:3
**destroyed** [6] - 44:1, 44:4, 44:13, 45:7, 58:6, 58:15
**details** [1] - 66:4
**detective** [6] - 23:20, 28:15, 61:22, 61:23, 62:21, 63:19
**Detective** [39] - 5:16, 23:5, 23:8, 23:13, 24:4, 30:19, 31:19, 31:23, 32:7, 32:16, 41:22, 42:11, 43:23, 44:5, 44:6, 44:13, 45:6, 46:1, 46:19, 46:22, 58:4, 58:16, 59:15, 59:19, 60:20, 61:5, 61:10, 61:13, 62:1, 63:4, 64:17, 65:4, 78:15, 80:11, 87:9, 87:10, 93:11
**detectives** [3] - 47:21, 60:3, 84:8
**determination** [2] - 99:19, 101:6
**determine** [3] - 94:15, 96:15, 99:21
**determined** [1] - 98:9
**determining** [2] - 95:10, 95:15
**develop** [1] - 47:7
**developed** [1] - 46:9
**developments** [1] - 20:12
**Diane** [1] - 78:16
**dictate** [1] - 14:15
**dictates** [1] - 30:2
**die** [1] - 22:20
**died** [6] - 24:18, 31:10, 31:12, 35:14, 43:11, 43:21
**different** [2] - 17:8, 46:12
**diligence** [1] - 85:15
**dinner** [1] - 105:1
**dire** [9] - 10:16, 30:11, 54:14, 54:18, 56:18, 57:22, 74:15, 75:13, 76:14
**direct** [7] - 23:2, 25:4, 29:23, 30:19, 91:19, 92:2, 92:10
**Direct** [3] - 24:5, 91:19, 92:12
**directed** [1] - 106:20
**directly** [3] - 51:5, 78:11, 98:17
**disadvantaged** [1] - 59:3

**disagree** [1] - 16:22
**disbelieve** [1] - 94:13
**discharged** [3] - 102:3, 111:9, 112:5
**disclose** [1] - 102:17
**discuss** [20] - 12:12, 13:2, 13:3, 13:12, 51:18, 51:20, 89:1, 89:3, 96:17, 99:17, 101:22, 102:1, 102:13, 103:5, 104:22, 105:2, 105:17, 111:9, 111:12
**discussed** [10] - 3:20, 9:10, 9:16, 10:10, 12:21, 13:11, 14:3, 14:4, 27:3, 27:5
**discussing** [2] - 104:16, 104:18
**DISCUSSION** [8] - 3:4, 20:4, 52:4, 54:2, 84:16, 85:2, 105:22, 112:17
**discussion** [4] - 13:23, 90:14, 101:1, 101:15
**dismiss** [4] - 10:15, 11:7, 12:6, 70:2
**dispositions** [1] - 14:16
**disputed** [2] - 89:16, 100:4
**disregard** [2] - 92:22, 100:17
**disturbing** [1] - 101:12
**DNA** [19] - 44:17, 45:7, 45:8, 45:12, 45:14, 45:17, 45:18, 45:20, 45:21, 63:20, 64:1, 64:3, 64:10, 64:14, 75:7, 79:4, 79:6, 79:10
**document** [3] - 6:21, 8:6, 53:16
**dollar** [2] - 37:17, 69:5
**dollars** [5] - 28:11, 28:19, 41:21, 42:2, 70:3
**done** [7] - 40:16, 46:7, 63:22, 73:18, 98:10, 100:14
**door** [2] - 7:23, 103:2
**double** [1] - 107:2
**doubly** [1] - 111:22
**doubt** [48] - 27:1, 45:5, 49:16, 49:21, 51:14, 55:9, 56:15, 57:10, 60:19, 70:13, 71:4, 71:6, 72:4, 72:18, 73:3, 74:1, 74:4, 74:13, 74:20, 74:22, 76:8, 76:13, 77:17, 78:3, 78:22,

83:20, 85:7, 86:1, 86:8, 88:12, 88:19, 90:17, 90:20, 90:22, 90:23, 91:1, 91:4, 91:5, 91:6, 91:9, 91:10, 96:21, 97:5, 97:9, 99:10, 99:14
**down** [7] - 15:8, 41:17, 54:12, 75:11, 75:22, 76:2, 77:9
**Dr** [1] - 43:8
**draft** [2] - 3:13, 17:2
**drastic** [1] - 14:13
**draw** [2] - 12:5, 93:4
**drop** [2] - 50:10, 50:12
**dropped** [16] - 22:16, 23:15, 24:21, 25:2, 26:12, 31:15, 36:17, 39:17, 43:16, 43:21, 65:7, 65:13, 73:10, 79:14, 80:20, 81:12
**Dropped** [2] - 26:2, 26:15
**dropping** [1] - 29:17
**DROUILLARD** [4] - 108:13, 108:16, 109:23, 110:2
**Drouillard** [2] - 109:21, 109:23
**drug** [6] - 47:9, 59:16, 59:21, 60:16, 79:21, 80:4
**Drug** [1] - 59:22
**drugs** [2] - 60:9, 79:20
**due** [2] - 15:7, 85:15
**during** [11] - 7:4, 7:8, 17:8, 21:8, 52:19, 57:17, 60:10, 91:15, 91:23, 100:13, 100:18
**duties** [1] - 106:12
**duty** [11] - 49:22, 51:14, 77:2, 86:5, 89:18, 95:9, 99:18, 99:21, 100:3, 100:7, 112:8
**dying** [3] - 24:7, 33:11, 35:9

## E

**education** [1] - 95:4
**efforts** [1] - 100:7
**eight** [1] - 46:12
**either** [8] - 9:11, 19:23, 27:21, 91:18, 103:17, 104:2, 109:9
**elaborate** [1] - 28:5
**element** [6] - 49:16, 55:10, 83:20, 90:20, 97:16, 98:16
**elements** [9] - 34:15, 34:17, 34:23, 49:21, 49:23, 90:12, 97:3, 99:10, 99:15

4

**elephant** [1] - 16:9
**eliminates** [1] - 34:8
**emotional** [1] - 41:18
**empaneled** [2] - 103:10, 108:23
**emphasize** [1] - 11:20
**end** [4] - 22:14, 38:6, 42:22, 60:21
**ends** [2] - 23:23, 31:22
**entering** [1] - 101:4
**entice** [1] - 112:12
**entire** [5] - 16:20, 24:23, 66:12, 74:17, 86:4
**entirely** [1] - 92:11
**entirety** [1] - 49:11
**ENTITLED** [1] - 116:10
**entitled** [4] - 103:10, 107:19, 107:21, 108:23
**equal** [1] - 92:13
**error** [1] - 93:14
**especially** [1] - 30:23
**Esquire** [3] - 1:15, 1:17, 1:18
**essential** [6] - 90:12, 90:20, 97:16, 98:15, 99:10, 99:15
**establish** [1] - 70:13
**established** [3] - 90:17, 92:10, 97:19
**et** [1] - 4:4
**event** [1] - 99:20, 111:13, 111:22
**Evidence** [2] - 91:14, 91:18
**evidence** [115] - 10:23, 14:20, 18:17, 21:9, 21:17, 21:23, 23:2, 23:18, 24:5, 24:15, 25:4, 26:22, 27:15, 27:16, 28:21, 29:13, 29:23, 30:2, 32:8, 38:9, 43:20, 44:1, 44:3, 44:14, 44:16, 44:23, 45:7, 45:9, 47:3, 47:5, 47:13, 47:20, 47:23, 48:3, 48:15, 51:4, 57:20, 57:23, 58:2, 58:3, 58:5, 58:12, 58:14, 58:17, 58:19, 58:21, 59:7, 59:8, 59:9, 63:1, 63:20, 63:21, 64:14, 67:13, 67:14, 67:18, 69:10, 70:10, 71:5, 72:18, 75:7, 76:5, 76:6, 76:20, 77:16, 77:17, 77:20, 78:3, 78:6, 78:8, 78:18, 78:21, 78:22, 79:1, 80:2, 80:3, 84:13, 84:19, 85:8, 85:9, 86:18, 87:8, 87:17, 87:23, 88:4, 88:11, 88:14, 89:11, 90:19, 91:3, 91:8, 91:13, 91:20, 91:23, 92:1, 92:2, 92:10, 92:12, 92:14, 92:19, 92:22, 93:9, 93:9, 95:17, 95:21, 96:3, 96:6, 96:16, 98:11, 100:3, 100:9, 106:22
**evidentiary** [3] - 20:14, 45:19, 79:9
**evoked** [1] - 41:18
**exact** [3] - 11:4, 31:13, 98:23
**exactly** [6] - 7:19, 26:5, 26:7, 32:12, 32:20, 42:9
**example** [1] - 22:11
**exceeded** [1] - 54:16
**except** [2] - 104:16, 104:18
**exceptions** [1] - 93:9
**excise** [1] - 63:12
**exercise** [1] - 75:18
**exert** [1] - 112:12
**Exhibit** [9] - 11:14, 11:18, 17:13, 18:13, 29:1, 45:16, 52:14, 52:16, 106:19
**EXHIBITS** [1] - 2:3
**exhibits** [6] - 91:15, 91:22, 96:10, 96:12, 96:15, 102:5
**exist** [1] - 69:13
**exists** [1] - 69:14
**exonerate** [2] - 45:1, 59:2
**exonerates** [1] - 29:11
**experience** [2] - 95:5, 95:12
**experiences** [1] - 92:5
**expert** [1] - 95:10
**explained** [3] - 7:19, 30:7, 43:14
**explanation** [1] - 50:12
**express** [7] - 19:9, 51:21, 89:4, 95:1, 95:3, 101:6, 105:8
**expresses** [1] - 98:6
**expressing** [1] - 15:18
**extort** [1] - 82:9
**extraneous** [1] - 21:2
**eyewitness** [2] - 3:17, 4:2
**eyewitnesses** [2] - 63:6, 63:13
**Eyewitnesses** [1] - 63:6

**F**

**face** [1] - 24:23
**faces** [1] - 29:12
**fact** [23] - 6:2, 9:4, 15:8, 29:14, 29:15, 29:16, 30:1, 31:6, 31:8, 38:14, 55:8, 58:9, 59:20, 60:2, 80:6, 80:18, 81:4, 85:18, 90:9, 92:8, 94:21, 100:4, 113:9
**factor** [3] - 68:5, 68:6, 68:17
**factors** [1] - 4:5
**facts** [21] - 55:23, 61:20, 66:16, 67:13, 71:7, 71:19, 71:20, 72:9, 72:17, 86:7, 89:16, 91:16, 91:21, 92:1, 92:3, 92:9, 93:17, 94:7, 95:13, 98:11, 100:16
**fade** [1] - 56:21
**faded** [1] - 57:4
**failed** [1] - 99:13
**failing** [1] - 69:4
**fair** [2] - 13:18, 14:10
**fairly** [1] - 100:12
**false** [7] - 40:7, 52:21, 53:7, 66:12, 66:13, 72:9
**familiarity** [1] - 95:13
**family** [1] - 55:18
**far** [1] - 59:6
**fashion** [1] - 75:20
**fast** [1] - 35:10
**fault** [2] - 27:22, 28:2
**favor** [1] - 83:1
**favorable** [1] - 83:15
**favorite** [1] - 25:9
**fear** [2] - 68:5, 68:6, 68:17
**feasible** [1] - 28:10
**feelings** [1] - 48:20
**fellow** [1] - 101:16
**felonious** [3] - 44:7, 58:9, 58:14
**felony** [2] - 40:4, 69:21
**female** [5] - 33:11, 33:19, 33:20, 34:1, 34:6
**few** [1] - 17:1
**fiber** [1] - 58:3
**fibers** [1] - 58:19
**file** [4] - 37:19, 107:5, 107:9, 107:19
**filed** [2] - 90:9, 111:7
**filing** [2] - 89:23, 90:6
**fill** [3] - 71:8, 71:19, 76:9
**final** [3] - 21:15, 51:18, 76:18

**Finally** [4] - 25:4, 41:13, 43:23, 49:14
**finally** [7] - 19:10, 32:15, 40:5, 41:20, 47:13, 51:22, 85:23
**financial** [2] - 39:9, 82:7
**financially** [1] - 69:3
**findings** [2] - 100:5, 100:9
**fine** [3] - 18:1, 54:22, 104:12
**finish** [2] - 15:14, 48:5
**FINN** [7] - 6:8, 6:11, 6:16, 6:22, 7:16, 7:19, 8:7
**firmly** [1] - 91:3
**FIRST** [1] - 2:7
**first** [9] - 6:20, 11:13, 22:2, 36:2, 55:5, 56:23, 78:17, 82:8, 97:15
**five** [4] - 39:22, 59:21, 62:5, 69:22
**fluids** [1] - 58:18
**focus** [4] - 29:19, 29:22, 30:1, 82:1
**focused** [1] - 70:18
**follow** [3] - 21:12, 71:15, 92:4
**followed** [4] - 62:14, 62:16, 62:20, 63:20
**following** [3] - 1:11, 17:19, 114:11
**FOLLOWING** [8] - 3:4, 20:6, 52:4, 54:3, 84:16, 85:3, 105:22, 112:17
**follows** [4] - 90:23, 95:2, 97:7, 103:9
**fooled** [1] - 57:2
**force** [2] - 24:19, 43:12
**FOREGOING** [1] - 116:8
**forelady** [1] - 102:6
**Foreman** [1] - 108:14
**foreman** [3] - 102:6, 102:20, 108:11
**foreperson** [7] - 100:19, 102:10, 102:14, 103:16, 104:1, 106:6, 106:13
**forewoman** [2] - 102:20, 108:12
**form** [10] - 19:9, 51:20, 75:19, 89:4, 102:5, 102:23, 103:5, 103:6, 108:18, 111:6
**formed** [1] - 19:13
**Forrester** [3] - 28:16, 41:15, 87:9
**forth** [1] - 107:18
**forward** [1] - 19:5, 31:6, 37:10, 46:19,

47:4, 61:16, 63:12, 65:16, 65:17, 69:1, 69:23, 85:22, 114:1
**Four** [1] - 50:3
**four** [3] - 39:22, 97:13, 99:4
**fourth** [1] - 4:18
**fracture** [2] - 24:22, 25:1
**fractures** [1] - 43:15
**frame** [11] - 11:19, 15:5, 28:6, 28:11, 28:19, 35:3, 60:10, 60:11, 82:10, 82:13, 83:5
**frankness** [1] - 94:5
**frantic** [4] - 23:14, 23:22, 31:20, 60:22
**fraught** [1] - 10:17
**free** [2] - 102:3, 105:13
**French** [1] - 7:14
**fresh** [1] - 57:3
**friends** [1] - 64:20
**front** [3] - 29:3, 42:6, 69:8
**fulfilling** [1] - 100:7
**full** [1] - 53:14
**fully** [2] - 103:14, 109:4
**Fults** [1] - 110:6
**FULTS** [1] - 110:8
**functions** [1] - 89:16

**G**

**gaps** [2] - 71:8, 76:9
**gauge** [1] - 46:2
**Generally** [1] - 95:1
**generated** [1] - 7:8
**gentlemen** [20] - 20:8, 26:22, 28:3, 31:17, 35:21, 36:19, 39:3, 46:13, 48:3, 49:14, 50:8, 54:7, 66:15, 70:23, 73:13, 73:23, 78:4, 82:12, 88:11, 88:18
**giant** [1] - 33:12
**Giant** [1] - 24:8
**gig** [1] - 24:2
**girl** [1] - 65:2
**gist** [2] - 39:5, 39:6
**given** [21] - 6:21, 10:2, 11:21, 12:3, 13:5, 18:20, 18:22, 21:13, 44:23, 46:11, 49:4, 58:12, 61:21, 71:22, 74:13, 75:9, 82:14, 89:19, 91:20, 95:10, 95:15
**grand** [10] - 29:6, 38:16, 39:6, 40:13, 48:19, 67:10, 67:11, 67:19, 68:3, 69:6
**grandson** [1] - 42:15

**Granted** [1] - 34:1
**granting** [1] - 114:5
**great** [6] - 47:17, 58:19, 67:1, 67:8, 68:21, 69:2
**greater** [1] - 106:7
**Guess** [1] - 70:1
**guess** [2] - 25:7, 60:16
**guilt** [5] - 32:11, 45:2, 78:23, 90:16, 99:19
**guilty** [26] - 5:3, 27:9, 45:5, 49:19, 49:22, 51:15, 72:15, 72:23, 76:22, 76:23, 77:4, 86:9, 88:18, 88:20, 90:11, 96:20, 97:6, 99:12, 99:16, 99:21, 103:18, 104:2, 108:3, 109:5
**gunshot** [1] - 31:11
**gut** [2] - 76:9, 76:10
**guy** [3] - 25:8, 25:9, 25:10

**H**

**habit** [1] - 56:8
**HAD** [1] - 116:9
**hall** [1] - 104:12
**hand** [1] - 108:17
**hands** [1] - 23:23
**handwritten** [2] - 5:9, 17:6
**Handwritten** [1] - 2:5
**harass** [1] - 112:12
**hard** [2] - 22:21, 33:6
**hate** [2] - 18:11, 25:9
**head** [23] - 22:16, 23:15, 24:7, 24:20, 25:3, 26:2, 26:12, 26:15, 29:18, 31:15, 33:12, 36:17, 43:12, 43:16, 43:21, 50:10, 50:13, 65:8, 65:13, 73:11, 79:15, 80:21, 81:12
**hear** [8] - 30:12, 32:6, 33:15, 63:19, 75:14, 89:7, 94:3, 106:9
**heard** [27] - 22:17, 25:7, 25:21, 26:11, 30:6, 33:18, 33:23, 35:9, 36:18, 38:19, 38:20, 39:21, 40:19, 42:11, 44:5, 57:18, 59:19, 60:14, 65:23, 66:4, 67:2, 77:20, 78:5, 89:11, 91:21, 92:23
**hearing** [3] - 21:14, 54:8, 82:4
**hearsay** [1] - 53:8, 53:15, 53:22, 93:8,

107:2
**heavy** [2] - 65:22, 68:20
**held** [2] - 1:12, 107:7
**HELD** [8] - 3:5, 20:6, 52:5, 54:4, 84:17, 85:4, 105:23, 112:18
**help** [2] - 58:19, 95:7
**helpfulness** [1] - 62:6
**HEREBY** [1] - 116:7
**herself** [2] - 68:19, 98:6
**hesitate** [2] - 101:8, 101:16
**hidden** [1] - 32:23
**hide** [1] - 85:17
**hiding** [1] - 38:10
**high** [2] - 62:5, 62:18
**himself** [1] - 98:6
**hinge** [1] - 24:22
**Hiser** [1] - 110:9
**HISER** [1] - 110:11
**hit** [1] - 31:11
**Hold** [1] - 54:21, 88:18
**hold** [1] - 75:19
**home** [2] - 18:15, 38:10
**homicide** [2] - 43:12, 62:12
**honest** [3] - 39:11, 41:10, 101:18
**Honor** [10] - 6:1, 13:8, 14:9, 17:15, 55:20, 62:23, 67:12, 84:14, 109:11, 113:7
**Honorable** [1] - 1:10
**hour** [1] - 82:4
**house** [6] - 8:22, 24:12, 37:23, 38:6, 38:11, 87:14
**human** [1] - 91:7
**hundred** [1] - 31:18, 50:9, 50:12
**hurting** [1] - 68:22
**husband** [10] - 8:18, 15:23, 16:7, 16:13, 28:12, 28:20, 39:7, 82:11, 83:5, 88:4
**hypothesis** [1] - 71:2
**hysterical** [1] - 80:12

**I**

**idea** [1] - 35:6
**Ideally** [1] - 47:14
**identifies** [1] - 34:7
**identify** [1] - 4:11
**identifying** [2] - 4:3, 4:9
**identity** [4] - 32:23, 33:3, 83:22, 84:6
**ignores** [1] - 29:13, 29:18

**imaginary** [1] - 91:9
**immediately** [1] - 101:6
**immunity** [1] - 13:23
**impartial** [1] - 14:11
**impartiality** [1] - 100:10
**impartially** [1] - 100:13
**implicating** [1] - 47:12
**importance** [4] - 43:10, 46:1, 46:3, 101:5
**important** [20] - 30:8, 32:15, 33:16, 33:21, 34:23, 48:9, 64:1, 64:2, 64:3, 64:12, 64:17, 70:16, 75:2, 75:5, 77:11, 86:3, 86:15, 91:12
**importantly** [3] - 64:16, 73:14, 87:17
**impose** [1] - 113:10
**improper** [3] - 84:23, 112:11, 112:12
**IN** [2] - 1:1, 116:9
**inasmuch** [1] - 12:14
**incarcerated** [1] - 29:2
**incident** [1] - 64:15
**include** [4] - 3:21, 17:19, 92:14, 93:23
**included** [3] - 5:11, 60:17, 93:5
**includes** [1] - 91:22
**including** [2] - 86:18, 102:9
**inconsistent** [1] - 61:20
**incriminate** [1] - 58:22, 59:1
**indicate** [7] - 6:20, 13:4, 57:23, 58:13, 61:4, 79:6, 113:18
**indicated** [5] - 3:20, 6:23, 14:17, 79:4, 113:18
**indicates** [1] - 98:7
**Indicating** [1] - 108:13
**indicating** [6] - 9:19, 14:5, 38:16, 65:2, 79:17, 100:21
**indication** [1] - 100:15
**indicted** [2] - 72:11, 72:20
**indictment** [11] - 72:12, 75:9, 79:21, 89:23, 90:7, 90:21, 92:15, 99:1, 103:22, 109:8
**individual** [6] - 55:4, 55:10, 58:10, 62:19, 65:6, 101:13
**individuals** [1] - 62:9

**infer** [2] - 92:3, 92:6
**inference** [3] - 92:6, 92:11, 93:4
**inferences** [2] - 23:17, 31:22
**inflection** [1] - 30:17
**influence** [1] - 112:13
**influenced** [1] - 100:1
**informant** [6] - 23:6, 33:5, 59:18, 60:1, 60:6, 88:3
**informants** [3] - 32:18, 32:21, 33:3
**Information** [1] - 37:10
**information** [11] - 19:14, 23:1, 43:18, 47:2, 47:15, 49:3, 62:7, 66:3, 82:14, 85:20, 87:11
**informs** [1] - 90:7
**initial** [3] - 7:6, 27:23, 101:4
**injuries** [1] - 43:14
**injury** [2] - 24:8, 43:12
**ink** [1] - 103:1
**innocence** [3] - 29:5, 32:11, 55:7, 57:11, 59:4, 59:5, 73:1, 74:16, 75:20, 99:19
**innocent** [2] - 55:5, 90:16
**innuendo** [1] - 71:2
**input** [1] - 106:7
**inquire** [2] - 10:9, 19:4
**inquiring** [2] - 9:5, 13:10
**inquiry** [2] - 9:15, 11:23
**insert** [2] - 103:17, 104:1
**inside** [1] - 16:9
**insignificant** [5] - 64:10, 64:11, 79:5, 79:6, 79:7
**Insignificant** [1] - 64:11
**insist** [1] - 101:7
**instinct** [1] - 76:10
**Institute** [1] - 114:22
**Institution** [1] - 114:13
**instruct** [3] - 15:2, 23:16, 93:10
**instructed** [9] - 7:4, 7:12, 9:1, 9:6, 15:19, 32:9, 56:3, 92:21, 100:16
**instructing** [3] - 17:19, 20:17, 21:4
**Instruction** [1] - 2:5
**instruction** [19] -

4:2, 5:9, 9:18, 10:13, 11:19, 12:5, 12:23, 15:6, 15:9, 15:10, 17:2, 17:7, 17:10, 18:9, 18:19, 18:22, 19:5, 20:10, 32:6
**Instructions** [1] - 2:6
**instructions** [15] - 3:13, 4:1, 7:7, 10:16, 10:22, 14:22, 19:8, 21:12, 71:15, 89:17, 89:18, 90:2, 90:4, 100:5, 106:5
**intelligence** [2] - 94:6, 100:9
**intent** [1] - 98:4
**intention** [2] - 97:18, 97:21
**intentionally** [1] - 98:3
**intents** [1] - 54:11
**interest** [1] - 94:6
**interpretation** [1] - 9:21
**interrelated** [1] - 55:12
**introduced** [4] - 8:23, 20:23, 21:10, 96:11
**intuition** [2] - 76:9, 76:11
**investigate** [1] - 46:7
**investigated** [3] - 46:15, 51:8, 85:15
**investigation** [2] - 27:23, 47:10
**investigations** [1] - 85:20
**investigator** [1] - 58:20
**involved** [9] - 25:18, 59:21, 59:22, 60:4, 62:11, 63:7, 64:15, 69:14, 80:1
**involving** [1] - 59:16
**irrelevance** [1] - 21:1
**IS** [1] - 116:8
**islands** [1] - 80:9
**Issue** [1] - 37:5
**issue** [8] - 10:11, 11:11, 16:8, 18:8, 72:15, 90:12, 96:7, 108:3
**issues** [2] - 10:17, 96:17
**IT** [1] - 1:8
**item** [1] - 82:3
**itself** [1] - 19:18

**J**

**jail** [2] - 39:21, 68:14
**James** [1] - 1:10
**Janet** [57] - 22:21, 24:11, 27:18, 28:5, 28:10, 29:6, 29:19,

37:20, 38:4, 40:12, 40:15, 40:18, 42:12, 42:16, 43:2, 46:4, 46:18, 47:4, 47:11, 47:16, 48:8, 48:9, 48:18, 49:4, 50:20, 61:15, 62:3, 63:11, 63:12, 64:19, 65:16, 65:20, 69:5, 70:12, 71:11, 72:5, 73:6, 73:18, 73:19, 75:3, 75:8, 77:23, 78:1, 78:9, 78:13, 78:19, 81:7, 82:9, 83:9, 85:22, 86:15, 86:16, 86:18, 88:2, 88:14
**job** [4] - 28:2, 40:10, 46:14, 69:18
**Joe** [1] - 109:18
**John** [1] - 109:15
**JOHNSON** [5] - 8:14, 108:21, 112:22, 113:2, 113:6
**JUDGE** [1] - 1:5
**Judge** [24] - 3:19, 4:21, 5:20, 10:14, 12:18, 13:14, 14:23, 18:1, 18:7, 22:4, 23:16, 32:9, 50:3, 52:2, 52:7, 53:9, 67:17, 77:7, 84:18, 86:5, 107:13, 107:20, 113:17, 114:9
**judge** [3] - 36:23, 41:8, 87:6
**judges** [3] - 27:10, 30:11, 93:17
**judgment** [2] - 101:13, 106:21
**juncture** [3] - 9:13, 12:13, 14:3
**June** [3] - 30:21, 42:19, 59:18
**juror** [14] - 6:21, 10:5, 12:7, 13:11, 14:9, 14:11, 15:8, 15:18, 20:13, 20:16, 57:7, 76:15, 102:12, 102:15
**Juror** [4] - 8:13, 11:14, 14:18, 18:12
**jurors** [19] - 4:7, 9:10, 9:13, 10:18, 10:21, 12:15, 14:16, 18:18, 19:8, 101:16, 101:21, 102:22, 104:16, 104:22, 109:8, 111:5, 111:18, 112:4
**Jury** [3] - 2:6, 41:6, 63:2
**jury** [49] - 4:1, 7:7, 8:2, 8:15, 9:12, 11:19, 14:4, 16:20, 17:20, 20:8, 20:18, 20:23, 21:3, 29:6, 37:7, 38:16, 39:7, 40:13, 44:10, 48:19, 52:3,

53:4, 53:16, 54:1, 55:8, 56:2, 61:3, 67:10, 67:11, 67:19, 68:3, 69:6, 74:18, 89:10, 89:15, 90:4, 101:5, 103:7, 103:9, 104:17, 104:19, 105:2, 105:12, 106:20, 108:6, 108:23, 109:10, 111:8, 112:15
**JURY** [6] - 2:9, 3:5, 20:5, 52:5, 108:9, 112:18
**justice** [5] - 39:16, 39:23, 55:3, 71:23, 76:22
**justification** [1] - 11:6

## K

**Karwacki** [5] - 7:2, 7:12, 11:11, 11:16, 109:13
**KARWACKI** [1] - 109:14
**keep** [13] - 22:10, 32:22, 48:10, 55:13, 59:5, 59:8, 61:14, 62:2, 64:21, 66:2, 70:3, 73:6, 73:13
**Keep** [3] - 29:9, 30:18, 43:5
**kept** [1] - 34:2
**Kill** [1] - 31:3
**kill** [6] - 22:11, 25:23, 26:18, 32:13, 36:15, 81:11
**killed** [10] - 22:9, 29:17, 31:9, 31:20, 33:23, 73:10, 80:11, 80:17, 80:20, 88:13
**killer** [2] - 47:2, 47:14
**Kind** [1] - 36:7
**kind** [2] - 10:6, 25:6
**kinds** [1] - 91:18
**Kinnebrew** [1] - 110:18
**KINNEBREW** [1] - 110:20
**knock** [1] - 7:23
**knocking** [1] - 103:2
**knowledge** [5] - 10:22, 16:21, 16:22, 95:5, 95:12
**Knowledge** [1] - 65:19
**known** [2] - 14:6, 98:5
**knows** [4] - 16:6, 16:18, 40:11, 83:6

## L

**lack** [1] - 94:5
**Ladies** [3] - 28:3, 50:8, 88:11
**ladies** [17] - 20:8, 26:22, 31:17, 35:21, 36:19, 39:3, 46:13, 48:2, 49:14, 54:6, 66:15, 70:23, 73:13, 73:22, 78:3, 82:12, 88:18
**language** [1] - 17:18
**last** [7] - 22:3, 48:5, 51:3, 54:9, 54:10, 86:10, 89:1
**Lastly** [1] - 99:4
**laughed** [1] - 25:6
**law** [34] - 8:20, 9:1, 9:19, 9:22, 10:22, 11:1, 11:20, 12:3, 13:5, 14:4, 14:14, 14:16, 15:3, 15:17, 15:19, 16:11, 16:17, 17:20, 17:21, 20:15, 20:18, 20:19, 20:21, 71:16, 71:18, 89:13, 89:17, 89:19, 89:20, 89:22, 93:9, 99:22
**lawyer** [1] - 112:11
**lawyers** [1] - 112:8
**laying** [2] - 24:8, 35:8
**layman's** [1] - 50:6
**lead** [1] - 58:20
**leads** [3] - 42:8, 82:15, 83:3
**learned** [5] - 22:20, 32:14, 81:3, 81:17, 81:18
**least** [4] - 6:3, 9:15, 10:8, 13:10
**leave** [4] - 53:10, 53:12, 61:3, 112:6
**leaves** [1] - 51:2
**leaving** [1] - 69:19
**led** [1] - 87:11
**left** [1] - 57:7
**legally** [1] - 21:9
**legitimate** [1] - 46:16
**less** [2] - 63:11, 75:9
**letter** [35] - 10:3, 29:1, 29:4, 29:5, 29:8, 29:10, 29:20, 38:15, 38:19, 38:20, 38:22, 39:2, 39:3, 39:5, 40:11, 43:5, 43:7, 48:11, 48:13, 48:14, 48:17, 48:18, 48:19, 48:22, 49:1, 49:2, 49:12, 68:9, 69:7, 69:9, 69:12, 69:16, 86:11, 86:20
**Look** [6] - 43:16, 43:17, 69:7, 69:11, 70:14, 78:8
**looked** [1] - 34:4
**looking** [1] - 56:13
**Lou** [1] - 66:5
**love** [3] - 35:20, 58:17, 74:8
**loved** [2] - 58:23, 75:14
**loves** [1] - 35:18

**level** [3] - 11:8, 57:14, 76:7
**lie** [6] - 25:11, 25:13, 38:21, 39:2, 67:7,

69:11
**lied** [10] - 27:19, 29:6, 35:21, 38:16, 39:6, 39:13, 40:12, 48:19, 87:3, 87:4
**life** [4] - 33:4, 38:12, 113:11, 113:19
**light** [2] - 47:5, 96:16
**likelihood** [1] - 9:6
**limited** [1] - 95:21
**line** [5] - 4:18, 35:17, 40:17, 95:3, 103:16
**lines** [1] - 104:6
**listed** [1] - 46:21
**listen** [3] - 61:11, 86:6, 86:7
**Listen** [1] - 86:4
**literally** [1] - 6:12
**litigants** [1] - 111:19
**litter** [1] - 57:5
**live** [8] - 17:3, 41:16, 65:17, 65:21, 69:6, 69:17, 70:1, 70:6
**lives** [1] - 93:22
**lock** [1] - 74:6
**logical** [2] - 23:17, 31:21
**logically** [1] - 92:4
**LOISEL** [43] - 3:7, 3:19, 4:21, 5:4, 5:6, 5:8, 5:20, 10:14, 12:18, 13:14, 13:20, 14:23, 16:5, 16:16, 18:1, 18:7, 19:15, 19:20, 22:4, 36:23, 37:8, 41:1, 41:8, 44:12, 52:13, 53:9, 55:20, 55:22, 62:23, 67:12, 67:17, 77:7, 81:3, 85:5, 87:22, 106:3, 106:9, 106:11, 106:15, 107:13, 108:5, 113:17, 115:2
**Loisel** [6] - 1:15, 3:18, 22:3, 65:18, 77:6, 77:19
**LOISEL........22** [1] - 2:7
**LOISEL.......77** [1] - 2:8
**look** [15] - 3:23, 12:6, 27:4, 30:14, 31:16, 43:9, 45:16, 48:17, 50:6, 69:9, 70:7, 72:6, 73:8, 83:17, 85:9
**Look** [6] - 43:16, 43:17, 69:7, 69:11, 70:14, 78:8

**LUCAS** [1] - 1:1
**Lucas** [15] - 1:11, 1:14, 1:20, 34:14, 34:17, 35:2, 50:2, 50:21, 50:23, 51:11, 84:3, 96:23, 97:13, 99:5, 99:8
**lunch** [1] - 19:2
**LUNCH** [1] - 89:9
**lying** [2] - 27:21, 87:5

## M

**majority** [1] - 77:21
**male** [5] - 33:18, 33:19, 34:1, 34:6, 60:15
**males** [1] - 34:9
**Malone** [2] - 34:10, 34:21
**man** [11] - 23:9, 25:14, 25:20, 27:2, 32:11, 37:22, 39:21, 40:4, 43:22, 75:10, 88:17
**man's** [1] - 78:23
**manipulate** [1] - 66:16
**mankind** [1] - 92:5
**Manner** [1] - 43:11
**manner** [3] - 31:13, 94:1, 98:9
**marijuana** [1] - 74:5
**marked** [4] - 11:14, 17:12, 18:14, 107:3
**match** [1] - 45:17
**matter** [15] - 5:19, 8:23, 9:4, 9:10, 13:12, 19:13, 20:14, 27:8, 57:2, 57:3, 57:4, 57:7, 57:8, 81:20, 85:5, 93:14, 101:5, 102:3
**matters** [4] - 21:1, 21:2, 45:21, 111:12
**McDevitt** [2] - 1:20, 116:17
**MCELROY** [15] - 4:23, 11:16, 19:17, 20:1, 52:7, 52:12, 52:15, 52:18, 52:23, 53:19, 53:23, 106:12, 106:23, 107:5, 107:20
**McElroy** [3] - 1:18, 72:22, 77:4
**mean** [9] - 4:5, 14:10, 15:4, 16:20, 36:14, 39:13, 87:3, 98:4, 107:16
**means** [3] - 14:13, 50:5, 98:10
**meant** [1] - 36:15
**medical** [1] - 35:11
**meet** [1] - 57:16
**meeting** [1] - 56:11
**Members** [2] - 89:10, 111:8

members [4] - 9:17, 10:11, 12:13, 13:13
memorable [1] - 38:7
memorialized [1] - 66:10
memories [5] - 41:19, 56:20, 57:3, 57:4, 57:13
memory [4] - 41:7, 44:11, 63:3, 94:5
mention [1] - 79:16
mentioned [7] - 21:5, 38:1, 52:18, 61:17, 69:12, 83:8, 85:16
mentioning [1] - 62:19
mere [2] - 26:3, 91:6
message [1] - 74:12
messenger [1] - 74:11
met [2] - 39:1, 77:1
MEYER [1] - 105:20
Meyer [1] - 105:6
Michael [1] - 1:15
middle [1] - 23:9
might [1] - 93:3
Mike [4] - 15:13, 16:15, 65:18, 77:19
mind [23] - 9:7, 11:7, 14:5, 18:15, 22:10, 29:9, 30:18, 43:6, 48:10, 55:14, 59:5, 59:9, 61:15, 62:2, 64:21, 66:3, 70:23, 72:8, 73:6, 73:13, 86:9, 97:21, 97:23
mindset [1] - 11:4
minimum [2] - 9:17, 10:6
minor [2] - 5:8, 5:15
minute [2] - 12:4, 51:17
minutes [5] - 17:2, 51:3, 51:23, 114:4, 114:8
missing [2] - 15:13, 15:15
misstating [1] - 63:1
mistake [1] - 58:8
mistrial [1] - 14:13
misunderstood [1] - 7:5
mom [6] - 25:10, 35:18, 73:21, 74:8, 74:10, 81:1
moment [3] - 22:23, 23:4, 112:15
money [3] - 37:16, 39:9, 39:11, 39:12, 41:23, 42:8, 82:6, 82:9, 82:10, 82:14, 82:18, 82:22, 83:1
MONTAGUE [1] - 110:23
Montague [3] - 8:13,

14:18, 110:21
moral [1] - 91:8
morning [3] - 20:8, 22:5, 54:6
most [8] - 43:13, 75:2, 75:4, 75:5, 77:11, 86:3, 91:12, 106:5
mother [6] - 26:11, 35:20, 68:22, 81:4, 81:18, 81:19
motion [3] - 3:16, 28:15, 106:19, 106:20, 107:8, 107:15, 107:18, 114:5
motive [9] - 32:12, 32:13, 59:10, 60:8, 79:16, 82:13, 96:8, 98:12, 98:13
Motive [1] - 60:8
mouth [2] - 61:1, 61:6
MR [115] - 2:7, 2:8, 2:8, 3:7, 3:9, 3:19, 4:16, 4:21, 4:22, 4:23, 5:4, 5:6, 5:8, 5:20, 5:21, 6:1, 6:15, 8:9, 8:15, 10:14, 11:16, 12:8, 12:11, 12:18, 13:8, 13:14, 13:17, 13:20, 14:2, 14:23, 15:13, 16:5, 16:14, 16:16, 17:15, 18:1, 18:4, 18:7, 19:15, 19:17, 19:20, 20:1, 22:4, 36:21, 36:23, 37:4, 37:8, 40:22, 41:1, 41:5, 41:8, 44:8, 44:12, 52:2, 52:7, 52:12, 52:13, 52:15, 52:18, 52:23, 53:9, 53:19, 53:23, 54:6, 55:20, 55:22, 56:5, 62:3, 63:4, 67:12, 67:15, 67:17, 67:22, 68:2, 77:7, 81:2, 81:3, 84:11, 84:14, 84:18, 85:5, 87:20, 87:22, 106:3, 106:9, 106:10, 106:11, 106:12, 106:15, 106:18, 106:23, 107:3, 107:5, 107:6, 107:13, 107:20, 108:5, 108:13, 108:16, 109:11, 109:17, 109:20, 109:23, 110:2, 110:11, 110:14, 110:20, 110:23, 113:7, 113:17, 114:9, 114:17, 114:21, 115:1, 115:2
MS [18] - 6:8, 6:11, 6:16, 6:22, 7:16, 7:19, 8:7, 8:14, 105:20, 108:21, 109:14, 110:5, 110:8, 110:17,

111:3, 112:22, 113:2, 113:6
multiple [1] - 62:10
murder [16] - 27:2, 41:18, 42:17, 43:2, 49:17, 65:19, 67:3, 87:1, 96:19, 97:4, 97:17, 98:16, 99:11, 99:15, 103:19, 109:6
murdered [2] - 30:2, 38:3, 65:3, 65:12, 83:23
murdering [1] - 88:20
must [33] - 14:6, 17:20, 20:18, 21:11, 29:10, 54:20, 55:8, 55:13, 57:9, 71:6, 72:6, 72:20, 72:23, 77:12, 86:2, 90:18, 92:22, 92:23, 93:4, 93:19, 94:22, 95:11, 96:20, 97:4, 97:8, 97:19, 99:11, 99:16, 100:1, 100:7, 101:13, 105:1, 111:11
mysteriously [1] - 31:6
mystery [1] - 29:20

## N

name [9] - 46:20, 47:4, 61:18, 62:11, 62:13, 63:18, 76:15, 104:8, 111:21
named [1] - 65:7
names [3] - 46:12, 51:7, 62:8
naturally [1] - 92:4
nature [5] - 7:17, 19:11, 57:12, 74:23, 102:18
Navarre [59] - 5:16, 22:8, 22:12, 22:20, 23:6, 23:8, 23:19, 24:6, 24:18, 26:5, 29:14, 30:3, 30:20, 31:4, 31:10, 32:13, 33:6, 33:20, 33:22, 35:8, 37:20, 38:3, 42:18, 43:1, 43:3, 43:11, 50:20, 51:12, 55:17, 58:2, 59:17, 59:20, 59:23, 60:10, 60:21, 61:6, 62:12, 63:22, 65:3, 65:11, 67:3, 73:10, 79:18, 80:4, 80:19, 80:21, 83:23, 87:1, 88:8, 88:13, 88:16, 88:17, 88:20, 93:11, 97:2, 97:10, 97:22, 103:20, 109:6
Navarre's [3] - 23:15, 79:11, 88:7
near [2] - 60:21, 99:3

necessary [4] - 17:22, 20:20, 94:18, 98:22
necessity [2] - 13:15, 13:18
need [11] - 11:10, 18:11, 20:10, 25:17, 27:3, 27:4, 37:9, 39:11, 104:11, 104:13, 114:6
needed [3] - 39:9, 39:12, 47:13
Neil [2] - 1:18, 72:22
never [8] - 10:12, 38:7, 43:4, 47:4, 56:17, 62:17, 75:21, 92:23
newsworthy [1] - 112:3
next [6] - 24:8, 33:12, 35:9, 35:17, 47:18, 65:15
nice [1] - 47:15
Niemiec [4] - 34:10, 34:22, 35:13
night [3] - 24:13, 24:15, 24:16, 26:8, 33:14, 33:22, 38:2, 38:6, 38:10, 38:12, 87:13
nights [1] - 37:21
NO [1] - 1:3
non [1] - 104:20
non-smoking [1] - 104:20
none [2] - 16:7, 72:7
noon [1] - 88:23
note [4] - 11:12, 11:13, 20:13, 101:2
Note [1] - 12:8
note-taking [1] - 11:12
noted [1] - 85:1
notes [11] - 7:6, 7:7, 11:15, 17:8, 18:14, 30:6, 57:17, 66:9, 70:15, 90:3, 102:8
nothing [10] - 14:8, 15:20, 51:8, 54:12, 55:23, 58:3, 64:14, 69:3, 72:12, 79:13
Nothing [1] - 106:16
Notice [2] - 40:17, 87:15
notion [1] - 15:16
notions [1] - 15:2
November [3] - 60:22, 61:5, 69:10
Number [6] - 8:13, 11:14, 11:16, 14:19, 17:13, 18:12
number [12] - 6:21, 7:1, 20:15, 21:2, 42:13, 42:21, 46:4, 46:11, 84:8, 96:10, 103:8, 108:22
numerous [1] -

62:10

## O

o'clock [1] - 113:5
oath [4] - 65:4, 72:7, 94:12, 111:17
object [7] - 36:21, 37:4, 40:22, 44:8, 54:20, 84:11, 87:20
objected [1] - 44:9
objection [8] - 4:14, 5:10, 5:20, 5:21, 12:8, 17:16, 18:2, 93:2
Objection [6] - 41:5, 55:20, 62:23, 67:12, 81:2, 85:1
objections [4] - 17:14, 54:15, 106:1, 106:2
objective [2] - 98:1, 101:11
objects [1] - 96:13
obstructing [2] - 39:16, 39:23
Obviously [1] - 10:18
obviously [3] - 15:10, 16:20, 41:18
occasion [1] - 62:20
occasions [5] - 40:21, 42:14, 42:18, 46:5, 62:10
occur [1] - 14:15
occurred [2] - 55:16, 98:18
occurring [1] - 59:18
Odett [2] - 33:8, 33:15
OF [11] - 1:1, 1:2, 1:6, 3:5, 20:5, 52:5, 112:18, 115:7, 116:9, 116:10
offense [17] - 68:12, 90:9, 90:13, 90:21, 95:19, 96:8, 97:3, 97:6, 97:16, 98:16, 98:19, 98:23, 99:2, 99:4, 99:7, 99:11, 99:15
offer [2] - 42:1, 42:7
offered [3] - 37:16, 53:1, 53:20
office [1] - 41:2
Officer [3] - 34:10, 34:21, 34:22
officers [3] - 34:11, 96:14, 112:5
Official [1] - 1:20, 116:18
official [1] - 42:19
Ohio [46] - 1:21, 16:17, 17:20, 19:21, 20:15, 20:18, 34:14, 34:16, 34:18, 35:2, 39:15, 44:20, 46:10, 49:15, 50:2, 50:21,

50:23, 51:1, 51:11, 51:13, 56:11, 57:16, 57:21, 69:20, 71:1, 77:16, 78:5, 79:4, 79:5, 79:8, 82:17, 83:2, 83:18, 84:3, 85:10, 86:13, 86:17, 96:23, 97:13, 99:5, 100:11, 103:7, 103:12, 108:21, 109:2
**OHIO** [2] - 1:1, 1:2
**Ohio's** [1] - 83:18
**ON** [1] - 115:8
**once** [1] - 40:23
**Once** [1] - 104:4
**One** [2] - 35:12, 48:5
**one** [36] - 4:8, 9:7, 9:14, 11:23, 18:8, 32:15, 34:16, 35:1, 37:8, 38:11, 39:22, 46:16, 49:18, 51:5, 55:2, 61:12, 61:17, 62:6, 62:17, 62:19, 62:20, 76:4, 76:15, 78:6, 80:5, 85:11, 85:13, 86:21, 88:2, 95:2, 97:9, 98:13, 99:14, 104:5, 112:15, 113:9
**open** [7] - 7:4, 20:17, 91:8, 101:22, 102:16, 103:4, 105:18
**opening** [3] - 49:17, 92:15, 92:17
**opinion** [7] - 19:9, 19:13, 51:21, 89:4, 95:2, 95:4, 101:17
**opinions** [1] - 101:20
**opportunity** [12] - 21:16, 30:13, 37:12, 54:9, 54:10, 57:1, 67:10, 68:2, 77:8, 77:10, 94:3, 102:12
**oral** [2] - 5:23, 17:10
**order** [5] - 55:6, 57:10, 95:23, 101:19, 107:23
**ordered** [1] - 114:21
**orderly** [1] - 102:12
**orders** [1] - 111:7
**ordinary** [2] - 74:23, 91:11
**original** [1] - 6:14
**originally** [1] - 96:13
**originated** [1] - 29:9
**otherwise** [2] - 102:14, 104:17
**outlines** [1] - 106:12
**OUTSIDE** [4] - 3:5, 20:5, 52:5, 112:18
**outside** [3] - 10:21, 53:8, 84:19
**outstanding** [1] - 107:7
**Overruled** [1] - 67:16

**overruled** [1] - 68:1
**own** [10] - 9:21, 75:2, 75:5, 86:3, 89:21, 91:13, 94:19, 101:13, 102:3, 105:4

## P

**P.M** [3] - 108:9, 108:10, 115:8
**package** [1] - 21:19
**Page** [4] - 3:18, 5:4, 5:11, 5:15
**panel** [5] - 9:17, 10:11, 12:13, 13:13, 14:9
**paper** [1] - 72:13
**paperwork** [1] - 58:5, 58:9, 73:16
**paragraph** [1] - 17:18
**pardon** [1] - 32:19
**parenthetical** [1] - 90:1
**part** [12] - 18:19, 23:9, 43:13, 48:15, 49:1, 81:17, 86:2, 94:13, 107:4, 107:9, 112:1, 112:2
**partially** [2] - 40:6
**participate** [1] - 105:9
**particular** [1] - 44:2
**parties** [1] - 12:2
**parts** [3] - 26:17, 39:4, 81:6
**party** [1] - 27:12
**passage** [1] - 56:21
**passed** [4] - 7:10, 50:20, 61:1, 61:5
**patience** [1] - 22:6
**Paul** [1] - 109:15
**Paxton** [3] - 34:13, 34:20, 50:22
**penalty** [1] - 39:23
**pending** [2] - 9:8, 10:5
**people** [5] - 12:21, 16:18, 79:22, 79:23, 85:16
**percipient** [2] - 59:13, 73:4
**performed** [1] - 58:11
**perhaps** [1] - 14:12
**permission** [1] - 105:3
**permitted** [1] - 89:20
**perpetrated** [1] - 59:11
**perpetrator** [1] - 63:17
**person** [13] - 28:1, 42:2, 42:14, 63:8, 74:9, 74:23, 78:6, 91:11, 97:17, 98:5,

98:8, 100:19, 102:20
**petite** [1] - 33:11
**Phone** [1] - 5:15
**phone** [4] - 23:14, 31:21, 42:14, 93:10
**phrased** [2] - 8:16, 8:17
**phraseology** [1] - 61:12
**physical** [9] - 44:3, 44:22, 57:23, 58:17, 58:21, 59:8, 59:9, 64:14, 75:7
**pick** [4] - 24:11, 50:9, 56:19, 57:5
**picked** [3] - 24:15, 24:16, 87:14
**picking** [1] - 37:22
**picks** [1] - 38:5
**pictures** [3] - 31:16, 43:9, 58:11
**piece** [1] - 72:12
**pieces** [1] - 6:13
**pillars** [1] - 55:12
**pink** [1] - 16:9
**place** [10] - 34:17, 36:2, 50:15, 98:20, 99:2, 99:5, 102:4, 103:23, 104:6, 105:11
**placed** [3] - 9:12, 99:22, 101:2
**PLAINTIFF** [1] - 1:3
**Plaintiff** [1] - 1:14
**planning** [1] - 12:22
**played** [3] - 68:4, 68:6, 68:17
**plea** [2] - 72:14, 90:10
**PLEAS** [1] - 1:1
**Pleas** [2] - 1:11, 1:20
**pleasant** [1] - 36:2
**point** [23] - 4:11, 13:7, 14:1, 14:11, 15:14, 18:18, 27:8, 27:10, 27:11, 30:5, 42:16, 44:11, 49:9, 53:5, 53:12, 53:17, 62:15, 74:15, 78:11, 85:11, 113:12, 113:14
**pointed** [2] - 43:19, 73:17
**points** [10] - 27:5, 27:12, 48:4, 49:6, 49:8, 51:4, 51:5, 51:9, 85:10, 85:12
**Police** [23] - 23:20, 27:22, 29:21, 33:2, 41:17, 46:13, 47:12, 50:16, 80:5, 82:10, 83:10, 84:8, 85:14
**police** [17] - 22:13, 23:11, 36:9, 37:9, 37:11, 63:5, 64:20, 65:23, 66:23, 67:4, 68:5, 68:7, 68:17, 73:7, 85:19, 88:3, 96:14

**policeman** [1] - 42:1
**policemen** [1] - 47:21
**poll** [1] - 109:10
**position** [3] - 53:1, 76:17, 101:9
**possession** [2] - 102:4, 102:7
**possible** [2] - 35:11, 91:6, 91:9
**pound** [4] - 22:16, 25:2, 50:9, 50:13
**pounds** [1] - 31:18
**pre** [2] - 14:16, 70:20
**pre-dispositions** [1] - 14:16
**pre-seasoned** [1] - 70:20
**PRECEDING** [3] - 20:4, 54:2, 85:2
**preconceived** [2] - 15:2, 15:16
**preface** [1] - 37:6
**prejudice** [4] - 56:4, 56:7, 100:2, 100:11
**premises** [2] - 103:14, 109:4
**prepared** [6] - 18:15, 40:8, 40:9, 41:1, 83:14, 113:13
**prepares** [1] - 40:14
**PRESENCE** [4] - 3:5, 20:5, 52:5, 112:18
**presence** [7] - 3:8, 3:11, 11:23, 51:20, 89:4, 98:13, 111:18
**present** [7] - 3:11, 3:12, 19:1, 21:5, 91:1, 97:20, 104:22
**presented** [6] - 11:3, 12:15, 21:10, 57:21, 76:5, 85:10
**preside** [1] - 102:21
**press** [3] - 102:2, 111:20, 112:1
**presumed** [2] - 55:5, 90:16
**presumption** [5] - 55:7, 57:11, 59:4, 73:1, 74:16
**pretending** [1] - 35:6
**pretrial** [1] - 20:22
**Pretty** [1] - 30:22
**prevents** [1] - 14:10
**previous** [1] - 107:18
**previously** [1] - 18:14
**pride** [1] - 101:8
**principal** [1] - 8:23
**principle** [9] - 9:5, 14:4, 15:19, 16:1, 16:11, 16:14, 16:16, 20:14, 55:4
**principles** [2] - 9:22, 55:11
**print** [2] - 104:7,

111:21
**prison** [2] - 39:20, 69:22
**privacy** [1] - 112:7
**private** [1] - 112:8
**privilege** [5] - 9:3, 10:12, 10:18, 16:2, 21:1
**probative** [1] - 92:13
**problem** [1] - 29:12
**problems** [1] - 15:11
**proceed** [7] - 54:5, 112:19, 113:11, 113:16, 113:22, 114:4, 114:8
**proceedings** [5] - 1:12, 20:22, 88:23, 105:8, 105:15
**PROCEEDINGS** [4] - 20:6, 54:3, 85:3, 116:9
**process** [2] - 15:1, 28:14
**produces** [2] - 90:19, 98:17
**producing** [1] - 98:1
**profession** [1] - 95:2
**promise** [1] - 69:4
**proof** [19] - 22:1, 27:1, 56:12, 57:15, 71:3, 72:3, 74:13, 74:21, 74:22, 76:7, 76:13, 77:2, 83:17, 88:19, 90:15, 91:10, 92:1, 96:7, 99:7
**Proof** [4] - 56:15, 74:22, 91:9, 98:12
**proper** [2] - 94:10, 99:22
**proposal** [1] - 3:14
**propose** [2] - 4:18, 112:19
**proposed** [3] - 3:13, 3:17, 17:10
**Prosecutor** [20] - 1:14, 8:19, 54:14, 56:8, 56:12, 56:18, 56:23, 58:7, 58:16, 60:13, 63:23, 66:1, 66:8, 68:15, 68:23, 69:13, 73:7, 74:6, 75:22, 76:6
**Prosecutor's** [3] - 69:15, 71:20, 107:9
**protect** [3] - 33:3, 33:4, 112:9
**prove** [12] - 34:16, 45:2, 49:15, 49:18, 53:1, 59:5, 75:20, 83:19, 95:23, 98:22, 99:1, 99:14
**proved** [4] - 77:16, 97:4, 97:8, 99:9
**proven** [4] - 49:20, 51:13, 62:17, 85:6
**proves** [3] - 29:4, 45:4, 96:7

**provide** [1] - 95:6
**provided** [2] - 9:18, 104:6
**provides** [4] - 17:20, 20:18, 89:17, 96:7
**province** [2] - 71:5, 94:14
**PSI** [1] - 113:15
**public** [1] - 112:4
**publish** [1] - 108:19
**puddle** [1] - 35:8
**pulls** [2] - 29:22, 30:1
**punishment** [3] - 99:18, 99:22, 113:19
**purpose** [8] - 90:10, 94:23, 95:21, 96:6, 98:4, 98:8, 98:14, 112:13
**Purpose** [3] - 97:16, 97:23, 98:3
**purposely** [11] - 50:2, 50:5, 50:7, 50:10, 51:12, 97:1, 97:9, 97:15, 97:17, 98:2, 103:20
**purposes** [2] - 45:11, 54:12
**put** [10] - 11:22, 40:2, 47:22, 60:23, 61:12, 64:7, 80:8, 80:18, 83:13, 100:20
**puts** [2] - 72:15, 90:11
**putting** [4] - 21:18, 83:9, 107:16

## Q

**qualify** [1] - 63:9
**questions** [16] - 6:3, 6:4, 6:6, 7:1, 7:3, 7:9, 7:21, 19:12, 19:18, 19:23, 20:16, 21:6, 21:7, 70:22, 100:4
**quite** [1] - 22:7
**quota** [1] - 54:17
**quote** [1] - 32:19

## R

**raised** [2] - 8:22, 9:7
**rang** [1] - 25:20
**rated** [3] - 62:4, 62:5, 62:18
**rather** [2] - 113:11, 114:14
**ratings** [1] - 62:5
**RC** [1] - 109:7
**reach** [2] - 92:7, 101:19
**reaching** [1] - 101:11
**read** [8] - 10:3, 20:10, 48:12, 48:14, 53:14, 86:21, 103:4,

106:10
**Read** [2] - 69:11, 69:15
**readers** [1] - 72:8
**ready** [1] - 5:23
**Ready** [1] - 54:5
**reaffirm** [1] - 53:17
**real** [2] - 47:2, 47:14
**realize** [1] - 106:4
**realized** [2] - 88:6, 88:15
**really** [5] - 4:7, 36:1, 36:7, 45:8, 113:14
**reason** [8] - 10:15, 25:10, 25:13, 36:19, 49:5, 61:2, 70:18, 91:5
**reasonable** [41] - 27:1, 45:4, 49:16, 49:21, 51:14, 55:9, 56:15, 57:10, 60:19, 70:13, 71:4, 71:6, 72:3, 72:18, 73:3, 74:1, 74:4, 74:13, 74:20, 74:21, 74:22, 76:7, 76:13, 77:17, 78:3, 78:22, 83:20, 85:7, 86:1, 88:12, 88:19, 90:17, 90:20, 90:22, 91:10, 92:7, 96:21, 97:5, 97:8, 99:10, 99:14
**Reasonable** [4] - 90:22, 91:1, 91:4, 91:6
**reasonableness** [1] - 94:2
**reasonably** [2] - 92:2, 99:2
**reasons** [2] - 21:2, 107:18
**receive** [4] - 11:23, 20:12, 46:2, 96:16
**received** [10] - 17:8, 18:17, 20:15, 21:17, 23:14, 81:13, 91:14, 95:17, 95:21, 95:22
**recess** [4] - 51:17, 51:22, 88:23, 89:8
**RECESS** [3] - 17:4, 52:1, 89:9
**recognized** [1] - 63:16
**recollect** [1] - 4:4
**recollection** [5] - 36:10, 36:11, 67:21, 73:9, 81:9
**Reconvene** [1] - 88:23
**record** [15] - 3:6, 3:10, 6:19, 11:22, 12:9, 13:7, 17:6, 18:10, 19:20, 67:23, 106:23, 107:4, 107:10, 114:6, 114:7
**records** [1] - 102:7
**reduced** [1] - 7:10

**redundant** [1] - 30:8
**refer** [1] - 53:11
**reference** [4] - 52:7, 53:4, 53:5, 53:15
**referenced** [1] - 7:6
**referring** [1] - 15:12
**refresh** [3] - 36:10, 36:11, 81:9
**refreshed** [1] - 73:8
**refused** [2] - 69:19, 83:11
**regarding** [1] - 93:8
**Regardless** [1] - 44:12
**regulations** [1] - 54:19
**rehab** [2] - 40:23, 41:3
**rehearsed** [1] - 41:11
**relate** [1] - 20:23
**related** [1] - 92:3
**relates** [4] - 9:23, 20:14, 66:21, 66:22
**relating** [2] - 91:7, 96:11
**relative** [1] - 9:12
**relatively** [1] - 11:6
**released** [1] - 105:13
**relevance** [1] - 64:10
**relieve** [1] - 68:19
**reluctant** [1] - 36:3
**rely** [7] - 41:6, 44:11, 75:1, 75:3, 75:4, 86:3, 91:11
**remains** [1] - 74:16
**remedies** [1] - 15:11
**remedy** [1] - 13:1
**remember** [11] - 11:4, 26:13, 29:8, 36:5, 42:22, 53:13, 77:12, 78:14, 80:23, 81:8, 111:20
**Remember** [7] - 30:10, 32:23, 33:17, 34:14, 34:19, 37:1, 49:17
**REMEMBERED** [1] - 1:8
**remembers** [1] - 37:22
**remind** [2] - 21:22, 70:11
**remove** [2] - 55:7, 57:10
**removed** [3] - 4:13, 9:14, 74:19
**render** [1] - 100:6
**rendered** [1] - 10:1
**rendition** [1] - 11:5
**renew** [2] - 106:19, 106:20
**reopened** [1] - 47:6
**repeat** [2] - 78:16, 102:22
**repeating** [1] - 73:16
**report** [10] - 60:23,

61:17, 61:19, 63:10, 63:15, 65:7, 73:7, 73:17, 81:9
**reported** [1] - 62:9
**reporter** [1] - 112:2
**Reporter** [2] - 1:20, 116:18
**reports** [9] - 62:4, 62:8, 62:19, 63:5, 63:12, 64:21, 64:22, 65:2, 65:5
**request** [3] - 7:21, 11:9, 17:17
**requested** [1] - 100:22
**required** [7] - 21:12, 92:8, 94:11, 98:12, 101:23, 105:16, 111:11
**respect** [16] - 3:17, 4:2, 5:9, 10:17, 11:11, 16:23, 23:18, 30:12, 32:3, 32:7, 32:10, 32:16, 41:22, 50:4, 85:23, 97:15
**respective** [1] - 111:19
**respond** [3] - 34:20, 77:10, 81:22
**responded** [3] - 34:12, 35:7, 50:17
**responding** [1] - 34:11
**response** [1] - 107:14
**responses** [1] - 41:11
**responsibility** [3] - 54:18, 77:3, 89:12
**rest** [1] - 3:23
**rests** [2] - 92:11, 95:9
**result** [3] - 23:11, 97:19, 98:2
**resurfaced** [1] - 62:11
**retain** [1] - 102:7
**retire** [4] - 18:23, 102:19, 108:7, 112:14
**return** [3] - 77:3, 102:10, 115:6
**RETURNED** [1] - 108:10
**returned** [4] - 101:3, 102:9, 103:2, 114:22
**reveal** [1] - 59:7
**review** [3] - 19:23, 57:19, 113:15
**reviewed** [7] - 19:18, 62:3, 63:7, 64:20, 64:21, 65:1, 65:5
**Revised** [2] - 16:17, 103:21
**revive** [1] - 46:18
**revolves** [1] - 84:5
**rid** [1] - 10:7
**rights** [2] - 112:7,

112:9
**ripped** [4] - 6:5, 6:10, 6:11, 18:14
**rise** [1] - 108:20
**rises** [2] - 11:8, 76:7
**road** [1] - 41:23
**robbed** [1] - 42:15
**ROBERT** [1] - 1:5
**Robert** [91] - 1:17, 13:19, 22:8, 22:19, 24:1, 24:2, 24:12, 25:11, 26:14, 27:19, 27:22, 28:6, 29:2, 29:15, 29:16, 30:2, 31:13, 32:2, 32:3, 33:7, 33:19, 34:8, 36:3, 36:5, 36:6, 37:18, 38:15, 40:8, 40:9, 40:16, 45:15, 45:18, 45:20, 46:20, 47:8, 47:12, 48:12, 48:18, 49:6, 49:8, 49:10, 49:23, 50:6, 51:2, 51:5, 51:9, 59:11, 59:17, 60:8, 61:7, 61:18, 62:13, 63:18, 64:5, 65:6, 65:9, 68:11, 69:14, 70:14, 70:22, 72:3, 72:11, 73:9, 73:18, 73:22, 74:1, 74:3, 74:8, 74:15, 75:13, 75:17, 77:23, 78:1, 78:5, 78:7, 78:12, 78:19, 78:20, 79:10, 79:20, 84:6, 85:11, 85:13, 86:16, 86:19, 88:9, 88:12, 103:8, 103:13, 108:22, 109:3
**rock** [17] - 22:16, 23:15, 24:8, 24:21, 25:2, 33:12, 35:9, 43:15, 43:21, 44:2, 44:17, 50:9, 50:13, 65:7, 65:13, 73:11, 79:14
**Roger** [2] - 33:9
**Ron** [1] - 77:19
**Ronnie** [4] - 1:17, 52:9, 77:14, 86:13
**room** [13] - 8:2, 9:12, 16:5, 16:10, 61:3, 74:18, 90:5, 101:5, 103:7, 104:17, 104:19, 105:3, 112:15
**Ross** [1] - 87:9
**RPR** [2] - 1:20, 116:17
**ruled** [1] - 53:14
**rules** [2] - 54:19, 95:14
**ruling** [2] - 53:10, 93:14
**rulings** [1] - 93:7
**run** [1] - 105:4
**rushing** [1] - 24:7

# S

safety [1] - 61:7
Saint [1] - 57:5
saint [1] - 57:6
sale [1] - 60:16
sales [1] - 59:16
sample [1] - 64:4
sat [2] - 30:15, 63:23
saved [1] - 53:3
saw [5] - 34:2, 36:18, 37:1, 41:17, 57:18
Scala [1] - 50:17
Scala-Barnett [1] - 50:17
scale [1] - 62:6
scared [3] - 24:3, 38:17, 49:13
scene [6] - 33:8, 33:10, 34:12, 44:3, 44:18, 64:7
scheme [2] - 28:5, 82:8
scope [2] - 84:12, 84:19
Scott [2] - 33:8, 33:15
seal [2] - 106:23, 114:7
Seal [1] - 107:5
sealed [1] - 107:19
sealing [1] - 114:6
seasoned [1] - 70:20
seated [2] - 20:7, 76:16
second [4] - 11:18, 17:18, 84:15
SECOND [1] - 2:8
Section [1] - 103:21
See [1] - 105:21
see [16] - 6:4, 17:2, 34:1, 34:3, 34:4, 34:5, 35:5, 36:1, 42:2, 42:3, 68:8, 70:21, 73:8, 76:8, 94:3, 102:11
seeking [1] - 19:14
seem [2] - 41:11, 41:12
select [4] - 100:20, 102:7, 102:19, 103:17
sense [1] - 19:19, 28:20, 32:2, 43:20, 46:23, 53:5, 61:2, 70:17, 91:5, 101:8
sent [2] - 102:8, 114:12
sentence [3] - 113:9, 113:14, 113:21
sentencing [6] - 112:20, 113:12, 114:3, 114:5, 114:8, 114:15
separate [5] - 40:21, 80:8, 89:15, 104:21, 104:23
SEPTEMBER [2] -

3:1, 115:8
September [3] - 1:9, 86:22, 113:4
Sergeant [6] - 28:16, 34:10, 34:22, 35:13, 41:15
serious [1] - 24:8
served [1] - 112:4
services [1] - 112:6
session [1] - 7:4
set [5] - 15:16, 34:12, 39:7, 107:18, 114:19
seven [1] - 46:12
several [2] - 52:18, 97:3
Seymour [20] - 5:16, 23:5, 23:8, 23:13, 24:4, 30:19, 31:5, 31:19, 31:23, 32:7, 32:16, 59:15, 59:19, 60:20, 61:5, 78:15, 79:17, 80:11, 93:11
share [1] - 8:1
shared [1] - 12:1
Shared [1] - 17:9
shelf [1] - 24:23
shift [1] - 56:17
shifting [2] - 84:20, 84:22
shifts [1] - 75:21
shoes [1] - 88:7
shoot [1] - 22:15
shortcomings [1] - 56:22
show [7] - 43:8, 53:3, 64:9, 64:14, 83:19, 96:1, 105:5
showed [5] - 36:8, 36:10, 41:2, 80:23, 81:8
shown [4] - 27:15, 27:16, 57:20, 73:20
shows [1] - 64:12
Shredded [1] - 2:5
shredded [4] - 6:12, 8:5, 11:15
shreds [1] - 6:12
Shumer [1] - 111:1
SHUMER [1] - 111:3
side [1] - 84:20
sides [1] - 114:2
sidewalk [4] - 24:7, 24:9, 33:12, 33:13
sign [9] - 40:15, 40:18, 40:20, 41:2, 41:4, 66:7, 83:12, 102:23, 104:5
signature [2] - 40:17, 104:8
signatures [3] - 104:1, 104:7, 104:9
signed [2] - 58:5, 109:8, 111:5
significance [5] - 60:23, 63:23, 64:6, 64:9, 65:10

significant [1] - 66:19
simple [1] - 22:7, 22:10, 27:2
simply [1] - 94:12
sister [1] - 57:6
Sister [1] - 57:6
sister's [3] - 24:12, 37:23, 87:14
sit [3] - 54:12, 75:11, 75:22
siting [1] - 72:21
sitting [1] - 8:2
situation [1] - 39:9
six [3] - 4:5, 4:19, 46:11
skill [1] - 95:12
skull [1] - 25:1
smoke [2] - 104:20, 104:23
smoking [4] - 74:4, 104:11, 104:14, 104:20
Smoking [1] - 104:13
snitch [17] - 22:12, 23:7, 23:10, 25:19, 25:21, 26:1, 26:19, 29:15, 29:17, 31:3, 31:4, 31:9, 32:4, 36:16, 80:17, 80:19, 81:12
snitched [7] - 22:9, 29:15, 31:7, 32:14, 79:19, 80:10, 88:9
snitches [2] - 25:22, 36:8
snitching [3] - 65:4, 65:6, 65:12
sold [1] - 60:9
sole [2] - 27:9, 93:17
solely [2] - 78:13, 101:20
someone [3] - 41:19, 42:5, 48:1
somewhat [1] - 20:11
somewhere [1] - 19:2
son [2] - 8:20, 73:5
son-in-law [1] - 8:20
sorry [4] - 35:2, 37:20, 42:16, 84:4
sort [3] - 21:19, 53:4, 56:13
sought [1] - 59:10
space [1] - 27:11
special [2] - 20:9, 95:3
specific [6] - 7:21, 18:22, 97:18, 97:21, 98:2, 115:2
specifically [2] - 54:10, 100:21
speculate [2] - 93:1, 93:5
speculation [4] -

14:8, 71:2, 71:13, 71:18
spend [2] - 38:6, 77:21
spent [3] - 38:12, 51:3, 70:4
spin [1] - 21:18
spousal [5] - 9:3, 10:12, 10:18, 13:23, 16:1
spouses [1] - 16:19
Stacey [1] - 1:20, 116:17
stand [17] - 23:3, 30:13, 41:9, 61:14, 64:18, 66:8, 66:17, 70:11, 70:13, 71:7, 71:14, 72:7, 72:18, 77:21, 87:5, 94:1, 94:19
standard [4] - 57:8, 57:14, 71:3, 88:19
standards [1] - 76:12
standing [1] - 58:10
standpoint [1] - 17:16
start [3] - 28:14, 55:1, 56:13
started [2] - 20:9, 28:17
State [52] - 3:12, 3:22, 5:12, 13:17, 16:2, 19:21, 21:23, 34:15, 39:15, 44:20, 46:10, 49:15, 49:20, 51:13, 52:20, 54:16, 56:11, 57:9, 57:15, 57:21, 59:9, 61:12, 62:15, 69:20, 71:1, 74:2, 75:9, 77:1, 77:16, 78:5, 79:4, 79:5, 79:8, 82:17, 82:19, 83:2, 83:18, 85:10, 86:13, 86:17, 90:18, 98:22, 99:9, 99:13, 100:11, 103:7, 103:12, 106:16, 108:21, 109:2, 113:21
STATE [1] - 1:2
State's [4] - 22:2, 45:16, 71:8, 107:18
statement [20] - 36:8, 42:19, 46:5, 47:11, 52:8, 52:9, 66:1, 66:9, 66:10, 66:13, 66:22, 72:10, 74:6, 74:7, 80:23, 81:6, 111:14, 111:16, 111:21, 111:23
Statements [1] - 92:20
statements [6] - 21:22, 47:10, 53:2, 92:15, 92:17, 111:20
states [1] - 103:9
stating [1] - 63:15

status [1] - 102:17
statute [1] - 90:23, 113:18
stay [2] - 105:14, 105:16
stemmed [1] - 32:13
step [1] - 104:12
stepfather [1] - 25:7
stepson [3] - 8:20, 25:6, 29:17
still [6] - 6:15, 19:14, 44:6, 44:15, 44:16, 45:9
stipulated [1] - 91:16
stock [1] - 83:13
stood [1] - 68:8
stopped [1] - 65:15
Stopper [11] - 41:23, 42:8, 61:17, 62:4, 62:18, 64:20, 64:22, 65:2, 82:6, 82:14, 82:22
story [8] - 42:4, 43:3, 43:5, 86:22, 87:18, 88:1, 88:5, 88:15
strangle [1] - 22:15
strangulation [1] - 31:11
street [2] - 65:10, 73:15
Street [4] - 1:21, 34:13, 34:20, 50:22
streets [3] - 66:4, 67:3, 73:14
stress [2] - 5:18, 93:12
stressed [1] - 69:3
stricken [2] - 11:10, 92:20
strike [4] - 5:7, 39:10, 43:1, 45:11
striking [1] - 4:18
strong [1] - 35:20
stuff [5] - 49:5, 49:7, 49:9, 70:21, 81:8
subject [1] - 99:18
submit [1] - 19:21, 23:19, 26:6, 26:21, 28:3, 38:8, 45:3, 46:12, 50:8, 87:7, 87:22
submits [2] - 46:10, 79:8
submitted [7] - 10:10, 14:18, 19:10, 51:22, 89:5, 106:19, 107:14
submitting [2] - 9:9, 13:12
sufficient [2] - 47:23, 99:1
sufficiently [2] - 76:2, 112:3
suggest [1] - 18:12
suggestion [2] - 14:1, 93:5

**suggests** [2] - 38:9, 87:23
**supplied** [1] - 53:3
**supply** [2] - 71:7, 71:20
**support** [1] - 81:7
**suppose** [1] - 36:10
**surfaced** [4] - 46:16, 47:6, 61:15, 62:3
**surrender** [1] - 101:18
**surrounding** [1] - 94:8
**suspect** [8] - 42:9, 46:17, 47:7, 60:17, 61:8, 62:10, 83:4, 85:21
**suspects** [4] - 29:20, 29:21, 46:8, 84:7
**Sustained** [2] - 36:22, 37:7
**sustained** [2] - 44:9, 93:1
**swab** [1] - 79:12
**sway** [1] - 56:13
**sworn** [4] - 86:5, 89:18, 103:11, 109:1
**sympathy** [7] - 55:18, 55:23, 56:3, 56:4, 56:7, 100:2, 100:10
**synopsis** [1] - 23:5
**system** [2] - 55:3, 71:23

## T

**taint** [3] - 9:11, 13:1, 15:7
**tainted** [2] - 9:11, 16:20
**taints** [1] - 14:9
**TAKEN** [3] - 17:4, 52:1, 89:9
**tall** [1] - 63:14
**tear** [1] - 77:9
**technology** [1] - 58:18
**ten** [2] - 59:21, 62:6
**terms** [3] - 28:7, 50:6, 97:14
**test** [2] - 59:6, 64:5
**testified** [21] - 5:17, 40:21, 44:9, 50:23, 52:20, 59:16, 60:20, 61:22, 62:1, 63:5, 64:18, 65:16, 70:5, 70:12, 82:17, 82:22, 84:9, 86:23, 93:12, 94:4
**testifies** [1] - 91:22
**testify** [19] - 8:18, 14:7, 15:22, 16:6, 16:19, 32:22, 36:2, 37:1, 44:1, 59:20, 69:19, 70:2, 75:14, 75:15, 75:17, 83:1,

94:18, 94:20, 94:22
**testifying** [4] - 10:19, 16:12, 32:10, 94:1
**testimony** [29] - 3:17, 4:2, 4:3, 23:21, 25:8, 26:21, 33:17, 35:10, 35:22, 42:23, 43:10, 43:13, 45:23, 53:5, 81:13, 81:14, 91:14, 91:20, 93:8, 94:2, 94:8, 94:9, 94:11, 94:14, 94:15, 94:16, 95:5, 95:16, 96:10
**testing** [1] - 95:14
**tests** [3] - 93:21, 93:22, 94:8
**THAT** [1] - 116:8
**THE** [121] - 1:1, 3:4, 3:5, 3:6, 3:10, 4:17, 5:2, 5:5, 5:7, 5:13, 5:22, 6:5, 6:10, 6:19, 6:23, 7:17, 8:5, 8:8, 11:13, 11:17, 12:10, 12:17, 13:21, 17:1, 17:5, 17:23, 18:3, 18:5, 19:7, 19:19, 20:2, 20:4, 20:5, 20:6, 20:7, 36:22, 37:5, 41:6, 44:10, 51:16, 52:4, 52:5, 52:11, 52:17, 52:22, 53:13, 53:21, 54:1, 54:2, 54:3, 54:5, 55:21, 56:2, 63:2, 67:14, 67:16, 67:20, 67:23, 77:6, 84:12, 84:16, 84:17, 85:1, 85:2, 85:3, 87:21, 88:22, 89:10, 105:21, 105:22, 105:23, 106:1, 106:8, 106:17, 107:1, 107:11, 108:2, 108:6, 108:11, 108:14, 108:17, 109:12, 109:15, 109:18, 109:21, 110:1, 110:3, 110:6, 110:9, 110:12, 110:15, 110:18, 110:21, 111:1, 111:4, 112:17, 112:18, 112:19, 112:23, 113:4, 113:13, 114:2, 114:16, 114:19, 114:23, 115:4, 115:7, 116:7, 116:8, 116:9, 116:10
**themselves** [1] - 19:12
**theory** [1] - 71:21
**Therefore** [1] - 46:17
**therefore** [5] - 4:13, 16:7, 53:7, 78:2, 82:18
**thick** [1] - 37:19
**thinking** [1] - 10:4

**third** [3] - 27:12, 69:21, 105:10
**thorough** [1] - 46:7
**thoughts** [1] - 48:20
**thousand** [1] - 6:13
**three** [10] - 9:17, 23:9, 23:23, 30:19, 39:22, 49:19, 59:16, 81:15, 97:11, 114:19
**Three** [1] - 98:19
**throughout** [2] - 74:17, 105:7
**tie** [1] - 64:6
**tip** [1] - 45:23
**tips** [7] - 46:1, 46:2, 46:11, 46:15, 46:21, 51:7, 85:17
**tired** [2] - 54:7, 82:4
**to-wit** [1] - 1:12
**today** [3] - 45:13, 55:15, 69:23
**together** [12] - 19:3, 37:13, 37:14, 47:22, 80:10, 80:18, 83:10, 85:9, 94:7, 104:17, 104:19, 107:17
**Toledo** [19] - 1:21, 23:20, 27:22, 29:21, 34:13, 35:1, 41:17, 46:13, 47:12, 50:16, 50:23, 80:5, 82:10, 83:10, 84:3, 84:7, 85:14, 114:13, 114:22
**Tomaselli** [1] - 109:18
**TOMASELLI** [1] - 109:20
**took** [8] - 32:5, 34:17, 50:15, 66:9, 73:16, 98:20, 99:2, 99:5
**torn** [1] - 76:2
**totality** [2] - 43:17, 78:7
**touch** [1] - 59:12
**tough** [2] - 39:8, 43:9
**TPD** [1] - 31:7
**trace** [3] - 44:16, 58:2, 58:19
**tragic** [2] - 55:16, 55:17
**TRANSCRIPT** [1] - 116:9
**trauma** [1] - 24:20
**treated** [1] - 92:22
**TRIAL** [2] - 115:7, 116:10
**trial** [16] - 1:8, 13:18, 17:9, 20:22, 33:3, 57:18, 74:14, 74:17, 76:6, 83:3, 91:16, 91:23, 95:20, 96:9, 100:14, 107:21
**tried** [2] - 63:9, 100:13
**trier** [1] - 72:17

**triers** [1] - 55:8
**trouble** [5] - 22:14, 23:11, 82:7, 107:11, 107:16
**TRUE** [1] - 116:8
**true** [24] - 28:21, 28:22, 38:23, 39:6, 40:6, 40:15, 40:16, 40:19, 47:7, 48:22, 49:4, 49:5, 52:20, 53:6, 66:2, 66:11, 66:12, 66:14, 67:6, 79:23, 83:11, 96:4, 103:11, 109:1
**truly** [2] - 66:13, 103:11, 109:1
**trust** [2] - 74:11, 74:12
**truth** [19] - 5:19, 27:19, 27:21, 30:18, 36:19, 36:20, 37:3, 37:5, 39:5, 53:2, 53:20, 66:6, 66:17, 66:20, 72:9, 87:2, 91:4, 93:5, 93:13
**truthful** [3] - 38:19, 39:4, 49:2
**truthfulness** [2] - 41:9, 93:21
**try** [8] - 28:4, 32:22, 33:2, 35:11, 75:10, 99:6, 103:11, 109:1
**trying** [4] - 34:2, 34:7, 50:11, 83:5
**turning** [1] - 88:6
**two** [24] - 9:14, 17:7, 19:2, 20:11, 23:22, 24:13, 24:16, 26:17, 33:8, 34:11, 34:23, 35:2, 38:1, 39:22, 40:21, 41:4, 55:11, 81:5, 91:18, 97:9, 112:20, 114:4, 114:7
**Two** [1] - 98:15
**type** [4] - 9:18, 68:21, 76:15, 76:19
**typewritten** [1] - 66:10
**typical** [1] - 4:1
**typically** [1] - 32:18

## U

**ultimately** [1] - 38:5
**under** [7] - 5:18, 65:4, 72:7, 93:12, 94:12, 111:17, 114:7
**underneath** [1] - 4:23
**UNDERSIGNED** [1] - 116:7
**unethical** [1] - 112:11
**unfortunate** [2] - 44:19, 55:15
**Unfortunately** [1] - 48:1

**Unit** [1] - 59:22
**unless** [8] - 18:21, 19:1, 74:19, 90:16, 90:18, 98:6, 111:15, 113:16
**unsigned** [1] - 83:7
**unsolved** [1] - 41:17
**up** [16] - 6:5, 6:10, 6:11, 7:1, 8:8, 8:10, 10:12, 12:5, 15:15, 15:21, 16:2, 18:14, 18:18, 22:14, 23:23, 24:2, 24:11, 24:15, 24:16, 31:22, 37:22, 38:5, 38:6, 39:7, 48:5, 50:9, 53:12, 62:14, 62:16, 62:20, 63:20, 64:23, 66:4, 66:22, 67:4, 68:4, 68:6, 68:12, 68:17, 69:21, 71:12, 85:7, 87:4, 87:14, 105:21
**usual** [1] - 95:14
**utilize** [1] - 71:1

## V

**vacillate** [1] - 66:16
**vagina** [5] - 45:10, 45:15, 45:17, 45:20, 79:11
**Valiquette** [1] - 109:16
**VALIQUETTE** [1] - 109:17
**value** [3] - 45:19, 79:9, 92:13
**various** [1] - 93:8
**Vasquez** [6] - 28:16, 42:11, 66:5, 87:10, 110:12, 110:15
**VASQUEZ** [1] - 110:14
**vehemently** [1] - 87:5
**venue** [3] - 35:1, 99:4
**veracity** [1] - 95:13
**verbal** [1] - 111:14
**verbatim** [1] - 17:11
**verdict** [51] - 9:23, 21:21, 55:13, 76:21, 76:23, 77:3, 95:7, 99:11, 99:16, 100:6, 100:8, 101:7, 101:20, 101:21, 102:5, 102:9, 102:16, 102:18, 102:23, 103:1, 103:3, 103:5, 103:14, 103:19, 104:3, 104:4, 105:18, 106:21, 108:3, 108:15, 108:18, 108:19, 109:4, 109:13, 109:16, 109:19, 109:22, 110:1, 110:4, 110:7, 110:10,

110:13, 110:16, 110:19, 110:22, 111:2, 111:4, 111:6, 111:9

**VERDICT** [1] - 108:10

**VERDICT**................ ....................**108** [1] - 2:9

**verge** [1] - 12:15
**verifying** [1] - 83:12
**versus** [12] - 46:10, 77:23, 78:1, 78:5, 78:6, 78:19, 78:20, 86:13, 86:16, 86:18, 103:8, 108:21
**viable** [1] - 46:8, 84:7, 85:21
**Vice** [1] - 59:22
**view** [1] - 100:16
**violated** [1] - 54:20
**violation** [2] - 103:21, 109:7
**visit** [1] - 68:14
**vocalize** [1] - 10:4
**voice** [6] - 30:17, 60:14, 60:15, 63:16, 63:17, 63:18
**voices** [1] - 33:18
**void** [2] - 71:8, 71:19
**voir** [9] - 10:15, 30:10, 54:14, 54:17, 56:18, 57:22, 74:14, 75:13, 76:14
**VOLUME** [1] - 1:6
**vote** [1] - 102:13

**W**

**wait** [4] - 51:6, 114:14
**waited** [1] - 28:12
**waive** [3] - 3:7, 29:3, 29:4
**waived** [1] - 3:11
**wants** [13] - 28:7, 28:8, 58:7, 61:12, 68:15, 69:1, 69:22, 74:2, 74:6, 82:6, 82:16, 82:19, 86:13
**WAS** [5] - 3:4, 52:4, 84:16, 105:22, 112:17
**watch** [1] - 105:15
**watched** [1] - 23:8
**watching** [1] - 58:11
**wave** [2] - 48:11, 69:8
**ways** [1] - 49:10
**weapons** [1] - 98:10
**week** [2] - 68:14, 114:11
**weeks** [2] - 112:20, 114:20
**weigh** [2] - 93:19, 100:3
**weight** [9] - 68:20,

92:13, 93:15, 93:18, 94:10, 95:9, 95:11, 95:15, 96:15
**welcome** [1] - 105:14
**WERE** [3] - 20:6, 54:4, 85:4
**whatsoever** [1] - 15:20
**Wherein** [1] - 6:23
**wherein** [3] - 5:17, 62:8, 93:11
**WHEREUPON** [9] - 3:4, 20:4, 52:4, 54:2, 84:16, 85:2, 105:22, 112:17, 115:7
**white** [6] - 33:11, 33:19, 33:20, 34:1, 34:6, 60:15
**whole** [3] - 28:14, 86:8, 112:1
**wife** [5] - 8:17, 15:22, 16:6, 16:12, 38:4
**willing** [6] - 46:9, 75:1, 91:11, 111:17, 113:16, 113:21
**willingness** [1] - 105:9
**WILSON** [1] - 1:5
**Wilson** [121] - 1:17, 10:19, 13:19, 22:8, 22:19, 22:22, 24:1, 24:11, 24:12, 25:11, 27:18, 28:5, 28:6, 28:10, 29:2, 29:6, 29:16, 30:2, 31:13, 32:2, 32:3, 33:7, 33:19, 34:8, 36:3, 36:5, 36:6, 36:12, 37:18, 37:20, 38:4, 38:15, 40:12, 40:16, 40:18, 42:12, 42:16, 43:2, 45:15, 46:4, 46:18, 47:4, 47:8, 47:12, 47:16, 48:8, 48:9, 48:12, 48:18, 49:4, 49:6, 49:8, 49:10, 49:23, 50:6, 51:2, 51:5, 51:9, 54:22, 58:1, 59:11, 59:17, 60:8, 61:7, 61:18, 62:3, 62:13, 63:18, 64:5, 64:13, 64:15, 65:6, 65:9, 68:11, 69:5, 70:12, 70:14, 72:3, 73:6, 73:18, 75:3, 75:8, 75:13, 76:17, 77:5, 77:23, 78:1, 78:5, 78:7, 78:9, 78:12, 78:13, 78:19, 78:20, 79:20, 81:7, 82:9, 83:9, 84:6, 85:11, 85:13, 85:22, 86:15, 86:16, 86:17, 86:18, 86:19, 88:2, 88:9, 88:12, 103:8, 103:13,

108:22, 109:3, 113:8, 114:12, 114:21
**Wilson's** [13] - 17:17, 29:19, 40:8, 40:9, 45:18, 45:20, 46:20, 47:11, 52:8, 57:10, 74:15, 79:10, 88:14
**Wingate** [36] - 1:17, 12:19, 12:20, 15:12, 22:5, 26:9, 27:15, 29:12, 32:17, 38:20, 38:21, 39:18, 39:22, 40:20, 43:4, 48:21, 54:15, 56:14, 75:23, 76:1, 77:8, 77:14, 77:19, 79:3, 79:16, 80:22, 81:4, 81:16, 82:16, 83:8, 84:22, 86:12, 86:13, 113:17
**WINGATE** [44] - 3:9, 4:16, 4:22, 5:21, 6:1, 6:15, 8:9, 8:15, 12:8, 12:11, 13:8, 13:17, 14:2, 15:13, 16:14, 17:15, 18:4, 36:21, 37:4, 40:22, 41:5, 44:8, 52:2, 54:6, 56:5, 63:4, 67:15, 67:22, 68:2, 81:2, 84:11, 84:14, 84:18, 87:20, 106:10, 106:18, 107:3, 107:6, 109:11, 113:7, 114:9, 114:17, 114:21, 115:1
**Wingate's** [2] - 11:5, 55:22
**WINGATE**............ **54** [1] - 2:8
**wise** [1] - 101:6
**wish** [4] - 90:3, 104:20, 105:16, 109:9
**wishes** [1] - 114:10
**wit** [3] - 1:12, 97:1, 97:10
**withholding** [1] - 82:23
**witness** [30] - 4:8, 4:9, 23:3, 30:7, 30:9, 30:13, 30:14, 30:15, 48:9, 61:13, 63:16, 64:18, 66:8, 66:16, 70:10, 70:12, 71:7, 71:14, 72:7, 72:17, 73:4, 91:20, 93:23, 94:1, 94:9, 94:11, 94:14, 94:19, 95:1, 95:10
**witnesses** [11] - 4:3, 33:8, 56:19, 57:5, 57:12, 57:18, 59:13, 91:15, 93:18, 93:20, 95:8
**woman** [3] - 63:8, 69:12, 69:17
**woman's** [1] - 76:11
**word** [10] - 30:3, 47:8, 61:1, 61:6,

65:10, 65:14, 73:14, 73:15, 75:8, 103:17
**wording** [1] - 11:5
**words** [3] - 17:19, 103:18, 104:2
**works** [1] - 71:23
**worry** [1] - 29:7
**worst** [1] - 13:21
**worth** [1] - 13:16
**worthy** [2] - 94:15, 94:16
**wound** [1] - 31:11
**writes** [1] - 49:2
**writing** [7] - 7:10, 7:21, 100:21, 111:14
**written** [5] - 7:1, 17:11, 21:6, 43:7, 90:2
**wrongs** [2] - 95:18, 96:4
**wrote** [10] - 11:2, 15:8, 29:2, 38:15, 48:11, 49:12, 52:9, 68:9, 69:7, 69:9

**Y**

**year** [1] - 65:15
**years** [11] - 28:11, 28:12, 37:10, 37:21, 39:1, 39:23, 41:14, 47:19, 48:2, 60:1, 69:22
**yesterday** [4] - 3:20, 8:11, 8:12, 52:10
**yourself** [2] - 101:14, 111:11
**yourselves** [3] - 51:19, 87:6, 89:2

**Z**

**Zajac** [1] - 110:16
**ZAJAC** [1] - 110:17